—PROOF OF SERVICE— UNITED STATES OF AMERICA v. BRENT DOUGLAS COLE

Party: Brent Douglas Cole 1x-635066
Sacramento County Main Jail 6W 329
651 "I" Street, Sacramento, CA 95814

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

In Propia Persona:

Case No.: 2:14-cr-00269 GEB

**FILED**

JUL 29 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

Judge: GEB

Dept: 13th Floor

On (Date:) July , 2015 at Time: _____ I served the following:

1.) "MOTION FOR CORRECTION OF PRE-SENTENCE REPORT
   WITH AFFIDAVIT IN SUPPORT" —          29 pages
   a) "Memorandum In Reply To Pre-Sentence Report" — 6 pages
   b) 7/22/15 Affidavit Of Relevant Facts" — 8 pages
   c) Appendices 1-5          — 28 pages

With a copy of this "Proof of Service" on the following entities:
1.) Clerk of the Court, United States District Court Eastern District
   Of California, 501 "I" Street, Room 4-200, Sacramento, CA 95814-2322
2.) Benjamin B. Wagner, United States Attorney, Michael D. McCoy, Assistant
   U.S. Attorney, 501 "I" St., Suite 10-100, Sacramento, CA 95814
3.) Lynda M. Moore, Senior United States Probation Officer, 501
   "I" Street, Suite 2-500, Sacramento, CA 95814-7302 Fax 930-4382

I hereby certify upon penalty of perjury that: I am over 18 years old;
I personally checked and placed the above listed documents addressed
to the above listed entities into an envelope and sealed them; then
deposited them into the prison mail system with arrangement for
delivery. Executed on July 27, 2015 at Sacramento, California
   Copy also sent to address below.

   Brent D. Cole                    Brent D. Cole

Printed Name of declarant          Signature of declarant

C.C. 4.) Clerk, US Court Of Appeals FOR THE NINTH CIRCUIT (15:10313)
   P.O. Box 193939, San Fransisco, CA 94119-3939

MEMORANDUM IN REPLY TO PRE-SENTENCE REPORT

To: UNITED STATES DISTRICT COURT EASTERN DISTRICT OF CA.

Probation Office: Lynda M. Moore, Robert A Ramirez, Chief
501 "I" St., Suite 2-500, Sacramento, CA 95814

To whom it may concern,

The trial briefs upon which the Pre-Sentence Report is based have been withheld from me. The counsel imposed upon me concealed discovery from me including the fact that he had filed a brief supposably "in my behalf". He has concealed the existance of witnesses and material evidence from both me and the court since early October until three months after the trial was over. Judge Burrell held trial knowing that I had received no discovery and denied me the evidence that the prosecution was suppressing, which proves the perjury of Tad Paltorak.

18 U.S.C. § 924 is a sentence enhancement which requires that previous felony convictions must have been made to apply. See pages 18-20. It is multiplicious and barred by the Fifth.

In Ladner the Supreme Court ruled that the unit of prosecution is the "act of hinderance", and the act of assault can only be one offense even though it has an impact on two officers. See page 17.

There is no evidence to substantiate the claim in 24 that the injury sustained was serious therefore only 3 levels can be added. There was no serious permanant or life threatening injury. See page 13. It is clear there has not been severe pain.

MEMORANDUM IN REPLY TO PPE-SENTENCE REPORT Pg. 1 of 6

The victim related adjustment in 26 should be 0. The claimed offense is assault. This is clearly a double jeopardy. The claimed reasoning for imposing the additional punishment being, "assaulted such officer during the course of the assault (offense). The fact that I did not inflict serious bodily injury is demonstrates that I did not risk serious bodily. To kill or maim would have been an easy shot. To inflict a minor flesh wound sufficient to deter was not an easy shot, and he inflicted serious bodily injury upon me with a second gat shot during the time I took to take careful aim. Officer Hardin testified as to my taking careful aim to minimize the injury to him. Pultorak's claim that I tried to murder him is utterly false. The minor flesh wound on Officer Hardin's lower leg is convincing proof that I deliberately minimized their injuries. Pultorak's testimony is perjury, and does not agree with Hardin's.

The government conceeded that officers assaulted me with firearms before I reached for my weapon. See page 28 of the motion. — "... both ... drew their weapons..."
"A person cannot assault another in self-defense and any act done in self-defense cannot be assault," People v Lynch, 101 Col. 229.
"Any necessary force may be used to protect ... oneself," Cal. Pen. Code § 692.
Tad Pultorak shot me before he backed away, and then perjured himself. "The statute does require a criminal intent," U.S. v. Feola, 420 US 671, 686 (1975). See page 21 - Actus non facit reum nisi mens sit rea.
MEMORANDUM IN REPLY TO PRE-SENTENCE REPORT Pg. 2 of 6

Pages 5-8, paragraphs 4-20 I do not agree with, but do not fully address in this motion as I am denied discovery and do not have sufficient documentation of the source to properly address: 4. Ranger Pultorak committed fraud, as BLM policy is to post notice of road closures, under 18 USC, § 1001. He seized my property using this fraud and threatened me, injuring me in my property in excess of his jurisdiction. 5. There was only one motorcycle in the campsite. See page 9, line 17 of motion for proof. N.C.S.O. moved the Kawasaki into the camp after the shooting. The information as to the statements of Grass Valley dispatch is correct, but it was falsified in the complaint, testimony before the grand jury and at trial. The BLM log shows that Pultorak decided to impound the motorcycles before he called in. 7. I responded from the trees walking up 30 yards before entering the clearing. I made much noise to announce my presence to avoid startling them.
8. Pultorak admitted he had conversation with me after I walked into the clearing. He asked me who the Honda belonged to. I told him Mike Radon as far as I knew. He asked me who the Kawasaki belonged to. I told him that I had no idea. I explained to him that the backpack he was taking belonged to me, and that I wanted my backpack, sleeping bag, and personal items, and to take them with me. Officer Hardin confirmed that I asked them to leave my things alone, and was conversing calmly with Pultorak.
MEMORANDUM IN REPLY TO PRE SENTENCE REPORT- Pg 3 of 6

9.) There were three witnesses in the Ambulance as to my statements. Kyle Rutherford, paramedic, stated before the grand jury on page 18, Lines 1-4, October 2, 2014:
"And he had told me that officers had drew their guns at him, and he didn't have a choice but to -- to shoot back at the officers or to shoot at the officers."
One can not "shoot back" until they have been fired upon!
Ricky Hurtado, the ambulance driver stated, "the suspect did not look good; he appeared altered. They had to yell at him to get a response, at which time he would open his eyes and answer them back." Hurtado said he heard the suspect say that they drew on him, so he shot back in self defense." Source: NCSO Incident Report 19, case # 1140 1626. Stefan C. Montelius said
"The officers asked him if he was armed. He said yes, I'm armed, and they drew their guns and he shot them. That's what he told us." Q. — "Did he say who fired first to your knowledge?"
A. "He did not specifically say that, but I interpreted-- he didn't say that they fired at him."
Defendant asked counsel to file a motion to suppress the interview in the I.C.U. and the hearsay, but counsel failed or refused to file any motions, and failed or refused to ask questions of witnesses defendant wrote at trial.
11.) In the I.C.U. interview on page 3 line 91 I stated, "... he shot me". At line 106, "And it was Pulaski, I think, that - that shot me."
MEMORANDUM IN REPLY TO PRE-SENTENCE REPORT-Page 4 of 6

11.) (cont.) Both in the ambulance and in the ICU unit I used an expression from the Southwest where I grew up. On page 9, from which you quote me on line 376, "drew down on" meaning "drew his gun and shot". After stating on page 3 at lines 91 and 106 that Pultorak had shot me. At line 376 I stated,

"He asked me if I had a weapon and I answered him yes. And he drew down on me right then and there. He didn't tell me I was under arrest, nothing. He just drew on me."

I had already stated that he shot me at lines 91 and 106. On page 13, line 568 I explained "...my short term memory is not the best, I really don't remember.

12.) On page 9 line 383 I state "No, I was standing close enough to him and I was convinced that he was gonna shoot me so I pulled my gun and tried to make him back away from me cause I was point blank range. And he was pulling up for a heart shot, I tried for a shoulder shot, which I made." — Within 10-12 seconds the two of them fired 17 shots at me. That Pultorak gut shot me, before he backed away, as soon as his gun cleared the holster and was pointed at me is evinced by the vertical wound inflicted upon me, and the bullet strike in the road where I was standing. At line 390 I said, "Well the other officer shot me a couple of times and I went down. ..., He-he pulled down on me, I was convinced he was gonna kill me and I tried to shoot him in the shoulder to stop him from killing me. No warning, no nothing he just..." (Interupted to hide what happened)

MEMORANDUM IN REPLY TO PRE-SENTENCE REPORT Page 5 of 6

The deception of Tod Pultorak is revealed somewhat by Investigator Robert A. Beresford's interview with Michael Radon. (Appendix C of Document 74) The suppression of the audio recording and the court records seized without a warrant and unlawfully with held by N.C.S.O., coupled with the deceptions and prosecutorial misconduct, and the bias of Judge Burrell have made this "trial" a travesty of justice.

This department ignores J. Toney concealing the witnesses and evidence that would prove the perjury and allow me to have proved my frame of mind, (see "6")

Ignored is the removal of my "ANSWER..." from the court file, (Doc. 107-2 Page 41), and my affidavit of standing (Page 39), and the vertical wound (page 40), and the bullet strike in the roadway where I was shot five (5) times. (Gov. Exhibit 3N).

"Woe unto you, scribes and Pharisees, hypocrites! For you pay tithe of mint and anise and cummin, and have neglected the weightier materials of the law: Justice and mercy and faith. These you ought to have done without leaving the others undone. Blind guides, who strain out a gnat and swallow a camel!" Mathew 23:23-24

The federal sentencing guidelines are entirely unjust!

Respectfully Submitted, Brent D. Cole

PS. The library has no copy of the sentencing guidelines, so a copy of the sentencing guidelines has been unavailable.

MEMORANDUM IN REPLY — Page 6 of 6

1   *Brent D. Cole* (Name)

2   *X-635066* (X-Ref. No)
3   Sacramento County Main Jail
    651 "I" Street,
4   Sacramento, CA 95814

5   In Pro Se

6
                **IN THE UNITED STATES DISTRICT COURT**
7               **FOR THE EASTERN DISTRICT OF CALIFORNIA**

8
9   UNITED STATES OF AMERICA,              Case No. *2:14-CR 00 269-GEB*
                            Plaintiff,     *MOTION FOR CORRECTION*
10                                         *OF PRE-SENENCE REPORT*
11  V.                                     *WITH AFFIDAUIT IN*
12  *BRENT DOUGLAS COLE,*                  *SUPPORT*
13                          Defendant(s).  Date: *July 21, 2014*
14                                         Time:
                                           Judge: *Garland E Burrell Jr.*
15                  *DECLARATION*
16  *Comes now the man, Brent Douglas Cole, defendant in the*

17
18  *above captioned case with this motion for correction*

19
20  *of the Pre-Sentence Report served July 8, 2015.*

21
22  *The facts that defendant has no criminal record, no*

23
24  *history of violence, and that the court has failed*

25
26  *to determine the legality of the arrest dictate*

27
28  *that the maximum possible sentence is unjust.*
    *MOTION FOR CORRECTION - Page 1 of 29 - U.S. v COLE*

                            1

1.) Defendant asserts that the "trial" was rendered fundamentally unfair before it began, and the verdict and proceedings were vitiated by due process violations, bias, suppression of the material evidence, prosecutorial misconduct, fraud, and the use of perjured testimony to obtain a guilty verdict. The indictment was obtained by abuse of process subsequent to violations of constitutionally guaranteed rights and the imposition of ineffective counsel upon the defendant. The time limit to obtain an indictment under 18 USC, § 3161(b) was exceeded subsequent to defendant being incarcerated in isolation without a valid warrant or commitment for 102 days and denied a due process hearing and meaningful access to the courts. Imposed counsel refused to file a motion to dismiss under § 3162, and under § 3060, insisting that this district does not adhere to statutory mandates for conducting preliminary examinations. The prosecuting attorney improperly dissuaded the grand jury.

MOTION FOR CORRECTION — Page 2 of 29 - U.S. v COLE

2.) The district court failed to schedule or hold a probable

cause determination or a preliminary examination as is

required per $3060, F.R. Crim. P. Rules 3-5, and County of

Riverside v. McLaughlin, 500 US 44, 114 L Ed 2d, 111 S Ct 1661 (1991)

No affient recited that they had personal knowledge, which

voids the arrest. United States v. Freeman (1958 SD. Ind.)

165 F. Supp. 121, 58-2 USTC. The prosecuting attorney

curtailed the investigative function by issuing undue

rebuke for properly and faithfully performing their

funtions and duty of protecting citizens against

unfounded criminal prosecutions. Branzburg v. Hays,

408 US 665, 686-687, 33L Ed 2d 626, 92 S Ct 2646 (1972). The

scope of inquiries is "not to be limited by questions of pro-

piety ... or doubts ... " United States v. Calandra, 414 US 338

343, 38 L Ed 2d 561, 94 S. Ct. 613 (1974), — "The purpose of

the grand jury requires that it remain free, within

constitutional and statutory limits, ... "independent of

either prosecuting attorney or judge." Stirone v. United

States, 361 US, 212, 218, 4 L Ed 2d 252, 80 S Ct 270 (1960)."

United States v. Sells Engineering Inc., 463 US 418, 430, 77 L Ed 2d 743.

MOTION FOR CORRECTION - Page 3 of 29 - U.S. v. COLE

3.) Defendant asserts that Ranger Paltorak acted in excess of his jurisdiction after committing fraud under 18 U.S.C. § 1001 to unlawfully seize the property of defendant. He assaulted the defendant verbally and perjured himself about his demeanor and the policy of BLM with regard to road closures and posting of closure notice to the public. Then he perjured himself by claiming there was no conversation when defendant stepped into the clearing and that defendant drew his gun first. The officers testimonies conflict and Officer Hardin made conflicting statements within his testimony and conflicting statements from his interview on June 17, 2014 while under oath. Under 18 U.S.C. § 1623 both officers are guilty of false declarations before the court as they both made inconsistent statements, one of which is necessarily false, under oath and material to issue.

4.) Officers had no warrant and no probable cause to

arrest the defendant. They made no attempt to inform

the defendant that they were placing him under arrest

and committed an assault with deadly weapons upon

the defendant without provocation and without any

lawful necessity. Ranger Pultorak had been informed

at the "traffic stop" that the defendant was armed.

His dispatch informed him that defendant had no

warrants and no history of violence: That he was

contesting misdemeanor weapons charges and had

been attending court for 6 months, and was

scheduled for court at the end of June.

"[S]urely a most familiar meaning is, as the Constitution's
Second Amendment ... indicates: wear, bear, or carry ...
upon the person or in the clothing or in a pocket, for
the purpose ... of being armed and ready for offen-
sive or defensive action in case of conflict with another
person." Muscarello v. United States, 554 US 125,143,
118 S. Ct. 1911, 141 L. Ed 2d 111 (1998)

   "When the constitutional validity of an arrest is chal-
lenged, it is the function of a court to determine ..."
Carol v. United States, 387 U.S. 310 (1967)
The court has failed to determine if arrest was legal.

MOTION FOR CORRECTION - Page 5 of 29 - US. v COLE

5.) Officers were not engaged in the performance of their law ful duties but were searching without a warrant and stealing property belonging to the defendant. **Appellant** had no mens rea (criminal intent) and approached to claim his property that officers were stealing.

"[I]t is unconsionable to convict a man for resisting an injustice. ... The freedom to refuse to obey a patently unlawful arrest is essential to the integrity of a government which purports to be one of laws, and not of men. Unless it is desirable to kill the impulse to resist arbitrary authority, the rule that such an arrest is a provocation to resist must remain fundamental." United States v Moore, 483 F.2d 1361 (9th Cir. 1973) 1973 U.S. App. LEXIS 8124 No 72-3181

"The statute (18 USC §III) does require a criminal intent, ... For example, where an officer fails to identify himself or his purpose, his conduct in certain circumstances might reasonably be interpreted as the unlawful use of force directed at the defendant or his property. In a situation of that kind, one might be justified in exerting an element of resistance, and an honest mistake of fact would not be consistent with criminal intent. — We hold therefore, that in order to incur criminal liability under §III an actor must entertain the criminal intent to do the acts therein specified." United States v. Feola, 420 U.S. 671, 686, 43 L Ed 2d 541, 95 S Ct 1255 (1975).

Criminal intent was never alleged by the prosecution.

MOTION FOR CORRECTION - Page 6 of 29 - U.S. v. COLE

6.) Defendant was not permitted to have any input in the formation of jury instructions. Defendant asserts that the criminal jury instruction of reasonable doubt was, for purposes of proving guilt beyond reasonable doubt, constitutionally deficient; and therefore requires reversal.

"It is not necessary for the defendant to establish self-defense by evidence sufficient to satisfy the jury that it is true, but if there is reasonable doubt as to whether the defendant was justified, then he is entitled to an acquittal. People v. Mohammed (1922) 189 Cal. 429, 208 P. 963, 122 Cal LEXIS 346.

"Any necessary force may be used to protect from wrongful injury the person ... of oneself." Cal. Pen. Code §692. — "Reasonableness is judged by how the situation appeared to the defendant, not the victim. As the Court of Appeal noted, "Because justification does not depend upon the existence of actual danger but rather depends upon appearances, "" People v. Clark (1982) 130 Cal. App. 3d 371, 377 [181 Cal. Rptr 682].

"A person claiming self defense is required to 'prove his own frame of mind,' and in so doing is entitled to corroborate his testimony that he was in fear for his life by proving the reasonableness of such fear,'" People v. Davis (1965) 63 Cal. 2d 648, 656 (47 Cal. Rptr. 801, 408 P 2d 129). — "Self-defense as justification for assault with a deadly weapon requires a showing that defendant was actually in fear of his life or serious bodily injury and that the conduct of the other party was such as to produce that state of mind in a reasonable person." People v. Sonier (1952 Cal App) 113 Cal App 2d 277, 248 P. 2d 155.

MOTION FOR CORRECTION - Page 7 of 29 - U.S. v. COLE

"A person cannot assault another in self-defense and any act done in self defense cannot be assault." *People v. Lynch* (1894) 101 Cal 229, 35 P. 860.

"Necessary self-defense sufficient to excuse a man for committing an assault includes every case where there is reasonable ground to apprehend a design to commit a felony or to do some great bodily injury under circumstances sufficient to excite fears of a reasonable man." *People v. Pollar* (1891) 89 Cal 513, 26 P 1086, 1891 Cal LEXUS 846.

"Self-defense is not available as a plea to defendant who sought quarrel with design to force deadly issue and thus, through his fraud, contrivance or fault, to create real or apparent necessity for making felonious assault." *People v. Hinshaw* (1924) 194 Cal. 1, 227 P. 156, 124 Cal. LEXUS 209.

"Self-defense as a justification for assault with a deadly weapon requires a showing that defendant was actually in fear of his life or serious bodily injury and that conduct of the other party was such as to produce that state of mind in a reasonable person." *People v. Sonier* (1952 Cal. App.) 113 Cal. App. 2d 277, 248 P.2d 155.

"A constitutionally deficient reasonable-doubt instruction will always result in the absense of "beyond a reasonable doubt" jury findings. That being the case, I agree that harmless-error analysis cannot be applied in the case of a defective reasonable-doubt instruction consistant with the Sixth Amendment's jury-trial guarantee. I join the Court's opinion. *Sullivan v. Louisiana*, 508 U.S. 275, 285, 124 L Ed 2d 182, 113 S.Ct. 2078 (1993).

The evidence defendant required to 'prove his own frame of mind' was suppressed by the prosecution and the counsel J. Toney.

MOTION FOR CORRECTION - Page 8 of 29 - U.S. v COLE

7.) The prosecution Kowingly subordinated perjury

in order to attain the conviction of the defendant.

In his interview officer Hardin stated they drew First:
June 17, 2014 CHP Office in Gross Valley 9:15-10:22 AM:
N.S.O, Case 1140-1626, DA; 14-06-031256, F14-000267:
Page 6, line 231 "... So, there was a backpack layin' right there
that had nothing in it so I- I started puttin the parts
in the backpack and he was gonna - we were gona
carry that down and he'd walked over to the
other motorcycle and I a - made him carry the
back pack ... (Stealing defendant's backpack and
dentures and had to walk to the only motorcycle that
was in the camp at that time) - line 245:
"... a guy came up, "Hey it - it - this is my stuff, this
is my camp, i - " ... and he says this is my stuff, I
don't want you guys takin my stuff. ... "
line 255"... the Ranger said, "Are you armed?" and
the suspect says "Yes I am," ... -Line 264:
"... and the other motorcycle was in the bushes,
over here, so as soon as he did not like seein'
those hand cuffs I kinda came forward, ... "
Line 268; " - the Ranger said, "Are you armed? and the
guy says, "Yes I am," and I immediately drew my
weapon, and I saw the ra- the BLM Ranger drew
his and we ordered, and we said, "Put the gun
down ... - lemme back up just a little bit - when, uh,
we asked if he was armed we both - we both drew,
I saw the Ranger drew his weapon, and the Ranger
started back towards the trail a little bit, kinda
backin' up a little bit. ... But the way he whipped
it out and he went straight for the Ranger just
pointed it, and then shots started firing, ... "
MOTION FOR CORRECTION - Page 9 of 29 - U.S. v. COLE

7.) (cont.) Page 7, line 283: " ..., I heard shots goin' and I believe he fired first, the - the suspect, I can't - I can't be - but as soon as he pointed out and was dead on target shots started fr- flyin', and I just kinda-I shot at him, multiple times, and I was backin' up when this happened. Um, I don't know how many shots went towards the Ranger, but he - as I'm backin'up, he turned on me, and started firin', and I can't tell you how many shots he shot at me or how many shots I shot at him, but I fell over, ... "

Defendant asserts that ranger Pultorak gut-shot him at point blank range before he started backing away from the defendant, and continued to shoot the defendant as he was backing up. As officer Hardin testified, both officers committed the crime of assault with a deadly weapon upon the accused without provocation. The accused having exercised his Second Amend-ment right, and informed officers of the fact upon their asking, was not justification for them to assault defendant with deadly weapons; but, a contrivance seeking quarrel with design to force deadly issue and create an apporrent necessity.

MOTION FOR CORRECTION - Page 10 of 29 - U.S.v. COLE

8.) Tad Pultorak knew that the accused was armed before he asked the question, as he had been told that he was armed hours earlier during the BLM "traffic stop"; and informed that the accused had no criminal record, no history of violence, and no warrants. He had been informed that the accused was attending court over a misdemeanor in Nevada City; had no warrant and no probable cause to arrest, but sought to institute a deadly confrontation as was observed by witnesses Michael Radon and Kevin Radon previously that day; which was deliberately concealed by imposed counsel's concealing all results of investigator Robert A. Beresford. Counsel failed to raise any of the issues or defenses sought to be raised by the defendant, and clearly acted to help the prosecution attain a conviction wrongfully. (See Appendix C of "MOTION IN ARREST OF JUDGEMENT")

MOTION FOR CORRECTION - Page 11 of 29 - U.S. v. COLE

8.) (cont.) Interview with Michael Radon July 21, 2014 by
Investigator Robert A. Beresford  Re: Brent Cole F14-0267
Page 4; " Pultorak told COLE that he did not want to "ever
see" him again back on the dirt road that led to COLE's
camp. PULTORAK added that the dirt road leading to the
camp was a "closed road." At some point PULTORAK
condescendingly asked COLE, "Does this look like a
road?" When he tried to respond, PULTORAK cut
COLE off and would not allow him to speak. Michael
added that PULTORAK seemed to focus his attention
on COLE. ── PULTORAK told Cole that if he saw him
on the road again that he was going to "impound" his
truck and arrest him. PULTORAK added that the
road which led to COLE's camp was closed. The
trio protested that there were no signs posted that
indicated the road was closed adding that there were
not any gates or locks across the road. PULTORAK
replied, "I'm the lock." Every time COLE tried to
speak, PULTORAK cut him off and he was not
allowed to respond, COLE's face expressed frustration.
   Michael described PULTORAK as "agitated" and
stated that it appeared PULTORAK had "a
vendetta out for Brent COLE." I clarified
whether it appeared PULTORAK wanted to
arrest, injure or hurt COLE for no apparent
reason and Michael replied, "Correct."
The manner in which PULTORAK spoke to COLE
angered Michael as well. Michael added that
PULTORAK spoke to COLE as though he wanted
to "Kick his ass," Michael agreed that PULTORAK
was aggressive and opined that he challenged
COLE as if to say, "Try something and see what
happens." ── Cole then started his truck and contin-
ued on North Bloomfield Road. "

<u>MOTION FOR CORRECTION</u> - Page 12 of 29 - U.S. v COLE

9.) On page 2 of the "Response To Objections" it is claimed
about "Paragraph 24" "serious bodily injury means injury
involving extreme physical pain." As such, the enhancement
is applied appropriately, and no changes will be made."
This shows how biased the Pre-Sentence Report is:
From Tad Pultorak's interview June 18, 2014, N.C.S.O. # 1140 1626,
Page 44, line 1926 "Q1: All right. So, um, the gun shot wound
you sustained to your upper left shoulder..."
A: Yes Sir. - Q1: Did they remove any thing from you-
any- any projectile or any bullet from you?
A: No Sir. - Q1: Was- was this what we would call a
through and through wound?
A: Yes Sir. - Q1: Did it break any bones?
A: No Sir. - Q1: All right. Did they, uh, stitch up
the wounds or did they just let them -uh, Kind of tape
them up a little bit in case they needed to drain?
A: Exactly, they - they did not do any stitches.
Q1: Okay. Have you been back to the doctor since you
were, uh, uh, originally shot?
A: No Sir. - Q1 Okay. And are you scheduled to go
back to the doctor? - A: Uh, they - it's not been
seven days yet. They said do a seven day follow up.
And it has not been that time.
Q1: Okay. All right. Have you had to take any kind
of medication or pain medication as a - as a result
of the gun shot wound?
A: Uh, they gave me, uh, antibiotic. - Q1: And that's it?
A: That's it. - Q1: Okay. Are you still taking antibiotics?
A: Yes sir. - Q1: And no other meds?
A: No sir. "

Tad Pultorak missed no work, required no surgery, no stitches, &
no pain medication, but now "extreme physical pain" is claimed.
MOTION FOR CORRECTION - Page 13 of 29 - U.S. v. COLE

1   The U.S. District Court Probation Office is basing its

2
3   Pre-Sentence report on bias, False assertions, and proceedings

4   vitiated by a vindictive prosecution perpetrated to
5
6   implement a conspiracy against rights. Tad Pultorak

7
8   has repeatedly perjured himself. His claim that the

9   defendant did not have valid insurance is shown to be
10
11   false by Document 107-2 filed 6/25/15, page 43 of 49.

12   His claim that he told the accused to turn around is
13
14   false. That Fact is evinced by Brant Hardin's testimony
15
16   and his own admission under oath that his claim that

17   there was no conversation between the accused and
18
19   himself when he entered the camp was false.

20   At the in camera hearing January 30, 2015 Judge
21
22   Burrell showed his bias by refusing to order the
23
24   audio recording of the BLM "traffic stop" be

25   available at trial. The accused asserted he had
26
27   not been given discovery and needed the audio for trial.

28   Counsel J. Toney concealed witnesses and suppressed evidence,
    see Document 107-2 pages 47-49, 39-41, and motion to reverse judgment, Doc.74
    MOTION FOR CORRECTION - Page 14 of 29 - U.S. v. COLE

10.) Defendant was denied meaningful access to courts from the time he was assaulted, shot, and incarcerated until after May 16, 2015, more than three months after "trial". Ineffective counsel was imposed upon him and no motions were ever filed in his behalf despite J. Toney having requested and being granted a two month postponement of trial to enable him to file inlimine motions. He submitted no evidence and called none of the witnesses defendant asked him to call. A note to the Clerk is Exhibit 1. A list of witnesses submitted to counsel by October 17, 2014 is Exhibit 2. The interview of Chris DONEGAN, concealed by counsel since October, is Exhibit 3. A few documents detailing defendant's injuries is Exhibit 4. Counsel concealed all evidence of injuries inflicted upon the accused. Excerpt of the testimony of Michael Radon before the grand jury is Exhibit 5. Concealment of it was prosecutorial misconduct.

MOTION FOR CORRECTION - Page 15 of 29 - U.S. v. COLE

11.) Defendant asserts that the trial was fundamentally unfair, ineffective counsel was imposed, due process violated, the indictment was vitiated by prosecutorial misconduct, material evidence was suppressed, the fifth amendment bar to double jeopardy violated by a multiplicious count, the judge was biased, officers were not lawfully engaged in performing their duties, drew their guns without provocation, constituting an assault upon the accused; and repeatedly shot the accused, inflicting serious bodily injury upon him and putting him in jeopardy of life and limb without a warrant or probable cause, and barring further prosecutions. This is a vindictive prosecution instituted in obstruct-ion of justice against a statutory federal officer.

1  12.) The Supreme Court ruled that lenity must be employed

3  in applying 18 U,S,C, § 111, and that the unit of prosecution

5  is therefore the act of hindrance as the unit of prosecution

7  "without regard to the number of federal officers affected".
8  " We cannot find clearly from the statute, even when
9  read in the light of its legislative history, that the
10  Congress intended that the person locking the door
11  might commit as many crimes as there are officers
12  denied entry. And if we cannot find this meaning in
13  the supposed case, we cannot find that Congress intended
14  that a single act of assault affecting two officers
15  constitutes two offenses under the statute, The
16  Government frankly conceded on the oral argument that
17  assault can be treated no differently from the
18  other outlawed activities,⁴ and that if a single
19  act of hindrance which has an impact on two
20  officers is only one <* pg. 205> offense when the
21  act is not an assault, an act of assault can be only
22  one offense even though it has an impact on two
23  officers. — Moreover, an interpretation that there are
24  as many assaults committed as there are officers
25  affected would produce incongruous results. Punish-
26  ments totally disproportionate to the act of assault
27  could be imposed because ... the number of officers,,, "
28  Ladner v. United States, 358 US 169, 177, 3L Ed 2d 199, 79 S.Ct.
   209. MOTION FOR CORRECTION - Page 17 of 29 - U.S. v. COLE

1  13.) Count 3 of the indictment is invalid and must be dismissed

2

3  For failure to describe scienter. The particulars of required

4

5  elements of the crime alleged are not specified: Prior Felony.

6  "It is an elementary principle of criminal pleading, that where

7  the definition of an offense,..., includes generic terms, it is

8  not sufficient that the indictment shall charge the offense

9  in the same generic terms as in the definition: but it must

10  state the species, - it must descend to particulars,'"

11  United States v. Cruikshank, 92 US 542, 558, 23 Led 588, 593.

12  An indictment not framed to apprise the defendant "with

13  reasonable certainty, of the nature of the accusation

14  against him ... is defective, although it may follow the

15  language of the statute." United States v. Simmons, 96

16  US 360, 362, 24 Led 819, 820. "In an indictment upon a

17  statute, is not sufficient to set forth the offense in the words of

18  the statute, unless those words of themselves fully, directly

19  and expressly, without any uncertainty or ambiguity, set

20  forth all the elements necessary to constitute the offense

21  intended to be punished;..." United States v. Carll, 105

22  US 611, 612, 26 Led 1135,  ... "it must... inform the accused

23  of the specific offense, ..., with which he is charged,"

24  United States v. Hess, 124 U.S 483, 487, 31 Led. 516, 518, 8 S,

25  Ct. 571." Russell v. United States, 369 US 749, 765, 8 L. ed.

26  2d 240, 82 S Ct 1038.

1  13.) (cont.) The indictment "must descend to particulars", the

2

3  question being "whether the offense has here been described

4

5  at all." United States v. Cruikshank, 92 US 542, 557, 558. The

6

7  indictment is insufficient for failure to allege scienter. It

8

9  is essentially the statement of conclusary allegations

10

11  which vaguely state an offense in generic statutory terms.

12

13  It alleges no facts different from the other counts,

14

15  and is in fact a sentence enhancement which requires

16

17  previous felony convictions (to be applicable) and is

18

19  a multiplicious count barred by the double jeopardy

20

21  clause of the Fifth Amendment. — To wit:

22     "[T]he legislative history of ACCA reveals that this difference

23     was intended and is a function of Congress' aim of subjecting

24     "career criminals" ... to federal prosecution without radically

25     expanding federal jurisdiction over common law crimes."

26     (130 Cong. Rec. H10550) U.S. v. Lowe, 860 F.2d 1370 (7th Cir. 1988)

   MOTION FOR CORRECTION - Page 19 of 29  - U.S. v COLE

13.) (cont.) Count three alleges defendant "did knowingly dis-
charge, carry and use a firearm ... during and in relation to
a crime of violence for which he may be prosecuted in
a court of the United States, that is, assault on a
federal officer with a deadly weapon which inflicts
bodily injury, in violation of Title 18 U.S.C. §§ 111(a)(1)&(b),
and assault on a person assisting a federal officer ..."

Because § 924 is a sentence enhancement, <u>which is only</u>

<u>applicable to "career criminals"</u> who have been previous-

<u>ly convicted of felony crimes</u>, defendant is not a person

who may be prosecuted under 18 U.S.C. § 924 . The indict-

ment fails to state any different facts than are stated

in counts one and two, and is therefore barred by the

double jeopardy clause of the Fifth Amendment. See

<u>United States v. Serino</u>, 835 F. 2d 924 (1st Cir. 1987), Count two

is also barred. See point "12.)" on page 17 of this motion. <u>Ladner,</u>

MOTION FOR CORRECTION — Page 20 of 29   — U.S. v. COLE

1  14.) "The requirement of due process in safe guarding liberty against depriv-

2   ation through action of the state embodies the Fundamental

3   concepts of justice." Herbert v. Louisiana, 272 U.S. 312, 316, 317, 47 S.Ct 103,

4   Mooney v. Holohen (1935) 294 U.S. 103, 112.

5

6  The standard common law test of criminal liability is expressed:

7   "actus non facit reum nisi mens sit rea," — which means:

8  "The act is not culpable unless the mind is guilty." Thus, due process

9

10  requires that there must be an "actus reus" or "guilty act", accompanied

11

12  by some level of "mens rea" or "guilty mind" to constitute the

13

14  crime with which the defendant is charged. As a general

15

16  rule, criminal liability does not attach to a person who acted with

17

18  the absense of mental fault. Petitioner asserts that he had no

19

20  intent to harm any one. He acted in self defense with minimal

21

22  force under the circumstances after being shot. He had

23

24  no mens rea. He did not commit a "guilty act". Officers

25

26  were not lawfully engaged in performance of duties.

MOTION FOR CORRECTION - Page 21 of 29 - U.S. v. COLE

15.) During the January 30, 2015 in camera hearing Judge Burrell

dismissed "MOTION FOR CHANGE OF COUNSEL", docket #25, without

making a record of the basis for the request and the court's response.

Defendant asserted eight (8) issues and violation of an agreement

stated in writing on October 19, 2014, which was detailed in the

motion. Judge Burrell read the motion, as he made much of the

incident in the courtroom of the federal marshals physically

removing the defendant, before the court was done with hearing

the "arraignment", upon imposing representation upon him in

contravention of his stated demands and objections. Judge

Burrell condoned and abetted defendant being tortured, denied

medically necessary treatments, being deliberately maimed,

and subjected to cruel and unusual treatments. A

biased judge vitiates the verdict and requires reversal,

MOTION FOR CORRECTION— Page 22 of 29 — U.S. v. COLE

1  16.) There is no truth to the allegation that Tod Pultorak

2

3  sustained serious bodily injury. He missed no work, had no

4

5  surgery, required no stitches, has no disfigurement nor

6

7  any loss of bodily function, and he has not sought

8

9  any pain medication for his flesh wound. His claim

10

11  of "serious bodily injury" is a fraud. See id. pg. 13.

12

13  On page 11 "55." shows that a warrant has been issued

14

15  in case M14-00388. This is evidence of ineffective

16

17  assistance of counsel. Defendant submitted a

18

19  motion for removal to federal district court to J.

20

21  Toney to file to join this to the current case as

22

23  Tad Pultorak was engaged in committing crimes

24

25  under 18 USC §§ 1503 and 1512 on June 14, 2014.

26

MOTION FOR CORRECTION - Page 23 of 29 - U.S. v. COLE

17.) On page 9 "28" and "36" there is an accusation that I was

not truthful on the stand. This is an unfounded and

un substentiated accusation. It is a violation of due

process of law and my right under the Sixth to be

appraised of the cause and nature of the accusation.

I demand that this be removed and rescinded. I

deny that I was untruthful on the stand. Tad

Pultorak committed fraud and perjury, Brant Hardin

made false statements. I requested an evidenciary

hearing to submit proof but my motion was denied.

See documents numbered 125 and 126 this case.

A term of supervised release after imprisonment is not

authorized by 18 USC §§ 111 or 3583(a) as §111 is not a

domestic violence crime. There is no authorization for 84-86.

MOTION FOR CORRECTION - Page 24 of 29 - U.S. v. COLE

18.) Page 15 paragraph 87: The claim that defendant is ineligible

for probation is incorrect. Count 3 must be dismissed as

18 U.S.C. §924 is a sentence enhancement that may only be law-

fully applied to "career criminals" who have previously

been convicted of felony crimes. United States v. Serino,

835 F.2d 924 (1st Cir 1987) establishes that prosecution

in this case under §924 is barred by the double jeopardy

clause of the Fifth Amendment as there are no facts

that are different than the other counts, See U.S. v Lowe,

860 F.2d 1370 (7th Cir 1988); 130 Cong. Rec. H10550: The

history of ACCA reveals the intent of Congress in passing §924

was to subject "career criminals" to federal prosecution.

Prior felony convictions are required for §924 to apply.

Only one count of assault may be charged under 18 U.S.C. §111 (Pg 17.)

MOTION FOR CORRECTION - Page 25 of 29 - U.S. v. COLE

19.) The statute under which defendant is charged, 18 USC §111(b),

is unconstitutional for violating the Second Amendment

mandate, "shall not be infringed". The sentencing guide-

lines are unconstitutional for violating the Fifth

Amendment bar of double jeopardy.  The defendant is

subject to many years of incarceration for having exercised

his Second Amendment right.   The guidelines have subjected

him to multiple jeopardies for the same act.  Officer's

assaulted defendant with firearms without lawful justif-

ication, i.e. a showing that they had valid reason to fear

for their lives or serious bodily injury. See People v. Sonier,

113 Cal App 277, 248, P.2d 155 (1952); Guidelines Manual

§ 2 A2.2 (6) "... increase by 2 levels"; Application Notes: 4. "... §

A1.2 shall also apply"; § 3 A1.2 "If (1) ...government officer ..."

MOTION FOR CORRECTION — Page 26 of 29  — U.S. v. COLE

1  "; and (2) the offense of conviction was motivated by such
2  status, increase by 3 levels. — (b) If subsection (a)(1) and (2)
3  apply, and the applicable Chapter Two guideline is from
4  Chapter Two, Part A, increase by 6 levels.
5  (c) If ... defendant ... (1) ... assaulted such officer during
6  the course of the offense (of assault) ... increase by 6 levels."
7
8  This guideline is unconstitutional because it provides
9
10  that a second enhancement shall be imposed if it is an
11
12  assault upon a government employee where the statute is
13
14  specifically for assault on a government employee,
15
16  which already has enhancements added for the same.
17
18  20.) §3A1.2 does not apply in this instance under the
19
20  Guidelines Manual because the offense of conviction
21
22  was motivated solely on the fact that officers
23
24  assaulted the defendant with semi-automatic firearms,
25
26  and the defendant attempted to defend himself.

1  21.) The fact that defendant's sole reason for having

2

3  used his firearm was that officers assaulted him

4

5  with firearms is proved by Officer Hardin's state-

6

7  ments in his interview June 17, 2014 and Andrew

8

9  Forristel's testimony before the grand jury 10/2/14:

10  Grand Jury 2014A at 501 I Street Sacremento California:

11  Page 12, line 12: "Q. What did the BLM ranger do in response?

12  A. The BLM ranger ended up removing a pair of handcuffs from

13  his duty belt. And upon seeing that, Mr. Cole backed up

14  a little bit and took kind of an aggressive stance.

15   In response to Mr. Cole's actions, the BLM ranger

16  asked Mr. Cole if he was armed. Mr. Cole said he was.

17  In response to that, both of the law enforcement

18  officers drew their weapons," (line 20).

19  "A person cannot assault another in self-defense..." People v. Lynch (1994)

20  Tad Pultorak had been informed hours earlier that defendant

21

22  was armed, had no history of violence, no criminal record, etc.

23   "§ 439 Assault by public officer — Every public officer

24  who, under color of authority, without lawful necessity,

25  assaults or beats any person is punishable by a fine,

26  as specified, or by imprisonment..." Pen. code §§ 149, 1170

27  (h). "Enhanced punishment provisions apply..." Pen. Code § 245(b).

MOTION FOR CORRECTION - Page 28 of 29  - U.S. v. COLE

1  Right before the jury went to deliberate, counsel granted

2

3  Tad Pultorak permission to sit in the audience with

4

5  his girlfriend. Counsel then infuriated the jury by very

6

7  loudly and repeatedly calling the ranger a LIAR!

8

9  Judge Burrell then made snide remarks about "how

10

11  hot of a day it was" on the day of the shooting, and

12

13  insinuated that the only reason for defendant to

14

15  have worn a sweatshirt was to conceal his weapon.

16

17  Defendant was hypothermic upon arrival at the hospital.

18

19  Temperature was in the high sixties on the ridge.

20  (see Exhibit 4)

21     I hereby certify that the foregoing is of my own personal

22  knowledge, except where citations to the record or other docum-

23  ents are given, and that to the best of my knowledge and belief

24  is the truth and nothing but the truth under penalty of perjury.

25  Executed on July 23, 2015

26    at Sacramento, California      Brent D. Cole / X-635066

   MOTION FOR CORRECTION - Page 29 of 29 - U.S. v. COLE

**\* 1.)** A singular incident which occurred durring a period of about 10 - 12 seconds is the basis of the charges. During that period of time, two heavily armed officers fired at least seventeen bullets at the defendant inflicting five bullet wounds upon him. Each bullet wound inflicted serious bodily injury upon him, and he is maimed for life due to the injuries officers' inflicted on him. The trial was rendered to be fundamentally unfair by the denial of due process of law, the suppression of material exculpatory evidence by the prosecution, and the abrogation of defendant's Constitutional rights under the Second, Fourth, Fifth, Sixth, and Eighth Amendments. The verdict was vitiated before the trial began. What is only one violation, at most, has been turned into three. All of the charges are based on the false assertions that the officers were engaged in the performance of their lawful duties, were acting lawfully, and that the defendant suddenly, without any possible motive, drew his gun and violently assaulted two heavily armed officers with a six shot revolver, despite that the defendant is over 60 years old, never in his life been violent, has no criminal history or record, and stood to gain absolutely nothing.

   Officer Hardin described the defendant's demeanor just before the shooting began in his interview June 17, 2014, page 26 : line 1109: "... the gentleman says, "I'm - he gave a name, he says, "you know me," (Then at line 1114:) "So - and then he c- he kinda came up and said, "Hey this is my stuff, I don't we- ... I mean it was almost like a plea, like hey, ju - can you - can you leave my stuff."

BLM ranger Tad Pultorak committed the crime of fraud to unlawfully seize defendant's property under 18 U.S.C. §1001 by falsely claiming BLM policy requires the public to call in to determine if a road is closed, and then committed the crime of perjury under §1623 to conceal his fraud.

     AFFIDAVIT OF RELEVANT FACTS - Page 1 of 8

1   ☀2.) The prosecution knew, or reasonably should have known
2   of the perjury and fraud. The ranger further purjured
3   himself by claiming, at first, that there was no conversation
4   between him and the defendant, and by claiming that
    there had never been any problems with anyone else.
5   Assistant U.S. Attorney Michael McCoy, knowing this
6   claim to be perjury, subordinated said perjuries by failing
7   to point them out to the jury. Mr. McCoy had questioned
    Michael Radon before the grand jury and knew that there
8   had been problems with Tad Pultorak violating his rights
9   under the Fourth Amendment, routinely, under color of office.
10  He also knew that Tod Pultorak's description of his
11  demeanor at the BLM "traffic stop" that morning was a
    perjury. The audio recording of the "traffic stop" is still
12  being suppressed by the prosecution, and Judge Burrell,
13  in order to conceal Tod Pultorak's perjury regarding
14  his demeanor during the "traffic stop", N.C.S.O. has
15  made attempts to destroy said exculpatory evidence; and
    counsel J. Toney attempted to assist the U.S. attorney
16  in falsely claiming that the audio recording did not
17  exist, even after the defendant provided documentation
18  of the fact that said audio recording is evidence entry
19  number 106 in N.C.S.O. case number 1140 1626 during trial.
    Instead of raising the issue before the court and requiring
20  that the audio recording of the "traffic stop" be played
21  for the jury to show Tad Pultorak's purjuries, Mr.
22  Toney concealed the existence of the documentation
23  I had just handed him. Judge Burrell refused to allow
24  the defendant to address the court even when the
    jury was not present in the courtroom. The defendant
25  asserts that the refusal of a court to allow a defendant
26  to address the court at "their" trial in a proper and
27  respectful manner is, in fact, the abrogation of the
28  right to proceedings according to the course of common law.

    AFFIDAVIT OF RELEVANT FACTS - Page 2 of 8

*3.) The refusal of a judge to allow a defendant to address the court at their trial renders the trial to be fundamentally unfair as due process of law demands that a defendant must be given ample opportunity to speak in their own behalf. The claim that the imposition of counsel to "represent" an accused deprives them of the common law right to respectfully address the court at their trial converts the proceeding into a mockery of justice. Such a "trial" is naught but a pretense of a trial. "Representation" is not "assistance". A court which uses such an artifice to silence the accused and the record becomes nothing but the "fit and fitting instrument for subjecting the People under absolute despotism".

*4.) The indictment was vitiated by prosecutorial misconduct and Andrew Forristel concealing material facts and making false statements in both his complaint and his "testimony" before the grand jury. He concealed that neither officer sustained any serious injury. He concealed the facts that the defendant sustained numerous serious injuries and is maimed for life. Mr. Forristel is not a witness and presented only hearsay before the grand jury. He falsely claimed that the Grass Valley dispatch reported the Kawasaki as being "Stolen", and falsely claimed that CHP dispatch reported it as "non-recovered." He conveyed the false impression that the Kawasaki was in the camp at the time of the shooting, when in fact it was only near the camp and was brought into the camp and photographed after defendant was transported to the hospital. The "trial briefs" upon which the Report is based have been utterly concealed from the defendant to date.

AFFIDAVIT OF RELEVANT FACTS - Page 3 of 8

1  *5,) Because it is actually the policy of the BLM that
2  signs must be posted whenever roads on BLM land are
3  closed, Tod Pultorak's actions constituted the crime of
4  Fraud under 18 U.S.C. § 1001 by knowingly and willfully
   covering up said material fact. Paltorak made materially
5  false representation regarding BLM road closure policy
6  and his authorities as a BLM ranger in order to seize the
7  property of the defendant and others, then ordering defendant
   to leave the area immediately using his Fraud to coerce
8  and threaten injury to person and property to enforce demands.
9  This matter was within the jurisdiction of the executive
10  branch of the Government of the United States as Tod
11  Pultorak was on paid duty working for the U.S. BLM.
   Defendant denies that his statement of the material fact
12  that no signs were posted and questioning the validity
13  of the purported reason for Paltorak's stated reason
14  for the exercise of jurisdiction over his person and
15  property constituted being "argumentative". The
16  fact that BLM policy requires the posting of closure
   notice attests to the fact that BLM ranger Paltorak
17  was committing a fraud to rationalize the exercise
18  of jurisdiction in an unlawful and improper manner.
19  His intent was to injure me in my person and property.
   His actions during the "traffic stop" constituted
20  an excess of jurisdiction and an assault and
21  battery. Defendant complied with his unreasonable
22  and unlawful demands in an attempt to placate
23  him and avoid confrontation. Defendant parked
24  his truck at the top of the ridge after taking his
   passengers to their destination and returned on foot
25  to find officers searching without a warrant and
26  stealing his backpack and dentures. Officers
27  were committing a trespass against my property and were
28  not engaged in the performance of lawful duties.

   AFFIDAVIT OF RELEVANT FACTS-Page 4 of 8

**6.)** There was only one motorcycle within the Camp. Government Exhibit 2J shows a cache hung in a tree to keep bears out of the food, and notably absent from the photograph is the Kawasaki motorcycle. The Honda appears in the foreground, which belonged to Michael Radon. Government Exhibit 4E shows the Kawasaki after N.C.S.O. moved it into the camp. Government Exhibit 3N shows the bullet strike in the roadway where the defendant was shot. Defendant is of the belief that bullet strike was from the first shot, fired by Tad Pultorak before he backed away from the defendant, inflicting the wound which entered just below his naval and exited out of his perinium at the apex of his inner left thigh. All other wounds had horizontal trajectories. The vertical wound on the defendant can only have been inflicted at very close range, evincing that Pultorak's testimony that defendant drew his gun and fired first is a perjury. Defendant was not permitted to cross examine any witnesses, and J. Toney refused to ask any question submitted by the defendant, including the prosecution's ballistics expert Mr. Day. He refused to recall any of the prosecution's witnesses, and failed to obtain the expert testimony of any expert witnesses. He failed to call any witnesses that defendant asked him to call and defendant was denied compulsary process for compelling witnesses in his favor. The deliberate concealment, avoidance, and suppression of evidence favorable to the accused was accomplished by the mutual collaborative efforts of the prosecution team, imposed counsel J. Toney, and Judge Burrell. Defense counsel failed to file any motions in defendant's behalf, failed to subject the prosecution's case to meaningful adversarial testing, failed to investigate, or do the things necessary to prepare a viable defense.

AFFIDAVIT OF RELEVANT FACTS – Page 5 of 8

1 Under § 435 of California Penal Codes, "Every person who commits
2 an assault on the person of another with a firearm" is punish-
3 able by imprisonment in the state prison or in a county jail for
4 periods specified. (Pen code §241(a)) — Under § 439:
5   "Every public officer who, under color of authority, with-
6 out lawful necessity, assaults or beats any person is
7 punishable by a fine, as specified, or by imprisonment
8 in the state prison, or in a county jail not exceeding
9 the specified term, or by both fine and imprisonment.
10 Pen code § 149 and § 1170 (h).
11 In order to be "engaged in the performance of duties" an
12 officer must be acting lawfully. People v. Gonzalez, 51
13 Cal 3d 1179, 1217, 275 Cal. Rptr, 729, 800, P2d 1159 (1990).
14 The prosecution has the burden of proving legal arrest
15 beyond a reasonable doubt, People v. Costain, 122 Cal. App.
16 3d 138, 145, 175 Cal, Rptr. 651.
17   "Fourth, Eighth, Ninth, Tenth and District of Columbia Cir-
18 cuits have all concluded that §924 is a sentence-enhancement
19 provision ... is applicable only after the defendant has been
20 convicted of one of the predicate offenses enumerated
21 in § 922 (g). The requirement that a defendant have
22 three prior convictions for serious drug offenses or
23 violent felonies as defined in § 922 (g) causes the
24 statute to closely resemble a recidivist provision. Dick-
25 erson, 857 F.2d 414, slip op. at 6; Jackson, 824 F.2d at 24.
26 ... And that previous determination must have been a
27 formal, judicial determination of guilt. United States
28 v. Lowe, 860 F.2d 1370; 1988 U.S. App. LEXIS 14462 (7th Cir)
AFFIDAVIT OF RELEVANT FACTS – Page 6 of 8

1  "The test of whether an indictment is multiplicious is straight-
2  forward. "Where the same act or transaction constitutes a
3  violation of two distinct statutory provisions, the
4  test to be applied to determine whether there are two
5  offenses or only one is whether each provision requires
6  proof of a fact which the other does not." Blockburger
7  v. United States, 284 U.S. 299, 304, 76 L Ed 306, 52 S.Ct.
8  180 (1932)." United States v. Serino, 835 F.2d 924; 1987
9  U.S. App. LEXIS 16587 (1st Cir.)
10
11 Count three of the indictment is a sentence enhancement
12 charged as a separate charge, which does not clearly
13 state the crime alleged and, as written in the indictment,
14 does not require proof of any fact which the other counts
15 do not. It violates the double jeopardy bar of the
16 Fifth Amendment as it is multiplicious under the
17 test given by the Supreme Court in Blockburger and must
18 be dismissed. Also, for 18 U.S.C. § 924 to be applicable
19 there must be previous convictions and there are none.
20 The subsections referred to apply only when "during and in
21 relation to any crime of violence or drug trafficking crime"
22 "and for which the person may be prosecuted in a Court
23 of the United States, uses or carries a firearm". Thus,
24 for this (§924) to be applicable there must have
25 been a previous formal determination of guilt, United
26 States v. Lowe; 860 F.2d 1370; 1988 U.S. App. LEXIS
27 14462 (7th Cir. 1988). —The failure of counsel to
28 research, raise, or pursue legal issues shows incompetence.

1  Counsel failed to act as a consciencious and diligent
2  advocate, investigate witnesses or interview them, failed
3  to provide discovery to the defendant or the prosecution, which
4  resulted in sanctions barring defendant from producing any
5  witnesses, and concealed witnesses and exculpatory facts
6  from the jury and defendant. Defendant's "MOTION TO DIS-
7  MISS COUNSEL AND REVERSE JUDGEMENT" (Docket #
8  74, 4/16/15) and "NOTICE OF Ineffective Assistance
9  of Counsel; and PETITION To Quash Verdict" (#72
10 04/08/2015) were summarily dismissed by Judge Burrell
11 04/22/2015, document 75, without any consideration
12 of the merits, claiming defendant was not authorized
13 to address the court at his trial after forcing
14 J. Toney upon him as counsel and refusing to allow
15 defendant a change of counsel based soley on his opinion
16 without making a record sufficient to show the bases
17 for defendant's request and the court's response.
18 Judge Burrell refused to require suppressed evidence to be
19 produced and misconstrued defendant's statement, made
20 after his motion for change of counsel was denied, that
21 he "did not wish to delay but had not been given discovery"
22 constituted acceptance of J. Toney as "representation".
23 I hereby certify that the foregoing is of my own personal
24 knowledge and is true and accurate to the best of my
25 knowledge and belief, the truth and nothing but. So help me God.
26
27 Executed July 23, 2015          Brent D. Cole
28 at Sacramento, California

AFFIDAVIT OF RELEVANT FACTS - Page 8 of 8

From: Brent D. Cole/x-635066 8W101A
Sacramento County Main Jail
651 "I" Street
Sacramento, CA 95814

EXHIBIT 1
page 1 of 1
May 16, 2015

To: United States District Court Eastern District of California
Office of the Clerk
501 I Street, Suite 4-200
Sacramento, CA 95814-2322

RE: Denial of my status as being in propia persona

On 4/24/2015 I invoked my right under USCA §46
to dismiss counsel; and counsel J. Toney was ordered to be
dismissed. I requested proof of my standing as in propia
persona because it is Sacramento County Jail policy to
deny all access to legal materials and assistance to all
inmates confined in T-Sep who have not been officially
declared pro-per by the court. My request was
denied. J. Toney assured the court that he would inform
the jail; which, he has not done despite my having
informed him of the denial of all ancillary services
orally April 28, 2015 and in writing April 30, 2015.
   I submitted a petition for a writ of mandamus May 4, 2015
and a motion for an order acknowledging standing May 11, 2015.
   I am denied all meaningful access to courts, and have
been since September 25, 2014 when I was placed in
Sacramento County Jail. Please see what you can do
to establish some proof of the fact that I am not
"represented" by any attorney.
                                              Brent D. Cole

EXHIBIT ~
Page 1 OF 1

# Witness List OF DEFENDANT IN OCTOBER

1.) Amanda - Nurse practitioner at Wayne Brown who treated defendant's wounds for two months - Not subpoenaed

2.) Brant Hardin - defendant's questions not asked at trial

3.) Ted Pultorak - defendant's questions not asked at trial

4.) Detective Rusty Greene - Lead investigator - not subpoenaed

5.) The two officers who brought Greene the keys to

6.) ranger Pultorak's service truck SIR #4 pages 26 and 27 names were redacted. J. Toney failed to return documents.

7.) Mac Blake Cole - Dependent's son - Not contacted by counsel.

8.) Marc L. Cole - Defendant's Brother - Not contacted by counsel.

9.) Kevin W. Cole - Defendant's Brother - Not contacted by counsel.

10.) Andrew Forristel - FBI Agent who wrote the complaint and sole source of "testimony" before grand jury despite that he was not a witness - Not contacted by counsel NOR was he called to testify at trial: 6th Amend. Violation!

11.) Josh Stani's M.C.S.C. deputy arrested defendant with firearms Counsel refused or failed to subpoena

12.) Michael Radon - Subpoenaed by prosecution

13.) Kevin Radon - Subpoenaed by prosecution

14.) Paramedic Kyle Rutherford subpoenaed by prosecution

15.) Officer Zelhart subpoenaed by prosecution; counsel refused to ask questions presented by defendant.

16.) NCSO deputies Sullivan not contacted by counsel.

17.) Sergeant Saunders        "        "        "        "        .

18.) Andrew Liler   — Testimony as to locations of evidence

19.) Brandon Corchero - No NCSO employee called by counsel

**BERESFORD INVESTIGATIONS**

*EXHIBIT 3*
*Page 1 of 7*

P.O. Box 505, Auburn, CA 95604
www.Beresford-PI.com

Cellular 530.320.0267
FAX 866.875.5255
CA Investigator Lic PI20759

13 August 2014

## ATTORNEY WORK PRODUCT

To:   Jody L. Schutz, Attorney

From:   Robert A. Beresford, Investigator

Re:   People v. Brent COLE
Nevada County Superior Court, No. F14-0267

Interview with: Chris DONEGAN
*(Contact info subject to Penal Code Sec. 1054.2(a)(1) /Available on Request)*

On Wednesday 8/6/14, at about 5:45 PM, I met with DONEGAN in person. I identified myself as Brent COLE's defense investigator and explained the nature of my investigation. In summary, DONEGAN stated the following. I digitally recorded this interview with DONEGAN's knowledge and permission. All statements in quotations are approximate.

For about 13 years, DONEGAN has been living in the vicinity of where the shooting under investigation occurred. DONEGAN's residence is located between ¼ and ½ mile from where the shooting took place. He described the road where the shooting took place as Come-Along Road. He described Come-Along Road as joining Mountain Spring Road - where he lives - and North Bloomfield Road.

DONEGAN and his neighbors frequently hike on Come-Along Road. DONEGAN hikes the road looking for any possible fire hazards and for persons that have set up camp and were living on the road. This has happened in the past. DONEGAN has also found household trash, appliances and at least one mattress dumped on the road. DONEGAN recalled that there is a 1960s model automobile lying on its roof near where the shooting occurred.

Sometime between August and November 2013, DONEGAN was hiking on Come-Along Road when he came upon Brent COLE and spoke with him. It

Case 2:14-cr-00269-GEB   Document 134   Filed 07/29/15   Page 48 of 73

ATTORNEY WORK PRODUCT
Interview with Chris DONEGAN cont.   EXHIBIT
Page 2 of 7

1 appeared DONEGAN had startled COLE and he was alone. COLE's blue truck
2 was parked nearby. After they began speaking, COLE asked if it was okay for
3 him to be there. DONEGAN told COLE that he was on Bureau of Land
4 Management (BLM) property and that he could camp there legally for two
5 weeks. DONEGAN told COLE that he was not welcome to stay there indefinitely
6 or live there. DONEGAN also shared his concerns regarding garbage left
7 behind by people who camped on Come-Along Road.

8 COLE replied that he planned to be there a short time and that he would
9 be sure to clean up any trash. DONEGAN described COLE as non-
10 confrontational, very friendly and apologetic. COLE respected DONEGAN's
11 thoughts and concerns. COLE and DONEGAN shared conversation for about
12 10 or 15 minutes while DONEGAN sat on the tailgate of COLE's pickup truck.
13 DONEGAN described their conversation as friendly and they discussed topics
14 that included the history of the area.

15 DONEGAN did not feel intimidated by COLE and there was no display of
16 weapons. DONEGAN was sure that he would have noticed whether COLE was
17 wearing a side-arm.

18 Sometime later, DONEGAN spoke with his neighbor, Ralph HANSON,
19 about COLE. HANSON told DONEGAN that in January 2014 HANSON had a
20 BLM Ranger evict or eject COLE from Come-Along Road. HANSON and his
21 wife enjoy hiking on Come-Along Road. HANSON has lived in the area for
22 "quite some time." DONEGAN did not know whether HANSON had ever
23 spoken with COLE.

24 In March or April 2014, DONEGAN attended a meeting with his
25 neighbors where concerns regarding fire suppression and other issues were
26 addressed. There was some discussion regarding concerns about COLE and
27 others camping on Come-Along Road.

28 On the date of the shooting, DONEGAN was driving from his residence

Case 2:14-cr-00269-GEB  Document 134  Filed 07/29/15  Page 49 of 73

ATTORNEY WORK PRODUCT
Interview with Chris DONEGAN cont.  EXHIBIT 7
page 3 of 7

1   on Mountain Spring Road to the North San Juan Transfer Station, which is
2   located at 10125 Flume Street in North San Juan. Flume Street intersects
3   with Highway 49 just north or east of the Brass Rail Saloon. DONEGAN saw
4   COLE as COLE was walking eastbound on Mountain Spring Road from North
5   Bloomfield Road toward Come-Along Road. COLE "waved down" DONEGAN on
6   Mountain Spring Road in front of Ralph HANSON's property.

7        COLE told DONEGAN that he was being ejected from his campsite and
8   wanted to collect his things from the campsite. COLE told DONEGAN that he
9   had parked his blue pickup truck on North Bloomfield Road near the driveway
10   of "Lisa's" residence. DONEGAN told me that COLE had actually parked his
11   truck on North Bloomfield Road near the driveway of Darlene MARKEY, who
12   lives at 18786 North Bloomfield Road.

13       He also told DONEGAN that a BLM Ranger told him that he could not
14   drive his truck onto Come-Along Road and that it would be towed away if he did
15   so. COLE asked DONEGAN for his permission to walk across private property
16   from Mountain Spring Road to his campsite on Come-Along Road to gather his
17   things.

18       DONEGAN "wasn't that happy about" COLE "wandering around in the
19   neighborhood." It was DONEGAN's understanding from HANSON that COLE
20   had been ejected once already from the campsite, had returned and was now
21   getting "in some trouble" with the Bureau of Land Management.

22       DONEGAN told COLE that the area he was entering was under BLM
23   management and that he could not authorize or give COLE permission to enter
24   that area. While speaking with COLE, DONEGAN pointed at Ralph HANSON's
25   property and told COLE, "This guy here, if he sees you walking around, he's
26   going to call the cops on you - again. You're not welcome."

27       In essence, DONEGAN told COLE that no matter where he went he
28   would still be in violation of the law as far as the Bureau of Land Management

Case 2:14-cr-00269-GEB   Document 134   Filed 07/29/15   Page 50 of 73
ATTORNEY WORK PRODUCT             EXHIBIT
Interview with Chris DONEGAN cont.        Page 4 of 7

1    was concerned. DONEGAN did not want to be perceived as assisting COLE in
2    his trespass or violation of BLM laws. DONEGAN approximately told COLE that
3    if he wanted to get his things and leave the area that he should "be quick
4    about it."

5         COLE approximately told DONEGAN, "I don't want anybody to feel weird
6    about me walking through here. I don't want to upset anybody. I understand
7    that there is a lot of private land out here." DONEGAN agreed that COLE was
8    being respectful of DONEGAN and his neighbor's wishes. To DONEGAN, it
9    appeared COLE was "trying to make sure that he wasn't upsetting anybody or
10   trespassing to the point where he was going to upset anybody."

11        In addition, it appeared COLE was doing his best to comply with the BLM
12   Ranger's order not to drive his truck on Come-Along Road. DONEGAN added
13   that COLE was not belligerent and was asking whether he could walk down
14   Mountain Spring Road. DONEGAN's sense was that COLE would have turned
15   around if he had denied COLE's request for permission. Instead, DONEGAN
16   had the exchange described above with COLE and told him, "Good luck."
17   DONEGAN then continued to the North San Juan Transfer Station.

18        During the exchange described above, COLE stood outside the front
19   passenger side window of DONEGAN's vehicle. DONEGAN did not see COLE
20   wearing a side-arm. DONEGAN explained that he walks around in the woods a
21   lot and probably would have noticed if COLE had been wearing a gun. However,
22   he opined that COLE could have been wearing a gun and he might not have
23   seen it. DONEGAN added that it was a hot day and it was not as though COLE
24   was wearing a lot of clothing that would have covered a gun worn on his hip or
25   in his waistband.

26        About 40 minutes later, DONEGAN returned to the area of his residence
27   on Mountain Spring Road. He saw a small "prop plane" circling the area above
28   where COLE had been camped. DONEGAN became very concerned that a fire

ATTORNEY WORK PRODUCT
Interview with Chris DONEGAN cont.   EXHIBIT
                                     Page 5 of 7

might have started in the area.  DONEGAN grabbed a pick ax and shovel from his residence and walked to where COLE had been camped on Come-Along Road.

DONEGAN walked past the 1960s model automobile, which was lying on the side of Come-Along Road and mentioned earlier in this report.  DONEGAN continued a short distance and walked into the area where COLE had been camped.  An unidentified Nevada County Deputy Sheriff had his back to the direction from which DONEGAN approached.  There was no crime scene tape cordoning off the area and DONEGAN did not see any other law enforcement personnel.

When he was about 15 feet away from the deputy, DONEGAN "rattled" his tools.  The deputy immediately turned and pointed his duty weapon at DONEGAN.  The deputy shouted, "Get on the fucking ground!"  DONEGAN dropped his tools and went to the ground.  The deputy aggressively approached DONEGAN and put his full weight on one knee on DONEGAN's back.  The deputy placed tightly fitted handcuffs on DONEGAN's wrists.  The deputy asked, "Oh, you're coming to check on your crop, huh?"  In retrospect, DONEGAN thought that he had come "pretty close to getting shot."

DONEGAN told the deputy that he had the wrong guy and tried to explain that he lived in the area and thought there was a fire burning.  A second officer arrived, who appeared younger and was carrying what appeared to be a military assault weapon hanging diagonally across his chest.  He made a statement to DONEGAN similar to, "Oh, you're looking for your buddy?"  DONEGAN answered "no" and again tried to explain who he was and why he was there.

The deputies retrieved DONEGAN's identification and left him lying on the ground.  The younger officer later returned and told DONEGAN something similar to, "Okay, you're not under arrest.  You're being detained."  The officer

Case 2:14-cr-00269-GEB Document 134 Filed 07/29/15 Page 52 of 73
ATTORNEY WORK PRODUCT EXHIBIT page 6 of 7
Interview with Chris DONEGAN cont.

1  apologized and told DONEGAN, "We just don't deal with this stuff every day."
2  DONEGAN then noted that both officers seemed genuinely scared or
3  "spooked."

4  A different officer then began placing crime scene tape around the area.
5  DONEGAN then noticed some movement in bushes nearby and realized that
6  "the suspect had been shot" and was being treated by "an EMT." More
7  emergency medical technicians arrived with a gurney and they placed COLE on
8  it. More law enforcement personnel also began to arrive. COLE was naked
9  and appeared to have been shot in the "groin area." DONEGAN suspected he
10 was the last person to speak with COLE before the shooting. DONEGAN
11 described COLE as "mumbling into space... and pale as a ghost."

12 A short time later, DONEGAN was released from the scene and told that
13 there might be a fugitive "loose in the area." DONEGAN returned home and
14 contacted his neighbors via telephone to warn them.

15 DONEGAN was "really surprised" when he saw COLE being loaded onto a
16 gurney with a gunshot wound. DONEGAN had never seen COLE with a gun or
17 behave in a threatening manner toward him or anyone else.

18 DONEGAN has seen a lot of bear in the area of Come-Along Road.
19 DONEGAN takes several precautions, including not leaving food outside his
20 home, so as not to antagonize or tempt any bears. He described bear
21 encounters in the area as "very common, very common" and has seen "many,
22 many, many bear encounters."

23 I asked DONEGAN whether it would surprise him if he learned that
24 someone dumped a stolen motorcycle on Come-Along Road. He replied, "Oh,
25 that wouldn't be a surprise to me at all." DONEGAN has never seen COLE
26 pushing a motorcycle or otherwise associated with the motorcycle.

27 DONEGAN has not had any contact with any BLM Rangers.

28 After the recorded portion of this interview was complete, DONEGAN

ATTORNEY WORK PRODUCT
EXHIBIT Page 7 of 7

Interview with Chris DONEGAN cont.

1  stated that he went into Nevada City during the late afternoon/evening on the
2  date of the shooting. On returning to his residence, he saw a large black bear
3  on North Bloomfield Road within 50 to a 100 yards of the entrance to Come-
4  Along Road.  The bear appeared to be agitated and running from someone or
5  "spooked."
6  ///
7  ///
8  ///
9  End of interview with Chris DONEGAN
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

For The Record         EXHIBIT 4
                       Page 1 of 13

In the "Trauma History and Physical" done on 6/14/2014
at Sutter Roseville Medical Center in Roseville, CA on page 1
PHYSICAL EXAMINATION: VITAL SIGNS: It is stated:
   "The patient is afebrile and actually hypothermic
    with a temperature of 35 degrees Celsius. He is
    tachycardic to the 100s and has a blood pressure
    of approximately 100/60"
On Page 2 MUSCULOSKELETAL; "Left upper extremity
    demonstrates 2 wounds in the lateral arm without any
    deformities of the left arm. ... Bilateral lower
    extremities demonstrated a wound on each gluteal
    region with some ecchymosis of the left gluteal
    region. ... However, he does have another wound
    on his perineum.
The "Operative Report" PREOPERATIVE DIAGNOSIS shows
    "1. Acute respiratory failure —(Respirator required)
     2. Multiple gunshot wounds to the abdomen,
     3. Right open supra pubic ramus fracture,
     4. Right ischial fracture.
     5. Left radial nerve injury.
     6. Gunshot wound to the left arm.
All information detailing defendant's injuries has been
hidden from the record and from the jury to date. So much
has been made of the assertion that June 14th, 2014 was a warm
day, and it being repeatedly asserted that the sweatshirt was to
conceal a weapon it should be noted that the defendant
was hypothermic upon arrival at the hospital even with it on.

# Trauma History and Physical

Date of Admission: 06/14/2014
Date of Birth: 08/12/1953

TRAUMA NAME: TRA, WALNUT 4196

EXHIBIT 4
Page 2 of 13

CHIEF COMPLAINT: Hip and arm pain.

HISTORY OF PRESENT ILLNESS: This is a 60-year-old male who was involved in an altercation with the police and multiple gunshots were exchanged. Apparently, the patient was shot in the left arm and the lower abdomen. The patient arrives to us hemodynamically stable, complaining of left shoulder and lower abdomen pain.

PAST MEDICAL HISTORY: Unobtainable.

PAST SURGICAL HISTORY: Unobtainable.

ALLERGIES: No known drug allergies.

SOCIAL HISTORY: Unobtainable.

MEDICATIONS: Unobtainable.

REVIEW OF SYSTEMS: Noncontributory.

PHYSICAL EXAMINATION:
VITAL SIGNS: The patient is afebrile and actually hypothermic with a temperature of 35 degrees Celsius. He is tachycardic to the 100s and had a blood pressure of approximately 100/60.
PRIMARY SURVEY: Airway is intact. Good breath sounds bilaterally. The patient is normotensive with appropriate IV access in place, bilateral upper extremities. The patient is bleeding some amount from his gunshot wounds. GCS is 15.
SECONDARY SURVEY: There are no scalp lacerations, no calvarial defects. Extraocular muscles intact. Pupils equal and reactive to light and accommodation. Midface is stable. Jaw occlusion is normal.
NECK: Trachea is midline. No JVD. Cervical spine is nontender.
CHEST: Without crepitus or tenderness.
ABDOMEN: Soft.
PELVIS: Stable.

| Sutter Roseville Medical Center | Name:   COLE, BRENT | |
|---|---|---|
| One Medical Plaza | MR#:   81-03-83   Acct#:   00048705305 | Pt. Type: X |
| Roseville, CA 95661 | Admit Date:   06/14/2014   Discharge Date: | |
| | Physician:   Zia A. Dehqanzada, MD | Page 1 of 3 |
| **Trauma History and Physical** | Room: TN1A-07 | |

EXHIBIT 4
page 3 of 13

MUSCULOSKELETAL: Left upper extremity demonstrates 2 wounds in the lateral arm without any deformities of the left arm. The patient has a full radial pulse and apparently good sensation throughout. He is complaining of some weakness of his left hand. Right upper extremity is within normal limits. Bilateral lower extremities demonstrated a wound on each gluteal region with some ecchymosis of the left gluteal region. There is a fair amount of bleeding in the lower abdomen and it is not discernable whether the bleeding is from the rectum or not. The patient's lower extremities are without any deformities or other lacerations. There are good palpable femoral pulses bilaterally. The dorsalis pedis and posterior tibialis pulses are not palpable, but are dopplerable with the Doppler. The patient has no thoracic or lumbar spine tenderness and no other wounds on his back. However, he does have another wound on his perineum.

LABORATORY EVALUATION: H&H was 10 and 30 and INR was 1.4. ETOH was less than 10. Creatinine was 1.2.

RADIOLOGICAL IMAGING: CT scan of the chest, abdomen and pelvis demonstrated no evidence of thoracic injury. There are no intraabdominal injuries. There was a right pelvic hematoma, which extended to the pelvic brim without any evidence of bowel or bladder injury. The bladder appeared to be intact. There was no free air in the abdomen. Minimum amount of free fluid within the abdomen was noted. There was a right superior pubic ramus fracture and a right ischial fracture, which was comminuted with fragment in this region. The bilateral femoral arteries are without any evidence of injury or extravasation. The retroperitoneum is normal. Minimum amount of air around the prostate is noted. CT of the left upper extremity demonstrates a fracture of the distal humerus and possibly ulna, with the fragment sitting within the joint of the left extremity.

Brachial index was then performed, which demonstrated a systolic of 120 on the right and 90 on the left. The left hand had good cap refill and had a palpable radial pulse, but no dopplerable or ulnar signal.

ASSESSMENT: This is a 60-year-old male:
1. Status post gunshot wound to the lower abdomen and the left arm with a right pubic ramus fracture.
2. Ischial fracture.
3. Left arm gunshot wound with possible nerve damage and possible ulnar artery injury.

PLAN: To proceed to the Operating Room for rigid proctoscopy and laparotomy. We will also plan on exploring the left arm for arterial/nerve injury.

---

Electronically signed by Zia A Dehqanzada, MD on 06/15/2014 at 14:32 PM

D:06/14/2014 21:50:34; T:06/14/2014 22:27:05; MT NTS; Conf # 348406; Dict ID 5059196ES

cc: Billing Service (Trauma) RTMG, RV –

EXHIBIT 4
Page 4 of 13

| Name: COLE, BRENT | MR#: 81-03-83 | Acct#: 00048705305 | Page 3 of 3 |
|---|---|---|---|
| Trauma History and Physical | | | |

## Operative Report

EXHIBIT 4
Page 5 of 13

Date of Procedure: 06/14/2014
Date of Birth: 08/12/1953

PREOPERATIVE DIAGNOSES:
1. Open pelvic fracture status post multiple gunshot wounds to the abdomen.
2. Status post left with the left arm with weakness and possible arterial injury.

POSTOPERATIVE DIAGNOSES:
1. Open pelvic fracture status post multiple gunshot wounds to the abdomen.
2. Status post left with the left arm with weakness and possible arterial injury.

PROCEDURES PERFORMED: Exploratory laparotomy.

PROCEDURE IN DETAIL: Following obtaining informed consent, the patient was taken to the Operating Room and placed on table in supine position. The patient was already endotracheally intubated, and general anesthesia was induced. The patient was prepped and draped in the usual sterile fashion. The patient had received 2 g of Ancef intravenously approximately 30 minutes prior to making the incision. A formal timeout and site verification was then performed. STDs were not placed. A rigid proctoscopy had already been performed which did not reveal any bleeding from the rectum. A lower midline incision was then made per routine fashion. Dissection was carried at the level of the fascia. The fascia was then entered using electrocautery and blunt dissection, and the incision was extended along the length of the incision. The omentum was eviscerated. The bowel was eviscerated. The pelvis was inspected. There was evidence of pelvic hematoma, right greater than left noted. The bladder appeared to be intact without any evidence of intraperitoneal bladder rupture. There was no evidence of vascular injury. There is no evidence of bowel injury. The bowel was then run from the ligament of Treitz all the way down to the ileocecal valve. There was no evidence of any injury noted. A small mesenteric contusion was noted in the terminal ileum. The right colon, transverse colon and descending colon were all within normal limits. The rectum appeared to be normal. The abdomen was then washed out thoroughly. The fascia was then closed using #1 looped PDS suture, and this was tied appropriately. The skin was closed using staples and dressed sterilely. The patient tolerated the procedure extremely well.

Electronically signed by Zia A Dehqanzada, MD on 06/15/2014 at 14:34 PM

D:06/14/2014 21:59:46; T:06/15/2014 04:27:37; MT NTS; Conf # 348410; Dict ID 5059200ES

cc: Billing Service (Trauma) RTMG, RV -

---

Sutter Roseville Medical Center
One Medical Plaza
Roseville, CA 95661

**Operative Report**

Name: COLE, BRENT
MR#: 81-03-83    Acct#: 00048705305    Pt. Type: X
Admit Date: 06/14/2014    Discharge Date: 06/19/2014
Physician: Zia A. Dehqanzada, MD    Page 1 of 1
Room: TNIA-07

# Operative Report

Date of Procedure: 06/14/2014
Date of Birth: 08/12/1953

EXHIBIT 4
Page 6 of 13

## PREOPERATIVE DIAGNOSES:
1. Acute respiratory failure.
2. Multiple gunshot wounds to the abdomen.
3. Right open suprapubic ramus fracture.
4. Right ischial fracture.
5. Left radial nerve injury.
6. Gunshot wound to the left arm.

## POSTOPERATIVE DIAGNOSES:
1. Acute respiratory failure.
2. Multiple gunshot wounds to the abdomen.
3. Right open suprapubic ramus fracture.
4. Right ischial fracture.
5. Left radial nerve injury.
6. Gunshot wound to the left arm.

PROCEDURES PERFORMED: Rigid proctoscopy.

DESCRIPTION OF PROCEDURE: Following up placement of the patient on the table in the low lithotomy position and appropriate endotracheal intubation, the patient underwent a formal timeout and site verification. A digital rectal examination was performed, which was within normal limits. Rigid proximal introduced into the anus and was advanced appropriately. The rectal canal was then insufflated and rigid proctoscopy was performed at 10 cm in height. There is no evidence of any blood within the rectal vault noted. Rigid proctoscopy was therefore negative. The procedure was terminated after release of the insufflation. The patient tolerated the procedure extremely well.


Electronically signed by Zia A Dehqanzada, MD on 06/15/2014 at 14:33 PM

D:06/14/2014 21:56:10; T:06/15/2014 04:04:13; MT NTS; Conf # 348409;  Dict ID 5059199ES

cc: Billing Service (Trauma) RTMG, RV -
Billing Trauma Medical Group, RV -

| Sutter Roseville Medical Center | Name:  COLE, BRENT | | |
| --- | --- | --- | --- |
| One Medical Plaza | MR#:   81-03-83    Acct#:   00048705305 | | Pt. Type:  X |
| Roseville, CA  95661 | Admit Date:  06/14/2014      Discharge Date: | | |
| | Physician:    Zia A. Dehqanzada, MD | | Page 1 of 1 |
| **Operative Report** | Room: TNIA-07 | | |

# Operative Report

EXHIBIT 4
Page 7 of 13

Date of Procedure: 06/14/2014
Date of Birth: 08/12/1953

PREPROCEDURE DIAGNOSES:
1. Acute respiratory failure.
2. Multiple gunshots to the abdomen, left arm.

POST PROCEDURE DIAGNOSES:
1. Acute respiratory failure.
2. Multiple gunshots to the abdomen, left arm.

PROCEDURES PERFORMED: Orogastric tube placement using direct laryngoscopy.

DESCRIPTION OF PROCEDURE: This patient was intubated in the Trauma Bay for multiple gunshot wounds and relative hypotension. Endotracheal tube was placed and was already established. However, multiple attempts at OG or NG tube placements were unsuccessful. Therefore, a direct laryngoscope was then used to expose the epiglottis and the esophageal opening. An OG tube was then advanced under direct vision into the esophagus. This was advanced to the patient's stomach. The patient tolerated the procedure extremely well. Bubble testing demonstrated appropriate placement in the stomach.

Electronically signed by Zia A Dehqanzada, MD on 06/15/2014 at 14:33 PM

D:06/14/2014 21:52:28; T:06/15/2014 03:59:31; MT NTS; Conf # 348408;  Dict ID 5059198ES

cc: Billing Trauma Billing Services - RTMG, RV -

| | | | | | |
|---|---|---|---|---|---|
| Sutter Roseville Medical Center | Name: | COLE, BRENT | | | |
| One Medical Plaza | MR#: | 81-03-83 | Acct#: | 00048705305 | Pt. Type:  X |
| Roseville, CA  95661 | Admit Date: | 06/14/2014 | | Discharge Date: | |
| | Physician: | Zia A. Dehqanzada, MD | | | Page 1 of 1 |
| **Operative Report** | Room: TNIA-07 | | | | |

## Operative Report

Date of Procedure: 06/14/2014
Date of Birth: 08/12/1953



EXHIBIT 4
Page 8 of 13

CHIEF COMPLAINT: Gunshot wound.

HISTORY OF PRESENT ILLNESS: This is a man apparently in his 60s or so, who was in some form of altercation with the police and was shot. He was brought to Sutter Roseville as a trauma patient. Dr. Zia Dehqanzada took him to the Operating Room for exploratory laparotomy and other exploratory surgery. He did a left upper extremity exploration for rule out of a vascular injury. I was consulted intraoperatively to evaluate him and helped him with a potential fracture of his left elbow. The patient had studies, although I was not aware of these until Dr. Dehqanzada called me into the room. I quickly looked at what he had and saw CT scan of his left arm and this shows a bullet fragment in the ulnar humeral joint on the ulnar side with fracture fragments in the proximal ulna, distal humerus and multiple bullet fragments. Dr. Dehqanzada had already explored his arm. He has 2 entry wounds on the lateral side, which he has interconnected with a surgical incision and then he has an anterior extensile wound from his extensile exposure for exploration. Through these wounds Dr. Dehqanzada showed me the radial nerve has an appearance to it that is macerated. The majority of the nerve is in continuity, although it looks severely contused. It is purplish in color in this area near the traumatic entry of the bullet. Beyond this, there is a large bullet fragment palpable.

X-rays were done intraoperatively just as I was arriving which show this large bullet fragment with multiple smaller bullet fragments and the fractures that I mentioned on CT scan. The entry wound tracts right down to the elbow joint and it is through this wound that I could carefully and fairly easily remove both fragment. This was done using a hemostat with clamping directly onto the bullet and carefully removing it without injuring the radial nerve or these surrounding vascular structures. This is submitted for evidence. There were some smaller fragments that were palpable within the elbow joint and one of these was removed. Another was not removable but was pushed out of the joint into some of the soft tissue, so it is less likely to become a problem into the joint. The fractures were not to be dealt with today but we simply washed out the wound which is considered an open fracture from a gunshot so we irrigated out the anterior surgical wound and the posterolateral traumatic wound and then these were closed. I assisted Dr. Dehqanzada in this portion and then splinted his arm into about 80 degrees of flexion. The patient maintained his pulse throughout. Once the wound was dressed in evaluation Dr. Dehqanzada shows me an entry wound that is just above the penis which is a gunshot wound that has injured and fractured his right superior pubic ramus. There are multiple fracture fragments to this, but no major bullet fragment in this location. As for orthopedic injuries that seems to be all of them that are known at this time. The patient is going to remain intubated and will be brought

| Sutter Roseville Medical Center | Name: COLE, BRENT | | |
|---|---|---|---|
| One Medical Plaza | MR#: 81-03-83 Acct#: 00048705305 | | Pt. Type: X |
| Roseville, CA 95661 | Admit Date: 06/14/2014 Discharge Date: | | |
| | Physician: Rafael Neiman, MD | | Page 1 of 2 |
| **Operative Report** | Room: TNIA-07 | | |

to the ICU where we will be able to get a better examination of him from a neurologic standpoint.

Electronically signed by Rafael Neiman, MD on 06/17/2014 at 11:58 AM

D:06/14/2014 21:12:59; T:06/15/2014 02:30:12; MT NTS; Conf # 2336215; Dict ID 5059169ES

cc: Billing Service (Trauma) RTMG, RV -

EXHIBIT 4
page 9 of 13

**Operative Report**

EXHIBIT 4
Page 10 of 13

Date of Procedure: 06/14/2014
Date of Birth: 08/12/1953

PREOPERATIVE DIAGNOSIS: Left arm gunshot wound with asymmetric brachial-brachial index and nonpalpable ulnar pulse or obtainable signal.

POSTOPERATIVE DIAGNOSIS: Left arm gunshot wound with asymmetric brachial-brachial index and nonpalpable ulnar pulse or obtainable signal.

PROCEDURES PERFORMED: Left arm exploration, venous injury ligation, and lateral wound washout.

SURGEON: Zia Dehqanzada, MD.

ASSISTANT: Dr. Pickard, Dr. Neiman

ANESTHESIA: General endotracheal anesthesia.

FLUIDS: 1 liter of crystalloid with 2 units of PRBC, 1 unit of FFP.

DESCRIPTION OF PROCEDURE: Following obtaining informed consent, the patient was taken to the Operating Room and placed on table in a supine position. The patient's left arm was then prepped and draped in an appropriate fashion. The patient already received Ancef and gentamicin for open fracture protocol. An incision was then made along the medial aspect of the arm between the biceps and triceps and extended over and crossed over the joint per routine fashion and dissection was carried down past the level of the fascia. The brachial artery was identified. This was followed down into the antecubital fossa where the radial artery was identified. During this process and injury to antecubital vein was noted. This was ligated per routine fashion. The radial artery was identified and dissected distal to the elbow. Appropriate pulse and Doppler signal was appreciated here. The ulnar vessels dove down and there was no evidence of injury at least proximally. Decision was made that given proper blood flow in the radial artery, no further need for exposure of the ulnar artery was present. Adequate hemostasis was assured. The lateral wound of the arm was then opened. A significant amount of muscle and subcutaneous injury in this level was noted. The radial nerve was noted to be severely contused but still intact. There was no evidence of humeral fracture. Traction along the trajectory of the projectile demonstrated the projectile at the level of the elbow. There was a known humerus fracture with the projectile at the level of the joint. Orthopedic surgeon, Dr. Neiman, was consulted intraoperatively who scrubbed in and extracted the projectile. This was submitted to forensics. Adequate hemostasis was assured. The wounds were then closed in

| | | |
|---|---|---|
| Sutter Roseville Medical Center | Name: COLE, BRENT | |
| One Medical Plaza | MR#: 81-03-83     Acct#: 00048705305 | Pt. Type: X |
| Roseville, CA 95661 | Admit Date: 06/14/2014     Discharge Date: | |
| | Physician: Zia A. Dehqanzada, MD | Page 1 of 2 |
| **Operative Report** | Room: TNIA-07 | |

layers and the skin was closed and dressed sterilely. The patient was then taken to the Trauma Neuro ICU and extubated in critical condition. Plan is to perform a CT angiogram of the left upper extremity to identify any further injury and delineate any bony injury for orthopedic purposes. All the instrument, sponge and needle counts were correct at the end of the case.

Electronically signed by Zia A Dehqanzada, MD on 06/15/2014 at 14:35 PM

D:06/14/2014 22:04:48; T:06/15/2014 04:12:31; MT NTS; Conf # 348411; Dict ID 5059201ES

cc: Billing Service (Trauma) RTMG, RV -
Billing Trauma Medical Group, RV -

EXHIBIT 4
Page 11 of 13

---



## SIGN IN
(before leaving preop/procedure area)

| VERIFY: | Yes | N/A |
|---|---|---|
| Correct patient – name & date of birth | ☐ | |
| Consent signed, in chart, matches scheduled procedure | ☐ | |
| Current/updated H&P in chart | ☑ | |
| Allergy status checked  Unk, | ☐ | |
| Pre-anesthesia assessment complete | ☑ | |
| NPO status checked | ☑ | |
| Laboratory/Imaging results in chart | ☑ | |
| Dentures/Partials removed & secured | ☐ | ☑ |
| Jewelry removed/taped | ☐ | ☑ |

Signature _____  Time __1800__

## TIME OUT
(immediately prior to incision)

| VERIFY: | Yes | N/A |
|---|---|---|
| TEAM INTRODUCTION (if necessary) | ☑ | ☐ |

| | Yes | N/A |
|---|---|---|
| **Correct patient (using 2 identifiers)** | ☑ | |
| **Correct site/side marked and visible** | ☐ | ☑ |
| **Correct procedure** | ☑ | |
| Accurate procedure on consent form | ☑ | |
| Correct patient position | ☑ | |
| Relevant images available | ☑ | ☐ |
| Appropriate core measure antibiotics ordered | ☑ | |
| DVT prophylaxis addressed | ☑ | |
| Beta Blocker administration addressed | | ☑ |

Signature _____  Time __1823__

EXHIBIT 4
Page 13 of 13

### MARKING THE PROCEDURE SITE:

| | Yes | N/A |
|---|---|---|
| Patient involved in site marking | ☐ | ☐ |
| Surgeon marked site with initials | ☐ | ☐ |
| Site marked matches ordered procedure | ☐ | ☐ |

Signature _____  Time _____

## BACK TABLE

| CONFIRM: | Yes | No | N/A |
|---|---|---|---|
| Medication Concentration and dosage correct | ☐ | | ☐ |
| Sterility indicators confirmed | ☐ | | |

Signature _____  Time __1853__

### ANTICIPATED:

| | Yes | No | N/A |
|---|---|---|---|
| EBL greater than 500ml | ☑ | ☐ | |
| Blood products available | ☑ | ☐ | ☐ |
| Cell-saver requested | ☑ | ☐ | ☑ |
| Difficult airway | ☑ | ☐ | |
| Position other than supine | ☑ | ☐ | |
| Special equip/implants available | ☑ | ☐ | ☐ |
| Films/PACS requested | ☑ | ☐ | |
| Manufacturer rep available | ☐ | ☐ | ☑ |
| Unusual steps in procedure | ☐ | ☑ | |
| ICU/TNI bed needed | ☑ | ☐ | ☐ |

Signature __Cf__  Time __1800__

## SIGN OUT
(before leaving OR)

| CONFIRM: | Yes | No | N/A |
|---|---|---|---|
| Correct surgical count | ☑ | ☐ | |
| Complete procedure done | ☑ | ☐ | |
| Confirm w/surgeon name, number, disposition of specimen(s)  to CAP | ☑ | ☐ | ☐ |
| Transition of care – additional tests, blood products, respiratory tx, labs, etc. | ☑ | ☐ | |
| Team review of what went well or needs improvement | ☑ | | |

Signature __Cf__  Time __2100__

Signature/title of person completing Final review: _____  Date: 6/14/14  Time 2115

Patient Identification

**Sutter Health**
Sutter Roseville
Medical Center

**Surgical/Procedural Checklist**

48705305
TRA. WALNUT4196            81-03-83

DOB: 1/01/1910  104YU   SRMC
T   ADT: 6/14/14

7429-0862  3/31/10)

EXHIBIT 5

<u>Testimony of Michael Radon</u>   Page 1 of 6

In the United States District Court Eastern District of California Reporter's Transcript of proceedings of an investigation conducted by the Grand Jury held in Room no. 5-200 Robert Matsui Courthouse, Sacramento, California September 4, 2014 12:51 p.m. Michael D. McCoy Assistant United States Attorney appeared to question Michael Radon, who was sworn and testified as follows: ".., Good afternoon, Mr. Radon, how old are you?" — A. "I'm 50," ...

Q. "How long have you been unemployed?" A. "Five years," ...

P. 4, line 4  Q. "... where are you currently living? Are you actually at a house? Are you living at a campsite? Where are you located?" A. "At a campsite." — Q. "Campsite. How long have you been living in campsites? — A. "Two years now." ...

Q. "And how often or how frequently are you moving from one campsite to the next? — A. "Every week"

Q. "Is that because you have to or because you want to? A. "Pretty much because I have to, and I want to."

Q. "And there's some time limit, I'm assuming, on how long you can stay at a particular place? — A. "Correct." ...

Q. Okay. And how is your current physical health? Do you have any medical problems or issues? Page 6, line 1: A. "Yes."

Q. "And what are those? A. "I take Valium for, like, bipolar schizophrenia and I have -- my back cracked there,"

Q. "A back injury?" A. "Yeah," ... Page 9, Line 4:

Q. "When you moved -- so the second place you were located at, when the ranger came back and said you got to get your stuff out of here, that's when you called Mr Cole, is that correct? — A. "Yeah"

<u>Testimony of Michael Radon  Page 2 of 6</u>

It should be noted that the Assistant U.S. Attorney Michael
D. McCoy is leading the witness, stating what he wishes
to establish to fit the prosecution's case knowing that
there will be no cross examination. Page 12, Line 1:
1 Q. "At some point did you start -- did you live with or
  stay with Mr. Cole at that camp site off North Bloomfield?"
A. "Only about a week before the shooting incident."  ... ln 9:
10 Q. "... did he help you move any of your other things to
  that campsite? — A. "Yeah. At that point, all's I had
  was a bag of laundry and my bedding and a few personal
  supplies and stuff."
ln. 15   Q. "Did you have a motorcycle or --" A. "I had a motorcycle"
17   Q.  "Just one or two?" A. "I had one"
19   Q.  "Did you have a gun?" A. "That was--"
21   Q.  "A shotgun there?" A. "I had a shotgun."
Page 13, Line 16  Q. "Okay. Why did you want to go to Yuba?"
17   A.  "Because its 30 miles away."
18   Q.  "Why is 30 miles significant?"
19.   A.  "That's where the forest ranger told us you can
  only camp here for 14 days, then you have to go 30
  miles for 14 days, and you can't come back to this
  same spot for 90 days."
Page 14 line 1  Q. "Okay. So your understanding was your time
  with Cole was going to have to be limited because of this
  -- it was within 30 miles of where you just left?"
5   A.  "Correct."
6   Q.  "Okay. Now, the night before the shooting incident took place

<u>Testimony of Michael Radon   Page 3 of 6</u>

-- and do you remember, what day did the shooting take place?

Ln. 9   A.   "June 14,"

10   Q. "Okay. The night before that took place, you had asked Cole if he could give you and your brother a lift somewhere, correct?"

13   A.   "Correct, yes."

14   Q.   "And where did you ask him to take you?"

15   A.   "To my aunt's,"  ...

21   Q.   "Okay. And did Cole say that he could give you a ride?"  Page 15, line 1,  A "Yes."

2   Q "And the following morning, did your brother Kevin show up for the ride?"  A.  "Yes."

5   Q.   "And he was comming from where?"  A, "His comp."

7   Q.   "Okay. And he walks to where you were located?"

9   A,   "Correct."

Page 16, line 13   Q. "And as you proceeded out of the campsite, did you notice any thing unusual?"

15   A.   "When we got down to the bottom of the hill, you know, there was a ranger there."

17   Q. "And what did you think when you saw the ranger?"

19   A.   "I thought I was going to jail because I thought I had a warrant,"  — Q. "Okay,"  A, "But I guess I didn't."

Page 17, line 16,   Q. "Okay, So Cole ends up driving past the ranger's vehicle?  A. "Correct" — Q." And what happens next?"

20   A.   "The ranger hits his lights and pulled us over,"

22   Q.   "And what happened when the ranger came up to -- did the ranger come up to the driver's side door?  A, "He did."

<u>Testimony of Michael Radon  Page 4 of 6</u>

Page 18, line 4  Q. " And did he engage in a conversation
with you guys?"  A. " He didn't conversate. He
asked for our IDs and then he looked at me and
said I thought I told you to get out of this area
a week ago."

9  Q. "He recognized you?  A. "Yes."
11  Q. "And did you recognize him?" A. "Yes."
13  Q. "And why? Why did you --"  A. "Because we're all
locals from that area. It's a small town."
16  Q. "And was he the -- you said that he had told you
to get out a week before?"  A. "Yeah."
19  Q. "So he's the one who asked -- who told you to
leave the last campsite, is that correct?"
21  A. "Correct."  ... Page 19 line 8: Q. "Okay. How long
was the -- and the ranger took the cards and went back to his
vehicle, is that correct?" A. "Took our cards and Kevin back
to the back of the vehicle."

17  Q. "And when he got back, what, if anything, did he tell
you guys?"  A. "He told us to get out of here and
that we're not allowed on the road because it's a closed
road."   Q. "And what was your -- did Mr. Cole respond
to that?"  A. "He did."  Q. "What did he say?"
4  A. "He said this isn't a closed road, there ain't no gate on it,
no sign."  Q. "And what did the ranger say?"
7  A. He did it kind of angry, too, he said I'm the--"
9  Q. I'm the what? I'm sorry?"  A. "He goes like this
up against the window. He goes I'm the -- (FUCKING

EXHIBIT 5

<u>Testimony of Michael Radon Page 5 of 6</u>

(LAW!) and don't let me see you back again or I'll have your vehicle towed."

13   Q. "And is that how it ended?" A. "Pretty much how it ended, Cole gave me a dirty look."

16   Q. "Cole gave you a dirty look?"

17   A. "Yeah, like I could tell how frustrated he was because he wouldn't let him speak to say, hey our stuff's up there."

20   Q. "You guys drove off then? The ranger allowed you to drive off?"   A. "Yeah."

Page 21, line 1, Q. "Now you have your stuff up there and you just testified that you --" A. "And some of his stuff was up there, too." Q. "And Mr. Cole's stuff, correct?"

5 A. "Um-hum" Q. "And you just testified that you recognized this same ranger as the one who told you to leave the last campsite, right?" A. "Um-hum."

10 Q. "Were you concerned about your stuff at that point?

12 A. "Yes I was concerned" — ... Page 22 line 4:

Q. "I understand. What did you say to Mr. Cole about that concern though?"

6 A. "Just that I hope he doesn't go up and trash through my stuff again; I'm tired of it. Every time it -- all my freshly clean laundry is all over the dirt. All my important paper work is all over the ground on the dirt.

11 Q. "And what did Mr. Cole say, if anything, in response to that?" A. "He was just like I know. He was frustrated

_Testimony Of Michael Radon   Page 6 of 6   EXHIBIT 5_

, too. We're all — — at that point, we're all pretty frustrated.   Page 22, line 16:

Q. "Did Mr. Cole say anything to you about going back to the campsite after he dropped you off?"

19   A. "Yeah. I told him not wise."

20   Q. "You told him it's not wise?"

21   A. "Well, not wise right now."

22   Q. "Why did you say that?"   Page 23, line 1:

1   A. "Because the ranger looked PO'd"

2   Q. "Okay. And did Mr. Cole say why he was going back to the campsite?"

4   A. "I've met that ranger before a few times. He didn't. He wanted to go find another officer to see if he could get an officer to go with him to try to talk to that ranger. He realized at that point that he can't; the ranger's not going to let him. That's what I don't understand."

10   Q. "And you're having this conversation during the trip between the campsite and your aunt's house?"

13   A. "Yeah."

18   Q. "So when you — — when he dropped you off at your aunt's house, your understanding was he was going to find another officer, you said? A. "Yeah."

Page 24 line 1: Q. "To go back to camp?"

A. "Yeah." "There's a community center they have out there and I just told him, you know, go out to the community center..."

CERTIFICATE OF SERVICE

Case Name: UNITED STATES OF AMERICA v. BRENT DOUGLAS COLE

9th Cir. Case No.: 15-10313

I certify that a copy of the following documents:

1.) "MOTION FOR STAY OF PROCEEDINGS PENDING APPEAL" 41 pgs.
   a) 13 District Court Orders (Appendices 1-13)           — 39 pages
   b) "Memorandum of Points and Authorities"          — 10 pages
   c) Motion To Dismiss Counsel And Reverse Judgment — 33 pages
   d) Oath 1 pg.   e) Transcript of Proceedings April 24, 2015 — 22 pages
2.) Copy of 28 USC, § 2255 MOTION and Memorandum was
   provided to the Ninth Circuit and US Attorney as evidence.

And listed attachments was served by placing in a sealed
envelope and depositing with the prison law library/mail
system with sufficient postage affixed or arrangements
made to deliver to the federal building across the street.
to the following entities at the address shown below:

1) Clerk, US Court of Appeals For the Ninth Circuit, Po Box
   193939, San Fransisco, CA 94119-3939  (7/27/2015)
2.) Benjamin B. Wagner, United States Attorney, Michael
   D. McCoy, Assistant U.S. Attorney, 501 "I" Street, Suite 10-100,
   Sacramento, CA 95814                    (7/27/2015)
3.) Clerk of the Court, United States District Court
   Eastern District of California, 501 "I" Street, Room 4-200,
   Sacramento, CA 95814                    (7/27/2015)

Date: 7/21/15                    Brent D. Cole
                                      signature