1   _Brent D. Cole_ (Name)

2   _X-635066_ (X-Ref. No)

3   Sacramento County Main Jail
    651 "I" Street,

4   Sacramento, CA 95814

5   In Pro Se

6



FILED

SEP 0 8 2015

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

8

9   UNITED STATES OF AMERICA,
                              Plaintiff,

10  V.

11

12

13  BRENT DOUGLAS COLE,
                              Defendant(s).

14

Case No. _2:14-CR-00269-GEB_

_ANSWER TO_
_CRIMINAL CHARGES:_
_COMPLAINT_

Date: _August 22, 2015_
Time:
Judge: _GEB_

15

16  Defendant hereby deposes and states that: He committed no crime.

17

18  Defendant's rights under the Constitution and laws of the United

19

20  States were violated, and defendant attempted lawfully to

21

22  protect rights as a statutory federal officer in state court,

23

24  Defendant was injured in his person and property for having

25

26  attempted to protect Second and Fourth Amendment rights,

27

28  and this vindictive prosecution was instituted by fraud.

ANSWER TO CRIMINAL CHARGES-U.S. v. COLE Page 1 of 31

# INDEX TO APPENDICES

1.

2. APPENDIX 1 - Oath of Brent D. Cole as statutory officer — 1 pg

3. APPENDIX 2 - Affidavit June 4, 2014 that was removed from file — 1 pg

4. APPENDIX 3 - Notification from Jody Schutz to J. Toney 10/8 — 1 pg

5. APPENDIX 4 - Memorandum Document removal from court file. — 1 pg

6. APPENDIX 5 - Grievance signed by Facility Comander 3/25/15 — 1 pg

7. APPENDIX 6 - Grievance 11/11/14 Concealed by Counsel - 2pgs. — 2 pgs.

8. APPENDIX 7 - Grievance 11/30/14 Denial of access to courts — 1 pg.

9. APPENDIX 8 - Grievance 2/23/15 Continued denial of access to courts — 1 pg

10. APPENDIX 9 - Letter to counsel J. Toney 10/4/2014 — 4 pages — 4 pgs

11. APPENDIX 10 - EMERGENCY MEDICAL REPORT DIAGRAM — 1 pg

12. APPENDIX 11 - Excerpt from South Yuba River Management Plan-8pgs. — 8 pgs

13. APPENDIX 12 - Sept. 3, 2014 Request to present to grand jury — 6 pgs

14. APPENDIX 13 - Excerpt of Interview - Brent Hardin 6/14/15 — 5 pgs

15. APPENDIX 14 - Testimony of Brent Hardin 2/3/15 District Court. — 21 pgs.

16. APPENDIX 15 - Exerpt of Interview - Tod Pultorek 6/18/14 — 7 pgs.

17. APPENDIX 16 - Excerpt of Testimony of Kyle Rutherford 10/2/14 — 9 pgs.

18. APPENDIX 17 - Excerpt of Testimony of Michael Radon 9/4/14. — 8 pgs.

19. APPENDIX 18 - Jan 14, 2015 "MOTION FOR CHANGE OF COUNSEL" — 9 pgs.

20. APPENDIX 19 - Transcript - Testimony of Andrew Forristel 10/2/14 — 21 pgs.

21. APPENDIX 20 - DMV Printout of defendant's CDL license — 1 pg

22. APPENDIX 21 - Blood Reciepts 2375 units June 14-15, 2014 — 8 pgs.

23. APPENDIX 22 - Trauma History and Physical - Diagnostic Imaging Report — 22 pgs

24. APPENDIX 23 - Sheduled Medications June 16, 2014 - 13 pages — 13 pgs

25. APPENDIX 24 - Beresford Investigations "Stolen" Kawasaki Report — 5 pgs.

26. APPENDIX 25 - Excerpt from Supplemental Report #4 No search of trucks. — 3 pgs

27. APPENDIX 26 - Copy of "Patton Assassinated for Criticism" link — 1 pg

ANSWER TO CRIMINAL CHARGES - U.S v. COLE - Page i (of 31)

I

1  Defendant asserts that there is an entire absense of any

2
3  complaint having been made before any magistrate or

4
5  officer charging an offense against him for which

6  BLM ranger Pultorak had any lawful justification to

7
8  arrest the defendant. There exists no evidence and no

9  accusations have been made that defendant committed
10
11  any violation or crime for which he could have been

12
13  lawfully arrested on June 14, 2014 at the time the

14  BLM ranger decided to "arrest" the defendant. It is

15
16  admitted that ranger Pultorak did not witness the

17  defendant commit any crime, that he had no warrant
18
19  to arrest him, and that he made no attempt to inform

20
21  the defendant that he was placing him under arrest.

22  FBI agent Andrew Forristel testified to the grand jury:
23  Page 12, lines 17-20, October 2, 2014, 10:31 AM., Sacramento, CA:
     "A. ...[T]he BLM ranger asked Mr. Cole if he was armed.
24  Mr. Cole said he was. In response to that, both of the
25  law enforcement officers drew their weapons."
26
27  The defendant had made no threats or provocations toward them.

28  ANSWER TO CRIMINAL CHARGES - US v. COLE - Page 2 of 31

It is claimed that on or about June 14, 2014, defendant: "did forcibly assault and inflict bodily injury upon a Bureau of Land Management (BLM) ranger, a person designated in Title 18, United States Code, section 1114, by means and use of a deadly and dangerous weapon, ..., while that person was engaged in, and on account of, the performance of his official duties, in violation of Title 18, United States Code, Sections 111(a)(1) and (b)."

A separate count was added claiming a separate assault upon a "Person Assisting a Federal Officer with a Deadly Weapon Which Inflicts Bodily Injury": defendant ... "did forcibly assault and inflict bodily injury upon a California Highway Patrol Officer, a person designated in title 18, United States Code, Section 1114, ... while that person was assisting a Federal Officer in the performance of the Federal Officer's official duties, and on account of that assistance, ..."

A third count was added claiming violation of 18 U.S.C. §924(c)(1)(A) and 924(c)(1)(A)(iii), that defendant: "did knowingly discharge, carry, and use a firearm, ..., during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, that is, assault on a federal officer with a deadly weapon which inflicts bodily injury, in violation of Title 18, United States Code, §§ 111(a)(1) and (b)..." "FORFEITURE ALLEGATION ... 1. Upon conviction of the offense alleged in Count Three of this Indictment, defendant ... shall forfeit ..."

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 3 of 31

COMPLAINT

The accused is the victim of a conspiracy against rights and the deprivation of rights under color of law. He was and has been incarcerated without a valid warrant or commitment in violation of the Second, Fourth, Fifth, Sixth, and Eighth Amendments to the Constitution. It is alleged that a Federal officer placed him under arrest without a warrant on June 14, 2014; and that incarcerating him in "Maximum A" secure confinement without a valid commitment or warrant until October 7, 2014 constitutes no violation. On Oct. 7, 2014 court appointed counsel was forced upon him, which has proven to be ineffective counsel; who is a principal in the conspiracy against rights; who did willfully deprive defendant of his constitutionally guaranteed rights in furtherance of the conspiracy to deprive the People of the United States of their inherent right to keep and bear arms; all of which constitutes violations of 18 U.S.C. §§ 2, 3, 4, 241 and 242.

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 4 of 31

## II - INEFFECTIVE COUNSEL

"To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case Counsel is not an assistant, but a master, and the right to make a defense is stripped of the personal character upon which the amendment insists." Faretta v. California, 422 US 806, 820, 95 SCt 2525, 45 LEd 2d 562, — "The common law rule ...has evidently always been that "no person charged with a criminal offense can have counsel forced upon him against his will." Id., at 825-826,

Counsel failed/refused to investigate or perform legal research and did not subject the prosecutions case to meaningful adversar-

## III - COUNT 3 MUST BE DISMISSED

ial testing. Count 3 alleges a violation of §924(c)(1)(A) which is a sentence enhancement that requires prior felony convictions to be applicable. Defendant has no prior convictions. "§924(c)(1)(A) Except ..., any person who, during and in relation to any crime of violence ... for which the person may be prosecuted in a court of the United States, uses or carries a Firearm ... "

§924 is applicable only to career criminals and applies only to "any person who, ... for which the person may be prosecuted... uses or carries a Fire arm...," See United States v Ricks, 817 F. 2d 692; 1987 U.S. App. LEXIS 6487 (11th Cir) and 18 USC § 924. See United States v. Lowe, 860 F. 2d 1370, 1988 US APP. LEXUS 14462 (7th) and the legislative history of the Armed Career Criminal Act of 1984. "H. R. 1627 would make it a federal offense for a defendant to commit any robbery or burglary with a firearm if such defendant had been convicted two or more times previously of a robbery or burglary under either Federal or State laws." 1984 U.S. Code Cong. & Admin. News p. 3182 at 3664.

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 5 of 31

## IV - COUNT 2 MUST BE DISMISSED

" [Under 18 USC § 111] an act of assault can only be one of-
fense even though it has an impact on two officers. More-
over, an interpretation that there are as many assaults
committed as there are officers affected would produce
incongruous results." Ladner v. United States, 358
U.S. 169, 177, 3 L Ed 2d 199, 79 S Ct 209 (1958).

The Supreme Court held that if the court is unable to define

the ambit of the criminal statute, the Rule of Lenity

requires that the court strictly construe the statute

in favor of the defendant. Count 2 must be dismissed.
"Punishments totally disproportionate to the act of
assault could be imposed because it will often
be the case that the number of officers affected
will have little bearing upon the seriousness of the
criminal act. For an assault is ordinarily held to be
committed merely by putting another in appre-
hension of harm whether or not the actor actually
intends to inflict or is capable of inflicting that harm."
Id., at 177.

## V - FACTUAL INNOCENCE

FBI Agent Andrew Forristel testified before the grand jury,
October 2, 2014, 10:51 AM - 11:17 AM in Sacramento, CA.
Page 12, lines 17-20: "... the BLM ranger asked Mr.
Cole if he was armed. Mr. Cole said he was. In res-
ponse to that, both of the law enforcement officers
drew their weapons." See APPENDIX 19 attached.

"A person cannot assault another in self-defense and any act
done in self defense can not be assault. People v. Lynch
(1894) 101 Cal 229, 35 P. 860.

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 6 of 31

# VI - IMPROPER JURY INSTRUCTION

"A defendant who testifies that he acted from fear of a clan united against him is entitled to corroborate that testimony with evidence tending in reason to prove that fear was reasonable." Cal. Evid. Code § 210.

The jury was not properly instructed on the criteria for determining reasonable doubt, their duties and rights as jurors, or given proper instructions on self-defense nor the factors of excessive force or requirement that officers be acting lawfully. Defendant had been promised by counsel that he would have input into jury instructions, but counsel did not confer with defendant sufficiently.

"It is not necessary for the defendant to establish self-defense by evidence sufficient to satisfy the jury that it is true, but if there is reasonable doubt as to whether the defendant was justified, then he is entitled to an acquittal. People v. Mohammed (1922) 189 Cal 429, 208 P. 963, 122 LEXIS 346. — "Any necessary force may be used to protect from wrongful injury the person... of oneself." Cal. Pen. Code § 692. "A constitutionally deficient reasonable-doubt instruction will always result in the absense of "beyond a reasonable doubt" jury findings. That being the case, I agree that harmless-error analysis cannot be applied in the case of a defective reasonable-doubt instruction consistant with the Sixth Amendment's jury-trial guarantee. Sullivan v. Louisiana, 508 US 275, 285, 124 LEd2d 182, 113 SCt 2078 (1993).

ANSWER TO CRIMINAL CHARGES - US v. COLE - Page 7 of 31

## VII - RIGHT TO RESIST UNLAWFUL AGGRESSION

"[S]ome minimal right of self-defense must be available to (even) inmates charged under 18 U.S.C. §111 because disabling an inmate entirely from protecting himself from wanton, unlawful aggression threatening death or serious bodily injury would violate the Eighth Amendment's prohibition of cruel and unusual punishments." United States v. Gore, 592 F.3d 489, 492, 493, 2010 U.S. App. LEXIS 712 (4th Cir. 8-446)

"[O]ne who gains possession of property by taking it from another steals." U.S. v. Suarez, 363 F.3d 468 (6th Cir 2001)

"One has an undoubted right to resist an unlawful arrest, and courts will uphold the right of resistance in proper cases." UNITED STATES v. Di Re, 332 US 581, 594, 68 S Ct 222, 92 L Ed 210.

"The right to resist an unlawful arrest was well established at common law. "If the officer have no right to arrest, the other party might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest." John Bad Elk v. United States, 177 US 529, 535, 44 L Ed 874, 20 S Ct 729 (1900)

"[I]t is unconsionable to convict a man for resisting an injustice. ... The freedom to refuse to obey a patently unlawful arrest is essential to the integrity of a government which purports to be of laws and not of men. Unless it is desirable to kill the impulse to resist arbitrary authority, the rule that such an arrest is a provocation to resist must remain fundamental." Chevigny, The Right to Resist an Unlawful Arrest, 78 Yale LJ, 1128, 1137-38, 1147 (1969); United States v. Moore, 483 F.2d 1361 (1973) (9th Cir.) 1973 U.S. App. LEXIS 8124;

Within 12 seconds of drawing guns officers fired 17 times, hitting defendant 5 times and inflicting serious bodily injury. ANSWER TO CRIMINAL CHARGES - U.S. v COLE Page 8 of 31

## VIII - FALSE STATEMENTS - CONFLICTING TESTIMONY

Paramedic Kyle Rutherford testified before the grand jury:
"He's got a bullet wound under -- below his belly button.
And it looked to me like an exit wound out his inner thigh."
Page 11, lines 12-14.  See APPENDIX 16, page 4, lines 12-16.

Government Exhibit 3N shows a bullet strike in the roadway
where defendant was shot. All other wounds were horizontal.
  APPENDIX 15, page 6, lines 320-326:
Ranger Pultorak claimed in his interview and at trial:
"I said, do you have any weapons on you? He said "Yes,"
I said, "Turn around." "No I'm not gonna turn around." I
took a step forward I said, "Turn around now," He
yelled very loudly, "I'm not going to turn around now,"
And then I saw his right hand go to his waist band,
Drew out something silver, Continue drawing it
out. And I see a gun being raised toward me. At
that point I duck, starting to draw my weapon. I
hear a loud boom in my left ear. And my left
shoulder I feel a twinge. Um, I raise my weapon up.
  APPENDIX 13, pages 4-5, lines 268-285:
In his interview Officer Hardin, June 18, 2014 stated:
Page 6, line 269 - " "Are you armed?" and the guy says,
"Yes, I am," and I immediately drew my weapon, and I
saw the ra- the BLM Ranger draw his and we ordered,
and we said, "Put the gun down..." ... lemme back up
just a little bit - (Page 7, line 274) when, uh, we asked
if he was armed we both - we both drew, I saw
the Ranger drew his weapon, and the Ranger started
back towards the trail a little bit, " ...(line 282)
"... and as soon as he pointed it out, I heard shots
going and I believe he fired first, the suspect I
can't - I can't be - but as soon as he pointed it out
and was dead on target shots started fr- flyin' ...",
ANSWER TO CRIMINAL CHARGES - U.S. v. COLE Page 9 of 31

These testimonies are inconsistent to the degree that one of them is necessarily false, and for a violation of 18 U.S.C. § 1623 there is no need to specify which declaration is false if — "(1) each declaration was material to the point in question, and (2) each declaration was made within the period of the statute of limitations for the offense charged under this section."

(APPENDIX 14, page 8, lines 10-18, page 9, lines 16-18, Pg 10, lns 3-4, 12)

Officer Hardin changed his testimony from what he stated in his interview at trial, and made statements establishing a violation of §1623: Trial Transcript, page 35, line 11: "...He put his jacket back and I saw the gun. So I drew mine at him." lines 17-18 "Q. So on his hip? A. Yes" — At line 21: "A. Yes. It was in a holster." — At page 36, lines 14-18 "Q. ... were you able to see what Ranger Pultorak was doing?" "A. He was backing out of there." — At page 37, lines 3-4: "Q. ..., what did he point at Ranger Pultorak?" "A. A gun that he retrieved from his holster." — Line 12: "A. And Ranger Pultorak was backing up. ..." On page 74, lines 4-5: "Q. You don't know who fired the first shot, do you?" "A. No, I don't." — At page 75 lines 3-7: "Q. Now, was Mr. Cole standing, as far as you could tell, during the entire gun fire exchange?" "A. Standing up? Q. Yeah. A. Yeah." — Page 77, line 9: "Q. ... when was it that you heard the first shot?" "A. Once Mr. Cole had grabbed his gun and extended it out the first shot went off." See appendix 14,

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 10 of 31

On page 74 at lines 4-5 Mr. Hardin states that he does not know who fired first. Then after a 15 minute break, on page 77 at lines 9-11 Mr. Hardin claims to know that the defendant fired the first shot. A violation of §1623. It is note worthy that the testimony of Mr. Paltorak is completely irreconcilable with Mr. Hardin's testimony. Mr. Paltorak also testified that there have never been any other problems with anyone except the defendant, that his demeanor at the "traffic-stop" that morning was calm and rational, that it is BLM policy to require the public to inquire if a road on BLM land is open before using it, and not to post signs, and that defendant drew and shot him before he drew his gun. It is also note worthy that Mr. Hardin claims to have been ordering defendant to "drop the gun" while defendant's gun was still in its holster and he claims to have drawn his gun and pointed it at the defendant.

ANSWER TO CRIMINAL CHARGES - U.S. v COLE - Page 11 of 31

The testimony of Mr. Pultorak contradicts the testimony of Mr. Hardin and the physical evidence. The vertical wound on defendant described by paramedic Rutherford, and the surgeons report, could only have been inflicted at point blank range before Pultorak backed away from the defendant. The bullet strike in the roadway where defendant was standing can only be explained by Pultorak firing the first shot and inflicting the vertical wound on the defendant.

APPENDIX 17: Page 4 (20) lines 6-13, page 6 (22), lines 4-10: The testimony of Michael Redon before the grand jury makes it clear that the prosecution knew that Pultorak lied to the jury about his demeanor at the traffic stop: —And that there had never been any problems with anyone else. —He did not correct that testimony: Deliberate deception of the jury, Counsel J. Toney also knew, but made no effort to correct the false testimony or make known the truth.

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 12of31

IX - VIOLATION OF DUE PROCESS

The prosecution contends in the RESPONSE to the motion

for transcript (ECF 115), page 5, lines 15-24, that this

prosecution was instituted by the State of California, and

that defendant failed to raise the issues before trial,

asserting that the September 25, 2014 charging by hearsay

complaint in the district court was timely. Rule 5:

" (a) In General. (1) Appearance Upon an Arrest.

(1) A person making an arrest within the United States must take

the defendant without unnecessary delay before a magistrate

judge, or before a state or local judicial officer as Rule 5(c)

provides, unless a statute provides otherwise."

(b) Arrest Without a Warrant. If a defendant is arrested

without a warrant, a complaint meeting Rule 4(a)'s require-

ment of probable cause must be promptly filed in the

district where the offense was allegedly committed."

Federal Officer Tad Pultorak "arrested" defendant without a warrant

or probable cause. — Due process has been violated by failing

to comply with the requirements of F.R.Cr.P. Rules 3-5.

There were no witnesses who's testimony established probable

cause; and Andrew Forristel's hearsay complaint did not

specify the source of his information. See Brown v. Duggan,

(1971, WD Pa) 329 F. Supp. 207; United States v. Freeman (1966, CA2

NY) 358 F.2d 459, cert den (1966) 385 US 882, 17 LEd 2d 109.

ANSWER TO CRIMINAL CHARGES - U.S.v. Cole - Page 13 of 31

"Magistrate should not accept complaint as instituting criminal prosecution until by examination under oath of at least one witness he finds probable cause for believing existance of one or more underlying facts from which in their context ultimate inference might reasonably be made where complaint alleges as fact defendant's state of mind constituted mens rea, United States v. Dolan (1953, DC Conn) 113 F Supp 757, 54-1 USTC ¶9108, 44 AFTR 376, — Magistrate must judge for himself persuasiveness of facts relied upon..." Giordenello v. United States (1958) 357 US 480, 2 L Ed 2d 1503, 78 S Ct 1245. "Failure of complaint to recite that affient had personal knowledge of facts and failure to present essential facts for commissioner [magistrate] to make determination as to probable cause rather than affient voids warrent of arrest." United States v. Freeman (1958 SD Ind) 165 F Supp. 121, 58-2 USTC ¶9939, 3 AFTR 2d 826.

The complaint written by Andrew Forristel did not meet these requirements as he is not a witness and did not specify his sources. The prosecution abused process by failing to abide by Rules 3-5 and using the grand jury to circum-vent the requirement of showing probable cause for the arrest. The grand jury was disuaded from investigating by prosecutorial misconduct and indictment was obtained by using soley hearsay when better evidence was available.

# LAW RELEVANT TO THE GRAND JURY

U.S.C.S. Indictment, Information, and Complaint § 8 - necessity of indictment - purpose. "9. The purpose of the requirement of the Fifth Amendment that a man be indicted by a grand jury is to limit his jeopardy to offenses charged by a group of his fellow citizens acting <* pg. 254> independently of either prosecuting attorney or judge; this purpose is defeated by a device or method which subjects the defendant to prosecution for an act which the grand jury did not charge."

"The right to have the grand jury make the charge on its own judgment is a substantial right which cannot be taken away with or without a court amendment.". ..."This was fatal error. CF Cole v. Arkansas, 333 U.S. 196, 92 L Ed 644, 68 S Ct. 514; De Jonge v. Oregon, 299 U.S. 353, 81 L Ed 278, 57 S. Ct. 255." Russel v. United States, 369 US 749, 787, 8 L Ed 2d 240, 82 S Ct 1038. See Indictment and Information Federal Procedure Lawyer's Edition, Sept 2013, Ch. 22, Criminal Procedure IX, Indictment and Information, A. Overview, 1 In General § 22.731 ——— "§ 22.728 The grand jury serves the dual function of determining if there is probable cause to believe that a crime has been committed and of protecting citizens against unfounded criminal prosecutions. United States v. Sells Engineering Inc. 463 US 418, 103 S Ct 3133, 77 Ed 2d 743 (1983). "Objection to multiplicitous indictment is only waived by defendant being convicted on only one count." Chee v. United States, 449 F2d 747 (9th Cir 1971). "To be sufficient an indictment must 1) state all the elements of the crime charged, 2.) adequately appraise the defendant of the nature of the charges so that he may prepare a defense. United States v. Kay 359 F. 3d 738 (5th Cir. 2004), and 3.) allow the defendant to plead the judgment as a bar to any future prosecutions." Russel id.

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 15 of 31

"Neither the verdict or evidence supporting the verdict can be used as a basis for dispensing with the rule that the indictment must state all the central ingredients of the crime." United States v. Debrow, 346 U.S. 374, 74 S Ct 113, 98 L Ed 92 (1953).

"An indictment based solely on the hearsay testimony of a prosecutor is prohibited by the Fifth Amendment." United States v. Hodge, 496 F 2d 87 (5th Cir 1974)

"Dismissal is appropriate where a witness's perjured testimony is material to indictment. United States v. Spillone, 879 F 2d 947, 28 Fed R. Evid Serv. 318

"The omission of the element of a crime from the indictment is not waived." United States v. Purvis, 580 F 2d 853 (5th Cir 1978); United States v. Hathaway, 318 F 3d 1001 (10th Cir 2003)

"Historically, this body (the grand jury) has been regarded as a primary security to the innocent against hasty, malicious and oppressive persecution; it serves the invaluable function in our society of standing between the accuser and the accused, whether the latter be an individual, minority group, or other, to determine whether a charge is founded upon reason or was dictated by an intimidating power or by malice and personal ill will. Particularly in matters of local political corruption and investigations is it important that freedom of communication be kept open and that the real issues not become obscured to the grand jury. It cannot effectively operate in a vacuum. It has been said that the "ancestors of our 'grand jurors' are from the first neither exactly accusors, nor exactly witnesses; they are to give voice to the common repute." 2 Pollock and Maitland, History of the English Law (2d ed 1909), 642." Wood v. Georgia, 370 U S 375, 390, 8 L Ed 2d 569, 82 S Ct 1364.

ANSWER TO CRIMINAL CHARGE - U.S. v COLE - Page 16 of 31

"Because of the strict protection of the secrecy of grand jury proceedings <*pg. 244> instances of prosecutorial misconduct rarely come to light. This is especially true in the pretrial setting, because defendant's chief source of information about grand jury proceedings is governmental disclosures under the Jencks Act, 18 USC. § 3500 [USCS], which do not occur until trial is underway. The fact that a prosecutor knows that a Rule 6 violation is unlikely to be discovered gives the rule little enough bite. To afford the occasional revelation of prosecutorial misconduct the additional insulation of harmless-error analysis leaves Rule 6 toothless. ... Rule 6 violations can be deterred and redressed effectively only by a per se rule of dismissal. Bank of Nova Scotia v. United States, 487 US 250, 264, 265, 101 LEd 228, 108 S Ct 2369.

"Before the grand jury the prosecutor has a dual role of pressing for an indictment and of being the grand jury adviser. In case of conflict, the latter duty must take precedence." United States v. Remington, 208 F. 2d 567, 573-74 (2d Cir 1953).

"[W]hen a prosecutor conducting a grand jury inquiry is personally aware of substantial evidence which directly negates the guilt of a subject of the investigation, the prosecutor must present or otherwise disclose such evidence to the grand jury before seeking an indictment against such a person." U.S. Dept. of Justice, United States Attorney's Manual, ¶ 9-11.2 33, p 88 (1988).

"A grand jury investigation 'is not fully carried out until every available clue has been run down and all witnesses examined in every proper way to find out if a crime has been committed.'" United States v. Calandra, 414 US 338, 344, 38 LEd 2d 561, 94 SCt 613.

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 17 OF 31

## X - CRIMINAL INTENT

18 U.S.C. §111 does require criminal intent, which was neither alleged or shown, See United States v. Feola, 420 U.S. 671, 686, 43 L Ed 2d 541, 95 S Ct 1255 (1974). The act is not culpable unless the mind is guilty: "actus non facit reum nisi mens sit rea". The evidence shows the accused had none. "What would be murder if the officer had the right to arrest might be reduced to manslaughter by the very fact that he had no such right. So an officer, at common law, was not authorized to make an arrest without a warrant, for a mere misdemeanor not committed in his presence. 1 Arch. Crim. Pr. & Pl. 7th Am. ed. 103, note (1); also page 861 and the following pages; 2 Hawk. P.C. 129, §8; 3 Russel on Crimes, 6th ed. 83, 84, 97; 1 Chitty's Crim. L. *15; 1 East, P.C. chap. 5, p 238; ... John Bad Elk v. United States, 177 US 529, 534-35, 44 L ED 874. "If the officer had no right to arrest, the other party might resist the illegal attempt to arrest him, using no more force than was absolutely necessary to repel the assault constituting the attempt to arrest." Id.

BLM ranger Pultorak had stopped the defendant earlier that day and run a complete check on him. He was informed at that time that the defendant was armed, that he had no record, no history of violence, no outstanding warrants, and was over 60. Pultorak committed fraud to seize property and was stealing it.

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 18 of 31

"[T]he charge presented the plaintiff in error to the jury as one having no right to make any resistance to an arrest by these officers, although he had been guilty of no offense, and it gave the jury to understand that the officers, in making the attempt, had the right to use all necessary force to overcome any and all opposition that might be made to the arrest, even to the extent of killing the individual whom they desired to take into their custody. Instead of saying that the plaintiff in error had the right to use such force as was absolutely necessary to resist an attempted illegal arrest, the jury were informed that the policemen had the right to use all necessary force to arrest him, and that he had no right to resist. ... [W]here the officer is killed in the course of the disorder which naturally accompanies an attempted arrest that is resisted, the law looks with very different eyes upon the transaction, <* pg. 8787 when the officer had the right to make the arrest, from what it does if the officer had no such right. What might be murder in the first case might be nothing more than manslaughter in the other, or the facts might show that no offense had been committed. The plaintiff in error was undoubtedly prejudiced by this error in the charge, and the judgment of the court below must therefore be reversed, ... " Bad Elk at 537.

Consel J. Toney concealed investigator Beresford's information including: "Michael described PULTORAK as "agitated" and stated that it appeared PULTORAK had "a vendetta out for Brent Cole." I clarified whether it appeared PULTORAK wanted to arrest, injure or hurt COLE for no apparent reason and Michael replied "Correct." ... Michael added that PULTORAK spoke to COLE as though he wanted to "Kick his ass." Page 4 of interview. See appendix C of "MOTION IN ARREST OF JUDGMENT", ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 19 of 31

The case of John Bad Elk v. United States is similar.

BLM ranger Pultorak was intent on provoking and had

a strong desire to injure or kill the accused. He used the

fact that the accused was armed as an excuse to draw

his weapon and inflict serious bodily injury. The

accused is of the belief that his intent was to injure or

kill him for having performed his duties as a statutory

federal officer. See APPENDIX 1 - Oath; APPENDIX 2 -

Affidavit June 4, 2014; APPENDIX 3 - Notification;

APPENDIX 4 - Memorandum Showing removal of court records;

APPENDICES 5-8 - Grievances showing violations of rights

That this prosecution is vindictive is evenced by (1) Target-

ing the accused for exercising Second Amendment rights (2) the

removal of court documents with unlawful siezure and

illegal retention of defendants conform copies and

related evidence (3) unreasonableness of the prosecu-

tor's conduct in this case and (4) intent to punish defend-

ant for the exercise of and attempt to defend the right.

ANSWER TO CRIMINAL CHARGE - U.S. v. COLE - Page 20 of 31

APPENDIX 4 - Aug. 14, 2014 Memorandum documents removal of defendant's ANSWER from the California Superior court file. Said "ANSWER WITH BILL OF EXCEPTIONS And Affidivit In Support" is the second appendix of "MOTION IN ARREST OF JUDGMENT". Appendix 2 of this ANSWER is the affidavit attached thereto. Appendix 6 was given to counsel to make copies. Counsel concealed it until April 28, 2015. Appendix 9 is a letter to counsel detailing my issues a bit. Appendix 11 is excepts from S. Yuba River Management plan which state general policy of land use of involved agencies. SGMJ, returned BLM Rel. No 9-390 to the sender, so I was unable to present it as evidence of BLM policy. The court imposed counsel, which was ineffective counsel, against the expressed considered wishes of defendant to manage and plead his own cause personally. Defendant affirms the "MOTION TO DISMISS COUNSEL AND REVERSE JUDGMENT" (ECF 74) filed 4/14/15, which judge Burrell disregarded due to counsel having been imposed.

ANSWER TO CRIMINAL CHARGES - U.S.v. COLE - Page 21 of 31

1    Counsel J. Toney failed and/or refused to file any inline

2    motions in defendant's behalf. Appendix 9, page 3, Dec. 4, 2014

3    defendant admonished counsel for his failure to file for

4    an evidenciary hearing and his right to a preliminary hearing

5    being abrogated. Complaint was made for his failures to

6    file for medical treatment, due process hearing, and failure

7    to provide any discovery or provide Sixth Amendment rights.

8    He was further admonished to obtain grand jury transcripts,

9    do legal research and file motions and pleadings submitted.

10   Counsel failed to subject the prosecution's case to meaning-

11   ful adversarial testing and failed to act as a diligent advo-

12   cate, which warrants presumption of ineffectiveness. Bell v.

13   Cone, 535 US 685, 122 S Ct 1843, 1850, 152 L Ed 2d 914, 927 (2002).

14   Appendix 10 is defendant's EMR showing 5 wounds, as 2

15   are through the left arm. Appendix 11 is evidence of the

16   policy to post public notices, and of the fraud used.

17   Appendix 12 is my request to present testimony and evidence

18   to the grand jury, which the court concealed from them.

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 22 of 31

The accused denies that he has been given ample opportunity to speak on his own behalf. A fair oppotunity to defend demands that a man standing in judgment for what he has allegedly done wrong without provocation must certainly have ample opportunity to speak on his own behalf. California Consti:

"§1. Inalienable rights — All people are by nature free and independant and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness and privacy.

§7. Due process; Equal protection; Privileges and Immunities
 (a) A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of laws; ..."

"That right to be secure in their property (and person) is preserved sacred and incommunicable in all instances where it has not been taken away or abridged by some public law for the good of the whole. Every invasion of private property, be it ever so minute, is a tresspass. If a man admits to invading private property, he is bound to show by way of justification that some positive law has has justified or excused him. ... If no such excuse can be found or produced, the silence of the books are an authority against him and the plaintiff must have judgment. These principles affect the very essence of constitutional liberty and security and apply to all invasions on the part of Government and its employees." Boyd v. United States (1886) 116 US 616, 627, 635, 29 LED 746.

ANSWER TO CRIMINAL CHARGES - U.S. v COLE - Page 23 of 31

## RELEVANT FACTS

On January 26, 2014 the lead investigator in this case, Rusty Greene, and Josh Stanis violated defendant's Second and Fourth Amendment rights and instituted a "criminal" prosecution under 'Bills of Attainder' which criminalize the exercise of Second Amendment rights. On June 5, 2014 the accused filed a formal written "ANSWER" in case number M14-0388, which was ordered to be part of the court file and District Attorney Jessie Wilson was ordered to respond by June 25. The filing was removed from the court file, no response made.

June 14, 2014, Rusty Greene's friend, BLM Ranger Pultorak, stopped the accused and committed fraud under 18 USC § 1001 by falsely claiming that 'Come Along Road' was closed to vehicular traffic and the BLM policy is to require the public to inquire, before using a road, as to if it is closed. It is in fact BLM policy to post signs. See BLM Manual Rel. No 9-390, 12/21/11. Appendix 1 is the Oath and Appendix 2 affidavit of standing of the accused. Appendix 3 documents notice and information given to counsel J. Toney by Jody Schatz, which counsel concealed.

The court should interdict the Indictment for numerous flaws.

§924 does not apply to defendant as it requires prior felony convictions, and defendant has none. See supra page 5, (Ricks, Lowe)

Only one assault can be charged, Ladner. See supra page 6.

Count 1 should be dismissed for factual innocence as it was admitted before the grand jury officers had no warrant and drew their weapons upon defendant without provocation. Lynch.

The defendant had a right to resist the unlawful arrest.

See supra page 8, Gore, Suarez, DiRe, John Bad Elk, Moore.

Within 12 seconds of drawing their guns officers fired 17 times.

False statements and conflicting testimony were concealed from the grand jury by using only hearsay testimony that was given by the prosecutor who wrote the complaint.

The grand jury was used improperly to circumvent due process and F.R.Crim.P. Rules 3-5. Prosecutorial Misconduct was used to disuade the grand jury from investigating and material evidence withheld from them to deceive.

ANSWER TO CRIMINAL CHARGES - US. v. COLE - Page 25 of 31

The complaint contains no affirmative allegation that the affient spoke with personal knowledge of the matters contained therein; it does not indicate any sources for the complainant's belief; and it does not set forth any other sufficient basis upon which a finding of probable cause could be made.

"Here, in the absense of an indictment, the issue of probable cause had to be determined by the Commissioner, and an adequate basis for such finding had to appear on the face of the complaint." Giordenello v. United States, 357 US 480, 487, 2 L Ed 2d 1503, 78 SCt 1245

Due process was circumvented by using only the prosecuter's hearsay in place of witness testimony and altering the historic function of the grand jury.  10/2/14, pg 21, line 15: "GRAND JUROR: But it would be revellent -- relevant in the fact that when they pulled arms he felt threatened and that's why he pulled his."

"MR. McCOY: Yeah. Let me make this clear first of all. Your role is to determine whether or not there's probable cause to believe these crimes have occurred."

"Grand Jurror: I understand." See APPENDIX 19.

"An indictment based soley on the hearsay testimony of a prosecutor is prohibited by the Fifth Amendment." United States v. Hodge, 496 F2d 87 (5th cir 1974) See supra pages 15-17.

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE  Page 26 of 31

## CONCLUSION

1. The trial was rendered fundamentally unfair before it began by

3. the deprivation of rights, violations of due process, suppres-

5. sion and concealment of material exculpatory evidence, and

7. denial of access to legal materials or meaningful access to the

9. courts. The court failed to perform its sua sponte duty to

11. determine the legality of the arrest, Imposed counsel

13. failed and/or refused to challenge prosecution's assertions

15. that officers were lawfully engaged in performance of

17. duties when in fact they were stealing defendant's

19. property and searching private property without a

21. warrant. Ranger Pultorak then attempted to un-

23. lawfully arrest the accused, did not inform him of his

25. intent to arrest him or the charges, then assaulted

27. him with a deadly weapon and inflicted serious injury.

1. The accused was acting in the capacity of a statutory federal officer. His

3  oath, appendix 1, was filed in Superior Court Feb. 19, 2014 in "Cross-

5  Complaint: An Information In The Nature Of Quo Warranto" in case no.

7  M14-000388 Superior Court of California. County of Nevada requesting

9  that Rusty Greene be required to produce a copy of his Oath. His

11  affidavit, appendix 2, was removed from the court file with

13  his "ANSWER...", His conform copy and opening brief in the

15  Ninth Circuit Court case no. 07-35630 were seized by

17  Rusty Greene and N.C. S.O. without a warrant, and have

19  been unlawfully retained and the accused's court papers

21  documents and other evidence concealed and supp-

23  ressed. Said brief details the attempt of APD officer Sturkie

25  to murder the accused for having performed his duty

27  as a statutory federal officer, is material evidence here.

1  Judge Burrell has demonstrated his bias by knowingly failing

3  to protect defendants rights to be free from cruel and unusual

5  punishments, to medically necessary treatments, to meaningful

7  access to courts, to discovery, to property, to effect-

9  ive counsel, and to his records and property. He failed

11  and/or refused to give consideration to defendant's request

13  for a change of counsel based soley on his opinion that

15  counsel was competent, failed to make a record of the

17  bases for defendant's request and the court's response.

19  Law enforcement personel have acted as a gang to

21  deprive rights and maliciously inflict permanantly

23  debilitating Injuries to defendant's person and property.

25  The equal protections of the law have been denied to

27  defendant and the conditions he has endured are unlawful.

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 29 of 31

1. The issues were timely raised prior to trial by defendant's

3. §2255 motion, which judge Burrell refused to consider, claim-

5. ing that defendant was "not authorized" to address the court

7. and that no constitutional issues were raised therein. Denial

9. of due process, cruel and unusual punishments inflicted, subjection to 'Bills of

11. Attainder', denial of access to courts, denial of Sixth Amendment rights, and

13. much more was alleged. Judge Burrell has refused to allow a

15. change of judge and has denied or impeded almost all of

17. defendants requests in a prejudicial manner. The grand

19. jury should have been notified of defendant's request to

21. present evidence and testify, but the court concealed it.

23. Defendant's dentures and backpack were stolen by

25. Tad Pultorak and Brent Hardin and the prosecution has

27. maliciously refused to return them to maximize injury.

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 30 of 31

Imposed counsel was ineffective and essentially denied, defendant assistance of counsel, which precludes the imposition of a jail sentence. _Faretta v. California_, 422 US 806, 807. "The denial of due process of law vitiated the verdict and the sentence." _Rogers v. Richmond_, 365 US 534, 545, 5 LEd 2d 760, For all of the reasons cited herein and in the other pleadings submitted; — the defendant moves this Court to:

1.) Resend the verdict returned on February 11, 2015 and dismiss the indictment with prejudice for prosecutorial misconduct in disuading the grand jury from investigating;

2.) In the alternative, set the verdict aside and acquit the defendant as being factually innocent, for as Andrew Porristel testified before the grand jury, both officers drew their guns on the defendant while his was still holstered and the officers' testimonies are inconsistent to the degree that one is false; and therefore, there is insufficient evidence to convict;

3.) Or in the alternative dismiss count 3 as it requires prior convictions and count 2 as it is admitted that Brant Hardin opened fire before defendant fired back.

4.) Take such actions as are needed to enforce equal protections.

I hereby certify under penalty of perjury that the contents herein are of my own personal knowledge, except where citation is given to the record or other documents, and is the truth and nothing but the truth to the best of my belief.

Executed on August 26, 2015    _Brent D. Cole_ / x-635066
At Sacramento, California

ANSWER TO CRIMINAL CHARGES - U.S. v. COLE - Page 31 of 31

*Appendix 1*

*OATH*

APPENDIX 1
Page 1 of 1

I, Brent Cole, do solemnly swear that I have never voluntarily borne arms against the United States since I have been a citizen thereof; that I have voluntarily given no aid, countenance, counsel, or encouragement to persons engaged in armed hostility thereto; that I have neither sought, nor accepted, nor attempted to exercise the functions of any office whatever, under any authority or pretended authority, in hostility to the United States; that I have not yielded a voluntary support to any pretended government, authority, power, or constitution within the United States, hostile or inimical thereto. And I do further swear that, to the best of my knowledge and ability, I will support and defend the Constitution of The United States against all enemies, foreign and domestic; that I will bear true faith and allegiance to the same; that I take this obligation freely, without any mental reservation or purpose of evasion, and that I will well and faithfully discharge the duties of the office of statutory Attorney General, on which I am about to enter,  So help me God.

*I, Brent Douglas Cole, being of sound mind and being willing and competent to testify, hereby depose and state of my own free will, under penalties of perjury: That the above testimony is true, accurate, and is not misleading to the best of my knowledge and belief; that facts presented herein are of my own personal knowledge, that the law presented is of my own research and is valid law to the best of my belief and understanding; and that these are not presented for the purpose of deception, delay, or evasion; these presents are to enforce a basic constitutional protection: So help me God.*

Brent Douglas Cole, Brent Douglas Cole,
P.O. Box 897, Anchor Point, AK 99556
Administered and witnessed by _____

*originally
Filed in
Anchorage AK.
District Court.*

[Printed Name]          H. FUENTES

[Title]          Deputy Clerk II

Executed This 28th day of February 2005

Page 16 of 16 - Affidavit Of Brent Douglas Cole - Re: A1383897

*Appendix 1
OF Cross-Complaint: An Information
In The Nature OF Quo Warranto
Case M-14-000388, Nevada County, CA.*

In The Superior Court For The State Of California In And For The County Of Nevada
RE: State of California -vs- Brent Douglas Cole  Case Number M-14-0000388

### Affidavit of Brent Douglas Cole, June 4, 2014

At the Arraignment proceeding on January 28, 2014, I clearly asserted my standing, and Linda J Sloven, without any input from the prosecutor, denied my assertions and entered a plea without any inspection of the questions required to be answered in the affirmative for arraignment to have occurred.

On February 19, 2014, I filed a cross complaint with the court stating my standing in writing, citing 18 U.S.C. Sections 6 and 1961(10), and etc. On this date Candice S. Heidelberger ruled that this was a criminal case and that no civil filing submitted by the accused would be considered by the court. This case was instituted by a civil form; that is, an information. This court's objection to the form of motions filed by the accused i apprehend is because my lawful standing is not acknowledged.

In federal case A01-0108CV(JKS) in the district of Alaska I filed suit against the state of Alaska for wetlands fraud and racketeering using this statutory authority. I was ordered to remove the caption to which this court specifically objected to in the motions I submitted; specifically, "In The Name Of The People Of The United States Of America". I could not in good conscience comply:
On July 11, 2001 I filed an amended complaint which stated the reasons, statutes, and court decision upon which I relied for my lack of compliance with the Order of the court, and stating my standing. Judge Singleton conceded the point. I proceeded using this authority until that case was closed, and have so proceeded since both in both federal and state courts.

My standing is as a statutory Attorney General of the United States arising under 18 U.S.C. Section 1961(10) and the Supreme Court Decision in Rotella v Wood. Under 18 U.S.C. Section 6, I am an agency of the United States. I lawfully entered into said Office. I am in compliance with the requirements of law for occupying said Office. I have faithfully exercised the duties of said office, and my authority has not been revoked. I last proceeded claiming this authority in the United States Court Of Appeals For The Ninth Circuit in City of Anchorage v Cole in 2007, case number 07-35630.

The refusal to recognize this authority serves to obstruct justice and deny equal protections to the People. I have been bombed, and attempts have been made to murder me for having exercised said authority. I am entitled to statutory protections and the emoluments of the office. I receive no compensation, and the authority is not tenured.

*I hereby certify, of my own free will, under penalties of perjury, that I am competent and willing to testify, that I have read this instrument, that I have personal knowledge of facts presented herein, that I know the contents thereof, and that, to the best of my knowledge and belief, it is true, correct, and not misleading; the truth, and nothing but the truth, So help me God.*

*Brent D. Cole*

*Supervaccuum esset leges condere, nisi esset qui leges tueretur.*

Brent Douglas Cole

Statutory Attorney General of the United States
206 90th Avenue NE, Bismarck, ND  58503

Executed this 7th day of May, 2014.
At Nevada City, California

Appendix 1 of ANSWER
Case No. M14-0388

| Subj: | **Brent Cole (Mutual Client)** |
|---|---|
| Date: | 10/8/2014 10:05:41 A.M. Pacific Daylight Time |
| From: | Jody.Schutz@co.nevada.ca.us |
| To: | yoloconflict@aol.com |

Hello Mr. Toney.

I am writing about Mr. Cole. I wanted to let you know I was Mr. Cole's state attorney. I am in possession of his medical records and defense investigation reports that I would like to provide to you.

In addition, Mr. Cole has a separate misdemeanor case that was not dismissed with the Federal Indictment. This case preceded the felony shooting case and was NOT dismissed with the filing of the Federal Indictment. Mr. Cole is requesting to have our office relieved and return to pro per status. We have scheduled a Motion Hearing for October 23, 2014 at 9:00 a.m. and I have submitted a transport order.

I anticipate that they will refuse to release him for transport to our county.

Please call or e-mail me back. Thank you.

Jody L. Schutz, Deputy Public Defender
Nevada County Public Defender
224 Main Street, Nevada City, CA 95959
(530) 265-1400; Fax: (530) 478-5626



APPENDIX 3
Page 1 of 1

COUNTY OF NEVADA
STATE OF CALIFORNIA

# OFFICE OF THE PUBLIC DEFENDER

224 MAIN STREET, NEVADA CITY, CALIFORNIA 95959
PHONE: (530) 265-1400    FAX: (530) 478-5626

**DEPUTIES:**

DONALD E. LOWN, JR.
**PUBLIC DEFENDER**
S.B. #119189

DAVID W. HUMPHREYS
JODY L. SCHUTZ
TAMARA ZUROMSKIS
COURTNEY ABRIL
KERI KLEIN
MICAH PIERCE
GINA LE

---

## *MEMORANDUM*

---

**TO:**       **BRENT COLE, WBCF**

**FROM:**   JODY SCHUTZ, DEPUTY PUBLIC DEFENDER

**SUBJECT:**   **OUT OF THE OFFICE/QUESTIONS**

**DATE:**     AUGUST 14, 2014

---

I am writing to let you know that I will be out of the office from Friday, August 15, 2014 – Monday, August 25, 2014, returning to the office on Tuesday, August 26, 2014.

In response to your question about the "Answer with Bill of Exceptions and Affidavit in Support." I had my secretary go the Courthouse and review all pleadings in your misdemeanor case, the above-reference document was not filed. I then contacted the District Attorney's Office and they had received the filing in that case. I am enclosing a copy of the document.

Mr. Beresford and I did go to the crime scene on Friday, August 8, 2014; no additional evidence was recovered at that time. We are waiting on the MAIT diagram, photographs and videos before proceeding further on that issue. I will discuss this issue with you further upon my return.

In my absence, my secretary will continue to process any in-coming discovery, and follow-up on our records requests. She will copy and forward these to you as they come in.

# SACRAMENTO COUNTY SHERIFF'S DEPARTMENT
## CORRECTIONAL SERVICES
## INMATE GRIEVANCE/SUGGESTION

To: Captain T. Andrus
Facility Commander


6W329

| NAME (PRINT LAST, FIRST, MIDDLE) | DATE OF BIRTH | XREF NUMBER | DATE |
|---|---|---|---|
| Cole, Brent, Douglas | 08/12/1953 | X-635066 | 03/25/15 |

| INMATES SIGNATURE | INMATE'S LOCATION | DATE AND TIME OF OCCURRANCE | |
|---|---|---|---|
| Brent D. Cole | SW101A | Routine and continuous crime September 25, 2014 till present | |

**INSTRUCTIONS:** PLEASE PRINT YOUR NAME ON THE FORM AS IT APPEARS ON YOUR WRISTAND AND INCLUDE YOUR XREF NUMBER.  IF MORE THAN ONE PERSON IS SIGNING THE GRIEVANCE/SUGGESTION, PLEASE PLACE FULL NAMES AND XREF NUMBERS AT THE END OF THE FORM.  USE A SECOND FORM IF MORE SPACE IS NEEDED.

GRIEVANCE/SUGGESTION: To: Facility Commander Captain T. Andrus: This Facilities acts and actions are reprehensible and unlawful. It is the policy of this jail to inflict punishments designed to seriously and permanently injure prisoners and destroy their health. This Facility refuses to comply with international law for the standard minimum rules for the treatment of prisoners of 1955 held at Geneva and approved by the United Nations by resolutions 663 C (XXIV) of July 31, 1957 and 2076 (LXII) of May 13, 1977. This Facility places inmates in TSEP without any due process hearing and unlawfully keeps them locked in their cells to destroy their physical health. They are never permitted to exercise or get fresh air. I have been allowed out of my cell into the day room for 30 minutes in the past 8 days, and I am not on disiplinary. I have been unlawfully held in TSEP since September 25, 2014 without a due process hearing in criminal contempt of the Supreme Court of the United States decision in Hutto v. Finney 437 U.S. 678 and violation of California law for the treatment of prisoners §§ 83, 84 and pen code §2652. Torturing and maiming prisoners is a sedition and a violation of the public trust, and a far more heinous crime than murder or rape because it destroys all faith in the judicial system. "Woe unto you, scribes and Pharisees, hypocrites! For you pay tithe of mint and anise and cummin, and have neglected the weightier matters of the law: justice and mercy and faith. These you ought to have done, without leaving the others undone." Mathew 23:23. The routine tortures and prejudicing of prisoners court cases is an abomination unto God and an affront to human dignity.

| RECEIVING OFFICER (PRINT) | BADGE NO. | SIGNATURE | DATE/TIME |
|---|---|---|---|
| KING | 736 | | 3/26  2105 |

RECEIVING OFFICERS/SUPERVISOR'S COMMENTS

Clap 4/7
RECLASSED

APPENDIX 5
page 1 of 1

| SUPERVISOR'S NAME (PRINT) | BADGE NO. | SIGNATURE | DATE/TIME |
|---|---|---|---|
| SGT. W. BELLI | 178 | | |

7400-012 (7421-084 Rev 1/90 PT)

# SACRAMENTO COUNTY SHERIFF'S DEPARTMENT
## CORRECTIONAL SERVICES

### INMATE GRIEVANCE/~~SUGGESTION~~

APPENDIX 6
Page 1 of 2

| NAME (PRINT LAST, FIRST, MIDDLE) | DATE OF BIRTH | XREF NUMBER | DATE |
|---|---|---|---|
| Cole, Brent, Douglas | 08/12/1953 | X-635066 | 11/11/14 |
| INMATES SIGNATURE | INMATE'S LOCATION | DATE AND TIME OF OCCURRANCE | |
| Brent D. Cole | 8W-101 | From 9/25/14 till 11/11/14 | |

**INSTRUCTIONS:** PLEASE PRINT YOUR NAME ON THE FORM AS IT APPEARS ON YOUR WRISTAND AND INCLUDE YOUR XREF NUMBER.  IF MORE THAN ONE PERSON IS SIGNING THE GRIEVANCE/SUGGESTION, PLEASE PLACE FULL NAMES AND XREF NUMBERS AT THE END OF THE FORM.  USE A SECOND FORM IF MORE SPACE IS NEEDED.

GRIEVANCE/~~SUGGESTION~~: This institution is and has been vindictively subjecting me to corporal punishments by unlawfully holding me in T-SEP and denying me medically necessary treatments, which is resulting in the infliction of physical harm that is debilitating and permanant. Sacramento County Jail is intentionally and maliciously causing me to loose the use of my left arm for the rest of my life. This is being done by keeping me in isolation locked down in a cell and denying me medical treatments ordered by the doctors at the Trauma Clinic Sutter Roseville Medical Center. I am 61 years old with no criminal record and no history of violence. There has been no due process hearing. There exists no written statement, which I am entitled to, giving me notice of the reasons including references to the evidence relied on for such confinement. This violation is routine for this facility. Requests and grievances are just ignored routinely, and there is usually refusal/failure to make forms available to inmates. Without the required due process hearing and written notice continuous confinement in T-SEP constitutes cruel and unusual punishment. Pen. Code 2652 provides that any person who violates or who aids, abets, or attempts in any way to contribute to the violation of §82 is guilty of a misdemeanor crime.

| RECEIVING OFFICER (PRINT) | BADGE NO. | SIGNATURE | DATE/TIME |
|---|---|---|---|
| | | | |

RECEIVING OFFICERS/SUPERVISOR'S COMMENTS

| SUPEVISOR'S NAME (PRINT) | BADGE NO. | SIGNATURE | DATE/TIME |
|---|---|---|---|
| | | | |

7400-012 (7421-084 Rev 1/90 PT)

Case 2:14-cv-00269-GEB Document 105 Filed 09/08/15 Page 39 of 203

The treatment of a prisoner in isolation is unlawful unless they have given the prisoner written notice of the reasons, a fair hearing before one or more prison officials, representation by counsel-substitute where deemed necessary, the opportunity to present witnesses and documentary evidence (unless unduly hazardous), and a written decision including references to the evidence relied on and the reasons for T-SEP (Maximum-A) solitary confinement (isolation). In re Corr, 116 Cal. App. 3d 962, 172 Cal Rptr. 417 (1st Dist. 1981) (per provisions of Federal and State Const.)

In my case there is nothing in writing and no hearing.

| Name | location | Hearing Held? | Written decision | Willing to sign suit for relief |
|---|---|---|---|---|
| Brent Cole | #635066 8W 101 | No | No | Yes |
| Greg Gadlin Jr. | X079636 8w 111 | NO | Yes/NO | yes |
| James Wallace | X067489 8w114 | NO | NO | YES |
| Mr Odis S. Murphy | 1808363 | NO | NO | yes |

APPENDIX 6
Page 2 of 2

(Other routine violations and unlawful conditions will be added)

"A writ of habeas corpus may be sought to obtain a declaration of prisoner's rights in confinement." In re Davis, 25 Cal. 3d 384, 158 Cal. Rptr. 384, 599 P. 2d 690 (1979). A class action writ of habeas corpus may be sought and obtained — Ex Parte Tobias Watkins, (1832) U.S. Supreme Court. Sacramento County Jail does not comply with Cal. Dept. of Corrections requirements for administrative remedy, so remedy is exhausted.

Share only with those you trust. Return to 101 when circulated.

10'

**SACRAMENTO COUNTY SHERIFF'S DEPARTMENT**
**CORRECTIONAL SERVICES**

Denial of access to legal materials/services: Denial of access to courts.

**INMATE GRIEVANCE/SUGGESTION**

| NAME (PRINT LAST, FIRST, MIDDLE) | DATE OF BIRTH | XREF NUMBER | DATE |
|---|---|---|---|
| Cole, Brent, Douglas | 08/12/1953 | X-635066 | 11/30/14 |

| INMATES SIGNATURE | INMATE'S LOCATION | DATE AND TIME OF OCCURRENCE |
|---|---|---|
| Brent D. Cole | 8W101A | 10/22/14 + in present |

**INSTRUCTIONS:** PLEASE PRINT YOUR NAME ON THE FORM AS IT APPEARS ON YOUR WRISTAND AND INCLUDE YOUR XREF NUMBER. IF MORE THAN ONE PERSON IS SIGNING THE GRIEVANCE/SUGGESTION, PLEASE PLACE FULL NAMES AND XREF NUMBERS AT THE END OF THE FORM. USE A SECOND FORM IF MORE SPACE IS NEEDED.

GRIEVANCE/SUGGESTION: I am in T-SEP facing life in prison and have been falsely accused. I am being denied all access to legal materials, denied the ability to create meaningful legal documents, denied the ability to make copies, and I am being denied all ability to have meaningful input into the preparation and presentation of my defense. I need to examine the following cases and law A.S.A.P.: Gerstein v. Pugh, 420 U.S. 103, 125 S.Ct. 854, 43 L.Ed 2d 54, 19 Fed. R. Serv. 2d 1499 (1975); County of Riverside v. McLaughlin, 500 U.S. 44, 56, 111 S.Ct. 1661, 114 L.Ed 2d 49 (1991); Boyd v. United States, 116 U.S. 616 (need better cite and copy of case); Ward v. Village of Monroeville, 409 U.S. 57, 61, 62; State v. Robinson, 145 Me 77, 72 Atl 2d 260, 262 [187 So 571, 575 Fla (1939) Roberts v. Dean]] 18 U.S.C. §§2072 et seq. United States v. Mckenzie, 678 F.2d 629, 631; People v. Superior Court (App. 6 Dist. 2000) 92 Cal.Rptr 2d 829, 78 Cal. App.(4th) 403; Westlaw crim. law key 627.9(1). Chapman v. California, 386 U.S. 18, 23 (1967); Glover v. United States (2001) 531 U.S. 198, 121 S.Ct. 696, 700, 148 L.Ed 2d 604, 608; United States v. Gonzalez-Lopez (2006) 548 U.S. 140 126 S.Ct. 2557, 2563, 165 L.Ed 2d 409, 419; United States v. Cronic ? U.S. ??, 104 S.Ct. 2039, ? (1984); Mason v. State of Arizona 504 F.2d 1352; 1 Stat, ch. XX, §§ 6-10, 34, 35; People v. Marsden (1970) 2 C 3d 118, 84 C.R. 156, 465 P.2d 44; I am being denied my rights by failure/refusal to allow me access to things necessary to prepare a defense.

| RECEIVING OFFICER (PRINT) | BADGE NO. | SIGNATURE | DATE/TIME |
|---|---|---|---|
| ORTIJANANG, S. | #1423 | | 12/3/14 - 0900 |

RECEIVING OFFICERS/SUPERVISOR'S COMMENTS

| SUPERVISOR'S NAME (PRINT) | BADGE NO. | SIGNATURE | DATE/TIME |
|---|---|---|---|
| | | | |

7400-012 (7421-084 Rev 1/90 PT)

APPENDIX 8
page 1 of 1

# SACRAMENTO COUNTY SHERIFF'S DEPARTMENT
## CORRECTIONAL SERVICES
### INMATE GRIEVANCE/~~SUGGESTION~~

*I am Pro Per Now.*
*Law Library  I have only till May 1, 2015 to serve and file.*

| NAME (PRINT LAST, FIRST, MIDDLE) | DATE OF BIRTH | XREF NUMBER | DATE |
|---|---|---|---|
| Cole, Brent, Douglas | 08/12/1953 | X-635066 | Feb. 23, 2015 |

| INMATES SIGNATURE | INMATE'S LOCATION | DATE AND TIME OF OCCURRENCE |
|---|---|---|
| Brent D. Cole | 8W101 | Feb. 21, 2015 till present |

**INSTRUCTIONS:** PLEASE PRINT YOUR NAME ON THE FORM AS IT APPEARS ON YOUR WRISTAND AND INCLUDE YOUR XREF NUMBER. IF MORE THAN ONE PERSON IS SIGNING THE GRIEVANCE/SUGGESTION, PLEASE PLACE FULL NAMES AND XREF NUMBERS AT THE END OF THE FORM. USE A SECOND FORM IF MORE SPACE IS NEEDED.

GRIEVANCE/~~SUGGESTION~~: My constitutional right of access to courts is being denied in contravention of the decisions of the Supreme Court of the United States; specifically the decisions expounded by the Court in Bounds v. Smith (1977) 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72. ― "It is now established that prisoners have a constitutional right of access to the courts." (430 U.S. 817) at p. 821. ... "It is indisputable that indigent inmates must be provided with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them." (430 U.S. 817, 824, 825)

"A court addressing a discretionary review petition is not primarily concerned with the correctness of the judgment below. Rather, review is generally granted only if a case raises an issue of significant public interest or jurisprudential importance or conflicts with controlling precident. (430 U.S. 817, 826)  I have been prevented from stating my case and denied an adequate opportunity to present my claims by ineffective assistance of counsel and the denial of ability to prepare and file meaningful legal papers. "We hold therefore, that the fundamental constitutional right of access to courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in Law." (430 U.S. 817, 828)  The policy has been taken that only "Pro Per" inmates can have assistance preparing and filing. My papers are prepared and need only be copied and served, Refusal is denial of right.

| RECEIVING OFFICER (PRINT) | BADGE NO. | SIGNATURE | DATE/TIME |
|---|---|---|---|
| J. AQUAIAV | 4SC | | 2-25-15 0 |

| RECEIVING OFFICERS/SUPERVISOR'S COMMENTS |
|---|
| |
| |
| |

| SUPEVISOR'S NAME (PRINT) | BADGE NO. | SIGNATURE | DATE/TIME |
|---|---|---|---|
| | | | |

7400-012 (7421-084 Rev 1/90 PT)

;page)

APPENDIX 9
Page 1 of 4

J.,                                                    Dec 4, 2014

We need to communicate. It can be by mail or a visit, but I need to know that definitive progress is being made and have some idea of how much and where. It is most difficult for me to be patient when every single day that goes by I am being maimed worse,.. And that is in fact the case. Each day that passes I have less mobility in my left arm than I did the day before; and all of the doctors at the Trauma Center assured me that I will never regain the mobility that I am loosing each day.

I asked for copies of that grievance and several pages about November 12, and still waiting... still need them. I filed another grievance with Classification after sending a request Kite; Got an admission of criminality back. I got an E-mail responding to the grievance after pointing out that they were violating both federal and state law. Basically they refuse to give me the required due process hearing stating; "Due to your current charges of shooting at peace officers you are considered a high security inmate. ... You are and will remain a total separation inmate. California Code Title 15 and Main Jail operation orders designate classification officers are the ones who gather all the information and determine an inmates housing level." "Not Grievable."

I will consider that as written notice, but it is not compliance with §84 requirement for a due processs hearing. I am therefore unlawfully subjected to cruel & unusual punishments; And they are committing the crime of mayhem,

Dec. 4, 2014

J., you promised me on October 9th that we would bring this medical issue up on a motion; and then on the 16th told the judge you would submit it to a magistrate. That was over 45 days ago. I needed to start getting medical treatments September 9... that was 86 days ago. I am loosing the use of my left arm for the rest of my life due to the delay... It is very difficult to remain patient not knowing that some progress is being made or at least some attempt to resolve the issue is occurring.

Discovery has been the same thing. I still do not have any discovery except the "indictment". I am precluded from being able to examine audio, video, and pictures; assuring that my right under the Sixth Amendment to be advised of the nature of the charges against me is completely abrogated.

I do not even have a witness list or a list of the evidence the prosecution plans to use at trial. There were Gerstein and Brady violations, and there has been no probable cause hearing and really no arraignment. I did not enter a plea, and there was no examination as to if a crime was actually committed.

I've tendered an answer, motion for acquittal, petitition for certiorari, mandamus, and prohibition, and a motion to set aside indictment, (to you) and no return or status or originals.

APPENDIX 1
Page 3 OF 4

J.,

Dec. 4, 2014

What I am seeing is that we have only about 2 weeks until the holidays to get some motions in. The failure to do so will preclude me from having any grounds to be able to raise appeal because nothing was timely raised before trial, and I'm being set up for a complete trial by ambush! I have no idea of what evidence is going to be presented, what witnesses there will be, nor the substance of their testimony; my right to pre trial discovery has been abidged completely; my right to an evidenciary hearing and to a preliminary hearing abrogated, many many serious violations of due process and substantial rights, and not one word, objection, or verbal snivel is on the record. If something is not done very quickly I am going to be convicted, sentenced to life in prison, and not even have grounds to file an appeal. I would much prefer to file all documents hand written as they are then to file nothing!!

I am not comfortable with the situation, and I am particularly uncomfortable with the utter lack of communication. I need research done, a witness list, a list of evidence they plan to use, my originals returned to know what I've said and covered, to be informed of what is going on, to come to a concensus with you about trial and defense strategy, and to know that my grounds for appeal are being reserved. I won't be able to remain patient unless these needs are met.

Brent D. Cole

Research Needed — <u>Grand Jury Trescripts</u> Priority <u>1</u>

Cal. Rules of Court : 8.4 , 8.490

Cal. Penal Code §§ 2652 , 12.9 ,

C.C. P. §§ 1102, 8.485 (?)

<u>Christopher v. Harbury</u>, 536 U.S. 417, 153 L.Ed 2d 413, 122 S.Ct. 2179 (2002)

<u>Bounds v. Smith</u>, 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed 2d 72 (1977)

<u>Bransburg v. Hays</u>, 408 U.S. 665, 668, 92 S.Ct 2646, 332 L.Ed 2d 626 (1972)

<u>Jackson v. Hering</u>, 42 F 3rd 1350 (CA 11 1995) P. 1367

<u>Bronsbury v. Hayes</u>, 408 U.S. 665, 668, 92 S.Ct. 2646, 32 L.Ed. 2d 626 (1972)

<u>United States v. Agurs</u> (1976) 427 U.S. 97, 107, 96 S.Ct, 2392 49 L.Ed 2d 342

<u>Giglio v. United States</u>, 450 U.S. 150, 154, 92 S.Ct 763, 766, 31 L.Ed, 2d 104

<u>Williams v. United States</u>, 265 F.2d 214, 218 (9th cir, 1959)

<u>United States v. O'Donnell</u>, 608 F.3d 546 (CA 9 2010)

** <u>U.S v Jenkins</u>, 675 F. Supp. 2d 647, 652 (W. Va. 2009) Post trial motion P.652

<u>Kingrea</u>, 573 F. 3d at 191

<u>Berger v. United States</u>, 295 U.S. 78, 88, 792 L.Ed 1314, 55 S.Ct. 629 (1935)

<u>Donnelly v De Christoforo</u>, 416 U.S. 637, 40 L.Ed. 2d 431, 94 S.Ct. 1868

<u>Miller v. Pate</u>, 386 U.S. 2 , 17 L.Ed. 2d 690, 87 S.Ct 785 (1967)

<u>Mooney v. Holohan</u>, 294 U.S. 103, 55 S.Ct, 340, 79 L.Ed. 791

<u>Powell v. Texas</u>, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed. 1254

<u>Murray v. Carrier</u>, 477 U.S. 496, 91 L.Ed 2d 397, 106 S.Ct. 2639 (1986)

<u>United States v. Cronic</u>, 466 U.S. 648

<u>Reynoso v. Giurbino</u>, 462 F.3d 1099 (Ca 9 2006) P. 1112

<u>Hoffington v. Nuth</u>, 140 F.3d 572, 580 (4th Cir. 1998)

<u>Izaza v. Superior Court</u> (1991) 54 C. 3d 656, 285 C.R. 2d 105, 815 P. 2d 304

<u>People v. Hayes</u> (1992) 3 C.A. 4th 1238, 1244, 5 C.R. 2d 105

<u>People v. Salazar</u> (2005) 35 C. 4th 1031, 1048, 29 C.R. 3d 16, 112 P. 3d 14

18 U.S.C. § 1510, 1512, 1515, 2072 et seq.

*Page 1 of 1*
*Appendix 10*

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL
**EMERGENCY MEDICAL REPORT (EMT-P, EMT-1, EMR)**
CHP 330 (Rev. 4-10) OPI 091

Page **1** of **3**

| LOG CODE | RESIDENT POST/AIR OPS | MISCELLANEOUS | CASE / A.I. NUMBER | INCIDENT TIME | RESP. TIME | ARRIVAL TIME (L1) | TRANS. TIME | FACILITY TIME | DATE | ☐ Off-duty incident |
|---|---|---|---|---|---|---|---|---|---|---|
| 216 | VDAO | Nevada Co. | 14-165-5-1 | 14:50 | 15:00 | 16:10 | 16:30 | 16:53 | 06/14/2014 | |

| INCIDENT LOCATION |
|---|
| 39.33583 -120.97528, Nevada Co. |

☐ TC   ☐ Off-highway accident   ☑ Other: Officer Involved Shooting

| NAME | WEIGHT | SEX | DATE OF BIRTH / Age |
|---|---|---|---|
| unknown | 70kg | ☑ Male  ☐ Female | |
| ADDRESS | TELEPHONE NUMBER | | |

## PATIENT ASSESSMENT

| CHIEF COMPLAINT / MECHANISM OF INJURY | TIME OF PATIENT CONTACT |
|---|---|
| COP to left arm and groin/GSWx2 to groin area and GSWx1 to left upper arm | 16:30 |

**LEVEL OF CONSCIOUSNESS**
- ☑ Conscious
- ☐ Unconscious
- ☑ Alert
- ☐ Disoriented
- ☐ Unresponsive

**PUPIL**  L  R
- Normal  ☑ ☑
- Dilated  ☐ ☐
- Constricted ☐ ☐
- Fixed  ☐ ☐

**SKIN — COLOR**
- ☐ Normal
- ☑ Pale
- ☐ Cyanotic
- ☐ Flushed
- ☐ Jaundiced

**TEMPERATURE**
- ☐ Hot
- ☐ Warm
- ☑ Cool
- ☐ Dry
- ☑ Moist

**RESPIRATIONS — RATE**
- ☑ Normal
- ☐ Rapid
- ☐ Slow
- ☐ Absent

**RHYTHM**
- ☑ Regular
- ☐ Irregular

**DEPTH**
- ☐ Normal
- ☐ Deep
- ☑ Shallow

**CIRCULATION — RATE**
- ☑ Normal
- ☐ Rapid
- ☐ Slow
- ☐ Absent

**RHYTHM**
- ☑ Normal
- ☐ Irregular

**STRENGTH**
- ☑ Strong
- ☐ Weak

**CAPILLARY REFILL**
- ☑ Normal
- ☐ Delayed

| 1. TIME | BLOOD PRESSURE | PULSE | RESP. | GCS | 2. TIME | BLOOD PRESSURE | PULSE | RESP. | GCS |
|---|---|---|---|---|---|---|---|---|---|
| 16:33 | 120 /72 | 96 | 18 | 15 | 16:43 | 128 /72 | 97 | 18 | 15 |
| 3. TIME | BLOOD PRESSURE | PULSE | RESP. | GCS | 4. TIME | BLOOD PRESSURE | PULSE | RESP. | GCS |
| 16:46 | 128 /72 | 90 | 16 | 15 | 16:53 | 100 /68 | 94 | 11 | 15 |

**OBSERVED CONDITION – INJURY**



R – FRONT – L      L – BACK – R

A — Abrasion
B — Burn
C — Contusion
CF — Closed Fracture
D — Deformity
H — Hemorrhage
I — Internal Injury
L — Laceration
OF — Open Fracture
P — Pain
PW — Puncture Wound
S — Swelling
X — Amputation
O — Other (Explain)

**ASSESSMENT**

| | WNL | ABN |
|---|---|---|
| Airway | ☑ | ☐ |
| Breathing | ☑ | ☐ |
| Circulation | ☑ | ☐ |
| C-Spine | ☑ | ☐ |
| Chest | ☑ | ☐ |
| Abdomen | ☑ | ☐ |
| Head | ☑ | ☐ |
| Face | ☑ | ☐ |
| Back | ☑ | ☐ |
| Pelvis | ☐ | ☑ |
| Extremities | ☐ | ☑ |

*If abnormal, explain in narrative.*

**MEDICAL HISTORY**
- ☐ Cardiac   ☐ Psychiatric
- ☐ Seizure   ☐ ETOH
- ☐ Diabetes  ☐ HTN
- ☐ CVA   ☐ Asthma/COPD
- Medication: none
- Allergies: none   ☑ NKDA

**EMERGENCY CARE ADMINISTERED**
- ☐ Assessment Only
- ☐ Airway Cleared
- ☐ Airway Inserted (OPA)
- ☐ Suctioning
- ☐ Assist Ventilations
- ☐ CPR   ☐ Pocket Mask
- ☑ Oxygen at 15 Liters/min.  ☐ Cannula
- ☑ Bleeding Control   ☑ Mask
- ☑ C-Collar Applied
- ☐ Occlusive Dressing   ☐ Assist Childbirth
- ☑ Treat for Shock   ☑ Spinal Immobilization
- ☐ Traction Splint   ☑ Other (Explain in narrative)
- ☐ Other Splinting   ☐ Refused Aid (see page 2)
- ☑ Bandaging   ☑ ALS Care (see page 2)

**AED APPLICATION**
- Operator ID Number:
- AED ID Number:
- Number of Shocks Administered:
- CPR prior to arrival:  ☐ YES  ☐ NO
- Witnessed cardiac arrest  ☐ YES  ☐ NO
- *(Attach hardcopy printout of event)*

**INCIDENT HISTORY**

| EXTRICATION REQUIRED | DNR | ROUGH TERRAIN RESCUE EQUIPMENT USED | SEAT BELT/CHILD SAFETY SEAT | HELMET | AIRBAGS | EST. SPEED | COMPARTMENT INTRUSION |
|---|---|---|---|---|---|---|---|
| ☐ YES ☑ NO | ☐ YES ☑ NO | ☐ YES ☑ NO | ☐ S ☐ L ☑ No ☐ Unk. | ☐ YES ☑ NO | ☐ YES ☑ NO | n/a | ☐ YES ☑ NO |

**NARRATIVE**
See page 3.

☑ Continued on attached

| CONDITION | TRANSPORTED TO | BY | TIME |
|---|---|---|---|
| ☒ Urgent  ☐ Non-Urgent | Sutter Roseville MC | H-20 | 1630 |
| NAME AND I.D. NUMBER | PARTNER NAME AND I.D. NUMBER | REVIEWED BY | RANK |
| Oakcutt 16734 P29039 | Emery 12875 | | |

*Shaded areas are minimum required entries.    **Destroy Previous Editions**    Chp330_0614.pdf

APPENDIX
Page 1 of 8

# South Yuba River
## COMPREHENSIVE MANAGEMENT PLAN



Funding made available through a grant from the California Bay Delta Authority

 Tahoe National Forest

 Bureau of Land Management

 California State Parks

 Nevada County

APPENDIX 11
Page 2 OF 8



APPENDIX
Page 3 of 8

## Public Safety/Law Enforcement

### *Desired Future Condition*

Adequate funding is available to public safety and law enforcement agencies to enforce local, state, and federal laws and regulations, and to provide adequate emergency medical, search and rescue services.

Law enforcement activities provide a safe environment, protect resources, and encourage river users' respect for the environment they have entered. A high priority is placed on minimizing unlawful activities that impair the enjoyment of other river users and neighbors, or damage cultural and natural resources.

All public agencies cooperate in performing their public safety and law enforcement responsibilities to maximize effectiveness and efficiency.

### *Existing Condition*

There are several agencies with law enforcement/public safety responsibilities within the planning area. The Nevada County Sheriff's Office (NCSO) has primary or concurrent jurisdiction on both public and private property throughout the county, which includes all of the management planning area. While California State Parks peace officers' jurisdiction includes the entire state, their primary duties are focused on State Parks property and within an established "Zone of Impact" near the parks. BLM and USFS peace officers enforce federal regulations and investigate crimes that occur upon, or involve lands or resources they manage. The California Department of Forestry and Fire Prevention (CDF) investigate fires, and both CDF and USFS enforce fire regulations. The California Highway Patrol (CHP) has statewide authority, but is primarily engaged in activities involving roads and highways, state facilities, motor vehicles, and vessels. The Army Corps of Engineers (ACOE) also has rangers. They work primarily on Englebright Lake and ACOE lands adjacent to the lake.

The primary law enforcement activities within the planning area involve activities that affect public safety. Enforcement of laws concerning crimes against persons, such as theft, auto burglary, assault, indecent exposure, being under the influence, etc., are the highest priority. Fortunately, these crimes occur infrequently. More common infractions involve minor drug and alcohol crimes, illegal parking, and various other nuisance violations. State Parks Rangers and federal peace officers also act as first responders to accidents on the river. Nevada County Sheriffs Office has the primary responsibility for search and rescue.

### *Management Actions*

  1.  Standardize, to the extent possible, regulations throughout the corridor.

APPENDIX
Page 4 of 8

2. Minimize conflicts by providing for the separation of incompatible uses.
3. Provide public information through placement of signs, informational contacts, and public outreach.
4. Develop mutual aid agreements
5. Ensure access for fire and safety vehicles in all areas through education and enforcement.

## Scenic Values

### *Desired Future Condition*

The existing Scenic Values of the South Yuba River are maintained, protected or enhanced over time. Management activities continue as needed, but are implemented in a way that the desired Scenic Values are protected.

### *Existing Condition*

Both the federal recommendations and the State Wild and Scenic River designation identified scenery as an Outstandingly Remarkable Value for the South Yuba River. The Scenic Values were considered of "particular note because of the wide variety of high quality features over the 39 mile length of river. Large sculptural smooth boulders and bedrock are major attractions both for scenic and recreation values. Other water features such as pools and falls along with the steep canyon walls that provide a dramatic steep canyon setting are the other Scenic Values" (22 Westside Rivers, Wild and Scenic River Study Report, Final Environmental Impact Statement, 1999).

The interplay of smooth sculpted rocks and wide variety of shapes, sizes, and depths of emerald pools provide unending viewing opportunities while also supporting wonderful waterplay opportunities that attract thousands of people to the river. Many of the pools are accented by small waterfalls, riffles, or rapids that add to the high scenic values. These same water features provide additional swimming opportunities where people can slide over the rocks and water into deep pools. Every segment of the river has a unique set of pools and rock formations that people enjoy viewing, exploring, and using. Many of the historic features listed under the Cultural Resources section also contribute to the aesthetic values along the river. Some notable examples include historic bridges such as the covered bridge at Bridgeport. The small town of Washington provides a rustic and historic character to that part of the river and can be seen as part of its aesthetic value.

The canyon walls along the South Yuba River vary from dense coniferous forests on the north facing slopes at the higher elevations to brush, oak scrub, and manzanita on the south facing slopes, particularly at the lower elevation near Bridgeport. Overall the slopes look quite natural with only a few road incursions down into the canyon at the

APPENDIX
Page 5 OF 8

## Planning Unit 3

### *Recreation Opportunity Spectrum Designations*

1. From Rock Creek to ¼ mile downstream from Purdon Crossing, the ROS Designation is – **TRANSITION.**
2. From ¼ mile downstream from Purdon Crossing to 100 yards upstream from China Dam, the ROS Designation is – **HIGH USE.**
3. From 100 yards upstream from China Dam to the State Parks boundary near Section 17/20 boundary, the ROS Designation is – **TRANSITION.**
4. From the State Parks boundary near the Section 17/20 boundary to ½ mile upstream from Edwards Crossing, the ROS Designation is – **HIGH USE.**
5. From ½ mile upstream from Edwards Crossing to Primitive Camp, the ROS Designation is – **TRANSITION.**
6. From Primitive Camp to the location where the South Yuba Trail leaves the river downstream from the eastern end of the National Forest Pans & Hands zone in Section 11, the ROS Designation is – **REMOTE.**
7. From the location where the South Yuba Trail leaves the river downstream from the eastern end of the National Forest Pans & Hands zone in Section 11 to Poorman Creek (end of Planning Unit 3), the ROS Designation is – **TRANSITION.**

### *Visitor Capacity Designations*

Purdon Crossing

| | |
|---|---|
| Low Contact: | Fewer than 132 people at one time |
| Moderate Capacity: | 133-199 people at one time |
| High Contact: | 200-272 people at one time |

Edwards Crossing

| | |
|---|---|
| Low Contact: | Fewer than 165 people at one time |
| Moderate Contact: | 166-224 people at one time |
| High Contact: | 225-285 people at one time |

Current limitations in parking spaces preclude reaching Visitor Capacity on the river. Visitor Capacity will be monitored annually and included in the annual assessment.

### *Management Actions*

**Nature Appreciation**

1. Expand program as much as possible to include all crossings.

59



APPENDIX
Page 6 of 8

**Commercial/Special Events**

1. Continue existing policies. Agencies will appoint a lead agency in permitting events that cross boundaries.

**Parking**

1. Maintain the current parking capacity based on 2000-2001 recreation study.
2. Establish a No Parking/Tow-Away Zone between Purdon Road and the parking lot.
3. Enforce parking regulations.
4. Develop a plan that addresses pedestrian/parking safety issues at the crossings.
5. Post "No Parking" signs along the guardrail on the south side approach to the Edwards Crossing Bridge.

**Trash/Sanitation (also see Riverwide Management Actions for Recreation)**

1. Educate the public. Include "Pack Your Trash Home" signs. Involve local school children in developing the signs.
2. Experiment with trash can removal and eliminate recycling containers. Initiate stewardship program.
3. Work to install vault toilet facility at Purdon Crossing.

**Stewardship (see Riverwide Management Actions for Recreation)**

**Facilities**

1. Install a kiosk at each crossing.
2. Improve the access road to the Purdon Crossing parking lot.

**Trails (also see Riverwide Management Actions for Recreation)**

1. Diamond Arrow Trail: construct a trail connecting the Diamond Arrow Camp to the South Yuba River Trail near Edwards Crossing.
2. South Yuba River Connector Trail: reconstruct and realign the trail from South Yuba River Campground to approximately ¼ mile east of Edwards Crossing Bridge.

**Waterplay**

1. Regularly monitor the use and take appropriate action to protect and enhance the Outstandingly Remarkable Values.

**Fees**

1. State Parks and BLM will continue existing policies. No fees will be charged.



APPENDIX II
Page 7 OF 8

### *Riverwide Management Actions for Recreation*

The Purpose and Need described a "shared vision" for public lands. The managing
agencies attempted, wherever possible, to offer consistent management direction in the
corridor. This direction provides for more effective land management and consistency
for public uses in the corridor. During the process of evaluating the various Planning
Units, the community group and the managing agencies crafted a list of Management
Actions that apply to the entire river corridor.

**Trash/Sanitation**
1. Where provided, keep trash cans from overflowing.
2. Add recycling bins where feasible.
3. Emphasize "Pack your trash home."

**Stewardship**
4. Develop a stewardship program to enhance on-the-river presences, monitor
   effects, and work with agencies and private landowners to enhance river
   management.
5. Consider organizing a community watch/education group as a first contact group.
   Work in conjunction with the land management and other law enforcement
   agencies.

**Trails**
6. Do an inventory of the feeder trail system. Evaluate, improve the keepers, close
   the rest.
7. Continue maintenance, encourage volunteer assistance, control poison oak.
8. New trail development in transition and remote areas may be considered through
   an additional public process. Maintaining the Outstandingly Remarkable Values
   and Recreational Opportunity Spectrum classification will be important
   evaluation factors in the planning process.
9. Provide accessibility where practicable.
10. For all major artery trails, adopt maintenance, educational signs and design
    aspects for each trail to reduce erosion and speed to improve safety and in
    accordance with established Recreation Opportunity Spectrum.

**Fees**
11. Continue existing policy of charging no fees because collection of fees is not cost
    effective.
12. If, in the future, fee collection becomes cost effective, fee collection will be
    considered on a case-by-case basis.

**Campfires**
13. Open campfires on public lands are not allowed anywhere within the corridor year
    round. Where camping is allowed, gas camp stoves are allowed unless fire

41

APPENDIX I
Page 8 of 8

restrictions are in effect.  Fires are allowed only in agency-provided pedestal grills and fire rings in designated sites.

**Alcohol**

14. Continue the policy of the prohibition of alcohol on State Park lands.  Ban possession of alcohol in high use areas on BLM and Forest Service lands.  Consumption allowed in transition and remote areas on both BLM and Forest Service lands.  Monitor for compliance and problems and modify if needed.

**Nude Sunbathing**

15. Continue policy of enforcing public nudity laws at river crossings, developed sites, and where complaints are received.

**Angling**

16. Angling is allowed throughout the corridor, subject to California Department of Fish and Game codes.

**Public Safety/Law Enforcement**

17. Ban all glass containers.
18. Explore feasibility of placing emergency phones at strategic locations.
19. Increase patrols as budgets allow.

**Dogs**

20. Encourage dog owners to pick up after their dogs.

**Hunting**

21. On State Parks lands, maintain current policy of no hunting.  This includes no possession of bows or arrows.  On BLM and Forest Service lands, allow bow hunting in transition and remote areas only.  Monitor for compliance and problems and modify if needed.

**Shooting**

22. No discharge of firearms within river corridor on BLM lands.  No possession of firearms on State Parks or Forest Service lands.
23. Target shooting with firearms is prohibited on all public lands within the river corridor.

**Signs**

24. Develop a riverwide signing plan.  Install signs on:
    - o  Interpretation
    - o  Trespass (Private/public: Need to delineate boundaries)
    - o  Nature appreciation
    - o  Develop signs created by locals
    - o  The "know" information (alcohol, dogs, bottles, campfires, etc).
    - o  Maps
    - o  Wildlife encounters

Page 6
APPENDIX 2

Sept. 3, 2014

To: Clerk of the U.S. District Court
    501 I Street Room 4-400
    Sacramento, CA 95814

From: Brent Douglas Cole
      Statutory Attorney General of the United States
      Imprisoned after being shot four times
      At Nevada County Jail - B14016142

Re: Request For Removal and Federal Assistance.

On June 14, 2014 I was assaulted by BLM
Ranger Ted Pultorak, who drew his gun and
shot me without any provocation or warning.
I was armed, drew my weapon, and defended
myself using non-lethal force; I shot him in
the left shoulder being careful not to hit
his heart or lungs after he shot me a second
time in the gut. Pultorak had involved
a CHP officer, Brent Hardin, who attempting
to back up BLM Ranger Pultorak, shot me
in my left elbow. I shot him in his
right leg and he went down, but shot
me a second time with his twelfth
shot at me, after he was on the ground.

Page 1 of 4

Ranger Pulterak had fled and was nowhere to
be seen. I surrendered to CHP Officer Hardin
at that point. I was taken to Sutter Roseville
Medical Center and treated for multiple gunshot
wounds, then arrested and held in the county
jails, charged with state charges since.

I understand that a federal Grand Jury
will be empanneled to indict me on Federal
Charges Thursday September 4th. Although
it may be irregular, I wish to address that
Grand Jury to present evidence and testimony
as to what happened and why, and submit
evidence of Federal Crimes, which include
the removal of my formal "ANSWER WITH
BILL OF EXCEPTIONS" from the court file
in case number M14-000388 after the
Judge ordered it to be part of the file,
and ordered DA Jessie Wilson to respond to
it on June 5, 2014. Ted Pultorak attempted
to murder me to conceal a R.I.C.O. style
racketeering enterprise involving the
Nevada County Sheriff's Office and numerous
others. Detective Rusty Green has prejudiced
the investigation to implicate me. I have
evidence that will exhonerate me.

Page 2 of 4

Please repper this request to a judge as soon as possible For immedicte attention.

I need to be transfered From Nevada County Jail with the evidence I have in my cell into Federal custody. I need a Federal investigator to veriFy and document the Federal crime of removal oF records From the court File in case number M14-000388; My "ANSWER..."

I also need Federal investigators to go to Detective Rusty Greene and take the Following evidence into Federal custody:

1.) The Black Canvas Bag Greene seized From my pickup, which contains court papers, private papers, six 44 caliper bullets, and my pickup truck keys in the side pocket.

2.) From my pickup truck, investigators need to get my digital camera hanging on the head rest oF the driver's seat and my black backpack containing more papers, my prescription eye glasses, which I badly need, my laptop computer and accessories, and three USB memory sticks. These things need to be out oF his hands before he destroys more evidence.

3.) A 284 hunting riFle and scabbard that should be behind the seat. Document iF it is not there!

Page 3 oF 4

4.) Investigators are requested to get my down coat from behind the seat, my tennis shoes, my green clothes bag with at least 1 change of my clothes in it, as I have no clothes or shoes or coat in my property.

5.) Investigators are requested to take anything they believe may be evidence that is in my pickup and are even requested to take the pickup if they wish.

6.) My backpack (minus the stolen parts put into it by Ted Puttorak and Grant Hardin)

7.) All evidence held by NCSO in case F14-000267

I wish to remove case F-14-000267, if prosecution of the case is going to continue, to Federal court. Inmates at Nevada County Jail are precluded from making copies or using the U.S. mail for anything except a 9X4 standard envelope with a single first class stamp; thereby precluded from any meaningfull access to courts.

Executed at Nevada City     Brent D. Cole
On September 2, 2014     B14016142
           Incarcerated at
           Nevada County Jail

Page 4 of 4

# UNITED STATES DISTRICT COURT

Eastern District Court of California

Marianne Matherly, Clerk

Keith Holland, Chief Deputy

## CLERK'S NOTICE

☐ REPLY TO:
Divisional Office
2500 Tulare St. #1-500
Fresno, California 93721

☐ **REPLY TO:**
Office of the Clerk
501 I Street #4-200
Sacramento, CA 95814

TO:
Brent Cole B14016142
Wayne Brown Correctional Facility
P.O. Box 928
Nevada City, CA 95959-0928

Case Number:

RE: Pleadings and/or Correspondence received on : 9/4/14

☒ CASE NUMBER: The Eastern District case number could not be identified for the attached filing. You must write your case number on all documents submitted to the court.

☐ FILING FEE: The filing fee of $400.00 was not received ($5.00 for habeas petitions), nor was an application to proceed In Forma Pauperis. Enclosed is an Application to Proceed In Forma Pauperis along with your original documents. Please resubmit your documents with the completed application or filing fee.

☐ COPYWORK: The Clerk's Office will provide copies of documents and of the docket sheet at $0.50 per page. Checks in the exact amount are made payable to "Clerk, USDC." Please Note: In Forma Pauperis status does not include the cost of copies. Copies of documents in cases may also be obtained by printing from the public terminals at the Clerk's Office or by contacting Cal Legal Support Group at: 3104 "O" Street, Suite 291, Sacramento, CA 95816, phone 916-441-4396, fax 916-400-4948.

☐ NAME SEARCHES: The Office of the Clerk requires a $30.00 charge, per name, to perform a records/name search. This fee must be paid in advance by check or money order to "Clerk, USDC." The search covers 1976 to present and includes civil, criminal, miscellaneous, and magistrate cases.

☐ CONFORMED COPIES: The Court requires the original plus one copy of most pleadings. See Local Rule 133 (d) (2). If you wish to have a conformed copy returned to you, you must file an original plus two copies and provide the court with a self-addressed stamped envelope with the correct postage.

☐ CASE STATUS INQUIRES: The Court will notify you as soon as any action is taken in your case. Due to the large number of civil actions pending before the court, THE CLERK IS UNABLE TO RESPOND IN WRITING TO INDIVIDUAL INQUIRIES REGARDING THE STATUS OF YOUR CASE. As long as you keep the court apprised of your current address, you will receive all court decisions which might affect the status of your case.

☐ DISCOVERY DOCUMENTS: Pursuant to Local Rule 250.2 (c), Interrogatories, responses and proofs of service shall not be filed with the clerk of court until there is a proceeding in which the interrogatories, production of documents or requests for admission are AT ISSUE.

☐ LOCAL RULES: The Eastern District of California Local Rules are available on the court website at www. caed.uscourts.gov.

☐ LEGAL ADVICE: The court can not give legal advice.

☐ EVIDENCE SUBMITTED: The court cannot serve as a repository for the parties' evidence. The parties may not file evidence with the court until the course of litigation brings the evidence into question.

☐ CHECKS SUBMITTED TO THE COURT: We are returning your check or money order for the following reason:

    ☐ We have no record of your case. Please return the funds with the appropriate case number, new complaint or petition.

    ☐ Your check or money order is not complete. Please return the check made payable to "Clerk, USDC" and the appropriate and exact amount for the item requested.

    ☐ The Clerk's office is not able to accept post-dated or altered checks. Please return payment made with an appropriately dated and/or unaltered check or money order.

☐ REQUESTED FORMS: Your requested forms are enclosed.

☐ DOCUMENTS NOT SUBMITTED IN ENGLISH: All documents submitted for filing must be written in English. Documents submitted in a language other than English cannot be translated.

☒ OTHER :

> Please find enclosed the form to be used if you wish to initiate a New Civil Rights Case with the U.S. District Court for the Eastern District of California.

Thank you for your future attention to this matter.

| LMS | 9/4/14 |
|-----|--------|
| Deputy Clerk | Date |

APPENDIX 13
Page 1 of 1

APPENDIX
Page 3 of 47

PETITION FOR REVIEW
9th Circuit





# OFFICE OF THE
## DISTRICT ATTORNEY
### COUNTY OF NEVADA

**ANNA M. FERGUSON**
ASSISTANT DISTRICT ATTORNEY

**RANDY BILLINGSLEY**
CHIEF INVESTIGATOR

**CLIFFORD H. NEWELL**
DISTRICT ATTORNEY

## INVESTIGATIVE MEMORANDUM
### Case Name: Cole, Brent
### DA: 14-06-031256
### F14-000267

### NCSO Case 1140-1626

On Tuesday, June 17, 2014, Detective Rusty Greene and I interviewed victim CHP Officer Hardin at the CHP Office in Grass Valley. The interview was recorded, starting at 9:15 AM concluded at 10:22 AM.

Attached in a corrected transcript of the interview with Officer Hardin

**Tom Swisher**
**Criminal Investigator**
**Nevada County District Attorney's Office**

APPENDIX 13
Page 2 of
APPENDIX H
Page 4 of 47

```
 1
 2
 3
 4
 5
 6
 7                  INTERVIEW WITH CHP OFFICER HARDIN
 8                         Q=Det. (Rusty) Green
 9                        Q1=Inv. (Tom) Swisher
10                        Q2=(Michael Pugh)
11                        Q3=Sgt. (Matt Whiting)
12                        A=Ofc. (Brant) Hardin
13                        A1=(Fulton Lillyquist)
14
15
```

16  Q:        All right, this is (Rusty) Green I'm a Detective, Nevada County Sheriff's
17            Department, our case number is 1140-1626, I'm speaking with Officer
18            Hardin, from the California Highway Patrol. Uh, we're gonna do an
19            introduction of everybody in the room. You wanna start (Tom)?
20

21  Q1:       Uh, (Tom Swisher), Criminal Investigator with the Nevada County District
22            Attorney's Office.
23

24  A1:       (Fulton Lillyquist), uh, Grass Valley Representative of the California
25            Association of Highway Patrolmen.
26

27  A:        Uh, (Brant) Hardin, California Highway Patrol Officer.
28

29  Q2:       Officer (Michael Pugh), California Association of Highway Patrol.
30

31  Q3:       And (Matt Whiting), Sergeant with the CHP, Grass Valley.
32

33  Q:        Okay. Um, durin' the interview we're gonna ask you several questions, if you
34            don't know just please tell me you don't know. I don't - I don't want you to
35            guess at anything, so we have a a - a clear understanding of what took place. If
36            there's any questions that you don't wanna answer, just make sure you let me
37            know you don't wanna answer them. Um, try to keep it low key, and if you
38            guys have anything that comes up, like I said, just let me know too.
39

40  A1:       Sure.
41

42  Q:        Okay? Um, to start off with, uh, (Brant), do you mind if I call you (Brant), is
43            that okay?
44

45  A:        No, that's fine.



| | | |
|---|---|---|
| 181 | Q: | Okay. When you say "for him" you're talkin' about the BLM Ranger? |
| 182 | | |
| 183 | A: | Yeah, I'm sorry, yeah, for the BLM Ranger. |
| 184 | | |
| 185 | Q: | Okay. Um, and when you arrive what - what - what happened? |
| 186 | | |

187 A: Um, I - I contacted the Ranger, I know him as (Tad) I d- we just met, um, he
188 was kinda parked, uh, it - it - I believe it's north Bloomfield in a - a dirt road,
189 comin' down to it, his nose was pointed towards north Bloomfield and, uh, he
190 indicated that there was two motorcycles up - up in a camp up this dirt road
191 and, uh, he said, uh, one of 'em has been expired over, I think it was seven
192 years, and the other one was just sitting there and he wanted to store them
193 'cause it was an illegal campsite. And he gave me the, uh, VIN number off
194 one of the motorcycles, and I took it and I ran it through my Dispatch and it
195 came back stolen, so I knew I had a- one stolen motorcycle up there and then
196 one that I guess was - hasn't been registered in a while. He, uh, informed me
197 that his agency did not like him filling out 180 forms for - for some reason
198 and, I said okay, I - I had no problem helpin' him out, so we, uh, decided he'd
199 show me where the - where the camp was and he also, uh, notified me that we
200 could drive part way, and then the - the branches kinda get tight over the trail
201 and it already hit i- broke his window when he went up there the first time, so
202 we may wanna park and walk, you know, a quarter of a mile into it, so I
203 followed him up there, we parked, and we walked up to the campground. You
204 want me to just continue with the whole story?
205

206 Q: Yeah, go ahead.
207

208 A: All right.
209

210 Q: You're doin' fine.
211

212 A: So we walked up to the campground and, uh, I looked and it i- it - it was - a
213 definitely a camp that had been lived in for a while, and it wasn't you know, it
214 wasn't real trashy it was kinda neat like, somebody had been stayin' there a
215 while and, um, stuff was folded, uh, it - it just wasn't a trashy campground.
216 Um, he - on our way up there, he - he kinda told me he - he was comin' up the
217 road and he saw three - three guys in a truck come down and, uh, he
218 questioned them like, "Hey what are you doin' up there?" that kinda thing and
219 he - they said somethin' to the fact is we're not camping, and he says "You
220 know, there's a g-" I - I don't know if he knew there was a camp up there or
221 what but he just - he sent 'em on their way he says "You can't be campin'
222 here" and they left, so as we're kinda walkin' we parked our vehicles and now
223 we're walkin' up towards the camp and I asked him I said, "Is there anyone up
224 here?" and he says, "No, there's no one,", um, that he n- that he knew of. So
225 we walked up to the camp, and, uh, I - I saw the motorcycles, one was kinda


Case 2:14-cr-00269-GEB Document 155 Filed 09/08/15 Page 64 of 203

APPENDIX 13
Page 4 of 5
APPENDIX H
Page 9 of 47

INTERVIEW WITH CHP OFFICER HARDIN
Interviewer: r. Green & T. Swisher
Case # NCSO 1140-1626
Page 6

226  parked out in the open, the <u>other was kinda tucked in the trees a little bit</u>, and
227  it was disassembled, the tank was off and there was parts of the engine on the
228  ground, and he informed me that the one that was kinda disassembled was the
229  stolen one. So, I thought okay, well, um, a tow truck's not gonna make it up
230  here, we're gonna have to push these things down the road to the main dirt
231  road where they could get 'em. So, there was a backpack layin' right there that
232  had nothing in it so I - I started puttin' the parts in the backpack and he was
233  gonna - we were gonna carry that down and he'd walked over to the other
234  motorcycle and I a- made him carry the backpack 'cause the motorcycle I had
235  - had no brakes, I mean they'd been disassembled so I was gonna have to
236  really be careful takin' it down. And, uh, before I actually pulled it out, there
237  was, uh, there was some cases, and I thought maybe I should get - see if
238  there's any ID, 'cause if the person who reported their motorcycle stolen had
239  some suspects it'd be nice if one of the suspects matched the ID of m- maybe
240  somebody in that camp or whatever, so as I'm, uh, lookin' for ID, there's
241  some rustlin' in the bushes, and, uh, kinda over towards where the BLM
242  Ranger was, and immediately he - he went over and he said he- he yelled out
243  "Police, who's" you know, "Who's down there?" and I don't remember his
244  exact - he said, "Police," and then basically identify yourself or who's down
245  there or - or somethin' to that fact, and, uh, a guy came up, "Hey it - it - this is
246  my stuff, this is my camp, i-" you know, uh, and he said, "Who are you?" and
247  he said, he gave a name, and he said, "You know me," and, uh, the Ranger
248  said "Okay," and he says this is my stuff, I don't want you guys takin' my
249  stuff. And the Ranger said somethin' to the fact of you know, this is an illegal
250  camp, or this - we're takin' the motorcycles or somethin' like that and, he, um,
251  he pulled out s- as the - the suspect was approaching he pulled out some
252  handcuffs, and right then the suspect kinda backed up, and took an aggressive
253  stance and went kinda down towards his waist and says, "You're not puttin'
254  those on me," and then right then I thought, wow this is not goin' good, and,
255  uh, because I'm assuming because he - he did this the - the Ranger said, "Are
256  you armed?" and the suspect says "Yes, I am." And at that point, I was too -
257  the Ranger i- I don't know if you want me to draw it or say it but...

259  Q:  Sure.

261  A:  The, kinda this was, the edge of the campground here, we had the motorcycle
262  about here, suspect came up from here, this is all downhill, he came up and
263  he's standin' here. I'm over this area where there was a be- there's a fireplace
264  here, there was a bed about here, and the other motorcycle was in the bushes,
265  over here, so as soon as he did not like seein' those handcuffs I kinda came
266  forward, 'cause I - it - it just sounded like there was gonna be some problems.
267  And the Ranger was kinda over here and there's a pathway that comes up to
268  the campground over here. So he's - you know, we ask - the Ranger said, "Are
269  you armed?" and <u>the guys says, "Yes, I am,"</u> and <u>I immediately drew my</u>
270  <u>weapon</u>, and I saw the ra- the BLM Ranger draw his and we ordered, and we

271     said, "Put the gun down - put it down - put it down," and I think we had said it
272     about two or three times and the guy just drew up, quick, came - pointed a m-
273     at the Ranger which is - he's over here, while we - lemme back up just a little
274     bit - when, uh, we asked if he was armed we both - we both drew, I saw the
275     Ranger draw his weapon, and the Ranger started back towards the trail a little
276     bit, kinda backin' up a little bit. I kinda held - held my own here, 'cause i- I -
277     you know, I've been through that a few times and usually you know, suspect
278     kinda drops it, puts it down and then we discuss what's gonna happen. But the
279     way he whipped it out and he went straight for the Ranger just pointed it, and
280     then shots started firing, I remember thinkin' oh, shit, he's gonna f- he's
281     gonna kill this Ranger. And I - I - at that point I could not see the Ranger, he
282     had backed up, and there was some trees here, and as soon as he pointed it
283     out, I heard shots goin' and I believe he fired first, the - the suspect, I can't - I
284     can't be - but as soon as he pointed out and was dead on target shots started fr-
285     flyin', and I just kinda - I shot at him, multiple times, and I was backin' up
286     when this happened. Um, I don't know how many shots went towards the
287     Ranger, but he - as I'm backin' up, he turned on me, and started firin', and I
288     can't tell you how many shots he shot at me or how many shots I shot at him,
289     but I fell over, 'cause I'm backin' up I fell over this, uh, he had a rock, it was
290     a bunch of rocks, it's a fire pit, I fell over that and I knew - I looked up, after
291     I'd fallen down I looked up and he - he was on target on me, and he was firing
292     and I was firing at that point I called for a 1199 but my radios were outta
293     range, it didn't work. And from that point I don't remember but there's a -
294     there was a large tree over here, I had somehow made it to this tree, and I was
295     on the ground and my, uh, I had to reload, so I'm assumin' I fired 12 at least. I
296     reloaded and I came up, and I was - I was on the ground, I came up back to
297     target and he wasn't there, and, uh, at first I thought oh, shit where'd he go,
298     but then he says, "I'm done I'm a-" i- somethin' to the fact, "It's over, I'm
299     done," and i- I remember thinkin' if it was like a timeout for you know, a kids
300     game or somethin'. And I went holy - okay, so I - I got up and I walked over
301     to him and I said, "Where's your gun? Drop your gun - drop your gun," and at
302     this point the Ranger came back in - in my vision, and he was you know, on
303     him too. So we're both sayin' drop your gun he says, "I don't have it," and
304     then I noticed - I - I still didn't see it but the Ranger pointed it out, it was
305     about 8' away from him on the ground over there. so at that point we decided
306     we were gonna cuff him, I - I went in and I handcuffed him, and, uh, I asked -
307     lemme back up just a tad - as we're comin' in, um, we have you know,
308     weapons drawn on him I asked him if he was okay, I said, "Are you hit?" and
309     he says, "Yeah, I think I am."
310
311    Q:          Asked who?
312
313    A:          I asked the Ranger.
314
315    Q:          Okay.

APPENDIX 14
Page 1 of 2

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                      ---oOo---

4       BEFORE THE HONORABLE GARLAND E. BURRELL, JR., JUDGE

5

6    UNITED STATES OF AMERICA,

7            Plaintiff,

8    Vs.                          CASE NO. 2:14-CR-269 GEB

9    BRENT DOUGLAS COLE,

10           Defendant.

11    _____/

12

13

14                      ---oOo---

15

16              REPORTER'S TRANSCRIPT

17           EXCERPT FROM JURY TRIAL

18          TESTIMONY OF BRANT HARDIN

19         TUESDAY, FEBRUARY 3RD, 2015

20

21                      ---oOo---

22

23

24

25    Reported by:            CATHERINE E.F. BODENE,
                              CSR. No. 6926, RPR

APPENDIX 14
Page 2 of 21

```
1                              APPEARANCES

2                               ---o0o---

3

4        For the Government:

5                OFFICE OF THE UNITED STATES ATTORNEY
                 501 I Street, Suite 10-100
6                Sacramento, California  95814

7                BY:  MICHAEL D. MCCOY,
                      Assistant United States Attorney
8
                 BY:  HEIKO COPPOLA,
9                     Assistant United States Attorney

10

11

12       For the Defendant:

13               LAW OFFICE OF J. TONEY
                 P.O. Box 1515
14               Woodland, California  95695

15               BY:  J. TONEY,
                      Attorney At Law
16

17

18

19

20                              ---o0o---

21

22

23

24

25
```

APPENDIX 14
Page 3 of 21

1        EXAMINATION INDEX

2         ---o0o---

3

4  FOR THE GOVERNMENT:

5    EXAMINATION:         PAGE

6

7   BRANT HARDIN

8
    Direct Examination by Mr. Coppola   1
9    Cross-Examination by Mr. Toney    64
    Redirect Examination by Mr. Coppola  76
10

11

12

13

14

15

16

17         ---o0o---

18

19

20

21

22

23

24

25

APPENDIX 14
Page 4 of 22

1

```
 1                    SACRAMENTO, CALIFORNIA
 2                 TUESDAY, FEBRUARY 3RD, 2015
 3                         ---o0o---
 4           (Excerpt from trial proceedings.)
 5           (On the record at 1:15 p.m.)
 6           THE CLERK:  You may remain seated.
 7           Court is now in session.
 8           THE COURT:  All participants are present.
 9           You may proceed.
10           MR. COPPOLA:  Thank you, Your Honor.
11           The United States calls Officer Brant Hardin.
12           THE CLERK:  You can be seated in the witness stand.
13           Raise your right hand, please.
14                         BRANT HARDIN,
15   was thereupon called as a witness herein by the Government,
16   and having been sworn to tell the truth, the whole truth and
17   nothing but the truth, was thereupon examined and testified
18   as follows:
19           THE CLERK:  Please, state and spell your name for the
20   record.
21           THE WITNESS:  My name is Brant Hardin, spelled
22   B-r-a-n-t; last is H-a-r-d-i-n.
23                      DIRECT EXAMINATION
24   BY MR. COPPOLA:
25   Q.     What do you do for a living?
```

APPENDIX 14
Page 5 of 8

36

1    Q.      Okay.  When you drew your firearm, Officer Hardin,

2    did you point it at the defendant?  Did you immediately point

3    it at the defendant?

4    A.      Oh, yes.

5    Q.      And at that point, based on his comments and his

6    actions, at that point, Officer Hardin, did you begin to fear

7    for your safety and that of Ranger Pultorak?

8    A.      Yes, I did.

9    Q.      Officer Hardin, what happened immediately after you

10   saw the defendant sweep his hand back and you drew and

11   pointed your firearm?

12   A.      I yelled at him, Drop the gun, drop the gun.

13   Q.      Do you recall how many times you said, "Drop the gun,

14   drop the gun"?  *(The defendant's gun is still in its holster)*

15   A.      No.  But I kept repeating it.

16   Q.      Okay.  And from your vantage point were you able to

17   see what Ranger Pultorak was doing?

18   A.      He was backing out of there.

19   Q.      And was the defendant focused on you at this point or

20   was he -- was the defendant's focus still on Ranger Pultorak?

21   A.      On Ranger Pultorak.

22   Q.      And as you saw Ranger Pultorak backing up, what did

23   you see the defendant do, if anything?

24   A.      He kind of held his stance with the -- you know the

25   grip.  And he held it for about a second, maybe two, and then

APPENDIX
Page 6 of

35

```
 1    Q.        Let me stop you right there.  When the defendant --
 2    you heard the defendant say that he was armed?
 3    A.        Yes.
 4    Q.        Okay.  What reaction did you have to hearing the
 5    defendant say that he was armed?
 6    A.        Well, that plus the stance he was in, kind of
 7    heightened my awareness, yeah.  I mean, that this could go
 8    really bad.
 9    Q.        What did you do?
10    A.        At that point -- I mean, it was almost immediate he
11    put his jacket back and I saw the gun.  So I drew mine at
12    him.
13    Q.        Okay.  Now, when you saw -- when you say that you saw
14    the gun, where was it located?
15    A.        It was where his hand was, where he had originally
16    put his hand down.
17    Q.        So on his hip?
18    A.        Yes.
19    Q.        Okay.  And could you tell from your vantage point
20    whether or not it was in a holster?
21    A.        Yes, it was in a holster.
22    Q.        You indicated that your response to the defendant
23    being armed -- saying he was armed and sweeping the jacket
24    back was that you drew your firearm?
25    A.        Yes.
```

34

1    to I think you described it as a bladed stance, did that
2    cause you concern?
3    A.      Yes.
4    Q.      Okay.  Why was it that that caused you concern?
5    A.      Well, he was taking an aggressive stance, and to me
6    it was -- you know, I had the inkling this was going to be
7    some trouble.
8    Q.      Okay.  All right.
9            At that point, when the defendant changed his tone of
10   voice and made the aggressive movement that you described, at
11   that point did you begin to fear for not only your safety,
12   but also that of Ranger Pultorak?
13   A.      When he bladed, took the fighting stance?
14   Q.      Yes.
15   A.      Not right then, no.
16   Q.      Okay.  At that point did you happen to see any weapon
17   on the defendant?
18   A.      No.
19   Q.      Okay.  Now, after that, after he took the bladed
20   stance, stepped back and reached for his waist, at that point
21   what happened next?
22   A.      Almost immediately Ranger Pultorak said asked him,
23   "Are you armed?"
24   Q.      And how did the defendant respond?
25   A.      He said, "Yes, I am."

18

1    shown you show on this -- you indicated the gas tank was off.

2    Then was the seat off as well; do you recall?

3    A.      I don't remember if the seat was or not.

4    Q.      But your recollection is the gas tank was not

5    attached?

6    A.      Right.

7    Q.      The photographs of this particular motorcycle show

8    the gas tank attached?

9    A.      Correct.

10   Q.      Okay.  How is it that -- do you know how that gas

11   tank got attached?

12   A.      Yeah.  I put it on there.

13   Q.      Okay.  What did you do with the rest of the parts

14   that you saw laying around in that area?

15   A.      We found an empty backpack, kind of near the

16   motorcycle, and I put the parts in that backpack.

17   Q.      Okay.  And what was the overall plan in terms of what

18   was going to happen with not only this partially disassembled

19   motorcycle, but also the fully assembled motorcycle that you

20   saw earlier -- that we saw earlier?

21   A.      Ranger Pultorak and I were going to walk these down

22   to where the tow truck could come and pick them up.

23   Q.      Okay.  So would that be going back to the -- where

24   the -- the area where you initially met Ranger Pultorak?

25           Is that the area where you planned to take the

APPENDIX
Page 9 of 21

2

1   A.      I work for the California Highway Patrol.

2   Q.      In what capacity do you work for the California

3   Highway Patrol?

4   A.      I'm a patrol officer.

5   Q.      How long have you been an employee of the California

6   Highway Patrol?

7   A.      Just about 20 years.

8   Q.      And how long have you been a road patrol officer?

9   The same length of time?

10   A.      Yes.  Correct.

11   Q.      Have you held any other positions with the California

12   Highway Patrol besides that of road patrol officer?

13   A.      No.

14   Q.      Okay.  Where are you currently stationed,

15   Officer Hardin?

16   A.      In the Grass Valley office.

17   Q.      And how long have you been stationed in the

18   Grass Valley office?

19   A.      I came up there in 2006.

20   Q.      And how large is the patrol area for the Grass Valley

21   Highway Patrol Office?

22   A.      Mileswise, I don't know.  It's pretty large.

23   Q.      Now, Officer Hardin, when you report to work every

24   day, are you assigned the entire area of Grass Valley to

25   patrol or are you given a certain area in which to patrol?

37

1   he just drew up and pointed it right at Ranger Pultorak.

2   Q.      When you say he drew up and pointed it at

3   Ranger Pultorak, what did he point at Ranger Pultorak?

4   A.      A gun that he retrieved from his holster.  And at

5   that time Ranger Pultorak, I'm going to say he pointed it in

6   that direction, because from my vantage point I was watching

7   him and --

8   Q.      Let me stop you there.  When you say you were

9   "watching him," who do you mean?

10  A.      Mr. Cole.

11  Q.      Okay.  Now, go ahead and continue your answer.

12  A.      And Ranger Pultorak was backing up, kind of down the

13  trail we came in.  And there was trees so I didn't see him.

14  Once he started backing I lost sight of him.

15  Q.      Now, you've been a law enforcement officer for almost

16  20 years?

17  A.      Correct.

18  Q.      Have you seen people draw weapons in the line of

19  duty?

20  A.      Yes.

21          MR. TONEY:  Objection to the relevance.

22          THE COURT:  Overruled.

23  BY MR. COPPOLA:

24  Q.      In your experience as a police officer have you seen

25  people draw weapons?

38

1    A.      Yes.

2    Q.      Had you ever seen -- or can you describe for the jury

3    how fast the defendant drew that pistol?

4    A.      Yeah.  It was quick.

5    Q.      Had you ever seen someone draw a weapon that quickly?

6            MR. TONEY:  Objection.  Relevance.

7            THE COURT:  Overruled.

8            THE WITNESS:  You know, on TV, yeah.

9    BY MR. COPPOLA:

10   Q.      But in your line of work?

11   A.      There are officers that can draw quick but, you know,

12   they practice.

13   Q.      Okay.  Did the defendant's movements appear to be

14   practiced to you?

15   A.      Yes, they did.

16   Q.      Now, could you tell from your vantage point whether

17   the defendant drew -- what type of pistol he drew or just the

18   fact that he drew a pistol?

19   A.      You asked me what type?

20   Q.      Could you tell what type, either an automatic or

21   revolver, or could you tell at that point --

22   A.      It was big.  I couldn't tell what type it was though.

23   Q.      Did it have any particular color to it?

24   A.      Metallic.

25   Q.      Silver?

1    A.    Yeah.

2    Q.    Okay.  Once the defendant drew that firearm, that

3    pistol, and pointed it at Ranger Pultorak, what did you hear

4    next?

5    A.    Well, as soon as he got to an extended position, I

6    heard a shot.

7    Q.    Okay.  Officer Hardin, when you heard that shot, what

8    did you do?

9    A.    Well, I started shooting myself.

10   Q.    Okay.

11   A.    Not myself, but shooting.

12   Q.    And where -- who were you shooting at?

13   A.    Mr. Cole.

14   Q.    Okay.  And was Mr. Cole's attention on you at this

15   point?

16   A.    No.

17   Q.    Okay.  Where was Mr. Cole still focused?

18   A.    He was focused in the direction that Ranger Pultorak

19   had taken.

20   Q.    Now, Officer Hardin, this may seem like a silly

21   question, but at the time the defendant started firing, were

22   you in fear for your life and Ranger Pultorak's life?

23   A.    Yes, I was.

24   Q.    At some point, Officer Hardin, did the defendant's

25   attention turn back to you?

APPENDIX 14
Page 13 of 21

66

1    when you first glimpsed Mr. Cole in feet, if you can?

2    A.      It would be 20-ish.  About 20 feet.

3    Q.      Would you say it was about the distance you are from

4    me, closer or further away?

5    A.      I would say a little bit farther.

6    Q.      Stop me when you think you're about the right

7    distance.

8    A.      Now, this is when he first came out?

9    Q.      Sure.  That's what I'm asking.

10   A.      I was kind of -- I would say a little bit farther

11   than we are.  Maybe about --

12   Q.      Somewhere around here?

13   A.      From what I remember, yes.

14   Q.      And you had a fairly clear line of sight of him at

15   that time?

16   A.      Correct.

17   Q.      And your testimony was he was -- he did not appear

18   agitated.  He actually was just asking to get his stuff,

19   right?

20   A.      Correct.

21   Q.      I think at one time you characterized it as he was

22   sort of pleading, "Please, let me have my things."

23           Is that fair?

24   A.      Yes.

25   Q.      Okay.  Now, was it immediately after that that

APPENDIX 14
Page 140

67

1    Pultorak had -- that you saw what turned out to be handcuffs?

2    A.      Immediately after him asking --

3    Q.      When he said, "Please, give me my stuff," or words to

4    that effect?

5    A.      I can't tell you if it was immediate.  I just

6    remember they were doing -- he was talking about the camp.

7    And I actually turned my attention back -- I was going to go

8    back to look for more ID to find out more about the stolen

9    stuff.

10   Q.      So at that point would it be fair to say that you

11   didn't see any dangerous situation?

12   A.      No, I did not.

13   Q.      Okay.  And did you hear what they were talking about?

14   A.      It was just more, "This is my camp.  I don't want you

15   taking my stuff."

16           He was mentioning the motorcycles, "I am going to

17   take the motorcycles."

18   Q.      "He" being?

19   A.      I'm sorry.  Ranger Pultorak.

20   Q.      Pultorak was saying that the motorcycles --

21   A.      Something about that the bikes were going to go.  I

22   don't know if he was -- he was talking about, you know, the

23   illegal campsite.  I don't know.  I don't work with federal

24   land so I don't know.  I was letting him deal with that.

25   Q.      All right.

68

1          But it still was a conversation that didn't sound
2     heated, right?
3     A.     No.
4     Q.     Am I right?
5     A.     You're correct.
6     Q.     Sometimes the way I ask the question, I understand
7     what you are saying, but I just want to make sure.
8          Okay.
9          And do you have any estimate of how long this
10    conversation was about his desire -- Cole's desire to get the
11    stuff and Pultorak saying that we're going to take the bikes?
12    A.     Maybe -- it was brief.  Fifteen seconds.
13    Q.     Okay.  And then Pultorak starts showing handcuffs to
14    Mr. Cole?
15    A.     He brought -- yeah.  He brought them out.  He didn't
16    show them.  He was coming closer to him.
17    Q.     Now, at that time had you seen Mr. Cole do anything
18    illegal?
19    A.     Other than the fact he claimed it was his campsite
20    and there was a stolen motorcycle in there, no.
21    Q.     Had he said, when Pultorak had said he was going to
22    take the motorcycles, do you know if Cole had said that
23    they're not mine or anything to that effect?
24    A.     I don't recall if he said anything about it.
25    Q.     You had run the one motorcycle and found it had been

APPENDIX 14
Page 16 of 50

73

| | | |
|---|---|---|
| 1 | A. | Not like that, no. |
| 2 | Q. | How? |
| 3 | A. | He kind of -- he kind of brushed it back. |
| 4 | Q. | Brushed it back? |
| 5 | A. | Yeah.  It almost looked like an old western where |

they square off in the city streets for, like, a gun duel.
You bring it back and -- so you can grab it quickly.  That's
what it looked like.

9         (Witness demonstrates.)

10   Q.    And is Cole facing you -- or he's facing Pultorak,
11 right?

12   A.    His body is facing me.

13   Q.    Okay.  And --

14   A.    And he's looking at Ranger Pultorak.

15   Q.    But at that point he had not reached for the gun,
16 correct?

17   A.    His hand was down there.  I don't know what you mean
18 by reached.  He hadn't brought it out or anything.

19   Q.    Okay.  And at that point you have your gun -- you
20 immediately take your gun out when he says he's armed,
21 correct?

22   A.    When he says he's armed and brings his jacket back
23 and I see it, my gun comes out, yes.

24   Q.    And does Pultorak's too?

25   A.    I'm watching -- I initially thought he had because he

*In his later plea, he states 3 times that he saw Ranger Pultorak drew his gun. This testimony changed from his previous statements.*

*APPENDIX 14*
*Page 17 of 21*

74

```
1    had -- I guess I'm seeing handcuffs, but as soon as I see

2    Mr. Cole's gun, my attention is on him.  And I'm yelling at

3    him to drop it.

4    Q.     You don't know who fired the first shot, do you?

5    A.     No, I don't.

6           MR. TONEY:  Would this be an appropriate break time?

7           THE COURT:  Yes.  Court is in recess for 15 minutes.

8           MR. TONEY:  I got it.  Thank you.

9           (Off the record at 3:01 p.m.)

10          (Back on the record at 3:17 p.m.)

11          THE CLERK:  You may remain seated.

12          Court is now in session.

13          THE COURT:  All participants are present.

14          You may proceed.

15          MR. TONEY:  Thank you.

16   BY MR. TONEY:

17   Q.     Running the motorcycle that was shown stolen, do you

18   recall if dispatch said that was not recovered?

19          Does that mean something to you, "not recovered"?

20   A.     An unrecovered stolen?

21   Q.     Yeah.

22   A.     Well, they told me it was 1036, which means it is

23   stolen.

24   Q.     Okay.  If it were said to be unrecovered, would that

25   mean it had been stolen for a period of time?
```

75

1    A.    It means it hasn't been found.  Or, yeah, recovered.

2    It's still outstanding.

3    Q.    Now, was Mr. Cole standing, as far as you could tell,

4    during the entire gun fire exchange?

5    A.    Standing up?

6    Q.    Yeah.

7    A.    Yeah.

8    Q.    Now, the stolen motorcycle -- the camp was in a

9    clearing, correct?

10   A.    Correct.

11   Q.    The stolen motorcycle was not in that clearing, was

12   it?

13   A.    No.

14   Q.    Where was the stolen motorcycle?

15         Was it in the trees?

16   A.    Yeah.  It was kind of under some foliage, trees,

17   bushes.

18   Q.    So how far from the site where Mr. Cole's belongings

19   were was it to the location of the motorcycle?

20   A.    Probably 15, 20 feet.

21   Q.    Prior to the shooting, you didn't hear Pultorak tell

22   the defendant he was under arrest, did you?

23   A.    No.

24   Q.    Or that he was being detained?

25   A.    No.

76

1    Q.      Or explain to him in any way why he would be

2    handcuffed?

3    A.      I did not hear that, no.

4    Q.      Prior to the actual first shot, from whomever shot

5    it, was -- had Pultorak put the handcuffs back?

6    A.      Back in his case or whatever?

7    Q.      Yeah.

8    A.      No.

9    Q.      If you feel you need to detain someone who is

10   apparently being polite, do you normally tell them what you

11   are doing and why you are doing it?

12           MR. COPPOLA:  Objection.  Relevance at this point.

13           THE COURT:  Overruled.

14           THE WITNESS:  Do I?  Yeah.

15           MR. TONEY:  That's all I have.

16                        REDIRECT EXAMINATION

17   BY MR. COPPOLA:

18   Q.      Mr. Toney asked you some questions about the word

19   "unrecovered"?

20   A.      Correct.

21   Q.      Do you recall those questions?

22   A.      Yes.

23   Q.      Okay.  Did dispatch ever say anything to you about

24   the motorcycle being unrecovered?

25   A.      The fact that it is 1036, which is stolen, it hasn't

77

1    been recovered.

2    Q.      Okay.

3    A.      So they don't say it is 1036 unrecovered.

4    Q.      So the only -- if I understand your testimony

5    correctly, the only thing you heard from dispatch about that

6    motorcycle was that code that you just said, 1036?

7    A.      1036 Frank out of Grass Valley.

8    Q.      Okay.  Now, Officer Hardin, with respect to the

9    shooting itself, when was it that you heard the first shot?

10   A.      Once Mr. Cole had grabbed his gun and extended it out

11   the first shot went off.

12   Q.      And Officer Hardin, when you tripped over or fell

13   backwards, rather, over the fire pit, did you attempt to use

14   your radio during that period?

15   A.      Yes, I did.

16   Q.      Were you successful in radioing out?

17   A.      No.

18   Q.      Was your radio out of range at that point?

19   A.      Correct.  Our car -- from our handhelds, you have to

20   be so close to your car to have it, then relay to our

21   dispatch.  Apparently I was a little bit farther than what's

22   allowed.

23         MR. COPPOLA:  If I could have just a moment, Your

24   Honor.

25         (Government cocounsel confer.)

*Handwritten in left margin:* He already Said he did not know who fired First. Now he Knows?

78

1          MR. COPPOLA:  I don't have any further questions at

2     this time.

3          THE COURT:  Okay.

4          MR. TONEY:  Nothing else.

5          THE COURT:  You are excused.

6          MR. TONEY:  Can he be subject to recall?

7     I'm not certain that I need it, but I would ask that.

8          THE COURT:  Okay.

9          MR. COPPOLA:  That's fine, Your Honor.

10          THE COURT:  He's asking whether he should stay here

11     today.

12          MR. TONEY:  Absolutely not.  I'll be happy to tell

13     the prosecution a full day in advance if he's needed, if

14     that's okay.

15          (Whereupon, excerpt concluded.)

16                    ---o0o---

17

18

19

20

21

22

23

24

25

*[handwritten annotation: Why did Mr. Toney Not ask about the changed testimony since break?]*

APPENDIX G
Page 1 of 7



# OFFICE OF THE
# DISTRICT ATTORNEY
## COUNTY OF NEVADA



**CLIFFORD H. NEWELL**
DISTRICT ATTORNEY

**ANNA M. FERGUSON**
ASSISTANT DISTRICT ATTORNEY

**RANDY BILLINGSLEY**
CHIEF INVESTIGATOR

## INVESTIGATIVE MEMORANDUM
## Case Name: Cole, Brent
## DA: 14-06-031256
## F14-000267

## NCSO Case: 1140-1626

On Wednesday, June 18, 2014, Detective Rusty Greene and I interviewed victim BLM Officer Pultorak at the Nevada County Sheriff's Department. The interview was recorded, starting at 9:31 AM and concluded at 10:35 AM.

Attached is a corrected transcript of the interview with Officer Pultorak.

**Tom Swisher**
**Criminal Investigator**
**Nevada County District Attorney's Office**

APPENDIX G
Page 3 of 52
PETITION FOR REVIEW 9th Circuit

APPENDIX
Page 2 of

APPENDIX G
Page 4 of 53

1
2
3
4
5
6
7           **INTERVIEW WITH OFC. TAD PULTORAK**
8                     **Q=Det. Green**
9                   **Q1=Tom Swisher**
10                **Q2=(Jeff Jacobson)**
11                   **A=Tad Pultorak**
12
13

14   Q:             And do you guys have a recordin'? Are you guys gonna record?
15

16   Q2:           No.
17

18   Q:             So I'm gonna go ahead and start both of these two. We do two, just, to make
19                     sure that everything's captured.
20

21   A:             Okay.
22

23   Q:             And you know who I am Tad. But I just want it on - on record. Make sure that
24                     we have, uh, everybody in here introduces themselves so it's on recordin'. Uh,
25                     who's present. So we're start off, just, by going off - around the room and say
26                     that. So my name's Rusty Green. I'm a detective with the Sheriff's
27                     Department, uh, investigating the case. Uh, you guys are here voluntarily. So,
28                     uh, any time you guys wanna stop, take a break, whatever all you gotta do is
29                     let us know. Okay? Um, Tom you wanna?
30

31   Q1:           Uh, Tom Swisher, criminal investigator with the Nevada County District
32                     Attorney's Office.
33

34   Q2:           I'm (Jeff Jacobson). I'm an attorney with the Federal Law Enforcement
35                     Officers Association representing Tad.
36

37   A:             Uh, Tad Pultorak, Law Enforcement Ranger with Bureau of Land
38                     Management of the, uh, El Dorado Hills Field Office.
39

40   Q:             Um, Tad, durin' the interview is it okay if we refer you to as Tad?
41

42   A:             That's fine.
43

44   Q:             Is it - is that okay with you?
45

APPENDIX 15
Page 3 OF 7
APPENDIX 6
Page 5 of 52

| | | |
|---|---|---|
| 46 | A: | Yeah. |
| 47 | | |
| 48 | Q: | Okay. Uh, you have any questions before we get started? |
| 49 | | |
| 50 | A: | No. |
| 51 | | |
| 52 | Q1: | I - I - I, just, have one. I'm sorry. How do you spell your last name? |
| 53 | | |
| 54 | A: | Uh, it's P as in Paul, U-L-T as in Tom, O-R-A-K. |
| 55 | | |
| 56 | Q1: | Thank you. |
| 57 | | |
| 58 | A: | You're welcome. |
| 59 | | |
| 60 | Q: | All right. Just, to begin with Tad, we're gonna ask ya some questions and |
| 61 | | stuff, like, that. If you don't know you don't know. We're not expecting you |
| 62 | | to know everything. All that we ask is that you, just, tell us hey I don't know. |
| 63 | | Don't - don't try to assume or guess or anything, like, that. Just, you don't |
| 64 | | know. You don't know. That's - and that's expected. There's gonna be things |
| 65 | | that you're not gonna know. Okay? |
| 66 | | |
| 67 | A: | Yes. |
| 68 | | |
| 69 | Q: | So don't feel, like, we think you're gonna have all the answers. |
| 70 | | |
| 71 | A: | Okay. |
| 72 | | |
| 73 | Q: | Um, so with that in mind, uh, the first part's, just, gonna be general questions. |
| 74 | | Uh, stuff that we - we ask of everyone involved. Okay? |
| 75 | | |
| 76 | A: | Okay. |
| 77 | | |
| 78 | Q: | So, uh, startin' off, uh, what's your assignment? |
| 79 | | |
| 80 | A: | Uh, my position title is Resident Law Enforcement Ranger. Uh, which means |
| 81 | | I'm a remote office. Our main field office is the, uh, in El Dorado Hills in |
| 82 | | California. The mother load field office. Uh, my duty station is up here mainly |
| 83 | | in Nevada County. And I have an office up in the or over down the street at |
| 84 | | the Forest Service, uh, Supervisor Office. Um, so my assignment is basic |
| 85 | | patrol. Uniform patrol. |
| 86 | | |
| 87 | Q: | And that's - that's a ranger with... |
| 88 | | |
| 89 | A: | With Bureau of Line Management, yes. |
| 90 | | |

INTERVIEW WITH TAD PULTORAK
Interviewer: Det. Green
06-18-14/9:31 am
Case # NCSO 1140-1626
Page 6

| 226 | A: | Oh yes, sir. It has the BLM patch on both sleeves. And it has a rocker up |
| 227 | | above that says - it says the Department of Interior or Bureau of Land |
| 228 | | Management above the, uh, the BLM patch. |
| 229 | | |
| 230 | Q: | Okay. So you're clearly identified as a law enforcement officer? |
| 231 | | |
| 232 | A: | Yes, sir. |
| 233 | | |
| 234 | Q: | Okay. Now were you under the care of a doctor or dentist? Were you taking |
| 235 | | any medication? |
| 236 | | |
| 237 | A: | No, sir. |
| 238 | | |
| 239 | Q: | Okay. Had you been drinking at all? |
| 240 | | |
| 241 | A: | No, sir. |
| 242 | | |
| 243 | Q: | Okay. Uh, prior to starting your shift did you - did you sleep the night before? |
| 244 | | |
| 245 | A: | I did. Uh, six or seven hours. I - I don't know exactly when I went to bed but |
| 246 | | it was a fair amount of time. |
| 247 | | |
| 248 | Q: | Okay. And is that a normal night's sleep for ya? |
| 249 | | |
| 250 | A: | Yes. |
| 251 | | |
| 252 | Q: | Okay. So - so when you started this shift there was no - no problems really |
| 253 | | you were bringin' into work? You weren't... |
| 254 | | |
| 255 | A: | No. |
| 256 | | |
| 257 | Q: | Okay. All right. Okay. Um, so why don't you st- start by describin' to me |
| 258 | | your shift and what transpired. |
| 259 | | |
| 260 | A: | Okay. Um, like, we were talkin' about. It's, uh, just, uniform patrol. So I |
| 261 | | started my patrol goin' down from Edwards Crossing, uh, from, uh, North |
| 262 | | Bloomfield Road. My main goal was to get to the - the - our one campground |
| 263 | | that we have. Um, but I stopped off on (Spur) Road, uh, to check it out. |
| 264 | | Because, um, occasionally folks camp up in the (Spur) Road. I go up there and |
| 265 | | find a mattress that somebody had dumped. And, um, instead of leavin' it |
| 266 | | there I - I throw it in the back of my truck. And while I was dealin' with that a |
| 267 | | blue truck came down from, uh, the (Spur) Road continues but it's brushed in. |
| 268 | | Completely brushed in. And, um, his truck was small enough to make it |
| 269 | | through. He came drivin' down. And it's closed to vehicular traffic this road. |
| 270 | | He came down from the road. I made a vehicle stop on him. And I went up to |

271    the vehicle and there were three individuals. A driver and two passengers in
272    the truck. Identified two of them. Um, the driver by his license. The center
273    passenger by, uh, name and date of birth. By word of mouth. The third
274    passenger I had dealt with a week and a half, two weeks prior. And I had run
275    him then. So I didn't, uh, I did get hi ID. But I did not - I did not run him since
276    I had already done that, uh, less than two weeks ago. And ran the vehicle.
277    And, um, both the driver and the center passenger they came back clear. Uh,
278    the driver was clear. The center passenger, I believe, was suspended revoked.
279    Uh, the vehicle itself he didn't have a - a valid insurance but it was a couple
280    months out. It wasn't that far out expired. Uh, but the vehicle itself came back
281    clear and valid. Um, I told him that it was - it was a closed area to vehicles.
282    Uh, he became kind of argumentative with me. And I - I, just, made it clear to
283    him that even though there were no signs I'm tellin' him that it's closed to
284    vehicular traffic. And if he - if I saw him up here again with a vehicle he'd be
285    ticketed and his vehicle might be impounded. He said he understood. And
286    then I cleared that contact. Um, after they left I drove up where he came from,
287    uh, to see what was up there. Uh, I found a campsite, uh, with two
288    motorcycles and gear, food, stuffs and cookin' equipment and that sort of
289    thing. Uh, I started investigatin' the two motorcycles. One had a California,
290    uh, license plate on it. Uh, the other one did not. It had the frame and the
291    wheels but the seat and - and some other items were removed from it. Uh, I
292    got the VIN off from it, however. And it was intact. I wrote it down. And I
293    called, uh, my - my Grass Valley Forest Service Dispatch and ran both of
294    them. The one with the tag came back 2009 expired. The other one they - they
295    told me it was a non-recovered vehicle and they didn't explain everything
296    after that. Uh, I called for CHP because to impound the vehicle, um, with the,
297    uh, California 180 Form. So I asked if there was a CHP, uh, unit available to
298    come assist me with that. They got back to me. They said, "Yes. One will be
299    in route." And I went down to the, uh, intersection of North Bloomfield and
300    the (Spur) Road and waited. Just, stood by. Uh, make it easier for the CHP
301    unit to find me since it's the main road. Uh, he eventually showed up. And I
302    briefed him. I gave him, uh, the VIN that I wrote down as well as the license
303    plate that I wrote down in my notebook. He ran it through his dispatch. He
304    only ran the VIN, I believe. And he said, uh, they came back that it's stolen -
305    stolen vehicle. And, uh, we were workin' out logistics how to get it. And he
306    wanted to go up and check out the area. Uh, we drove up to the flat area where
307    I picked the mattress up and walked up to the campsite. Um, we were gettin'
308    together the, uh, the parts for the motorcycle. Uh, I believe, he called a tow.
309    I'm not exactly sure if he had or not. Uh, we were gettin' all the parts together
310    to, I guess, transport them down to the flat area for it to be more easily
311    accessible for the impound. Um, while we were doin' that I hear a brush, uh,
312    crunchin' in the background. And it sounds, like, a human to me. Comin'
313    through the woods. I drop what I'm doin'. I got to the wood line at the
314    campsite. And I see a person comin' towards the - toward the campsite
315    through the woods. I say, "Hello. Police. Who's there?" And the individual

Case 2:14-cr-00269-GEB Document 155 Filed 09/08/15 Page 92 of 203

APPENDIX 6 of 6
Page 6 of 6
APPENDIX G
APPENDIX H of 52
Page H of 52

INTERVIEW WITH TAD PULTORAK
Interviewer: Det. Green
06-18-14/9:31 am
Case # NCSO 1140-1626
Page 8

316 responds, "Uh, you know me. You've dealt with me a little bit ago. I'm, just,
317 comin' up to get my stuff." I said, "Okay." Um, and he - he continued to walk
318 toward the - the campsite. Uh, at the wood line I told him to stop right there.
319 And I said, "Do you have any," um, before that I got out my handcuffs. I said,
320 "Do you have any weapons on you?" He said, "Yes." I said, "Turn around."
321 "No I'm not gonna turn around" I about took a step forward I said, "Turn
322 around now." He yelled very loudly, "I'm not going to turn around now." And
323 then I saw his right hand go to his waistband. Draw out something silver.
324 Continue drawing it out. And I see a gun being raised toward me. At that point
325 I duck, startin' to draw my weapon. I hear a loud boom in my left ear. And my
326 left shoulder I feel a twinge. Um, I raise my weapon up. Um, engage the
327 suspect while I'm moving to the right - to my right. Um, I forget how many
328 steps I took but there's a bunch of manzanita. And I stopped when there was
329 manzanita between myself and the suspect. I was still aimed in where I last
330 saw - saw him and stopped. Um, I couldn't hear anything. Um, and I saw I
331 had my handcuffs. I dropped the handcuffs. Uh, dropped the magazine,
332 reloaded and, uh, press checked. I heard the CHP officer, "Drop the gun. Drop
333 the gun now." I hear the suspect, "I threw the gun away. I threw the gun
334 away." And CHP officer says to me, "Tad." "Yes, sir." "Get over here." I'm
335 still aimin' down range. I duck, pick up the magazine that I dropped 'cause I
336 saw that there was a round in it still. So put it in my magazine pouch and go
337 over to the CHP officer. Um, we come up with a plan to approach the subject.
338 And, um, handcuff him. At that point, uh, it's me coverin' him. CHP, uh, he
339 went to cuff. After that, uh, CHP officer, uh, said he had to go down to the
340 trucks can I cover him. I said, "Yes. No problem. I got him." And he went
341 down to the trucks. And I'm coverin' the suspect. Um, and then I get onto my
342 dispatch sayin', "Shots fired. You know, I was hit. Suspect was hit. And, you
343 know, send back up. Everybody." Uh, which they were workin' on. They did,
344 you know, checks with me every - every few minutes. Um, CHP eventually
345 returned, uh, with the med kit. Started doin' EMS on him - on the suspect. I
346 was doin' self-assessment. I didn't see any blood from here down, I'm sorry,
347 from my chest down. I, just, kept lookin' at my shoulder because the blood
348 spot kept expandin' on my shoulder. Um, it didn't hurt. It wasn't expandin'
349 that quickly. I - doing the self-assessment I didn't think that it was that
350 serious. Um, I was still conscious. I didn't feel light headed or anything. And I
351 was able to remain focused on the suspect. CHP starts doin' the, uh, EMS.
352 Other units arrive. Um, and eventually I get, uh, the clearance to go down to
353 the - to medics where they checked me out. Uh, took my shirt - my uniform
354 shirt. Um, cut my undershirt and the guy put some gauze on the wound and
355 patched me up. Transported by ground to the helicopter. Flew from the LZ
356 which I heard was at the (Grizzle Hill School). I - I couldn't see lookin' at the
357 ceilin'. They flew me from there to Roseville. Where, um, they did their thing
358 in the ER so.
359

| | | |
|---|---|---|
| 360<br>361<br>362<br>363 | Q: | Okay. Okay. Um, yesterday at this time when we, uh, took a break. You wanna break or do you wanna keep goin'. Um, usually what- what's gonna happen is Tom is probably gonna direct you - more direct questions now. |
| 364<br>365 | A: | Mm-hmm. |
| 366<br>367 | Q: | Um, but we can take a break or we can keep going. It's up to you. |
| 368<br>369 | A: | Mind if I use the bathroom? |
| 370<br>371 | Q: | No. No. |
| 372<br>373 | A: | I was drinkin' some water earlier. |
| 374<br>375 | Q: | Yeah. We'll take a break. |
| 376<br>377 | A: | Great. |
| 378<br>379 | Q: | Let me pause. |
| 380<br>381<br>382<br>383<br>384 | Q1: | It's now about 9:51 in the morning. This is, uh, Tom Swisher. I'm a criminal investigator with the Nevada County DA's Office. Um, we're still conducting the interview, uh, with BLM Officer Tad and I'm not gonna insult you that - how - how do you pronounce your last name? |
| 385<br>386 | A: | It's Pultorak. |
| 387<br>388<br>389 | Q1: | Okay. When - when you and the CHP Officer got up to - what I'm gonna - I'm gonna refer to it as the campsite that you - you talked about. |
| 390<br>391 | A: | Okay. |
| 392<br>393 | Q1: | Okay. And you said there were two motorcycles. |
| 394<br>395 | A: | Yes sir. |
| 396<br>397<br>398 | Q1: | Uh, I've been out there and I've seen some photographs. What I'm gonna ask you to do is, um, to start with, do you remember about where the fire pit was? |
| 399<br>400 | A: | Yes sir. |
| 401<br>402 | Q1: | Okay. Start - draw me about where the fire pit was. |
| 403<br>404 | A: | Okay. |

1                        GRAND JURY 2014A

2                 EASTERN DISTRICT OF CALIFORNIA

3

4

5

6

7

8

9               REPORTER'S TRANSCRIPT OF PROCEEDINGS

10               TESTIMONY OF KYLE RUTHERFORD

11               AT 501 I STREET, SACRAMENTO

12           THURSDAY, OCTOBER 2, 2014, 10:11 A.M.

13

14

15

16

17

18  FOR THE GOVERNMENT:

19         BENJAMIN B. WAGNER

20         UNITED STATES ATTORNEY

21         BY:  MICHAEL D. McCOY

22         ASSISTANT UNITED STATES ATTORNEY

23         U.S. DEPARTMENT OF JUSTICE

24         501 I STREET, SUITE 10-100

25         SACRAMENTO, CALIFORNIA 95814

COLE_01283

APPENDIX 16
Page 2 OF 1

```
 1                           INDEX

 2                                                        Page

 3   KYLE RUTHERFORD

 4          Examination by MICHAEL D. McCOY                  3

 5

 6                          -oOo-

 7

 8                         EXHIBITS

 9   Number                Description                     Page

10   None

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

COLE_01284

APPENDIX 16
Page 3 of 7

```
 1              THURSDAY, OCTOBER 2, 2014; 10:11 A.M.
 2          THE FOREPERSON:  Are you ready for the oath?
 3          THE WITNESS:  Yep.
 4          THE FOREPERSON:  Would you state and spell your name
 5   for the record.
 6          THE WITNESS:  It's Kyle Edward Rutherford.  K-y-l-e.
 7   E-d-w-a-r-d.  And Rutherford, R-u-t-h-e-r-f-o-r-d.
 8          THE FOREPERSON:  Thank you.
 9
10                     KYLE RUTHERFORD,
11   having been duly sworn, testified as follows:
12          THE FOREPERSON:  Thank you.
13
14                     EXAMINATION
15
16   BY MR. McCOY:
17          Q.     Please take a seat.  All right.  Good morning.
18          A.     Good morning.
19          Q.     Where are you currently employed?
20          A.     I work for Nevada County Fire, and I also work
21   for Sierra Nevada Ambulance.
22          Q.     All right.  Let's -- and what is your position
23   with Sierra Nevada Ambulance?
24          A.     I'm a paramedic.
25          Q.     And how long have you been a paramedic?
```

COLE_01285

APPEN TX 16
Page 4 of

```
 1          A.      Yes.

 2          Q.      Okay.  Who was brought to the emergency

 3    center.  They bring Mr. Cole down to you.  He's in this

 4    stretcher device of some sort?

 5          A.      Uh-huh.

 6          Q.      What's the first thing you do when you get the

 7    patient?

 8          A.      So, I get him.  Do, you know, a quick look at

 9    him.  Listen to the, you know, the fire department.  It was

10    North San Juan Fire Department is telling me his injuries

11    and kind of briefly what happened.

12                  So, I'm looking at him.  He's got a bullet

13    wound under -- below his belly button.  And to me it looked

14    like an exit wound out his inner thigh.  And then, he had

15    also been shot -- I don't recall which arm he had shot, but

16    basically through his bicep.  So, at that point I kind of do

17    a quick little assessment.

18                  At that point I decided I wanted to put him in

19    C-spine which is where we put him on a backboard and strap

20    his head down and secure his spine so that it's immobile.

21          Q.      And why do you do that?  What's --

22          A.      Basically with the fact that he's got an

23    entrance wound and an exit wound that's not in line, I don't

24    know where that bullet had gone in throughout his -- his

25    body cavity.  So, at that point in order to protect his
```

COLE_01293

APPENDIX 16
Page 5 of 9

```
 1   spine from further damage, I hold it in a neutral position.

 2        Q.    Which keeps him immobile?

 3        A.    Yes.  I mean, his arms -- his arms are mobile.

 4   But, you know, he's strapped from his ankles all the way up

 5   to the top of his head, so....

 6        Q.    Okay.  Now, once he's in C-spine -- well,

 7   while he's being put into C-spine, are you also assessing,

 8   you know, like his blood pressure and breathing and heart

 9   rate and all that stuff?

10        A.    Yes.  You know, I do what we call a rapid

11   trauma survey.  So, I look at him head to toe in the major

12   areas that are life-threatening.  You know, so I'm going to

13   look in his ears real quick.  Look in his mouth.  You know,

14   assess his breathing.  Maybe put my hand on his pulse to

15   check that.  Kind of look over.

16             You know, obviously the fire department had

17   already what we call stripped and flipped him.  So, they cut

18   off all of his clothes.  Checked to see all the wounds and

19   then went and they'll flip him over and check the back of

20   him and see if there's any wounds.  So, the fire department

21   already kind of told me where his wounds were, but I still

22   double check.

23             I had him squeeze my hands, have him push on

24   my feet to see if he's got any alert neurological deficits.

25   I'll ask him orientation questions.  Basically, you know,
```

COLE_01294

APPENDIX
Page 6 of 9

```
 1   what year it is, who's the president, how many quarters make
 2   a dollar.  And by him answering those correctly, I know that
 3   his mentation is -- is correct.
 4        Q.    And did -- did he answer those questions
 5   correctly?
 6        A.    Yes.
 7        Q.    And how was he when you asked him to squeeze
 8   your hand or push back on you?  How -- well --
 9        A.    He had good grips, good push/pulls.  So, I
10   didn't see any deficits from -- from the wound.
11        Q.    So, based on that and the assessment of
12   mentation which are the questions you asked him; is that
13   correct?
14        A.    Uh-huh.
15        Q.    Does it also include push-backs as well or --
16   and the squeezing, or is that a separate test?
17        A.    Well, basically the squeezing and the pushback
18   is I'm checking how well his motor skills are, and then
19   the -- the questions are his mentation.
20        Q.    Okay.  And so, you said he answered all the
21   questions correctly?
22        A.    Yes.
23        Q.    Which indicates what?
24        A.    That he's oriented.  He knows what's going on.
25   He's alert -- what we call alert and oriented.
```

COLE_01295

APPENDIX 16
Page 7 of 9

```
 1        A.      I asked him what happened.  And he had told me
 2   that the officers had drew his gun, their guns at him, and
 3   he didn't have a choice but to -- to shoot back at the
 4   officers or to shoot at the officers.
 5        Q.      And did he say what he -- what type of weapon
 6   he used to fire at them?
 7        A.      He did.  He said he had used a .44.
 8        Q.      And when he told you that he shot at the
 9   officers, how did you respond if at all to that?
10        A.      I told him, "You can't shoot at cops."
11        Q.      And what did he say when you said that?  What
12   did he say --
13        A.      He in turn said basically the same thing, that
14   he didn't have a choice but -- but to shoot at them because
15   they had drawn on him.
16                And at that point I kind of repeated the same
17   thing, "You can't shoot at officers."
18                At that point, he started to become agitated
19   and wanted to argue with me.  And I just -- I dropped it.
20   Didn't need to irritate --
21        Q.      To agitate the patient?
22        A.      Yeah.
23        Q.      Any more agitated I guess?
24        A.      Yeah.
25        Q.      How long -- well, let me ask you this:  You
```

COLE_01300

APPEN  EX 16
Page 89

```
 1        Q.      Okay.  How are his vitals at the time
 2   initially?
 3        A.      When we got him, he was -- his blood pressure
 4   was low.  It was around 70 systolic which is low.  120 is
 5   considered normal.  Below 100 is where we start paying
 6   attention what's going on.
 7        Q.      Okay.  What did you do -- at this point after
 8   you've done the assessment and he's put into a C-spine, this
 9   initial assessment, is he then placed into the ambulance?
10        A.      Yes.
11        Q.      Okay.  And time-wise from the time you
12   received the patient and he came down in the stretcher
13   device thing and the time that you actually get him to the
14   ambulance, how much time passed would you say approximately?
15        A.      Three minutes.
16        Q.      So, pretty quick?
17        A.      Yeah.
18        Q.      So, once you get him in the ambulance, do you
19   depart right away at that --
20        A.      Yes.
21        Q.      -- at that point?
22                And did you at that point know where you were
23   headed?
24        A.      Yes.  We had -- well, actually, at that point
25   we had another North San Juan guy drive us out.  And he
```

COLE_01296

APPENDIX 16
Page 9 of

```
 1    said that when you asked him what happened, he said the
 2    officers drew their guns on him and he -- and he shot.  How
 3    did you take that to mean?
 4              Did you mean that they -- that he -- they
 5    fired first and he responded, or they drew their guns and he
 6    fired first?
 7         A.   The second.  I felt that his inter- -- or my
 8    interpretation was that they drew on him and he didn't have
 9    a choice but to shoot at them.
10         Q.   How long did it take you to get from where you
11    loaded the -- Mr. Cole into the ambulance to the landing
12    zone?
13         A.   Ten to twenty minutes.
14         Q.   And did you give him any more fluids other
15    than the 1,000 milliliters?
16         A.   No, that was continuously running.  And by the
17    time I had gotten to the LZ, it was at 1,000.
18         Q.   Was he complaining of pain during the trip
19    over there?
20         A.   Yes.
21         Q.   And where?
22         A.   Just kind of in the general groin area.  And
23    then in the arm that he had been shot in.
24         Q.   Did he complain of dizziness or feeling like
25    he was going to black out or anything along those lines?
```

COLE_01301

Capital Reporting Company
Radon, Michael 09-04-2014

1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

*APPENDIX 17*
*Page 1 of 8*

--o0o--

REPORTER'S TRANSCRIPT OF
PROCEEDINGS OF AN INVESTIGATION
CONDUCTED BY THE GRAND JURY

--o0o--

HELD IN
GRAND JURY ROOM NO. 5-200
ROBERT MATSUI COURTHOUSE
SACRAMENTO, CALIFORNIA

--o0o--

SEPTEMBER 4, 2014

12:51 p.m.

--o0o--

APPEARANCES:

Benjamin B. Wagner
United States Attorney
By:  MICHAEL D. McCOY
Assistant United States Attorney
501 I Street, Tenth Floor
Sacramento, California

TRANSCRIBED BY:  SHARI K. DOYLE

2

APPENDIX 17
Page 2 of 8

1                              SACRAMENTO, CALIFORNIA

2                              September 4, 2014

3                              12:51 P.M.

4                       --oOo--

5                  MICHAEL RADON

6        was sworn and testified as follows:

7              BY MR. McCOY:

8        Q.    Good afternoon.  Mr. Radon, how old are

9   you?

10       A.    I'm 50.

11       Q.    Fifty years old?  And you have -- are

12  you currently married?

13       A.    Divorced.

14       Q.    Divorced.  Do you have any children?

15       A.    I have two daughters.

16       Q.    And what are their ages?

17       A.    Thirty and 31.

18       Q.    Okay.  And where are you currently

19  living?

20       A.    In North San Juan area.

21       Q.    And are you -- do your children -- both

22  of your children are grown, obviously, but they

APPENDIX 17
Page 3 of 8

19

1     A.    Yes.

2          Q.    And your brother's and Cole's, correct?

3     A.    Correct.

4          Q.    Okay.  Your brother was asked to exit

5    the vehicle, correct?

6     A.    Correct.  Probably because he's the only

7    one that didn't have his ID card on him.

8          Q.    Okay.  How long was the -- and the

9    ranger took the cards and went back to his

10   vehicle, is that correct?

11    A.    Took our cards and Kevin back to the

12   back of the vehicle.

13         Q.    How long was the ranger away before he

14   came back to the window and gave you back your

15   cards?

16    A.    Ten or 15 minutes.

17         Q.    And when he got back, what, if anything,

18   did he tell you guys?

19    A.    He told us to get out of here and that

20   we're not allowed on the road because it's a

21   closed road.

22         Q.    And what was your -- did Mr. Cole

Capital Reporting Company
Radon, Michael  09-04-2014

APPENDIX 17
Page 4 of 8

20

1   respond to that?

2       A.   He did.

3       Q.   What did he say?

4       A.   He said this isn't a closed road, there

5   ain't no gate on it, no sign.

6       Q.   And what did the ranger say?

7       A.   He did it kind of angry, too, he said

8   I'm the --

9       Q.   I'm the what?  I'm sorry?

10      A.   He goes like this up against the window.

11  He goes I'm the -- and don't let me see you back

12  again or I'll have your vehicle towed.

13      Q.   And is that how it ended?

14      A.   Pretty much how it ended.  Cole gave me

15  a dirty look.

16      Q.   Cole gave you a dirty look?

17      A.   Yeah, like I could tell how frustrated

18  he was because he wouldn't let him speak to say,

19  hey, our stuff's up there.

20      Q.   You guys drove off then?  The ranger

21  allowed you to drive off?

22      A.   Yeah.



21

```
 1        Q.    Now, you have your stuff up there and

 2   you just testified that you --

 3        A.    And some of his stuff was up there, too.

 4        Q.    And Mr. Cole's stuff, correct?

 5        A.    Um-hum.

 6        Q.    And you just testified that you

 7   recognized this same ranger as the one who told

 8   you to leave the last campsite, right?

 9        A.    Um-hum.

10        Q.    Were you concerned about your stuff at

11   that point?

12        A.    Yes, I was concerned.

13        Q.    All right.  And what -- did you express

14   that concern to Michael or to Kevin or to Cole?

15        A.    Never got a chance.

16        Q.    Pardon me?

17        A.    To the ranger or --

18        Q.    No, not to the ranger, but I mean to Mr.

19   Cole or your brother?

20        A.    Well, yeah.

21        Q.    Pardon me?

22        A.    Yeah.
```

APPENDIX 17
page 6 of 6

Capital Reporting Company
Radon, Michael  09-04-2014

22

1      Q.    What did you say to him?

2      A.    But not to the ranger because he never

3   gave us a chance to.

4      Q.    I understand.  What did you say to Mr.

5   Cole about that concern, though?

6      A.    Just that I hope he doesn't go up and

7   trash through my stuff again; I'm tired of it.

8   Every time it -- all my freshly clean laundry is

9   all over the dirt.  All my important paperwork is

10  all over the ground on the dirt.

11     Q.    And what did Mr. Cole say, if anything,

12  in response to that?

13     A.    He was just like I know.  He was

14  frustrated, too. We're all -- at that point, we're

15  all pretty frustrated.

16     Q.    Did Mr. Cole say anything to you about

17  going back to the campsite after he dropped you

18  off?

19     A.    Yeah.  I told him not wise.

20     Q.    You told him it's not wise?

21     A.    Well, not wise right now.

22     Q.    Why did you say that?

Capital Reporting Company
Radon, Michael 09-04-2014

23

1      A.   Because the ranger looked PO'd.

2      Q.   Okay.  And did Mr. Cole say why he was

3  going back to the campsite?

4      A.   I've met that ranger before a few times.

5  He didn't. He wanted to go find another officer to

6  see if he could get an officer to go with him to

7  try to talk to that ranger.  He realized at that

8  point that he can't; the ranger's not going to let

9  him.  That's what I don't understand.

10     Q.   And you're having this conversation

11  during the trip between the campsite and your

12  aunt's house?

13     A.   Yeah.

14     Q.   Was there any other conversation between

15  you and Mr. Cole about --

16     A.   Not really.  I don't remember a whole

17  lot of it.

18     Q.   So when you -- when he dropped you off

19  at your aunt's house, your understanding was he

20  was going to go find an officer, you said?

21  Another officer?

22     A.   Yeah.

Capital Reporting Company
Radon, Michael 09-04-2014

24

1        Q.    To go back to the camp?

2        A.    Yeah.   There's a community center they

3    have out there, and I just told him, you know, go

4    out to the community center; they have computers

5    there that -- for the local people to use and get

6    on there and see if you can find one.

7        Q.    Find another police officer?

8        A.    Yeah.

9        Q.    Did he say anything about a restraining

10   order, to your knowledge?

11       A.    No.

12       Q.    Okay.   Now, while you're at your aunt's

13   house, sometime after this, you and your brother

14   noticed a lot of police vehicles or law

15   enforcement vehicles traveling down the road with

16   their sirens and lights on, correct?

17       A.    Correct.

18       Q.    And did you have any conversation with

19   your brother about where they were headed?

20       A.    Well, yeah.   It was a code 3 lights and

21   siren on the ranger.   We knew it was somebody got

22   hurt.

- PROOF OF SERVICE - UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF CALIFORNIA
501 "I" Street, Suite 4-200, Sacramento, CA 95814-
2322; United States v. Cole — Case No.: 2:14-cr-00269-GEB
Party: Brent Douglas Cole / x-635066 8W101
    Sacramento County Main Jail
    651 "I" St., 8W101
    Sacramento, CA 95814                APPENDIX 18
                                        Page 1 of 9
Method of Service:
    On (date) Jan. 14, 2015    I served the following documents:
    1.) "MOTION FOR CHANGE OF COUNSEL"   8 pages

With a copy of this certificate of service on the following parties:
    1.) Clerk of the Court, U.S. District Court, Eastern District
    of California, 501 "I" St., Room 4-200, Sacramento, CA
    95814-2322
    2.) J. Toney, Attorney at Law, P.O. Box 1515, Woodland, CA
    95766  Phone/Fax  (530) 666-1908
    3.) Benjamin B. Wagner, United States Attorney, Michael
    D. McCoy, Assistant U.S. Attorney, 501 "I" St., suite 10-100,
    Sacramento, CA 95814 (916) 554-2700
DATE: 01/14/2015       TIME: 1:00 AM
    I hereby certify that I am over 18 years of age and personally
checked and mailed the services of the above listed documents
to the parties listed by placing in a sealed envelope and
depositing into the prison mail system with prepaid postage
affixed.                      Brent D. Cole / x-635066
    Brent Douglas Cole          Signature of Declarant
        Printed name of declarant

Defendant:
Brent D. Cole / X-635066 8W101
2  Sacramento County Main Jail
651 "I" St., Sacramento, CA 95814

APPENDIX 18
Page 2 of 9

4  In Propia persona;

IN THE UNITED STATES DISTRICT COURT

6  FOR THE EASTERN DISTRICT OF CALIFORNIA


| | |
|---|---|
| 8  UNITED STATES of AMERICA, | CASE NO.: 2:14-cr-00269-GEB |
| Plaintiff, | |
| 10   V. | |
| BRENT DOUGLAS COLE, | MOTION FOR CHANGE |
| 12  Defendant, | OF COUNSEL |

DECLARATION

14

I, Brent Douglas Cole, defendant, hereby depose and state:

16

I am indigent and that fact is so recognized by this court,

18

1.) On 9/25/14 I demanded that I be allowed to manage and

20

present my case with the assistance of counsel in accord with

22

the Judiciary Act of 1789, §35 and the Sixth Amendment.

24

2.) This court imposed counsel J. Toney to represent me and ordered

26

me to try to make it work, despite my demand (on 10/7/14).

28  MOTION FOR CHANGE OF COUNSEL - Page 1 of 8

On or about October 19, 2014 defendant stated his goals,

and interests in writing to counsel:

"I am being tortured continuously, subjected to inhumane unlawful treatment, which is cruel and unusual punishment that also constitutes corporal punishment. It is being maliciously inflicted by a plurality of hands, very deliberate, and is intended to maim me for the rest of my life, and prejudice the outcome of my current court case so as to result in a conviction on baseless charges that are predicated on perjury and manipulated evidence. I did not consent to anyone representing me. The court ran over the top of me and my objections that were raised in open court on September 25, 2014: By entering a plea, without my consent or approval, and making sure that I had absolutely no opportunity to speak or even have you present the issues we talked about. The federal marshals physically grabbed me and drug me out of the court room before the court was done hearing my "arraignment", subsequent to imposing "representation" upon me in contravention of my demands and stated objections. My right to manage and present my own case was abrogated by gross violations of due process of law and an assault upon my person in open court. You failed to object. 18 U.S.C. § 2340 defines torture: "an act by a person under color of law specifically intended to inflict severe physical or mental pain or suffering upon

MOTION FOR CHANGE OF COUNSEL - Page 2 of 8

another person..., ""Sacramento County Jail is the "person", ..."

" If I seem brash and abrupt in this letter, I am noted for being brutally honest and having no tact. My purpose is to clarify my position so as to avoid wasting my time or yours if you are unable or not willing to pursue my immediate legal interests, which I do not consider to be even slightly negotable:

1.) My concerns, allegations, objections, and goals must be immediately entered into the court record so as to assure they are recorded timely in the record to preserve grounds for appeal, or resolve.

2.) The denial of medical attention must be ended A.S.A.P. Every day that goes by without it results in the permanent loss of some of the use of my left arm. ..."

" 3.) The unreasonable and unlawful T-SEP classification must be immediately challenged, and I will bring as much retribution as I can for its having been employed.

4.) Some pretrial motions and petitions must be filed A.S.A.P. for release of property and to attain a stay of state court proceedings; and motions for suppressions of evidence and interviews, and for acquittal of these fraudulent charges need be filed before trial.

5.) My right to manage and present my own case congruously with the Judiciary Act of 1789, section 35 MUST BE ENFORCED! 1 Stat., ch. xx, §35 (a Prior Engagement).

MOTION FOR CHANGE OF COUNSEL - Page 3 of 8

"6.) The issue of the Oath required by the Supremacy Clause of the U.S. Constitution having been taken prior to the "Officers" having exercised the duties of their office, and their being bound (there by):

"... all executive and judicial Officers, both of the United States, and of the several States, shall be bound by Oath or Affirmation to support this Constitution ...", See 5 U.S.C. § 3331: Statutory construction is necessary!

"I am innocent of the charges against me, I am the victim. I was viciously and violently attacked, The assault against me was deliberate, and premeditated using semi-automatic weapons wearing body armor. This is a conspiracy against rights and the depriv-ation of rights under color of law targeting the right of the People to keep and bear arms, and attempting to libel the sovereignty movement and Operation Mutual Aid and to fraudulently label both as "domestic terrorist organizations"."

"     If you have any problem with any of these goals or assertions then you need to resign as my assistance of counsel and my "representation."
                                        Brent D. Cole  "

Counsel assented to support these goals by not resigning.

MOTION FOR CHANGE OF COUNSEL - Page 4 of 8

3.) This is a trial of a serious charge. The assigned counsel

2

has grossly neglected the preparation and failed to take

4

needed actions; repeatedly postponing and continually

6

failing to prepare or file motions and petitions

8

he has agreed to prepare and file. Worse, defendant's

10

original papers are never returned and there has

12

not been any discussion or feedback. Counsel has

14

simply prevented defendant from accessing the court.

16

It is worse than just the denial of the right to

18

assistance of counsel, it is subterfuge of every

20

assertion and right of the defendant, and seems

22

clearly intended to assist the prosecution in

24

obtaining conviction while precluding all

26

issues that are grounds for appeal from being raised.
MOTION FOR CHANGE OF COUNSEL — Page 5 of 8

4.) Counsel has shared almost no discovery with the defendant,

has not discussed possible strategy or any information of

what witnesses or evidence the prosecution intends

to use. Counsel has spent less than an hour per month

consulting with the defendant, and has done almost

nothing he has agreed to do. No legal research has

been done and no copies have been made for defendant.

5.) Sacramento County Jail has returned legal research

on only 4 cases and no law, and has not made any

copies. Defendant is thereby denied the ability to

prepare meaningful legal papers or access Courts.

6.) Severe bias has been introduced in this case by

concealment and withholding of evidence, by fraud,

and by tendering false testimony.

MOTION FOR CHANGE OF COUNSEL - Page 6 of 8

7.) Counsel has failed to object to unsworn testimony

being entered as evidence, and failed to object to with-

holding of material evidence from the grand jury.

8.) Counsel has failed/refused to marshal evidence

that was unlawfully seized and illegally withheld that

both is material to innocence and impeachment of

prosecution's key witnesses; NCSO Entry 120.

Absent this evidence the trial cannot be relied upon

to produce a just result. Counsel has deliberately

avoided filing any pleading to obtain this evidence.

Evidence includes proof of motive for the attack

upon the defendant, and proof of a previous attempt

by a police officer to murder the defendant for

having acted in capacity as a statutory federal officer.

MOTION FOR CHANGE OF COUNSEL - Page 7 of 8

APPENDIX

Page 9 of 9

Counsel stated no objections to the demands made by the letter

2

of October 19, 2014, personally delivered by defendant. By

4

remaining as counsel and silent acquiescence counsel agreed.

6

Counsel has repeatedly breached the agreement. Wherefore:

8

The trial has been rendered fundamentally unfair by torts

10

and violation of due process. Defendant moves the court to

12

1.) Dismiss counsel and provide assistance of counsel in

14

compliance with 1 Stat., ch xx, § 35 and the Sixth Amend.;

16

2.) Order Sacramento County Jail to comply with Supreme Court

18

rulings in Bounds v. Smith, 97 S Ct 1491, 1493 and Hutto v. Finney

20   437 U.S. 678, 98 S Ct 2565, 57 L Ed 2d 522, 523.

3.) Order counsel J. Toney to return defendant's documents

22

4.) Order reasonably necessary ancillary services be provided,
     and take all actions deemed appropriate by this Court.

24

     Executed on 01/11/15        Brent D. Cole / X-635066

26   at Sacramento California        Defendant Brent D. Cole

I hereby certify that the foregoing is of my own personal knowledge and is true and
accurate to the best of my knowledge under penalties of perjury.

MOTION FOR CHANGE OF COUNSEL - Page 8 of 8

APPENDIX 19
Page 1 of 5

```
1                THURSDAY, OCTOBER 2, 2014; 10:51 A.M.
2          THE FOREPERSON:  Are you ready for the oath?
3          THE WITNESS:  I am.
4          THE FOREPERSON:  Would you state and spell your name
5     for the record.
6          THE WITNESS:  Andrew Forristel.  F- as in Frank, -o-,
7     double -r-, -i-s-t-e-l.
8
9                          ANDREW FORRISTEL,
10    having been duly sworn, testified as follows:
11         THE FOREPERSON:  Thank you.
12
13                          EXAMINATION
14
15    BY MR. McCOY:
16         Q.    All right.  Good morning.
17         A.    Good morning.
18         Q.    Where are you currently assigned?
19         A.    I'm an FBI agent assigned to the Chico
20    Resident Agency.
21         Q.    And how long have you been an FBI agent?
22         A.    Approximately eleven years.
23         Q.    And have you been assigned to Chico that
24    entire time?
25         A.    No.  My first office assignment was down in
```

COLE_01307

APPENDIX 19
Page 2 of 2

1   Los Angeles.  And I've been up in the Chico area for a
2   little over seven years.
3          Q.     And what as a special agent, specifically an
4   agent assigned to the Chico office, what types of crimes
5   have you investigated over the course of the last eleven
6   years?
7          A.     I've investigated a lot of different types of
8   violent crimes.  Crimes against children.  Child
9   exploitation.  Bank robberies.  Murder for hire.  Fugitives.
10  Narcotics investigations.  And weapon violations.
11         Q.     In your capacity as a special agent with the
12  FBI, did you have the occasion to participate in an
13  investigation involving an individual by the name of Brent
14  Douglas Cole?
15         A.     I did.  I have.
16         Q.     And how did you -- how were you involved in
17  that investigation?
18         A.     On June 14th, I received a call notifying me
19  of an incident that occurred in Nevada County.  That's when
20  I responded to the area and began my involvement in this
21  investigation.
22         Q.     And during the course of -- on that day and in
23  subsequent days and during the course of your investigation
24  as well as your discussions with other law enforcement and
25  medical personnel, were you able to learn certain

COLE_01308

APPENDIX

Page 3 of 25

```
 1    information regarding the incidents that occurred on June

 2    14th, 2014?

 3         A.    I was.

 4         Q.    And I'm assuming you discovered that there had

 5    been a shooting, correct --

 6         A.    Yes.

 7         Q.    -- in Nevada County?

 8               And that allegedly Mr. Brent Douglas Cole had

 9    shot two law enforcement officers; correct?

10         A.    Correct.

11         Q.    If you could, tell the Grand Jury a little bit

12    about the background of the investigation, what you came to

13    learn regarding Mr. Cole's interaction with one or both of

14    the law enforcement officers and how things progressed that

15    day on June 14th, 2014?

16         A.    Sure.  As I previously stated, on June 14th,

17    2014, a law enforcement ranger with the Bureau of Land

18    Management -- I'll sometimes use the acronym BLM -- which is

19    part of the United States Department of Interior was on

20    patrol in rural Nevada County which is in the State and

21    Eastern District of California.

22               (Grand Jury Exhibit 2 was

23               marked for identification)

24         THE WITNESS:  The Grand Jury exhibit that is on the

25    monitor here shows the area that he was patrolling on and
```

COLE_01309

APPENDIX 19
Page 4 of 7

1    near BLM land.  And this graphic of the forested area is

2    approximately eight miles north, northeast of Nevada City as

3    a reference point.

4              The ranger was patrolling the area.  There's a

5    little bridge that crosses over the Yuba River.  And this

6    road is North Bloomfield Road.

7    BY MR. McCOY:

8         Q.    Is that a paved road or a dirt road?

9         A.    It's a dirt road.  The many miles -- I

10   couldn't tell you exactly the distance.  But to get to this

11   area, it's conservatively two to three miles of dirt road

12   off the last portion that's paved.

13        Q.    Okay.

14        A.    The ranger was in this area.  And it will be

15   difficult to see in great clarity especially because I'm

16   jittery.

17             Off North Bloomfield right about here is --

18   you might be able to see some speckled brown.  That's a

19   little dirt road that spurs off North Bloomfield where the

20   pointer is right now.  The ranger had pulled up into this

21   area, and there was a little clearing.

22             And while he was in that area, he observed a

23   blue-colored Dodge pickup truck come off an even smaller

24   dirt road and trail roughly in this area on to the spur

25   where the BLM ranger was and drive past him.  The BLM ranger

COLE_01310

APPENDIX
Page 5 of 21

1  knows that these two roads and trails are not roads that are
2  open to public use.

3            So, the ranger got into his BLM law
4  enforcement pickup truck, and he activated the emergency
5  lights and siren and conducted a traffic stop on the Dodge
6  pickup truck.

7       Q.    And if I could, let me ask you in regards to
8  the ranger himself, how was he dressed at the time?

9       A.    The BLM ranger was in his full uniform which
10  consists of a light tan-colored shirt, has BLM patches as
11  well as a badge on the chest, chocolate brown patrol pants,
12  black boots, and a black duty belt that is consistent with
13  what you would see uniformed law enforcements wear.

14       Q.    And when he entered his -- you said his BLM
15  truck, was that a marked law enforcement vehicle?

16       A.    It was.  It had BLM markings on the sides.  It
17  had a very large overhead light bar.  And it was also
18  equipped with a siren.

19       Q.    Did -- you said he activated his lights to
20  conduct the stop?

21       A.    He did activate his lights.  He also activated
22  his siren and pulled the Dodge pickup truck over just prior
23  to intersecting with North Bloomfield.

24       Q.    And what happened when he approached the
25  vehicle, the BLM ranger?

COLE_01311

APPENDIX 19
Page 6 of 21

1      A.      The ranger approached the vehicle and

2   contacted the driver who identified himself with his

3   identification card as Brent Douglas Cole.  The ranger had a

4   discussion with Mr. Cole, advised him that the roads that he

5   had been driving on are not open to the public, that they're

6   closed roads, and told him not to come back and drive on

7   these roads again.

8              The ranger did not issue a citation.  He just

9   gave him a warning and sent him on his way.

10     Q.      What did the ranger do after Mr. Cole departed

11  the area?

12     A.      The ranger went back up to where he had

13  previously been and then started traveling up in this

14  direction along the path in the road that he saw the Dodge

15  pickup truck come down --

16     Q.      Why did --

17     A.      -- to see --

18     Q.      Why did he do that?

19     A.      To see what was up there.  To see what Mr.

20  Cole had left.

21             And when I -- when I reference this area as

22  being a dirt road, it -- it's really more accurately to

23  describe it as a trail.  It has branches from bushes and

24  trees growing into it to the point where any vehicle that

25  would drive in and out of it, the sides would get scratched

*False Testimony* (handwritten annotation)

*NOT TRUE* (handwritten annotation)

BEHMKE REPORTING AND VIDEO SERVICES, INC.
(415) 597-5600

8

COLE_01312

APPENDIX 19
Page 7 OF 8

1   up with different kind of foliage.

2         Q.    What did he -- what if anything did the ranger

3   discover as he traveled up that dirt path for lack of a

4   better term?

5         A.    When the ranger got up to where this little

6   red triangle is -- and if we could advance to the next jury

7   exhibit, Grand Jury Exhibit.

8         Q.    And this exhibit that you've been looking at

9   is marked Grand Jury Exhibit 2.

10              The next one you'll look at, this one, is

11  Grand Jury Exhibit 1.

12              (Grand Jury Exhibit 1 was

13              marked for identification)

14  MR. McCOY:  Both have been presented to the

15  Foreperson.  We'll admit that after the end of Mr.

16  Forristel's -- Agent Forristel's testimony.  This is Grand

17  Jury Exhibit 1.

18  THE WITNESS:  So, the BLM ranger came in from this

19  direction, came in and discovered this campsite.  As he

20  looked around the campsite, he identified or located two

21  motorcycles.  I'll call this Motorcycle 1 and Motorcycle 2.

22  Motorcycle 1 had a California license plate on it.

23  Motorcycle 2 was partially disassembled and had no license

24  plate.  But the ranger was able to locate the vehicle

25  identification number off of the frame.

COLE_01313

APPENDIX 19
Page 8 of 25

1          The ranger contacted his dispatch center, the

2   Grass Valley Forest Service dispatch center, provided the

3   identifying information for the two motorcycles.  And the

4   dispatch center advised him that Motorcycle 1 had expired

5   registration from 2009 and Motorcycle 2 had been reported

6   stolen.          *False Testimony* —

7   BY MR. McCOY:

8          Q.      After he learned this information about the

9   status of the motorcycles, what did the ranger do?

*False*

10         A.      The ranger decided he was going to impound  *False*

*He had*

11   both of the motorcycles, but he was not able to do that by  *See log*

*already*

12   himself.  So, he contacted the California Highway Patrol and

*decided*

13   asked for their assistance in impounding these two

*to impound*

14   motorcycles.

*before*

15         Q.       And to your knowledge, is that fairly standard

*checking*

16   procedure in this type of a situation?

*VIN's*

17         A.      Yeah.  My understanding, BLM will not impound

18   vehicles by themselves, that they do ask for assistance from

19   the Highway Patrol in doing that.  But also to just provide

20   with two motorcycles getting another law enforcement officer

21   into the area.  The --

22         Q.      Sorry.  Go ahead.

23         A.      After requesting the assistance, it would have

24   been very difficult for the CHP officer to locate the BLM

25   ranger at this campsite.  So, the BLM ranger went back down

COLE_01314

APPENDIX 19
Page 9 of 2

```
 1  to North Bloomfield where the arriving CHP officer met him.

 2           The CHP officer was also in full uniform and

 3  driving a fully marked CHP patrol vehicle.  The ranger

 4  briefed the CHP officer on what had transpired and provided

 5  the CHP officer with the identifying information from the

 6  two motorcycles.  The CHP officer contacted his dispatch

 7  center, provided the information as well.  And CHP dispatch

 8  confirmed that the second motorcycle had been reported

 9  stolen and not yet recovered.  — False testimony

10           Both the ranger and the CHP officer brought

11  their vehicles back up to -- if we can go back to Grand Jury

12  Exhibit 2.  CHP and BLM brought their vehicles back up to

13  this area and then walked in on foot back up into the

14  campsite.

15           When they arrived in the campsite, the BLM

16  ranger again told the CHP officer what he had discovered.

17  And they began developing a plan of how to extract these two

18  motorcycles and get them back down towards North Bloomfield.

19  Given the paths and the roads up there, there's no way a tow

20  truck could get all the way into the campsite.  And of

21  concern was this partially disassembled motorcycle here.

22      Q.      And as they're developing a plan on how to get

23  these motorcycle down, did they encounter any sort of

24  unexpected activity?

25      A.      They did.  They both ended up hearing some
```

COLE_01315

1  rustling in the bushes and trees roughly in this area.  The

2  BLM ranger identified himself as the police and directed

3  whoever was down there to identify themselves.

4          Mr. Cole came out from the trees roughly into

5  this area here in the campsite.  The BLM ranger was about

6  here.  And the CHP officer who had been working on this

7  motorcycle was approximately here.  When Mr. Cole came into

8  the campsite, he identified himself as the person that the

9  BLM ranger had earlier contact with.  He indicated that this

10  was his campsite, that these were his belongings, and that

11  he did not want law enforcement taking his things.

12          Q.      What did the BLM ranger do in response?

13          A.      The BLM ranger ended up removing a pair of

14  handcuffs from his duty belt.  And upon seeing that, Mr.

15  Cole backed up a little bit and took kind of an aggressive

16  stance.

17          In response to Mr. Cole's actions, the BLM

18  ranger asked Mr. Cole if he was armed.  Mr. Cole said he

19  was.  In response to that, both of the law enforcement

20  officers drew their weapons.

21          Q.      May I ask, the BLM ranger was standing -- how

22  close was he to where Mr. Cole was during -- at this point?

23          A.      They were approximately eight feet apart.  The

24  BLM ranger was approximately here.  Mr. Cole was

25  approximately there.

*False*

*He was*

*not there*

*and has*

*no knowledge*

APPENDIX 19
Page 11 of 12

1      Q.      And where was the CHP officer?

2      A.      The CHP officer was in this general area down

3  here.

4              Both the CHP officer and the BLM officer gave

5  commands for Mr. Cole to surrender his weapon.  And instead

6  of surrendering his weapon, in a very quick movement Mr.

7  Cole drew a silver-colored revolver from his right waist

8  area and fired multiple rounds at the BLM ranger.

9      Q.      And what happened once he started firing on

10  the BLM ranger?

11     A.      One of the rounds struck the BLM ranger in the

12  left shoulder.

13             As both law enforcement officers began

14  returning fire, Mr. Cole turned the weapon and directed it

15  at the CHP officer and fired multiple rounds.  And the CHP

16  officer ended up with some shrapnel wounds in his lower

17  right leg.

18     Q.      Did either -- either the BLM ranger or the CHP

19  officer once Cole started firing fire back at him?

20     A.      They did.  Both law enforcement officers

21  returned fire and struck Mr. Cole approximately three times.

22     Q.      And where did they do that from do you know?

23     A.      They were both -- once the exchange of gunfire

24  occurred, both law enforcement officers began separating

25  themselves from Mr. Cole.  I'm not able to tell you exactly

*Handwritten annotations:*

*Left margin (lines 4-8):* False He was not there he does not know.

*Right margin (line 7):* False

*Center (line 10):* Deception of the grand jury

*Left margin (lines 14-17):* False They Already Fired.

*Left margin (lines 20-22):* False 5 times

*Left margin (lines 23-24):* False

COLE_01317

```
 1   where they were standing in relation to Mr. Cole as they
 2   fired their weapons.  But roughly, the BLM ranger once he
 3   was engaged with gunfire retreated in this direction.  The
 4   CHP officer retreated in this direction.  Took up positions
 5   of cover and concealment.  FALSE
 6   FALSE   After Mr. Cole had been struck multiple times
 7   and had fallen to the ground, he was roughly in this area,
 8   he indicated he was giving up.  So, both law enforcement
 9   officers cautiously advanced onto him, detained him in  FALSE
10   handcuffs.  The CHP officer went back down this little trail
11   to his patrol car.
12        Q.    May I -- may I stop you there?
13        A.    Sure.
14        Q.    Forgive me if you've already testified to
15   this.  But you said that the BLM officer was struck in the
16   left shoulder; correct?
17        A.    Correct.
18        Q.    Was the CHP officer injured at all during this
19   gun battle?
20        A.    He was.  He suffered shrapnel wounds to his
21   lower right leg.
22        Q.    Okay.  And where did that -- where was he when
23   the injury occurred do you know approximately?
24        A.    This little area depicts a campfire pit.  And
25   he was roughly in this area when he was struck by the
```

COLE_01318

1  shrapnel.

2       Q.    All right.

3       GRAND JUROR:  So, that means he hit something else and

4  it ricocheted --

5       MR. McCOY:  If we could just hold off on questions

6  just till the end.

7       THE WITNESS:  After detaining Mr. Cole in handcuffs,

8  the CHP officer went back down to his car, called for

9  assistance, called for medical aid, retrieved a medical bag

10  that he had with him, returned to the campsite.  And the BLM

11  ranger and the CHP officer rendered medical aid to Mr. Cole

*FALSE* (handwritten in left margin)

12  until Fire and EMS were able to arrive.  *Pultorak rendered no*

13            Once Fire and EMS and other law enforcement  *Aid*

14  resources did arrive, all three were transported out to  *Hardin*

15  medical facilities.  And all three are going to survive  *drove*

16  their -- their wounds.  *This is the withholding of*  *himself.*

17  BY MR. McCOY:  *the Material Facts from the jury*

18       Q.    Mr. Cole was Life Flighted down to Sutter

19  Roseville Hospital; correct?

20       A.    Correct.

21       Q.    And that was shortly after the incident took

22  place; correct?

23       A.    That is correct.

24       Q.    And that's June 14th.

25            On June 16th, was he interviewed --

COLE_01319

APPENDIX
Page 14 of 2

```
 1          A.      Mr. -- Mr. McCoy, if I may I have one more --
 2          Q.      Yeah.
 3          A.      -- piece of information.
 4                  Immediately after handcuffing Mr. Cole in this
 5  area, law enforcement located a silver-colored handgun just
 6  to the side of him and recovered that weapon.  And that
 7  weapon is more fully described as the silver-colored Taurus
 8  .44 caliber revolver with serial number WG141325.  And an
 9  inspection of that weapon revealed that it had six spent
10  shell casings inside of it.
11          Q.      And that -- that firearm had been manufactured
12  outside of the State of California; correct?
13          A.      That is correct.  That firearm was
14  manufactured in the country of Brazil and imported into the
15  United States.
16          Q.      So, I'm sorry.  Once he was provided medical
17  aid here at the scene and then he was Life Flighted,
18  correct, down to Sutter Roseville Hospital?
19          A.      That's correct.
20          Q.      Two days later on June 16th, did investigators
21  have an opportunity to speak to Mr. Cole?
22          A.      Yes, they did.  Investigators went to the
23  hospital and were allowed access to Mr. Cole.
24                  Mr. Cole indicated he was willing to speak
25  with law enforcement and was read his rights per Miranda.
```

COLE_01320

APPENDIX 9
Page 15 of 8

```
 1    Mr. Cole waived his rights per Miranda and subsequently was
 2    interviewed by law enforcement.
 3              During that interview, Mr. Cole admitted that
 4    he had fired a total of six rounds at the two law
 5    enforcement officers with three being directed at the BLM
 6    ranger.  He further elaborated saying he was aiming for and
 7    trying to hit the BLM ranger in the left shoulder and
 8    acknowledged that he knew he had struck the BLM ranger in
 9    the left shoulder.
10              Mr. Cole went on to discuss how he knew the
11    BLM ranger was the same law enforcement officer that he
12    contacted in the morning.  He stated he recognized the BLM
13    ranger to be in uniform, and he recognized the BLM ranger to
14    be a law enforcement officer.  Mr. --
15         Q.    How about the CHP trooper?
16         A.    Mr. Cole also stated that -- he referred to
17    the CHP officer as a State trooper and acknowledged that he
18    was in full uniform and that Mr. Cole realized he was a law
19    enforcement officer as well.
20              Mr. Cole then also when asked about the
21    weapon, he described the weapon he used during the shooting
22    as a .44 magnum which he received as a gift from his son.
23    And when asked about the ammunition, he said he bought the
24    ammunition in a store, and it was a soft lead bullet that
25    he -- bullets that he had in the gun.
```

COLE_01321

APPENDIX 19
Page 16 of 27

```
 1          Q.    At some point one of the investigators asked
 2   Mr. Cole if he thought it was wrong to have -- to have shot
 3   the law enforcement officers; is that correct?
 4          A.    Yes, that is correct.
 5          Q.    And how did Mr. Cole respond to that question?
 6          A.    I would have to reference my notes.  I believe
 7   he acknowledged that it was not the right response.
 8          Q.    Did he provide any details as to why he -- as
 9   to why he shot the BLM ranger where he did?  Specifically, I
10   think you testified he shot him in the upper left shoulder;
11   is that correct?  Withheld the defendant's assertion that
12          A.    That is correct.  He said he just wanted to
            Pultorak fired first when he drew and
13   wound him.  He wanted to -- he wanted to just wound the BLM  gut shot
14   ranger.                                                       him.
15               I believe he made a comment that he is an
16   excellent marksman and if he wanted to kill the ranger he
17   could have.  But instead, he just wanted to shoot for the
18   shoulder that -- of the arm in which the BLM ranger was
19   holding his weapon.
20          Q.    And that's the shoulder that he hit?
21          A.    That is correct.
22          Q.    Let me ask you just some background questions.
23   You testified that this occurred in a remote area of Nevada
24   County; correct?
25          A.    Correct.
```

COLE_01322

APPENDIX
Page 17 of

```
 1        Q.    The shooting.  And that's in the State and
 2   Eastern District of California?
 3        A.    It is.
 4        Q.    And just to recap, the firearm that was
 5   recovered on scene that is believed to have been used by Mr.
 6   Cole was a Taurus .44 caliber revolver with serial number
 7   WG141325; is that correct?
 8        A.    That is correct.
 9        Q.    And that firearm was manufactured outside of
10   the State of California?
11        A.    That is correct.
12        MR. McCOY:  Okay.  Those are all the questions I have
13   for this witness.  Do the Grand Jurors have questions?
14        GRAND JUROR:  The shrapnel thing, so that was a
15   ricochet that came off and hurt the officer.  With the
16   bullet, how do you get shrapnel?
17        THE WITNESS:  At this point, I don't know the origin
18   of the metal that was pulled out of and later came out of
19   the CHP officer's calf.  It was not a size and shape
20   consistent with a spent bullet.
21             As to whether it was a fragment of the bullet
22   itself, there were a lot of items in and around the
23   campfire, one of which appeared to have been struck by one
24   of the rounds fired by Mr. Cole.  So, whether any of the
25   shrapnel from that metal object found its way into his leg,
```

COLE_01323

APPENDIX 19
Page 18 of 21

```
 1    I can't tell you at this point.  What I can tell you is that
 2    the officer received penetrating trauma in his lower right
 3    leg, and over the course of 24 hours different pieces of
 4    metal were working their way out of those wounds.
 5            MR. McCOY:  Yes.
 6            GRAND JUROR:  Mr. Cole met the BLM ranger twice in one
 7    day.  He never met him before?
 8            THE WITNESS:  Could you repeat that please?
 9            GRAND JUROR:  Mr. Cole, he met the BLM ranger twice in
10    the one day, but he never met him before?
11            THE WITNESS:  During the day of this incident, he had
12    met him earlier in the day at the traffic stop.  And then a
13    few hours later when the CHP officer and the BLM ranger were
14    in the campsite working on the impound of the two
15    motorcycles is when Mr. Cole returned.  And so, that was the
16    second time that --
17            GRAND JUROR:  Never met him before that day?
18            THE WITNESS:  I'm not positive on that.  I don't know
19    the answer to that.
20            GRAND JUROR:  Are there signs on closed roads to say
21    you can't go up there, or it's just common knowledge?
22            THE WITNESS:  I don't know the answer to that.
23            GRAND JUROR:  This morning confrontation between this
24    BLM, was it a normal confrontation?  Was it friendly?  He
25    said, "Hey, listen, you guys can't be here.  Please go
```

COLE_01324

APPENDIX 19
Page 19 of 20

1    somewhere else."

2        MR. McCOY:  I'm going to have to say I don't know that

3    that's relevant.

4        GRAND JUROR:  Okay.

5        MR. McCOY:  Only because of, you know, the facts, is

6    if it was friendly or not.

7            I know you have heard testimony from two of

8    the other individuals in the vehicle with him that morning

9    who indicated the nature of that conversation, because the

10   agent has no firsthand knowledge of that.  I don't think

11   it's a relevant question, and I also don't know that he's

12   the best witness.

13           So, I would refer you back to the testimony of

14   those two witnesses.

15       GRAND JUROR:  But it would be revellent -- relevant in

16   the fact that when they pulled the arms he felt threatened

17   and that's why he pulled his.

18       MR. McCOY:  Yeah.  Let me make this clear first of

19   all.  Your role is to determine whether or not there's

20   probable cause to believe these crimes have occurred.

21       GRAND JUROR:  I understand.

22       MR. McCOY:  Not whether or not he has defenses.

23   Right?  There are various defenses that Mr. Cole may have to

24   any charges that are brought.  That's not your role to

25   consider at this point.  It's whether or not the elements --

*Rebuke for asking an obvious relevant question*

COLE_01325

APPENDIX 19
page 20 of 21

```
 1   and I'll go over the elements of the crimes -- are satisfied
 2   and you believe there's probable cause to believe that that
 3   crime was committed.

 4              I don't want to foreclose the discussion on
 5   defenses.  And clearly, there will be discussion once -- if
 6   the case is indicted and it progresses.  I'm sure that's an
 7   appropriate discussion that will be had in court.  But at
 8   this point it's just not relevant.

 9              Any other questions?

10              Okay.  Thank you very much.

11              (Whereupon, the testimony of

12                     ANDREW FORRISTEL

13              was concluded at 11:17 a.m.)

14
15
16
17
18
19
20
21
22
23
24
25
```

The indictment was tendered to the Court the same day.

COLE_01326

APPENDIX
Page 21 of 22

```
 1   STATE OF CALIFORNIA           )
 2                                 )     ss.
 3   COUNTY OF SACRAMENTO          )
 4
 5
 6             I, MITCHELL D. THOMAS, do hereby certify that
 7   the foregoing proceedings in the within-entitled cause was
 8   taken at the time and place herein named; that the
 9   transcript is a true record of the proceedings as reported
10   by me, a duly certified shorthand reporter and a
11   disinterested person, and was thereafter transcribed into
12   typewriting by computer.
13             I further certify that I am not interested in
14   the outcome of the said action, nor connected with, nor
15   related to any of the parties in said action, nor to their
16   respective counsel.
17             IN WITNESS WHEREOF, I have hereunto set my
18   hand this Tuesday, October 14th, 2014.
19
20
21                          _____
22                          MITCHELL THOMAS, CSR #10137
23                          STATE OF CALIFORNIA
24
25
```

COLE_01327

APPENDIX 20
Page 1 of 1

```
Msg - 07032014175915323, Date - 07/03/2014, Time - 10:59:15
CARSDMXCSV.I*

R.NDDMV0000
0:59 07/03/2014 02838
0:59 07/03/2014 34984 CA0290000
CARSDMXCSV
XT
ORTH DAKOTA DRIVERS LICENSE DIVISION RECORD STATUS

AM/COLE,BRENT DOUGLAS              DOB/1953-08-12

06 90TH AVE NE                     SEX/MALE        HGT/507    WGT/140
ISMARCK, ND 585036500              HAI/BROWN       EYE/HAZEL

LN/COL532099    OLS/ND                             DONOR/NO

TATUS: VALID  - CURRENT LICENSE
SSUED: 2012-10-09 CLASS: D         EXPIRES: 2015-08-12
NDORSEMENTS: HAZARDOUS MATERIAL ()
                TANK ()
                DOUBLES//TRIPLES ()
OMMERCIAL CLASS: A                 COMMERICAL STATUS: VALID

·*THIS INFORMATION IS PROVIDED FOR LAW ENFORCEMENT PURPOSES ONLY***
```

Pultorak, looking at this, declares defendant "just a transient" and knowingly lies, claiming he had no current insurance.

See APPENDIX 6 of "Objection To Pre-Sentence Report" for proof that insurance was current.



**Sutter Health**
Sutter Roseville
Medical Center

One Medical Plaza
Roseville, CA 95661-3037

DEPT. OF LABORATORY MEDICINE
Directors of Laboratory
Ronald Rowberry, M.D.

| Patient | | |
|---|---|---|
| | TRA, WALNUT4196 | BB1198 |
| MR# | | DOB |
| | 810383 | 01/01/1910 |
| Physician | | RM |
| | DEHQANZADA, ZIA A | TRA |

## TRANSFUSION RECORD

| BLOOD PRODUCT DATA | PATIENT DATA |
|---|---|

| Unit Number | W0358 14 090799 | UNIT DIV: 00    VOLUME: 325 |
|---|---|---|
| Blood Type | A-Positive | **Blood Type** A-Positive |
| Component | RBC AS Leukoreduced | **Antibody Screen** Negative   Electronically Com |
| | | **Date** 06/14/2014   **Tech ID** 9132 |
| Unit Expiration | 06/24/2014    2359 | **Signature** SM |

### PATIENT / PRODUCT COMMENTS

AKA: TRA, WALNUT4196, DOB:01/01/1910

APPENDIX 21
page 1 of 8

### ISSUE DATA

| Date and time 6/15/14 1035 | Inspected and Issued by | Accepted by |
|---|---|---|

### TRANSFUSION RECORD

| | TIME | B/P | PULSE | RESP | TEMP |
|---|---|---|---|---|---|
| Start time Vital Signs | 1040 | 110/54 | 71 | 14 | 37.7 |
| 15 min. Vital Signs | 1055 | 115/58 | 75 | 13 | 37.8 |
| End of Transfusion Vital Signs | 1215 | 120/61 | 76 | 12 | 37.7 |

Before initiating transfusion, I have verified the name, Medical Record number, transfusion armband number, blood group and type for the donor, and recipient as recorded on labels and forms for the above unit(s). I have verified the identification of the recipient using the red blood bank armband and the consent form has been signed.

_A. Do_                         6/15/14
Signature of person initiating the transfusion    Date

_I.A. Mullukk_                 6/15/14
Signature of verifier                              Date

### STEPS FOR SUSPECTED TRANSFUSION REACTION:

1. Stop the transfusion and keep the IV open (allergic reaction is exception).
2. Notify the Transfusion Service (Ext. 1187) and Physician immediately.
3. Compare the patient name and ID number on the blood Bag and the patient ID band for error. Complete a Report of Suspected Transfusion Reaction form and send to the lab with blood bag(s).
4. Send the first post transfusion urine specimen to lab, if Class III reaction used.
5. Blood warmer used:   YES    NO   (circle one)

(Signature of person reporting suspected transfusion reaction)

| Patient | | |
|---|---|---|
| | TRA, WALNUT4196 | |
| MR# | | DOB |
| | 810383 | 01/01/1910 |
| Physician | | RM |
| | DEHQANZADA, ZIA A | TRA |

W0358 14 090799

**Sutter Health**
Sutter Roseville
Medical Center

One Medical Plaza
Roseville, CA 95661-3037

DEPT. OF LABORATORY MEDICINE
Directors of Laboratory
Ronald Rowberry, M.D.

| Patient | | |
|---|---|---|
| **TRA, WALNUT4196** | | **NRQ** |
| MR# | | DOB |
| **810383** | | **01/01/1910** |
| Physician | | RM |
| **DEHQANZADA, ZIA A** | | **TRA** |

# TRANSFUSION RECORD

| BLOOD PRODUCT DATA | PATIENT DATA |
|---|---|
| Unit Number  **WO358 14 058118** | **UNIT DIV: 00    VOLUME: 200** |
| Blood Type  **A-Positive** | Blood Type  **A-Positive** |
| Component  **FFP, Thawed** | Antibody Screen |
|  | Date **06/14/2014**   Tech ID **9132** |
| Unit Expiration  **06/15/2014    1815** | Signature  **SMR** |

### PATIENT / PRODUCT COMMENTS

AKA: TRA, WALNUT4196, DOB:01/01/1910 RE: Jumbo is equivalent to 2
individual units.

### ISSUE DATA

| Date and time **6/15/14    0325** | Inspected and issued by **R- Navou** | Accepted by **M. James** |
|---|---|---|

### TRANSFUSION RECORD

| | TIME | B/P | PULSE | RESP | TEMP |
|---|---|---|---|---|---|
| Start time Vital Signs | 0330 | 112/58 | 106 | 24 | 37 |
| 15 min. Vital Signs | | | | | |
| End of Transfusion Vital Signs | 0335 | 116/55 | 83 | M | 37.1 |

Before initiating transfusion, I have verified the name,
Medical Record number, transfusion armband number,
blood group and type for the donor, and recipient as
recorded on labels and forms for the above unit(s). I have
verified the identification of the recipient using the red blood
bank armband and the consent form has been signed.

Signature of person initiating the transfusion          Date **6/15/14**

Signature of verifier          Date **6/15/14**

APPENDIX 21
Page 2 of 8

#### STEPS FOR SUSPECTED TRANSFUSION REACTION:

1. Stop the transfusion and keep the IV open (allergic reaction
   is exception).
2. Notify the Transfusion Service (Ext. 1187) and Physician
   immediately.
3. Compare the patient name and ID number on the blood
   Bag and the patient ID band for error. Complete a Report of
   Suspected Transfusion Reaction form and send to the lab
   with blood bag(s).
4. Send the first post transfusion urine specimen to lab, if
   Class III reaction.
5. Blood warmer used:  YES     NO   (circle one)

(Signature of person reporting suspected transfusion reaction)

7500-1316 (2/7/07)

| Patient | | |
|---|---|---|
| **TRA, WALNUT4196** | | |
| MR# | | DOB |
| **810383** | | **01/01/1910** |
| Physician | | RM |
| **DEHQANZADA, ZIA A** | | **TRA** |

**Sutter Health**
Sutter Roseville
Medical Center

One Medical Plaza
Roseville, CA 95661-3037

DEPT. OF LABORATORY MEDICINE
Directors of Laboratory
Ronald Rowberry, M.D.

**TRANSFUSION RECORD**

| Patient | | |
|---|---|---|
| TRA, WALNUT4196 | | NRQ |
| MR# | | DOB |
| 810383 | | 01/01/1910 |
| Physician | | RM |
| DEHQANZADA, ZIA A | | TRA |

| BLOOD PRODUCT DATA | PATIENT DATA |
|---|---|
| **Unit Number** W0358 14 058148 | **UNIT DIV: 00    VOLUME: 200** |
| **Blood Type** A-Positive | **Blood Type** A-Positive |
| **Component** FFP, Thawed | **Antibody Screen** |
| | **Date** 06/14/2014   **Tech ID** 9132 |
| **Unit Expiration** 06/15/2014  1815 | **Signature** |

**PATIENT / PRODUCT COMMENTS**

AKA: TRA,WALNUT4196, DOB:01/01/1910 RE: Jumbo is equivalent to 2 individual units.

**ISSUE DATA**

| Date and time | Inspected and issued by | Accepted by |
|---|---|---|
| 6/15/14 @ 0325 | R.Near | M.James |

**TRANSFUSION RECORD**

| | TIME | B/P | PULSE | RESP | TEMP |
|---|---|---|---|---|---|
| Start time Vital Signs | 0340 | 110/55 | 83 | 14 | 37. |
| 15 min. Vital Signs | | | | | |
| End of Transfusion Vital Signs | 0350 | 115/56 | 84 | 14 | 37.4 |

Before initiating transfusion, I have verified the name, Medical Record number, transfusion armband number, blood group and type for the donor, and recipient as recorded on labels and forms for the above unit(s). I have verified the identification of the recipient using the red blood bank armband and the consent form has been signed.

Signature of person initiating the transfusion    Date 6/15/14

Signature of verifier    Date 6/15/14

APPENDIX 2
Page 3 of 8

**STEPS FOR SUSPECTED TRANSFUSION REACTION:**

1. Stop the transfusion and keep the IV open (allergic reaction is exception).
2. Notify the Transfusion Service (Ext. 1187) and Physician immediately.
3. Compare the patient name and ID number on the blood Bag and the patient ID band for error. Complete a Report of Suspected Transfusion Reaction form and send to the lab with blood bag(s).
4. Send the first post transfusion urine specimen to lab, if Class III reaction.
5. Blood warmer used:   YES    NO   (circle one)

(Signature of person reporting suspected transfusion reaction)

W0358 14 058148

| Patient | | |
|---|---|---|
| TRA, WALNUT4196 | | |
| MR# | | DOB |
| 810383 | | 01/01/1910 |
| Physician | | RM |
| DEHQANZADA, ZIA A | | TRA |



**Sutter Health**
Sutter Roseville
Medical Center

One Medical Plaza
Roseville, CA 95661-3037

DEPT. OF LABORATORY MEDICINE
Director of Laboratory
Ronald Rowberry, M.D.

| Patient | | |
|---|---|---|
| TRA, WALNUT4196 | | NRQ ✓ |
| MR# | | DOB |
| 810383 | | 01/01/1910 |
| Physician | | RM |
| DEHQANZADA, ZIA A | | TRA |

## TRANSFUSION RECORD

| BLOOD PRODUCT DATA | | PATIENT DATA | |
|---|---|---|---|
| **Unit Number** | W0358 14 102310 | UNIT DIV: AO   VOLUME: 400 | |
| **Blood Type** | AB-Negative | Blood Type | A Pos |
| **Component** | Plasma, Thawed | Antibody Screen | |
| | | Date 06/14/2014   Tech ID 9132 | |
| **Unit Expiration** | 06/17/2014   2359 | Signature   SMK | |

### PATIENT / PRODUCT COMMENTS

AKA: TRA,WALNUT4196, DOB:01/01/1910 RE: Jumbo is equivalent to 2 individual units.

### ISSUE DATA

| Date and time 6|14|14  1720 | Inspected and issued by | Accepted by |
|---|---|---|

### TRANSFUSION RECORD

| | TIME | B/P | PULSE | RESP | TEMP |
|---|---|---|---|---|---|
| Start time Vital Signs | | | | | |
| 15 min. Vital Signs | | | | | |
| End of Transfusion Vital Signs | | | | | |

Before initiating transfusion, I have verified the name, Medical Record number, transfusion armband number, blood group and type for the donor, and recipient as recorded on labels and forms for the above unit(s). I have verified the identification of the recipient using the red blood bank armband and the consent form has been signed.

Signature of person initiating the transfusion   Date 6/14/14

Signature of verifier   Date 6/14/14

APPENDIX 21
Page 4 of 8
#1

### STEPS FOR SUSPECTED TRANSFUSION REACTION:

1. Stop the transfusion and keep the IV open (allergic reaction is exception).
2. Notify the Transfusion Service (Ext. 1187) and Physician immediately.
3. Compare the patient name and ID number on the blood Bag and the patient ID band for error. Complete a Report of Suspected Transfusion Reaction form and send to the lab with blood bag(s).
4. Send the first post transfusion urine specimen to lab, if Class III reaction.
5. Blood warmer used:  YES   NO  (circle one)

(Signature of person reporting suspected transfusion reaction)

7500-1318 (2/1/07)

| Patient | | |
|---|---|---|
| TRA, WALNUT4196 | | |
| MR# | | DOB |
| 810383 | | 01/01/1910 |
| Physician | | RM |
| DEHQANZADA, ZIA A | | TRA |



**Sutter Health**
Sutter Roseville
Medical Center

One Medical Plaza
Roseville, CA 95661-3037

DEPT. OF LABORATORY MEDICINE
Directors of Laboratory
Ronald Rowberry, M.D.

| Patient | | |
|---|---|---|
| TRA, WALNUT4196 | | BB1198 |
| MR# | | DOB |
| 810383 | | 01/01/1910 |
| Physician | | RM |
| DEHQANZADA, ZIA A | | TRA |

## TRANSFUSION RECORD

| BLOOD PRODUCT DATA | | PATIENT DATA | |
|---|---|---|---|
| **Unit Number** | W0358 14 009670 | **UNIT DIV: 00 VOLUME: 325** | |
| **Blood Type** | A-Positive | **Blood Type** A-Positive | |
| **Component** | RBC AS Leukoreduced | **Antibody Screen** Negative Electronically Com | |
| | | **Date** 06/14/2014 **Tech ID** 9132 | |
| **Unit Expiration** | 06/25/2014 2359 | **Signature** | |

### PATIENT / PRODUCT COMMENTS

AKA: TRA,WALNUT4196, DOB:01/01/1910

### ISSUE DATA

| Date and time | Inspected and issued by | | Accepted for |
|---|---|---|---|

### TRANSFUSION RECORD

| | TIME | B/P | PULSE | RESP | TEMP |
|---|---|---|---|---|---|
| Start time Vital Signs | | | | | |
| 15 min. Vital Signs | | | | | |
| End of Transfusion Vital Signs | | | | | |

Before initiating transfusion, I have verified the name, Medical Record number, transfusion armband number, blood group and type for the donor, and recipient as recorded on labels and forms for the above unit(s). I have verified the identification of the recipient using the red blood bank armband and the consent form has been signed.

Signature of person initiating the transfusion    Date 6/14/14

Signature of verifier    Date 6/14/14

**STEPS FOR SUSPECTED TRANSFUSION REACTION:**

1. Stop the transfusion and keep the IV open (allergic reaction is exception).
2. Notify the Transfusion Service (Ext. 1187) and Physician immediately.
3. Compare the patient name and ID number on the blood Bag and the patient ID band for error. Complete a Report of Suspected Transfusion Reaction form and send to the lab with blood bag(s).
4. Send the first post transfusion urine specimen to lab, if Class III reaction.
5. Blood warmer used:  YES    NO  (circle one)

APPENDIX 21
Page 5 of 8    #1

_____
(Signature of person reporting suspected transfusion reaction)

| Patient | | |
|---|---|---|
| TRA, WALNUT4196 | | |
| MR# | | DOB |
| 810383 | | 01/01/1910 |
| Physician | | RM |
| DEHQANZADA, ZIA A | | TRA |



**Sutter Health**
Sutter Roseville
Medical Center

One Medical Plaza
Roseville, CA  95661-3037

DEPT. OF LABORATORY MEDICINE
Directors of Laboratory
Ronald Rowberry, M.D.

| Patient | |
|---|---|
| TRA, WALNUT4196 | RR1198 |
| **MR#** | **DOB** |
| 810383 | 01/01/1910 |
| **Physician** | **RM** |
| DEHQANZADA, ZIA A | TRA |

## TRANSFUSION RECORD

| BLOOD PRODUCT DATA | PATIENT DATA |
|---|---|

| | |
|---|---|
| **Unit Number** W0515 14 043765 | **UNIT DIV: 00    VOLUME: 325** |
| **Blood Type** A-Positive | **Blood Type** A-Positive |
| **Component** RBC AS Leukoreduced | **Antibody Screen** Negative   Electronically Com |
| | **Date** 06/14/2014   **Tech ID** 9132 |
| **Unit Expiration** 06/24/2014   2359 | **Signature** SMK |

| PATIENT / PRODUCT COMMENTS |
|---|

AKA: TRA, WALNUT4196, DOB:01/01/1910

| ISSUE DATA | | |
|---|---|---|
| **Date and time** 6/15/14 0857 | **Inspected and issued by** QA | **Accepted by** Barneto |

### TRANSFUSION RECORD

| | TIME | B/P | PULSE | RESP | TEMP |
|---|---|---|---|---|---|
| Start time Vital Signs | 0900 | 123/60 | 74 | 14 | 37.8 |
| 15 min. Vital Signs | 0915 | 113/54 | 74 | 14 | 37.8 |
| End of Transfusion Vital Signs | 1035 | 99/53 | 71 | 14 | 37.7 |

**Before initiating transfusion, I have verified the name, Medical Record number, transfusion armband number, blood group and type for the donor, and recipient as recorded on labels and forms for the above unit(s). I have verified the identification of the recipient using the red blood bank armband and the consent form has been signed.**

O. Der                                6/15/14

Signature of person initiating the transfusion    Date

V. beckman                            6/15/14

Signature of verifier                              Date

### STEPS FOR SUSPECTED TRANSFUSION REACTION:

1. Stop the transfusion and keep the IV open (allergic reaction is exception).
2. Notify the Transfusion Service (Ext. 1187) and Physician immediately.
3. Compare the patient name and ID number on the blood Bag and the patient ID band for error. Complete a Report of Suspected Transfusion Reaction form and send to the lab with blood bag(s).
4. Send the first post transfusion urine specimen to lab, if Class III reaction.
5. Blood warmer used:  YES   NO  (circle one)

APPENDIX 21
Page 6 of 8

(Signature of person reporting suspected transfusion reaction)

7500-1316 (2/7/07)

| Patient | |
|---|---|
| TRA, WALNUT4196 | |
| **MR#** | **DOB** |
| 810383 | 01/01/1910 |
| **Physician** | **RM** |
| DEHQANZADA, ZIA A | TRA |





**Sutter Health**
Sutter Roseville
Medical Center

One Medical Plaza
Roseville, CA 95661-3037

DEPT. OF LABORATORY MEDICINE
Directors of Laboratory
Ronald Rowberry, M.D.

| Patient | | |
|---|---|---|
| TRA, WALNUT4196 | | RR1198 |
| MR# | | DOB |
| 810383 | | 01/01/1910 |
| Physician | | RM |
| DEHQANZADA, ZIA A | | TRA |

## TRANSFUSION RECORD

| BLOOD PRODUCT DATA | PATIENT DATA |
|---|---|

**BLOOD PRODUCT DATA**

**Unit Number**  WO879 14 802491

**Blood Type**  A-Positive

**Component**  RBC AS Leukoreduced

**Unit Expiration**  06/21/2014  2359

**PATIENT DATA**

**UNIT DIV: 00   VOLUME: 325**

**Blood Type**  A-Positive

**Antibody Screen** Negative   Electronically Com

**Date**  06/14/2014   **Tech ID** 9132

**Signature**  SN

### PATIENT / PRODUCT COMMENTS

AKA: TRA, WALNUT4196, DOB:01/01/1910

### ISSUE DATA

**Date and time**  (signature)

**Inspected and issued by** SN

**Accepted by** X

### TRANSFUSION RECORD

| | TIME | B/P | PULSE | RESP | TEMP |
|---|---|---|---|---|---|
| Start time Vital Signs | | | | | |
| 15 min. Vital Signs | | | | | |
| End of Transfusion Vital Signs | | | | | |

Before initiating transfusion, I have verified the name, Medical Record number, transfusion armband number, blood group and type for the donor, and recipient as recorded on labels and forms for the above unit(s). I have verified the identification of the recipient using the red blood bank armband and the consent form has been signed.

Signature of person initiating the transfusion   Date 6/14/14

Signature of verifier  Cynthia Percera   Date 6/14/14

### STEPS FOR SUSPECTED TRANSFUSION REACTION:

1. Stop the transfusion and keep the IV open (allergic reaction is exception).
2. Notify the Transfusion Service (Ext. 1187) and Physician immediately.
3. Compare the patient name and ID number on the blood Bag and the patient ID band for error. Complete a Report of Suspected Transfusion Reaction form and send to the lab with blood bag(s).
4. Send the first post transfusion urine specimen to lab, if Class III reaction.
5. Blood warmer used:   YES   NO   (circle one)

APPENDIX 21
Page 7 of 8

#2

_____
(Signature of person reporting suspected transfusion reaction)

| Patient | | |
|---|---|---|
| TRA, WALNUT4196 | | |
| MR# | | DOB |
| 810383 | | 01/01/1910 |
| Physician | | RM |
| DEHQANZADA, ZIA A | | TRA |



**Sutter Health**
Sutter Roseville
Medical Center

One Medical Plaza
Roseville, CA 95661-3037

DEPT. OF LABORATORY MEDICINE
Directors of Laboratory
Ronald Rowberry, M.D.

| Patient | | |
|---|---|---|
| COLE, BRENT | | NRQ |
| MR# | | DOB |
| 810383 | | 08/12/1953 |
| Physician | | RM |
| DEHQANZADA, ZIA A | | TNIA-O |

## TRANSFUSION RECORD

| BLOOD PRODUCT DATA | | PATIENT DATA | |
|---|---|---|---|
| **Unit Number** | W0358 14 094199 | **UNIT DIV: OO    VOLUME: 275** | |
| **Blood Type** | A-Positive | **Blood Type** | A-Positive |
| **Component** | Pltpher. 2, Leukored. Unit CMV Negative | **Antibody Screen** | |
| | | **Date** | 06/15/2014    Tech ID 9037 |
| **Unit Expiration** | 06/18/2014    2359 | **Signature** | ✓ |

### PATIENT / PRODUCT COMMENTS

061414 AKA TRA, WALNUT4196 DOB 01011910

### ISSUE DATA

| Date and time 6/15/14 | Inspected and issued by | Accepted by |
|---|---|---|

### TRANSFUSION RECORD

|  | TIME | B/P | PULSE | RESP | TEMP |
|---|---|---|---|---|---|
| Start time Vital Signs | 1242 | 132/74 | 77 | 12 | 37⁷ |
| 15 min. Vital Signs | 1257 | 148/81 | 79 | 12 | 37⁸ |
| End of Transfusion Vital Signs | 1420 | 131/54 | 71 | 12 | 37⁹ |

Before initiating transfusion, I have verified the name, Medical Record number, transfusion armband number, blood group and type for the donor, and recipient as recorded on labels and forms for the above unit(s). I have verified the identification of the recipient using the red blood bank armband and the consent form has been signed.

_a. Delune_    6/15/14
Signature of person initiating the transfusion    Date

_Lewis RN_    6/15/14
Signature of verifier    Date

APPENDIX 21
Page 8 of 8

### STEPS FOR SUSPECTED TRANSFUSION REACTION:

1. Stop the transfusion and keep the IV open (allergic reaction is exception).
2. Notify the Transfusion Service (Ext. 1187) and Physician immediately.
3. Compare the patient name and ID number on the blood Bag and the patient ID band for error. Complete a Report of Suspected Transfusion Reaction form and send to the lab with blood bag(s).
4. Send the first post transfusion urine specimen to lab. If Class III reaction.
5. Blood warmer used:  YES    NO   (circle one)

(Signature of person reporting suspected transfusion reaction)

7000-1318 (2/7/07)

| Patient | | |
|---|---|---|
| COLE, BRENT | | |
| MR# | | DOB |
| 810383 | | 08/12/1953 |
| Physician | | RM |
| DEHQANZADA, ZIA A | | TNIA-O |

**CFMG**
California Forensic Medical Group
I N C O R P O R A T E D

## PROBLEM LIST

APPENDIX 22
Page 1 of 9

Cole, Brent
DOB: 08/12/53
NAME: ___ DA: NKDA
(Last)          (First)      (M.I.)      DOB _____     BKG # _____

**MAJOR PROBLEMS:**   ALLERGIES: _____

| DATE EACH ENTRY | DATE OF ONSET | ACTIVE PROBLEMS | DATE RESOLVED | INACTIVE PROBLEMS |
|---|---|---|---|---|
| PROB. # | 1953 | Health Maintenance | | |
| PROB. # | | | | |
| PROB. # | | | | |
| PROB. # | | | | |
| PROB. # | | | | |

**TEMPORARY PROBLEMS**   (SELF LIMITING)

| LETTER | PROBLEM | DATE OF EACH RECURRENCE | | | | | |
|---|---|---|---|---|---|---|---|
| A14 | Gunshot Wounds x 5 | 7/2 | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| | | | | | | | |

CFMG PL1

**PREANESTHESIA EVALUATION** SOURCE OF INFORMATION: ☐ PATIENT ☐ SPOUSE / PARENT / FAMILY MEMBER ☐ INTERPRETER ☐ CHART REVIEW

| AGE: | ☐ M | ☐ F | WT | /Kg | BP | HR | RR | SpO2 % |

**SURGI. & ANESTH. HX.**
☐ NO PREV. SURG. ☐ NO ANESTH. PROB. ☐ PONV ☐ DIFFICULT AIRWAY ☐ FAMILY HX ANESTH. PROB. ☐ MH SUSEPTI.

GSW TO ⓁARM , Ⓑ bnolns.

∅ PMH AvaIlable

PROPOSED SURGERY:

Ex. Lap.

PREOP. DIAGNOSES:

GSW

**CARDIOVASCULAR**
☐ DENIES PROBLEMS
☐ HYPERTENSION
☐ CAD/ANGINA
☐ PREV. MI
☐ DOE / ORTHOPNEA
☐ CHF / PERI. EDEMA
☐ ARRYTHMIAS / PALPITATIONS
☐ PACEMAKER
☐ HYPERLIPIDEMIA
☐ VALVULAR DIS. / MVP
☐ PERIP. VASC. DIS
☐ CARDIAC WORK UP
EKG: ☐ NORMAL

*APPENDIX 22*
*Page 2 of 9*

**G.I.**
☐ DENIES PROBLEMS
☐ HIATAL H. / GERD
☐ HEPATITIS
☐ PUD
☐ NAUSEA/VOMITING
☐ ACUTE ABDOMEN

**G.U.**
☐ DENIES PROBLEMS
☐ U.T.I.
☐ URINARY OBSTRUCT.
☐ STONES
☐ CHR RENAL FAILURE
☐ ESRD/ ☐ DIALYSIS
☐ ? PREGNANCY
☐ PIH

**RESPIRATORY**
☐ DENIES PROBLEMS
☐ SMOKING
☐ ASTHMA / HAYFEVER
☐ RECENT URI
☐ COPD
☐ SLEEP APNEA
☐ SHORT OF BREATH
Chest x-ray:
☐ NORMAL

**ENDO/HEM.**
☐ DENIES PROBLEMS
☐ DIABETES I / II
☐ THYROID hyper/hypo.
☐ ANEMIA
☐ COAGULOPATHY
☐ RECENT STEROID RX
☐ PREV. TRANSFUSIONS

**NEURO.**
☐ DENIES PROBLEMS
☐ SEIZURE
☐ CVA ☐ TIA
☐ HEADACHES / MIGRAINES
☐ NEUROPATHY
☐ PARESIS / PLEGIA
☐ DEMENTIA

**MISCELLANEOUS**
☐ ARTHRITIS
☐ BACKACHE
☐ OBESITY
☐ GLAUCOMA
☐ VISION / HEARING DECREASED
☐ MALIGNANCY
☐ FIBROMYALGIA
☐ PSYCHIATRIC PROB.
☐ FRACTURES

**CURRENT MEDS**
☐ NO CURRENT MEDS

ALLERGIC & ADVERSE REACTIONS: ☐ NKDA

**PHYSICAL EXAM.**
GENERAL:

HEART: ☐ RRR ☐ MURMUR ☐ GALLOP ☐ CAROTID BRUIT

LUNGS: ☐ CLEAR TO AUSC ☐ RALES ☐ WHEEZING

OTHER:

AIRWAY EXAMINATION
NECK ROM ☐ WNL ☐ RESTRICTED
MOUTH OPENING ☐ WNL ☐ RESTRICTED
THYROMENTAL DIST ☐ WNL ☐ <NORMAL
MALLAMPATI CLASS 1 2 3 4
☐ DENTURES ↑ ↓
☐ CAPS / LOOSE TEETH / CHIPPED TEETH
BLOOD AVAILABILITY ☐ TYPE & SCREEN
☐ TYPE & CROSS Units
☐ Autologous Units

**LABS**
NPO STATUS: NPO > HRS ☐ FULL STOMACH LAST SOLIDS @ LIQUIDS @
DATE OF LAB WORK
☐ LABS REVIEWED
☐ NO LABS ORDERED

PT / INR = PTT / RATIO =

**ANESTHESIA PLAN & RISK**
ANESTHESIA PLAN ☐ G.A. ☐ MAC ☐ SAB ☐ EPIDURAL ☐ _____ BLOCK ☐ G.A. + R.A. ☐ INTRASPINAL NARCOTICS ☐ INVASIVE MONITORS ART. LINE/CVP/PA CATH
☐ Anesthesia Plan and Alternatives, Including Possiblity of Change in Plan Discussed With Patient / Guardian / Family
☐ Discussed Anesthesia Related Risks, Including But Not Limited to, Catastrophic Life Threatening Complications
☐ Discussed Regional Anesthesia Complications, Including But Not Limited To, PDPH, Nerve Injury, Infection, Bleeding, Paralysis
☐ Discussed Probability & Risks Of ☐ Invasive Monitoring ☐ Blood Transfusion ☐ Post Op Ventilatory Support
☐ Questions's Answered ☐ Understands And Accepts Anesthesia Plan ☐ Anesthesia Risk Discussions Declined
☐ Unable to Give Informed Consent, Patient Sedated / Unconscious / Life Saving Procedure / Family Unavailable

ADDITIONAL DISCUSSIONS:
☐ Intra-op suspension of DNR Orders

☐ Presurg. Anesthesia Consult By _____ MD Date: _____ ☐ Telephone Interview Date _____
Patient Interview: In ☐ SPA ☐ Floor ☐ ER ☐ OR ☐ ICU SIGNATURE: _____

ASA PS: 1 2 3 ④ 5 6 Ⓔ

MD DATE/TIME 6/14/14

1800

**FOLLOW UP**
POST ANESTHESIA NOTE:
☐ Awake
☐ Vital Signs Reviewed
☐ Pain and Nausea/Vomiting Status Reviewed
☐ Hydration Status Reviewed
☐ No significant Anesthesia Complications Noted
☐ Intubated & Sedated
☐ See Progress Notes

Signature _____ MD Date: 6/14/14

Date: 6-14-14

## VENTILATOR SETTINGS

| TIME | FiO₂ Set/Analyzed | MODE | Automode | Vt SET/ TARGET mL | Vt Insp mL | Vt Exp mL | Vt Spont mL | Ve Set L | Total Ve | Tubing Compl Calc/AutoFlow | RR SET | RR Spont | RR Total | Insp Time Sec | Insp Time % / Breath Cycle Time | Insp Flow L/S L/M | Insp Rise Time or Ramp | I : E Ratio | PC Set | PS Set | PEEP/CPAP SET | PIP Obs | Plateau Pres | Static Comp |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1730 | | PC V | | 30 | | 43 | | | 58 | | 18 | | 12 | 1.0 | | | | 1:4.0 | | | 5 | 13 | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |

APPENDIX 22
Page 3 of 9

**Sutter Health**
*Sacramento Sierra Region*

☐ SAFH ☐ SAH ☐ SDH ☐ SMCS ☑ SRMC ☐ SSMC

**Ventilator Flowsheet**
**Respiratory Care /**
**Pulmonary Services**

ORDERS

ZZ20740 (9/16/10)

48705305
TRA, WALNUT4196          81-03-83

DOB: 1/01/1910   104YU   SRMC
T  ADT: 6/14/14

APPENDIX 22
Page 3 of 9



Sutter Roseville
Medical Center

**GRAPHIC AND INTAKE & OUTPUT**

PATIENT IDENTIF   48705305        81-03-83
TRA. WALNUT4196

DOB: 1/01/1910  104YU  SRMC
T  ADT: 6/14/14

*Sutter Roseville Medical Center Cardiopulmonary Services Procedure / Progress Report*

**COLE, BRENT**

TN17

06/14/2014 17:20                                        **Patient Room/Bed at Time of Encounter: ERD/Unknown**

**Respiratory Care Mechanical Ventilation Initiation Note:** Mechanical ventilation initiated with LTV ventilator serial number FA10671. RCP assisted with intubation.   See Ventilator Flowsheet for detailed information.

**Electronically Signed by: Christina Vierra - RCP**

---

06/14/2014 17:20                                        **Patient Room/Bed at Time of Encounter: ERD/ Unknown**

**Respiratory Care Mechanical Ventilation Note:** Ventilator was manitained for the initial day and monitored  one time on on this shift. Pt.'s airway suctioned one time. Indications for Ventilator Withdrawal not met. RCP Tech Time documented for trauma call for 15 minutes. See Ventilator Flowsheet for detailed information.

**Electronically Signed by: Christina Vierra - RCP**

---

06/14/2014 17:30                                        **Patient Room/Bed at Time of Encounter: ERD/ Unknown**

**Respiratory Care Tech Time Note:** RCP Tech Time documented for trauma call for 45 minutes.

**Electronically Signed by: Kimberly B. Farnsworth - RCP**

---

06/14/2014 17:40                                        **Patient Room/Bed at Time of Encounter: ERD/ Unknown**

**Respiratory Care In-House Transport Note:** The patient was taken on a one way in-house transport from ER to CT. with stand by for 45 minutes. The pt was transported on an FiO2 of 0. 50 via ventilator. The patient tolerated the transport very well. The patient was transported with a ventilator and a ventilator check has been performed after the transport. **Transport Complications:** None.

**Electronically Signed by: Christina Vierra - RCP**

---

06/14/2014 18:20                                        **Patient Room/Bed at Time of Encounter: ERD/ Unknown**

**Respiratory Care In-House Transport Note:** The patient was taken on a one way in-house transport from CT to OR. The pt was transported on an FiO2 of 0. 100 via bag-valve device. The patient tolerated the transport very well. **Transport Complications:** None.

**Electronically Signed by: Christina Vierra - RCP**

APPENDIX 22
Page 5 of 9

---

Sutter Roseville
Medical Center
A Sutter Health Affiliate

**Sutter Roseville Medical Center Cardiopulmonary Services Procedure / Progress Report**
**Name: COLE, BRENT**                          **Account #: 00048705305**
**Room/Bed: TNIA/07**                          **MRN: 81-03-83**

Printed on: 06/15/2014  09:24                          Page 1 of 1
S_RESP_PROGRESS REPORT TOP MARGIN1_ANNOTATION CC

*Sutter Roseville Medical Center Cardiopulmonary Services Procedure / Progress Report*

## COLE, BRENT

06/14/2014 21:30                                     Patient Room/Bed at Time of Encounter: TNIA/07
**Respiratory Care Tech Time Note:** RCP Tech Time documented for Patient Assist/Monitoring for 30 minutes.

Electronically Signed by: Shawn Sullivan - RCP

---

06/14/2014 22:03                                     Patient Room/Bed at Time of Encounter: TNIA/07
**Respiratory Care Tech Time Note:** RCP Tech Time documented for Patient Assist/Monitoring for ABG 15 minutes.

Electronically Signed by: Yana Tumanov - RCP

---

06/14/2014 22:07                                     Patient Room/Bed at Time of Encounter: TNIA/07
**Respiratory Care In-House Transport Note:** The patient was taken on a round trip in-house transport from TNIA A second stop was made in CT with stand by for 45 minutes. Pt. then returned to TNIA The pt was transported on an FiO2 of 0. 40 via ventilator. The patient tolerated the transport very well. The patient was transported with a ventilator and a ventilator check has been performed after the transport. **Transport Complications:** None.

Electronically Signed by: Yana Tumanov - RCP



APPENDIX 22
Page 6 of 9



**Sutter Roseville**
**Medical Center**
A Sutter Health Affiliate

**Sutter Roseville Medical Center Cardiopulmonary Services Procedure / Progress Report**
Name: COLE, BRENT                                Account #: 00048705305
Room/Bed: TNIA/07                                MRN: 81-03-83

Printed on: 06/15/2014 09.24                     Page 1 of 1
S_RESP_PROGRESS REPORT TOP MARGIN1_ANNOTATION_C(



*Sutter Roseville Medical Center Cardiopulmonary Services Procedure / Progress Report*

## COLE, BRENT

**06/15/2014 03:53**                                    **Patient Room/Bed at Time of Encounter: TNIA/07**
**Respiratory Care Tech Time Note:** RCP Tech Time documented for Patient Assist/Monitoring for ABG 15 minutes.

**Electronically Signed by: Yana Tumanov - RCP**

---

**06/15/2014 05:20**                                    **Patient Room/Bed at Time of Encounter: TNIA/07**
**Respiratory Care Mechanical Ventilation Note:** Mechanical ventilation changed to Servo ventilator serial number FA018619.
Ventilator was manitained and monitored five times on this shift. Vent settings were adjusted 1 times on this shift EtCO2 monitored and
maintained for subsequent day. Pt.'s airway suctioned three times. Pt's ET Tube holder was repositioned five times. Ventilator circuit filter
changed one time. Indications for Ventilator Withdrawal not met. RCP Tech Time documented for Patient Assist/Monitoring for 30 minutes.
See Ventilator Flowsheet for detailed information.

**Electronically Signed by: Yana Tumanov - RCP**

---

**06/15/2014 16:24**                                    **Patient Room/Bed at Time of Encounter: TNIA/07**
**Respiratory Care Mechanical Ventilation Note:** Ventilator was manitained and monitored six times on this shift. Vent settings were
adjusted 1 times on this shift Pt.'s airway suctioned four times. Ventilator circuit filter changed two times. Indications for Ventilator
Withdrawal not met. RCP Tech Time documented for Patient Assist/Monitoring for 180 minutes (3 hours).   See Ventilator Flowsheet for
detailed information.

**Electronically Signed by: Suzanne Mitchell - RCP**

---

**06/15/2014 17:25**                                    **Patient Room/Bed at Time of Encounter: TNIA/07**
**Respiratory Care Mechanical Ventilation Note:** Ventilator was manitained and monitored already charted times on this shift. Vent
settings were adjusted 1 times on this shift EtCO2 monitored and maintained for subsequent day. Pt.'s airway suctioned six times. The
following supplies were provided: bacteria filter . Ventilator discontinued. Indications for Ventilator Withdrawal met Spontaneous Evaluation
Criteria met. with evaluation performed one time. Spontaneous Breathing Trials (SBT) per Physician order were not performed.   See
Ventilator Flowsheet for detailed information.

**Electronically Signed by: Suzanne Mitchell - RCP**

---

**06/15/2014 19:12**                                    **Patient Room/Bed at Time of Encounter: TNIA/07**
**Respiratory Care Pulse Oximetry Monitoring Note:** Continuous SpO2 was 98 % via nasal cannula at 3 LPM O2 with a HR of
102 . There was excellent pulse rate and pulse amplitude correlation  between the EKG monitor display and SpO2 monitor. No changes were
made to Pt.'s O2 delivery.

**Electronically Signed by: Peter Turner - RCP**

APPENDIX 22
Page 7 OF 9

---



*Sutter Roseville*
*Medical Center*

A Sutter Health Affiliate

**Sutter Roseville Medical Center Cardiopulmonary Services Procedure / Progress Report**
        Name: COLE, BRENT                          Account #: 00048705305
        Room/Bed: TNIA/07                           MRN: 81-03-83

Printed on: 06/16/2014  08:07                      Page 1 of 1
S RESP PROGRESS REPORT TOP MARGIN1 ANNOTATION CC

## Trauma History and Physical

APPENDIX 22
Page 1 of 22

Date of Admission: 06/14/2014
Date of Birth: 08/12/1953

TRAUMA NAME: TRA, WALNUT 4196

CHIEF COMPLAINT: Hip and arm pain.

HISTORY OF PRESENT ILLNESS: This is a 60-year-old male who was involved in an altercation with the police and multiple gunshots were exchanged. Apparently, the patient was shot in the left arm and the lower abdomen. The patient arrives to us hemodynamically stable, complaining of left shoulder and lower abdomen pain.

PAST MEDICAL HISTORY: Unobtainable.

PAST SURGICAL HISTORY: Unobtainable.

ALLERGIES: No known drug allergies.

SOCIAL HISTORY: Unobtainable.

MEDICATIONS: Unobtainable.

REVIEW OF SYSTEMS: Noncontributory.

PHYSICAL EXAMINATION:
VITAL SIGNS: The patient is afebrile and actually hypothermic with a temperature of 35 degrees Celsius. He is tachycardic to the 100s and had a blood pressure of approximately 100/60.
PRIMARY SURVEY: Airway is intact. Good breath sounds bilaterally. The patient is normotensive with appropriate IV access in place, bilateral upper extremities. The patient is bleeding some amount from his gunshot wounds. GCS is 15.
SECONDARY SURVEY: There are no scalp lacerations, no calvarial defects. Extraocular muscles intact. Pupils equal and reactive to light and accommodation. Midface is stable. Jaw occlusion is normal.
NECK: Trachea is midline. No JVD. Cervical spine is nontender.
CHEST: Without crepitus or tenderness.
ABDOMEN: Soft.
PELVIS: Stable.

| Sutter Roseville Medical Center | Name: COLE, BRENT | | | |
|---|---|---|---|---|
| One Medical Plaza | MR#: 81-03-83 Acct#: 00048705305 | | | Pt. Type: X |
| Roseville, CA 95661 | Admit Date: 06/14/2014 Discharge Date: | | | |
| | Physician: Zia A. Dehqanzada, MD | | | Page 1 of 3 |
| Trauma History and Physical | Room: TN1A-07 | | | |

MUSCULOSKELETAL: Left upper extremity demonstrates 2 wounds in the lateral arm without any deformities of the left arm. The patient has a full radial pulse and apparently good sensation throughout. He is complaining of some weakness of his left hand. Right upper extremity is within normal limits. Bilateral lower extremities demonstrated a wound on each gluteal region with some ecchymosis of the left gluteal region. There is a fair amount of bleeding in the lower abdomen and it is not discernable whether the bleeding is from the rectum or not. The patient's lower extremities are without any deformities or other lacerations. There are good palpable femoral pulses bilaterally. The dorsalis pedis and posterior tibialis pulses are not palpable, but are dopplerable with the Doppler. The patient has no thoracic or lumbar spine tenderness and no other wounds on his back. However, he does have another wound on his perineum.

LABORATORY EVALUATION: H&H was 10 and 30 and INR was 1.4. ETOH was less than 10. Creatinine was 1.2.

RADIOLOGICAL IMAGING: CT scan of the chest, abdomen and pelvis demonstrated no evidence of thoracic injury. There are no intraabdominal injuries. There was a right pelvic hematoma, which extended to the pelvic brim without any evidence of bowel or bladder injury. The bladder appeared to be intact. There was no free air in the abdomen. Minimum amount of free fluid within the abdomen was noted. There was a right superior pubic ramus fracture and a right ischial fracture, which was comminuted with fragment in this region. The bilateral femoral arteries are without any evidence of injury or extravasation. The retroperitoneum is normal. Minimum amount of air around the prostate is noted. CT of the left upper extremity demonstrates a fracture of the distal humerus and possibly ulna, with the fragment sitting within the joint of the left extremity.

Brachial index was then performed, which demonstrated a systolic of 120 on the right and 90 on the left. The left hand had good cap refill and had a palpable radial pulse, but no dopplerable or ulnar signal.

ASSESSMENT: This is a 60-year-old male:
1. Status post gunshot wound to the lower abdomen and the left arm with a right pubic ramus fracture.
2. Ischial fracture.
3. Left arm gunshot wound with possible nerve damage and possible ulnar artery injury.

PLAN: To proceed to the Operating Room for rigid proctoscopy and laparotomy. We will also plan on exploring the left arm for arterial/nerve injury.

APPENDIX 22
Page 2 of 22

---

| Name: COLE, BRENT | MR#: 81-03-83 | Acct#: 00048705305 | Page 2 of 3 |
|---|---|---|---|
| **Trauma History and Physical** | | | |

Electronically signed by Zia A Dehqanzada, MD on 06/15/2014 at 14:32 PM

D:06/14/2014 21:50:34; T:06/14/2014 22:27:05; MT NTS; Conf # 348406;  Dict ID 5059196ES

cc: Billing Service (Trauma) RTMG, RV -

APPENDIX 22
Page 3 oF 22

## Trauma History and Physical

Date of Admission: 06/14/2014
Date of Birth: 08/12/1953

TRAUMA NAME: TRA, WALNUT 4196

APPENDIX 22
Page 4 of 22

CHIEF COMPLAINT: Hip and arm pain.

HISTORY OF PRESENT ILLNESS: This is a 60-year-old male who was involved in an altercation with the police and multiple gunshots were exchanged. Apparently, the patient was shot in the left arm and the lower abdomen. The patient arrives to us hemodynamically stable, complaining of left shoulder and lower abdomen pain.

PAST MEDICAL HISTORY: Unobtainable.

PAST SURGICAL HISTORY: Unobtainable.

ALLERGIES: No known drug allergies.

SOCIAL HISTORY: Unobtainable.

MEDICATIONS: Unobtainable.

REVIEW OF SYSTEMS: Noncontributory.

PHYSICAL EXAMINATION:
VITAL SIGNS: The patient is afebrile and actually hypothermic with a temperature of 35 degrees Celsius. He is tachycardic to the 100s and had a blood pressure of approximately 100/60.
PRIMARY SURVEY: Airway is intact. Good breath sounds bilaterally. The patient is normotensive with appropriate IV access in place, bilateral upper extremities. The patient is bleeding some amount from his gunshot wounds. GCS is 15.
SECONDARY SURVEY: There are no scalp lacerations, no calvarial defects. Extraocular muscles intact. Pupils equal and reactive to light and accommodation. Midface is stable. Jaw occlusion is normal.
NECK: Trachea is midline. No JVD. Cervical spine is nontender.
CHEST: Without crepitus or tenderness.
ABDOMEN: Soft.
PELVIS: Stable.

| | |
|---|---|
| Sutter Roseville Medical Center<br>One Medical Plaza<br>Roseville, CA 95661<br><br>**Trauma History and Physical** | Name: COLE, BRENT<br>MR#: 81-03-83   Acct#: 00048705305   Pt. Type: X<br>Admit Date: 06/14/2014   Discharge Date:<br>Physician: Zia A. Dehqanzada, MD   Page 1 of 3<br>Room: TN1A-07 |

MUSCULOSKELETAL: Left upper extremity demonstrates 2 wounds in the lateral arm without any deformities of the left arm. The patient has a full radial pulse and apparently good sensation throughout. He is complaining of some weakness of his left hand. Right upper extremity is within normal limits. Bilateral lower extremities demonstrated a wound on each gluteal region with some ecchymosis of the left gluteal region. There is a fair amount of bleeding in the lower abdomen and it is not discernable whether the bleeding is from the rectum or not. The patient's lower extremities are without any deformities or other lacerations. There are good palpable femoral pulses bilaterally. The dorsalis pedis and posterior tibialis pulses are not palpable, but are dopplerable with the Doppler. The patient has no thoracic or lumbar spine tenderness and no other wounds on his back. However, he does have another wound on his perineum.

LABORATORY EVALUATION: H&H was 10 and 30 and INR was 1.4. ETOH was less than 10. Creatinine was 1.2.

RADIOLOGICAL IMAGING: CT scan of the chest, abdomen and pelvis demonstrated no evidence of thoracic injury. There are no intraabdominal injuries. There was a right pelvic hematoma, which extended to the pelvic brim without any evidence of bowel or bladder injury. The bladder appeared to be intact. There was no free air in the abdomen. Minimum amount of free fluid within the abdomen was noted. There was a right superior pubic ramus fracture and a right ischial fracture, which was comminuted with fragment in this region. The bilateral femoral arteries are without any evidence of injury or extravasation. The retroperitoneum is normal. Minimum amount of air around the prostate is noted. CT of the left upper extremity demonstrates a fracture of the distal humerus and possibly ulna, with the fragment sitting within the joint of the left extremity.

Brachial index was then performed, which demonstrated a systolic of 120 on the right and 90 on the left. The left hand had good cap refill and had a palpable radial pulse, but no dopplerable or ulnar signal.

ASSESSMENT: This is a 60-year-old male:
1. Status post gunshot wound to the lower abdomen and the left arm with a right pubic ramus fracture.
2. Ischial fracture.
3. Left arm gunshot wound with possible nerve damage and possible ulnar artery injury.

PLAN: To proceed to the Operating Room for rigid proctoscopy and laparotomy. We will also plan on exploring the left arm for arterial/nerve injury.

---

Electronically signed by Zia A Dehqanzada, MD on 06/15/2014 at 14:32 PM

D:06/14/2014 21:50:34; T:06/14/2014 22:27:05; MT NTS; Conf # 348406;  Dict ID 5059196ES

cc: Billing Service (Trauma) RTMG, RV -

APPENDIX 22
Page 6 of 22

SUTTER HEALTH CENTRAL                    **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

DIAGNOSTIC IMAGING REPORT

PATIENT:  BRENT COLE          MRN: 000000000810383:RV
AGE: 60 years        DOB: 8/12/1953          GENDER: Male

PROCEDURE: XR CHEST 1 VIEW MOBILE - , 6/19/2014 5:52 AM
ACCESSION NUMBER(S): RVR14035222
LOCATION:  TNIA

CLINICAL INDICATION:    RESP.    *APPENDIX 22*
                                 *Page 7 of 22*
COMPARISON: 6/18/14

TECHNIQUE: Single portable radiograph of the chest.

FINDINGS:  Portable sitting upright view of the chest.


IMPRESSION:

1. Lines and tubes:
Right-sided PICC line with its tip in the SVC is unchanged.

2.  Decreased basilar atelectatic opacities with otherwise well
aerated lungs and clear pleura.

3.  Normal size heart.

4. The visualized subcutaneous soft tissues and osseous
structures are grossly unchanged.

NOTE: This dictation was performed using voice recognition
software and some phonetic and grammatical errors may have been
missed in proofreading.

Electronically Signed by Horacio Murillo, MD, Sutter Medical
Group
    6/19/2014 8:10 AM Images available in EPIC and Sutterlink and
https://pacsweb.ssr.sutterhealth.org/




MR#:      0810383   ACCT:  48705305        ROOM: TNIA-07 (RV
PATIENT:  COLE,BRENT                     DOB: 08/12/1953
ORDER#:   RVR14035222
ORDERING PHYSICIAN:   PICKARD, BRIAN J
ATTENDING PHYSICIAN:  DEHQANZADA, ZIA A

SUTTER HEALTH CENTRAL                    **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

### DIAGNOSTIC IMAGING REPORT

PATIENT: BRENT COLE          MRN: 000000000810383:RV
AGE: 60 years        DOB: 8/12/1953        GENDER: Male

PROCEDURE: XR CHEST 1 VIEW MOBILE - , 6/18/2014 5:05 AM
ACCESSION NUMBER(S): RVR14035015
LOCATION:  TNIA

COMPARISON: CXR 6/17/14

*APPENDIX 22*
*Page 8 of 22*

CLINICAL INDICATION:    RESP. Dyspnea

TECHNIQUE: Frontal Portable Chest Radiograph

FINDINGS:

No lobar consolidation or large pleural effusion.
No evidence of pneumothorax or appreciable mediastinal shift.
No cardiomegaly or overt pulmonary vascular congestion.

IMPRESSION:

1. Subsegmental atelectasis at right lung base appears unchanged.
2. Left basilar subsegmental atelectasis has improved in the
interval.
3. Right PICC tip overlies low SVC at level of carina.

Electronically Signed by Kamran Ahmed, MD, Sutter Medical Group
    6/18/2014 11:39 AM Images available in EPIC and Sutterlink
and https://pacsweb.ssr.sutterhealth.org/

MR#:       0810383    ACCT:  48705305          ROOM: TNIA-07 (RV
PATIENT:   COLE,BRENT                      DOB: 08/12/1953
ORDER#:    RVR14035015
ORDERING PHYSICIAN:    PICKARD, BRIAN J
ATTENDING PHYSICIAN:   DEHQANZADA, ZIA A

SUTTER HEALTH CENTRAL                **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

DIAGNOSTIC IMAGING REPORT

PATIENT:  BRENT COLE          MRN: 000000000810383:RV
AGE: 60 years        DOB: 8/12/1953        GENDER: Male

PROCEDURE: XR BLADDER CYSTOGRAM MIN 3V - , 6/17/2014 12:01 PM
ACCESSION NUMBER(S): RVR14034883
LOCATION:  TNIA

*APPENDIX 22*
*page 9 of 22*

COMPARISON: None

CLINICAL INDICATION: Rule out bladder rupture. Post penetrating
trauma.

TECHNIQUE:
The study was explained to the patient. Related questions were
answered.
Under aseptic condition, a 16-gauge French Foley catheter was
placed through the external meatus into the bladder.
Under fluoroscopic supervision the total amount of 300 cc of
Cystografin was instilled into the urinary bladder.
The total time of 0.6 minutes of fluoroscopy was used.
Multiple images were obtained.

FINDINGS:
Urinary bladder is unremarkable. No evidence for extravasation.
No filling defect is identified.

No reflux is identified into the distal ureters.

Postvoid images show no abnormal urethral abnormality or reflux
into the distal ureters.
No appreciable residual urine identified in the urinary bladder.

IMPRESSION:
1.   No evidence for intraperitoneal or extraperitoneal urinary
bladder rupture.
2.   No evidence of reflux.

Electronically Signed by Bijan Bijan, MD, Sutter Medical Group
    6/17/2014 3:29 PM Images available in EPIC and Sutterlink and
https://pacsweb.ssr.sutterhealth.org/

MR#:     0810383   ACCT:   48705305          ROOM: TNIA-07 (RV
PATIENT:   COLE,BRENT                  DOB: 08/12/1953
ORDER#:    RVR14034883
ORDERING PHYSICIAN:   BOSCO, PHILIP
ATTENDING PHYSICIAN:   DEHQANZADA, ZIA A

SUTTER HEALTH CENTRAL                    **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

### DIAGNOSTIC IMAGING REPORT

PATIENT:  BRENT COLE         MRN: 000000000810383:RV
AGE: 60 years      DOB: 8/12/1953      GENDER: Male

PROCEDURE: NI  VENOUS DUPLEX EXT BILAT - , 6/17/2014 7:02 AM
ACCESSION NUMBER(S): RVV14002477
LOCATION:  TNIA

COMPARISON: None            *APPENDIX 22*
                            *page 10 of 22*

CLINICAL INDICATION: Concern for deep venous thrombosis

TECHNIQUE: Multiple transverse and longitudinal images were
acquired of the deep veins of the bilateral lower extremities in
grayscale, color Doppler, and spectral Doppler..

FINDINGS:
Left lower extremity:
The left common femoral, superficial femoral, popliteal veins
demonstrate compression, flow, and response to augmentation.
Short segments of the left calf veins were visualized and are
grossly patent. However, the calf veins are incompletely
visualized.

Right lower extremity:
The right common femoral, superficial femoral, and popliteal
veins demonstrate compression, flow, and response to
augmentation. Short segments of the right calf veins were
visualized and are grossly patent. However, the calf veins are
incompletely visualized.

IMPRESSION:
No sonographic evidence for deep venous thrombosis in the
bilateral lower extremities.

Electronically Signed by Parmbir Sandhu, MD, Sutter Medical Group

    6/17/2014 8:51 AM Images available in EPIC and Sutterlink and
https://pacsweb.ssr.sutterhealth.org/

MR#:      0810383   ACCT:  48705305        ROOM: TNIA-07 (RV
PATIENT:   COLE,BRENT                  DOB: 08/12/1953
ORDER#:    RVV14002477
ORDERING PHYSICIAN:    PICKARD, BRIAN J
ATTENDING PHYSICIAN:   DEHQANZADA, ZIA A

SUTTER HEALTH CENTRAL                    **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

DIAGNOSTIC IMAGING REPORT

PATIENT:  BRENT COLE          MRN: 000000000810383:RV
AGE: 60 years          DOB: 8/12/1953          GENDER: Male

PROCEDURE: XR CHEST 1 VIEW MOBILE - , 6/17/2014 5:36 AM
ACCESSION NUMBER(S): RVR14034826
LOCATION:  TNIA

*APPENDIX 22 Page 11 of 22*

COMPARISON: 6/16/14, 6/15/14, and 6/14/14.

CLINICAL INDICATION:    Gunshot wound to abdomen.

TECHNIQUE: Single portable radiograph of the chest.

FINDINGS:

Lines and tubes: Right PICC line tip in the lower SVC.

Lungs: The lungs are grossly stable in appearance. Reticular
opacities at the lung bases bilaterally, likely representing
atelectasis. Minimal blunting of the right costophrenic angle is
also unchanged and suggests a minimal right effusion. There is no
pneumothorax.

Mediastinum and Hila:  The cardiomediastinal silhouette is
unchanged. The pulmonary vasculature is stable.

Bones and soft tissues:  The visualized bones and soft tissues
are grossly unchanged.


IMPRESSION:

1. No significant change since the prior radiograph.
2. Bibasilar atelectasis and minimal right pleural effusion.

Electronically Signed by Minh Nguyen, MD, Sutter Medical Group
     6/17/2014 8:36 AM Images available in EPIC and Sutterlink and
https://pacsweb.ssr.sutterhealth.org/


MR#:        0810383    ACCT:   48705305          ROOM: TNIA-07 (RV
PATIENT:   COLE,BRENT                          DOB: 08/12/1953
ORDER#:    RVR14034826
ORDERING PHYSICIAN:    PICKARD, BRIAN J
ATTENDING PHYSICIAN:   DEHQANZADA, ZIA A

SUTTER HEALTH CENTRAL                    **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

## DIAGNOSTIC IMAGING REPORT

PATIENT:  BRENT COLE        MRN: 000000000810383:RV
AGE: 60 years        DOB: 8/12/1953        GENDER: Male

PROCEDURE: XR CHEST 1 VIEW MOBILE - , 6/16/2014 5:18 AM
ACCESSION NUMBER(S): RVR14034603
LOCATION:  TNIA

COMPARISON: 6/15/14, 6/14/14.          *APPENDIX 22*
                                        *Page 12 of 22*

CLINICAL INDICATION:     Gunshot wound to abdomen.

TECHNIQUE: Single portable radiograph of the chest.

FINDINGS:

Lines and tubes: Interval extubation and removal of NG tube. A
right PICC line has been retracted with tip in the lower SVC,
approximately 4 cm from the cavoatrial junction.

Lungs: The lungs are stable in appearance. Minimal right pleural
effusion. Probable right basilar atelectasis, stable. No new
focal opacities bilaterally. There is no pneumothorax.

Mediastinum and Hila:  The cardiomediastinal silhouette is
unchanged.  The pulmonary vasculature is stable.

Bones and soft tissues:  The visualized bones and soft tissues
are grossly unchanged.


IMPRESSION:

1. Interval extubation and removal of NG tube.
2. Retraction of the right PICC line with tip now in the lower
SVC.
3. Remainder of the chest is stable.

Electronically Signed by Minh Nguyen, MD, Sutter Medical Group
    6/16/2014 8:18 AM Images available in EPIC and Sutterlink and
https://pacsweb.ssr.sutterhealth.org/




MR#:      0810383   ACCT:   48705305        ROOM: TNIA-07 (RV
PATIENT:  COLE,BRENT                        DOB: 08/12/1953
ORDER#:   RVR14034603
ORDERING PHYSICIAN:    PICKARD, BRIAN J
ATTENDING PHYSICIAN:   DEHQANZADA, ZIA A

SUTTER HEALTH CENTRAL                    **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

DIAGNOSTIC IMAGING REPORT

PATIENT:  WALNUT4196 TRA        MRN: 000000000810383:RV
AGE: 104 years        DOB: 1/1/1910        GENDER: Male

PROCEDURE: XR CHEST 1 VIEW MOBILE - , 6/14/2014 9:37 PM
ACCESSION NUMBER(S): RVR14034407
LOCATION:  TNIA

COMPARISON: Chest x-ray dated June 14, 2014 at 1736 hrs.

CLINICAL INDICATION:    S/P SURG.

TECHNIQUE:  Portable supine AP view of the chest.

*APPENDIX 11*
*Page 13 of 22*

FINDINGS:

Tubes/lines: There has been interval placement of an endotracheal
tube the tip of which is seen 5.3 cm from the carina. Enteric
tube has also been placed which overlies the expected course with
the tip and side-port beyond the inferior margin of the image.

Lungs and pleura: Mild low lung volumes. There is asymmetric
elevation of the right hemidiaphragm as compared with the left
with linear atelectasis seen in the right lung base. No
pneumothorax or pleural effusions.

Mediastinum and hila: The cardiac silhouette is within normal
limits.  Remaining mediastinal and hilar structures are
unremarkable. The trachea is midline.

Bones and soft tissues:  The visualized bones are grossly
unremarkable. Skin staples overlie the medial soft tissues of the
distal left upper extremity above the elbow.

IMPRESSION:

1.  Mild low lung volumes with asymmetric elevation of the right
hemidiaphragm and linear density in the right lung base favored
to represent linear atelectasis however, developing infection is
not excluded.

2.  Endotracheal tube tip seen 5.3 cm from the carina. Enteric
tube overlies the expected course with the tip and side-port
beyond the inferior margin of the image, below the
gastroesophageal junction.

MR#:      0810383    ACCT:   48705305        ROOM: TNIA-07 (RV
PATIENT:  TRA,WALNUT4196                     DOB: 01/01/1910
ORDER#:   RVR14034407
ORDERING PHYSICIAN:    PICKARD, BRIAN J
ATTENDING PHYSICIAN:   DEHQANZADA, ZIA A

(Page 1 of 2. Continued on next page)

SUTTER HEALTH CENTRAL                    **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

DIAGNOSTIC IMAGING REPORT
Electronically Signed by Jason M Allen, MD, Sutter Medical Group
   6/14/2014 10:19 PM Images available in EPIC and Sutterlink
and https://pacsweb.ssr.sutterhealth.org/

*APPENDIX 22*
*Page 14 of 22*

MR#:      0810383    ACCT:   48705305          ROOM: TNIA-07 (RV
PATIENT:  TRA,WALNUT4196                     DOB: 01/01/1910
ORDER#:   RVR14034407
ORDERING PHYSICIAN:    PICKARD, BRIAN J
ATTENDING PHYSICIAN:   DEHQANZADA, ZIA A

SUTTER HEALTH CENTRAL                    **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

### DIAGNOSTIC IMAGING REPORT

PATIENT:  WALNUT4196 TRA        MRN: 000000000810383:RV
AGE: 104 years        DOB: 1/1/1910        GENDER: Unknown

PROCEDURE: XR HUMERUS MOBILE - RIGHT, 6/14/2014 8:36 PM
ACCESSION NUMBER(S): RVR14034400
LOCATION:  ERD

CLINICAL INDICATION:  LT HUMERUS, CHECK FRAGMENT, 1 VIEW.

COMPARISON:  CT performed earlier on June 14, 2014

TECHNIQUE: Portable frontal examination of the left elbow.

FINDINGS: Bullet fragments are seen centered at the olecranon.
Small bullet fragments extend proximally for approximately 11 cm.
There is an apparent extensive soft tissue defect surrounding the
distal humerus. Fractures of the articular distal humerus, the
olecranon, and radial head (that were better seen on CT) appear
unchanged.

IMPRESSION: Evidence of gunshot wound in region of left elbow.
Extensive soft tissue defect. Multiple fractures, better seen on
CT.


Electronically Signed by Scott A Foster, MD, Sutter Medical Group

    6/14/2014 9:04 PM Images available in EPIC and Sutterlink and
https://pacsweb.ssr.sutterhealth.org/



APPENDIX 22
Page 15 of 22

---

MR#:      0810383    ACCT:  48705305           ROOM: TNIA-07  (RV
PATIENT:  TRA,WALNUT4196                       DOB: 01/01/1910
ORDER#:   RVR14034400
ORDERING PHYSICIAN:    DEHQANZADA, ZIA A
ATTENDING PHYSICIAN:   DEHQANZADA, ZIA A

SUTTER HEALTH CENTRAL                    **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

### DIAGNOSTIC IMAGING REPORT

PATIENT: BRENT COLE      MRN: 000000000810383:RV
AGE: 60 years      DOB: 8/12/1953      GENDER: Male

PROCEDURE: XR CHEST 1 VIEW MOBILE - , 6/15/2014 4:55 AM
ACCESSION NUMBER(S): RVR14034410
LOCATION: TNIA

CLINICAL INDICATION:   RESP.

COMPARISON: 6/14/2014.

TECHNIQUE: Single AP view of the chest.

*APPENDIX 22*
*Page 16 of 22*

FINDINGS:

Mediastinum and hila: The cardiac silhouette and mediastinal
shadows appear unchanged.

Lines and tubes: Interval placement right PICC line tip high
right atrium. Visualized support lines otherwise appear
unchanged.

Lungs and pleura: Mild elevation right hemidiaphragm with likely
adjacent atelectasis unchanged. No pneumothorax or pleural
effusion. The lung volumes are within normal limits.

Bones and soft tissues: The osseous structures are unchanged.

IMPRESSION:

Interval placement right PICC line tip high right atrium.
Consider pulling back 2-3 cm.

Otherwise unchanged study.

Electronically Signed by Dylan Witt, MD, Sutter Medical Group
   6/15/2014 9:51 AM Images available in EPIC and Sutterlink and
https://pacsweb.ssr.sutterhealth.org/

---

MR#:      0810383    ACCT:   48705305          ROOM: Trauma
PATIENT:  COLE,BRENT                       DOB: 08/12/1953
ORDER#:   RVR14034410
ORDERING PHYSICIAN:   PICKARD, BRIAN J
ATTENDING PHYSICIAN:  DEHQANZADA, ZIA A

SUTTER HEALTH CENTRAL                    DOCUMENT STATUS:Final
SUTTER ROSEVILLE MEDICAL CENTER

DIAGNOSTIC IMAGING REPORT

PATIENT: WALNUT4196 TRA      MRN: 000000000810383:RV
AGE: 104 years      DOB: 1/1/1910      GENDER: Unknown

PROCEDURE: CT ABD AND PELVIS W CON - , CT CHEST W CONTRAST - ,
6/14/2014 5:54 PM
ACCESSION NUMBER(S): RVC14016677, RVC14016678
LOCATION: ERD

CLINICAL INDICATION:   TRAUMA. Gunshot wound.

COMPARISON: None

*APPENDIX 22*
*Page 17 of 22*

TECHNIQUE:
Postcontrast helical CT acquisition performed from the lung
apices through the pubic rami with coronal and sagittal
reformats.

IV Contrast: 120 ml Isovue 300 nonionic iodinated contrast.
Complications: None.

FINDINGS:

On the scout film, there are apparent gunshot fragments in the
region of the left elbow as well as within the pelvis extending
into the proximal left lower extremity. Not all these gunshot
fragments are seen on the axial, coronal and sagittal images of
the chest, abdomen, and pelvis.

Lungs: No focal consolidations, pleural effusions or
pneumothoraces. No nodules or masses. Endotracheal tube is seen
with its tip 3.5 cm above the carina.

Mediastinum: No lymphadenopathy.

Heart T great vessels: No significant cardiomegaly or
pericardial effusions. Visualized thoracic aorta and proximal
great vessels appear within normal limits. No evidence for
thoracic aortic injury.

Visualized Thoracic Inlet: There is a small amount of
subcutaneous air just deep to the central clavicle and extending

MR#:      0810383   ACCT:   48705305          ROOM: Trauma
PATIENT:  COLE,BRENT                          DOB: 08/12/1953
ORDER#:   RVC14016677
ORDERING PHYSICIAN:      DEHQANZADA, ZIA A
ATTENDING PHYSICIAN:     DEHQANZADA, ZIA A

SUTTER HEALTH CENTRAL                    **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

### DIAGNOSTIC IMAGING REPORT

to the anterior superior axillary soft tissues. I see no definite
fracture or involving the left shoulder girdle area. There is
also a single drop of air in the anterior left internal jugular
vein.

*APPENDIX 22*
*Page 18 of 22*

Axilla: No lymphadenopathy.

Hepatobiliary system: The liver demonstrates homogeneous
enhancement without focal masses. No hepatic lacerations. No
intra- or extrahepatic biliary ductal dilatation. The gallbladder
either has mild wall thickening or a small amount of
pericholecystic fluid. Recommend clinical correlation.

Upper abdomen: Nasogastric tube has tip in the stomach. There are
some drops of air, best seen on series 3 images 8, 89, and 93.
While these appear to be contained within the stomach, I cannot
completely exclude free air tracking from the extensive pelvic
injury.

Pancreas: No focal masses. No pancreatic ductal dilatation. No
pancreatic lacerations.

Spleen: No splenomegaly or focal abnormalities.

Adrenal glands: No focal mass, hyperplasia, or hemorrhage.

Kidney T collecting system: No hydronephrosis or
nephrolithiasis. No focal masses. No renal lacerations. No
evidence for contrast extravasation from renal collecting system.

Bowel: Normal in caliber without wall thickening or dilatation.
No adjacent fat stranding.

Pelvis: There is evidence of extensive injury in the pelvis with
subcutaneous and deep free air extending from the most inferior
of the images which is at the level of the proximal thigh.
Gunshot fragments are seen in the proximal left thigh and left
gluteal area and there is air dissecting from the proximal thigh
into left hemiscrotum and centrally into the pelvis. Subcutaneous
air is also seen in the right inguinal region. Fractures
involving the right symphysis pubis as well as the inferior
ischium are noted. There appears to be some free fluid within the

---

MR#:      0810383    ACCT:    48705305          ROOM: Trauma
PATIENT:  COLE,BRENT                        DOB: 08/12/1953
ORDER#:   RVC14016677
ORDERING PHYSICIAN:    DEHQANZADA, ZIA A
ATTENDING PHYSICIAN:   DEHQANZADA, ZIA A

SUTTER HEALTH CENTRAL                        **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

### DIAGNOSTIC IMAGING REPORT

scrotum, nonspecific. There is free fluid involving the right
hemipelvis which displaces the urinary bladder to the left and
compresses the external iliac vessels and common femoral vessels.
There does not appear to be acute vascular injury although air
tracks into the region of the common femoral artery bifurcation.
Similarly, although the urinary bladder is displaced to the left,
it does not appear to be primarily affected by the extensive
injury involving the right hemipelvis. Similarly, the
rectosigmoid region is displaced slightly to the left and there
is some free fluid and free air tracking into the right
perirectal area. The bowel does not appear to have a primary
injury. However, a small amount of free air is seen in the region
of the urinary bladder and rectosigmoid junction and therefore, a
subtle injury cannot be entirely excluded. There is some free air
in the region of the prostate gland. No definite urethral injury
is identified but there is close proximity injury to be entirely
excluded. Several small calcifications are seen within the
prostate gland.

*APPENDIX 22*
*Page 19 of 22*

Abdominal Vasculature: The IVC, abdominal aorta, and proximal
mesenteric arteries are within normal limits.

Visualized osseous structures: Apart from the pelvic fractures
described above, only mild degenerative changes are present.

IMPRESSION:

1. Extensive injury (from gunshot wound) that involves the
proximal left thigh, the deep pelvis, the scrotum, and the
anterior right inguinal area. Although pelvic structures are
displaced by free fluid, (likely with a component of hematoma),
there is no definite injury involving urinary bladder, bowel, or
vascular structures. Note that air is seen in the region of the
prostate gland and therefore urethral injury cannot be entirely
excluded and, some air is seen in the rectosigmoid junction -
therefore a subtle bowel injury cannot be entirely excluded.
There is a extensive comminuted fracture involving the right
symphysis pubis and ischium with bursting of bone fragments.
Bullet fragments are seen in the proximal left thigh area and
posterior gluteal area.

2. Nasogastric tube with tip in stomach. Endotracheal tube in

---

```
MR#:       0810383   ACCT:  48705305          ROOM: Trauma
PATIENT:   COLE,BRENT                         DOB: 08/12/1953
ORDER#:    RVC14016677
ORDERING PHYSICIAN:    DEHQANZADA, ZIA A
ATTENDING PHYSICIAN:   DEHQANZADA, ZIA A
```

SUTTER HEALTH CENTRAL                        **DOCUMENT STATUS:Final**
SUTTER ROSEVILLE MEDICAL CENTER

### DIAGNOSTIC IMAGING REPORT

satisfactory position.

3.  On the scout film, apparent bullet fragments are seen in the
left elbow area. No definite bullet fragments or osseous
abnormalities are seen the left shoulder girdle area. However,
there is a small amount of air seen in the superior axillary
subcutaneous tissues - this appears to track into the soft
tissues just deep to the left clavicle. Additionally, there is a
single drop of air in the inferior left internal jugular vein. In
discussion with trauma surgery, there has been no attempted
vascular access into either the left subclavian vein or left IJ
and therefore, the etiology of this air remains indeterminate.

4.  Small foci of air in left upper quadrant of abdomen, likely
within the stomach. This cannot be completely confirmed as the
stomach is fluid-filled and this air is not necessarily in a
nondependent area. No definite air is seen tracking up the left
abdomen however.

5.  Either free fluid surrounding the gallbladder or gallbladder
wall thickening. No definite secondary findings of cholecystitis.
No definite evidence of acute injury in this area. Consider
ultrasound when the patient is stable.

6.  Immediate report was made to Dr. Dehqanzada, the patient's
trauma surgeon, at 6:45 PM on June 14, 2014.

Total exam Dose Length Product: 1350.54 mGy-cm
Total exam CT Dose Index: 13.53 mGy

Electronically Signed by Scott A Foster, MD, Sutter Medical Group

   6/14/2014 6:51 PM Images available in EPIC and Sutterlink and
https://pacsweb.ssr.sutterhealth.org/

*APPENDIX 22*
*Page 20 of 22*

| MR#: | 0810383 | ACCT: | 48705305 | | ROOM: Trauma |
|---|---|---|---|---|---|
| PATIENT: | COLE,BRENT | | | | DOB: 08/12/1953 |
| ORDER#: | RVC14016677 | | | | |
| ORDERING PHYSICIAN: | | DEHQANZADA, ZIA A | | | |
| ATTENDING PHYSICIAN: | | DEHQANZADA, ZIA A | | | |

## Consultation

Date of Admission: 06/14/2014
Date of Consultation: 06/17/2014
Date of Birth: 08/12/1953

*APPENDIX 22*
*Page 21 of 22*

REPORT TITLE: Intraoperative Consultation

HISTORY OF PRESENT ILLNESS: Mr. Cole was involved in an altercation with police and sustained multiple gunshot wounds and was brought in as a trauma activation. He was taken emergently to the Operating Room for exploratory laparotomy and presumed for a proctoscopy, possible exploratory laparotomy and exploration of the brachial artery. Orthopedics was consulted intraoperatively for intra-articular bullet fragment, which was removed through the posterior entrance wound that had been opened up by General Surgery.

PAST MEDICAL HISTORY: Unknown.

PAST SURGICAL HISTORY: Unknown.

ALLERGIES: No known drug allergies.

SOCIAL HISTORY: Unknown.

PHYSICAL EXAMINATION:
GENERAL: The patient is currently intubated and anesthetized patient who was involved in an altercation with police in which he was shot several times including in the anterior left pelvis and left arm.
HEENT: Normocephalic, atraumatic, intubated.
PULMONARY: Respirations controlled by the ventilator.
CARDIOVASCULAR: Regular rate and rhythm.
ABDOMEN: Unable to be assessed due to use sterile drapes.
EXTREMITIES: Left upper extremity open wounds on the anterior and posterior surfaces of the distal humerus and ulna, exposed radial nerve in the posterior surface with some partial lacerations or contusions, but partially intact, palpable fragments within the olecranon fossa which were removed during the procedure.
NEUROVASCULAR: Unable to assess neurovascular status secondary to sedation and intubation. Remainder of exam was deferred secondary to patient being asleep and open on the operating room table.

X-ray and CT images were reviewed which show what appears to be a nondisplaced distal humerus fracture although partially obscured by a metal artifact from the bullet, as well as

| Sutter Roseville Medical Center | Name:  COLE, BRENT | |
| One Medical Plaza | MR#:  81-03-83   Acct#:  00048705305 | Pt. Type:  X |
| Roseville, CA 95661 | Admit Date:  06/14/2014   Discharge Date: | |
| | Physician:   Jennifer L. Bruggers, MD | Page 1 of 2 |
| **Consultation** | Room: TNIA-07 | **Preliminary** |

proximal ulna fracture, mostly at the articular surface involved in the coronoid with slight displacement. X-ray images of the pelvis show a less severe pubic ramus fracture with metal artifact and overall acceptable alignment.

ASSESSMENT: Status post gunshot wounds with left superior pubic ramus fracture and right intra-articular split with likely coronoid and proximal ulna fracture and possible distal humerus fracture.

PLAN:
1. Bullet is removed intraoperatively during the above-mentioned procedure. We will plan for repeat CT scan of his left elbow to better assess the fragments without the metal artifact and determine whether surgery is required. He will be placed in a posterior _____ splint to protect the area for now.
2. With regards to his pubic ramus fracture this can be treated nonoperatively. The patient will be weightbearing as tolerated on both lower extremities. Will need to do a neurovascular exam once patient is awake and able to cooperate.
3. Pain control.
4. Postoperative antibiotics.


This report is not considered Final until authenticated by the clinician.


Jennifer L Bruggers, MD

D:06/17/2014 18:33:45; T:06/17/2014 19:27:16; MT NTS; Conf # 351945;  Dict ID 5068696ES

cc: Billing Service (Trauma) RTMG, RV -

APPENDIX 22
Page 22 OF 22



**Sutter Roseville Hospital**
A Sutter Health Affiliate

**Covers Doses from:**

**6/15/2014  0001 to 6/16/2014  0000**

Medical Record

eMAR

## Scheduled Medications

| | | Drug/Dose/Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|---|
| Order Start 06/15/2014 0411 | Order Stop 06/15/2014 0611 | **Albumin, Human 5%** 250 mL Intravenous INFUSE OVER NO MORE THAN 4 HOURS AS RECOMMENDED BY THE CDC AND THE FDA | NOW | I 0421   *RPSI* 250 mL/hr | | |
| Confirmed by RPSI 06/15/2014 0421 | Order # 10822242 | | | | | |
| | | | | I At 0421 *RPSI* recorded: (Manufacturer = grifols), (Lot = b3na3gk003), (Expiration = 06-03-16)]. | | |
| Order Start 06/14/2014 2100 | | **Bacitracin Ointment (500units/gm)** 1 application TOPICAL- TO ABRASIONS | TWO TIMES A DAY | | 0755     *AD5* | 2216     *AS* |
| Confirmed by RPSI 06/14/2014 2339 | Order # 10821546 | | | | | |
| Order Start 06/15/2014 0500 | Order Stop 06/15/2014 2359 | **Calcium Chloride Injection 1,000 mg/NS 50 mL** 1000 mg [100 mL/hr] Intravenous ** OVER 30 MINUTES THRU CENTRAL LINE **For ionized Calcium .evel = 1 - 1.15 ** (Infusing too rapidly can cause drop in BP, periph. vasodilation, bradycardia, tingling sensation- SLOW infusion if these occur) *Do NOT use if patient on Digoxin * PER CALCIUM IV PROTOCOL - CRITICAL CARE UNITS * PROTOCOL DOES NOT APPLY TO PTS WITH sCr > 2 | TODAY | 0424     *RPSI* | | |
| Confirmed by RPSI 06/15/2014 0421 | Order # 10822241 | | | | | |

APPENDIX 23
Page 1 of 13

see page 10

| Allergies: *NKA*, NO ALLERGY INFORMATION | MRN 810383 | | Acct.# 48705305 | |
|---|---|---|---|---|
| | **COLE, BRENT** | | TNIA-07 | TNIA |
| | DOB: 08/12/1953     60 years | Male | Adm: 06/14/2014 | |
| | Height: 178 cm | | Weight: 77.2 kg | |
| | Dr: ZIA A DEHQANZADA25311 | | | |



**Sutter Roseville Hospital**
*A Sutter Health Affiliate*

**Covers Doses from:**

**6/15/2014 0001 to 6/16/2014 0000**

Medical Record

eMAR

## Scheduled Medications

| | | Drug/Dose/ Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|---|
| Order Start 06/14/2014 2200 Confirmed by RPS1 06/14/2014 2339 | Order # 10821538 | ceFAZolin (Ancef/Kefzol) 1 g Intravenous Open Fracture Protocol INFUSE OVER 30 MINUTES RECONSTITUTE WITH 100ML MINI BAG PLUS EXPIRES 24 HRS AFTER MIXING | EVERY 8 HOURS | 0537   *RPS1* | | 1511   *AD5* <br> 2216   *AS* |
| Order Start 06/14/2014 2200 Confirmed by RPS1 06/14/2014 2339 | Order Stop 06/15/2014 1200 Order # 10821547 | Diphtheria, Pertussis (Acell), Tetanus Vaccine / PF (Adacel) 0.5 mL Intramuscular TDaP = FOR AGE 7 YEARS AND ABOVE GIVE IN DELTOID MUSCLE OF UPPER ARM | TODAY | 1 <br> 0119   *RPS1* <br> Deltoid L | | |
| | | | | 1 At 0119 *RPS1* recorded: (Manufacturer = adacel), (Lot = c4519aa), (Publication = 10-09), (Expiration = 04-16-16), (Co-Signature = VCK)]; | | |
| Order Start 06/15/2014 0900 Confirmed by RPS1 06/14/2014 2339 | Order Stop 06/15/2014 0902 Order # 10821867 | Gentamicin 385 mg/NS 100 mL 385 mg [100 mL/hr] Intravenous **HOLD DOSE FOR LEVEL GREATER THAN 0.75**and re-draw level 12 hours after previous draw** INFUSE OVER 60 MINUTES. DRAW LEVEL AT 0500 DAILY for patients in TNI | EVERY 24 HOURS | | 1 <br> (0858)   *AD5* | |
| | | | | | 1 At 0858 *AD5* recorded: (Reason not given = Order discontinued)]; | |



APPENDIX 23
Page 2 of 13

| | | | |
|---|---|---|---|
| **Allergies:** *NKA*, NO ALLERGY INFORMATION | MRN 810383 | Acct.# 48705305 | |
| | **COLE, BRENT** | TNIA-07 | TNIA |
| | DOB: 08/12/1953   60 years | Male   Adm: 06/14/2014 | |
| | Height: 178 cm | Weight: 77.2 kg | |
| | Dr: ZIA A DEHQANZADA25311 | | |

**Sutter Roseville Hospital**
A Sutter Health Affiliate

**Covers Doses from:**

6/15/2014  0001 to 6/16/2014  0000

Medical Record

eMAR

| | | Scheduled Medications | | | | |
|---|---|---|---|---|---|---|
| | | Drug/Dose/ Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
| Order Start 06/15/2014 0900 Confirmed by AD5 06/15/2014 0940 | Order # 10821867 | *update to above order.* DISCONTINUE AT 06/15/2014 0902 AD5 | EVERY 24 HOURS | | | |
| Order Start 06/15/2014 0100 Confirmed by BAM 06/15/2014 0100 | Order Stop 06/15/2014 2359 Order # 10821936 | **Lidocaine (Xylocaine-MPF) 1% Vial** 3 mL INTRADERMAL- 3ml = 30mg ** FOR IV THERAPY USE ONLY *** X1 DOSE ***PER PICC PROCEDURE | TODAY | 1 0100  *BAM* Arm RU  1 At 0100 *BAM* recorded Admin Obs: (Comment = VAT: 0.5mg given for PICC placement), (Obs Taken = 06/15/14 at 01:00)]; | | |
| Order Start 06/14/2014 2200 Confirmed by RPS1 06/14/2014 2340 | Order # 10821526 | **MESSAGE (RN to use REMOVE function to erase this)** 1 each MISCELLANEOUS ROUTE STOP PROPOFOL INFUSION Q24H UNTIL PT AWAKE OR RASS _____ or BIS Greater than 80, then resume sedation order | EVERY 24 HOURS | | | 1 (2217)  *AS*  1 At 2217 *AS* recorded: (Reason not given = Nursing judgement)]; |

APPENDIX 23
Page 3 of 13

| | | |
|---|---|---|
| **Allergies: *NKA*, NO ALLERGY INFORMATION** | MRN 810383 **COLE, BRENT** DOB: 08/12/1953   60 years   Male   Adm: 06/14/2014 Height: 178 cm   Weight: 77.2 kg Dr: ZIA A DEHQANZADA25311 | Acct.# 48705305 TNIA-07   TNIA |


**Sutter Roseville Hospital**
*A Sutter Health Affiliate*

**Covers Doses from:**

**6/15/2014  0001 to 6/16/2014  0000**

Medical Record

eMAR

| | | Scheduled Medications | | | | |
|---|---|---|---|---|---|---|
| | | Drug/Dose/Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
| Order Start 06/15/2014 0000 | Order Stop 06/16/2014 1400 | **Phytonadione (Vitamin K) 10mg/ml Adult Ampul** 10 mg -SUBCUTANEOUS X 48 HRS | **EVERY 12 HOURS** | | 1301        *AD5* Ab RLQ | |
| Confirmed by RPS1 06/14/2014 2340 | Order # 10821883 | | | | | |
| Order Start 06/14/2014 2200 | | **Sodium Chloride 0.9% Flush Syringe** 5 mL Intravenous FLUSH PORT Q8H - (No Heparin) | **THREE TIMES A DAY** | 0534      *RPS1* | 1301        *AD5* | 2216        *AS* |
| Confirmed by RPS1 06/14/2014 2340 | Order # 10821530 | | | | | |
| Order Start 06/15/2014 0000 | | **Sodium Chloride 0.9% Flush Syringe** 10-20 mL Intravenous Q8H ** FLUSH EACH LUMEN OF PICC AS PER PROTOCOL ***DOCUMENT BLOOD RETURN FOR EACH LUMEN IN eMAP COMMENTS DURING FLUSH PROCEDURE *** (FLUSH WITH 20ML AS DIRECTED AFTER BLOOD WITHDRAWAL - SEE POLICY) | **THREE TIMES A DAY** | 0113      *RPS1* 10 mL | 1 0745        *AD5* 10 mL | 2 1511        *AD5* 10 mL |
| Confirmed by BAM 06/15/2014 0100 | Order # 10821937 | | | | | |
| | | | | | 1 At 0745 *AD5* recorded Admin Obs: (Comment = positive flush and blood return all lumens), (Obs Taken = 06/15/14 at 07:45)], 2 At 1511 *AD5* recorded Admin Obs: (Comment = positive flush and blood return all lumens), (Obs Taken = 06/15/14 at 15:11)]. | | |

*APPENDIX 23*
*Page 4 of 13*

| Allergies: *NKA*, NO ALLERGY INFORMATION | MRN 810383 | Acct.# 48705305 | |
|---|---|---|---|
| | **COLE, BRENT** | TNIA-07 | TNIA |
| | DOB: 08/12/1953     60 years    Male     Adm: 06/14/2014 Height: 178 cm          Weight: 77.2 kg | | |
| | Dr: ZIA A DEHQANZADA25311 | | |



**Sutter Roseville Hospital**
*A Sutter Health Affiliate*

**Covers Doses from:**

6/15/2014  0001 to 6/16/2014  0000

Medical Record

eMAR

## Scheduled Medications

| Order Start / Order Stop | Drug/Dose/ Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|
| Order Start 06/15/2014 0308 / Order Stop 06/15/2014 0508<br>Confirmed by RPS1 06/15/2014 0312 / Order # 10822197 | **Sodium Chloride 0.9% IV 1000ml (FS)**<br>1000 mL [1000 mL/hr] Intravenous<br>OBTAIN FROM MATERIALS MANAGEMENT | NOW | 0312  *RPS1* | | |

## Continuous Solutions

| Order Start / Order Stop | Drug/Dose/ Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|
| Order Start 06/14/2014 2200 / Order Stop 06/15/2014 1750<br>Confirmed by RPS1 06/14/2014 2340 / Order # 10821524 | **FentaNYL (Sublimaze) 2500mcg/250 mL Drip\***<br>250 mL Intravenous<br>Start at 25 -50 mcg/hour; increase by 25mcg every 30 min. If NOT effective, re-bolus with 25mcg IV Q15Min x4. IF still not effective, Notify Physician. For Over-Sedation, decrease dose by 50% | Infusion | | | |
| Order Start 06/14/2014 2200<br>Confirmed by AD5 06/15/2014 1817 / Order # 10821524 | *update to above order.* | Infusion | | | |
| | DISCONTINUE AT 06/15/2014 1750 AD5 | | | | |

*APPENDIX 23*
*page 5 of 13*

| Allergies: *NKA*, NO ALLERGY INFORMATION | MRN 810383 | Acct.# 48705305 | |
|---|---|---|---|
| | **COLE, BRENT** | TNIA-07 | TNIA |
| | DOB: 08/12/1953   60 years   Male   Adm: 06/14/2014<br>Height: 178 cm   Weight: 77.2 kg | | |
| | Dr: ZIA A DEHQANZADA25311 | | |

**Sutter Roseville Hospital**
*A Sutter Health Affiliate*

**Covers Doses from:**

**6/15/2014  0001 to 6/16/2014  0000**

Medical Record

eMAR

### Continuous Solutions

| | | Drug/Dose/ Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|---|
| Order Start 06/15/2014 0600 | Order Stop 06/15/2014 0903 | **Normosol R IV Soln 1000ml (Floorstock)** 1000 mL [150 mL/hr] Intravenous OBTAIN FROM MATERIALS MANAGEMENT ***PLASMA-LYTE = NORMOSOL-R*** | Infusion | 0534  *RPSI* | | |
| Confirmed by AD5 06/15/2014 0735 | Order # 10822332 | | | | | |
| Order Start 06/15/2014 0600 | | *update to above order.* | Infusion | | | |
| Confirmed by AD5 06/15/2014 0939 | Order # 10822332 | | | | | |
| | | DISCONTINUE AT 06/15/2014 0903 AD5 | | | | |
| Order Start 06/15/2014 1800 | | **Normosol R IV Soln 1000ml (Floorstock)** 1000 mL [50 mL/hr] Intravenous OBTAIN FROM MATERIALS MANAGEMENT ***PLASMA-LYTE = NORMOSOL-R*** | Infusion | | | |
| Confirmed by AD5 06/15/2014 1817 | Order # 10824183 | | | | | |

*APPENDIX 23*
*Page 6 of 13*

| | |
|---|---|
| **Allergies: *NKA*, NO ALLERGY INFORMATION** | MRN 810383      Acct.# 48705305 |
| | **COLE, BRENT**      TNIA-07      TNIA |
| | DOB: 08/12/1953   60 years    Male    Adm: 06/14/2014 |
| | Height: 178 cm      Weight: 77.2 kg |
| | Dr: ZIA A DEHQANZADA25311 |



**Sutter Roseville Hospital**
A Sutter Health Affiliate

**Covers Doses from:**

6/15/2014  0001 to 6/16/2014  0000

Medical Record

eMAR

## Continuous Solutions

| | | Drug/Dose/ Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|---|
| Order Start 06/14/2014 2200 | Order Stop 06/15/2014 1750 | **Propofol (Diprivan) Vial** 100 mL, Intravenous CHANGE TUBING EVERY 12 HOURS - For Mechanically Ventilated Patient with Anxiety - Expected to wean in 24 hours. Start Infusion at 20 mcg/kg/min. Increase by 5 - 10 mcg/kg/min Q10 min up to 100 mcg/kg/min. Call physician if not effective ORDER TRIGLYCERIDE LEVEL AFTER 72 HOURS | **Infusion** | 0312  *RPSI* 4.8 mL/hr | 0745  *ADS* 14.4 mL/hr 1245  *ADS* 14.4 mL/hr | 1511  *ADS* 24 mL/hr |
| Confirmed by RPSI 06/14/2014 2340 | Order # 10821525 | | | | | |
| Order Start 06/14/2014 2200 | | *update to above order.* | **Infusion** | | | |
| Confirmed by ADS 06/15/2014 1817 | Order # 10821525 | | | | | |
| | | DISCONTINUE AT 06/15/2014 1750 ADS | | | | |
| Order Start 06/14/2014 2200 | Order Stop 06/15/2014 0540 | **Sodium Chloride 0.9% IV 1000ml (FS)** 1000 mL [125 mL/hr] Intravenous | **Infusion** | | | |
| Confirmed by RPSI 06/14/2014 2333 | Order # 10821532 | | | | | |

APPENDIX 23
Page 7 of 13

| Allergies: *NKA*, NO ALLERGY INFORMATION | MRN 810383 | | Acct.# 48705305 | |
|---|---|---|---|---|
| | **COLE, BRENT** | | TNIA-07 | TNIA |
| | DOB: 08/12/1953   60 years | Male | Adm: 06/14/2014 | |
| | Height: 178 cm | Weight: 77.2 kg | | |
| | Dr: ZIA A DEHQANZADA25311 | | | |



**Sutter Roseville Hospital**
*A Sutter Health Affiliate*

**Covers Doses from:**

6/15/2014  0001 to 6/16/2014  0000

Medical Record

eMAR

## Continuous Solutions

| | | Drug/Dose/ Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|---|
| Order Start 06/14/2014 2200 | | *update to above order* | Infusion | | | |
| Confirmed by AD5 06/15/2014 0735 | Order # 10821532 | | | | | |
| | | DISCONTINUE AT 06/15/2014 0540 AD5 | | | | |
| Order Start 06/15/2014 0400 | | **Vasopressin (Pitressin) 100 Units/NS 250 mL** | Infusion | 0334   *AAG* 6 mL/hr | | |
| Confirmed by AAG 06/15/2014 0333 | Order # 10822200 | 250 mL Intravenous CONC = 0.4 UNITS / ML 0.04 UNIT/MINUTE = 2.4 UNIT/HOUR = 6 ML/HR *** 0.03 UNIT/MINUTE = 1.8 UNIT/HR = 4.5 ML/HR 0.02 UNIT/MINUTE = 1.2 UNIT/HOUR = 3 ML/HR | | | | |

## PRN Medications

| | | Drug/Dose/ Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|---|
| Order Start 06/15/2014 0100 | | **Alteplase (Cathflo Activase) 2mg vial** 2 mg Intravenous | AS DIRECTED PRN | | | |
| Confirmed by HAM 06/15/2014 0100 | Order # 10821939 | TO CLEAR OCCLUDED LUMEN OF PIC AS PER IV THERAPY PROTOCOL *** RECONSTITUTE WITH 2.2ML STERILE WATER. INJECT IN EACH CATHETER LUMEN UD. MRX1. ***DO NOT SHAKE*** USE IMMEDIATELY | | | | |

APPENDIX 23
Page 8 of 13

| | | |
|---|---|---|
| **Allergies:** *NKA*, NO ALLERGY INFORMATION | MRN 810383 **COLE, BRENT** | Acct.# 48705305 TNIA-07          TNIA |
| | DOB: 08/12/1953   60 years     Male     Adm: 06/14/2014 Height: 178 cm                    Weight: 77.2 kg | |
| | Dr: ZIA A DEHQANZADA25311 | |


**Sutter Roseville Hospital**
*A Sutter Health Affiliate*

**Covers Doses from:**

**6/15/2014 0001 to 6/16/2014 0000**

Medical Record

eMAR

| | | Drug/Dose/Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|---|
| **PRN Medications** | | | | | | |
| Order Start 06/15/2014 0900 / Confirmed by RPS1 06/14/2014 2339 | Order # 10821541 | **Bisacodyl (Dulcolax) 10mg Supp** 10 mg RECTAL FOR CONSTIPATION - PER LAXATIVE PROTOCOL | **EVERY DAY, AS NEEDED** | | | |
| Order Start 06/14/2014 2200 / Confirmed by RPS1 06/14/2014 2338 | Order # 10821537 | **Calcium Chloride Injection mg/NS 50 mL** mg Intravenous REQUEST CALCIUM DOSE BASED ON SLIDING SCALE & IONIZED CALCIUM ** SCAN REQUEST TO PHARMACY ** CRITICAL CARE IV CALCIUM PROTOCOL IONIZED Ca++ Level = 1 - 1.15 give 1 Gram IONIZED Ca++ Level = 0.85 - 0.99 give 2 Grams IONIZED Ca++ Level = 0.75 - 0.84 give 3 Grams IONIZED Ca++ Level less than 0.75 give 3 Grams & call MD PROTOCOL DOES NOT APPLY TO PTS WITH sCr > 2 | **AS DIRECTED PRN** | | APPENDIX 23 Page 9 of 13 | |
| Order Start 06/14/2014 2200 / Confirmed by RPS1 06/14/2014 2340 | Order Stop 06/15/2014 1750 / Order # 10821523 | **fentaNYL (Sublimaze)*** 25 mcg Intravenous RE-BOLUS with 25mcg Q 15 Minutes x4 if INFUSION is NOT EFFECTIVE as directed. IF still not effective, Notify Physician. For Over-Sedation, decrease dose by 50% | **AS DIRECTED PRN** | 0333  *AAG* | | |

| | | |
|---|---|---|
| **Allergies:** *NKA*, NO ALLERGY INFORMATION | **MRN** 810383 | **Acct.#** 48705305 |
| | **COLE, BRENT** | **TNIA-07**         **TNIA** |
| | DOB: 08/12/1953   60 years   Male   Adm: 06/14/2014 Height: 178 cm            Weight: 77.2 kg | |
| | Dr: ZIA A DEHQANZADA25311 | |



**Sutter Roseville Hospital**
*A Sutter Health Affiliate*

**Covers Doses from:**

**6/15/2014  0001 to 6/16/2014  0000**

Medical Record

cMAR

| | | Drug/Dose/ Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|---|
| Order Start 06/14/2014 2200 Confirmed by AD5 06/15/2014 1817 | Order # 10821523 | *update to above order.* | **AS DIRECTED PRN** | | | |
| | | DISCONTINUE AT 06/15/2014 1750 AD5 | | | | |
| Order Start 06/15/2014 1800 Confirmed by AD5 06/15/2014 1817 | Order # 10824182 | **HYDROmorphone (Dilaudid) 1mg/ml Syringe\*** 1 mg Intravenous PRN PAIN | **EVERY HOUR, IF NEEDED** | APPENDIX 23 Pg. 10 of 13 | | 1820  AD5<br>2216  AS |
| Order Start 06/14/2014 2200 Confirmed by RPS1 06/14/2014 2338 | Order # 10821534 | **Lidocaine (Xylocaine) 1% Vial** 10 mg Intravenous May add 10mg Lidocaine to each KCl bolus if patient has discomfort during infusion - per facility protocol | **AS DIRECTED PRN** | | | |
| Order Start 06/14/2014 2200 Confirmed by RPS1 06/14/2014 2339 | Order # 10821543 | **Magnesium & Aluminum Hydroxide / Simethicone (Maalox Plus Extra-Strength) 400-400-40 mg/5 mL Oral Susp** 15 mL ORAL PRN DYSPEPSIA - PER LAXATIVE PROTOCOL | **EVERY 6 HOURS, AS NEEDED** | | | |

**Allergies: *NKA*, NO ALLERGY INFORMATION**

MRN 810383

**COLE, BRENT**

DOB: 08/12/1953    60 years    Male
Height: 178 cm                  Weight: 77.2 kg
Dr: ZIA A DEHQANZADA25311

Acct.# 48705305

TNIA-07          TNIA

Adm: 06/14/2014



**Sutter Roseville Hospital**
A Sutter Health Affiliate

**Covers Doses from:**

6/15/2014 0001 to 6/16/2014 0000

Medical Record

eMAR

## PRN Medications

| | | Drug/Dose/ Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|---|
| Order Start 06/14/2014 2200 / Confirmed by RPS1 06/14/2014 2339 | Order # 10821539 | **Magnesium Hydroxide (MOM)** **400 mg/5 mL Oral Susp** 30 mL ORAL FOR CONSTIPATION - PER LAXATIVE PROTOCOL | **EVERY 24 HOURS, AS NEEDED** | | | |
| Order Start 06/14/2014 2200 / Confirmed by RPS1 06/14/2014 2207 | Order # 10821535 | **Magnesium Sulfate 2 g in 50 mL IVPB** 0-4 g Intravenous MAGNESIUM PROTOCOL - remove dose from pyxis For Mag 1.5 - 1.9 give 2GM in 50ml over 2 hours** For Mag 1 - 1.4 give 4GM (2 x 2GM) each over 2 hours** For Mag Less Than 1 give 4GM (2x2GM) each over 1 hour* REPEAT Mag Level: (2 hours post dose in Critical Care; next AM all other units). If Mag level less than 1, repeat level in 2 hrs post dose). DO NOT USE PROTOCOL IF sCr greater than 2, CrCl less than 30ml/min, hemodialysis or peritoneal dialysis. | **AS DIRECTED PRN** | 0013  *RPS1* 2 g  *APPENDIX 23* *PAGE 11 of 13* | | |
| Order Start 06/14/2014 2200 / Confirmed by RPS1 06/14/2014 2339 | Order # 10821545 | **Ondansetron (Zofran)** 4 mg Intravenous PRN N/V | **EVERY 6 HOURS, AS NEEDED** | | | |

| Allergies: *NKA*, NO ALLERGY INFORMATION | MRN 810383 | | Acct.# 48705305 | |
|---|---|---|---|---|
| | **COLE, BRENT** | | TNIA-07 | TNIA |
| | DOB: 08/12/1953   60 years Height: 178 cm Dr: ZIA A DEHQANZADA25311 | Male | Adm: 06/14/2014 Weight: 77.2 kg | |


**Sutter Roseville Hospital**
*A Sutter Health Affiliate*

**Covers Doses from:**

**6/15/2014  0001 to 6/16/2014  0000**

Medical Record

eMAR

## PRN Medications

| | | Drug/Dose/ Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|---|
| Order Start 06/14/2014 2200<br><br>Confirmed by RPSI 06/14/2014 2338 | Order # 10821536 | **PHOSPHATE PROTOCOL** 1 rx monitor MISCELLANEOUS ROUTE Pharmacy will review AM Lab results & enter replacement dose per protocol. Repeat Phos level the day after any dose administered. | **AS DIRECTED PRN** | | | |
| Order Start 06/14/2014 2200<br><br>Confirmed by RPSI 06/14/2014 2338 | Order # 10821533 | **Potassium Chloride 10mEq/50ml SW Piggyback** 0-60 mEq Intravenous Replace to 4: IV K REPLACEMENT PROTOCOL For K+ = 4 or greater, No Replacement For K+ = 3.8 - 3.9 Give 10mEq IVPB x 2 (20mEq) over 2 hrs For K+ = 3.6 - 3.7 Give 10mEq IVPB x 3 (30mEq) over 3 hrs For K+ = 3.4 - 3.5 Give 10mEq IVPB x 4 (40mEq) over 4 hrs For K+ = 3 - 3.3 Give 10mEq IVPB x 5 (50mEq) over 5 hrs For K+ Less than 3, Give 10mEq IVPB x 6 (60mEq) over 6 hrs, place on cardiac monitor & call MD. Repeat K+ Level in 2 hrs * **Confirm sCr before giving - Does not apply if sCr > 2 * | **AS DIRECTED PRN** | *APPENDEX 23 Page 120 of 13* | | |
| Order Start 06/14/2014 2200<br><br>Confirmed by RPSI 06/14/2014 2339 | Order # 10821544 | **Sennosides (Senokot) Tab** 2 tab ORAL FOR CONSTIPATION - PER LAXATIVE PROTOCOL | **Q12H As Needed** | | | |

| | | |
|---|---|---|
| **Allergies: *NKA*, NO ALLERGY INFORMATION** | **MRN** 810383 | **Acct.#** 48705305 |
| | **COLE, BRENT** | **TNIA-07**     **TNIA** |
| | DOB: 08/12/1953   60 years   Male   Adm: 06/14/2014 | |
| | Height: 178 cm   Weight: 77.2 kg | |
| | Dr: ZIA A DEHQANZADA25311 | |



**Sutter Roseville Hospital**
A Sutter Health Affiliate

**Covers Doses from:**

**6/15/2014  0001 to 6/16/2014  0000**



APPENDIX 23
Page 13 of 13

Medical Record

eMAR

## PRN Medications

| | Drug/Dose/Route/Comments | Freq | 0001-0700 | 0701-1500 | 1501-0000 |
|---|---|---|---|---|---|
| Order Start 06/15/2014 0100<br>Confirmed by BAM 06/15/2014 0100<br>Order # 10821938 | **Sodium Chloride 0.9% Flush Syringe** 10-20 mL Intravenous<br>FLUSH EACH LUMEN OF PICC BEFORE AND AFTER IV MEDS (FLUSH WITH 20ML AS DIRECTED AFTER BLOOD WITHDRAWAL - SEE POLICY)<br>***DOCUMENT BLOOD RETURN FOR EACH LUMEN IN eMAP COMMENTS DURING FLUSH PROCEDURE *** | **AS DIRECTED PRN** | | 1<br>1434    *ERC2*<br>10 mL | |
| | | | | 1 At 1434 *ERC2* recorded Admin Obs: (Comment = red lumen flushed with brisk blood return. other lumen infusing. arm circumference=30cm. dressing c,d,i and placed on 6.15.14 ), (Obs Taken = 06/15/14 at 14:34)]; | |
| Order Start 06/15/2014 0900<br>Confirmed by AD5 06/15/2014 0939<br>Order # 10822587 | **Sodium Chloride 0.9% Flush Syringe** 5 mL Intravenous<br>FLUSH EACH SHIFT AND BEFORE AND AFTER IV MEDS | **AS DIRECTED PRN** | | | |
| Order Start 06/15/2014 0900<br>Confirmed by RPS1 06/14/2014 2339<br>Order # 10821542 | **Sodium Phosphate (Fleet Enema)** 1 enema RECTAL<br>FOR CONSTIPATION, IF OTHER MEASURES INEFFECTIVE - PER LAXATIVE PROTOCOL | **EVERY DAY, AS NEEDED** | | | |

| Initials | Name | Initials | Name |
|---|---|---|---|
| AAG | Amberly A. Galli, RN | AD5 | Astrid Delmue, RN |
| AS | Andrea Seerley, | BAM | Bryan A. Manugo, RN |
| ERC2 | Erin Renee Cristales, RN | RPS1 | Riley P. Stamper |
| VCK | Valerie C. Ko, RN | | |

**Allergies: *NKA*, NO ALLERGY INFORMATION**

MRN 810383

**COLE, BRENT**

DOB  08/12/1953    60 years
Height: 178 cm

Dr: ZIA A DEHQANZADA25311

Acct.# 48705305

TNIA-07          TNIA

Male          Adm: 06/14/2014
Weight: 77.2 kg

**BERESFORD INVESTIGATIONS** 

P.O. Box 505, Auburn, CA 95604
www.Beresford-PI.com

Cellular 530.320.0267
FAX 866.875.5255
CA Investigator Lic PI20759

13 August 2014

### ATTORNEY WORK PRODUCT

*APPENDIX 24*
*Page 1 of 5*

To:    Jody L. Schutz, Attorney

From:  Robert A. Beresford, Investigator

Re:    People v. Brent COLE
       Nevada County Superior Court, No. F14-0267

Interview with: Ginger GEMIGNANI
*(Contact info subject to Penal Code Sec. 1054.2(a)(1) /Available on Request)*

On Monday 8/11/14, at about 2:25 PM, I attempted to contact Ginger GEMIGNANI via telephone and spoke with an adult male who identified himself as Nick, her husband.  I identified myself as a defense investigator and explained the nature of my investigation.

In summary, Nick stated the following.  Neither Nick nor his wife had been informed that the stolen motorcycle was recovered.  They had settled with the insurance company and they no longer had ownership interest in the motorcycle.  Nick was also part owner of the motorcycle; however, Ginger would probably know more about the motorcycle theft.

Nick was very friendly and curious about my job as a private investigator; he asked about my background.  I mentioned that I was previously employed as a deputy sheriff.  He then informed me that his wife, Ginger, was employed at the Grass Valley Police Department.  He did not name her job title or mention in what capacity she was employed there.  He also told me that his grandfather was a retired deputy sheriff.

Nick told me he would contact Ginger at her workplace and return my call with information about when she would be home so that we could set up a meeting.  He recalled that her shift ended at 3:00 PM and that we could meet as early as 3:30 PM.

ATTORNEY WORK PRODUCT
Interview with Ginger GEMIGNANI cont.

APPENDIX 24
Page 2 of 2

1      About 5 minutes later, Nick called me back. He advised that Ginger's
2 work day ended at 3:00 PM and that he or she would call me at that time to
3 confirm a time and place for a meeting. I did not receive a return telephone
4 call from Nick or Ginger.

5      At about 4:00 PM, I again attempted to contact Ginger or Nick via
6 telephone and Ginger answered my telephone call. I explained that I had
7 previously spoken with Nick and was calling about their stolen motorcycle. I
8 further explained that I wanted to meet with her and Nick regarding the theft.

9      Ginger then asked who she was speaking with and asked me to spell my
10 last name, which I did. I repeated that I was a defense investigator and again
11 explained the nature of my investigation. When I again indicated that I wanted
12 to meet with her, she told me she did not know "how to proceed." She
13 approximately replied, "Shouldn't the sheriff's office be investigating this? Isn't
14 it their jurisdiction?" I offered examples of the questions I wanted to ask; e.g.
15 When was the motorcycle stolen? Where was it stolen from?

16      I further explained that the motorcycle had been recovered during the
17 shooting investigation that involved a BLM Ranger and a California Highway
18 Patrol officer in June this year. She referred to the defendant, Brent COLE,
19 and said, "I know about that and I know who that is."

20      In summary, Ginger stated the following. The motorcycle was stolen
21 about a year ago. Her father had bought the motorcycle new and given it to
22 her as a gift. She had the motorcycle for about four months before it was
23 stolen from the front yard of her residence. She suggested that it had been
24 stolen for three or four days before she or anyone else noticed.

25      At the time, neither she nor her husband suspected any particular
26 person was responsible for the motorcycle theft. On asking this question,
27 Ginger asked me to clarify. I offered the example that someone might have
28 recently been looking at the motorcycle in the front yard and that she or her

ATTORNEY WORK PRODUCT
Interview with Ginger GEMIGNANI cont.

1　husband might have suspected a particular person as the thief in the example

2　I offered.

3　　　I determined from my experience that Ginger was reluctant to speak

4　with me. She hesitated when I asked questions and referred me to the police

5　report with replies similar to, "I would have told the CHP that. That would be in

6　the police report." When I began to thank her for speaking with me, she

7　ended our telephone conversation abruptly.

8　///

9　///

10　///

11　End of interview with Ginger GEMIGNANI

*APPENDIX 24*
*Page 3 of 5*

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

APPENDIX 24
Page 4 of 5

**VEHICLE REPORT**
CHP 180 (Rev. 4-11) OPI 061

NOTE CHP 180 IS FURNISHED TO ALL PEACE
OFFICERS BY THE CALIFORNIA HIGHWAY PATROL

5 002323013

| REPORTING DEPARTMENT | LOCATION CODE | DATE / TIME OF REPORT | NOTICE OF STORED VEHICLE DELIVERED PERSONALLY | FILE NO |
|---|---|---|---|---|
| GRASS VALLEY | 9230 | 4-4-13  0740 | ☐ | #A 11603 |

| ... TOWED / STOLEN FROM | ODOMETER READING | VIN CLEAR IN SVS? ☐ YES ☒ NO | DATE / TIME DISPATCH NOTIFIED | LOG NO. |
|---|---|---|---|---|
| 13706 BANNER LAVA CAP RD | 15,000 ? | LIC CLEAR IN SVS? ☐ YES ☒ NO | 04-04-2013 | 262 |

| YEAR | MAKE | MODEL | BODY TYPE | COLOR | LICENSE NO | ☒ONE ☐TWO | MONTH/YEAR 01/14 | STATE CA |
|---|---|---|---|---|---|---|---|---|
| 03 | KAWK | KLR 650 | M/C | GRN/BLK | 16N2774 | | | |

| VEHICLE IDENTIFICATION NO | ENGINE NO | VALUATION BY ☐OFFICER ☒OWNER |
|---|---|---|
| J K A K L E A 1 8 3 D A 0 3 1 7 7 | KLG50AEA031177 | ☐0-300 ☒301-4000 ☐4001+ $ 5,000 |

| REGISTERED OWNER | LEGAL OWNER |
|---|---|
| GEMIGNANI, GINGER OR NICK ☒SAME AS R/O | |
| 13706 BANNER LAVA CAP RD | |
| NEVADA CITY, CA 95959 | |

☐ **STORED**    ☐ **IMPOUNDED**    ☐ **RELEASED**    ☐ **RECOVERED - VEHICLE / COMPONENT**

| TOWING / STORAGE CONCERN (NAME, ADDRESS, PHONE) | STORAGE AUTHORITY / REASON |
|---|---|

| TOWED TO / STORED AT | AIRBAG? ☐YES ☐NO ☐1 ☐2 | DRIVEABLE? ☐YES ☐NO ☐JUNK ☐UNK | VIN SWITCHED? ☐YES ☐NO |
|---|---|---|---|

| CONDITION | YES | NO | ITEMS | YES | NO | ITEMS | YES | NO | ITEMS | YES | NO | TIRES / WHEELS | CONDITION |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WRECKED | | | SEAT (FRONT) | | | REGISTRATION | | | CAMPER | | | LEFT FRONT | |
| BURNED HULK per 431(c) CVC | | | SEAT (REAR) | | | ALT / GENERATOR | | | VESSEL AS LOAD | | | RIGHT FRONT | |
| VANDALIZED | | | RADIO | | | BATTERY | | | FIREARMS | | | LEFT REAR | |
| ENG / TRANS. STRIP | | | TAPE DECK | | | DIFFERENTIAL | | | OTHER | | | RIGHT REAR | |
| MISC. PARTS STRIP | | | TAPES | | | TRANSMISSION | | | | | | SPARE | |
| B... AL STRIP | | | OTHER RADIO | | | AUTOMATIC | | | | | | HUB CAPS | |
| S... STRIP per 431(b) CVC | | | IGNITION KEY | | | MANUAL | | | | | | SPECIAL WHEELS | |

| R...SE VEHICLE TO: ☐R/O OR AGENT ☐AGENCY HOLD ☐22850.3 CVC | GARAGE PRINCIPAL / AGENT STORING VEHICLE (SIGNATURE) | DATE / TIME |
|---|---|---|

| NAME OF PERSON / AGENCY AUTHORIZING RELEASE | I.D. NO. | DATE | CERTIFICATION: I, THE UNDERSIGNED, DO HEREBY CERTIFY THAT I AM LEGALLY AUTHORIZED AND ENTITLED TO TAKE POSSESSION OF THE ABOVE DESCRIBED VEHICLE. |
|---|---|---|---|
| SIGNATURE OF PERSON AUTHORIZING RELEASE | | | SIGNATURE OF PERSON TAKING POSSESSION |

☒ **STOLEN VEHICLE / COMPONENT**    ☐ **EMBEZZLED VEHICLE**    ☐ **PLATE(S) REPORT**

| DATE / TIME OF OCCURRENCE | DATE / TIME REPORTED | NAME OF REPORTING PARTY (R/P) | DRIVER LICENSE NO. / STATE |
|---|---|---|---|
| 04-01-2013  1600 | 04-04-2013  0730 | R/O | AS135042 |

| LAST DRIVER OF VEHICLE | DATE / TIME | ADDRESS OF R/P | TELEPHONE OF R/P |
|---|---|---|---|
| NICK GEMIGNANI | 03/25/2013  0900 | R/O | (530) 265-2817 |

I CERTIFY OR DECLARE UNDER PENALTY OF PERJURY UNDER THE LAWS OF
THE STATE OF CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.

SIGNATURE OF PERSON MAKING REPORT
X Nicki Gemignani

**REMARKS**
[LIST PROPERTY, TOOLS, VEHICLE DAMAGE, ARRESTS]

| DRIVER'S NAME | ARRESTED / SECTION? ☐YES ☐NO | REPORTED BY | CARGO / TYPE? ☐YES ☐NO | VALUE $ ☐BILL OF LANDING ATTACHED |
|---|---|---|---|---|

| FRONT | LEFT SIDE | RIGHT SIDE | REAR | TOP |
|---|---|---|---|---|

| SIGNATURE OF OFFICER TAKING REPORT | I.D. NO. | SUPERVISOR | REQUIRED NOTICES SENT TO REGISTERED AND LEGAL OWNERS PER 22852 CVC? ☐YES ☐NO | DATE NOTIFIED |
|---|---|---|---|---|
| T. SHERMAN | 16243 | I. L...FF | | |

OSP 11 124279    *An Internationally Accredited Agency*    Chp180_1011.pdf

COLE_02130

STOLEN / EMBEZZLED NARRATIVE

| 1. AREA | 2. TAKEN FROM | | | | | | 3. REGISTRATION IN VEHICLE? |
|---|---|---|---|---|---|---|---|
| ☒ RURAL  ☐ URBAN | ☐ STREET  ☐ PARKING LOT  ☐ GARAGE  ☒ DRIVEWAY  ☐ OTHER _____ | | | | | | ☐ YES  ☒ NO |

| 4. WAS NEIGHBORHOOD CHECKED FOR VEHICLE, WITNESSES, CLUES, OTHER CRIMES? | 5. PAYMENTS CURRENT? | 6. DOORS LOCKED? N/A | 7. KEYS IN VEHICLE? | 8. ALL KEYS ACCOUNTED FOR? |
|---|---|---|---|---|
| ☒ YES  ☐ NO | ☒ YES  ☐ NO | ☐ YES  ☐ NO | ☐ YES  ☒ NO | ☒ YES  ☐ NO |

| 9. WAS VEHICLE LAST SERVICED? | 10. WHERE? | 11. IS THIS THE USUAL MECHANIC? |
|---|---|---|
| LAST YEAR? | FAMILY | ☒ YES  ☐ NO |

| 12. RECENTLY LEFT IN PARKING GARAGE OR PARKING VALET SERVICE? | 13. IF YES, WHERE? | 14. VEHICLE EQUIPPED WITH ORIGINAL ENGINE? |
|---|---|---|
| ☐ YES  ☒ NO | | ☒ YES  ☐ NO  ☐ UNK |

| 15. ORIGINAL TRANSMISSION? | 16. ORIGINAL PAINT? | 17. IF ANSWER TO 14, 15, OR 16 IS NO, PROVIDE ADDITIONAL INFORMATION, SERIAL NO., ORIGINAL COLOR, ETC |
|---|---|---|
| ☒ YES  ☐ NO | ☒ YES  ☐ NO | |

| 18. HAS VEHICLE BEEN PREVIOUSLY INVOLVED IN AN ACCIDENT? | 19. IF YES, HAS DAMAGE BEEN FIXED? | 20. PARTS DAMAGED |
|---|---|---|
| ☐ YES  ☒ NO | ☐ YES  ☐ NO | |

| 21. FACTORY EQUIPPED RADIO? | 22. IF NO, MAKE AND SERIAL NO | 23. DOES VEHICLE HAVE LOCKING GAS CAP? |
|---|---|---|
| ☐ YES  ☐ NO  N/A | | ☒ YES  ☐ NO |

| 24. IS VEHICLE FULLY INSURED? | 25. NAME / ADDRESS OF INSURANCE COMPANY |
|---|---|
| ☒ YES  ☐ NO | AFH INS. CO.   052-261-575 |

26. NAME / ADDRESS OF NEAREST RELATIVE NOT LIVING WITH R/P
SUMMIT GORDON? 11676 WILLOW VALLEY RD NEVADA CITY CA 95950

27. IDENTIFYING MARKS, BUMPER STICKERS, ADD ON EQUIPMENT, ETC.
CANVAS SADDLE BAGS ON REAR FENDER, HELMET BLACK "HARLEY DAVIDSON"

| 28. SUSPECT NAME | DRIVER LICENSE NO / STATE | ADDRESS | | |
|---|---|---|---|---|
| HEIGHT | WEIGHT | EYES | HAIR | MISC |

RECOVERY NARRATIVE

29. NAME, DATE AND CASE NUMBER OF REPORTING AGENCY

| 30. AREA RECOVERED | 31. DESCRIPTION OF RECOVERY AREA | 32. RECOVERY |
|---|---|---|
| ☐ RURAL  ☐ URBAN | | ☐ COMPLETE  ☐ PARTIAL |

| 33. EVIDENCE LOCATED? | 34. WITNESSES, CLUES AND OTHER CRIMES | 35. HAVE MISSING, IDENTIFIABLE PARTS BEEN ENTERED IN SVB? |
|---|---|---|
| ☐ YES  ☐ NO | | ☐ YES  ☐ NO |

COMPONENT RECOVERY

| 36. DESCRIPTION | 37. SERIAL NO |
|---|---|
| | |

NARRATIVE

R/O HAD RIDDEN VEHICLE ON MONDAY APRIL 1st IN THE AFTERNOON @
APPROX. 1600 HRS. LAST FENESHCA PARKED VEHICLE UNDER CARPORT IN
DRIVEWAY ATTACHED TO HOUSE NOTICED VEHICLE WAS GONE
$ REPORTED IT. R/O CHECKED AREA FOR CLUES & USTS NO SUSPECT
ON FURTHER INFORMATION.

APPENDIX 24
PAGE 5 OF 5

COLE_02131

| INCIDENT REPORT | NEVADA COUNTY SHERIFFS OFFICE | CASE NUMBER 11401626 | SUP NO 4 |
|---|---|---|---|

E-54 is a gray plastic milk crate. The milk crate contained items of indicia, including a social security card
d to Michael Lee Radon number 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 displayed on it, a proposition 215 medical recommendation
card issued to Michael Radon, a receipt from the Holiday Lodge in Grass Valley CA under the name of
Michael Radon, a jury summons from the County of Nevada addressed to Michael Lee Radon, P.O. Box 200,
North San Juan, CA 95960 on the address label, the butt plate for the western field shotgun. Also the handgun
grips, possibly for the 44magnum; the magnum had aftermarket hand gun grips installed on it and the original
factory grips where found within the milk crate.

E-55 is going to be a medication bottle from the CVS pharmacy with the name of Brent Cole. It appears to be
oxycodone with an unknown quantity inside. This medication bottle was recovered from a black plastic
craftsman tool box which was also located in the sleeping area of the south camp.

E-56 is going to be a spent 12 gauge shot gun cartridge. This item was located in a blue Ikea brand plastic bag.
The bag was located at the head of the sleeping area on the south camp.

E-57 is going to be a green ammo can container commonly used in the military and purchased from military
supply stores. The container contains unexpended 12 gauge rounds.

Both of the motorcycles at the camp were taken as evidence. The motorcycles were placed in the evidence
storage yard at the sheriff's department property unit. The backpack that contained the motorcycles parts that
appear to be from the stolen motorcycle was also taken and stored with the motorcycle.   Ranger Pultorak's
l truck was towed and stored at the sheriff's department property evidence yard.

While the units and investigators were preparing to process the crime scene, a California State Park Ranger
found Cole's truck parked in front of 18805 North Bloomfield Road. The State Park Ranger was aware the
vehicle was wanted in connection to the incident. Deputy Mackey responded to the scene where the truck was
located. The truck was towed and held as possible evidence in the case. The truck was placed in the evidence
yard at the sheriff's department property unit. The doors of the vehicle were sealed with evidence tape, but no
search of the interior of the vehicle was conducted.

By the time the scene was processed and the units were able to clear from the scene it was approximately 0130
hours, on 06-15-14. Two trail cameras were placed to monitor the roadway into the camp to record the vehicles
that enter the area after we left the crime scene that night. At that time, the investigation was processed as far as
needed for the initial evidence to be retained.

On 06-15-14, at approximately 1200 hours, Detective Hutson took a Ramey Warrant for Brent Cole's arrest to
Nevada County Superior Court Judge Heidleberger. Judge Heidleberger issued a No Bail Ramey Arrest
Warrant for Brent Cole, 08-12-1953, for two counts of attempted murder on a peace officer (664/187(a)P.C.)
and use of a firearm during the commission of attempted murder (12022.53(a)(c)P.C.).

While Detective Hutson had the Ramey Warrant Issued, I met with BLM Special Agents Joe Andrews and Ed
Delmolino. They had the keys to Ranger Pultorak's patrol truck, they unlocked the truck and I viewed the
interior of the truck.

APPENDIX 25
Page 1 of 3

| INCIDENT REPORT | NEVADA COUNTY SHERIFFS OFFICE | CASE NUMBER 11401626 | SUF NO 4 |

Upon reviewing the interior of the vehicle, it appears that everything was as Ranger Pultorak left it. It does not appear that the vehicle is going to be involved in the scene. The vehicle is a four-door crew cab Dodge pick-up. The rear passenger seat portion has a caged section for prisoner transport. The rear sliding window on the passenger side is broken. There is an AR-15 style rifle, secured in the rack in the front area in between the passenger and driver seat. In the front passenger seat there are several bags that the ranger uses to store duty equipment on. On the center console there is a set of gloves as well as a coffee cup. There is a Streamlight flashlight and a charger next to the driver's seat. There's a pair of sunglasses on the dash as well as a BLM Ranger baseball hat. There is a mount for what appears to be a GPS unit on the dash, although the GPS unit is not in it. Above the driver's side visor, there is a daily log book. Above the front passenger seat visor, there are several maps. It should also be noted that there is a BLM jacket secured over the headrest of the passenger seat as well as some binoculars and a handheld GPS unit located on the front passenger seat.

At this time, it appears that the broken rear window on the passenger side of the vehicle is not related to the officer involved shooting incident. While reviewing the interior of the truck, we removed what appears to be a journal from the visor above the driver's seat. Inside the journal it documents his contacts with the subjects, and it appears that there are two separate contacts documented in the log. The log was collected as evidence and will be booked into the Sheriff's Department Property Unit.

Date: 06/16/2014

Location: Nevada County Sheriff's Department (Follow-up Investigation)

On the above date at approximately 0700 hours, there was a meeting held in the conference room of the Nevada County Sheriff's Department to cover the initial investigation. During the conference, we went around and established what agency would be responsible for doing follow-up on the case. Agent Forristel from the FBI was placed on speaker phone for the conference. He advised that he could have agents do follow-up investigations in Alaska and North Dakota where suspect Brent Cole had lived prior to coming to California. We spoke about Cole's criminal record, which indicated only one arrest in California in January of this year. Other than that, his criminal RAP showed no arrests.

On 06/15/2014, I had called and spoke to a dispatcher (dispatcher #2924) at the Bismarck Police Department in Bismarck, North Dakota. She indicated that they had no record of contact with suspect Cole, either in the city or county.

Sergeant Matt Whiting from the Grass Valley CHP office was present and said he would do follow-up to identify medical personnel who transported and rendered aid to both the officers and the suspect. The Sheriff's Department was going to continue the main portion of the criminal investigation.

After the conference, Sergeant Saunders and I went to the Grass Valley CHP office and met with Sergeant Whiting and Officer Earl Cummings. Officer Cummings is responsible for processing the evidence for Grass Valley CHP Office. Officer Cummings escorted us back into their department's evidence room. The Grass Valley CHP office had booked into evidence, Officer Hardin's duty belt including his duty weapon, duty ..rm, body armor, and pictures taken at the scene. They also booked into evidence Ranger Pultorak's duty


APPENDIX 25
Page 2 of 3

| INCIDENT REPORT | NEVADA COUNTY SHERIFFS OFFICE | CASE NUMBER<br>11401626 | SUP NO<br>4 |
| --- | --- | --- | --- |

also a green and white plaid flannel shirt.

‎. ‎ ‎ will be a magazine from a weapon. It looks like it is an "Accuguide" brand magazine. It has a black plastic plate on the butt of it. The magazine is marked with 40S&W indicating it is for a 40 "Smith & Wesson" caliber handgun. It has a blue plastic follower.

E-24 appears to be a silver metal eating utensil.  It has a red colored stain on it, possibly blood.

E-25 will be a spent Winchester 40 caliber shell casing, collected next to the east end of the tarp.

E-26 is going to be a pill bottle collected from a "Natural Ice" twelve pack cardboard box. The pill bottle has a name of Mike L. Radon displayed on it. The prescription is for "Seudogest" tab 60mg.

E-27 is going to be a cigarette butt collected from the west end area of the tarp.

E-28 is going to be a shell casing from a 44 magnum caliber weapon.

E-29 is going to be a casting collected from the dirt area between the camp fire and the tarp. The casting was done by an FBI agent. The casting was of a shoe print in the dirt.

E-30 is going to be a coffee pot with an apparent bullet strike. It was collected from the dirt next to the camp fire ring.

‎ ‎ ‎ is a spent shell casing, appears to be a 44 magnum caliber. It should be noted that item was collected next to ‎ ‎ the frying liquid boxes described earlier in the report.

E-32 is going to be a dirt impression labeled for photographic purposes. It appears to be a bullet strike. This is next to the piece of wood that the subject was using as a table near the campfire. This item was not collected.

E-33 is a spent Winchester 40 caliber shell casing, collected from the west area of the camp.

E-34 is a half a set of dentures collected from an area on the south side of the campsite, next to a trail that leads down into a wooded area.

E-35 is an impression in the dirt labeled for photographic purposes. It is a bullet strike near the campfire ring.

E-36 is a cigarette butt collected from the northwest side of the camp.

E-37 is also an impression in the dirt. It will be labeled and photographed. It will not be collected as it is a bullet strike on the south edge of the roadway in what would be about the middle of the campsite.

E-38 is going to be a black cloth sweater. It appears to be "Carhartt" brand. This is collected from the north campsite, the area where the suspect was rendered aide to.

E-39 is going to be a large knife.  It has what appears to be a bone handle with a silver metal blade. It is not in a ‎ ‎ ‎ath. This item was collected from the north campsite near the base of a tree below E-45. The brand appears

APPENDIX 25
Page 3 of 3

donied. The officer that arrested me perjured himself repeatedly, and of course the court took his side... but you should have seen his face when I asked him if he was aware of the penalty for perjury and pointed out that he had just perjured himself, and then moved to call the other officer in to testify... which was of course denied by California's kangaroo court. I was able to get my formal written answer served and filed. The court once again claims that it is not subject to federal law.

Like · Comment · Share

2 people like this.

> Blair Gable Something tells me that I can't really trust your account of things considering you are tin foil hat wearing lunatic.
> June 18 at 8:15am · Like ·   2
>
> Mike Escuela Do you consider yourself to be "Normal" Blair?
> 21 hours ago · Like

Write a comment...
Press Enter to post.

**Brent Cole** shared a link.
June 5

I have been convinced for decades that Patton was murdered to silence him.

http://www.telegraph.co.uk/news/worldnews/northamerica/usa/3869117/General-George-S.-Patton-was-assassinated-to-silence-his-criticism-of-allied-war-leaders-claims-new-book.html

> General George S. Patton was assassinated to silence his criticism of allied war leaders claims...
> www.telegraph.co.uk
>
> George S. Patton, America's greatest combat general of the Second World War, was assassinated after the conflict with the connivance of US leaders, according to a new book.

Like · Comment · Share

2 people like this.

Write a comment...
Press Enter to post.

See More Recent Stories ▾

APPENDIX 26
Page 1 of 1

The Pre-Sentence Investigation claims that the defendant posted a post about Patton being assassinated "For claiming that the United States conspired with Russia during WW II. I shared this link when I uploaded the "ANSWER WITH BILL OF EXCEPTIONS And Affidavit In Support" in case no. M14-000388. Querry to see public copy. "Affidavit of Brent D. Cole June 4, 2014. Querry also: "Cross-Complaint: AN INFORMATION IN THE NATURE OF QUO WARRANTO"

COLE_02253

☐ **Ventilator Protocol   –OR–**

**A pulse oximeter and either an ETCO₂ monitor or TCM monitor (for pediatrics/infants) will be used to adjust ventilator settings unless otherwise identified below.**

**A daily evaluation of Spontaneous Evaluation Criteria will be obtained if patient is stable.**

**GUIDELINES FOR TIDAL VOLUMES:**

Adult mechanical $V_t$ 6-8 mL/kg of predicted body weight   Pressure ventilation patient cycled: 3-6 mL/kg of body weight
Pediatric mechanical $V_t$ 6-8 mL/kg of body weight   Pressure ventilation to not exceed a pressure setting of 40 cm
Infant mechanical $V_t$ 3-6 mL/kg of body weight   $H_2O$ pressure

**Please complete each section**

---

**I.   MODE OF VENTILATION NOTE: Tidal Volume guidelines will be used, unless identified by the physician.**

UNDERLINE VOLUME VENTILATION                    PRESSURE VENTILATION

☐ SIMV+PS (Pressure Support)          ☐ SIMV+PS
☑ Volume Control                      ☐ Pressure Control      *APPENDIX 22*
☐ Volume Support                      ☐ Pressure Support      *Page 8 of 9*
☐ PRVC (Pressure regulated volume control) (Infant target is measured on inspiration; adult/pediatric is measured on expiration)
☐ Automatic Mode
☐ Do not utilize guidelines for the tidal volume
   Place patient on a target Machine Vt of _500_; Patient-cycled Vt of _____ (for pressure support modes).
☐ Other modes _____

---

**II.   RESPIRATORY RATE**

Initial Machine-cycled respiratory rate at _12_ /minute.   ☐ Do not use an ETCO₂ or TCM to monitor patient
Adjust the respiratory rate to maintain ETCO₂ or TCM between 30 and 45 mm Hg. **OR**   ☐ Between _____ and _____ mm Hg

---

**III.   FIO₂**

Adjust $FiO_2$ to maintain $SpO_2$ at or above 90% **OR**   ☐ Between _____ % and _____ %

---

**IV.   PEEP/CPAP LEVEL**

5 cm $H_2O$ pressure **OR**   ☐ at _____ cm $H_2O$

---

**V.   ADDITIONAL ORDERS**

**Obtain Chest Radiograph for tube pacement**
After initial ventilator settings, an arterial blood gas (or venous for pediatrics/infants) will be obtained within 30 minutes and PRN there after (or a change in patient status).
☐ Do not obtain a blood gas if there is a change in patient status.
**Correlate the non-invasive monitors: if ETCO₂ or TCM less than or equal to 10 mm Hg from the PaCO₂, use the ETCO₂ or TCM values to adjust respiratory rate and target $V_t$.**

**Predicted Body Weight Calculation:**
Males = 50 kg for first 5' of height, plus 2.3 kg for each subsequent inch **OR** 50 + [2.3 x (height in inches - 60)]
Females = 45.5 kg for the first 5' of height, add 2.3 kg for each subsequent inch
**OR** 45.5 + [2.3 x (height in inches - 60)]

_____   _____   _____   _____
(Physician Signature)   (Date)   (Time)   RCP Noting orders

Patient Identification

**Sutter Health**
Sacramento Sierra
Region
☐ SAFH   ☐ SDH   ☐ SMCS   ☑ SRMC

**Initial Ventilator Management Physician Orders**

48705305                     81-03-83
TRA, WALNUT4196

DOB: 1/01/1910   104YU   SRMC
T   ADT:  6/14/14

# Trauma Clinic Patient Problem List

☑ Orthopedics _Trauma_    ☐ Neurosurgery _____    ☐ Plastics/ENT
☑ General Surgery

## Allergies and Adverse Drug Reactions

APPENDIX 22
Page 9 of 9

☑ NKDA

_[handwritten, illegible]_

| Date | Injury/Problem | Date Resolved |
|------|----------------|---------------|
| 6/14 | _[illegible]_ | 7/15/14 |
| | _[illegible]_ | 7/15/14 |
| | _[illegible]_ | |
| | _[illegible]_ | |
| | _[illegible]_ | |
| | _[illegible]_ | 7/15/14 |
| | _[illegible]_ | |
| | _[illegible]_ | |
| | _[illegible]_ | |
| | _[illegible]_ | |
| | _[illegible]_ | |
| | _[illegible]_ | |

| Date | Operative Procedures |
|------|----------------------|
| | _[illegible handwritten]_ |

| Date | Referrals |
|------|-----------|
| | |

**Medications - See Medication List**



Sutter Roseville
Medical Center
A Sutter Health Affiliate

**Trauma Clinic Patient Problem List**

Patient Identification

48838627        81-03-83
COLE, BRENT
TRA, WALNUT4196
DOB: 8/12/1953  60Y  M  SRMC
C  ADT: 7/15/14

-PROOF OF SERVICE- UNITED STATES OF AMERICA v. BRENT DOUGLAS COLE

| | |
|---|---|
| Party: Brent Douglas Cole /x-635066 6W329 | Case no.: 2:14-cr-00269-GEB |
| Sacramento County Main Jail | |
| 651 "I" Street, Sacramento, CA 95814 | |
| UNITED STATES DISTRICT COURT | |
| EASTERN DISTRICT OF CALIFORNIA | Judge: GEB |
| In Propia Persona: | Dept: 13th Floor |

On (Date:) August , 2015   Time       I served the following:

1.) "ANSWER TO CRIMINAL CHARGES"  — 31 pages
      Appendices 1-26                                        — 162 pages

With a copy of this "PROOF OF SERVICE" on the following entities:

1.) Clerk of the court, United States District Court Eastern District of California, 501 "I" St., Room 4-200, Sacramento, CA 95814-2322

2.) Assistant U.S. Attorney, Heiko P. Coppola, 501 "I" Street, Suite 10-100, Sacramento, CA 95814-2322

3) Clerk, US Court of Appeals For the Ninth Circuit, P.O. Box 193939, San Fransisco, CA 94119-3939

I hereby certify upon penalty of perjury that: I am over 18 years of age and that I personally placed the above listed documents addressed to the entities listed above as shown, which envelopes were sealed and placed into the prison mail-system with sufficient postage affixed or personally delivered.

Executed on August 28, 2015   Brent D. Cole/x-635066

at Sacramento, California       signature of declarant