1

            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF CALIFORNIA
2        BEFORE THE HONORABLE GARLAND E. BURRELL, JR., JUDGE

3                       ---o0o---

4

    UNITED STATES OF AMERICA,
5
            Plaintiff,
6
    Vs.                         CASE NO. 2:14-CR-269 GEB
7                               VOLUME 1 - PAGES 1-210

    BRENT DOUGLAS COLE,
8
            Defendant.
9    _____/

10

11              REPORTER'S TRANSCRIPT OF JURY TRIAL
             TUESDAY, FEBRUARY 3RD, 2015, 9:00 A.M.
12

13   For the Government:       OFFICE OF THE UNITED STATES ATTORNEY
                               501 I Street, Suite 10-100
14                             Sacramento, California  95814

15                             BY:  MICHAEL D. MCCOY,
                               Assistant United States Attorney
16
                               BY:  HEIKO COPPOLA,
17                             Assistant United States Attorney

18

19   For the Defendant:        LAW OFFICE OF J. TONEY
                               P.O. Box 1515
20                             Woodland, California  95695

21                             BY:  J. TONEY, Attorney At Law

22

23   Reported by:  CATHERINE E.F. BODENE, CSR #6926, RPR
                     Official Court Reporter USDC, 916-446-6360
24                   501 I Street, Room 4-200
                     Sacramento, California  95814
25
     TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

<pre>
 1                    PROCEEDINGS INDEX

 2                       ---o0o---

 3

 4   PROCEEDINGS:                            PAGE

 5   Jury Selection                           6

 6   Preliminary Jury Instructions           63

 7   Opening Statement by Government         70

 8   Opening Statement by Defendant         79

 9

10                       ---o0o---

11

12                 EXAMINATION INDEX

13                       ---o0o---

14

15   FOR THE GOVERNMENT:

16       EXAMINATION:                       PAGE

17     BRANT HARDIN

18       Direct Examination by Mr. Coppola     82
         Cross-Examination by Mr. Toney        142
19       Redirect Examination by Mr. Coppola   153

20

21     TAD PULTORAK

         Direct Examination by Mr. McCoy       158
22

23

24

25                       ---o0o---
</pre>

EXHIBIT INDEX

---o0o---

| GOVERNMENT'S EXHIBITS: | EVD | VOL |
|---|---|---|
| 1A | 171 | 1 |
| 1B | 90 | 1 |
| 1C | 170 | 1 |
| 1D | 172 | 1 |
| 1F | 94 | 1 |
| 2F | 96 | 1 |
| 2P | 192 | 1 |
| 2Q | 192 | 1 |
| 3E | 140 | 1 |
| 3O | 183 | 1 |
| 3P | 183 | 1 |
| 4E | 97 | 1 |
| 4F | 97 | 1 |
| 4G | 97 | 1 |
| 4H | 97 | 1 |
| 4I | 127 | 1 |
| 4J | 127 | 1 |
| 4K | 127 | 1 |
| 4L | 127 | 1 |
| 4M | 129 | 1 |
| 4N | 129 | 1 |

---o0o---

EXHIBIT INDEX

---o0o---

| GOVERNMENT'S EXHIBITS: | EVD | VOL |
|---|---|---|
| 4P | 131 | 1 |
| 4T | 179 | 1 |
| 4U | 174 | 1 |
| 5B | 99 | 1 |
| 6A | 208 | 1 |
| 6B | 208 | 1 |
| 6C | 208 | 1 |
| 6D | 208 | 1 |
| 6E | 136 | 1 |
| 6F | 136 | 1 |
| 6G | 136 | 1 |
| 7A | 138 | 1 |
| 7B | 138 | 1 |
| 7C | 138 | 1 |
| 7D | 204 | 1 |
| 7E | 204 | 1 |
| 7F | 205 | 1 |
| 7G | 205 | 1 |
| 8A | 133 | 1 |
| 8B | 165 | 1 |
| 8C | 133 | 1 |

---o0o---

EXHIBIT INDEX

---o0o---

| GOVERNMENT'S EXHIBITS: | EVD | VOL |
|---|---|---|
| 8D | 167 | 1 |
| 8H | 164 | 1 |
| 8I | 192 | 1 |
| 8J | 204 | 1 |
| 8L | 109 | 1 |
| 8M | 109 | 1 |
| 8N | 130 | 1 |
| 8O | 130 | 1 |
| 10 | 157 | 1 |

---o0o---

1    SACRAMENTO, CALIFORNIA, TUESDAY, FEBRUARY 3RD, 2015, 9:00 A.M.

2                              ---o0o---

3              THE CLERK:  You may remain seated.  Court is now in

4    session.

5         Calling 14-269, United States versus Brent Douglas Cole.

6              THE COURT:  Please, state your appearances for the

7    record.

8              MR. MCCOY:  Good morning, Your Honor.  Michael McCoy

9    and Heiko Coppola on behalf of the United States.

10             THE COURT:  Thank you.

11             MR. TONEY:  Good morning.  J. Toney with Mr. Cole.  He

12   is present here.

13             THE COURT:  Thank you.  Are you ready to proceed?

14             MR. TONEY:  Yes.

15             THE COURT:  I would like the courtroom deputy to

16   please administer the oath to the prospective jurors.

17             THE CLERK:  Would all prospective jurors please raise

18   your right hands.

19        (Oath administered.)

20             THE COURT:  Thank you.  Good morning.  Welcome to the

21   United States District Court for the Eastern District of

22   California.

23        We will be asking you questions concerning whether this is

24   the type of case that you could sit as a fair and impartial

25   juror on.

1          The court personnel who will assist me in this trial are on

2     the platform below me.  The courtroom deputy clerk just

3     administered the oath to you.  Next to her is the certified

4     court reporter.

5          The court reporter may interrupt from time to time to

6     ensure that witnesses speak up or that a prospective juror is

7     heard because it is essential to what she is obligated to do

8     that she hear everything that is said because she has to report

9     everything that is said.

10         We are about to begin a process that is known in the law as

11    voir dire.  The purpose of this process is to determine whether

12    this is the type of case that you can be a juror on.

13         Each side -- each party involved in the case has what's

14    called a peremptory challenge under the law.  It authorizes a

15    party to thank and excuse a prospective juror.  And at the

16    appropriate point during the proceeding, each side will be

17    exercising its peremptory challenges.

18         The jury administrator has already randomly selected each

19    of you, and each of you has a number that reflects that random

20    selection.  We'll probably be using the number rather than your

21    name unless a party has a problem with that procedure.  If so,

22    the party should let me know.

23         We'll be doing that during the proceeding in part because

24    it is easier for the court reporter to readily report what is

25    stated by a particular juror if you just give your seat number

1    and then you go ahead and give any response that you may have.

2         If you conclude during the process that, from your

3    perspective, a question unduly pries into your private affairs,

4    and you therefore would prefer to discuss the matter in a more

5    private setting, let me know that is your desire.

6         I may ask additional questions so that I can become assured

7    that it is the type of matter that should be discussed in a

8    more private setting, and it is conceivable that I may in part

9    grant your request by not having you respond in front of so

10   many members of the community.

11        The parties anticipate that it could take six court days

12   for them to present all of the evidence involved in this case

13   to you and make their closing arguments, after which you will

14   retire to the jury deliberation room to seek to deliberate on a

15   verdict.

16        Trials will be conducted on Tuesdays, Wednesdays and

17   Thursdays from 9:00 a.m. to about 4:30 p.m.  However, once you

18   commence jury deliberations, you will be expected to deliberate

19   every day, except weekends, from that same approximate time

20   unless all of you agree that you should deliberate for a longer

21   period.

22        Does the schedule present a special problem to any member

23   of the jury panel?

24        There is a response.  I see a hand.  Please show me your

25   juror number.

1      Juror 33, what is your response?

2          PROSPECTIVE JUROR 33:  Sir, I have a surgery scheduled

3      for Wednesday of next week.

4          THE COURT:  All right.  I'm going to thank and excuse

5      you.  You can follow the instructions of the jury

6      administrator.  I've just excused the juror in Seat No. 33.

7          This is a criminal trial brought by the United States

8      against Brent Douglas Cole.  The government alleges that on

9      June 14th, 2014, Brent Douglas Cole committed the following

10     crimes on Bureau of Land Management property located in Nevada

11     County, California:

12         Assault on a federal officer with a deadly weapon which

13     inflicted bodily injury;

14         Assault on a person assisting a federal officer with a

15     deadly weapon which inflicted bodily injury;

16         Discharging a firearm during and in relation to each

17     referenced assault.

18         The defendant has pleaded not guilty to all charges and is

19     presumed innocent.  The United States bears the burden of

20     proving each element of each crime charged beyond a reasonable

21     doubt.

22         Raise your number if you have any knowledge of the facts or

23     events in this case, or if there is anything about the

24     allegations which causes you to feel that you might not be a

25     fair juror on this case.

1      There is no response.

2      Raise your number if there is any reason you would not be

3  able to give your full attention to this case.

4      Again, there is no response.

5      Raise your number if you will not be able to decide this

6  case based solely on the evidence presented at the trial, or if

7  you are opposed to judging a witness's credibility.

8      Again, there is no response.

9      Raise your number if you will not apply the law as I will

10  give it to you whether you agree with it or not.

11      There is no response.

12      I'm now going to provide each attorney with the opportunity

13  to introduce themselves so that you will be provided the

14  opportunity to let me know if you are familiar with any

15  attorney introduced.

16      I'm going to also require the government to read the names

17  of all witnesses it intends to call so that I can ask you if

18  you are familiar with any individual just named.

19      MR. MCCOY:   Thank you, Your Honor.

20      Good morning.   My name is Mike McCoy, and as I stated

21  earlier, I'm an Assistant United States Attorney representing

22  the United States in this case.   Sitting with me at counsel

23  table is Mr. Heiko Coppola, also an Assistant United States

24  Attorney.

25      Next to him is the case agent in this case, FBI Special

1    Agent Andrew Forristel.  Next to Agent Forristel is the

2    paralegal in the case Donna Castruita.

3        The government may call some or all of the following

4    witnesses:

5        Randy Billingsly, Chief Investigator, Nevada County

6    District Attorney's Office.

7        Kelly Boyle.

8        Steve Day, Sergeant, California Highway Patrol.

9        Dr. Dehqanzada, Sutter Roseville Medical Center.

10       Rusty Greene, Detective, Nevada County Sheriff's Office.

11       Brant Hardin, Officer, California Highway Patrol.

12       Marcus Knutson, Special Agent, Federal Bureau of

13   Investigators.

14       Andrew Liller, Deputy, Nevada County Sheriff's Office.

15       Susan Marvin, FBI Laboratory, Quantico, Virginia.

16       Stefan Christoffer Montelius, EMT, North San Juan Fire

17   Department.

18       Tad Pultorak, Ranger, Bureau of Land Management.

19       Dr. Jaron Ross, Sierra Nevada Memorial Hospital.

20       Steve Ruppert, Officer, California Highway Patrol.

21       Kyle Rutherford, Paramedic, Sierra Nevada Ambulance.

22       Eric Smith, FBI Laboratory, Quantico, Virginia.

23       Tom Swisher, Investigator, Nevada County District

24   Attorney's Office.

25       Mark Zelhart, Officer, California Highway Patrol.

1        THE COURT:  Raise your number if you know or have had

2   any interaction with any person just introduced or named.

3        There is no response.

4        Defense counsel is provided the opportunity to introduce

5   himself and his client if he desires.

6        MR. TONEY:  Thank you.  My name is J. Toney.  I'm a

7   lawyer in private practice.  My home is in Woodland, Yolo

8   County.  This is Brett Cole -- stand up -- from Nevada County,

9   who is the defendant in this case obviously.

10       Thank you.

11       THE COURT:  Okay.  If you know any person just named

12   or introduced, please raise your number.

13       Raise your number if you have ever served as a juror in the

14   past.

15       Okay.  There are a number of numbers raised.  We'll start

16   with the juror first selected -- or the lowest number selected,

17   then I will give everyone an opportunity to respond.

18       Starting with Juror 1, what's your response?

19       When did you -- what type of case was it?

20       PROSPECTIVE JUROR 1:  It was in --

21       THE COURT:  The microphone is being passed to you.

22       PROSPECTIVE JUROR 1:  I haven't served -- I haven't

23   served in federal court, but in Superior Court a number of

24   times.

25       THE COURT:  What type of cases?

1        PROSPECTIVE JUROR 1:  Criminal.

2        THE COURT:  What were the nature of the criminal

3   charges?

4        PROSPECTIVE JUROR 1:  Possession of a firearm.  One

5   case was possession of a firearm.  I think it was

6   breaking probation, drugs and robbery.  And the third recently,

7   was just a couple weeks ago, was a DUI.

8        THE COURT:  Okay.  Without telling me the actual

9   verdict reached, did the jury reach a verdict in each of the

10  cases?

11       PROSPECTIVE JUROR 1:  The most recent one was three

12  counts.  It was a verdict in two of the counts.  Hung jury on

13  the third.  And the other one was six counts in the guilty

14  phase and six counts for the sanity phase.  It was -- there was

15  one count that was hung jury on each of those two sections.

16       THE COURT:  All right.  Thank you.  Pass the

17  microphone to the next juror in your row.

18    This will be the juror in seat 5.

19    You need to speak directly into the microphone so your

20  voice is amplified.  What is your response?

21       PROSPECTIVE JUROR 5:  I have served on two juries in

22  San Joaquin Superior Court.  They were approximately -- one was

23  probably about 15 years ago, the other one maybe 20.  We did

24  reach a verdict.  One was a drug charge, selling drugs.  We did

25  reach a verdict on that case.

1    Then the other one was a child molestation case that had

2 three counts, and we found there was a verdict on two and a

3 hung jury on one.

4        THE COURT:  All right.  Thank you.

5    Juror in seat 8?

6        PROSPECTIVE JUROR 8:  I have served at Sacramento

7 Superior Court.  It was an armed robbery.  There was a verdict.

8 There was also a DUI.  There was also a verdict.  In Placer

9 County I served on a -- I don't even remember, it was so long

10 ago, but it was a contractor so it was, I think, civil.  And

11 there was a verdict in that.

12        THE COURT:  All right.  Thank you.

13        THE COURT:  Are you in seat 12?

14        PROSPECTIVE JUROR 12:  Yes, I am.

15        THE COURT:  Thank you.

16        PROSPECTIVE JUROR 12:  I served on a jury, I'm going

17 to say, approximately 20 years ago in Superior Court in Placer

18 County in Auburn.  And I believe the defendant was judged

19 guilty, but I can't remember the circumstances or anything of

20 that nature.

21        THE COURT:  All right.  Thank you.

22    That means you don't remember the nature of the charges?

23        PROSPECTIVE JUROR 12:  I don't.

24        THE COURT:  Okay.  Thank you.

25    You're in seat 11.

1          PROSPECTIVE JUROR 11:  Good morning.

2          THE COURT:  Good morning.

3          PROSPECTIVE JUROR 11:  I served on two juries

4    approximately 20 years ago.  There was a verdict in both cases.

5    One was a DUI, the other one was theft.

6          THE COURT:  All right.  Thank you.

7          THE COURT:  Juror in seat 9?

8          PROSPECTIVE JUROR 9:  It's been over 25 years.  It was

9    one, and it was -- it was two counts, insurance fraud and

10   threatening a witness with a firearm.  And a verdict was --

11   there was a verdict.

12         THE COURT:  All right.  Thank you.

13      What is your seat number?  Seat 16?

14         PROSPECTIVE JUROR 16:  I served in Superior Court in

15   Santa Clara County, medical malpractice against two doctors,

16   and there was a verdict.

17         THE COURT:  Thank you.

18         PROSPECTIVE JUROR 21:  I served on a jury in Solano

19   County approximately 20 years ago.  It was breaking and

20   entering and grand theft.  There was a verdict reached.

21         THE COURT:  Thank you.  You are in seat 21?

22      Thank you.

23         PROSPECTIVE JUROR 24:  I served on a jury where the

24   FedEx driver was hit by a car, and we had to -- there was no

25   contest as far as the other person's guilt.  We were only to

1    award a monetary value, which we did.

2            THE COURT:  Thank you.  You are in seat 24?

3        All right.  Thank you.

4        What's your seat number?  25?

5            PROSPECTIVE JUROR 25:  I served on a jury in Solano

6    County in a criminal case, a DUI and disorderly conduct, and

7    there was a verdict.

8            THE COURT:  Thank you.  26.

9            PROSPECTIVE JUROR 26:  I served on a jury in Orange

10   County.  And it was against Newport Yachts and -- the buyer.

11   And we decided the monetary amount to give, and it went to the

12   buyer.

13           THE COURT:  You're in seat 26?

14           PROSPECTIVE JUROR 26:  Yes.

15           THE COURT:  Thank you.  Pass it to the juror in seat

16   28 unless a juror has a response on that row before we get to

17   seat 28.

18           PROSPECTIVE JUROR 28:  I served last year in Yolo

19   County Superior Court.  There was a verdict reached.  The case

20   was a violation of parole and possession of a firearm.

21           THE COURT:  Thank you.

22           PROSPECTIVE JUROR 30:  I served on a case in Shasta

23   County, a criminal case, with drug charges.  And we reached a

24   verdict.

25           THE COURT:  Are you in seat 30?

 1          All right.  Thank you.

 2          Please state your seat number before your response.

 3                PROSPECTIVE JUROR 35:  I served on a jury about 30

 4     years ago in the County of Alameda.  It was assault and auto

 5     theft, and there was a verdict.

 6                THE COURT:  Thank you.  That is the juror in seat 35.

 7          Juror in seat 37?

 8                PROSPECTIVE JUROR 37:  I served on three juries in

 9     Sacramento Superior Court.  All of them were criminal trials.

10     All of them had a verdict reached.

11                THE COURT:  What were the nature of the charges?

12                PROSPECTIVE JUROR 37:  One was a drunk driving case.

13     Another one was an assault with a deadly weapon.  And the third

14     one was a child molestation case.

15                THE COURT:  Juror in seat 39.

16                PROSPECTIVE JUROR 39:  I served on two, twice in Yuba

17     County.  The first one was driving without a license.  We

18     didn't reach a verdict because a juror was willing to change

19     his vote just to be done.  The second one was a lady trying

20     to -- I don't know if she -- she was trying to take a child

21     that wasn't hers.  And we reached a verdict on that one.

22                THE COURT:  Thank you.  Juror in seat 41.

23                PROSPECTIVE JUROR 41:  I served on a jury in Solano

24     County about 16 years ago.  It was a real estate nondisclosure

25     case.

1       THE COURT:  Did the jury reach a verdict?

2       PROSPECTIVE JUROR 41:  Yes, sir, they did.  In favor

3   of plaintiff.

4       THE COURT:  Thank you.  Okay.  There are no other

5   responses.

6     Raise your number if you, any member of your family, or any

7   close friend has ever been employed by a law enforcement

8   agency, including military law enforcement.

9       There are -- a number of numbers are raised.  Please take

10  the microphone, the juror that is closest to it, and pass it to

11  a juror behind you that has a raised number.

12    Just state your seat number.

13      PROSPECTIVE JUROR 8:  Seat No. 8.

14      THE COURT:  Thank you.

15      PROSPECTIVE JUROR 8:  My brother-in-law is highway

16  patrol, and I'm friends with a Judge Keith Levy.

17      THE COURT:  Will the fact that your brother-in-law is

18  a California Highway Patrol man, and one of the individuals

19  that is involved in the trial is a California Highway Patrol

20  man, and I believe the government stated that two witnesses

21  will be California Highway Patrol men, will that have a bearing

22  on your ability to be a fair and impartial juror?

23      PROSPECTIVE JUROR 8:  I don't think so.

24      THE COURT:  Okay.  The response that you just gave,

25  it's a response -- it is used by a lot of people outside the

1  courtroom and inside the courtroom.  However, I probe those

2  responses.

3         When you say "I don't think so," what does that convey?

4         What do you mean when you say "I don't think so"?

5                PROSPECTIVE JUROR 8:  I would -- I hold the law in the

6  highest regard, so if you told me -- that's all I can say, is

7  my brother-in-law is a very fair individual.  So that's about

8  all I can say.

9     I do find him and law officials usually correct.  I can't

10  say that I would be prejudiced either way.

11               THE COURT:  I appreciate your responses.  The court

12  system will not work effectively if we don't have individuals

13  to respond truthfully.  But knowing yourself the way you know

14  yourself, is this the type of a case where you could be a fair

15  and impartial juror?

16               PROSPECTIVE JUROR 8:  I believe so.

17               THE COURT:  And why did you give me that response?

18  What is it that you know about yourself?

19               PROSPECTIVE JUROR 8:  Because I'm a very fair person

20  and honest.

21               THE COURT:  Is there any other response to the

22  question?

23     Who has the microphone?

24     Juror in seat 7.

25               PROSPECTIVE JUROR 7:  My father was in the Marine

1    Corps.  He was in the Nevada County Sheriff's Office more than

2    30, 40 years ago.  Also served on the Emeryville Police

3    Department.

4        My brother was in the Marine Corps.  He retired out of the

5    Coast Guard.  And I currently have a coworker whose husband is

6    going through CHP academy.

7            THE COURT:  Based upon your associations with

8    individuals in law enforcement, and the way you know yourself,

9    is this the type of a trial that you could be a fair and

10    impartial juror on?

11            PROSPECTIVE JUROR 7:   Absolutely.

12            THE COURT:  Okay.  You can pass the microphone.

13            PROSPECTIVE JUROR 4:  Juror No. 4.  My uncle served in

14    the Marine Corps and retired and served as a sheriff's deputy

15    in Humboldt County.

16        My family has a friend who serves in the California Highway

17    Patrol currently, I believe out of -- I can't remember the name

18    of the city at the moment.

19        But my associations with law enforcement, I work for the

20    City of Shasta Lake and work closely with the sheriff's

21    department.  And I know that law enforcement officers are not

22    any more or less truthful or honest than any other person.

23            THE COURT:  All right.  Thank you.

24            PROSPECTIVE JUROR 2:  Juror No. 2.  My brother is a

25    police officer, and before that he was in the Marine Corps.

1          THE COURT:  Is there anything about what you just

2     related that could bear on your ability to be a fair and

3     impartial juror?

4          PROSPECTIVE JUROR 2:  No.

5          THE COURT:  Thank you.

6          PROSPECTIVE JUROR 1:  Juror No. 1.  My brother is a

7     retired FBI agent.  I worked for the FBI a long time ago in the

8     70s for about four years.

9       I have a cousin that is a retired police officer, and a

10     brother-in-law that was in the Army.

11          THE COURT:  Is there anything about what you just

12     related that has a bearing on your ability to be fair and

13     impartial to each side?

14          PROSPECTIVE JUROR 1:  No.

15          THE COURT:  All right.  Thank you.

16       Is there any other response in the jury box?

17       Juror in seat 11?

18          PROSPECTIVE JUROR 11:  Juror No. 11.  Can you repeat

19     your question that you asked earlier?

20          THE COURT:  The one that's now being responded to?

21          PROSPECTIVE JUROR 11:  Yes.

22          THE COURT:  Okay.  Raise your number if you, any

23     member of your family, or any close friend has ever been

24     employed by a law enforcement agency, including military law

25     enforcement.

1    PROSPECTIVE JUROR 11:  Thank you.  I have a niece who

2    is married to a detective who works in Placerville, I believe.

3    THE COURT:  Okay.  Is there anything about your

4    relationship to that individual that can bear on your ability

5    to be fair and impartial to each side?

6    PROSPECTIVE JUROR 11:  No, sir.

7    THE COURT:  Thank you.  Any other response in the jury

8    box?

9    There is not.

10   I'm going to ask those in the outer portion of the

11   courtroom.

12   Juror in seat 16.

13   PROSPECTIVE JUROR 16:  My son was a previous deputy in

14   the County of Yuba.  He worked in the jail.

15   THE COURT:  Okay.  Will that have a bearing on your

16   ability to be fair and impartial to each side?

17   PROSPECTIVE JUROR 16:  No, sir.

18   THE COURT:  Okay.  Juror in seat 17.

19   PROSPECTIVE JUROR 17:  I work as an attorney for the

20   California Department of Corrections and Rehabilitation.  And

21   also my husband was in the U.S. Navy for four years and has

22   been in the United States Coast Guard for almost 14.

23   THE COURT:  Could what you just related have a bearing

24   on your ability to be fair and impartial to each side?

25   PROSPECTIVE JUROR 17:  No.

1          THE COURT:  Juror in seat 19.

2          PROSPECTIVE JUROR 19:  My father was in the

3    United States Marine Corps.  His cousin, I believe, was

4    United States Marine Corps.  He now works for the Yolo

5    Department of Corrections.

6      My father also maintains several close friendships with

7    police officers in the Folsom Police Department, none of which

8    will affect my judgment on this case.

9          THE COURT:  Thank you.  Juror in seat 20.

10         PROSPECTIVE JUROR 20:  My mother-in-law is a retired

11   clerk from the Sacramento County Sheriff's Office.  This would

12   not -- it would not have any effect.

13         THE COURT:  Thank you.

14         PROSPECTIVE JUROR 21:  I have two friends that are

15   retired.  One is retired from the OSI military and is a retired

16   Solano County sheriff's investigator.  Another friend is from

17   the Vacaville Police Department and is now working for the

18   district attorney's office in a fraud case.

19     I have several family members that served or are currently

20   in the military.  None of it will have any bearing on my

21   ability to serve on this case.

22         THE COURT:  What is your number?

23         PROSPECTIVE JUROR 21:  Number 21.  I'm sorry.

24         THE COURT:  Thank you.  All right.

25         PROSPECTIVE JUROR 22:  Number 22.  My uncle was a

1  San Joaquin County sheriff.  And I have several friends in law

2  enforcement, but I believe I would be an impartial juror.

3            PROSPECTIVE JUROR 23:  Number 23.  My father-in-law

4  was a homicide detective for Maricopa County for about 30

5  years.  He currently serves -- he works in the San Joaquin

6  County jails.  I don't think that will affect my ability to

7  serve.

8            THE COURT:  All right.  Thank you.

9            PROSPECTIVE JUROR 24:  My brother-in-law worked as a

10  guard at San Quentin Prison for 25 years as sergeant.  And then

11  he -- the remainder of his career, 15 years, at the Black

12  Mountain Forestry Camp out of Casadero, California, which he

13  retired from.  None of those would bear, you know, on a fair

14  trial for me.

15            THE COURT:  Okay.  Please give the microphone back to

16  23.

17      You said, "I don't think that would affect my ability to

18  serve."

19            PROSPECTIVE JUROR 23:  I'm sorry.  It would not.

20            THE COURT:  I want you to give the microphone back to

21  22.

22            PROSPECTIVE JUROR 22:  It would not affect my ability

23  to be fair and impartial.

24            THE COURT:  All right.  Thank you.  You can pass it

25  on.

1          PROSPECTIVE JUROR 26:   My brother-in-law is a judge in

2     Long Beach.

3          THE COURT:   What's your seat number?

4          PROSPECTIVE JUROR 26:   26.

5          THE COURT:   Will that have any bearing on your ability

6     to be fair and impartial to each side?

7          PROSPECTIVE JUROR 26:   No, it wouldn't.

8          THE COURT:   All right.   Thank you.

9          PROSPECTIVE JUROR 34:   Number 34.   I'm currently a

10    sworn peace officer with Lassen County Probation Department,

11    and I was injured in the line of duty about four years ago.

12         THE COURT:   Will that have a bearing on your ability

13    to be fair and impartial to both sides?

14         PROSPECTIVE JUROR 34:   I don't believe so.   I find

15    that I am very fair when it comes to my position.   I go with

16    the evidence only.

17         THE COURT:   Everything you have stated is very clear

18    except for the words "I don't believe so."   Do you want to

19    explain those words?

20         PROSPECTIVE JUROR 34:   I don't -- I don't know.

21         THE COURT:   Are you thinking about it, is that why you

22    used those words?

23         PROSPECTIVE JUROR 34:   Yes.

24         THE COURT:   Do you think it would be better that you

25    be on a jury panel other than one that involves law enforcement

1    officers?

2          PROSPECTIVE JUROR 34:  An assault on an officer, I

3    think, is my issue at this point.

4          THE COURT:  Okay.  I'm going to thank and excuse you,

5    and you can follow the instructions of the jury administrator.

6    Thank you.

7    That's the juror in seat 34.

8    The number that you have, place it on the ground right next

9    to the exit door.  Just drop it on the floor as you leave the

10   courtroom.  You are excused now.

11   Any other responses to the question?

12   Juror in seat 32.

13         PROSPECTIVE JUROR 32:  I myself am a veteran, and my

14   father is a veteran.  My brother and my sister are veterans.  I

15   am very good friends with a police lieutenant in the Sacramento

16   Police Department.  And no, it will have no effect on my

17   ability to judge.

18         THE COURT:  All right.  Thank you.

19         PROSPECTIVE JUROR 31:  Seat 31.  I'm close friends

20   with a retired police chief of the City of Vacaville.  I have

21   two members of my congregation who are -- one is a retired

22   police officer with the City, and one is currently a police

23   officer for the State of California.

24   And I've spent about 20 years of my career in higher

25   education working closely with police officers as a student

1    conduct officer most recently at Sonoma State University.

2            THE COURT:  In light of what you related, could you be

3    fair and impartial to each side?

4            PROSPECTIVE JUROR 31:  I don't believe so.

5            THE COURT:  Okay.  You think it would be better that

6    you be considered for another panel?

7            PROSPECTIVE JUROR 31:  Correct.  Yes, Your Honor.

8            THE COURT:  I'm going to thank and excuse you.  Thank

9    you, sir.  Follow the instructions of the jury administrator.

10      That's the juror in seat 31.

11           Juror in seat 30?

12           PROSPECTIVE JUROR 30:  Yes.  I have a cousin that

13   serves on the Corning Police Department, and his wife is

14   highway patrol.  My dad is retired Marine Corps, and my son is

15   current active Marine Corps.  None of this will affect my

16   judgment.

17           THE COURT:  All right.  Thank you.

18           PROSPECTIVE JUROR 38:  Number 38.  My brother is a

19   lieutenant in the Sheriff's Department in Santa Clara County,

20   and my next-door neighbor is CHP.  But I feel I would be fair

21   and impartial.

22           THE COURT:  All right.  Thank you.

23           PROSPECTIVE JUROR 39:  39.  My neighbor is CHP.  My

24   son is currently in the Air Force.  I have a couple of nephews

25   in the Air Force.  And a nephew is OSI in the Air Force.  None

1   of this will affect my judgment.

2          THE COURT:  Thank you.

3          PROSPECTIVE JUROR 40:  Number 40.  My brother is a

4   retired chief of police.  My husband was a lawyer.  My

5   father-in-law was a lawyer.  My sister-in-law is a judge in

6   Santa Clara County.  None of this would affect my judgment.

7          THE COURT:  Thank you.  Juror in seat 41.

8          PROSPECTIVE JUROR 41:  Yes, sir.  I worked for

9   Fairfield Police Department for five years, and my current

10  fiancee is a retired police sergeant.

11         THE COURT:  Will that have a bearing on your ability

12  to be fair and impartial to each side?

13         PROSPECTIVE JUROR 41:  No, sir, it will not.

14         THE COURT:  Thank you.  All right.  There appears to

15  be no other responses.

16    I would like the microphone passed back to the juror in

17  seat 38.

18    You said in part, "I feel I would be fair and impartial."

19  I'm focused on the word "feel."  What does that mean to you?

20         PROSPECTIVE JUROR 41:  I believe that I could be fair

21  and impartial.  I think I can.

22         THE COURT:  Are you thinking about it?

23         PROSPECTIVE JUROR 41:  I thought about it.  I can.

24         THE COURT:  Okay.  All right.

25    If during this process any juror ponders a prior question,

1  and you conclude that you wish you had another opportunity to

2  respond to that question because you have been thinking about

3  it, let me know that.

4      You have the freedom to volunteer information at any point

5  during this proceeding.  You can exercise that freedom by

6  simply raising your number.

7      Even if we are asking another question, if you have

8  reflected, and you want to respond to a prior question, you may

9  do that.

10      Raise your number if you would tend to believe the

11  testimony of a witness just because that witness is a law

12  enforcement officer and for no other reason.

13      There's no response.

14      Raise your number if you would tend not to believe the

15  testimony of a witness just because that witness is a law

16  enforcement officer.

17      There is no response.

18      Raise your number if you, any member of your family, or any

19  close friend has ever been arrested or charged for a crime or

20  been a defendant in a criminal case.

21      Okay.  There are a few responses.  We'll start with the

22  lowest numbered juror in seat 4.

23          PROSPECTIVE JUROR 4:  Many years ago my husband was

24  arrested and incarcerated for one year in L.A. County jail.

25  The charges were dismissed, and he failed to get his record

1   expunged.

2           THE COURT:  What was the nature of the charge?

3           PROSPECTIVE JUROR 4:  Grand theft refrigerator.

4           THE COURT:  Will that experience have any bearing on

5   your ability to be fair and impartial to each side?

6           PROSPECTIVE JUROR 4:  No, sir.

7           THE COURT:  All right.  Thank you.

8           PROSPECTIVE JUROR 4:  Also I have two nephews that

9   were arrested and incarcerated, one in Iowa and one in

10  Illinois.  And they both spent time there.  And that would not

11  affect my ability to be impartial.

12          THE COURT:  All right.  Thank you.

13      Juror in seat 11.

14          PROSPECTIVE JUROR 11:  I have a brother-in-law, my

15  wife's brother, who was convicted in Solano County of the

16  premeditated murder of a Fairfield police officer approximately

17  30 years ago.

18          THE COURT:  Will that have a bearing on your ability

19  to be fair and impartial to each side?

20          PROSPECTIVE JUROR 11:  No, sir.

21          THE COURT:  All right.  Thank you.

22      Please pass it to the juror in seat 8.

23          PROSPECTIVE JUROR 8:  Hello.  Seat 8.  About 20 years

24  ago one of our friends was incarcerated for murder for hire in

25  Placer County.

1          THE COURT:  Will that have a bearing on your ability

2     to be fair and impartial?

3          PROSPECTIVE JUROR 8:  No, it will not.

4          THE COURT:  Okay.  Thank you.

5        I'm going to move to the gallery portion of the courtroom.

6          PROSPECTIVE JUROR 16:  Seat 16.  My brother is on

7     death row in the State of Louisiana convicted of murder.

8          THE COURT:  Will that have a bearing on your ability

9     to be fair and impartial to each side?

10          PROSPECTIVE JUROR 16:  No, sir.

11          PROSPECTIVE JUROR 17:  Seat 17.  Ten years ago my

12     sister-in-law served, I think, a four-year sentence in state

13     prison for possession of controlled substances with intent to

14     distribute.

15          THE COURT:  Will that have a bearing on your ability

16     to be fair and impartial to each side?

17          PROSPECTIVE JUROR 17:  No, Your Honor.

18          THE COURT:  Thank you.

19          PROSPECTIVE JUROR 22:  22.

20          THE COURT:  Thank you.

21          PROSPECTIVE JUROR 22:  My son was arrested and served

22     time for drug-related, I think, theft charges, is actually what

23     they were.

24          THE COURT:  Will that have a bearing on your ability

25     to be fair and impartial?

1          PROSPECTIVE JUROR 22:  No, it will not.

2          THE COURT:  Okay.  Juror in seat 30.

3          PROSPECTIVE JUROR 30:  My uncle was charged with

4    murder and rape and was facing the death penalty.  And he was

5    found innocent during the trial when DNA evidence came to

6    light.

7          THE COURT:  Will that have a bearing on your ability

8    to be fair and impartial to each side?

9          PROSPECTIVE JUROR 30:  No, it will not.

10          THE COURT:  Thank you.

11          THE COURT:  Juror in seat 28.

12          PROSPECTIVE JUROR 28:  My ex-husband had multiple

13    arrests for DUI, and I do not know if there is a conviction or

14    not.  It would not have any bearing on my judgment.

15          THE COURT:  Thank you.

16          PROSPECTIVE JUROR 39:  Juror 39.  Two of my sons have

17    done county time.  One was drunk related and one was robbery.

18    And no, it will not affect my judgment.

19          THE COURT:  Thank you.  Juror in seat 41.

20          PROSPECTIVE JUROR 41:  Yes, sir.  Two of my sons were

21    arrested, one as a juvenile, one as an adult, for theft.  And

22    that would not affect my responses or my judgment on this

23    trial.

24          THE COURT:  Thank you.  Juror in seat 43.

25          PROSPECTIVE JUROR 43:  As an adolescent, I was

1    arrested several times for drug possession, trespassing, curfew

2    violation.  And I have a very close friend who is a recovering

3    addict that had a few run-ins with the law over copper theft.

4    This will not affect my judgment in this case.

5             THE COURT:  Thank you.

6             PROSPECTIVE JUROR 36:  I have two brothers -- I have

7    two brothers that were convicted of DUI -- felony DUIs.  And I

8    don't believe -- this will not affect my judgment.

9             THE COURT:  Thank you.  All right.

10      Raise your number if you have any difficulty with the rule

11   of law that a person charged with a crime is presumed innocent

12   and need not present any evidence, and the government at all

13   times bears the burden of proving guilt beyond a reasonable

14   doubt.

15      There is no response.

16      Raise your number if you have any problem with the rule of

17   law that the defendant need not testify on his own behalf and

18   that if the defendant chooses not to testify that factor may

19   not be considered by you in your deliberations.

20      There is no response.

21      Raise your number if you have had any experience or are

22   aware of anything that you think a party would want to know

23   before selecting you as a juror.

24      Juror in seat 6.

25             PROSPECTIVE JUROR 6:  I'm an attorney.  When I started

1   my career, I worked as a public defender for a little over a

2   year.  And I have a brother who supervises the felony unit of

3   the Public Defender's Office in the State of Alaska.

4           THE COURT:  Are you still an attorney?

5           PROSPECTIVE JUROR 6:  I am.  But I'm in civil

6   practice.  I do civil appeals.

7           THE COURT:  What type of appeals?  Criminal or civil?

8       You just said civil.

9           PROSPECTIVE JUROR 6:  Civil appeals.

10          THE COURT:  I see.  Civil appeals in a particular

11  area?

12          PROSPECTIVE JUROR 6:  No.  It's a wide-ranging

13  practice.

14          THE COURT:  All right.  Thank you.

15      Any other response?

16      Okay.  I'm going to have the courtroom deputy give the

17  juror in seat 1 a sheet of paper that I think has two or three

18  questions on it.  One of the questions I believe says to state

19  your name.  I think you can state your seat number in lieu of

20  that.

21      When you are ready to respond, you can respond.  And all

22  jurors will be given an opportunity to respond to the same

23  questions.

24          PROSPECTIVE JUROR 1:  I'm Juror No. 1.

25          THE COURT:  It's on.  It was on.

1          PROSPECTIVE JUROR 1:  I graduated from college, UC

2     Davis, and I have postgraduate work as well.  My husband has a

3     master's degree in economics.

4          And I'm currently employed by a Schools Insurance

5     Authority.  I do -- I write and produce videos and materials

6     for schools.

7          Let's see.

8          And my husband is national director of buildings for the

9     Energy Foundation in San Francisco.

10          THE COURT:  In what area did you obtain a degree?

11          PROSPECTIVE JUROR 1:  In graphics.

12          THE COURT:  And your postgraduate work has been in

13     what area?

14          PROSPECTIVE JUROR 1:  It was actually in reading

15     disability and art education.

16          THE COURT:  All right.  Thank you.

17          PROSPECTIVE JUROR 2:  Juror No. 2.  My highest

18     education is high school.  One of my -- both of my roommates

19     are in college.

20          I'm currently unemployed.  The occupation of my roommate,

21     one is retired, one works for the City of Tracy.

22          THE COURT:  Provide me with an example of employment

23     you have held in the past.

24          PROSPECTIVE JUROR 2:  Recently I was assistant manager

25     at a movie theater.

1    THE COURT:  Thank you.

2    PROSPECTIVE JUROR 3:  Juror No. 3.  I am currently a

3  college student at CRC.  My dad is a college graduate and works

4  as a civil engineer.

5    I'm currently a waiter at a restaurant, at Macaroni Grill.

6  That's it.

7    THE COURT:  Do you have a college major yet?

8    PROSPECTIVE JUROR 3:  I'm currently working to be a

9  film major.

10    THE COURT:  All right.  Thank you.

11    PROSPECTIVE JUROR 4:  Juror No. 4.  I've completed

12  high school and some college.  I have a -- college was mostly

13  office administration and English.  My husband also completed

14  some college.

15    I currently work for the City of Shasta Lake in the

16  building and planning department.  I have previously worked in

17  the utilities department also.  Before that I worked for Shasta

18  Community College in Redding in the admissions office.

19    My husband and a partner have a tree service in the

20  Redding, California area.  And formerly he worked for an HVAC

21  company as a metal bender.

22    THE COURT:  Thank you.

23    PROSPECTIVE JUROR 5:  I'm Juror No. 5.  I have two

24  years of college that I completed.  I'm currently retired, and

25  I worked for a recycling company for 39 years as an operations

1   manager and a senior buyer.

2       My wife has a degree in accounting, and is a controller for

3   a recycling company.

4       I think that's it.

5           THE COURT:  All right.  Thank you.

6           PROSPECTIVE JUROR 6:  I'm Juror No. 6.  I have a BA in

7   anthropology.  I have two years of graduate school in

8   archeology.  I worked as a contract archeologist for about four

9   or five years, and then I went to law school so I have a JD.

10  I've been an attorney since 1998.

11      My husband is an archeologist.  Right now he owns his own

12  consulting business in GIS graphics.

13          THE COURT:  Thank you.

14          PROSPECTIVE JUROR 7:  Juror No. 7.  I have a high

15  school degree with some college classes.  My spouse has two AA

16  degrees in drafting and electrical engineering.

17      My present employer, I have been with the same company for

18  15 years now.  We make classroom amplification systems and

19  command and control systems.

20      And my spouse's current occupation is a CNC programmer.

21          THE COURT:  Thank you.

22          PROSPECTIVE JUROR 8:  Juror No. 8.  I have a high

23  school education along with some college in business

24  management.  I am a current business administrator at a small

25  corporation.  My husband is a service advisor for a dealership

1   in Sacramento, and his education is high school.

2           THE COURT:  Thank you.

3           THE COURT:  You can respond.

4           PROSPECTIVE JUROR 15:  I'm Juror 15.  I graduated from

5   Cal Poly with a major of psychology.  My husband has some

6   college.  He owns a construction company, and I am a

7   stay-at-home mother.

8           THE COURT:  Thank you.

9           PROSPECTIVE JUROR 14:  Juror No. 14.  I have an

10  undergraduate degree in mechanical engineering.  My husband has

11  an undergraduate degree in English and a master's degree in

12  public affairs.

13      My current employment is with a local nonprofit consultancy

14  firm.  I'm a project leader there.  And my former occupation

15  was an engineer with Motorola and Frazier Semiconductor in

16  Texas.  And my husband works for the State Senate and formerly

17  of the legislative analyst's office.

18          PROSPECTIVE JUROR 13:  I'm Juror No. 13.  High school

19  graduate.  College and travel in tourism.

20      My husband is a master welder for the railroad.  I'm

21  currently a travel -- group travel supervisor in a travel

22  management corporation.  And my husband is also retired now.

23          THE COURT:  Thank you.

24          PROSPECTIVE JUROR 12:  I am Juror No. 12.  In terms of

25  educational background, I have a high school diploma.  I

1  attended college for five years.  I earned an AA degree in

2  liberal arts, and then pursued college at night for a number of

3  years.  I then went to work in banking.

4      I'm a retired commercial banker.  I made loans to small and

5  medium-sized businesses for a number of years.

6      Getting back to my education, I attended the University of

7  Washington for three years with a focus on economics and

8  accounting and marketing.  That helped me with my career.

9      I'm a divorced individual, so there is no person residing

10  with me.  I'm working part-time now for a bookkeeping service

11  two days a week, and I enjoy that.  And I'm residing by myself.

12          THE COURT:  Okay.  Thank you.

13          PROSPECTIVE JUROR 11:  I'm Juror No. 11.  My

14  educational background is I have a high school diploma.  I have

15  attended numerous colleges and universities with no degree.

16      My wife is a high school graduate.  I'm a former federal

17  employee at a shipyard, and I've worked in various occupations

18  such as radiological control, shipbuilding, and environmental

19  cleanup.

20      I was also an instructor for an environmental company,

21  teaching students as far as how to perform environmental work

22  and hazardous materials cleanup.  I am currently a consultant

23  for that company.

24          THE COURT:  Thank you.

25          PROSPECTIVE JUROR 10:  I'm Juror No. 10.  I have a

1   high school diploma.  Some college.  My husband has a high

2   school diploma.

3       I'm a bookkeeper/accountant for a home builder.  And my

4   husband has his own business in electrical contracting.

5               THE COURT:  Thank you.

6               PROSPECTIVE JUROR 9:  I'm Juror No. 9.  I have a

7   degree in journalism and psychology.  Graduate work.  Some

8   psychology, and then a teaching credential, multiple subjects

9   and special ed.  My husband also has a degree in psychology,

10  and he is currently in sales.  And I am a special ed teacher.

11              THE COURT:  Thank you.

12              PROSPECTIVE JUROR 16:  I'm Juror No. 16.  I have a --

13  I completed my bachelor's in science and business at the

14  University of San Francisco.  I completed my MBA at Golden

15  State University.  My husband completed high school.

16      I currently work for Hewlett-Packard and have been

17  there for 17 years as a strategic procurement manager.  My

18  husband is now retired.  He was previously a small business

19  owner.  He became disabled 19 years ago.

20              THE COURT:  Thank you.

21              PROSPECTIVE JUROR 16:  I'm Juror No. 16.  I have --

22  sorry.  Juror No. 17.  Sorry.

23      I have an undergraduate degree in communication arts.  Then

24  I went on to law school.  I graduated from Southwestern

25  University, so I have a JD degree.  My husband has high school,

1    some college, but he's currently stationed in Florida with the

2    United States Coast Guard.

3        I'm an attorney for the California Department of

4    Corrections and Rehabilitation.  I've been with them for about

5    seven years with an intervening year with the Department of

6    Consumer Affairs.

7        I've been an attorney for 11 years.  And my mother also

8    lives with me.  She's a retired information and research

9    specialist.

10            THE COURT:  Thank you.

11            PROSPECTIVE JUROR 18:  Juror No. 18.  I've got a

12   bachelor's degree in South Korea in the engineering part over

13   20 years ago.  And I became -- I came to the US to study at

14   Stanford University for an engineering degree, master's

15   program.  My wife got a bachelor's degree for interior design,

16   but she's working as a domestic engineer.

17       I got another master's degree in public administration.

18   I'm serving the public as a public works director with local

19   government in the Central Valley of California.  I became a

20   U.S. citizen several years ago.

21            THE COURT:  Thank you.

22            PROSPECTIVE JUROR 19:  Juror No. 19.  I have a high

23   school education.  I'm currently living with my girlfriend who

24   is attending college in pursuit of an associate's degree in

25   psychology.

1    My present occupation is a diesel hydraulic mechanic,

2    welder, fabricator, heavy equipment operator.  My former

3    occupations include retail sales, security guard, followed by

4    another bout of retail sales.

5    My girlfriend currently works for the American River

6    College book store.  Prior to that she was the volunteer

7    coordinator for the Renaissance Fair Productions Company.

8        THE COURT:  Thank you.

9        PROSPECTIVE JUROR 20:  I'm Juror No. 20.  My

10   educational background is high school graduation, of course,

11   and partial college.  My educational background for my wife,

12   she has an AA degree.

13   My present employer is the State of California, which I've

14   worked there for 30 years in the IT field.  I am currently an

15   IT manager.  My wife works for the Elk Grove Unified School

16   District as a clerk for the last ten years.

17       THE COURT:  Thank you.

18       PROSPECTIVE JUROR 21:  I'm Juror No. 21.  I have a

19   high school diploma and some college education.  My college

20   stuff pertains to algae control and herbicide applications.

21   Then I shifted to water and wastewater technologies.

22   I'm currently retired.  I used to work for the City of

23   Vacaville.  That's where I retired from.  My wife is retired.

24   She retired from the Department of Defense after 36 years.  And

25   her career field was in safety.

1       THE COURT:  Thank you.

2       PROSPECTIVE JUROR 22:  I'm Juror No. 22.  I have a

3   high school diploma and some college, administration-type

4   courses.  And my husband also has a high school diploma with

5   some college.

6     I work for Sutter Health and have been in the health care

7   field for about 25-or-so years.  And my husband is recently

8   disabled.  He worked for UC Davis as a controls engineer.

9       THE COURT:  Thank you.

10      PROSPECTIVE JUROR 23:  I'm Juror No. 23.  I have a BA

11  and teaching credential from Sacramento State.  My husband has

12  a high school diploma.  I am a kindergarten teacher, and he is

13  a UPS package car driver.

14      THE COURT:  Thank you.

15      PROSPECTIVE JUROR 24:  I'm Juror No. 24.  I have a BA

16  in social work and corrections.  I'm single.  I have worked for

17  Methodist Hospital as a quality analyst for the last 23 years.

18      THE COURT:  Thank you.

19      PROSPECTIVE JUROR 25:  I'm Juror 25.  My educational

20  background is I have a high school diploma and some college in

21  business administration.  My husband also has some college.

22    I have worked for Sutter Medical Corporation for the last

23  25 years in insurance billing.  And my husband's -- I'm now

24  retired.  My husband is also retired.  And his last job was

25  with the Vallejo Unified School District as a storekeeper for

1  approximately 15 years.

2          THE COURT:  Thank you.

3          PROSPECTIVE JUROR 26:  I'm Juror 26.  I have a high

4  school diploma.  My husband has a high school diploma.  I'm

5  retired from the Postal Service, and my husband is retired from

6  Verizon Wireless.

7          THE COURT:  Thank you.

8          PROSPECTIVE JUROR 37:  Juror No. 37.  I have completed

9  high school and some college.  I'm a maintenance manager for a

10  large brewing business right now.  And my wife is a homemaker.

11  And that's about it.

12          THE COURT:  Thank you.

13          PROSPECTIVE JUROR 36:  Juror No. 36.  I have three

14  years at the California Maritime Academy, nautical science, no

15  degree.  My wife who resides with me is a graduate from

16  Sacramento State, journalism.

17      I'm a retired associate safety engineer enforcement officer

18  with CAL-OSHA.  And she's retired from the Board of

19  Equalization.

20          THE COURT:  Thank you.

21          PROSPECTIVE JUROR 35:  Juror 35.  Both myself and my

22  wife have college -- some college -- high school graduate and

23  some college.  I'm a retailer.  I am a wine consultant in a

24  retail operation.  My wife is a tax manager at a local

25  financial institution.

1          THE COURT:  Thank you.

2          PROSPECTIVE JUROR 32:  Juror No. 32.  I am -- I have a

3   high school diploma, three years college in medical

4   certifications.

5      I am divorced.  There is no one living with me.  I am

6   currently with Dignity Health with Mercy San Juan.  And

7   again -- that's it.

8          THE COURT:  What do you do there?  What is your job at

9   Dignity Health?

10         PROSPECTIVE JUROR 32:  I work in the sleep center.  We

11  do polysomnographs, and I run the administration part of that.

12         THE COURT:  Thank you.

13         PROSPECTIVE JUROR 30:  I am Juror No. 30.  I have an

14  AA degree in behavioral science.  My husband is a high school

15  graduate.  I work with special needs children, and my husband

16  is a truck driver.

17         THE COURT:  Thank you.

18         PROSPECTIVE JUROR 29:  I am Juror No. 29.  I have a

19  bachelor's degree in psychology and a master's in social work.

20  I am also a licensed clinical social worker in the State of

21  California.

22      My husband is the assistant director of dining services at

23  Chico State.  And I'm currently employed by Glenn County Health

24  and Human Services in behavioral health.  I'm a senior mental

25  health counselor.

1          THE COURT:  Thank you.

2          PROSPECTIVE JUROR 28:  Juror No. 28.  High school

3     diploma.  Some college.  My husband has a degree in ag

4     business.  My present employer is University of California Ag

5     and Natural Resources.

6        Previously with University of California Davis in

7     environmental health and safety.  My husband is a sports turf

8     manager and coach at Woodland Christian School.

9          THE COURT:  Thank you.

10         PROSPECTIVE JUROR 27:  Juror No. 27.  I have some

11    college.  My husband has some college.  Both have a high school

12    degree.

13       I currently work as the director of the Medicare office for

14    Chico State University.  My husband is in skilled labor.  And

15    formerly I worked for United Healthcare as an escalation

16    supervisor.

17         THE COURT:  Thank you.

18         PROSPECTIVE JUROR 38:  I am Juror No. 38.  I have a

19    high school diploma.  I work full-time in sales selling

20    construction supplies.  My wife has a master's agree degree in

21    business and works in the IT department of a company that finds

22    jobs for handicapped people.

23         THE COURT:  Thank you.

24         PROSPECTIVE JUROR 39:  Number 39.  I graduated high

25    school.  My husband has an AA in electronics.

1    I'm currently a homemaker.  I was formally a personal care

2    attendant for developmentally disabled adults.  And my husband

3    is currently an electrician at Secured Installation on Beale

4    Air Force Base.  He previously worked at Sunsweet Growers as an

5    electrician.

6              THE COURT:  Thank you.

7              PROSPECTIVE JUROR 40:  Juror No. 40.  I have a high

8    school diploma and some college.  I'm currently widowed.  I

9    work for a local water utility.  I've been there almost 17

10   years as an operations analyst.

11      My previous occupations were in safety and health.

12             THE COURT:  Thank you.

13             PROSPECTIVE JUROR 41:  Juror 41.  I have a business

14   administration degree.  My fiancee has a criminal justice

15   degree.  We are both retirees from the City of Fairfield.  I

16   worked in administration, and he was a police officer.

17             THE COURT:  Thank you.

18             PROSPECTIVE JUROR 42:  Juror No. 42.  I attended some

19   college.  I'm a retail store manager.  And that's it.

20             THE COURT:  Thank you.

21             PROSPECTIVE JUROR 43:  Juror 43.  I have some college.

22   I currently work as a delivery driver for a deli provisions

23   company.  And my fiancee is attending college to be a neonatal

24   respiratory care therapist.

25             THE COURT:  Thank you.

1    PROSPECTIVE JUROR 44:  I'm Juror No. 44.  I have a BS

2   in managerial economics and agricultural economics.  I did my

3   graduate work in educational administration and my credential.

4   And I am currently a high school athletic director and

5   teacher.

6    THE COURT:  Thank you.

7    PROSPECTIVE JUROR 45:  I'm Juror No. 45.  I have an AA

8   in administrative business.  My husband is currently in

9   Sacramento State.  I work as an administrative assistant at a

10  charter school, and my husband is a New Castle firefighter.

11   THE COURT:  Thank you.

12  Counsel, I'm going to provide the parties with an

13  opportunity to do follow-up questions if you have any.  Is your

14  preference that I take a break first, then you do that?

15   MR. MCCOY:  Yes, Your Honor.

16   MR. TONEY:  I agree.

17   THE COURT:  Do you want to cover anything with me

18  during the break?

19  I'm trying to figure out how long a break to make.

20   MR. TONEY:  I don't have anything.

21   MR. MCCOY:  Not at this time, Your Honor, no.

22   THE COURT:  Court is in recess for 15 minutes.  You

23  can leave the numbers that you have on the seat where you are

24  located.  The courtroom deputy will have you to come into the

25  courtroom when we're ready, so just wait outside the courtroom

1    when you return from the recess.

2            Thank you.

3            (Off the record at 10:20 a.m.)

4            (Back on the record at 10:37 a.m.)

5            THE CLERK:  You may remain seated.

6            Court is now in session.

7            THE COURT:  The parties are present and all jurors

8    appear to be present.

9        If the parties have follow-up questions, you may begin.

10           MR. MCCOY:  May I come to the podium, Your Honor?

11           THE COURT:  Yes.  You don't have to seek leave to do

12   that in the future.

13           MR. MCCOY:  Okay, Your Honor.

14       Good morning.  I'll try not to keep my back too much to

15   those sitting in the gallery.  Again, my name is Mike McCoy.  I

16   represent the United States, as I previously introduced myself.

17   As you know, based on what the court has told you -- what the

18   judge has told you, this case involves an indictment that was

19   filed against the defendant charging him with various crimes,

20   including assault on law enforcement officers.

21       So for that reason I would like to follow up on some of the

22   questions the judge has asked you with some specific questions

23   related to your feelings about law enforcement officers, your

24   experience with them, as well as some specific questions of

25   those of you who asked or responded that you had family or

1    close friends who had either been arrested or charged or

2    convicted of a criminal offense.

3        So if I might, I would like to ask a general question for

4    all of you, and if you have a response, please raise your

5    number.  Similar rules apply as to when the judge was asking

6    you questions.

7        But have any of you had any experience, either positive or

8    negative, with law enforcement, whether it be state or local,

9    sheriff's office or state with the California Highway Patrol or

10   federal, if any federal agency like the FBI or BLM, again any

11   experience, positive or negative, that that would be -- impact

12   on your ability to be fair and impartial during this

13   proceeding?

14       No response.

15       Let me ask this question:  For those of you who indicated

16   that someone close to you or a family friend had been either

17   arrested or charged of a criminal offense, do you believe that

18   they were treated fairly by the legal system?

19       And by "the legal system," I mean not only the courts, not

20   only during the trial, but during the investigation as well by

21   the police, by the prosecutors, et cetera?

22           Number 16.

23           PROSPECTIVE JUROR 16:  No, I do not.

24           MR. MCCOY:  You do not believe -- if I remember

25   correctly, a family member was convicted?

1          PROSPECTIVE JUROR 16:  Yes.

2          THE COURT:  In Texas; is that right?

3          PROSPECTIVE JUROR 16:  In Louisiana.

4          MR. MCCOY:  You do not believe he was treated fairly?

5          PROSPECTIVE JUROR 16:  No.

6          MR. MCCOY:  Why not?

7          THE COURT:  Please use the microphone on the ledge in

8    front of you.  Thank you.

9          PROSPECTIVE JUROR 16:  They did not offer a defense

10   when he was at trial -- his attorney.  His case is currently

11   under appeal, and as you may know, that will take several

12   years.

13         MR. MCCOY:  And how long ago was he convicted of this

14   offense?

15         PROSPECTIVE JUROR 16:  In '97.

16         MR. MCCOY:  How do you feel he was treated by the

17   police who investigated the crime itself?

18      How do you feel -- how do you feel about the investigation

19   itself?

20         PROSPECTIVE JUROR 16:  This was out of state, and I

21   wasn't close enough to the details of the investigation to be

22   able to articulate that very well.

23         MR. MCCOY:  Any other responses to that question?

24   Number 30?

25         PROSPECTIVE JUROR 30:  Number 30.

1    My uncle was the one who was charged with murder and rape

2   and was facing the death penalty.  When he was arrested, the

3   Shasta County investigator said that they had taken a monster

4   off the street, and he sat in jail for three years.  And then

5   during the trial is when the DNA evidence came out and proved

6   he was innocent.  And he actually won a large sum of money in

7   federal court because of his treatment in Shasta County.

8        MR. MCCOY:  Do you feel that experience -- your

9   experience, which you witnessed, what was your interpretation

10  or impression or opinion of law enforcement in general?

11       PROSPECTIVE JUROR 30:  Not of my opinion really of law

12  enforcement.  I just thought obviously their behavior was

13  awful, and the county paid for it.

14       MR. MCCOY:  If I could, I would like to ask a

15  follow-up question of Juror No. 17.

16    You previously responded, I believe, that you had a family

17  member who had a drug arrest, perhaps a conviction?

18       PROSPECTIVE JUROR 17:  Correct.  Yes.

19  Sister-in-law.

20       MR. MCCOY:  Sister-in-law?

21       PROSPECTIVE JUROR 17:  Uh-huh.

22       MR. MCCOY:  Was she convicted as well?

23       PROSPECTIVE JUROR 17:  She served a four-year prison

24  term for that.

25       MR. MCCOY:  How do you feel she was treated by the

1    legal system?

2              PROSPECTIVE JUROR 17:  I think it was accurate.  So

3    from that -- in that regard I don't have an opinion one way or

4    the other.  I think they did their job.  I think she learned

5    from that experience and never repeated it, but I think they

6    were accurate in that final outcome.

7              MR. MCCOY:  Juror 22, hello.  You stated that you had

8    some family members that also had been convicted of an offense;

9    is that correct?

10             PROSPECTIVE JUROR 22:  Right.

11             MR. MCCOY:  What is your opinion regarding how they

12   were treated by the police during the investigation of that

13   crime?

14             PROSPECTIVE JUROR 22:  They were treated fairly.  He

15   was treated fairly.

16             MR. MCCOY:  The court has previously talked to you

17   about your role as a juror and receiving the evidence and

18   applying the evidence to the law as the court explains it to

19   you.

20        Can everyone assure both parties, not just the government,

21   but the defense as well, that they'll follow the court's

22   instruction on the law, regardless of your personally held

23   beliefs on what you believe about that law, and apply it -- not

24   what you think it ought to be, and apply it to the facts in

25   your deliberations?

1    Does anyone have a problem with doing that?

2    May I have a moment, Your Honor?

3         THE COURT:  Yes.

4    (Government cocounsel confer.)

5         MR. MCCOY:  Those are all the questions I have, Your

6    Honor.

7         THE COURT:  All right.  Thank you.

8         MR. TONEY:  You can just leave it.  You're not

9    supposed to have your back to anyone when you're an attorney,

10   and in this situation it is pretty impossible so I'll do the

11   best I can.

12   Guns are a hot topic in this country.  Some people feel

13   that only law enforcement should have guns.  Other people

14   belong to organizations that actively resist any attempt to

15   impinge on what is called the Second Amendment right to bear

16   arms.  So the question I have is are any of you of the opinion

17   that private ownership of guns is either wrong or should be

18   extremely more restrictive than it is today?

19   Okay.

20   How about anyone who feels the opposite; that the gun laws

21   are either too lax or too strict?

22   Finally got a response.  Juror 19.

23        PROSPECTIVE JUROR 19:  I actually am a contributor to

24   organizations that defend our Second Amendment rights.  I do

25   believe that some states are unnecessarily restrictive upon

1   that right and that legal action should be taken to return it

2   to a fair balance.

3          MR. TONEY:   Juror 21.

4          PROSPECTIVE JUROR 21:   I'm a life member of the NRA,

5   and I stand with him.   Like there is way too many restrictions

6   for law-abiding citizens in ownership of guns.

7          MR. TONEY:   Juror 22.

8          PROSPECTIVE JUROR 22:   I agree with both of them, that

9   there are a lot of restrictions that are not reasonable.

10         MR. TONEY:   Juror 25.

11         PROSPECTIVE JUROR 25:   I'm also a lifetime member.

12         MR. TONEY:   We need the mic so the court reporter can

13   pick it up.

14         PROSPECTIVE JUROR 25:   Juror 25.   I'm also a lifetime

15   member of the NRA.   And I agree with the first gentleman, that

16   it is too restrictive.

17         MR. TONEY:   Is the mic up there somewhere?

18         PROSPECTIVE JUROR 9:   Juror No. 9.   I just wanted to

19   clarify.   You know, based on the terms you used, I don't think

20   that laws are extremely lax, but I do have a problem with the

21   current laws.   I think they should be more restrictive.

22         MR. TONEY:   Okay.   In this case, if the evidence shows

23   the defendant had a firearm, would that by itself count against

24   you?

25         PROSPECTIVE JUROR 9:   No, it would not.

1          MR. TONEY:  I should say count against us.  It is not

2     going to count against you, is it?

3        Would you pass the microphone up?

4          PROSPECTIVE JUROR 1:  My answer is in response to the

5     question before, that one regarding ownership of guns.  I do

6     feel that individuals that are not law enforcement should not

7     have the ability to buy assault weapons.

8          MR. TONEY:  Okay.  Would you feel the same way about a

9     pistol?

10         PROSPECTIVE JUROR 1:  No.

11         MR. TONEY:  But something like an AK-47 you feel

12    should be restricted to law enforcement or military?

13         PROSPECTIVE JUROR 1:  Yes.

14         THE COURT:  Let the record reflect that counsel is now

15    speaking to the juror in seat 1.

16         MR. TONEY:  Yes.  Thank you.  I'm sorry.  I should

17    have mentioned that.

18       Okay.  This case involves, I believe the evidence will

19    show, that shots were fired between the defendant, a CHP

20    officer, and a BLM employee.  And it made some news in the

21    county where it happened.

22       Has anybody heard anything about this case and now that you

23    know a little about it, does it ring a bell to anybody?

24       It's a fairly remote county.

25       Okay.  Thank you.  No response to that.

1      We don't have any evidence of this, but as you know, the

2  only time we get to ask questions is before any of the

3  evidence, so it is sort of hypothetical.

4      If the evidence showed that the officers acted

5  unreasonably, and the defendant resisted because of that,

6  depending on the instructions, would you feel that you could

7  consider that or that whatever the officers said should

8  immediately be complied with?

9      It is kind of a vague question.  I'll try and make it

10  little better.

11      Number 19.

12          PROSPECTIVE JUROR 19:  As a further clarification,

13  were these officers immediately identified as officers of the

14  law?

15          MR. TONEY:  Assume that's true, yes.

16          PROSPECTIVE JUROR 19:  In that case, something that

17  doesn't put you or the surrounding people at immediate risk is

18  a reasonable request and a reasonable instruction.

19      If the officer is unaware of a risk that you may be or

20  something, I believe it would be your duty to notify the

21  officer.

22          MR. TONEY:  Can I just have one second.

23          THE COURT:  Yes.

24      (Counsel confers with defendant.)

25          MR. TONEY:  I think this may have been asked, but it

1    is important in this case.

2        Do you feel that you can judge the testimony of a defendant

3    who testifies by the same standards as law enforcement?

4        If you feel you can't, would you raise your number.

5        I'm not saying you can't take into account officer training

6    or experience, but would that fact alone make it difficult for

7    you to be fair to both sides?

8        No answers.  I'm concluded.  Thank you.

9            THE COURT:  Does either side desire to communicate

10   with me concerning the selection process, or are you at a point

11   where you should begin exercising peremptory strikes?

12           MR. MCCOY:  May I have a moment, Your Honor?

13           THE COURT:  Yes.

14       (Government cocounsel confer.)

15           MR. MCCOY:  The government is ready to proceed, Your

16   Honor, on the peremptories.

17           MR. TONEY:  So am I.

18           THE COURT:  Okay.  You may proceed.

19           MR. TONEY:  May I inquire, would the peremptories at

20   this time be exercised for only the first 12 or anyone in the

21   entire 45?

22           THE COURT:  It's up to counsel.  It is up to each side

23   how you proceed at this point.

24           MR. TONEY:  Okay.  Thank you.

25       (Brief pause while strike sheet exchanged.)

1        MR. TONEY:  Your Honor, should we do the alternates

2    also before presenting it?

3        THE COURT:  Yes.  There is information about selecting

4    jurors in the trial confirmation that each side has been

5    provided.

6        MR. TONEY:  I forgot.  I'm sorry.

7        THE COURT:  Okay.  I have a copy of it if you don't

8    have a copy with you.

9        MR. TONEY:  This is about done so the next time I'll

10   reread it.

11     (Brief pause.)

12        MR. MCCOY:  I believe both sides have done their

13   initial peremptory challenges.  The alternates have not been

14   done yet.

15     May I approach and provide this to the clerk?

16        THE COURT:  We don't need to see it until you are

17   done.

18        MR. MCCOY:  All right.

19     (Brief pause while jury selection continues.)

20        MR. TONEY:  May I now give it to your clerk?

21        THE COURT:  Yes.

22     (Strike sheet handed to the court for review.)

23        THE COURT:  I'm going to return the sheets you gave

24   me.  I want you to look at how the alternate strikes have been

25   exercised, and I want you to look at footnote 2 of my trial

1    confirmation order which I'm giving to you right now.

2         (Strike sheet returned to the attorneys with the trial

3          confirmation order.)

4         I can show you the rule if you want to see it.

5         (Brief pause.)

6         If I need to talk to you about the matter, you can approach

7    the bench.

8         THE COURT:  Approach the bench.

9         (Whereupon, the following discussion was held at sidebar.)

10         THE COURT:  When you approach, speak directly into the

11    microphone and you can hold it when you talk.  I would release

12    it.  Then when you set it down, set it on this pad because if

13    you don't, you make a noise that is really annoying to the

14    court reporter.

15         The defense used an alternate peremptory challenge to

16    challenge a regular juror.  The rule says you can't do that.

17         MR. TONEY:  I see.  I see.  Okay.  So what I propose

18    to do --

19         THE COURT:  You don't have to tell me.  You can just

20    think about it, and then you can chat with your client.

21      Have you talked to your client about his letter at all?

22         MR. TONEY:  I will.

23         THE COURT:  We will share that later.  We will

24    consider that later.

25         MR. TONEY:  If they'll let me do it later at the noon

1  hour -- if the marshals will let me talk to him at noon, or at

2  the very latest after court.

3          THE COURT:  All right.  Why don't you reflect on your

4  use of the alternate challenge based on -- you used an

5  alternate peremptory challenge to strike a regular juror.

6          MR. TONEY:  I understand.

7          THE COURT:  Thank you.

8      (Sidebar discussion concluded.)

9      (Strike sheet handed to clerk.)

10     (Clerk confers with the court.)

11         THE COURT:  Each side has seen the strike sheet that

12  you've just given the court?

13         MR. MCCOY:  Yes.

14         MR. TONEY:  Yes.

15         THE COURT:  Each of you saw the modifications, and you

16  agree to the modifications that were made by each side?

17         MR. MCCOY:  We do, Your Honor.  We've each seen

18  them.

19         THE COURT:  Okay.  Thank you.

20     (Brief pause.)

21     The courtroom deputy will verify with each side that we

22  have identified the individuals selected to serve on this jury.

23  We're asking you to confirm that.

24     (Jury selection sheet handed to counsel for review.)

25         MR. TONEY:  We both agree.

1          THE COURT:  Okay.  I think this process will work

2     better if all of you that are in the jury box would leave the

3     jury box and go to the audience or gallery portion of the

4     courtroom, and then those who have been selected will be

5     returning to the jury box.

6          THE CLERK:  Juror No. 1, Kari Rose.

7     Juror No. 2, Gregory Di Puccio.

8     Juror No. 3, Dawn Druge.

9     Juror No. 4, Nancy Tiff.

10    Juror No. 5, Marianne Wilson.

11    Juror No. 6, Tara Thronson.

12    Juror No. 7, Shannon Stephens.

13    Juror No. 8, Koosun Kim.

14    Juror No. 9, Thomas Norman.

15    Juror No. 10, Lori Haynes.

16    Juror No. 11, Bonnie Andrade.

17    Juror No. 12, Janet Henshall.

18    Alternate No. 1, Ronda Kramer.

19    Alternate No. 2, Tracy Harrison.

20         THE COURT:  Okay.  I want to speak to counsel at

21    sidebar.

22    (Whereupon, the following discussion was held at sidebar.)

23         THE COURT:  Whoever speaks, please identify yourself

24    by your last name and then say what you have to say.

25    Do you have any objection to the manner in which the other

1    side exercised the peremptory challenge?

2         MR. TONEY:  For defense, J Toney, no.

3         MR. MCCOY:  For the United States, Mike McCoy, no,

4    Your Honor.

5         THE COURT:  Mr. Toney, it is my understanding that

6    your client still wants you to represent him.  I've seen that

7    you have been amicably engaged in communications with him

8    throughout the process.

9       Is that your understanding?

10        MR. TONEY:  Yes.

11        THE COURT:  Okay.  Thank you.

12      (Sidebar discussion concluded.)

13        THE COURT:  I'm going to thank and excuse all other

14   participants in this process.  Thank you very much.  You are

15   now free to follow the instructions of the jury administrator.

16      Please leave the signs -- the number signs that you have.

17   There is a marshal there at the door who can take them.

18      Thank you.

19      (Brief pause while the excused jury pool exits the

20       courtroom.)

21      I would like the courtroom deputy to please administer the

22   oath to the jury.

23        THE CLERK:  Raise your right hands, please.

24      (Whereupon, the oath was administered.)

25        THE COURT:  Ladies and Gentlemen, you are now the jury

1   in this case, and I want to take a few minutes to tell you

2   something about your duties as jurors and to give you some

3   preliminary instructions.  At the end of the trial I will give

4   you more detailed instructions that will control your

5   deliberations.

6       When you deliberate, it will be your duty to weigh and

7   evaluate all of the evidence received in the case, and in that

8   process to decide the facts.

9       To the facts as you find them, you will apply the law as I

10  will give it to you whether you agree with it or not.  You must

11  decide the case solely on the evidence and the law before you,

12  and you must not be influenced by any personal likes or

13  dislikes, opinions, prejudices or sympathy.

14      Please do not take anything I may say or do during the

15  trial as indicating what I think of the evidence or what your

16  verdict should be.  That is entirely up to you.

17      I'm going to give you what is characterized as jury

18  admonitions that you must remember.  When we take a recess, I

19  doubt that I will remind you to remember the admonitions, but

20  you nevertheless have to remember them throughout this trial

21  process.

22      First, keep an open mind throughout the trial and do not

23  decide what the verdict should be until you and your fellow

24  jurors have completed your deliberations at the end of the

25  case.

1    Second, because you must decide this case based only on the

2    evidence received in the case and on my instructions as to the

3    law that applies, you must not be exposed to any other

4    information about the case or to the issues it involves during

5    the course of your jury duty.

6        Thus, until the end of the case, or unless I tell you

7    otherwise, do not communicate with anyone in any way, and do

8    not let anyone else communicate with you in any way about the

9    merits of the case or anything to do with it.

10       This includes discussing the case in person, in writing, by

11   phone or electronic means, via email, Facebook, text messaging,

12   or any Internet chat room, blog, website, app or other feature.

13   This applies to communicating with your fellow jurors until I

14   give you the case for deliberation.

15       And it applies to communication with everyone else,

16   including your family members, your employer, and the people

17   involved in the trial.  Although you may notify your family and

18   your employer that you have been seated as a juror in the case,

19   but if you are asked or approached in any way about your jury

20   service or anything about the case, you must respond that you

21   have been ordered not to discuss the matter and to report the

22   contact to the court.

23       Because you will receive all the evidence and legal

24   instructions you properly may consider to return a verdict, do

25   not read, watch or listen to any news or media accounts or

1    commentary about the case or anything to do with it.

2        Do not do any research such as consulting dictionaries,

3    searching the Internet, or using other reference materials, and

4    do not make any investigation or in any other way try to learn

5    about the case on your own.

6        Third, if you need to communicate with me, simply give a

7    signed note to my courtroom deputy clerk, or to the court

8    reporter if my courtroom deputy clerk is not present, who will

9    give it to me.

10       The law requires these admonitions to ensure that the

11   parties have a fair trial based on the same evidence and that

12   each party has had an opportunity to address it.

13       A juror who violates these restrictions jeopardizes the

14   fairness of these proceedings.  If any juror is exposed to any

15   outside information, please notify the court immediately.

16       This is a criminal case brought by the United States

17   government.  The government charges the defendant with assault

18   on a federal officer with a deadly weapon which inflicts bodily

19   injury; assault on a person assisting a federal officer with a

20   deadly weapon which inflicts bodily injury; and discharging a

21   firearm during and in relation to a crime of violence.

22       The charges against the defendant are contained in what is

23   called the indictment.  The indictment simply describes the

24   charges the government brings against the defendant.  The

25   indictment is not evidence and does not prove anything.

1        The defendant has pleaded not guilty to the charges and is

2    presumed innocent unless and until the government proves the

3    defendant's guilt beyond a reasonable doubt.

4        In addition, the defendant has the right to remain silent

5    and never has to prove innocence or present any evidence.

6        The evidence you are to consider in deciding what the facts

7    are consists of the sworn testimony of any witness, the

8    exhibits that are received into evidence, and any facts to

9    which the parties agree.

10       The following things are not evidence and you may not

11   consider them in deciding what the facts are:

12       First, questions, statements, objections and arguments by

13   the lawyers are not evidence.  The lawyers are not witnesses.

14   Although you must consider a lawyer's questions to understand

15   the answers of a witness, the lawyers' questions are not

16   evidence.

17       Similarly, what the lawyers will say in their opening

18   statements, closing arguments, and at other times is intended

19   to help you interpret the evidence, but it is not evidence.

20       If the facts as you remember them differ from the way the

21   lawyers state them, your memory of them controls.

22       Second, testimony that I have excluded, stricken, or

23   instructed you to disregard is not evidence.

24       Third, anything you may have seen or heard when the court

25   was not in session is not evidence.  You are to decide the case

1   solely on the evidence received at the trial.

2       Evidence may be direct or circumstantial.  Direct evidence

3   is direct proof of a fact, such as testimony by a witness about

4   what that witness personally saw or heard or did.

5       Circumstantial evidence is indirect evidence, that is, it

6   is proof of one or more facts from which one can find another

7   fact.

8       You are to consider both direct and circumstantial

9   evidence.  Either can be used to prove any facts.  The law

10  makes no distinction between the weight to be given to either

11  direct or circumstantial evidence.  It is for you to decide how

12  much weight to give to any evidence.

13      During deliberations you will have to base your decision on

14  what you recall of the evidence.  You will not have a

15  transcript of the trial.  I urge you to pay close attention to

16  the testimony as it is given.

17      If at any time during the trial you cannot hear what is

18  said or see what is shown, let me know so that I can correct

19  the problem.

20      If you wish, you may take notes to help you remember the

21  evidence.  If you do take notes, please keep them to yourself

22  until you and your fellow jurors go to the jury room to decide

23  the case.  Do not let note taking distract you.

24      When you leave, your notes should be left on the seat on

25  which you are seated.

1   Whether or not you take notes, you should rely on your own

2   memory of the evidence.  Notes are only to assist your memory.

3   You should not be overly influenced by your notes or those of

4   your fellow jurors.

5   The courtroom deputy will give you a tablet and a pen that

6   can be used for taking notes.  Just because I'm giving it to

7   you does not indicate that I'm telling you that you have to

8   take notes.

9   If you do take notes, and you use the tablet, you should

10  put something on the outside that identifies you so that we can

11  make sure we give you the same tablet if there is a recess.

12  From time to time during the trial it may become necessary

13  for me to talk with the attorneys out of the hearing of the

14  jury either by having a conference at the bench when the jury

15  is present in the courtroom or by calling a recess.

16  Please understand that while you are waiting, we are

17  working.  The purpose of these conferences is not to keep

18  relevant information from you, but to decide how certain

19  evidence is to be treated under the Rules of Evidence and to

20  avoid confusion and error.

21  We will, of course, do what we can to keep the number and

22  length of the conferences to a minimum.  I may not always grant

23  an attorney's request for a conference.

24  The next phase of the trial will now begin.  First, each

25  side may make an opening statement.  An opening statement is

1    not evidence.  It is simply an outline to help you understand

2    what that party expects the evidence will show.  A party is not

3    required to make an opening statement.

4        The government will then present evidence and counsel for

5    the defendant may cross-examine.  Then, if the defendant

6    chooses to offer evidence, counsel for the government may

7    cross-examine.

8        After the evidence has been presented, I will instruct you

9    on the law that applies to the case and the attorneys will make

10   closing arguments.  After that, you will go to the jury room to

11   deliberate on your verdict.

12       Any objection to the preliminary jury instructions as

13   given?

14            MR. MCCOY:  No, Your Honor.

15            MR. TONEY:  No.

16            THE COURT:  Does the government desire to make an

17   opening statement?

18            MR. MCCOY:  Yes, Your Honor.

19            THE COURT:  You may.

20            MR. MCCOY:  From the forest, hidden from view, the

21   defendant quietly listened, listened as two law enforcement

22   officers moved through his campsite, listened as they began to

23   collect items that he believed they had no right to take.

24       As he listened, he started to fume.  Not outwardly.  Not

25   yet.  But a fire was stoked within him, and a confrontation

1    with these law enforcement officers became inevitable.

2         He didn't care that they were law enforcement officers.

3    They were messing with his stuff.  And he wasn't going to let

4    that happen.

5         As will become apparent through the evidence that's

6    presented during this trial, the defendant is an island unto

7    himself.  It's his way that matters.  And it was his way, that

8    warm afternoon last June 14th, that compelled him to step

9    forward, out of the forest and into the campsite, to confront

10   these two law enforcement officers and eventually to use a .44

11   caliber revolver to shoot them.

12        When the defendant began to move toward the woodline that

13   marked the distinction, the barrier between the forest and the

14   small clearing in the forest where his campsite was located,

15   the sound of his feet moving through the dense brush caught the

16   attention of Bureau of Land Management Ranger Tad Pultorak, a

17   sworn law enforcement officer who has spent his career in the

18   forest on national park lands, and he immediately recognized

19   that this wasn't an animal approaching, but a human.

20        This caught his attention and caused him to stop what he

21   was doing and to focus in on the sound.  Because whoever was

22   approaching the campsite was doing so not from the trail that

23   led to it, but from a portion of the forest that was dominated

24   by a steep slope that was choked with manzanita bushes, an

25   unusual way to approach.

1    So Pultorak stopped what he was doing and called out

2    "Hello" and then "Police."  And he began to move toward the

3    sound of the approaching feet.  And as he moved toward the

4    woodline, he saw the defendant moving towards him.

5    And as Ranger Pultorak will testify, when he saw the

6    defendant, he recognized him right away.  And the defendant

7    recognized him, for the two had met in less than ideal

8    circumstances just a few hours before and just 300 yards away

9    from where they were currently standing.

10    What were the circumstances of this first meeting?

11    Well, it was, for lack of a better term, a traffic stop.

12    Ranger Pultorak is a uniformed patrol officer.  And that day,

13    June 14th, 2014, he was patrolling an area of forest near the

14    South Yuba campground.  And while he was patrolling that area,

15    he observed the defendant driving down a brushed-in trail in

16    his Dodge pickup truck.

17    This caught Ranger Pultorak's attention because this was a

18    trail that was covered with dense brush.  So Pultorak decided

19    to stop the truck and to issue the defendant a warning.  Not a

20    citation.  Just a warning.

21    When Pultorak made contact with the defendant, he noticed

22    that in the vehicle with him were two other men sitting in the

23    passenger seats of the cab.  And Pultorak began to explain to

24    the defendant why he had stopped him.

25    But the defendant didn't accept that answer.  He began to

1  argue with Pultorak.  Pultorak explained:  Listen, the road is

2  closed.  That trail is closed.  It is not suitable for cars to

3  be driving on it.

4      The defendant argued with him:  Well, if it is closed,

5  where is the sign saying it is closed?  Isn't this BLM land?

6  Shouldn't it be opened to the public?

7      And Pultorak continued to try to explain to the defendant

8  why it was closed, why he stopped him, but the defendant

9  continued to argue.

10     Eventually Pultorak said:  I'm telling you the road is

11  closed.  Don't drive on it again.  If I catch you driving on

12  that road again, I will issue a citation and impound your

13  vehicle.

14     That admonition seemed to end the debate and the defendant

15  drove away.

16     Ranger Pultorak will testify that after this initial

17  contact he decided he was going to go investigate where the

18  defendant had just been seen driving down from.  So Pultorak

19  proceeded up this brushed-in trail, and at the top of it he

20  discovered the campsite in this clearing.

21     In the campsite there were a lot of things, but in

22  particular two things caught his attention; two motorcycles,

23  one of which had expired registration, and the other was

24  reported stolen.

25     Now, Pultorak decided he was going to impound these

1  vehicles, for obvious reasons, but he also knew that he, out

2  there by himself, couldn't get these motorcycles down to the

3  road where they could be picked up by a tow.  So he radioed in

4  for assistance, and CHP Officer Brant Hardin responded to

5  assist him.  He confirmed that the motorcycle was, in fact,

6  stolen, and the two then traveled back up to the campsite to

7  develop a plan on how to get these motorcycles down.

8      It was while they were there gathering up the motorcycles

9  that the defendant returned to the campsite, listens to their

10  activity, and then decides to reveal himself.  So yes, when

11  Pultorak and the defendant stood face-to-face on the woodline

12  there at the campsite, they did recognize each other based on

13  that previous traffic stop just a few short hours before.

14      Now, Ranger Pultorak will testify that when he observed the

15  defendant emerging from the forest he grew concerned.  A lot of

16  things started going through Pultorak's mind.

17      First of all, he's in a campsite where there is a stolen

18  motorcycle.  Second of all, the person coming up through the

19  forest is a person he just stopped during a traffic stop,

20  suddenly appearing in the forest.  And third was the direction

21  of travel.  Rather than coming up the trail, the defendant was

22  coming through the forest.

23      All of these things caused Ranger Pultorak, based on his

24  experience and training as a police officer, it heightened his

25  sense of concern, his suspicion.  So he began to take certain

1   actions.  And he asked the defendant:  Are you armed?  And the

2   defendant's response was:  Yes, I am armed.

3       Now, Pultorak couldn't see the weapon.  Defendant was

4   wearing a top that proceeded down below his waist.  But he

5   decided that he needed to take control of the situation before

6   things got out of hand.  So Pultorak said:  Turn around.  The

7   defendant said:  I'm not turning around.

8       Pultorak repeated the command:  Turn around.  And the

9   defendant said again:  I'm not turning around.

10      Instead, the defendant took a step back, taking a position

11  which Ranger Pultorak will testify was a blading-type position,

12  right foot back.

13      Now, Officer Hardin -- CHP Officer Hardin who was in the

14  campsite at the same time assisting with the impound of the

15  motorcycles, he heard the defendant say that he was armed.  And

16  he saw the position and stance that defendant took.  And he too

17  grew immediately concerned.  And he, based on his training,

18  withdrew his firearm to be prepared for any eventuality.

19      Unfortunately, any eventuality quickly manifested itself

20  when the defendant removed a firearm, a revolver from his

21  waist, and pointed it at Ranger Pultorak.

22      A flash of steel and then a boom.

23      Now, Ranger Pultorak was just feet away from the defendant

24  at the time.  He saw the defendant grab the gun and remove it

25  from his waist.  And he heard the boom.  But on top of that he

1    felt immediately a sharp pain in his left shoulder.

2        Ranger Pultorak and Officer Hardin will testify they

3    immediately responded and began to return fire.

4        Ranger Pultorak began to retreat down the trail in an

5    effort to find cover, or concealment at the very least, so he

6    wasn't so exposed to the defendant.

7        Officer Hardin, who was farther away on the other side of

8    the campsite, but equally exposed, began to back up while

9    firing at defendant.

10       While he was backing up, Officer Hardin tripped over a fire

11   pit -- a stone fire pit and fell on his back.  In a moment of

12   what must have been sheer terror.  Officer Hardin found himself

13   laying on the ground, looking up as the defendant pointed the

14   gun at him and continued to fire.

15       One of those rounds struck Officer Hardin in the right leg.

16   Officer Hardin will testify that he's not sure how he did it,

17   but some way he got back up on his feet and was able to run to

18   another section of the campsite where he had concealment.

19       Eventually, when the defendant had fired all six rounds --

20   all six bullets in his revolver, the gunfight ended and quiet

21   returned.

22       Once the defendant announced from his position that it was

23   over, he was done, Hardin and Pultorak cautiously approached

24   him, still with weapons drawn.

25       The defendant was now lying in the same spot where he had

1    just been standing.  He had been shot multiple times.  Pultorak

2    had been hit in the left shoulder.  Officer Hardin had been hit

3    in the right leg.

4        Now, Hardin and Pultorak will testify that they were

5    concerned, concerned about many things still obviously, but

6    also concerned by the fact that Pultorak remembered the last

7    time he had seen the defendant there were two other men with

8    him.  And they were concerned there may be others in the

9    forest.

10        So while Hardin put handcuffs on the defendant, Pultorak

11    continued to cover with a firearm to provide, in essence,

12    perimeter security, to make sure no one else in the forest was

13    going to pop out.

14        After assessing the defendant, Hardin determined that the

15    defendant needed medical attention.  But he didn't have any

16    medical aid or any equipment to help him, so Hardin stood up

17    and told Ranger Pultorak to continue to watch the defendant.

18    And Officer Hardin hiked 300 yards back to his patrol car where

19    he had radio coverage, could make a distress call through the

20    radio, grab his medical bag, and request further medical

21    assistance.

22        And once he made these radio messages and grabbed his

23    medical bag, Hardin then hiked back up the 300 yards and began

24    to provide medical aid to the defendant, to the very man who

25    just minutes before had fired a gun at him.

1    Hardin continued to apply pressure to defendant's wounds to

2    stop them from bleeding.  Eventually he was relieved by another

3    responding CHP officer, and eventually EMTs arrived on scene.

4    It was a remote location, so it took a while for them to

5    get there.  But in the meantime Hardin and this other CHP

6    officer continued to give medical aid to the defendant.

7    When the EMTs arrived, they transferred the defendant down

8    to a waiting ambulance.  And you'll hear testimony from

9    Paramedic Kyle Rutherford and EMT Christoffer Montelius that

10   when they were transporting the defendant in the ambulance, as

11   part of their routine questions to determine the level of

12   consciousness of the patient, they asked him who he was, where

13   he is, what year it is, how many quarters make a dollar.

14   And they asked another question:  What happened?  What

15   happened?

16   And the defendant's response was:  The officers drew down

17   on me, so I shot them.

18   His response was:  The officers drew down on me, so I shot

19   them.

20   Why did the officers draw down on him?

21   Well, the evidence in this case will show that the officers

22   only drew down on the defendant after he admitted to them that

23   he was armed and showed through his words and through his

24   actions that he had absolutely no intent of following their

25   orders and instructions.

1          The government is confident that after you have received

2     all of the evidence in this trial that you will find that the

3     defendant committed the crimes that he stands charged with

4     today.

5          First, assault on a federal officer with a deadly weapon

6     causing bodily injury for the shooting of Ranger Tad Pultorak;

7     assault on a person assisting a federal officer with a deadly

8     weapon causing bodily injury for the shooting of Officer Brant

9     Hardin; and discharging a firearm in furtherance of a crime of

10    violence.

11         Thank you.

12              THE COURT:   Does the defense desire to make an opening

13    statement?

14              MR. TONEY:   Yes.

15              THE COURT:   You may.

16              MR. TONEY:   On this day, Mr. Cole had been camping in

17    the forest.  He camped there off and on for years.  The

18    motorcycles weren't his.  He didn't know who belonged to the

19    motorcycles, but people sometimes dump stuff in the forest.

20         He was with, at one time that day, two brothers, the Radon

21    brothers.  And the Radon brothers had been given a lot of

22    trouble by Ranger Pultorak in the past.  This trail was

23    perfectly passable for the truck that Mr. Cole drove, and it

24    was clear to Pultorak, when he first saw the truck, that it had

25    come down this spur road.

1    And Cole was driving.  It was his truck.  The Radon

2  brothers were in it.  He stopped them, and he said that he was

3  closing the road.  And Mr. Cole said that there is no sign that

4  says this road is closed, I just drove up and down it.  And

5  Pultorak said:  I'm closing the road.

6    So after checking Mr. Cole and making sure that he had a

7  driver's license, that there were no warrants out, that the

8  only problem was a slightly expired insurance card, he let them

9  go.  And the evidence will show that Mr. Cole drove the Radon

10  brothers to their destination and let them off and came back.

11    Now, at this point Pultorak had asked for the CHP to come.

12  Not for some reason of safety, but because there are certain

13  forms that have to be filled out with motorcycles that are

14  abandoned or may be stolen.  There is some sort of form

15  required by law enforcement.

16    And Pultorak said that he did not want to file the reports

17  himself because his department preferred that the CHP be there,

18  so that's why the CHP gets there.  The CHP has never seen Cole

19  before this day, and Pultorak had never seen Cole before this

20  day nor vice versa.

21    Cole decides to come back and comply with exactly what the

22  officer had told him, and that is he leaves his truck down the

23  trail.  All he wants to do is to go up and gather his

24  belongings.

25    Unlike the prosecutor's statement, the evidence will show,

1    not just from Mr. Cole, but also the CHP officer, that Cole

2    approaches and is pleading:  Just give me my property.

3        Pultorak, on the other hand, starts brandishing handcuffs.

4    Mr. Cole has a gun.  It's in a holster.  He has it because

5    there's wildlife out there, including a bear near the campsite.

6    So it is in a holster.  It is not concealed somehow on his

7    person.

8        Pultorak, after arguing with Cole and telling him what to

9    do and Cole saying, "All I want is my property, that's it," and

10   Pultorak continues to argue with Cole brandishing the

11   handcuffs.  And that testimony also will come out from, I

12   believe, all three of the people who were at this site.

13       And then they just ask Cole:  Are you armed?  And he's

14   honest.  He thought they knew because there's a firearm in the

15   holster.  He says yes, and they immediately draw down.

16       Pultorak reaches up and shoots Cole, hitting him.  And that

17   is when Cole returns fire.  And the CHP starts shooting at

18   Cole.  Fortunately, no one was killed in this exchange.

19       Cole was attempting to just get his property back.  He was

20   assaulted by the officers and acted only after he was hit.  I

21   believe this is what the evidence will show.

22       Thank you, Your Honor.  I'm concluded.

23            THE COURT:  We're going to adjourn for the noon

24   recess.  Court is in recess until one o'clock.

25       Please wait outside the courtroom doors and the courtroom

 1    deputy will escort you into the courtroom at the appropriate

 2    moment.

 3        You can leave the numbers that you have.  You can leave

 4    them on your seat.  We'll pick them up later.

 5        (Off the record at 12:01 p.m.)

 6        (On the record at 1:15 p.m.)

 7            THE CLERK:  You may remain seated.

 8            Court is now in session.

 9            THE COURT:  All participants are present.

10        You may proceed.

11            MR. COPPOLA:  Thank you, Your Honor.

12        The United States calls Officer Brant Hardin.

13            THE CLERK:  You can be seated in the witness stand.

14        Raise your right hand, please.

15     (WHEREUPON, BRANT HARDIN WAS CALLED AS A WITNESS AND SWORN)

16            THE CLERK:  Please, state and spell your name for the

17    record.

18            THE WITNESS:  My name is Brant Hardin, spelled

19    B-r-a-n-t; last is H-a-r-d-i-n.

20                        DIRECT EXAMINATION

21    BY MR. COPPOLA:

22    Q.  What do you do for a living?

23    A.  I work for the California Highway Patrol.

24    Q.  In what capacity do you work for the California Highway

25    Patrol?

1    A.   I'm a patrol officer.

2    Q.   How long have you been an employee of the California

3    Highway Patrol?

4    A.   Just about 20 years.

5    Q.   And how long have you been a road patrol officer?  The same

6    length of time?

7    A.   Yes.  Correct.

8    Q.   Have you held any other positions with the California

9    Highway Patrol besides that of road patrol officer?

10   A.   No.

11   Q.   Okay.  Where are you currently stationed, Officer Hardin?

12   A.   In the Grass Valley office.

13   Q.   And how long have you been stationed in the Grass Valley

14   office?

15   A.   I came up there in 2006.

16   Q.   And how large is the patrol area for the Grass Valley

17   Highway Patrol Office?

18   A.   Mileswise, I don't know.  It's pretty large.

19   Q.   Now, Officer Hardin, when you report to work every day, are

20   you assigned the entire area of Grass Valley to patrol or are

21   you given a certain area in which to patrol?

22   A.   A certain area.  We call it a beat.

23   Q.   Okay.  And generally speaking, how many other officers are

24   working with you on any given shift?

25   A.   It depends on the time, but usually there will be three of

1    us at any one time.

2    Q.   Okay.  After you were hired by the California Highway

3    Patrol, Officer Hardin, did you have to undergo any special

4    training?

5    A.   Yes.

6    Q.   Where did that training take place?

7    A.   In Sacramento at our academy on Reed Avenue.

8    Q.   How long was the highway patrol academy?

9    A.   Six months.

10   Q.   And briefly, for the jury, what types of subjects are

11   taught at that basic highway patrol academy?

12   A.   Many, from investigations to law to driving to shooting.

13   Just pretty much anything you can think of.

14   Q.   Would you describe it as a crash course for brand-new

15   police officers?

16   A.   Yes.

17   Q.   Now, as a road patrol officer, do you frequently assist

18   other law enforcement agencies during the course of your

19   duties?

20   A.   Yes.

21   Q.   Okay.  And what other agencies do you sometimes assist?

22   A.   Pretty much anybody that requests us to, but a lot of times

23   it is the police department, the sheriff's department.  We've

24   helped, you know, rangers.  That's the main ones.

25   Q.   When you say that you have helped rangers, do you mean

1  federal law enforcement rangers?

2  A.  Correct.

3  Q.  Officer Hardin, do you receive or did you receive as a

4  highway patrol officer any medical training?

5  A.  Yes, I did.

6  Q.  Can you describe for the jury what medical training you

7  received?

8  A.  We -- in the academy we became EMTs, which is an emergency

9  medical technician.  Once you become an EMT you have to keep up

10  your certification.  I believe it is every three months.

11  Q.  Have you been an EMT for the nearly 20 years you've been a

12  highway patrolman?

13  A.  I think I was for about 17, and then the department went to

14  EMRs, which is an emergency medical responder, which is

15  basically like a EMT, but you don't have the training

16  requirements.  The EMT, I believe, is run by the state, and the

17  EMR is highway-patrol-based training.

18  Q.  All right.

19     Now, as an EMR, do you carry medical equipment in your

20  patrol vehicle?

21  A.  Yes, we do.

22  Q.  And what specifically do you carry in your patrol vehicle

23  as an EMR?

24  A.  Splints.  Bandages.  Oxygen.  Just pretty much first

25  responder emergency medical supplies.

1   Q.   Okay.  Would it be fair to describe -- fair to say that you

2   carry all of this equipment in essentially an aid bag?

3   A.   Excuse me?

4   Q.   In an aid bag?

5   A.   Yes.

6   Q.   All right.

7        Now, Officer Hardin, as a highway patrolman -- and this may

8   seem like a silly question -- do you carry a firearm?

9   A.   Yes.

10  Q.   What firearm are you -- or rather what is your assigned

11  duty weapon?

12  A.   A Smith & Wesson, .40 caliber.

13  Q.   Okay.  And do you carry -- is that a semiautomatic pistol

14  or is that a revolver?

15  A.   A semiautomatic pistol.

16  Q.   And do you carry extra ammunition for that?

17  A.   Yes.

18  Q.   How many extra magazines do you carry?

19  A.   We carry two on the belt and one in the weapon itself.

20  Q.   One in the weapon itself.  Okay.

21       Officer Hardin, I would like to direct your attention to

22  June the 14th, 2014.

23       Do you recall working on June 14th, 2014?

24  A.   Yes, I do.

25  Q.   And Officer Hardin, do you recall what day of the week June

1    14th, 2014, was?

2    A.  It's a Saturday, the day before Father's Day.

3    Q.  And do you recall what your assigned patrol area was on

4    June the 14th?

5    A.  Yes.  I was working our beat 6070, which incorporates

6    our -- the Penn Valley area on up to our North San Juan area.

7    Q.  Okay.  And what were the hours of your shift on June the

8    14th, 2014?

9    A.  We start at 6:00 in the morning, and you go back to the

10   office at 6:00 p.m. and then have a half hour debriefing.

11   Q.  Okay.

12   A.  So 6:30 p.m. we're done.

13   Q.  Okay.  So about a 12-and-a-half-hour shift?

14   A.  Correct.

15   Q.  Okay.  And as part of your routine patrol duties, were you

16   attired in a full uniform?

17   A.  Yes.

18   Q.  Was the uniform that you were wearing on June the 14th,

19   2014, similar to the uniform that you're currently wearing

20   today?

21   A.  Yes.  Very similar.

22   Q.  What type of patrol vehicle were you driving?

23   A.  I was driving -- well, it was our brand-new Ford Explorer.

24   It's kind of a SUV.

25   Q.  And is that a fully marked patrol vehicle?

1   A.  Yes, it is.

2   Q.  All right.

3       Now, at some point during your shift on June the 14th,

4   2014, did you receive a request for assistance from your

5   dispatch center?

6   A.  Yes.

7   Q.  Okay.  And do you recall what the nature of that request

8   for assistance was?

9   A.  It was to meet a BLM ranger with two vehicle storage forms.

10  Q.  And is there a form number for the vehicle storage forms?

11  A.  Yes.  It's a 180.

12  Q.  Do you recall approximately what time you received that

13  request for assistance from your dispatch center?

14  A.  About 1:00.

15  Q.  1:00 p.m.?

16  A.  Yes.  Correct.

17  Q.  And as part of that request for assistance, were you

18  provided with a location to proceed to?

19  A.  Yes, I was.

20  Q.  And do you recall what that location was?

21  A.  Grizzly Hill Road at, I believe, North Bloomfield Road.

22  Q.  After you received that dispatch, approximately how long

23  did it take for you to reach the North Bloomfield Road area?

24  A.  Well, where they dispatched me was not really where I was

25  supposed to go.  I took a back road, and it took probably two

1   hours -- close to two hours to get there.

2   Q.  Okay.

3   A.  I got lost on the way too.  These are all dirt roads up

4   there.

5   Q.  Okay.  Did you eventually locate the area in which you

6   were -- or locate the person who you were supposed to contact?

7   A.  Yes.

8   Q.  Okay.  And who was it that you made contact with?

9   A.  It was Ranger Pultorak.

10  Q.  Okay.  Prior to June the 14th, 2014, Officer Hardin, had

11  you ever met Ranger Pultorak?

12  A.  I don't believe I had.

13  Q.  Where was it that you contacted Ranger Pultorak?

14  A.  He was off North Bloomfield Road, and his vehicle was on a

15  little trail that kind of came right off North Bloomfield Road.

16  Q.  Okay.  I'm going to direct your attention to the exhibit

17  binder in front of you, if you would, please.

18      Could you turn to what's been marked for identification as

19  Government's Exhibit 1B, please.

20      Officer Hardin, do you recognize what's been marked for

21  identification as Government's Exhibit 1B?

22  A.  Yes, I do.

23  Q.  And is that a photograph of the spur road off North

24  Bloomfield Road?

25  A.  Correct.  Yes.

1          MR. COPPOLA:  Your Honor, there has been a stipulation

2     between the parties as to admission of all the photographic

3     evidence, so at this time I would move to admit Exhibit 1B.

4          THE COURT:  Admitted.

5          (Whereupon, Government's Exhibit 1B was received.)

6          MR. COPPOLA:  May I publish to the jury, Your Honor?

7          THE COURT:  Yes.

8          (Exhibit published.)

9     BY MR. COPPOLA:

10     Q.   Okay.  Officer Hardin, directing your attention to

11     Exhibit 1B, is this the spur road where you met

12     Officer Hardin -- I'm sorry -- or you met Ranger Pultorak?

13     A.   Yes, it is.

14     Q.   Okay.  Now, as we look at Exhibit 1B, Officer Hardin, did

15     you meet Ranger Pultorak closer to the main road or further up

16     the spur road?

17     A.   I was on the main road, and he was kind of parked just up

18     from the main road.

19     Q.   Okay.  What I would like for you to do now is -- the patrol

20     vehicle that is in this photo is not your patrol vehicle; is

21     that correct?

22     A.   I don't believe so.

23     Q.   Okay.  What I would like for you to do is touch on the

24     screen where it was you met Officer Hardin (sic), the

25     approximate area on this photo.

1   A.  Officer Pultorak?

2     He was right here facing out, and I came up and probably

3   parked right about there.

4     (Marks photo.)

5   Q.  Okay.  Now, when you made contact with Ranger Pultorak,

6   Officer Hardin, what was he wearing?

7   A.  A uniform.

8   Q.  Was that a police uniform similar to your own?

9   A.  Yes.

10   Q.  And when you first made contact with Ranger Pultorak, were

11   you also able to see his patrol vehicle?

12   A.  Yes.

13   Q.  Okay.  And how would you describe that patrol vehicle?

14   A.  It was a truck, marked.  It was white.  It had, you know,

15   decals on the side.

16   Q.  Okay.  Now, when you came into contact with Ranger Pultorak

17   at that location off of Bloomfield Road, did you have a

18   conversation with him?

19   A.  Yes, I did.

20   Q.  Okay.  Following that conversation did you and

21   Ranger Pultorak do anything?

22   A.  Yes.

23   Q.  What was it that you did at that point?

24   A.  He handed me a vehicle identification number off a

25   motorcycle he said was up in the hills there.

1    Q.  Okay.

2    A.  And I ran it on my computer.

3    Q.  So you have a computer in your vehicle?

4    A.  Actually, I'm sorry.  I actually ran it over the radio to

5    dispatch.

6    Q.  Okay.  And why were you doing that?

7    A.  Just to check it.  He indicated that there were two

8    motorcycles up there.  One was kind of disassembled, and the

9    other one had registration expired, like seven years.  So I was

10   checking up on that.

11   Q.  Okay.  Did you eventually receive a return on the number

12   that he provided you?

13   A.  Yes.  Yes, I did.

14   Q.  Okay.  And what was it that you determined about that VIN

15   number?

16   A.  It came back -- we call it 1036 Frank, but that means it is

17   stolen.

18   Q.  Now, following receiving that information, did you and

19   Ranger Pultorak then go further up the spur road?

20   A.  Yes.  He indicated that a truck had come down with three

21   people in it.  And he had a conversation with them, and they

22   left.  And he said there was an illegal campsite up there with

23   the motorcycles, and he wanted to get rid of them or store

24   them.

25   Q.  Okay.  So did you walk up with Ranger Pultorak at that

1    point or did you follow in your patrol vehicle?

2    A.  Followed in my patrol vehicle.

3    Q.  Now, as you drove up that spur road, did you come to kind

4    of a clearing area?

5    A.  Yes.

6    Q.  Did you drive your patrol vehicle all the way to this

7    campsite that Ranger Pultorak had described to you?

8    A.  No, I did not.

9    Q.  Okay.  And is there a reason that you didn't drive all the

10   way to this campsite?

11   A.  Yes.  The tree canopy got kind of tight.  And he had

12   already -- he had been up there once, and one of the tree limbs

13   had smashed out his back window.

14       And I actually had -- it was the newest car on the patrol.

15   And if I had scratched that thing, I would probably be in

16   trouble.  So we decided to park it down and not take the chance

17   of it getting bushwhacked.

18   Q.  Okay.  You mentioned that the canopy was fairly thick.

19   What type of vegetation are we talking about in this area?

20   A.  It was kind of like tree branches.  It kind of almost

21   looked like a tunnel coming out over the dirt road.

22           MR. COPPOLA:  Okay.  If I could have just a moment,

23   Your Honor?

24       (Brief pause.)

25   ///

1    BY MR. COPPOLA:

2    Q.  I want to direct your attention in the binder in front of

3    you to what's been marked for identification as Government

4    Exhibit 1F.

5        Officer Hardin, do you recognize 1F?

6    A.  Yeah.  That looks like the trail we had to take to get up

7    to the campsite.

8        MR. COPPOLA:  Okay.  At this point, Your Honor, I move

9    to admit 1F.

10        THE COURT:  It's admitted.

11    (Whereupon, Government's Exhibit 1F was received.)

12    MR. COPPOLA:  Please show 1F

13    (Exhibit published.)

14   BY MR. COPPOLA:

15   Q.  Officer Hardin, as we're looking at Exhibit 1F, is this

16   the -- there appear to be branches above and encroaching on the

17   trail.

18       Is that what you were describing in terms of why it would

19   have been difficult for you to drive your patrol vehicle into

20   that area?

21   A.  Yes.

22   Q.  Okay.  Now, once you and Officer Pultorak parked your

23   patrol vehicles in the clearing, about how long did it take you

24   to walk from that clearing up to the campsite area?

25   A.  It was a good couple minutes.  I don't recall the time,

1    but...

2    Q.  Do you recall approximately -- what the approximate

3    distance was between where you parked your patrol vehicles and

4    when you reached the campsite?

5    A.  To estimate I would say between, like, an eighth and a

6    quarter mile maybe.

7    Q.  Would you describe the area that you were in,

8    Officer Hardin, as fairly remote?

9    A.  Oh, yes.

10   Q.  What about your handheld radio?

11       Was that working in that area, if you recall, as you were

12   walking up to the campsite?

13   A.  Part way, yes.

14   Q.  Okay.  At some point did it stop working?

15   A.  Yes.

16   Q.  Okay.  And at what point did it stop working?

17   A.  Well, the time I noticed it is when I needed it.

18   Q.  All right.  Okay.  We'll get to that in a few minutes.

19       Okay.  Once you reached the campsite area, how would you

20   describe it?

21   A.  It was a -- the trail led in and then it kind of opened up.

22   It was kind of like a circular site.  It was level.  You know,

23   trees all around it.  Then it had another trail kind of exiting

24   out from it.

25   Q.  And what was it that you and -- what did you do once you

1   reached that campsite with Ranger Pultorak?

2   A.  He showed me where the -- well, one motorcycle was visible,

3   and he showed me where the other one was.  It was kind of

4   tucked in some trees.

5   Q.  I'm going to direct your attention to the binder to what's

6   been marked for identification as Exhibit 2F.

7   A.  Okay.

8   Q.  Do you recognize 2F?

9   A.  Yeah.  That's one of the motorcycles that was up there.

10           MR. COPPOLA:  Your Honor, I move to admit 2F.

11           THE COURT:  Admitted.

12       (Whereupon, Government's Exhibit 2F was received.)

13       MR. COPPOLA:  Go ahead and show it to the jury, please.

14       (Exhibit published.)

15   BY MR. COPPOLA:

16   Q.  Is this what would be the first motorcycle that you saw?

17   A.  Yes.

18   Q.  Okay.  I'm going to direct your attention now in the binder

19   to exhibits that are marked for identification specifically as

20   4E, 4F, 4G and 4H, please.

21   A.  Okay.

22   Q.  Do you recognize -- Officer Hardin, do you recognize 4E, F,

23   G and H?

24   A.  Yes.  That was the motorcycle that had the VIN number that

25   was listed as stolen.

1          MR. COPPOLA:  Your Honor, I move to admit Exhibits 4E,

2     4F, 4G and 4H.

3          THE COURT:  Admitted.

4     (Whereupon, Government's Exhibits 4E, 4F, 4G and 4H were

5     received.)

6          MR. COPPOLA:  All right.  If we can show 4E.

7     (Exhibit published.)

8     BY MR. COPPOLA:

9     Q.  Okay.  Now, when you first saw this particular motorcycle,

10    what's been -- that we see in 4E, was it fully assembled or was

11    it partially disassembled?

12    A.  No.  It was disassembled.  The gas tank was off, and there

13    were various engine parts on the ground kind of next to it.

14    Q.  Let's take a look at 4F, please.

15    (Exhibit published.)

16    Okay.  Now, let's also now take a look at 4G.

17    (Exhibit published.)

18    And also 4H, please.

19    (Exhibit published.)

20    Okay.  What are we looking at when we're looking at 4H,

21    Officer Hardin?

22    A.  There is a VIN number down there, a vehicle identification

23    number.

24    Q.  All right.  Okay.

25    Now, some of the photos that we -- that I have just shown

1    you show on this -- you indicated the gas tank was off.  Then

2    was the seat off as well; do you recall?

3    A.  I don't remember if the seat was or not.

4    Q.  But your recollection is the gas tank was not attached?

5    A.  Right.

6    Q.  The photographs of this particular motorcycle show the gas

7    tank attached?

8    A.  Correct.

9    Q.  Okay.  How is it that -- do you know how that gas tank got

10   attached?

11   A.  Yeah.  I put it on there.

12   Q.  Okay.  What did you do with the rest of the parts that you

13   saw laying around in that area?

14   A.  We found an empty backpack, kind of near the motorcycle,

15   and I put the parts in that backpack.

16   Q.  Okay.  And what was the overall plan in terms of what was

17   going to happen with not only this partially disassembled

18   motorcycle, but also the fully assembled motorcycle that you

19   saw earlier -- that we saw earlier?

20   A.  Ranger Pultorak and I were going to walk these down to

21   where the tow truck could come and pick them up.

22   Q.  Okay.  So would that be going back to the -- where the --

23   the area where you initially met Ranger Pultorak?

24       Is that the area where you planned to take the motorcycles

25   to?

1    A.  Yes, it was.

2    Q.  Now, when you Ranger Pultorak got to -- or arrived at the

3    campsite on June the 14th, 2014, besides the two of you, did

4    you notice anybody else present when you initially got there?

5    A.  No.

6    Q.  Okay.  All right.

7         I want to direct your attention now in the binder,

8    Officer Hardin, to what's been marked for identification as

9    Exhibit 5B.

10   A.  Okay.

11   Q.  Officer Hardin, do you recognize what's been marked for

12   identification as Exhibit 5B?

13   A.  Oh, yes.  I do.

14   Q.  Okay.  And what is Exhibit 5B?

15   A.  It's a diagram of the campsite and the trail leading in, as

16   well as the trail leading out.

17   Q.  Does that diagram comport with your recollection of -- your

18   approximate recollection of the general layout of that campsite

19   on June the 14th, 2014?

20   A.  It does.

21        MR. COPPOLA:  Your Honor, at this point I move to

22   admit Exhibit 5B.

23        THE COURT:  Admitted.

24   (Whereupon, Government's Exhibit 5B was received.)

25        THE WITNESS:  One of the motorcycles was over a little bit.

1    BY MR. COPPOLA:

2    Q.  We'll get to that.

3        Let's talk a little bit about the diagram that we've just

4    put in front of the jury.

5        (Exhibit published.)

6        Okay.  Now, Officer Hardin, there is a -- I'm going to put

7    a blue dot on the diagram where it indicates "Dirt Road."

8        (Marks diagram.)

9        Do you see that blue dot?

10   A.  Yes.

11   Q.  Is that the path or trail that you and Officer Hardin (sic)

12   utilized to enter the camp?

13   A.  Yeah.

14   Q.  I'm sorry.  Ranger Pultorak.

15   A.  Yeah, that is.

16   Q.  I'm going to do that several times today so bear with me.

17       Now, I'm also placing a blue dot -- or a dot next to that

18   first motorcycle that we see.

19       (Marks diagram.)

20       Now, is that the fully assembled motorcycle we saw the

21   photograph of earlier?

22   A.  Yes, it is.

23   Q.  Okay.  Now, you indicated just a moment ago that the

24   positioning of that motorcycle is not all together accurate; is

25   that correct?

1   A.   Correct.

2   Q.   Okay.  Where do you -- where do you recall seeing that

3   motorcycle or the approximate area you saw that motorcycle when

4   you and Ranger Pultorak were in the campsite?

5   A.   You want me to touch the screen?

6   Q.   Yes.  Would you, please.

7   A.   (Marks diagram.)

8        That's a big arrow.  Kind of over, right about there.

9   Q.   Now that arrow, Officer Hardin, almost makes it seem as

10  though the motorcycle was in the bushes or in the trees; is

11  that correct?

12  A.   No, that isn't.  That's just a big arrow.  It was kind of

13  in the -- up against -- I mean, it might have been a little bit

14  under the trees, but it was in plain sight.

15  Q.   So it was not in the brush, but right up against the brush;

16  would that be fair?

17  A.   Yeah.

18  Q.   Okay.  All right.

19       Now, the blue dot -- I'm going to place another blue dot on

20  the screen.

21       (Marks diagram.)

22       Is that the disassembled motorcycle we saw in Exhibits 4E

23  through -- 4E, F, G and H?

24  A.   Yes, it is.

25  Q.   Okay.  Now, Officer Hardin, you indicated a few moments ago

1  that when you came to the disassembled motorcycle, you began

2  gathering the pieces into an empty backpack.

3      Do you recall that a few moments ago?

4  A.  Yes.

5  Q.  And you also placed -- apparently placed the gas tank back

6  on the vehicle?

7  A.  Correct.

8  Q.  And were you doing anything else to try and ascertain who

9  might own that particular motorcycle?

10  A.  Well, I know who owned it.  I just didn't know who took it.

11  Yes, I did.

12  Q.  All right.

13      So what specifically were you doing to further that portion

14  of your investigation?

15  A.  In this campsite -- you want me to point to where?

16  Q.  Yes.  I would like you to please point.

17  A.  Do you want me to use a little pen so it is not as big?

18      Right -- right in that area.

19      (Marks diagram.)

20      There was a bed, and it had a box -- almost like a file

21  box.  And I was looking for identification in it to see who

22  might be staying in this campsite.  Because a lot of times when

23  we do stolen vehicle reports, if there is a suspect, they list

24  it on the report.  And I was going to see if -- I didn't have

25  the stolen vehicle report, but I was going to make note of what

1    names I found in that campsite.  And it might come back to a

2    suspect on that stolen report.

3    Q.  Okay.  Now, while you were taking care of the motorcycle or

4    attempting to find out what was going on with the motorcycle,

5    was Ranger Pultorak assisting you or was he in another area of

6    the camp?

7    A.  He had walked over to where the other motorcycle was.

8    Q.  Okay.  So if I recall correctly, where you recall that

9    other motorcycle would be somewhere where I placed the blue dot

10   on 5B, correct?

11   A.  Yes.  Correct.

12   Q.  Okay.  Now, were you -- so your position, while he's in

13   that area, would be right about where I placed the second blue

14   dot towards the center bottom of the diagram?

15   A.  Yes.  In that area.

16   Q.  Okay.  Now, from your location did you have a clear view of

17   Ranger Pultorak?

18   A.  Yes.

19   Q.  Okay.  And while you were looking through, I think you

20   described it as a file box, and Ranger Pultorak had walked

21   away.  Did you hear any unusual noises?

22   A.  Yes, I did.

23   Q.  Okay.  And describe for the jury what noises you heard?

24   A.  It was like a rustling in the leaves or the bushes.

25   Q.  Okay.  And when you heard those noises, you were where I

1   have described, where I placed the blue dot on the lower

2   portion of the diagram?

3   A.   Correct.

4   Q.   And Ranger Pultorak is where we placed the dot over by the

5   first motorcycle?

6   A.   Yes.

7   Q.   All right.

8       Now, did those particular noises cause you any concern

9   right out of -- at that juncture?

10  A.   Well, yeah.  I knew somebody was down the hill there.

11  Q.   Okay.  And did you take any action because of those noises,

12  or did you just continue to do what you were doing?

13  A.   Well, no.  I stopped what I was doing and kind of headed

14  over towards that direction.

15  Q.   Okay.  Now, at that point, Officer Hardin, did you draw

16  your firearm?

17  A.   No.

18  Q.   Okay.  And was Ranger Pultorak still in your line of sight

19  at that point?

20  A.   Yes, he was.

21  Q.   All right.

22      Approximately, how far away from Ranger Pultorak were you?

23  A.   Fifteen to 20 feet.

24  Q.   Okay.

25  A.   About that.

1    Q.  All right.

2        And did you make any observations of what Ranger Pultorak

3    was doing as you were keeping him in your sight and walking

4    closer to his location?

5    A.  Yes.  He walked kind of towards where the rustling was, and

6    he yelled out.  He said, Police.  Identify yourself.

7        Or he yelled out, Police.  Then he might have said, Who is

8    there?  But it was asking who was down there.

9    Q.  Okay.  Now, Officer Hardin, could you please point to or

10   place a dot on the diagram as to where it was you heard the

11   rustling or the noises coming from the forest?

12   A.  (Marks diagram.)

13       Maybe a little bit closer.

14       Right there.  The hills -- it is flat up at the campground

15   in this area.  Then it goes down.  So it was down this kind of

16   hillside that it came from.  But it was right in that direction

17   there.

18       (Marks diagram.)

19   Q.  So that approximate area?

20   A.  Yes.

21   Q.  Okay.  And was the rustling particularly noisy?

22   A.  I mean, it wasn't like a train going through there, but it

23   was bigger than like a deer or rabbit, yes.

24   Q.  Okay.  So enough to draw your attention?

25   A.  Oh, yes.

1  Q.  Okay.  Now, at some point did you stop walking towards

2  Ranger Pultorak?

3  A.  Yeah.

4  Q.  Okay.  What did you see Ranger Pultorak do?

5  A.  He kind of stopped, and a gentleman came up from the area

6  where we heard the rustling.

7  Q.  Okay.  All right.

8      Could you please go ahead and could you please point on the

9  diagram to where you saw that individual come out of the tree

10  line?

11  A.  (Marks diagram.)

12      About in there.

13  Q.  Okay.  That approximate area?

14  A.  Uh-huh.

15  Q.  Okay.  Now, I'm going to go ahead and -- and when you saw

16  that individual come out of the tree line there, what was your

17  location on the diagram?

18  A.  (Marks diagram.)

19      Right about down there.  Maybe little bit further away.

20  Right in there.

21  Q.  Understanding this is an approximation?

22  A.  Yeah.  I can't get these arrows to work for me too well.

23  Q.  Now, the person that you saw emerge from the tree line on

24  June 14, 2014, do you see that individual in the courtroom

25  today?

1    A.  Yes, I do.

2    Q.  Could you please point him out and describe the clothing

3    that he's wearing and identify him for the record, please?

4    A.  The second one in from that table in a button-up shirt,

5    checkered.  Looks like it is blue and gray.

6          MR. COPPOLA:  Your Honor, the record should reflect

7    that Officer Hardin has identified the defendant.

8          THE COURT:  It does.

9    BY MR. COPPOLA:

10   Q.  All right.

11       Officer Hardin, when you saw the defendant emerge from the

12   tree line, do you recall what he was wearing that day?

13   A.  Yes, I do.

14   Q.  Okay.  What specifically was he wearing?

15   A.  He had jeans, a T-shirt, and a sweatshirt hoodie.

16   Q.  Okay.  Now, at the time the defendant emerged from the tree

17   line, did you draw your firearm at that point?

18   A.  No.

19   Q.  Okay.  What did you observe Ranger Pultorak do at the time

20   the defendant emerged from the tree line?

21   A.  He was kind of walking towards him.

22   Q.  Okay.  At some point did Ranger Pultorak stop --

23   A.  Yes.

24   Q.  -- stop walking towards the defendant?

25   A.  Yes.

1   Q.  And approximately how far away were you from

2   Ranger Pultorak and the defendant's position at this time?

3   A.  Still about that arrow.  In there.

4   Q.  Okay.  Approximately how many feet?

5   A.  Fifteen.

6   Q.  Okay.

7   A.  Maybe a little bit farther.  Twenty.

8   Q.  Did you have a clear view of Ranger Pultorak interacting

9   with the defendant?

10  A.  Yes.

11          MR. COPPOLA:  Your Honor, if I may approach?

12          THE COURT:  Yes.  You need not seek permission.

13  BY MR. COPPOLA:

14  Q.  I'm going to hand you what's been marked for identification

15  as Government's Exhibits L and M.

16      Do you have gloves?

17  A.  Yes, I do.

18  Q.  Go ahead and put your gloves on, if you would like.

19      8L and 8M.

20      (Exhibits handed to witness for review.)

21      First off, I would like you to take a look at the items

22  that are in that bag.

23      Do you recognize what's been marked as 8L and 8M?

24      You can take them out if you need to.

25  A.  I know what they are.

1    Q.   Okay.   Go ahead and take them out, if you would, please.

2    A.   (Witness removes exhibits from the bag.)

3    Q.   Do you recognize those two items that came from that

4    package?

5    A.   Yes, I do.

6    Q.   And what are they, Officer Hardin?

7    A.   This is the jacket and shirt that Mr. Cole was wearing.

8              MR. COPPOLA:   Your Honor, at this point I move to

9    admit what's been marked for identification as 8L and 8M into

10   evidence at this time.

11             MR. TONEY:   No objection.

12             THE COURT:   Admitted.

13        (Whereupon, Government's Exhibits 8L and 8M were received.)

14             THE WITNESS:   Do you want this back?

15   BY MR. COPPOLA:

16   Q.   Actually, if you could, show the hoodie first.

17   A.   If I could what?

18   Q.   Would you show the jury the hoodie, please?

19   A.   (Witness publishes the exhibits.)

20   Q.   Was the defendant wearing that over the T-shirt --

21   A.   Yes.

22   Q.   -- that you have in your other hand?

23   A.   Yes.

24   Q.   Okay.   All right.   You can go ahead and place those back in

25   the bag.

1          Now, from your vantage point, Officer Hardin, did the

2     hoodie we've just seen, which is Exhibit 8L, did that obscure

3     the defendant's waist area?

4     A.   Yes.

5     Q.   In other words, was his waist covered?

6     A.   Yes.

7     Q.   Now, Officer Hardin, do you recall whether or not June 14th

8     was a particularly warm or cool day at about two or

9     three o'clock in the afternoon?

10    A.   Yes, I do recall.   It was very warm.

11    Q.   Okay.   All right.

12         I want to get back now to your observations of

13    Ranger Pultorak's interaction with the defendant.

14         Okay.   Once you saw the defendant emerge from the tree

15    line, Officer Hardin, did you actually observe interaction

16    between Ranger Pultorak and the defendant?

17    A.   Yes, I did.

18    Q.   What did you observe from your vantage point?

19    A.   Well, they were talking.   He was --

20    Q.   Before we get into anything that you heard, what was the

21    tone of the defendant -- or from your vantage point could you

22    clearly hear the tone of the defendant's voice?

23    A.   Yes.

24    Q.   Okay.   And what was the tone of his voice during that

25    initial encounter when he broke through the tree line?

1   A.   Just normal.

2   Q.   Okay.  And what, if anything, do you recall the defendant

3   saying to Ranger Pultorak during that period of time?

4   A.   He came up and he said, "Hey, this is my camp.  This is my

5   gear."  Or something to the fact that it was his stuff.

6        And he says -- he said his name.  He says, "You know me."

7   And he asked us kind of not to take his stuff.

8   Q.   And how did Ranger Pultorak respond at that point?

9   A.   He -- he took out some handcuffs he had.

10  Q.   Okay.  And from your vantage point, Officer Hardin, did you

11  see Ranger Pultorak remove those handcuffs from his duty belt?

12  A.   I saw him remove something.  I mean, I didn't know they

13  were handcuffs.  I figured that out a little bit later.  But I

14  remember that, yeah.

15  Q.   Do you recall where from his duty belt he removed them,

16  what side?

17  A.   I don't.

18  Q.   At that point was your firearm drawn?

19  A.   No.

20  Q.   And from your vantage point, at that point was Ranger

21  Pultorak's firearm drawn?

22  A.   No.

23  Q.   Once you saw Ranger Pultorak draw what appeared to you to

24  be handcuffs from his duty belt, did the tone of the

25  defendant's voice change?

1    A.   Yes.

2    Q.   Okay.  What do you recall hearing the defendant say at the

3    time those handcuffs came from Ranger Pultorak's duty belt?

4    A.   He said, "You're not putting those on me."

5    Q.   And what was the tone of his voice?

6    A.   It was loud.

7    Q.   Okay.  Louder than the conversational tone that you had

8    described earlier?

9    A.   Yes.

10   Q.   Did you observe the defendant make any movements with his

11   body at that point when he said "You're not putting those on

12   me"?

13   A.   Yes, I did.

14   Q.   What did you observe the defendant do?

15   A.   He bladed his stance.  He put one arm -- can I show you?

16   Q.   Actually, I would like it if you would come off the witness

17   stand and show the jury what you observed.

18   A.   (Witness gets of the witness stand and

19   demonstrates.)

20       He was talking, and then as soon as he saw the handcuffs,

21   he went like this.  He says, "You're not putting those on me."

22   Just, like, grabbed for his waist, one hand out.

23   Q.   And before you assume the witness stand again, was -- as

24   you described it was the defendant's right hand going towards

25   the waist and his left hand pushing out?

1   A.   Correct.  Yeah.

2        (Witness returns to the witness stand.)

3   Q.   Okay.  Now, from your vantage point, when you saw both the

4   change in the defendant's voice and also the change to I think

5   you described it as a bladed stance, did that cause you

6   concern?

7   A.   Yes.

8   Q.   Okay.  Why was it that that caused you concern?

9   A.   Well, he was taking an aggressive stance, and to me it

10  was -- you know, I had the inkling this was going to be some

11  trouble.

12  Q.   Okay.  All right.

13       At that point, when the defendant changed his tone of voice

14  and made the aggressive movement that you described, at that

15  point did you begin to fear for not only your safety, but also

16  that of Ranger Pultorak?

17  A.   When he bladed, took the fighting stance?

18  Q.   Yes.

19  A.   Not right then, no.

20  Q.   Okay.  At that point did you happen to see any weapon on

21  the defendant?

22  A.   No.

23  Q.   Okay.  Now, after that, after he took the bladed stance,

24  stepped back and reached for his waist, at that point what

25  happened next?

1   A.   Almost immediately Ranger Pultorak said asked him, "Are you

2   armed?"

3   Q.   And how did the defendant respond?

4   A.   He said, "Yes, I am."

5   Q.   Let me stop you right there.   When the defendant -- you

6   heard the defendant say that he was armed?

7   A.   Yes.

8   Q.   Okay.   What reaction did you have to hearing the defendant

9   say that he was armed?

10   A.   Well, that plus the stance he was in, kind of heightened my

11   awareness, yeah.   I mean, that this could go really bad.

12   Q.   What did you do?

13   A.   At that point -- I mean, it was almost immediate he put his

14   jacket back and I saw the gun.   So I drew mine at him.

15   Q.   Okay.   Now, when you saw -- when you say that you saw the

16   gun, where was it located?

17   A.   It was where his hand was, where he had originally put his

18   hand down.

19   Q.   So on his hip?

20   A.   Yes.

21   Q.   Okay.   And could you tell from your vantage point whether

22   or not it was in a holster?

23   A.   Yes, it was in a holster.

24   Q.   You indicated that your response to the defendant being

25   armed -- saying he was armed and sweeping the jacket back was

1   that you drew your firearm?

2   A.   Yes.

3   Q.   Okay.   When you drew your firearm, Officer Hardin, did you

4   point it at the defendant?  Did you immediately point it at the

5   defendant?

6   A.   Oh, yes.

7   Q.   And at that point, based on his comments and his actions,

8   at that point, Officer Hardin, did you begin to fear for your

9   safety and that of Ranger Pultorak?

10  A.   Yes, I did.

11  Q.   Officer Hardin, what happened immediately after you saw the

12  defendant sweep his hand back and you drew and pointed your

13  firearm?

14  A.   I yelled at him, Drop the gun, drop the gun.

15  Q.   Do you recall how many times you said, "Drop the gun, drop

16  the gun"?

17  A.   No.  But I kept repeating it.

18  Q.   Okay.  And from your vantage point were you able to see

19  what Ranger Pultorak was doing?

20  A.   He was backing out of there.

21  Q.   And was the defendant focused on you at this point or was

22  he -- was the defendant's focus still on Ranger Pultorak?

23  A.   On Ranger Pultorak.

24  Q.   And as you saw Ranger Pultorak backing up, what did you see

25  the defendant do, if anything?

1   A.   He kind of held his stance with the -- you know the grip.

2   And he held it for about a second, maybe two, and then he just

3   drew up and pointed it right at Ranger Pultorak.

4   Q.   When you say he drew up and pointed it at Ranger Pultorak,

5   what did he point at Ranger Pultorak?

6   A.   A gun that he retrieved from his holster.  And at that time

7   Ranger Pultorak, I'm going to say he pointed it in that

8   direction, because from my vantage point I was watching him

9   and --

10   Q.   Let me stop you there.  When you say you were "watching

11   him," who do you mean?

12   A.   Mr. Cole.

13   Q.   Okay.  Now, go ahead and continue your answer.

14   A.   And Ranger Pultorak was backing up, kind of down the trail

15   we came in.  And there was trees so I didn't see him.  Once he

16   started backing I lost sight of him.

17   Q.   Now, you've been a law enforcement officer for almost 20

18   years?

19   A.   Correct.

20   Q.   Have you seen people draw weapons in the line of duty?

21   A.   Yes.

22            MR. TONEY:  Objection to the relevance.

23            THE COURT:  Overruled.

24   BY MR. COPPOLA:

25   Q.   In your experience as a police officer have you seen people

1   draw weapons?

2   A.  Yes.

3   Q.  Had you ever seen -- or can you describe for the jury how

4   fast the defendant drew that pistol?

5   A.  Yeah.  It was quick.

6   Q.  Had you ever seen someone draw a weapon that quickly?

7          MR. TONEY:  Objection.  Relevance.

8          THE COURT:  Overruled.

9          THE WITNESS:  You know, on TV, yeah.

10  BY MR. COPPOLA:

11  Q.  But in your line of work?

12  A.  There are officers that can draw quick but, you know, they

13  practice.

14  Q.  Okay.  Did the defendant's movements appear to be practiced

15  to you?

16  A.  Yes, they did.

17  Q.  Now, could you tell from your vantage point whether the

18  defendant drew -- what type of pistol he drew or just the fact

19  that he drew a pistol?

20  A.  You asked me what type?

21  Q.  Could you tell what type, either an automatic or revolver,

22  or could you tell at that point --

23  A.  It was big.  I couldn't tell what type it was though.

24  Q.  Did it have any particular color to it?

25  A.  Metallic.

1   Q.  Silver?

2   A.  Yeah.

3   Q.  Okay.  Once the defendant drew that firearm, that pistol,

4   and pointed it at Ranger Pultorak, what did you hear next?

5   A.  Well, as soon as he got to an extended position, I heard a

6   shot.

7   Q.  Okay.  Officer Hardin, when you heard that shot, what did

8   you do?

9   A.  Well, I started shooting myself.

10  Q.  Okay.

11  A.  Not myself, but shooting.

12  Q.  And where -- who were you shooting at?

13  A.  Mr. Cole.

14  Q.  Okay.  And was Mr. Cole's attention on you at this point?

15  A.  No.

16  Q.  Okay.  Where was Mr. Cole still focused?

17  A.  He was focused in the direction that Ranger Pultorak had

18  taken.

19  Q.  Now, Officer Hardin, this may seem like a silly question,

20  but at the time the defendant started firing, were you in fear

21  for your life and Ranger Pultorak's life?

22  A.  Yes, I was.

23  Q.  At some point, Officer Hardin, did the defendant's

24  attention turn back to you?

25  A.  Yes, it did.

1   Q.   Okay.  Or rather turn to you?

2   A.   Yes.

3   Q.   Okay.  And when the defendant turned his attention to you,

4   what did he do?

5   A.   He shot at me.

6   Q.   Okay.  Do you recall how many times he shot at you?

7   A.   No.  I know it was -- You mean the total amount of times?

8   I know it was at least two.

9   Q.   Okay.  When the defendant shot at you, did you continue

10   fire at him?

11   A.   Oh, yeah.

12   Q.   Okay.  All right.

13       Officer Hardin, while the defendant was firing at you, and

14   you were firing back, were you making any other movements?

15   A.   Yes.

16   Q.   Okay.  What movements were you making?

17   A.   I was moving sort of at a back left direction.

18   Q.   Okay.  And could you point on Exhibit 5B what you mean

19   by -- the direction you were going?

20   A.   (Marks diagram.)

21   Q.   Okay.  And were you keeping yourself oriented so your front

22   was facing the defendant?

23   A.   Yes.

24   Q.   All right.

25       Where was the defendant located while he was shooting at

1    you?

2    A.  (Marks diagram.)

3         Oops.   Kind of back in there.

4         When he came out -- once he came out of the trees and

5    stuff, into this little opening, he hadn't moved.   He reared

6    back, and that was the only movement that he did.

7    Q.  All right.

8         Now, you have drawn the line as kind of the direction you

9    are going which is moving backwards.

10        While you're moving backwards, did anything happen to you?

11   A.  Yeah.

12   Q.  What happened?

13   A.  I fell over his fire pit made of rocks.

14   Q.  Okay.   What went through your mind when you fell over the

15   fire pit?

16   A.  What went through my mind?

17        That I didn't really want to be on the ground.   I didn't

18   want to be stationary there.

19   Q.  Was the defendant still firing at you while you were on the

20   ground?

21   A.  Yes, he was.

22   Q.  Okay.   Did you continue to fire at the defendant?

23   A.  Yes, I did.

24   Q.  Were you able to get up and get off your back and get to a

25   position of cover?

1    A.   Yes, I was.

2    Q.   Do you have any recollection how it was that you did that?

3    A.   I couldn't tell you if I crawled or got up and ran or if

4    I -- no.  I don't know how I got behind the tree.

5    Q.   What tree did you get behind?

6         Point on the diagram.

7    A.   (Marks diagram.)

8         That one right there.

9    Q.   Okay.  When you found yourself behind the tree,

10   Officer Hardin, what did you notice about your weapon -- about

11   your gun?

12   A.   It was empty.

13   Q.   Okay.  So what did you do at this point?

14   A.   I reloaded.

15   Q.   Okay.  When you reloaded your firearm, what did you do?

16        Following reloading your firearm, what did you do?

17   A.   I went back and pointed it in the direction where Mr. Cole

18   had been standing.

19   Q.   Was Mr. Cole in the location where you had last seen him?

20   A.   No.

21   Q.   Okay.  Did you have any idea where Mr. Cole was at that

22   point?

23   A.   At that point, no.  I kind of said to myself, Oh, man,

24   where did he go?

25   Q.   Okay.  At some point did you leave your covered position

1   and move out towards where he had been?

2   A.  Yeah.

3   Q.  Okay.  Let me ask you a couple of questions.

4       Before you moved from your covered position and advanced

5   towards the area that you had last seen Mr. Cole, had the

6   shooting stopped at that point?

7   A.  Yes, it had.

8   Q.  Okay.  After you reloaded your weapon, did you fire any

9   additional rounds?

10  A.  No, I did not.

11  Q.  Okay.  Once the shooting had stopped did you call out to

12  anyone, or did you hear the defendant say anything?

13  A.  Yes, I did.

14  Q.  Okay.  What did you hear the defendant say?

15  A.  He said he was hit, he's down, it's over.

16  Q.  Okay.

17  A.  Just along those lines.  I don't know if those were his

18  exact quotes.

19  Q.  Words to that effect?

20  A.  Yes.

21  Q.  Now, Officer Hardin, when you heard those words, had you

22  seen Ranger Pultorak at that point?

23  A.  No, I had not.

24  Q.  When you heard the defendant say those words, what did you

25  do?

1   A.   I went and kind of approached him cautiously.

2   Q.   Okay.  And was the defendant laying in approximately the

3   same position -- or laying in approximately the same place that

4   you had seen him standing earlier?

5   A.   Yes, he was.

6   Q.   When he was firing at you?

7   A.   Yes.

8   Q.   Did you see Ranger Pultorak at any point?

9   A.   Once I kind of came up to Mr. Cole lying there, he kind of

10   came back in my vision from the side.

11   Q.   Okay.  Ranger Pultorak?

12   A.   Yes.

13   Q.   Okay.  Once Ranger Pultorak came into your line of sight --

14   or actually from -- how close to Mr. Cole did you get at that

15   point, the defendant?

16   A.   Probably about ten feet.  I didn't see his gun, and I

17   didn't know where it was.  So I kind of held back and kept him

18   in my sight.

19   Q.   Were you still pointing your weapon at Mr. Cole at this

20   point?

21   A.   Yes.

22   Q.   When Ranger Pultorak -- when you reacquired contact with

23   Ranger Pultorak, could you see if Ranger Pultorak still had his

24   firearm out at that point; if you recall?

25   A.   Yes, he did.

1    Q.   Okay.  Now at this point, Officer Hardin, did you realize

2    that you might have been hit during the exchange of gun fire

3    with Mr. Cole?

4    A.   Yeah.  I felt my leg.  There was a little pain coming.

5    Q.   Did you take a look at it at that point, or did you just

6    notice the pain in your leg?

7    A.   I just noticed it at that time.

8    Q.   What leg are we talking about?  Right or left?

9    A.   My right.

10   Q.   Okay.  And with Mr. Cole laying on the ground, what did you

11   do at that point once you and Ranger Pultorak had reacquired

12   contact with each other?

13   A.   We located the gun he had, which was away from him.  Then I

14   handcuffed him.

15   Q.   You handcuffed Mr. Cole?

16   A.   Yes.

17   Q.   Now, when you handcuffed Mr. Cole, did it appear that he

18   had been shot?

19   A.   Yes, it did.

20   Q.   Okay.  And what led you to that conclusion?

21   A.   Well, first he told me he had been shot.  Then there was

22   blood.

23   Q.   Okay.  Now, when you saw the blood, and once Mr. Cole was

24   handcuffed, what did you do next?

25   A.   I checked -- just prior to that I checked Ranger Pultorak,

1   and I asked him if he had been hit.  And then I kind of checked

2   my wound out.  Made sure it wasn't, you know, bleeding out or

3   anything.

4       And then I had Ranger Pultorak watch the area because he

5   had seen three people earlier with, I believe, Mr. Cole.  And

6   we didn't know where they were so he was watching the area.

7   And I went back down to my vehicle and radioed the whole thing

8   out.

9   Q.  Okay.  So when you went down to your vehicle and radioed it

10  out, what do you mean by that?

11  A.  I contacted my dispatch.  I said that we had shots fired.

12  I said that we have a suspect down who has been shot and the

13  ranger had been shot.  And I didn't know if I had been shot or

14  I cut it going over the fire pit, the rocks there, so I said I

15  might have, but I had a laceration.

16      I ordered up an ambulance for those two and actually

17  requested the helicopter.  The helicopter was down when I first

18  radioed out, and then it went up.  I advised them we probably

19  needed to transport at least Mr. Cole out.

20  Q.  Did you do anything with your patrol vehicle at that point?

21  A.  Yeah.  I had to -- because we were on such a little

22  desolate road, I informed my dispatch I would bring it down to

23  the main dirt road and leave my lights on and have the incoming

24  units responding turn right after my vehicle.  That's the

25  trail.  And I said I would be out of radio range, I needed to

1    hike back up.  So I grabbed my EMT kit and hiked back up to

2    where they were.

3    Q.  Your EMT kit or your medical bag?

4    A.  Yes.  That's correct.

5    Q.  How long did it take you round trip from the time you left

6    the camp area until you radioed it in and then got back to the

7    camp area?

8    A.  To walk it?  Probably -- I don't know.  Ten -- five to ten

9    minutes.  Ten minutes.

10   Q.  I take it Ranger Pultorak -- or excuse me --

11   Officer Hardin, this being a fairly traumatic incident, you

12   weren't exactly looking at your watch; is that correct?

13   A.  That is correct.

14   Q.  Once you got back to the campsite area, what did you do at

15   that point?

16   A.  I had Ranger Pultorak still -- I told him to just keep

17   scanning the area.  And then I cut the clothes off Mr. Cole,

18   and where he was shot I held direct pressure and watched his

19   airway.  Made sure, you know -- I basically rendered aid to

20   him, medical aid.

21   Q.  Okay.  All right.

22       I'm going to direct your attention now, Officer Hardin, to

23   the binder that's in front of you to what's been marked for

24   identification as Exhibits 4I, 4J, 4K and 4L.

25   A.  I, J, K and L?

1   Q.  I, J, K and L, yes.

2   A.  Okay.

3   Q.  Do you recognize those photographs?

4   A.  Yeah.

5          MR. COPPOLA:  Your Honor, at this point I move to

6   admit 4I through 4L.

7          THE COURT:  Admitted.

8      (Whereupon, Government's Exhibits 4I, 4J, 4K, 4L, were

9      received.)

10         MR. COPPOLA:  Let's take a look at 4I.

11     (Exhibit published.)

12  BY MR. COPPOLA:

13  Q.  Officer Hardin, what are we looking at in the -- or

14  describe for the jury what we are seeing in Exhibit 4I.

15  A.  Those are the pants I cut off Mr. Cole.

16  Q.  You say those are the pants?

17  A.  I'm sorry.  Number 49.

18  Q.  Where the marker place is 49?

19  A.  Yeah.

20  Q.  Okay.  And the other items that we see strewn about in the

21  area of the number in the photograph that says 48, what do

22  those appear to be?

23  A.  Those are bloodied medical compressions, four-by-fours.

24  Q.  Something that you used?

25  A.  Yeah.  I mean, another officer took over for me, but those

1     were -- I mean --

2   Q.   Okay.  All right.  Let's take a look now at 4J, please.

3        (Exhibit published.)

4        Okay.  Do you recognize 4J?

5   A.   Yes.

6   Q.   What is 4J?

7   A.   That's his jacket and shirt.

8   Q.   Okay.  When you say "his," you mean the defendant?

9   A.   Yes.  I'm sorry.

10  Q.   Okay.  And that's a photograph of Exhibits 8L and 8M; is

11  that correct?

12       The hoodie and shirt?

13  A.   Oh, yes.  Sorry.

14  Q.   Okay.  Now, when you cut the shirt off Mr. Cole, did you

15  cut his jacket as well?

16  A.   No, I did not.

17  Q.   Okay.  Why not?

18  A.   He told me it was $100 jacket.  He asked me to just slide

19  it down his arm.  He was complaining about pain in the arm, and

20  I needed to see it, but he didn't want me to cut his jacket.

21  Q.   All right.  Let's take a look at 4K.

22       (Exhibit published.)

23       What's 4K?

24  A.   Those are his pants.

25  Q.   After you had cut them off?

1   A.  Yes.

2   Q.  And then let's look at 4L, if we could, please.

3       (Exhibit published.)

4       Okay.  I want to direct your attention to where I have

5   placed the blue dot.

6       (Marks photo.)

7       Can you see that clearly?

8   A.  Yes.

9   Q.  Okay.  What is that, the dark leather object that appears

10  to be attached to the belt in that photograph?

11  A.  That's his holster -- Mr. Cole's holster.

12  Q.  Okay.  Turn in the binder, if you would, to 4M and 4N.

13  A.  Okay.

14  Q.  Do you recognize 4M and 4N?

15  A.  Yes.

16          MR. COPPOLA:  Your Honor, at this point I move to

17  admit 4M and 4N.

18          THE COURT:  Admitted.

19      (Whereupon, Government's Exhibits 4M and 4N were received.)

20  BY MR. COPPOLA:

21  Q.  All right.

22      Is that a different perspective on 4M of the location of

23  the defendant's holster on the -- on his belt?

24      (Exhibit published.)

25  A.  Yes.

1    Q.   Okay.  And let's look at 4N.

2         (Exhibit published.)

3         Is that the belt with just the holster?

4    A.   Yes.

5    Q.   Okay.

6         I'll hand you what's been marked for identification,

7    Officer Hardin, as Government's 8N and 8O.

8         (Exhibits handed to witness.)

9         Do you recognize 8N and 8O, Officer Hardin?

10   A.   Yes.

11   Q.   Okay.  What are they?

12   A.   That's his belt, and that's his holster.

13   Q.   When you say "his," do you mean the defendant's,

14   Mr. Cole's?

15   A.   Mr. Cole's, yes.

16            MR. COPPOLA:  Your Honor, I move to admit 8N and 8O.

17            MR. TONEY:  No objection.

18            THE COURT:  Admitted.

19        (Whereupon, Government's Exhibits 8N and 8O were received.)

20   BY MR. COPPOLA:

21   Q.   Direct your attention in the binder to what's been marked

22   for identification as 4P, if you would, please.

23        Do you recognize the photograph at 4P?

24   A.   Yeah.

25            MR. COPPOLA:  Your Honor, I move to admit 4P.

1        THE COURT:  Admitted.

2        (Whereupon, Government's Exhibit 4P was received.)

3        (Exhibit published.)

4   BY MR. COPPOLA:

5   Q.  Officer Hardin, what are we looking at in Exhibit 4P?

6   A.  That's Mr. Cole's shoe and pants and used medical supplies.

7   Q.  Okay.  Officer Hardin, you indicated earlier that at some

8   point another police officer relieved you from -- while you

9   were performing first aid on the defendant.

10  A.  Correct.

11  Q.  What police officer was it that relieved you?

12  A.  That was Officer Zelhart.

13  Q.  Okay.  And do you know Officer Zelhart?

14  A.  Yes.  I work with him.

15  Q.  Is he also a California Highway Patrolman such as yourself?

16  A.  Yes, he is.

17  Q.  What happened when Officer Zelhart came to relieve you at

18  the scene?

19  A.  He basically asked if there was anything he could do, and I

20  said, Yes, you can take over the first aid.

21  Q.  Okay.  At that point, Officer Hardin, were you pretty

22  tired?

23  A.  Oh, yeah.

24  Q.  Okay.  Would you say that you were almost exhausted?

25  A.  Pretty much, yes.

1   Q.   How long, approximately, had you been performing first aid

2   on the defendant before Officer Zelhart relieved you, again

3   recognizing you're not checking your watch at this point?

4   A.   Probably 15 to 20 minutes.

5   Q.   Okay.  Now, during the time period that you had Mr. Cole --

6   or you were rendering aid to Mr. Cole, did he ever lose

7   consciousness?

8   A.   No, he did not.

9   Q.   And do you recall how many wounds you attempted to patch up

10   during that period of time or apply pressure on?

11   A.   It appeared he had two in the pelvic area and one at the

12   arm.  The arm wasn't bleeding, so I concentrated on the two to

13   the pelvic area.

14   Q.   Did those two cause you some concern?

15   A.   Oh, yeah.

16   Q.   Were they bleeding fairly heavily?

17   A.   Yes.  And they had been.  That was more my concern.  They

18   weren't bleeding so much once I was patching them, but

19   beforehand they had a lot of blood missing, yes.

20   Q.   Officer Hardin, I'm going to show you what's been marked

21   for identification as 8C.

22        Would you take a look at 8C, please?

23        (Exhibit handed to witness.)

24        Do you recognize 8C?

25   A.   Yes.

1    Q.  What's 8C?

2    A.  This is the duty weapon the highway patrol issued to me.

3    Q.  That's your gun?

4    A.  Yes, it is.

5    Q.  Is that the gun you used on June 14th when the defendant

6    was shooting at you?

7    A.  Yes, it is.

8              MR. COPPOLA:  Your Honor, I move to admit 8C.

9              MR. TONEY:  No objection.

10             THE COURT:  It's admitted.

11       (Whereupon, Government's Exhibit 8C was received.)

12   BY MR. COPPOLA:

13   Q.  Officer Hardin, I would like for you to turn to Tab 8A in

14   the binder in front of you, please.

15       Do you recognize what's been marked for identification as

16   8A?

17   A.  Yes, I do.

18             MR. COPPOLA:  Okay.  Your Honor, I move to admit 8A,

19   please.

20             THE COURT:  Admitted.

21       (Whereupon, Government's Exhibit 8A was received.)

22       (Exhibit published.)

23   BY MR. COPPOLA:

24   Q.  What are we looking at in 8A, Officer Hardin?

25   A.  That is my duty belt.

1  Q.  Is that the duty belt that you were wearing on June 14th,
2  2014?
3  A.  Yes, it is.
4  Q.  Okay.  What are the different items that we see on your
5  duty belt?
6  A.  Starting from left to right?
7  Q.  Let's go left to right, please.
8  A.  That's my weapon, my Smith & Wesson .40 caliber.  Next is
9  an ASP.  There are two handcuff pouches with handcuffs in them.
10  My radio.  My Taser or electronic, you know, control device.
11  My pepper spray.  And a pouch with two magazine containers.
12  Q.  Going back to the item that you said was next to your duty
13  weapon that I'm putting the blue dot on it, you said that is an
14  ASP.  Is that a collapsible baton?
15  A.  Yes, it is.
16  Q.  Now, when Officer Zelhart came and took over first aid for
17  you on Mr. Cole, what did you do at that point?
18  A.  I kind of stood up and stretched.  Then I looked at my
19  wound to see how it was doing.
20  Q.  Okay.  And did Officer Zelhart -- do you recall if
21  Officer Zelhart looked at your wound at that point?
22  A.  No, he did not.
23  Q.  What did you do following stopping and stretching and
24  letting Officer Zelhart take over first aid?
25  A.  I contacted Officer Lilyquist, who I work with, as he came

1    up the road.

2    Q.   Were you on your way back to your patrol vehicle at that

3    point?

4    A.   Not at that point, no.

5    Q.   What was the nature of your contact with Officer Lilyquist?

6    A.   I had to give him a brief run down.

7    Q.   Following your contact with Officer Lilyquist, did you go

8    to the hospital?

9    A.   Yes, I did.

10   Q.   And Officer Hardin, how was it that you went to the

11   hospital?

12        How did you get to the hospital?

13   A.   I drove my patrol car.

14   Q.   Okay.  And what hospital did you go to?

15   A.   Sierra Nevada Hospital in Grass Valley.

16   Q.   Now, at the time that you left to drive yourself to the

17   hospital on June the 14th, 2014, where was Ranger Pultorak?

18   A.   Excuse me.  At the time I left?

19   Q.   Yes.  Where was Ranger Pultorak?  Or did you see

20   Ranger Pultorak before you left for the hospital?

21   A.   Yes, I did.

22   Q.   Okay.  And where was it that you saw Ranger Pultorak?

23   A.   He was sitting on the back -- like the back bumper of an

24   ambulance.

25   Q.   Okay.  And did you see Ranger Pultorak leave -- or did

1   Ranger Pultorak leave before you did or did you leave before

2   Ranger Pultorak left?

3   A.  I left before he did.

4   Q.  Okay.  About how long did it take you to get to the

5   hospital?

6   A.  Twenty minutes.

7   Q.  And once you got to the hospital, Officer Hardin, were you

8   treated by a physician?

9   A.  Yes, I was.

10  Q.  All right.

11      I want to direct your attention now, Officer Hardin, to the

12  binder again in front of you, and specifically I want you to

13  look at Tabs 6E, 6F and 6G.

14  A.  Okay.

15  Q.  Do you recognize 6E, 6F and 6G?

16  A.  Yes, I do.

17          MR. COPPOLA:  Okay.  Your Honor, at this point I would

18  move to admit 6E, F and G, please.

19          THE COURT:  Admitted.

20      (Whereupon, Government's Exhibits 6E, 6F and 6G were

21      received.)

22      (Exhibit published.)

23  BY MR. COPPOLA:

24  Q.  All right.

25      Officer Hardin, what are we looking at on 6E?

1   A.   That's my right leg.

2   Q.   Okay.  And it appears in the photograph that there is one

3   large wound, and there appears to be other smaller wounds

4   around your right calf; is that correct?

5   A.   That is correct.

6   Q.   Okay.  And do you know what those other small wounds are?

7   A.   They're shrapnel.

8   Q.   You got to the hospital and the doctors removed shrapnel

9   from your leg?

10   A.   Not when I was first there, no.  I went back later after --

11   Q.   We'll get to that in just a second.

12       Let's take a look at 6F.

13       (Exhibit published.)

14       Is that your leg before the medical personnel cleaned it up

15   a little bit?

16   A.   Yes;

17   Q.   Then let's look at 6G.

18       (Exhibit published.)

19       All right.

20       This gives us a better perspective.  I'm going to put a

21   blue dot.

22       (Marks photo.)

23       Is that also some shrapnel in your leg?

24   A.   Yes, it is.

25   Q.   Okay.  And over where the second blue dot is?

1    A.   Yes.

2    Q.   Okay.   Now, did the doctors -- or did the doctor sew up

3    your wound, or how was that wound treated?

4    A.   They x-rayed it.   They irrigated it and kind of numbed it

5    up.   They kind of scrubbed it a little, but they weren't going

6    to close it.

7    Q.   Did they put any kind of dressing or some type of covering

8    over it?

9    A.   Yes, they did.

10   Q.   Okay.   And did they give you some antibiotics?

11   A.   Yes, they did.

12   Q.   I'm going to direct your attention in the binder to 7A

13   through C.

14        Okay.   Do you recognize 7A through C?

15   A.   Yes, I do.

16             MR. COPPOLA:   Your Honor, I move to admit 7A, 7B and

17   7C.

18             THE COURT:   Admitted.

19        (Whereupon, Government's Exhibits 7A, 7B and 7C were

20        received.)

21        (Exhibit published.)

22   BY MR. COPPOLA:

23   Q.   Let's look at 7A.

24        What are we looking at here, Officer Hardin?

25   A.   You're looking at my right leg with my pants, the one that

1    got hit.

2    Q.  All right.

3        And where I'm placing the blue dot, about the center of the

4    photograph, is that about the tear in your pants?

5        (Marks photo.)

6    A.  Yes.

7    Q.  Okay.  Let's take a look at 7B.

8        (Exhibit published.)

9        Is that a close up version of that tear?

10   A.  Yes.

11   Q.  The red item, does that appear to be blood?

12   A.  Yes.

13   Q.  Let's turn to 7C.

14       (Exhibit published.)

15       What's 7C a photograph of?

16   A.  That's the inside of my uniform pants.

17   Q.  Following treatment at the hospital?  Or this is what it

18   looked like when you took your pants off and gave them to

19   somebody else for evidence?

20   A.  Yes.

21   Q.  Okay.  After you went to the hospital, did you have to --

22   in later days after your initial visit, did you have to go back

23   to the hospital another couple of times?

24   A.  Yes, I did.

25   Q.  Why was that?

1   A.  The first time because I was getting an infection around

2   the main wound.

3   Q.  Okay.  And the second time?

4   A.  The second time, in the kind of back part of my calf, it

5   was becoming infected.  They had to dig out a piece of

6   shrapnel.

7   Q.  I'll direct your attention in the binder, Officer Hardin,

8   to what's been marked for identification as Exhibit 3E.

9   A.  Okay.

10  Q.  Do you recognize 3E?

11  A.  Yeah.

12        MR. COPPOLA:  Your Honor, at this point I move to

13  admit 3E.

14        THE COURT:  Admitted.

15    (Whereupon, Government's Exhibit 3E was received.)

16    (Exhibit published.)

17  BY MR. COPPOLA:

18  Q.  What are we looking at in Exhibit 3E?

19  A.  This is the -- this is the area where I took cover behind

20  the tree.  That's my magazine -- my empty magazine.

21  Q.  Where is your empty magazine?

22  A.  Number 23 on this.

23  Q.  Okay.  All right.

24    Now, Officer Hardin, you indicated that during the shooting

25  you reloaded.  Okay.

1       How many bullets do you carry in your magazine?

2   A.  Eleven.

3   Q.  Okay.  Now, when you -- and do you carry another round in

4   the chamber?

5   A.  Yes.

6   Q.  So during the shooting you fired -- did you fire at least

7   12 shots?

8   A.  Yes.

9   Q.  Okay.  But you didn't fire any additional shots once you

10  reloaded?

11  A.  No.

12  Q.  Okay.  Officer Hardin, with respect to the time that

13  Mr. Cole was shooting at you and Ranger Pultorak, were you in

14  fear for your life and that of -- and for Ranger Pultorak?

15          MR. TONEY:  Objection.  That's been asked and

16  answered.

17          THE COURT:  Overruled.

18          THE WITNESS:  Yes.

19          MR. COPPOLA:  I don't have any further questions at

20  this time, Your Honor.

21          MR. TONEY:  Can I ask the court when you intend to

22  break?

23          THE COURT:  At three o'clock.

24          MR. TONEY:  Thank you.

25  ///

1                        CROSS-EXAMINATION

2    BY MR. TONEY:

3    Q.  Good afternoon.

4    A.  Good afternoon.

5    Q.  Had you been in this particular area of the forest before?

6    A.  No.

7    Q.  When you drove there, what were you wearing?

8        I understand you were wearing a uniform.  Is there any

9    protective gear that you were wearing on that day?

10   A.  The same I'm wearing now, a bulletproof vest.

11   Q.  And do you recall how Ranger Pultorak was dressed?

12   A.  In a uniform similar to mine.

13   Q.  Did he have some sort of poncho or anything on?

14   A.  Excuse me.  A poncho?

15   Q.  Yeah.  Or a cape or anything over his shirt?

16   A.  No.

17   Q.  Now, as you arrived there, did you see any signs indicating

18   that the public could not freely go there?

19       In other words, no trespassing, keep out, anything like

20   that?

21   A.  No.

22   Q.  And at the entrance to the small road that was shown to you

23   about that first photograph, the spur road, there was no sign

24   indicating that that road was closed, was there?

25   A.  No.

1    Q.  Did you understand from Pultorak that he had had contact

2    with Mr. Cole earlier that day?

3    A.  At what time?

4    Q.  At any time?

5    A.  He mentioned three people had come down out of there, and

6    he sent them off.  And afterwards I knew -- I don't know if it

7    was at the scene that I found out or talking to him later or

8    what, but he mentioned that, yes, Mr. Cole was one of the ones

9    in the initial meeting.

10   Q.  Okay.  And did he indicate to you at that time that they

11   had been armed or dangerous to him in any way?

12   A.  When he first met them?

13   Q.  Yeah.

14   A.  No.

15   Q.  Now, you heard a rustling.  And I'm starting up with when

16   you're about to see Mr. Cole.  And I have trouble with that

17   diagram visualizing how far it was.

18       How far, approximately, were you from your location when

19   you first glimpsed Mr. Cole in feet, if you can?

20   A.  It would be 20-ish.  About 20 feet.

21   Q.  Would you say it was about the distance you are from me,

22   closer or further away?

23   A.  I would say a little bit farther.

24   Q.  Stop me when you think you're about the right distance.

25   A.  Now, this is when he first came out?

1    Q.   Sure.   That's what I'm asking.

2    A.   I was kind of -- I would say a little bit farther than we

3    are.   Maybe about --

4    Q.   Somewhere around here?

5    A.   From what I remember, yes.

6    Q.   And you had a fairly clear line of sight of him at that

7    time?

8    A.   Correct.

9    Q.   And your testimony was he was -- he did not appear

10   agitated.   He actually was just asking to get his stuff, right?

11   A.   Correct.

12   Q.   I think at one time you characterized it as he was sort of

13   pleading, "Please, let me have my things."

14        Is that fair?

15   A.   Yes.

16   Q.   Okay.   Now, was it immediately after that that Pultorak

17   had -- that you saw what turned out to be handcuffs?

18   A.   Immediately after him asking --

19   Q.   When he said, "Please, give me my stuff," or words to that

20   effect?

21   A.   I can't tell you if it was immediate.   I just remember they

22   were doing -- he was talking about the camp.   And I actually

23   turned my attention back -- I was going to go back to look for

24   more ID to find out more about the stolen stuff.

25   Q.   So at that point would it be fair to say that you didn't

1   see any dangerous situation?

2   A.   No, I did not.

3   Q.   Okay.  And did you hear what they were talking about?

4   A.   It was just more, "This is my camp.  I don't want you

5   taking my stuff."

6       He was mentioning the motorcycles, "I am going to take the

7   motorcycles."

8   Q.   "He" being?

9   A.   I'm sorry.  Ranger Pultorak.

10  Q.   Pultorak was saying that the motorcycles --

11  A.   Something about that the bikes were going to go.  I don't

12  know if he was -- he was talking about, you know, the illegal

13  campsite.  I don't know.  I don't work with federal land so I

14  don't know.  I was letting him deal with that.

15  Q.   All right.

16      But it still was a conversation that didn't sound heated,

17  right?

18  A.   No.

19  Q.   Am I right?

20  A.   You're correct.

21  Q.   Sometimes the way I ask the question, I understand what you

22  are saying, but I just want to make sure.

23      Okay.

24      And do you have any estimate of how long this conversation

25  was about his desire -- Cole's desire to get the stuff and

1    Pultorak saying that we're going to take the bikes?

2    A.   Maybe -- it was brief.  Fifteen seconds.

3    Q.   Okay.  And then Pultorak starts showing handcuffs to

4    Mr. Cole?

5    A.   He brought -- yeah.  He brought them out.  He didn't show

6    them.  He was coming closer to him.

7    Q.   Now, at that time had you seen Mr. Cole do anything

8    illegal?

9    A.   Other than the fact he claimed it was his campsite and

10   there was a stolen motorcycle in there, no.

11   Q.   Had he said, when Pultorak had said he was going to take

12   the motorcycles, do you know if Cole had said that they're not

13   mine or anything to that effect?

14   A.   I don't recall if he said anything about it.

15   Q.   You had run the one motorcycle and found it had been

16   stolen, correct?

17   A.   Correct.

18   Q.   Did you find out when it had been stolen?

19   A.   As of the date?

20   Q.   Yeah.  How long before?

21   A.   Yeah.   Actually, I don't think they told me.  They don't

22   usually tell you that right over the air.  They just inform you

23   that it is stolen, where it is stolen from.  And if you ask,

24   they'll say who owned it.

25   Q.   Yeah.  Did you ever find out how long it had been?

1    A.   I don't believe I did, no.

2    Q.   Now, do you know if Pultorak had asked Mr. Cole about who

3    belonged to the motorcycles?

4    A.   I don't know.  I don't recall him asking.

5    Q.   And at least at first Pultorak's answer, if I heard you

6    correctly, is "We're going to take the bikes"; we being law

7    enforcement, correct?

8    A.   Correct.  Something to that effect, yes.

9    Q.   But had he said that he wasn't going to give Mr. Cole his

10   stuff back?

11   A.   No.  Mr. Cole said that he didn't want him taking his

12   stuff, and he mentioned something about the motorcycles, like

13   "the motorcycles are going to be going."

14       And after that, I don't recall really what was -- I mean,

15   like I said, they were getting along.  And then I kind of

16   turned my attention back until, you know, he got approached

17   and, you know, went a little sideways.

18   Q.   So did you see anything or hear anything that would trigger

19   a reason for Pultorak to go show handcuffs to Mr. Cole?

20             MR. COPPOLA:  Objection as to speculation at this

21   point, Your Honor.

22             THE COURT:  Overruled.

23             THE WITNESS:  Yes.  I would have done the same

24   thing.

25   ///

1    BY MR. TONEY:

2    Q.   Why?

3    A.   We're in a campsite.  We haven't checked for weapons.  He

4    was -- you know, you have stolen property there.  We don't know

5    who he is.  And we have to, you know, basically take these

6    bikes out.

7         I don't want someone I don't know who has stolen property

8    to, you know, have hands free.

9    Q.   You didn't know you had stolen property?

10   A.   I did.  The motorcycle was stolen.

11   Q.   Did you know that Cole had possession of that motorcycle or

12   that it was just in the trees at the camp?

13   A.   When he said it was his camp, and the motorcycle is in his

14   camp, I'm going to assume that he knows about the motorcycle.

15   Q.   That motorcycle looked like it had been there a long time,

16   didn't it?

17   A.   It looked like it had been disassembled.  I don't know

18   about it looking like it had been there a long time.

19   Q.   Did Pultorak say anything like, "I'm putting you under

20   arrest," or "I'm detaining you," or anything at all?

21   A.   Not that I heard.

22   Q.   So he's just showing handcuffs?  He just got handcuffs out?

23   A.   Correct.

24   Q.   How far away is he from Mr. Cole?

25   A.   Probably ten feet.  Maybe a little bit less.

1   Q.   Let me -- if it is all right, I'm going to walk toward him

2   and find out.

3       Your best recollection, closer than we are now?

4   A.   Yes.

5   Q.   Stop me when you think it is about right.

6   A.   Where he has the handcuffs out you mean?

7   Q.   Yeah.  At first.

8       (Counsel walks toward the witness.)

9   A.   Okay.  Probably about there

10  Q.   Okay.

11  A.   Maybe.  I was over here.  Probably right about here, and he

12  was approaching him.

13  Q.   With the handcuffs?

14  A.   Yeah.

15  Q.   That's when Cole said, "You're not putting those on me"?

16  A.   Yes.

17  Q.   All right.

18      How long after that was it that Pultorak asked if he was

19  armed -- if Cole was armed?

20  A.   After what?

21  Q.   After Cole said, "You're not putting them on me."

22  A.   Well, he said that, and he reached to his waistband.  And

23  he asked just almost immediately after that.

24  Q.   So it was immediately after that that the ranger asked if

25  he was armed?

```
1    A.  Correct.

2    Q.  And at that point what Mr. Cole did was he said, "Yes,"

3    right?

4    A.  Correct.

5    Q.  Was that in a normal voice?

6    A.  No.

7    Q.  Loud?

8    A.  A little bit loud, yes.

9    Q.  A little bit loud.

10       And he brought his garment back so you could see the

11   holster?

12   A.  Not like that, no.

13   Q.  How?

14   A.  He kind of -- he kind of brushed it back.

15   Q.  Brushed it back?

16   A.  Yeah.  It almost looked like an old western where they

17   square off in the city streets for, like, a gun duel.  You

18   bring it back and -- so you can grab it quickly.  That's what

19   it looked like.

20       (Witness demonstrates.)

21   Q.  And is Cole facing you -- or he's facing Pultorak, right?

22   A.  His body is facing me.

23   Q.  Okay.  And --

24   A.  And he's looking at Ranger Pultorak.

25   Q.  But at that point he had not reached for the gun, correct?
```

1    A.   His hand was down there.  I don't know what you mean by

2    reached.  He hadn't brought it out or anything.

3    Q.   Okay.  And at that point you have your gun -- you

4    immediately take your gun out when he says he's armed, correct?

5    A.   When he says he's armed and brings his jacket back and I

6    see it, my gun comes out, yes.

7    Q.   And does Pultorak's too?

8    A.   I'm watching -- I initially thought he had because he

9    had -- I guess I'm seeing handcuffs, but as soon as I see

10   Mr. Cole's gun, my attention is on him.  And I'm yelling at him

11   to drop it.

12   Q.   You don't know who fired the first shot, do you?

13   A.   No, I don't.

14             MR. TONEY:  Would this be an appropriate break time?

15             THE COURT:  Yes.  Court is in recess for 15 minutes.

16             MR. TONEY:  I got it.  Thank you.

17        (Off the record at 3:01 p.m.)

18        (Back on the record at 3:17 p.m.)

19             THE CLERK:  You may remain seated.

20        Court is now in session.

21             THE COURT:  All participants are present.

22        You may proceed.

23             MR. TONEY:  Thank you.

24   BY MR. TONEY:

25   Q.   Running the motorcycle that was shown stolen, do you recall

1    if dispatch said that was not recovered?

2        Does that mean something to you, "not recovered"?

3    A.  An unrecovered stolen?

4    Q.  Yeah.

5    A.  Well, they told me it was 1036, which means it is stolen.

6    Q.  Okay.  If it were said to be unrecovered, would that mean

7    it had been stolen for a period of time?

8    A.  It means it hasn't been found.  Or, yeah, recovered.  It's

9    still outstanding.

10   Q.  Now, was Mr. Cole standing, as far as you could tell,

11   during the entire gun fire exchange?

12   A.  Standing up?

13   Q.  Yeah.

14   A.  Yeah.

15   Q.  Now, the stolen motorcycle -- the camp was in a clearing,

16   correct?

17   A.  Correct.

18   Q.  The stolen motorcycle was not in that clearing, was it?

19   A.  No.

20   Q.  Where was the stolen motorcycle?

21       Was it in the trees?

22   A.  Yeah.  It was kind of under some foliage, trees, bushes.

23   Q.  So how far from the site where Mr. Cole's belongings were

24   was it to the location of the motorcycle?

25   A.  Probably 15, 20 feet.

1   Q.  Prior to the shooting, you didn't hear Pultorak tell the

2   defendant he was under arrest, did you?

3   A.  No.

4   Q.  Or that he was being detained?

5   A.  No.

6   Q.  Or explain to him in any way why he would be handcuffed?

7   A.  I did not hear that, no.

8   Q.  Prior to the actual first shot, from whomever shot it,

9   was -- had Pultorak put the handcuffs back?

10  A.  Back in his case or whatever?

11  Q.  Yeah.

12  A.  No.

13  Q.  If you feel you need to detain someone who is apparently

14  being polite, do you normally tell them what you are doing and

15  why you are doing it?

16          MR. COPPOLA:  Objection.  Relevance at this point.

17          THE COURT:  Overruled.

18          THE WITNESS:  Do I?  Yeah.

19          MR. TONEY:  That's all I have.

20                      REDIRECT EXAMINATION

21  BY MR. COPPOLA:

22  Q.  Mr. Toney asked you some questions about the word

23  "unrecovered"?

24  A.  Correct.

25  Q.  Do you recall those questions?

1   A.   Yes.

2   Q.   Okay.   Did dispatch ever say anything to you about the

3   motorcycle being unrecovered?

4   A.   The fact that it is 1036, which is stolen, it hasn't been

5   recovered.

6   Q.   Okay.

7   A.   So they don't say it is 1036 unrecovered.

8   Q.   So the only -- if I understand your testimony correctly,

9   the only thing you heard from dispatch about that motorcycle

10   was that code that you just said, 1036?

11   A.   1036 Frank out of Grass Valley.

12   Q.   Okay.   Now, Officer Hardin, with respect to the shooting

13   itself, when was it that you heard the first shot?

14   A.   Once Mr. Cole had grabbed his gun and extended it out the

15   first shot went off.

16   Q.   And Officer Hardin, when you tripped over or fell

17   backwards, rather, over the fire pit, did you attempt to use

18   your radio during that period?

19   A.   Yes, I did.

20   Q.   Were you successful in radioing out?

21   A.   No.

22   Q.   Was your radio out of range at that point?

23   A.   Correct.   Our car -- from our handhelds, you have to be so

24   close to your car to have it, then relay to our dispatch.

25   Apparently I was a little bit farther than what's allowed.

1    MR. COPPOLA:  If I could have just a moment, Your

2  Honor.

3       (Government cocounsel confer.)

4       MR. COPPOLA:  I don't have any further questions at

5  this time.

6       THE COURT:  Okay.

7       MR. TONEY:  Nothing else.

8       THE COURT:  You are excused.

9       MR. TONEY:  Can he be subject to recall?

10   I'm not certain that I need it, but I would ask that.

11      THE COURT:  Okay.

12      MR. COPPOLA:  That's fine, Your Honor.

13      THE COURT:  He's asking whether he should stay here

14  today.

15      MR. TONEY:  Absolutely not.  I'll be happy to tell the

16  prosecution a full day in advance if he's needed, if that's

17  okay.

18    MR. COPPOLA:  Your Honor, before we call our next witness,

19  we have a factual stipulation we would like to read to the

20  jury.

21    Your Honor, we've marked this as Government's Exhibit 10,

22  and it is a stipulation between the parties regarding the

23  nature of the injuries sustained by CHP Officer Brant Hardin

24  and the medical treatment.

25      (Reading:)

1    The United States, through Assistant United States

2    Attorneys Michael D. McCoy and Heiko Coppola and defendant

3    through his counsel of record J. Toney hereby stipulate to the

4    following:

5    If called as a witness, Dr. Jaron Ross, an emergency room

6    doctor at Sierra Nevada Memorial Hospital in Grass Valley,

7    would testify as follows:

8    CHP Officer Brant Hardin was initially treated at Sierra

9    Nevada Memorial Hospital on June 14th, 2014, for a gunshot

10   wound to his lower right leg.

11   Dr. Ross was the attending physician who provided medical

12   treatment to Officer Hardin for his injuries.  After assessing

13   Officer Hardin, Dr. Ross concluded, based on his medical

14   training and experience, that Officer Hardin had sustained a

15   gunshot wound to his lower right leg that resulted in a large

16   tunneled central calf abrasion surrounded by multiple smaller

17   abrasions.

18   X-rays taken of Officer Hardin's right leg revealed

19   multiple small bullet fragments lodged within the soft tissues

20   of the right calf.  Dr. Ross did not attempt to remove these

21   fragments from Officer Hardin's leg.

22   Prior to being discharged from the hospital on June 14th,

23   2014, antimicrobial ointment was applied to Officer Hardin's

24   wounds and he was given a tetanus immunization and oral

25   antibiotic to reduce the risk of bacterial infection

1   developing.

2      On June 19th, 2014, Officer Hardin returned to Sierra

3   Nevada Memorial Hospital complaining of pain emanating from the

4   area of the gunshot wound.

5      After inspecting the wound, Dr. Ross concluded, based on

6   his medical training and experience, that it was infected.

7   Antimicrobial ointment was applied to the area of the wound,

8   and Officer Hardin was given a second type of oral antibiotic.

9      If called as a witness, Dr. Brent McDermott, a primary care

10  physician at Sierra Nevada Memorial Hospital in Grass Valley,

11  would testify as follows:

12     On June 26th, 2014, Officer Hardin returned to the Sierra

13  Nevada Memorial Hospital to have his gunshot wound checked for

14  post-infection.

15     After assessing Officer Hardin's wound, Dr. McDermott

16  removed a bullet fragment from Officer Hardin's lower right

17  leg.

18     (Reading concluded.)

19     Your Honor, we would move to admit the stipulation as

20  Exhibit 10.

21          MR. TONEY:  Yes.  That's our stipulation.  Yes.

22          THE COURT:  And he's moved to have it admitted.

23          MR. TONEY:  Fine.

24          THE COURT:  All right.  It is admitted.

25     (Whereupon, Defendant's Exhibit 10 was received.)

1        MR. MCCOY:  Your Honor, at this time the government

2   would call Ranger Tad Pultorak.

3        THE CLERK:  You can be seated.

4        THE WITNESS:  Thank you.

5        THE CLERK:  Raise your right hand, please.

6   (WHEREUPON, TAD PULTORAK WAS CALLED AS A WITNESS AND SWORN)

7        THE CLERK:  Please, state your full name and spell it

8   for the record.

9        THE WITNESS:  Tad Pultorak.  T-a-d, last name

10  Pultorak, P-u-l-t-o-r-a-k.

11                    DIRECT EXAMINATION

12  BY MR. MCCOY:

13  Q.  Good afternoon.

14  A.  Good afternoon, sir.

15  Q.  Where are you currently assigned?

16  A.  I'm currently assigned with the Bureau of Land Management

17  in the Mother Lode Field Office.  The main field office is in

18  El Dorado Hills, but I'm in a remote office out of Nevada City.

19  Q.  And how long in total have you been with the Bureau of Land

20  Management?

21  A.  I've been with the Bureau of Land Management since January

22  of 2008, which would make it -- if we want to go on actual

23  date, about six years -- six-and-a-half years.

24  Q.  And in that six-and-a-half years, what positions have you

25  held within the BLM?

1    A.   I've held only one position, which is uniformed patrol, a

2    law enforcement ranger.

3    Q.   Have you always been assigned to Nevada County?

4    A.   No, sir.   Previous to being assigned to the Mother Lode

5    Field Office out of Nevada County, I was assigned to the

6    El Centro Field Office in Southern California, El Centro,

7    California.

8    Q.   And in your current position, you conduct uniformed patrol;

9    is that correct?

10   A.   Yes, sir.

11   Q.   If you could, tell us what your responsibilities are as a

12   uniformed patrol ranger with the BLM.

13   A.   As a patrol function, it's mainly checking on areas, public

14   lands in the field office, checking on resource damage, mining

15   claim issues.

16        We have one campground in my area that I check on that gets

17   pretty busy during the summertime, just to make sure that folks

18   are behaving themselves.

19   Q.   And which campground is that?

20   A.   The South Yuba campground.

21   Q.   When you're conducting your patrols, do you have a partner

22   with you typically?

23   A.   No, sir.   It is just myself.

24   Q.   Are you the only one in the Nevada County office?

25   A.   Yes, sir.

1   Q.  So you're the only uniformed patrol officer up there?

2   A.  Correct.

3   Q.  What size is the area you are covering?

4   A.  It's large.  I don't know an exact acreage because it is so

5   spread out and noncontiguous.  But we have quite a bit of land

6   in Nevada County.

7   Q.  Prior to joining BLM -- you said in 2006, correct?

8   A.  2008.

9   Q.  2008.  I'm sorry.  Prior to joining the BLM in 2008, did

10  you have any other law enforcement or previous law enforcement

11  experience?

12  A.  Yes, sir.  I was a law enforcement ranger with the National

13  Park Service.

14  Q.  How long were you with them?

15  A.  I started seasonally with them in 1996.  And I worked three

16  seasons before I got my status as a permanent law enforcement

17  ranger in 2000.

18  Q.  Where were you -- I don't know if I'm using the right

19  term -- stationed during that period of time you were with the

20  National Park Service?

21  A.  All over the United States.  With BLM my current position

22  is this is my ninth duty station.

23  Q.  Including your time with the National Parks?

24  A.  Correct.

25  Q.  So you have seen the country, a good portion of it.

1    So in total then, how many years of law enforcement

2    experience do you have?

3    A.   Give or take, 17 years.

4    Q.   I would like to direct your attention to June 14th of 2014.

5    Were you on duty that day?

6    A.   Yes, sir.

7    Q.   Conducting uniformed patrol?

8    A.   That's correct.

9    Q.   What was your shift that day; do you remember?

10   A.   My shift is 7:00 in the morning until 5:00 at night.

11   Q.   And how did you start your shift that day?

12   A.   I start my shift by going to the office, which is in the

13   supervisor's office with the National Forest Service in Nevada

14   City.  I go there to pick up my patrol vehicle and put on my

15   uniform and collect gear and that sort of thing.

16   Q.   Let's talk a little bit about your patrol vehicle.

17        What type of a patrol vehicle is it?

18   A.   It's a 2010 Dodge 2500 series, I believe.  It is a Power

19   Wagon pickup truck.

20   Q.   A pickup truck.

21        Does it -- is it a marked patrol vehicle?

22   A.   Yes, sir.

23   Q.   So it has the BLM emblems on it?

24   A.   Yes, sir.  It has a stripe and the BLM emblem, as well as

25   the BLM law enforcement badge.

1    Q.  Does it also contain a light bar and siren?

2    A.  Yes, sir.

3    Q.  I would like you -- there is a binder right in front of

4    you.  It includes exhibits.  I would like you to turn to Tabs

5    4R and 4S.

6        Actually, the exhibit is on top of the tab, so once you

7    find the tab it will be right above it.

8    A.  4R?

9    Q.  4R and 4S.

10   A.  Okay.

11          MR. MCCOY:  Your Honor, as was referenced with the

12   previous witness, there is a stipulation regarding admission of

13   these photographs.

14          THE COURT:  Okay.

15   BY MR. MCCOY:

16   Q.  Do you recognize what is contained in the pictures in 4R

17   and 4S?

18   A.  Yes, sir, I do.

19   Q.  What is that?

20   A.  They're pictures of my patrol vehicle.

21          MR. MCCOY:  Your Honor, I move to admit 4R and 4S.

22          THE COURT:  Admitted.

23      (Whereupon, Government's Exhibits 4R and 4S were received.)

24      (Exhibit published.)

25   ///

1   BY MR. MCCOY:

2   Q.   Okay.  We're looking at Exhibit 4R.  What is that again?

3   A.   That's the front of my patrol vehicle -- patrol truck.

4   Q.   Move to 4S.

5        (Exhibit published.)

6        Is that another view of your patrol vehicle?

7   A.   Yes, sir.  A side view of it.

8   Q.   Is that how your patrol vehicle looked on June 14th, 2014?

9   A.   Yes, sir.

10  Q.   Now, you said you went to the office to pick up your patrol

11  vehicle, but you also said to pick up some of your gear as

12  well?

13  A.   Correct.

14  Q.   How were you dressed that day?  Let's start with your

15  uniform.

16  A.   I'm dressed as I am today.  The only difference now being

17  my undershirt color and my uniform of that day in June is a

18  sewn-on patch badge and an embroidered name tag.

19       Today I'm wearing the pin badge and the pin name plate.

20  Q.   In addition to your uniform, what other equipment did you

21  pick up at the office?

22  A.   My long guns and just my duty belt.

23  Q.   All right.  May I have Exhibit 8H.

24       Agent Pultorak, I'm handing you what's marked Government

25  8H.

1    A.  Sure.

2    Q.  Do you recognize that?

3    A.  Yes, sir.  That's my old duty belt.

4    Q.  Is that the duty belt you picked up on June 14th?

5    A.  Yes, sir.

6    Q.  You were wearing it that day?

7    A.  Correct.

8    Q.  How do you recognize it to be your duty belt?

9    A.  I've worn it for a few years and put it on every shift.

10   Q.  Now, does it look like it looked like the last time you saw

11   it?

12   A.  Yes.  Except no equipment in it.

13   Q.  So typically when you would pick this up, it would have

14   equipment in it?

15   A.  Yes, sir.

16            MR. MCCOY:  Your Honor, government moves to admit

17   8H.

18            MR. TONEY:  No objection.

19            THE COURT:  Admitted.

20      (Whereupon, Government's Exhibit 8H was received.)

21            MR. MCCOY:  May I walk by the jury to show them?

22            THE COURT:  Yes.

23      (Exhibit published.)

24   BY MR. MCCOY:

25   Q.  I would like you to turn, if you could, to Tab 8B in the

1   binder in front of you.

2   A.   Yes, sir.   8B?

3   Q.   Yes.

4   A.   Okay.

5   Q.   Do you recognize what's pictured in that image?

6   A.   Yes, sir.   That's the duty belt that you just handed me.

7              MR. MCCOY:   Your Honor, government moves to admit

8   8B.

9              THE COURT:   Admitted.

10      (Whereupon, Government's Exhibit 8B was received.)

11      (Exhibit published.)

12  BY MR. MCCOY:

13  Q.   So this is -- the jury just saw your duty belt with the

14  equipment out of it.   This a picture of your duty belt with the

15  equipment in it; is that correct?

16  A.   Yes, sir.

17  Q.   If you could, starting from your left -- or the left of the

18  picture to the right, describe what your duty belt contained.

19  A.   Two magazines for my service pistol, a taser with the

20  cartridge attached to it, a flashlight.   The handcuff pouch

21  would have a pair of handcuffs in it.   There's a light keeper

22  basically to put a large flashlight in the ring.   A key holder.

23      And next to that is my holster with my duty weapon in it.

24  Next to the holster is OC or a pepper spray pouch.   And next to

25  that is an extendable baton holder with the baton in it.

1   Q.   Let me ask you about the duty belt.   As far as positioning

2   on your body, we are looking at it obviously laid open on the

3   table?

4   A.   Yes, sir.

5   Q.   When you put the duty belt on, particularly this duty belt,

6   on which side would, for instance, the firearm versus the

7   handcuffs fall on your body?

8   A.   The handgun -- the pistol would be on my right side.   And

9   the handcuffs, they would be on my left.

10  Q.   So the belting mechanism, which is on either side of this

11  photograph now pictured --

12  A.   Yes.

13  Q.   -- that would be snapped in front of you?

14  A.   Correct.

15  Q.   You mentioned and you pointed out that one of the items on

16  your duty belt is your service weapon.

17      What type of service weapon is that?

18  A.   It's a Sig --

19      (Court Reporter asks the witness to repeat his answer.)

20  BY MR. MCCOY:

21  Q.   Can you repeat what type of weapon it is?

22  A.   I'm sorry.   Sig Sauer P229 .40 caliber.

23  Q.   And you spell Sig S-i-g?

24  A.   Yes, sir.

25  Q.   That was issued to you?

1    A.   Yes.

2    Q.   By BLM?

3    A.   Yes.

4    Q.   May I have Exhibit 8D, please.

5         I'm handing you what's been marked as Exhibit 8D.  Do you

6    recognize that?

7    A.   Yes, sir.  That's my service weapon.

8    Q.   Is that the service weapon you had with you on June 14th?

9    A.   Yes, sir, it is.

10   Q.   How do you know that is your service weapon?

11   A.   I recognize the light attached to it, and I also recognize

12   the serial number on it.

13   Q.   So you had already memorized the serial number on the

14   weapon?

15   A.   We write it down every time we go to the range to qualify,

16   so I have a pretty good idea of what it is, sir.

17            MR. MCCOY:  Your Honor, government moves to admit

18   Exhibit 8D.

19            MR. TONEY:  No objection.

20            THE COURT:  Admitted.

21       (Whereupon, Government's Exhibit 8D was received.)

22            MR. MCCOY:  May I show it to the jury?

23       (Exhibit published.)

24   BY MR. MCCOY:

25   Q.   You referenced there was a flashlight on the end of the

1    weapon; is that correct?

2    A.   Yes.

3    Q.   Why did you have that on the weapon?

4    A.   I obtained that when I had a dog, a K-9 in El Centro.   The

5    dog was retired when I moved up to the Mother Lode Field

6    Office, and I didn't switch my holster out.   So the light

7    stayed on the weapon.

8    Q.   Now, when you acquired your duty belt with your service

9    weapon, before you left on patrol, was your weapon loaded?

10   A.   Yes, sir.

11   Q.   And do you remember how many rounds were loaded into the

12   firearm?

13   A.   Total, 13.

14   Q.   And you pointed out there were magazine pouches or

15   magazines on the duty belt.   Were those also loaded with

16   ammunition?

17   A.   Yes.

18   Q.   And how many rounds did each of those hold?

19   A.   Each magazine carries 12 rounds.

20   Q.   So when you say that your service weapon had 13 rounds in

21   it, how is that possible?

22   A.   There was one round in the chamber of the weapon and the

23   fully loaded magazine.

24   Q.   Now, on June 14th, in the morning after you picked up your

25   gear, do you make a decision on which area of your territory

1   you're going to go and patrol at that point?

2   A.   Yes, sir.

3   Q.   What do -- which area did you decide to patrol?

4   A.   Up to the South Yuba campground.

5   Q.   This is the campground you referenced before?

6   A.   Yes, sir.

7   Q.   Why did you decide to go up there that day?

8   A.   This was in June, so it was summertime.  And it's our -- my

9   only campgrounds in the area.  So during the summertime it gets

10  pretty busy with visitation.

11  Q.   When you left the office to head to the South Yuba

12  campground, did you head directly there?

13  A.   No, sir.  I made a couple stops.

14  Q.   And what stops were those?

15  A.   I stopped at Edwards Crossing, at the bridge there at the

16  South Yuba River just to see if anybody was out and about.  And

17  after I cleared that, there's a spur road on the other side of

18  the river, I believe the north side from North Bloomfield Road,

19  there is a spur road that I pulled into.

20  Q.   And what type of road is this spur road?

21  A.   It's a dirt road.

22  Q.   I would like you to turn, if you could, to Exhibit 1B and

23  1C.

24       These have both been admitted.

25       If you could put up -- look at 1B first, if you would, then

1    1C for me.

2         (Exhibit published.)

3    A.  Okay.

4    Q.  Have you looked at 1C?

5    A.  Yes, sir.

6    Q.  And what's depicted in those photographs?

7    A.  That's the entrance of the spur road off from North

8    Bloomfield.

9         MR. MCCOY:  Your Honor, the government would move to

10   admit Exhibit 1C.

11        THE COURT:  Admitted.

12        (Whereupon, Government's Exhibit 1C was received.)

13        (Exhibit published.)

14   BY MR. MCCOY:

15   Q.  Turn to 1C.  Now we're looking at Exhibit 1C.

16        This is a picture of the spur road as well?

17   A.  Yes, sir, it is.

18   Q.  Is this just farther up the road?

19   A.  Yeah.  This is a little further off from North Bloomfield.

20   Q.  Now, why did you decide to drive up this road before you

21   got to the campground?

22   A.  I found folks camping.  This road levels out into a flat

23   area, and it is an open area.  I found folks camping up there

24   previously.

25   Q.  Are people allowed to camp up there?

1    A.   They are with certain limitations.

2    Q.   What are those limitations?

3    A.   There's no resource damage that you can cause or create,

4    and you can't have any open fires.

5    Q.   By "open fires," what do you mean by that?

6    A.   If it's not a designated fire pit, you can't have a fire.

7    Q.   Once you turned onto the spur road from North Bloomfield,

8    how far up the road did you proceed?

9    A.   Well, it levels out.  From that point it's about 40, 50

10   yards.

11   Q.   I would like you to turn to Tab 1A in the binder.

12   A.   Yes, sir.

13   Q.   Do you recognize this?

14   A.   Yes, sir.  The winding section that is more prevalent,

15   that's North Bloomfield Road.  And the section with the lone

16   truck, that's the level, open area off the spur road.

17           MR. MCCOY:  Your Honor, government moves to admit

18   1A.

19           THE COURT:  Admitted.

20      (Whereupon, Government's Exhibit 1A was received.)

21      (Exhibit published.)

22   BY MR. MCCOY:

23   Q.   So if you could, now that the jury has the exhibit in front

24   of them, could you describe that again for us?

25   A.   Yes, sir.  This winding section with all the vehicles

1    parked alongside it, that is North Bloomfield Road.

2    Q.  I believe if you touch the screen you should be able to --

3    A.  Highlight it?

4        There we go.  That's North Bloomfield Road.  And the spur

5    road starts where this white vehicle is, and it curves around

6    until you reach that truck.  Where the truck is, that's a

7    level, open area on the spur road.

8    Q.  If you could now, turn to Tab 1D.

9    A.  Yes, sir.

10   Q.  Do you recognize this?

11   A.  Yes, sir.  That is that level, open area.

12          MR. MCCOY:  Your Honor, I move to admit Exhibit 1D.

13          THE COURT:  Admitted.

14       (Whereupon, Government's Exhibit 1D was received.)

15       (Exhibit published.)

16   BY MR. MCCOY:

17   Q.  This is the flat area you referenced that you reach once

18   you go up the spur road?

19   A.  That's correct.

20   Q.  Now, when you got up to this flat area, what, if anything,

21   did you discover?

22   A.  I discovered somebody had dumped a mattress on that flat,

23   open area.

24   Q.  So what did you do?

25   A.  I put it into the back of my vehicle -- the bed of the

1   pickup truck.

2   Q.  Did anything unusual happen while you were dealing with

3   this mattress here in this flat area?

4   A.  Yes.  As I was dealing with that, a vehicle came off from

5   the left-hand side through a very brushed-in area and began

6   driving toward North Bloomfield Road.

7   Q.  Why did this vehicle catch your attention?

8   A.  Because the area it was coming from is completely

9   brushed-in, and it would be very difficult to drive a vehicle.

10  And it would be causing resource damage.

11  Q.  Is there any sign posted around this flat area leading to

12  this brushed-in trail that indicates the trail is closed to

13  traffic?

14  A.  No, sir.

15  Q.  Would you turn to Exhibit 1F, please.

16  A.  Yes, sir.  Okay.

17  Q.  Is this a picture of the brushed-in trail?

18  A.  Yes, it is.

19          MR. MCCOY:  Your Honor, I move to admit Government

20  Exhibit 1F.

21          THE COURT:  It is already in.

22      (Exhibit published.)

23          MR. MCCOY:  Sorry.  Thank you.

24  BY MR. MCCOY:

25  Q.  Is this an image of the brushed-in trail?

1    A.  Yes, it is.

2    Q.  So after you observed the Dodge pickup driving down the

3    trail, what did you do?

4    A.  I activated my emergency lights on my patrol vehicle and

5    pulled in behind it to attempt a vehicle stop on it.

6    Q.  And did the truck stop right away?

7    A.  No, sir.

8    Q.  How long after you pulled behind it did it take before it

9    stopped?

10   A.  Not long.  It was a couple of seconds.  I had to activate

11   my emergency air horn a couple of times.

12   Q.  If you could, turn to Exhibit 4U.

13   A.  Yes, sir.

14   Q.  What is this?

15   A.  That's the vehicle that I made a stop on.

16        MR. MCCOY:  Your Honor, the government moves to admit

17   Exhibit 4U.

18        THE COURT:  Admitted.

19     (Whereupon, Government's Exhibit 4U was received.)

20     (Exhibit published.)

21   BY MR. MCCOY:

22   Q.  What happened after this Dodge pickup truck came to a stop?

23   A.  The driver attempted to exit the vehicle.

24   Q.  And what did you do when you saw him attempting to exit the

25   vehicle?

1    A.   I yelled at him to return into the vehicle, to sit back

2    down into the truck.

3    Q.   Why did you tell him to get back into the car?

4    A.   In my training and experience -- I don't know what the

5    driver's intentions are without me asking him to step out of

6    the vehicle.  I'm unsure of what his motives are.  So I had him

7    step back into the vehicle so I can control him and be more

8    aware of what he's doing.

9    Q.   And did he comply with your order?

10   A.   Yes, sir, he did.

11   Q.   What did you do next?

12   A.   I approached the vehicle.  And then I got the driver's --

13   his license, registration, proof of insurance.

14   Q.   And through his driver's license were you able to identify

15   the driver?

16   A.   Yes, sir.

17   Q.   Who did he come back as?

18   A.   Brent Douglas Cole.

19   Q.   Now, do you recognize Mr. Cole here in the courtroom today?

20   A.   Yes, sir.  He's sitting right there.

21   Q.   Would you please point to him and identify an article of

22   clothing he's wearing.

23   A.   Yes, sir.  He's wearing a green plaid shirt.

24        MR. MCCOY:  Your Honor, let the record reflect the

25   witness has identified the defendant, Brent Cole.

1        THE COURT:  Yes.

2   BY MR. MCCOY:

3   Q.  In addition to Mr. Cole, were there any other occupants in

4   this Dodge pickup truck?

5   A.  Yes.  There were two more occupants in the vehicle.

6   Q.  Were you able to identify them as well?

7   A.  Yes, sir, I was.

8   Q.  And who did you identify them to be?

9   A.  Kevin and Michael Radon.

10  Q.  Had you had any prior contact with either Mr. Cole, Kevin

11  Radon or Michael Radon?

12  A.  The only occupant I had previous encounters with was

13  Michael Radon.

14  Q.  Under what context did you have previous contact with him?

15  A.  It was several weeks earlier.  I contacted him while he was

16  camping further up North Bloomfield Road.

17  Q.  And what was the nature of your conversation with him once

18  you contacted him?

19  A.  I just wanted him to be aware of the 14-day camping limit

20  on BLM land, as well as not to cause any resource damage or

21  have any fires where he was camping.

22  Q.  Once you had identified the occupants of the vehicle, what

23  did you do?

24  A.  I ran the information through the Forest Service Dispatch

25  Center.

1   Q.  And what, if anything, was returned after you ran the

2   information?

3   A.  The driver, Mr. Cole, he came back clear and valid.  One of

4   the occupants, I believe it was Kevin, he came back suspended.

5   I'm not sure if one or both of them were suspended, but all

6   three came back with negative wants or warrants.

7   Q.  At some point did you explain to Mr. Cole, the driver, why

8   you had pulled him over?

9   A.  Yes, sir.

10  Q.  What did you tell him?  What was the reason for why you

11  pulled him over?

12  A.  He was driving in an area that was closed to vehicular

13  traffic.

14  Q.  What was his response when you told him this?

15  A.  He said there aren't any signs and this is BLM land.

16  Q.  What was his tone when he was communicating with you?

17  A.  He was pretty argumentative with me.

18  Q.  Did this discussion -- was that the extent of the

19  conversation, or did it go on past that?

20  A.  No.  It really wasn't a discussion.  He just keep

21  repeating, this is BLM land to my saying that this was a closed

22  area to vehicular traffic, you can't drive up here.  "But this

23  is BLM land," that kept going in circles like that for a couple

24  of times.

25  Q.  And how did it end?

178

1   A.  It ended with me making sure that Mr. Cole was aware that

2   it was closed to vehicular traffic and if he was found in that

3   area again he would be cited at least, if not possibly have his

4   vehicle impounded.

5   Q.  Did you issue Mr. Cole a citation at that point?

6   A.  No, sir.

7   Q.  Just a warning?

8   A.  Just a verbal warning.

9   Q.  At any point during the traffic stop with Mr. Cole, did you

10  remove your handcuffs from your duty belt?

11  A.  No, sir.

12  Q.  Your taser?

13  A.  No, sir.

14  Q.  Gun?

15  A.  No, sir.

16  Q.  Anything from your duty belt?

17  A.  No, sir.

18  Q.  How long in total would you estimate this traffic stop

19  lasted?

20  A.  It was 15 minutes, if that.

21  Q.  What did you do next?

22  A.  After Mr. Cole and his occupants cleared the area in their

23  vehicle, I drove my vehicle -- my patrol vehicle up the area

24  where I saw him driving down from.

25  Q.  The brushed-in trail?

1   A.  Correct.

2   Q.  Now, we've seen your vehicle, and we've seen Mr. Cole's

3   vehicle.  Yours is considerably larger?

4   A.  That's correct.

5   Q.  How did you get your vehicle up that area?

6   A.  Very carefully.

7   Q.  Were you successful in getting it up there without damage?

8   A.  No, sir.  I damaged the rear slider window.

9   Q.  Would you please turn to Exhibit 4T?

10  A.  4T.  Yes, sir.

11      Yes, sir.

12  Q.  And what is that a picture of?

13  A.  That's a picture of the basically shattered rear slider

14  window.

15      MR. MCCOY:  Your Honor, I move to admit Government

16  4T.

17      THE COURT:  Admitted.

18      (Whereupon, Government's Exhibit 4T was received.)

19      (Exhibit published.)

20  BY MR. MCCOY:

21  Q.  It's a little difficult to tell in the picture, but would

22  you use your finger to point to the window that was shattered

23  when driving up the trail?

24  A.  Yes, sir.  (Indicates.)

25  Q.  Now, what, if anything, did you discover as you proceeded

1    up the trail?

2    A.   It basically opened up into a campsite where I stopped my

3    vehicle.

4    Q.   Okay.  What did you find in the campsite?

5    A.   Predominately, the first things that I saw were two

6    motorcycles.  Beyond that I saw some bedding, food stuffs, and

7    basic camping equipment.

8    Q.   In regards to the motorcycles, did you attempt to determine

9    ownership of those vehicles?

10   A.   Yes, sir.  One motorcycle had a California registration

11   plate on it.  The second motorcycle had no such registration on

12   it, but it did have a VIN attached to it.

13   Q.   I'm showing you what's already been admitted as Government

14   2F.  Do you recognize what's in that photograph?

15   A.   Yes, sir.  That's the motorcycle that did have the

16   California registration plate attached to it.

17   Q.   But what was the issue with the California registration?

18   A.   It was expired since 2009.

19   Q.   4E, please.

20        Showing you what's been admitted as Exhibit 4E, what is

21   this?

22        (Exhibit published.)

23   A.   That's a second motorcycle with no registration attached to

24   it, but I was able to get the VIN off from that one.

25   Q.   So after you located these motorcycles in the campsite, and

1  as you said got the information off it, what did you do?

2  A.  I called both the tag and the VIN into the Forest Service

3  dispatch.

4  Q.  And what, if anything, did you learn from dispatch?

5  A.  I learned the one with the tag was expired since 2009, and

6  I learned that the motorcycle where I got the VIN -- the Forest

7  Service dispatch termed it as a non-recovered vehicle.

8  Q.  What did that mean?

9  A.  I wasn't exactly sure.

10  Q.  Did the dispatch provide any clarification on what that

11  meant?

12  A.  No, they did not.

13  Q.  So what did you do after you received this information?

14  A.  I asked if there was a CHP or California Highway Patrol

15  unit that would be able to respond to my location.

16  Q.  Why would you want CHP to respond to your location?

17  A.  Perhaps he would be better help with determining what the

18  non-recovered status of the vehicle is, as well as to help

19  impound one or both of the vehicles.

20  Q.  Had you already made a decision at that point on what you

21  were going to do with the vehicle that had expired

22  registration?

23  A.  Yes, sir.  If I got the resources to do it, it would be

24  impounded.

25  Q.  So you called out for assistance through your Forest

1    Service dispatch?

2    A.   Yes.

3    Q.   And what did they tell you?

4    A.   They said there was a CHP unit available, but they did not

5    have a time frame of when they would arrive to my location.

6    Q.   Now, let me ask you this:   Stepping back, you stated -- you

7    just testified that you decided that you were going to impound,

8    at the very least, the motorcycle with the expired

9    registration?

10   A.   Yes.

11   Q.   As a ranger with the BLM -- with the Bureau of Land

12   Management, did you have the legal authority to impound that

13   vehicle?

14   A.   Yes, sir.  I'm also a state peace officer.  I took the

15   PC-832 class while in El Centro, California, which gives me the

16   authority to fill out a CHP 180 form or an impound form, and to

17   use the authority codes thereby impounding vehicles.

18   Q.   Can I have you turn to Tab 3O and 3P.

19        Just let me know when you have a chance to look at them.

20   A.   Yes, sir.  I did.

21   Q.   And what's depicted in those photographs?

22   A.   The first, 3O, is a view of the gas tank of the motorcycle

23   that had the registration tag on it.  And it has one of our BLM

24   warning stickers attached to the gas tank.

25        And the next one is a close-up of the tag that's on -- the

1  warning tag that's on the gas tank of the motorcycle.

2  　　　　MR. MCCOY:  Your Honor, I move to admit Government's

3  Exhibit 3O and 3P.

4  　　　　THE COURT:  Admitted.

5  　　(Whereupon, Government's Exhibits 3O and 3P were received.)

6  　　(Exhibit published.)

7  BY MR. MCCOY:

8  Q.  So this is -- you were saying this is a close-up of the

9  warning sticker you placed on it?

10  A.  Yes, sir.

11  Q.  Did you place the sticker on the bike?

12  A.  I did, yes.

13  Q.  Why did you place the sticker on the bike?

14  A.  Like I said, if I had the resources and everything worked

15  out, the vehicle -- the motorcycle would be impounded.  I

16  attached the sticker to it.  If the resources didn't all come

17  together to make that happen, and if I had to depart the area,

18  if the owner returned, they would find the sticker and be aware

19  of the issue.

20  Q.  Once you were informed that CHP -- or a CHP unit would be

21  responding to your location, what did you do?

22  A.  I did a couple -- I did the stickers and looked around the

23  camp a little bit more generally.  And then I drove my

24  vehicle -- my patrol vehicle back down to the intersection of

25  North Bloomfield Road and the spur road.

1    Q.  Why did you do that?

2    A.  If I had given the camp as my location, nobody would have

3    found me.  That intersection is a more visible location for

4    them to intersect with me.

5    Q.  It was CHP Officer Brant Hardin that responded to your

6    location?

7    A.  Yes.

8    Q.  In what type of vehicle did Officer Hardin respond?

9    A.  He was driving a fully marked California Highway Patrol

10   Ford Explorer, I believe.

11   Q.  How was he dressed?

12   A.  He was dressed in a California Highway Patrol uniform.

13   Q.  What happened after Officer Hardin arrived?

14   A.  I gave him the information that I wrote down in my notebook

15   about the two motorcycles and asked if he wanted to run them,

16   which he did.

17   Q.  And what, if anything, did he discover when he ran them?

18   A.  He ran the VIN first.  It came back almost immediately as a

19   stolen vehicle.

20   Q.  That was for the second motorcycle?

21   A.  Correct.

22   Q.  Did he learn anything more regarding the first motorcycle?

23   A.  He didn't run the tag then.  I'm not sure if he did later

24   on down the line, but he just ran the VIN and got the stolen

25   status.

1   Q.   Once you had the stolen status, what did you and

2   Officer Hardin decide to do?

3   A.   We came up with a plan for logistics of the two bikes.   And

4   it was determined that we would drive up to the flat area on

5   the spur road, park there, and then walk up to the campsite.

6   Q.   You weren't going to attempt to drive your vehicle up a

7   second time?

8   A.   No, sir.   Nor would I make him drive his brand-new vehicle

9   through there either.

10   Q.   Now, once you got to the -- parked your vehicles on the

11   flat area, approximately how far is it from the flat area where

12   you left your vehicles to the campsite?

13   A.   About 300 yards.

14   Q.   What happened after you and Officer Hardin arrived at the

15   campsite?

16   A.   I pointed out which motorcycle was which, which was the

17   stolen and which was the solely expired one.   After that we

18   came up with a plan to -- the stolen motorcycle had some parts

19   laying around it, body parts, as well as mechanical parts.   So

20   we were going to gather those up, and after that was complete,

21   for the most part we were going to roll the bikes down to the

22   flat area for the impound, to make it easier for them to

23   collect the vehicles.

24   Q.   While you were in the campsite picking up the parts as you

25   mentioned -- the motorcycle parts, did you hear something that

1  caught your attention?

2  A.  Yes, sir.  I heard some rustling and crunching of brush.

3  Q.  And were you able to determine whether -- based just on

4  hearing the sound, what it was?  Was it an animal or human?

5  A.  I judged it to be a human.

6  Q.  Why did you judge it to be a human?

7  A.  I've spent quite a bit of time in the woods with my job, as

8  well as personal time.  I have done multiple hunting patrols.

9  And, like I said, I have spent a lot of time in the woods and

10  feel that I can determine the difference between the sound of

11  an animal, say a deer, and a human in the woods.

12  Q.  How long after you and Officer Hardin had arrived, had

13  hiked up, made it to the campsite before you heard the sound?

14  How long had it been?

15  A.  By the time we made it up to the campsite, it wasn't long.

16  About ten, 15 minutes.

17  Q.  Now, what did you do when you heard the sound?

18  A.  I dropped what I was doing and began walking toward the

19  tree line, toward the first motorcycle.  And I yelled out:

20  Hello.  Police.

21  Q.  If I could have Government Exhibit 5B.

22      (Exhibit published.)

23      Ranger Pultorak, I'm showing you what's been previously

24  admitted as 5B.

25  A.  Yes, sir.

1    Q.   What is this?

2    A.   That's an overview of the campsite area.

3    Q.   Does this diagram overview of the campsite comport with how

4    you remember the campsite to look on June 14th?

5    A.   For the most part.  The motorcycle here -- sorry about

6    that -- it's a little off.  It's been moved a little bit.

7    Q.   Where was it located, as far as you remember, when you

8    arrived in the campsite?

9    A.   It was closer to the tree line, right about -- not that far

10   in.  (Indicates on diagram.)

11       It is not very detailed.  About right on the edge of the

12   tree line.

13   Q.   Was the front wheel into the brush itself, or was it still

14   in the clearing?

15   A.   It was still in the clearing.  It was just way closer to

16   the tree line than depicted on this diagram.

17   Q.   All right.  If you don't mind, I'm going to erase those

18   marks.

19   A.   Thank you.

20   Q.   Now, I would like you to mark on the diagram where you were

21   located when you first heard this rustling sound.

22   A.   Officer Hardin and I were over by the second motorcycle,

23   and I was about in this general area where I first heard the

24   sounds.  (Indicates on diagram.)

25   Q.   Where was Officer Hardin located?

1  A.  He was also by the motorcycle.  I believe he was on the

2  other side of it.

3  Q.  If you could, also mark on the diagram approximately where

4  you heard the rustling come from.

5  A.  It was generally this area.  (Indicates on diagram.)

6  Q.  So what did you do once you heard the rustling?

7     You said that you began to approach; is that correct?

8  A.  Yeah.  I dropped whatever I was doing to help

9  Officer Hardin, and I began walking toward the tree line from

10  where I was toward that way.  And I yelled out:  Hello.

11  Police.

12  Q.  Did you get a response when you yelled out:  Hello.

13  Police.

14  A.  No, sir.

15  Q.  What did you do?

16  A.  I yelled a second time a little louder:  Hello.  Police.

17  Q.  Any response at that point?

18  A.  I did hear a response coming from the general location of

19  where I heard the rustling.

20  Q.  What was that response?

21  A.  It was Mr. Cole.  He said:  Yeah.  It is me.  You dealt

22  with me earlier.  I'm just coming up to get my stuff.

23  Q.  If you could, on the diagram, show at this point when you

24  do first view -- get a sight of Mr. Cole, where you're located

25  and where he's located.

1  A.  He's about in this general area.  And I'm approaching the

2  first motorcycle right about here.  (Indicates on diagram.)

3  Q.  What is the terrain like where you are in the campsite?

4  A.  The campsite itself and that trail is pretty level.  You're

5  going on a slight decline as you're going toward North

6  Bloomfield.  But where Mr. Cole is, it's going downhill toward

7  where he was.

8  Q.  But even though he was downhill, you could see him at that

9  point?

10  A.  Yes, sir.

11  Q.  Did you recognize him when he identified himself?

12  A.  Yes.  I recognized him as the driver of the vehicle that I

13  had stopped earlier.

14  Q.  How was he dressed?

15  A.  I believe he was wearing jeans and some type of button-down

16  shirt.  I'm not exactly sure how it fastened, but button down

17  or zipper, long-sleeved shirt.

18  Q.  Did this top or shirt, did it extend past his waist?

19  A.  It did.

20  Q.  His belt area?

21  A.  Yes.

22  Q.  If you could, tell us what happened next.

23  A.  Well, as he was replying, he was continuing to walk toward

24  the tree line toward where I was located.

25       As he finished talking, saying I'm coming up to get my

1    stuff, he was about at the tree line.  One more step, then he

2    reached the edge of the bushes into the open area, the camp

3    where I told him to stop.

4    Q.  Why did you tell him to stop?

5    A.  So that I could ask him if he had any weapons.  And I

6    didn't want him getting all the way into the camp.  I didn't

7    know exactly if there were any weapons inside the camp itself.

8    Q.  What was your concern, if any, at that point?

9    A.  Again, I didn't know what his intentions were.  And I

10   didn't want him gaining access to anything that might be

11   dangerous to myself or Officer Hardin in the camp.

12   Q.  So you told him to stop, and then what happened?

13   A.  He complied.  He stopped.  He was at the edge of the tree

14   line.  Then I asked him:  Do you have any weapons.

15   Q.  What was his response?

16   A.  He said:  Yes, I do.

17   Q.  What did you do at that point?

18   A.  I told him to turn around.

19   Q.  Why did you want him to turn around?

20   A.  Because he told me he was armed.  There is a stolen vehicle

21   in the camp.  And basically I wanted to detain him for further

22   investigation and figure out exactly what was going on.

23   Q.  Did Mr. Cole comply with your order to turn around?

24   A.  No, sir.  He said:  No, I'm not turning around.

25   Q.  So what did you do?

1    A.   At that point I pulled my handcuffs out of my pouch and

2    began taking a step forward while saying:  Turn around now.

3    Q.   At this point, if you could on the diagram, point out where

4    you were positioned and where the defendant was positioned at

5    the time that you pulled out your handcuffs.

6    A.   Yes, sir.  (Indicates on diagram.)

7        I was off to the left though.  He was at the tree line.

8    About there.  It was a little further down on the screen.

9    Q.   Is this the approximate location when you took out the

10   handcuffs?

11   A.   Yes, sir.

12   Q.   Once you removed the handcuffs, what did you say?

13   A.   When I removed my handcuffs, I told him to turn around now.

14   Q.   Let me ask you about the handcuffs.  We have seen your duty

15   belt.  You pointed out that your -- that the pouch for the

16   handcuffs was on your left-hand side; is that correct?

17   A.   Yes, sir.

18   Q.   Was that the case on June 14th, as well?

19   A.   Yes.

20   Q.   So when you reached for your handcuffs, which hand did you

21   use to reach for your handcuffs?

22   A.   I used my left hand.

23   Q.   Can I have Exhibit 8I.

24       I'm handing you what's been marked as Government Exhibit

25   8I.

1      Do you recognize those?

2   A.  Yes, sir.  Those are the handcuffs that were on my duty

3   belt.

4   Q.  Those are the ones you had in your position on June 14th?

5   A.  Yes, sir.

6   Q.  How do you recognize them as your handcuffs?

7   A.  I've had that pair for a few years and cleaned them

8   numerous times, taken them in and out of my pouch multiple

9   times.

10      MR. MCCOY:  Your Honor, the government moves to admit

11  Government Exhibit 8I into evidence.

12      MR. TONEY:  No objection.

13      THE COURT:  Admitted.

14      (Whereupon, Government's Exhibit 8I was received.)

15      (Exhibit published.)

16  BY MR. MCCOY:

17  Q.  I would like you to turn, if you would, to Tabs 2P and 2Q

18  in the binder.

19  A.  Yes, sir.

20  Q.  What are these?

21  A.  Pictures of my handcuffs.

22      MR. MCCOY:  Government moves to admit 2P and 2Q into

23  evidence.

24      THE COURT:  Admitted.

25      (Whereupon, Government's Exhibits 2P and 2Q were received.)

1          (Exhibit published.)

2     BY MR. MCCOY:

3     Q.  You testified that you removed the handcuffs from the left

4     side of your duty belt, correct?

5     A.  Yes.

6     Q.  At that point you issued another order?

7     A.  Yes, sir.

8     Q.  What was that order?

9     A.  Turn around now.

10    Q.  What was the defendant's reply?

11    A.  I'm not turning around now.

12    Q.  Then what happened?

13    A.  I saw him blade off, take a blading stance to me.  His

14    right foot went back as well as his left shoulder.  I'm sorry.

15    Right shoulder and right hand.  And he reached to his

16    waistband.

17          MR. MCCOY:  Your Honor, may I have the witness

18    demonstrate this for the jury.

19          THE COURT:  Okay.

20    BY MR. MCCOY:

21    Q.  Can you step down.

22       If you could, demonstrate what you just described to the

23    jury.

24    A.  (Witness steps out of the witness stand to demonstrate to

25    the jury.)

1    He said, I'm not turning around now, when he started

2    blading off and stepped back with his right foot.  And his

3    right shoulder and right hand went to his waistband.

4    Q.  Thank you.

5    A.  (Witness resumes the witness stand.)

6    Q.  What was your reaction when you saw him take this stance?

7    A.  I was a little alarmed.  I thought he was going for the

8    weapon he said he had.

9    Q.  At that time did you see a weapon on him?

10   A.  Not when he started blading off, no.

11   Q.  What did you decide to do at this point?

12   A.  I decided to do something.  Move.

13   Q.  Did you start moving back?

14   A.  I started moving to my right.

15   Q.  If I can have 5B again.

16       (Exhibit published.)

17       Now, if you could, I know it is difficult with the

18   sensitive pointer, but if you could put the points back on the

19   diagram where you were located and where the defendant was

20   located at the time that you saw him take this blading action.

21   A.  Okay.  (Indicates on diagram.)

22   Q.  So you both moved, or is that just an X?

23   A.  No.  I thought you said mark both of them.

24   Q.  No.  I'm sorry.  Let me step back again.

25       I'm looking for -- first of all, put a mark where the

1  defendant was standing at the time he took the blading action.

2  A.  Okay.  I'm sorry.  (Indicates on diagram.)

3  Q.  And where were you located?

4  A.  (Indicates on diagram.)

5  Q.  You just testified once you saw him take this action, you

6  began to move to the right; is that correct?

7  A.  That's correct.

8  Q.  And if you could, indicate by moving your finger in

9  whichever direction you were moving at the time.

10 A.  (Indicates on diagram.)

11 Q.  What happened next?

12 A.  I saw him draw something big and silver out of his

13 waistband.

14 Q.  Did you know what it was?

15 A.  I took it to be a gun.

16 Q.  So what did you do?

17 A.  As I was moving to my right, I was beginning to crouch down

18 as well as draw my weapon -- my service weapon.

19 Q.  What happened next?

20 A.  As I was doing that, I heard a loud bang in my left ear,

21 and I felt a twinge of pain in my left shoulder.

22 Q.  Do you know what had happened?

23 A.  I assumed I was shot.

24 Q.  So what did you do?

25 A.  I continued to draw my weapon and bring it up on target and

```
1    return fire.
2    Q.  Let me ask you this:  At the time that you heard this loud
3    bang and you felt this twinge in your shoulder, where was your
4    service weapon at that time?
5    A.  I was in the process of drawing it.
6    Q.  Had you drawn the weapon up on point?
7    A.  No, sir.
8    Q.  And what do you mean by drawing it up on point?
9    A.  To bring it up on target.
10   Q.  So where approximately was your weapon at the time that you
11   heard the bang and felt the twinge?
12   A.  I believe it was somewhere -- cleared the holster, to me
13   raising it up, but not on target yet.
14   Q.  Were you able to get your weapon at some point up on
15   target?
16   A.  Yes, sir.  Eventually.
17   Q.  What did you do at that point?
18   A.  I began returning fire, as well as moving to my right
19   still.
20   Q.  Had you fired any rounds prior to hearing this bang and
21   feeling this twinge in your shoulder?
22   A.  No, sir.
23   Q.  Now, why did you start -- let me step back.
24       Why did you remove or decide to draw your weapon from its
25   holster?
```

1  A.  Because I perceived a deadly threat.  I saw imminent threat

2  of serious bodily injury or death to myself or to my fellow

3  officer that was also in the campsite.

4  Q.  And why then did you decide to actually fire rounds once

5  your weapon was up and ready?

6  A.  Because I heard that loud bang and felt the pain and taking

7  it to mean that I was shot and Mr. Cole was firing at me openly

8  and actively.

9  Q.  After you clear your weapon past the holster and put it on

10  point and fire rounds, where are you located at this point?

11  A.  I'm not exactly sure.  Off to my right.  Probably about

12  here.  (Indicates on diagram.)

13  Q.  Where is Mr. Cole?

14  A.  As far as I know, I didn't see him move from the last I saw

15  him.  (Indicates on diagram.)

16  Q.  Was he still focused on you during this period of time?

17  A.  As soon as I started moving -- I saw that barrel pointed

18  right at me, and when I started moving, I lost sight of the

19  barrel and if it was tracking me or not.

20  Q.  Why were you moving?

21  A.  Don't be where the bullet is going to hit.

22  Q.  And in which direction were you moving at this point?

23  A.  Off to my right.

24  Q.  Could you show it on the diagram?

25  A.  Yes, sir.  (Indicates.)

1   Q.  So you are moving down the trail?

2   A.  Yes, sir.

3   Q.  Now, you previously testified that your first reactions --

4   or action was to remove your handcuffs from your -- from the

5   pouch and you brought them up, correct?

6   A.  That's correct.

7   Q.  This is prior to removing your weapon?

8   A.  That's correct.

9   Q.  Prior to drawing your weapon, did you put your handcuffs

10  back into the pouch?

11  A.  No, sir.

12  Q.  Where were your handcuffs at the time that you drew your

13  weapon?

14  A.  They were still in my left hand.

15  Q.  Did you realize you still had your handcuffs in your hands?

16  A.  I did eventually.

17  Q.  But not at the time you were firing?

18  A.  That's correct.

19  Q.  Where was Officer Hardin while this was taking place?

20  A.  To be honest, I don't know where he was after I left him at

21  the motorcycle picking up the parts.  I'm not sure exactly

22  where he was.

23  Q.  And why did you not have a view of him?

24  A.  I was focused on Mr. Cole and what was happening there.

25  Q.  Do you know how long this exchange of gunfire took place?

1    A.   A couple seconds.

2    Q.   And did you -- do you know how many rounds of ammunition of

3    bullets that you actually fired at the defendant?

4    A.   Not at that time.

5    Q.   But subsequently you learned?

6    A.   I still don't know, but I guess about seven.

7    Q.   Now, where did you end up prior -- or at the time the

8    gunfight gunfire stopped?

9    A.   After the gunfire stopped, I was about here.

10         (Indicates on diagram.)

11   Q.   What did you do when you reached that point?

12   A.   I realized I had my handcuffs in my hands still.  I dropped

13   them and reloaded my pistol.

14   Q.   Why did you reload your pistol?

15   A.   I'm not sure how many rounds I expelled, and I had two

16   fresh magazines on my belt.

17   Q.   At the time that you reloaded your pistol, were you still

18   hearing gunfire?

19   A.   At that point, no.

20   Q.   And did you know where Officer Hardin was at that point?

21   A.   Not when I was reloading my weapon, no.

22   Q.   What happened after you reloaded your weapon?

23   A.   I hear Officer Hardin yell out:  Drop the weapon.  Drop the

24   gun.

25   Q.   And then what happened?

1    A.   I honed in where Officer Hardin was, and I hear Mr. Cole

2    say:  I dropped the weapon.  I threw it away.

3    Q.   What happened next?

4    A.   At that point Officer Hardin says to me:  Tad.  I say:

5    Yes, sir.  And he says:  Come over here.  I say:  Okay.  I drop

6    down and pick up the magazine that I dropped, put it in another

7    one of my pouches, then move over to Officer Hardin's location.

8    Q.   Let me ask you, before we talk about what happened after

9    you moved to Officer Hardin's location, you mentioned you had

10   the handcuffs in your hand until you reloaded your magazine; is

11   that correct?

12   A.   Yes.

13   Q.   And you said that you dropped them at that point?

14   A.   Before I reloaded my pistol, yes, I dropped them.

15   Q.   So when you went down to pick up the magazine that you had

16   dropped, did you also retrieve your handcuffs?

17   A.   No, sir.

18   Q.   So you left them where you had dropped them?

19   A.   Correct.

20   Q.   When Officer Hardin called you over, was your gun still

21   drawn?

22   A.   Yes, sir.

23   Q.   And why was it drawn?

24        Why did you keep it out?

25   A.   I still don't know what a threat Mr. Cole posed at that

1    point.

2    Q.  And where were you pointing the weapon?

3    A.  The last spot that I saw Mr. Cole.

4    Q.  When Officer Hardin calls you over, if you could, point on

5    the diagram where Officer Hardin was.

6    A.  I don't know if I can get it exactly on this.

7    Q.  Or as close to exact as possible.

8    A.  He was about here.  (Indicates on diagram.)

9    Q.  And did you join him at that location?

10   A.  Yes.

11   Q.  Did he also have his firearm out and pointing down towards

12   where Mr. Cole was?

13   A.  He did, yes.

14   Q.  Once you reached Officer Hardin's location, were you able

15   to see where the defendant was?

16   A.  Yes.

17   Q.  And where was he located?

18   A.  He was generally in the same spot where I last saw him

19   before the gunfire started.  (Indicates on diagram.)

20       Right about there.

21   Q.  Was he still standing?

22   A.  No.  He was on the ground.

23   Q.  And what, if anything, did you and Officer Hardin decide to

24   do at that point?

25   A.  We decided that I would provide cover and Officer Hardin

1   would go up and handcuff Mr. Cole.

2   Q.  And why were you providing cover if Mr. Cole was down on

3   the ground?

4   A.  We had just been in an active gunfight and still, again,

5   I'm not sure of what threat he posed to us.

6   Q.  Other than Mr. Cole, were there any other concerns you had

7   about safety or security for either you or Officer Hardin?

8   A.  Absolutely.  When I contacted Mr. Cole earlier, he was with

9   two other individuals who I did not see in the area at that

10  time.  And I was just questioning where they might be.

11  Q.  What happened after you and Officer Hardin began to

12  approach the defendant?

13  A.  We put him on his belly so that Officer Hardin can handcuff

14  him behind his back.

15  Q.  Then what happened?

16  A.  He was secured, handcuffed behind the back.  Officer Hardin

17  said he was going to go down to the truck and get a medical

18  kit, if I could cover Mr. Cole in the meantime.

19  Q.  And did Officer Hardin depart to get the medical kit?

20  A.  Yes, sir, he did.

21  Q.  What did you do at this point?

22  A.  I did what I said I would do.  I still provided cover and

23  scanned the area for the other two individuals.

24  Q.  Now, did you have radio coverage where you were in the

25  campsite?

1   A.   Yes.

2   Q.   Were you able to radio out the events to your dispatch?

3   A.   Yes, sir.  After Officer Hardin left, I got onto my

4   portable radio and advised the Forest Service dispatch that

5   shots had been fired.

6   Q.   How long was Hardin away from the campsite before he

7   returned?

8   A.   I couldn't tell you exactly.  I didn't look at my watch so

9   I don't know the time frame.  Anywhere from five to 20 minutes.

10   Q.   Once he returned, did he -- what did he do?

11   A.   He asked me if I was okay.  And I said that I was fine at

12   the moment.  And then he began administering emergency care to

13   Mr. Cole.

14   Q.   What were you doing during this time?

15   A.   I was still providing cover.

16   Q.   Now, at some point during all of this did you realize you

17   had been shot?

18   A.   Yes, sir.  After Officer Hardin went down to the vehicles,

19   I did a self-assessment on myself and determined that I saw a

20   blood stain that was getting larger on my left shoulder.

21   Q.   Handing you 8J.

22   A.   Yes, sir.

23   Q.   I have gloves if you would like to use them?

24   A.   It is my blood, so I'm fine.  Thank you.

25   Q.   What do you recognize that to be?

1   A.   This is my uniform shirt that I was wearing at the time.

2   Q.   How do you recognize it as your uniform shirt?

3   A.   It has my name right here.

4   Q.   All right.

5        MR. MCCOY:   Your Honor, government moves to admit

6   Government Exhibit 8J into evidence.

7        MR. TONEY:   No objection.

8        THE COURT:   Admit.

9   (Whereupon, Government's Exhibit 8J was received.)

10   (Exhibit published.)

11   BY MR. MCCOY:

12   Q.   If you could, also turn to 7D and 7E in the binder, please.

13   A.   I'm sorry.  D as in David?

14   Q.   D as in David.  E as in Echo.

15   A.   Thank you.

16   Q.   What are these photographs of?

17   A.   One is a general overview of my uniform shirt that you just

18   handed me.  The other is a close-up of where I was bleeding on

19   my uniform shirt you just handed me.

20        MR. MCCOY:   Your Honor, government moves to admit

21   Exhibits 7D and 7E into evidence.

22        THE COURT:   Admitted.

23   (Whereupon, Government's Exhibits 7D and 7E were received.)

24   (Exhibit published.)

25   ///

1   BY MR. MCCOY:

2   Q.  7D please and 7E.

3       (Exhibits published.)

4       Now, were you wearing a ballistic vest under your uniform

5   shirt?

6   A.  Yes.

7   Q.  If you could, turn to Tab 7F and 7G.

8   A.  Okay.

9   Q.  And what are those photographs of?

10  A.  Those are photos of my ballistic vest.

11       MR. MCCOY:  Your Honor, government moves to admit 7F

12  and 7G into evidence.

13       THE COURT:  Admitted.

14       (Whereupon, Government's Exhibits 7F and 7G were received.)

15       (Exhibit published.)

16  BY MR. MCCOY:

17  Q.  Back to 7F.

18       (Exhibit published.)

19       If you could, describe how you were wearing the ballistic

20  vest on June 14th.

21  A.  Yes, sir.  That is showing the back panel, so that segment

22  would be across my back, and the front panel is underneath it.

23  Q.  7G.

24       (Exhibit published.)

25       And what is this a photograph of?

1   A.   I believe that's the top left section of the back panel.

2   Q.   At the time you were doing the self-assessment, you said

3   you noticed a blood stain growing on your shirt; is that

4   correct?

5   A.   That's correct.

6   Q.   At any point while you were still at the campsite did you

7   remove your shirt and ballistic vest?

8   A.   No, sir.

9   Q.   So you did not actually see your wound?

10   A.   No.

11   Q.   Do you know what effect, if any, your ballistic vest had on

12   the bullet that hit you?

13   A.   I'm not sure.  It looked like it went right through it.

14   Q.   While you were in the campsite while Officer Hardin was

15   away, were you feeling lightheaded or at any point in extreme

16   pain?

17   A.   No, sir.

18   Q.   How long after Officer Hardin arrived on scene and he began

19   providing medical care to the defendant was it before

20   additional law enforcement responded?

21   A.   Again, I'm not exactly sure.  I wasn't looking at my watch.

22   I'm assuming about ten, 15 minutes.

23   Q.   What happened when additional law enforcement responded to

24   the scene?

25   A.   They began also administering EMS to Mr. Cole.

1    Q.  Were you given any medical aid on scene?

2    A.  No, sir.

3    Q.  At some point were you transported to a hospital?

4    A.  Eventually, yes.

5    Q.  And how were you transported to the hospital?

6    A.  Initially they transported me by ground, by ambulance, to

7    the landing zone where there was a helicopter -- a life flight

8    helicopter.  They determined at the landing zone to fly me to

9    the emergency room in Roseville.

10   Q.  Which hospital in Roseville did you go to?

11   A.  I believe it was Sutter Roseville.

12   Q.  What happened after you arrived at the hospital?

13   A.  They took all my gear.  I flew on the helicopter with my

14   duty belt and service weapon.  They secured all my gear, took

15   x-rays, irrigated the wound, put gauze on it and released me.

16   Q.  Was there any efforts to close the wounds up with stitches

17   or some sort of sterile strip or anything like that?

18   A.  No, sir.

19   Q.  Why didn't they want to close the wound up?

20   A.  Because it was a through-and-through bullet wound.  What

21   they told me is they wanted it to keep -- wanted to keep it

22   open so the wound could drain.

23   Q.  I would like you to turn to Tab 6A, 6B, 6C and 6D in the

24   binder, please.

25   A.  Yes, sir.

1   Q.   What are those photographs of?

2   A.   They're photographs of my gunshot wound.

3           MR. MCCOY:   Your Honor, government moves to admit 6A,

4   6B, 6C and 6D into evidence.

5           THE COURT:   Admitted.

6       (Whereupon, Government's Exhibits 6A, 6B, 6C and 6D were

7       received.)

8       (Exhibits published.)

9   BY MR. MCCOY:

10  Q.   Now, looking at Government Exhibit 6A, if you could,

11  describe for the jury where the camera is situated and what we

12  are looking at here.

13  A.   Okay.   This is a photograph of my left shoulder overall.

14  This is my left arm, upper arm right here.   And this is the top

15  of my shoulder.   And so down here is my back.   This side is my

16  back.   (Indicates on diagram.)

17  Q.   6B.

18      (Exhibit published.)

19      Same view with this photograph?

20  A.   Yes, sir.

21  Q.   And when were these photographs taken?

22  A.   I believe they were taken the day after I was shot.

23  Q.   6C.

24      (Exhibit published.)

25      What is this a -- what's the angle of this photograph?

1    A.   It's canted off to the side.   Again, this is my upper left

2    arm right here.

3         This is my neck going up toward my head.

4         Again, this is my back.   (Indicates on diagram.)

5    Q.   6D.

6         (Exhibit published.)

7         After you were initially treated for these wounds, what

8    additional follow-up or medical care did you require?

9    A.   Well, they prescribed an antibiotic for seven days when

10   they released me from the emergency room and advised a

11   seven-day follow-up to an emergency room or trauma doctor,

12   which I did seven days afterwards.   And after being advised by

13   the trauma doctor, he wanted to get me into wound care.

14   Q.   Did you go into wound care?

15   A.   Yes, sir, for seven weeks.

16        MR. MCCOY:   Your Honor, may I have a moment?

17        THE COURT:   Yes.

18        (Government cocounsel confer.)

19        MR. MCCOY:   Your Honor, those are all the questions

20   the government has for this witness at this time.

21        THE COURT:   Okay.   Should we take the recess now,

22   Mr. Toney, or do you want to start questions?

23        MR. TONEY:   Being past 4:30, if we could recess now?

24        THE COURT:   Okay.

25        MR. TONEY:   That would be appreciated.

1    THE COURT:  Court is adjourned until 9:00 a.m. in the

2  morning.

3        (Off the record at 4:38 p.m.)

4                          ---o0o---

5

6

7                     REPORTER'S CERTIFICATE

8                          ---o0o---

9

   STATE OF CALIFORNIA  )
10   COUNTY OF SACRAMENTO )

11

12        I certify that the foregoing is a correct transcript
   from the record of proceedings in the above-entitled matter.
13
          IN WITNESS WHEREOF, I subscribe this certificate at
14  Sacramento, California.

15

16   /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
17        Official United States District Court Reporter

18

19

20

21

22

23

24

25