```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF CALIFORNIA
 2          BEFORE THE HONORABLE GARLAND E. BURRELL, JR., JUDGE

 3                         ---o0o---

 4
     UNITED STATES OF AMERICA,
 5
          Plaintiff,
 6
     Vs.                              CASE NO. 2:14-CR-269 GEB
 7                                    VOLUME 2 - PAGES 211-373
     BRENT DOUGLAS COLE,
 8
          Defendant.
 9    _____/

10

11              REPORTER'S TRANSCRIPT OF JURY TRIAL
              WEDNESDAY, FEBRUARY 4TH, 2015, 9:00 A.M.
12

13   For the Government:      OFFICE OF THE UNITED STATES ATTORNEY
                              501 I Street, Suite 10-100
14                            Sacramento, California  95814

15                            BY:  MICHAEL D. MCCOY,
                              Assistant United States Attorney
16
                              BY:  HEIKO COPPOLA,
17                            Assistant United States Attorney

18

19   For the Defendant:      LAW OFFICE OF J. TONEY
                              P.O. Box 1515
20                            Woodland, California  95695

21                            BY:  J. TONEY, Attorney At Law

22

23   Reported by:  CATHERINE E.F. BODENE, CSR #6926, RPR
                    Official Court Reporter USDC, 916-446-6360
24                  501 I Street, Room 4-200
                    Sacramento, California  95814
25
     TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION
```

1              EXAMINATION INDEX

2                 ---o0o---

3    FOR THE GOVERNMENT:

4      EXAMINATION:                              PAGE

5

     TAD PULTORAK (Previously Sworn 2-3-2015)
6
        Cross-Examination by Mr. Toney            215
7        Redirect Examination by Mr. McCoy         225

8

     MARK ZELHART
9
        Direct Examination by Mr. Coppola         228
10       Cross-Examination by Mr. Toney            240

11

12   STEFAN MONTELIUS

13       Direct Examination by Mr. McCoy           243
        Cross-Examination by Mr. Toney            254

14

15   KYLE RUTHERFORD

16       Direct Examination by Mr. McCoy           257
        Cross-Examination by Mr. Toney            266
17       Redirect Examination by Mr. McCoy         272

18

19   ANDREW LILLER

20       Direct Examination by Mr. Coppola         276

21

22   MARCUS KNUTSON

23       Direct Examination by Mr. Coppola         284
        Cross-Examination by Mr. Toney            298

24

25                 ---o0o---

1                        EXAMINATION INDEX

2                           ---o0o---

3

4    FOR THE GOVERNMENT:

5        EXAMINATION:                              PAGE

6      STEVE DAY

7          Direct Examination by Mr. McCoy          302

8

9      RANDALL BILLINGSLY

10         Direct Examination by Mr. Coppola       328
           Cross-Examination by Mr. Toney          348
11         Redirect Examination by Mr. Coppola     367
           Recross-Examination by Mr. Toney        371

12

13

14

15

16

17

18

19

20

21                          ---o0o---

22

23

24

25

EXHIBIT INDEX

---o0o---

| GOVERNMENT'S EXHIBITS: | EVD | VOL |
|---|---|---|
| 2A | 317 | 2 |
| 3I | 294 | 2 |
| 3J | 298 | 2 |
| 4A | 281 | 2 |
| 4B | 281 | 2 |
| 4D | 323 | 2 |
| 5A | 313 | 2 |
| 5C | 318 | 2 |
| 5D | 319 | 2 |
| 8E | 283 | 2 |
| 8F | 295 | 2 |
| 9 | 373 | 2 |

---o0o---

1    SACRAMENTO, CALIFORNIA, WEDNESDAY, FEBRUARY 4, 2015, 9:00 A.M.

2                            ---o0o---

3         THE CLERK:  You may remain seated.  Court is now in

4    session.

5         THE COURT:  All participants are present.  You can

6    continue.

7       (PREVIOUSLY SWORN, TAD PULTORAK RESUMES THE WITNESS STAND)

8                        CROSS-EXAMINATION

9    BY MR. TONEY:

10   Q.  Hello.

11   A.  Good morning, sir.

12   Q.  So as I understand it, camping is allowed as long as you're

13   not hurting the environment and having open fires, if you limit

14   it to two weeks or less; is that the rule?

15   A.  Yes, sir.

16   Q.  So the fact that people were camping at the location that

17   ultimately wound up as the place where the gunfire happened,

18   somebody could legally camp there if they complied with those

19   rules; am I right?

20   A.  That's correct, sir.

21   Q.  And is there a protocol or procedure for declaring a road

22   closed under your organization's policy?

23   A.  Well, sir, it would have to be under the management plan of

24   the field office.  Under that management plan there is a

25   separate travel management plan which designates routes that

1    are open for vehicular traffic.

2    Q.   And had that plan included the spur road?

3    A.   Yes, sir.

4    Q.   For how long?

5    A.   I'm not sure of the last date of the management plan of the

6    field office.

7    Q.   For some time?

8    A.   It was before my time.

9    Q.   So that road -- and your time there started when?

10   A.   June of 2012.

11   Q.   So that road had been closed.  Why was there no sign

12   indicating it was closed?

13   A.   Well, sir, typically we like to sign our areas as such,

14   according to the regulations.  However, folks like to destroy

15   them.

16   Q.   So under the regulations, when the management plan deems a

17   road to be closed, the regulations say there has to be some

18   sort of sign, correct?

19   A.   More or less.  Not necessarily.  If it is part of the plan,

20   it doesn't necessarily have to be a sign there, as long as it

21   is written down.

22   Q.   How would -- what notice would the public get that a road

23   is closed?

24   A.   Well, they can contact the field office and ask questions

25   of the public contact there.

1  Q.  There would be no way a person, on the day of this

2  shooting, who came to that road, would know that it is closed;

3  am I correct?

4  A.  Unless they did the research required upon them, no.

5  Q.  What research is required?

6  A.  Well, it's a public land, and a user -- it's incumbent upon

7  them to know the rules and regulations of the land upon their

8  visiting.

9  Q.  Now, when you stopped the vehicle, Mr. Cole said there was

10  no sign saying it was closed, or words to that effect, correct?

11  A.  Yes, sir.

12  Q.  And do you recall saying that you were the sign?

13  A.  I do.

14  Q.  So essentially at that point, unless somebody had

15  researched the bureau's management plan, the only person or

16  persons who would know that they were being subject to being

17  impounded was Mr. Cole and the other two passengers, right?

18  A.  I'm sorry.  Can you repeat the question?

19  Q.  Sure.  The only people who would know that their car was

20  going to be impounded, if they drove on that road, were the

21  ones you talked to unless somebody had gone to the management

22  plan and found out that was a closed road?

23  A.  I don't recall saying their vehicle was going to be

24  impounded.

25  Q.  Didn't you tell them, if he drove it on that road again, he

1   would be cited and the vehicle would be impounded?

2   A.   Sir, I said "possibly impounded."  A citation at least.

3   Q.   When you drove up that spur road, did it appear that any

4   damage had been done to the trees or the foliage?

5   A.   There were leaves on the ground and a few of the branches

6   had been broken.

7   Q.   Did Mr. Cole or the Radons say they had camping gear up

8   there?

9   A.   No, sir.

10   Q.   Did you ask them if they had a camp up there?

11   A.   I asked Mr. Cole initially.  The first question I asked

12   Mr. Cole was, are you camping up there.

13   Q.   What did he say?

14   A.   He said no.

15   Q.   Did you ask the Radons if they were camping up there?

16   A.   I asked why they were with Mr. Cole.

17   Q.   What did they say?

18   A.   They said something to the general effect that they were

19   just in the truck with him.

20   Q.   How long did the actual conversation with Mr. Cole take?

21   A.   The initial traffic stop, about 15 minutes total.

22   Q.   A large part of that was you running names and seeing if

23   there were warrants and driver's license status, correct?

24   A.   Yes, sir.

25   Q.   So the actual talking with Mr. Cole back and forth, how

1   long would you say you actually talked to him?

2   A.  I would say about a third of the time.  Probably five

3   minutes, if that.

4   Q.  Now, when you heard a man or a person apparently

5   approaching, you were where with respect to either of the

6   motorcycles?

7   A.  I was closest to the motorcycle that was reported stolen.

8   Q.  And that was the one that was partially disassembled?

9   A.  Yes, sir.

10  Q.  And where was, if you know, Officer Hardin at that point?

11  A.  He was also by that same motorcycle.

12  Q.  So how long would you say it was between the time that

13  Mr. Cole first said "You know me, I want to get my stuff,"

14  words to that effect, and the shooting?

15  A.  Generally, a couple of minutes.

16  Q.  And was Hardin near you all that time?

17  A.  Like I said before, I didn't keep track of where

18  Officer Hardin was.

19  Q.  What I understand your testimony is, is that Mr. Cole said

20  that he wanted his stuff, correct?

21      That was the first thing he said?

22  A.  He first said, "Yeah, it is me."

23  Q.  "You know me.  You saw me before."  Right?

24      Then did he say he wanted his belongings?

25  A.  Yes.  He said he was coming up to get his stuff.

1  Q.  Okay.  And did you tell him that he couldn't take the

2  motorcycles or the motorcycles weren't going to be taken?

3  A.  I'm not sure what I said in effect with the motorcycles to

4  Mr. Cole.

5  Q.  Well, you testified yesterday that you immediately said,

6  "Are you armed?"  Right?

7  A.  "Immediately," as in --

8  Q.  The first thing you said to him is, "Are you armed?"

9  A.  After I said, "stop."

10 Q.  After you said, "stop."  Okay.

11     So he emerges.  He is able to say, "You know me, and I want

12 to pick up my stuff."  And you say "stop," correct?

13 A.  Yes, sir.

14 Q.  He does stop, doesn't he?

15 A.  He does.

16 Q.  All right.  And your testimony is that he immediately --

17 that you immediately said, "Are you armed?"

18 A.  Do you have any weapons.

19 Q.  Okay.  And after that, he immediately said that he was,

20 correct?

21 A.  Yes.

22 Q.  And the next thing you did was you ordered him to turn

23 around, correct?

24 A.  Correct.

25 Q.  And he refused in a loud voice, correct?

1   A.  He said no.

2   Q.  Well, yesterday I think, although the record never shows

3   these things, you said in a loud voice that -- I think your

4   words were, "I'm not going to turn around."

5       Do you recall that testimony?

6   A.  It's not the first time he said.  The first time he said,

7   "No, I'm not turning around."

8   Q.  And so you immediately repeated the order?

9   A.  After drawing my handcuffs and taking a step forward.

10  Q.  And that's when he essentially said, in a very loud voice,

11  that I'm not going to turn around?

12  A.  Yes, sir.  "I'm not turning around now."

13  Q.  You had a bullet proof vest on; is that correct?

14  A.  A ballistic vest.

15  Q.  Bullet resistant maybe, but bullet proof no?

16  A.  Fair enough.

17  Q.  Do you normally wear that?

18  A.  Yes, sir.

19  Q.  And a shirt similar to the one that you're wearing now, but

20  actually the one that has been shown to you in evidence, right?

21  A.  Correct.

22  Q.  Did you have anything else on?

23  A.  Undershirt.  Pants.  Boots.  Socks.

24  Q.  Nothing over the shirt?

25  A.  No over garment.  No.  No, sir.

1    Q.   So after -- how many times did you order him to turn

2    around?

3    A.   Twice.

4    Q.   So the first time he said no, and the second time, in a

5    loud voice, he said "I'm not turning around now."  Correct?

6    A.   Correct.

7    Q.   How close were you to him at that point?

8    A.   Six, seven feet.

9    Q.   So what happened then?

10   A.   Mr. Cole bladed off, his right shoulder, right arm and

11   right hand went to his waistband.  His hand went to his

12   waistband.  His shoulder and arm went back.

13   Q.   And so what did you do at that point, if anything?

14   A.   I was watching his movement to see what he was doing.

15   Q.   Isn't it correct that before he did that, you indicated to

16   him that the motorcycles were not going to be released to him?

17   A.   Honestly, sir, I don't remember.

18   Q.   Well, you testified under oath that the next thing you did,

19   after you said "Stop" was to say, "Do you have any weapons,"

20   correct?

21   A.   Yes, sir.

22   Q.   And are you saying you're not sure if that's correct, that

23   there might have been a conversation before that?

24   A.   Not to my recollection.

25   Q.   In fact, you were interviewed by possibly the district

1    attorney's office very shortly after this incident, weren't

2    you?

3    A.  Yes, sir.

4    Q.  And were you able to review your interview prior to

5    testifying?

6    A.  Yes, sir.

7    Q.  Okay.  So you -- I'm not saying it is wrong.  I expect that

8    normally when you come into testify you would often do that,

9    correct?

10   A.  I believe so.

11   Q.  Okay.  And your testimony yesterday is consistent with what

12   you told the district attorney's office within a few days,

13   isn't it?

14   A.  I believe so.  Yes.

15   Q.  So when you pulled the handcuffs out, you were six or seven

16   feet away?

17   A.  Give or take.

18   Q.  I understand you weren't measuring.

19   A.  Yes.

20   Q.  Okay.  Let me do this, I'm going to slowly walk to you, if

21   that is okay, and you tell me to stop when you remember the

22   distance between you and Mr. Cole is about that.  Okay?

23   A.  Okay.

24   Q.  (Counsel walks towards witness stand.)

25   A.  At the time when I am drawing the handcuffs?

1    Q.   Exactly.

2    A.   Okay.   Right about there.

3    Q.   Okay.   Thank you.

4         You don't recall, I take it, asking Mr. Cole if he knew who

5    the motorcycles belonged to?

6    A.   No, sir.

7    Q.   Do you know when Officer Hardin drew his weapon?

8    A.   No, sir, I don't.

9    Q.   Did you see Mr. Cole draw the weapon?

10   A.   Yes, sir, I did.

11   Q.   And I believe -- I wrote this down.   See if I'm correct.

12   The whole incident of the actual firing took a couple of

13   seconds.   It was very quick.   Is that true?

14   A.   Yes, sir, it was very quick.

15   Q.   About two seconds worth of intense gunfire?

16   A.   Thereabouts.   I wasn't timing the incident.

17   Q.   I know, but this is something that you clearly, vividly

18   remember, and that was your testimony yesterday, under oath,

19   that it took a couple of seconds?

20   A.   Yes, sir.

21   Q.   So in that time you were able to pull your gun out and fire

22   several shots?

23   A.   Return fire.   Sir, yes.

24   Q.   You don't know how many you shot?

25   A.   Still to this day nobody has told me how many rounds I

1    fired from my weapon.  I guessed seven later on.

2              MR. TONEY:  That's all I have at this time.

3              MR. MCCOY:  I just have a few questions.

4              THE COURT:  Okay.

5                        REDIRECT EXAMINATION

6    BY MR. MCCOY:

7    Q.  Good morning.

8    A.  Good morning, sir.

9    Q.  So Mr. Toney was asking you about the traffic stop that you

10   conducted with the defendant earlier that day.  And he was

11   asking about the status of the road being closed, correct?

12   A.  That's correct.

13   Q.  Why was it that you determined that -- or how was it that

14   you determined Cole should not have been driving his car down

15   that path?

16   A.  Well, during the orientation that I received when I first

17   began working at the field office, I was told that that road

18   was closed.

19   Q.  And when you pulled him over, did you tell him whether or

20   not you were going to issue him a warning or citation?

21   A.  No, sir.  I didn't tell him that.

22   Q.  What did you decide to do?

23   A.  To give him a verbal warning.

24   Q.  So no citation was issued?

25   A.  No, sir.

1   Q.  Now, Mr. Toney asked you questions about timing -- the time

2   frame between one event and the other and the events leading up

3   to the shooting itself as well as the shooting.

4       You responded with certain answers, but how confident are

5   you in the answers that you have given regarding the specific

6   time -- periods of time that occurred between one event and

7   another?

8   A.  Are you referring to --

9   Q.  Well, take, for instance, starting with the incident

10  between when you first heard the defendant approaching and when

11  the actual shooting took place?

12  A.  I am generally confident.  It's a general time frame.

13  Q.  And how much time was that, do you believe?

14  A.  Between getting into the campground and hearing Mr. Cole,

15  about ten, 15 minutes.

16  Q.  I'm actually asking from when you hear the rustling in the

17  woods until you confront Mr. Cole?

18  A.  Oh, yes, sir.  A minute.

19  Q.  You stated that you believe that you fired -- during the

20  gunfight you believe that you fired around seven rounds?

21  A.  Yes, sir.

22  Q.  And that you had subsequently estimated that to be the

23  case; is that correct?

24  A.  Yes, sir.

25  Q.  How did you come to that estimation?

1   A.  When I reloaded my pistol, I -- and went to

2   Officer Hardin's location, I ducked down to pick up the

3   magazine I dropped.  Later, after the scene was secured, it was

4   either the Nevada County Sheriff's Office or a CHP officer

5   asked me how many rounds did you fire.  I replied I don't know,

6   and then realized I picked up that magazine that I dropped from

7   my pistol.

8       I picked it out of my magazine pouch, and there is

9   gradations on the magazine itself that show how many rounds are

10  actually in the magazine.

11      There were no rounds below the five mark, but you could see

12  a round in the five hole on the magazine.  And I just guessed

13  seven.

14  Q.  How many rounds -- how many rounds are contained in your

15  magazine when it is fully loaded?

16  A.  In the magazine are 12.

17          MR. MCCOY:  May I have a moment, Your Honor?

18          THE COURT:  Yes.

19      (Government cocounsel confer.)

20          MR. MCCOY:  Just one more question, Your Honor.

21  BY MR. MCCOY:

22  Q.  Ranger Pultorak, have you ever been involved in a situation

23  like this before?

24  A.  No, sir.

25          MR. MCCOY:  Those are all my questions.

1          MR. TONEY:  I have no redirect, but would ask this

2     witness be subject to recall in my case.  I will give 24 hours

3     notice.

4          MR. MCCOY:  That's fine, Your Honor.

5          THE COURT:  All right.  You can leave the stand,

6     sir.

7          THE WITNESS:  Thank you, sir.

8          THE COURT:  And the courtroom.

9          THE WITNESS:  Thank you.

10         MR. COPPOLA:  Your Honor, the United States calls

11    Officer Mark Zelhart.

12         MR. COPPOLA:  Your Honor, the United States calls

13    Officer Mark Zelhart.

14     (WHEREUPON, MARK ZELHART WAS CALLED AS A WITNESS AND SWORN)

15         THE CLERK:  Please, state and spell your name for the

16    record.

17         THE WITNESS:  Mark Zelhart, M-a-r-k, Z-e-l-h-a-r-t.

18                         DIRECT EXAMINATION

19    BY MR. COPPOLA:

20    Q.  What do you do for a living, sir?

21    A.  I'm an officer for the California Highway Patrol.

22    Q.  How long have you been employed by the California Highway

23    Patrol?

24    A.  Almost 15 years.

25    Q.  And what is your current position with the California

1   Highway Patrol?

2   A.   Peace officer at the Grass Valley area office.

3   Q.   How long have you been assigned to the Grass Valley area?

4   A.   Four-and-a-half years.

5   Q.   As part of your training as a law enforcement officer, did

6   you receive any specialized medical training?

7   A.   Yes, I have.

8   Q.   Okay.  Can you describe what that training is for the jury?

9   A.   I'm an EMR, Emergency Medical Responder.  It's part of the

10  curriculum at the academy.  Prior to that I was a volunteer

11  firefighter for almost six, seven years.  So I've been CPR

12  trained since I was about 16 years old, and I've been doing it

13  almost my whole life.

14  Q.   I want to direct your attention, Officer Zelhart, to June

15  the 14th, 2014.

16      Were you working that day?

17  A.   I was.

18  Q.   Do you recall what day of the week it was?

19      It is okay if you don't.

20  A.   I don't.

21  Q.   On June 14th, 2014, did you have occasion to respond to the

22  North Bloomfield Road area of Nevada County for an

23  officer-involved shooting call?

24  A.   Yes, I did.

25  Q.   Okay.  From what location did you respond to North

1    Bloomfield Road?

2    A.  I had just parked my patrol car and was walking into an

3    establishment to get some lunch.  Just after I walked in the

4    door, I heard Officer Hardin's transmission to dispatch,

5    "officer-involved shooting."  I immediately ran out and jumped

6    in my patrol car and started responding.

7    Q.  Okay.  About how far away from that location -- from

8    the North Bloomfield location were you?

9    A.  Miles-wise it may have been 20 miles, I believe, but the

10   roads are -- it seems like it was 100 miles.  The roads are

11   very windy and narrow.

12   Q.  Do you recall about how long it took you from the time you

13   heard Officer Hardin's call to the time you actually got to the

14   scene?

15   A.  It may have been 15 minutes.  I don't know.  I was driving

16   very fast.

17   Q.  Fair to say you weren't looking at your watch?

18   A.  No.  No.

19   Q.  All right.

20        And is this the type -- this may seem like a silly

21   question, and I apologize for that.  Is this the type of call

22   that all the lights and sirens come on on your vehicle?

23   A.  Absolutely.

24   Q.  Is this what law enforcement officers refer to as

25   responding Code 3 to a situation?

1   A.   Yes.

2   Q.   All right.

3        On the way up to the scene, did you pass any other law

4   enforcement officers?

5   A.   I passed two deputies on the way.  They were responding

6   Code 3 as well, but I came up upon them very fast, and they

7   decided maybe I should go first since I was driving at a much

8   greater speed.

9   Q.   When you arrived at the North Bloomfield location, did you

10  make contact with any other law enforcement officers?

11  A.   Yes.  I was first to arrive.  Officer Hardin had stated on

12  his transmission that his -- he put his patrol vehicle on the

13  main road.

14       Originally his car was off the main road.  It had been

15  impossible to see from the main road.  He moved his car down.

16  And when I arrived, I arrived directly at his car.  And

17  officer -- or Deputy Liller, who I passed along the way,

18  arrived shortly after I did.

19  Q.   Once Deputy Liller arrived, what did you do?

20  A.   When I exited my patrol car, I grabbed an AR-15, also

21  known, as you know, a long rifle.  And I grabbed my EMT bag.

22  That's standard issue in our patrol cars.

23       Officer Liller had much of the same information as me so he

24  grabbed his AR, and we proceeded to the shooting scene

25  together.

1  Q.  Okay.  And why was it that the two of you took long guns up

2  the trail?

3  A.  It was our understanding from the radio transmission from

4  dispatch that there may be two other suspects within the

5  vicinity.  That there was only one at the scene, but there

6  could have been two more outstanding.  And not knowing whether

7  or not that was the fact, we were going to take some additional

8  firearms with us.

9  Q.  Could you please describe for the jury, Officer Zelhart,

10  how you and Deputy Liller approached the scene?

11  A.  When we got together, he exited, I exited.  I put on my EMT

12  bag.  I said, "There could be some people outstanding."  He

13  said, "I got the same thing."  I said, "You take a flank, I'll

14  take a flank as we're coming up the road."

15      It's really not much of a road.  It's almost a four-wheel

16  drive road that we were walking up.  So we both had a side for

17  coverage, he covering me and me covering him.

18  Q.  When you say he took one flank and you took one flank, so

19  you didn't walk down the center of the road; is that right?

20  A.  Correct.  We were on the sides.

21  Q.  Which side of the trail did you take?

22  A.  I took the right side.  He took the left side, I believe.

23  When we -- there's a fork in the road a little bit further up.

24  I know at that point -- I was trying to communicate with

25  Officer Hardin.  Radio transmissions up there -- with just the

1    terrain and distance from our vehicles, just the way that our

2    radios work, our radios work through our cars, so the further

3    you get, the worse the transmission gets.

4         So when we got to the fork in the road, I know we couldn't

5    get ahold of anyone.  So at that point we said, well, we'll go

6    up the upper flank because -- or the upper road because, one,

7    it is easier to go downhill, and two, the pickup -- the BLM

8    officer's pickup was facing that direction.

9         So we decided to take that road since we had no clear

10   understanding, and I know I had the right flank at that point.

11   Q.   Okay.  About how long did it take you to traverse that

12   trail until you came into -- until you had Officer Hardin in

13   view?

14   A.   It seemed like forever.  It might have been five minutes.

15   It's a pretty good walk.  It's all uphill, but more importantly

16   we were taking cover.  We weren't just running in there because

17   we weren't sure what we had.

18   Q.   Okay.  At some point did you find yourself in a campsite

19   area?

20   A.   Yes.

21   Q.   Okay.  Officer Zelhart, describe for the jury what it was

22   that you saw when you entered that campsite area?

23   A.   When we came in, it's a pretty good sized clearing.  I

24   could see camp stuff.  Some tarps and what have you.  And on

25   the right-hand side there is a motorcycle on its kickstand.

1   The suspect was laying down, and I observed Officer Hardin

2   tending to the suspect.

3   Q.   Did you see Ranger Pultorak at that point?

4   A.   I did.   Everyone has a different communication center, the

5   sheriff's department, the BLM.   So he was trying to contact his

6   communication center because we weren't able to make

7   transmission.

8        We knew that, so we're relying on him to relay to his com

9   center which then in return would relay to the other com

10   centers.   So he was walking around and trying to put out the

11   necessary information.

12   Q.   Okay.   Once you arrived and made those -- actually, did you

13   and Deputy Liller arrive at about the same time?

14   A.   Exactly.   Yes.

15   Q.   Once you made those initial observations of the location of

16   Officer Hardin and the suspect and also Ranger Pultorak, what

17   did you do at that point?

18   A.   I had officer -- or Deputy Liller take cover, again not

19   knowing if we have outstanding suspects.   Then I addressed

20   Officer Hardin and asked him if he was okay.

21        In the transmission he said that he thought he had been

22   shot or had a deep laceration.   I said, "Are you okay?"   He

23   responded yes.   I said, "Well, show me."   Because I wanted to

24   make sure that shock hadn't caught in or something.   I wanted

25   to see the extent of his injury.

1    At the time I didn't even know that the BLM officer had

2    been shot.  He was walking wounded, but I had no evidence of

3    it.

4    Brant -- or Officer Hardin showed me his leg, and then I

5    knew he was okay.  And I said, "You know, what do you need me

6    to do?"

7    Q.  Okay.  And what did Officer Hardin ask you to do at that

8    point?

9    A.  He asked for me to take over on the assisting -- on the

10   medical.

11   Q.  Okay.  And did you do that?

12   A.  I did.  I gloved up, opened up my EMT bag, retrieved saline

13   wash for cleaning wounds, new dressings, and some tape if I was

14   able to utilize that.

15   The suspect was on his back.  There was a lot of bushes.

16   It wasn't in the main clearing area.  So in order to have Brant

17   there, the suspect and myself, it was rather tight.  So I got

18   my bag close, gathered what I thought I needed, and then went

19   in and relieved Officer Hardin.

20   Q.  Okay.  Now, you indicated that you made contact with the

21   person who was down?

22   A.  Correct.

23   Q.  Okay.  Do you see that person in the courtroom today?

24   A.  I do.

25   Q.  Okay.  Where is that individual seated and what is he

1    wearing, please?

2    A.  He's seated to the right in a black shirt with a white

3    T-shirt underneath.

4          MR. COPPOLA:  Your Honor, the record should reflect

5    that the officer has identified the defendant.

6          THE COURT:  It shall.

7    BY MR. COPPOLA:

8    Q.  Now, when you took over medical care from Officer Hardin,

9    what initially did you do?

10   A.  The first thing I did was do a reassessment.

11   Officer Hardin had explained what he had, then I do a

12   reassessment and start care on my own so there isn't anything

13   missed.  Officer Hardin may have told me something, maybe not.

14   So I do a reassessment so I know what I'm working with at the

15   time.

16       I reassessed.  I could see an injury to the elbow -- right

17   near the elbow area on the left arm, not bleeding at all.

18   There was some blood, but I wasn't concerned about that.

19       I rolled him on to his side and could see his buttocks.  He

20   was -- his pants had been cut off, his underwear had been cut

21   off so we could clearly see the wounds.

22       I saw the wounds on the backside.  I can't put pressure on

23   both sides.  Knowing that, because I could see the wounds on

24   the top immediately, so I used saline wash, got it as clean as

25   I could, put new dressings underneath the buttocks, had him

1    back onto his backside, had the top cleaned, put new dressings

2    on there.

3        And then I just put direct pressure on the wounds on the

4    front, using the ground so I could have pressure on both sides.

5    I couldn't do that if he was stood, but I could do it a lot

6    easier if he was still on the ground.

7    Q.   All right.

8        Now, was the defendant handcuffed at the time you were

9    rendering aid to him?

10   A.   Yes.  He was handcuffed behind his back and was resting

11   basically on his elbows so -- at a slight incline.

12   Q.   Okay.  Now, at the time you were assisting or rendering aid

13   to the defendant, was he conscious?

14   A.   He was conscious.

15   Q.   And were you conversing with him about the pressure you

16   were placing and the wound care that you were doing?

17   A.   Yes.  As I was holding pressure, I asked him, "You know, is

18   that good?"

19       And there were a couple of times I moved by his direction a

20   little up, a little down.  And he would indicate that felt

21   better or it was a better location to hold pressure.

22   Q.   Okay.  And did he ever lose consciousness while you were

23   attending to him?

24   A.   No.  Never lost consciousness and his breathing wasn't

25   labored.  I wasn't -- in our EMT bags --

1          MR. TONEY:  Objection.  Nonresponsive at this point.

2          THE COURT:  Sustained.

3  BY MR. COPPOLA:

4  Q.  All right.

5      Did you continue to assess his level of consciousness?

6  A.  Yes.

7  Q.  Did you continue to assess his orientation?

8  A.  Yes.

9  Q.  Okay.  At any point did he appear to become confused or

10  disoriented?

11  A.  No.

12  Q.  Okay.  Now, the questions that you were asking Mr. Cole,

13  were those all related to the treatment that you were providing

14  him?

15  A.  Yes.

16  Q.  Okay.  Did you ask him any questions about what had

17  happened?

18  A.  No, I did not.

19  Q.  Okay.  Did Mr. Cole make any spontaneous statements to you

20  about what had transpired while you were rendering aid to him?

21  A.  Yes, he did.

22  Q.  Okay.  What did he say?

23  A.  In essence he stated:  I don't know how this happened.

24      And I said, "You did a stupid thing."

25      And then he stated:  Well, they were going to take my

1   stuff.

2        And I said, "Well, if a policeman tells you, you know, show

3   me your hands, you go with the program until we figure it all

4   out."

5        Then he said:  Well, they were going to take my stuff, and

6   I had to shoot them -- or I shot until I ran out of bullets.

7   Or something like that.

8        And I looked up.  I said, "This isn't the O.K. Corral.

9   Just go with the program.  I don't know what you were

10  thinking."  And it was -- basically that was the gist.

11  Q.  Now, how long did you put pressure on the wounds?

12  A.  Until I was relieved by the fire department and/or the

13  paramedics that arrived, a higher level of care, EMT,

14  paramedic, nurse, doctor.

15       And it was a long time, 40 minutes to an hour it seemed.  I

16  don't know for sure, but it was a long time.

17  Q.  When you were finally relieved, were you pretty tired and

18  exhausted?

19  A.  Definitely.  My arms were shaking by the time it was done.

20  I wasn't directly over him.  I was kneeled next to him, and I

21  was -- you know, not just my body weight.  I was literally

22  pushing on him for all I had.  And, you know, when they got

23  there, I was spent.

24            MR. COPPOLA:  Your Honor, if I could just have a

25  moment?

1    (Government cocounsel confer.)

2         MR. COPPOLA:  Your Honor, I don't have any further

3    questions for this witness.

4         THE COURT:  Okay.

5                      CROSS-EXAMINATION

6    BY MR. TONEY:

7    Q.  Did it appear that there was one wound that was most

8    serious and you needed to put pressure on?

9    A.  One area.

10   Q.  Okay.

11   A.  There was multiple wounds in the same area.  The only other

12   wound that was visible was the one in the elbow.

13   Q.  Okay.  Could you see where the wounds -- obviously, you

14   were treating him.

15       Where were the wounds on the body?

16   A.  Just above the groin.  So the abdomen area, but just above

17   the groin.

18   Q.  How many?

19   A.  Two I know.  They were very adjacent.  I don't know if

20   there were two, three.

21   Q.  Did there appear to be any wound, whether it was exit or

22   entrance, on his back?

23   A.  Yeah.  On his backside, on his buttocks.

24   Q.  Where, as best you recall?

25   A.  The buttocks.

1  Q.  Well, look, could you -- do you remember about where on his

2  backside this was?

3  A.  No.  I mean, in the buttocks area.

4  Q.  Okay.  And were you able to see it to the point of thinking

5  that it was an entrance or an exit wound?

6  A.  I couldn't tell you.  It was a hole.

7  Q.  Yep.  The ones on the front, did they appear to go inward

8  as if bullets had caused them?

9  A.  Well, I could tell bullets had caused them.

10  Q.  Okay.  But you can't tell with the one on the buttocks

11  whether it was an entrance or exit?

12  A.  No.  I'm not an expert in that field.

13  Q.  Was there a fire captain at the scene while you were there?

14  A.  Yeah.  When the EMS -- I say EMS, the fire department and

15  ambulance crew.  Yeah, there was a fire captain, battalion

16  chief.

17  Q.  Do you know him?  It's a small area?

18  A.  I know one of them that was there.  Yeah.

19  Q.  Do you know a person named Paul Castidlioni?

20  A.  Maybe by face.  I don't know the name.

21  Q.  But you know the North San Juan fire captain?

22  A.  No.

23  Q.  So who did you see there with the EMR?

24  A.  There were a bunch of fire department personnel.  I know

25  one of the battalion chiefs was there.  I know him personally.

1  And an ambulance crew.

2  Q.  Given the location of this shooting, would that have

3  logically been the North San Juan Fire Department?

4  A.  I believe they were there.  I believe another engine

5  company came as well.

6  Q.  How long did you talk to Mr. Cole about the incident rather

7  than treatment?

8      How long did that conversation --

9  A.  It was throughout my process of being with him, until I was

10  relieved.

11  Q.  How long were you with him, in your estimate?

12      Approximately?

13  A.  Forty minutes to an hour.  I don't know.  It seemed like --

14  it seemed like five hours.  It just was a long, long time.

15  Q.  Did he tell you he had just come up there to get his stuff?

16  A.  He -- I remember him saying that they were going to take

17  his stuff.  And I knew that part of the stuff was the stolen

18  motorcycle.  That's why Officer Hardin was there.

19          MR. TONEY:  That's all I have.

20          MR. COPPOLA:  Your Honor, I don't have any further

21  questions for Officer Zelhart.

22          THE WITNESS:  Thank you, Your Honor.

23          MR. MCCOY:  Your Honor, the government now calls

24  Stefan Christopher Montelius.

25          THE COURT:  You can take a seat.  Please, raise your

 1   right hand.

 2   (WHEREUPON, STEFAN MONTELIUS WAS CALLED AS A WITNESS AND SWORN)

 3            THE COURT:  Please, state your full name and spell

 4   your first and last name for the record.

 5            THE WITNESS:  Stefan Christopher Montelius,

 6   S-t-e-f-a-n, M-o-n-t-e-l-i-u-s.

 7                       DIRECT EXAMINATION

 8   BY MR. MCCOY:

 9   Q.  Good morning.

10   A.  Good morning.

11   Q.  Where are you currently employed?

12   A.  Dignity Health.  Sierra Nevada Ambulance and North San Juan

13   Fire Department.

14   Q.  You have two jobs?

15   A.  Correct.

16   Q.  Let's talk about the position at Sierra Nevada.

17       What position do you hold there with that hospital?

18   A.  EMT.

19   Q.  What does your job as an EMT with Sierra Nevada entail?

20   A.  Patient care.  BLS, basic life support.  Driving the

21   ambulance, and supporting my paramedic.

22   Q.  Now, you said you drive an ambulance.  Even though you're

23   assigned to the hospital, is your function to respond to

24   emergencies with an ambulance -- or in an ambulance?

25   A.  Correct.

1  Q.  And what are the responsibilities -- or what are the areas

2  of coverage that EMT takes care of?

3  A.  Patient care.  Trauma.  Vehicle accidents.  Stabbings.

4  Shootings.  Support.  First Aid.  Basic life support on scene

5  for patients.  Medical scenarios.  The whole range.  Why people

6  call 911.

7  Q.  Anything that falls under 911?

8  A.  Yes.

9  Q.  That includes trauma-type situations; is that correct?

10  A.  Yes.

11  Q.  How about your position with the fire department?

12  A.  EMT and captain.

13  Q.  How long have you been with the fire department?

14  A.  Since 2011.

15  Q.  So do you have two roles where you're a captain and EMT, or

16  do you fulfill both roles at the same time when working with

17  the fire department?

18  A.  Both roles at the same time.  The EMT is the medical aspect

19  of being part a fire department.  And the captain indicates a

20  bigger incident, a vehicle accident or fire -- wild land fire

21  or structure fires.

22  Q.  Are all members of the fire department, at least in

23  San Juan Fire Department, all trained and registered as EMTs?

24  A.  Most of them are.

25  Q.  Is that a requirement, though, to be an EMT?

1   A.   No.   It is a recommendation.

2   Q.   Do they have any other -- the ones that are not EMTs, do

3   they have any other status they fall under?

4   A.   EMR.

5   Q.   What is that?

6   A.   Emergency medical responder.   It is below EMT.

7   Q.   So let's talk a little bit about your training as an EMT.

8   What does your training involve?

9   A.   My training, I started off with first aid and CPR.   Then I

10   went on to emergency medical responder.   And then I did a

11   Sierra College class, a EMT class, 166 hours.

12   Q.   What was the length of training -- your EMT training?

13   A.   It is 166 hours.

14   Q.   Okay.   How about EMR?   You just said it is a step below, so

15   is it less training, less time, what is it?

16   A.   It's 60 hours.

17   Q.   I apologize.   Perhaps you said this.   But how long -- you

18   said that you have been with the fire department for four

19   years, correct?

20   A.   Correct.

21   Q.   How long have you been an EMT with Sierra Nevada Hospital?

22   A.   I have been working as an EMT since May of 2014.

23   Q.   I want to focus your attention to June 14th of 2014, this

24   last June.   Were you working that day?

25   A.   I was not working, no.

1   Q.  Were you on call?

2   A.  No, I was not on call.

3   Q.  So when you're not working, and you're not on call, you

4   were not working for the fire department or the hospital; is

5   that correct?

6   A.  Correct.

7   Q.  When you are not working or on call, do you continue to

8   maintain contact with either the fire department or the

9   hospital?

10   A.  Yes, I do.  If I'm in district, I have a pager on me most

11   of the time.  And I can respond.  I have my own medical bag, my

12   own medical gear.  I have my own radio and a pager on me.

13   Q.  So even though you are not on call, if you receive a page,

14   you're able and obviously willing to respond to the scene?

15   A.  Correct.

16   Q.  On that day, did you receive a page or a call to respond to

17   a shooting incident in the North Bloomfield area of Nevada

18   County?

19   A.  I did.

20   Q.  And what did you do when you received that page?

21   A.  When I received that page, I responded.  It was a call,

22   staging required, which means I can't -- I have to stage away

23   from the scene because the scene has not been safe for us to

24   enter and provide patient care.

25        So I have to wait for law enforcement to say that it is now

1    safe to enter the scene, so we had -- we were staging away from

2    the actual incident.

3    Q.  Do you know why in this situation there was a staging area

4    set up?

5    A.  Yes.  There was a shooting.

6    Q.  Now, once you responded, did you respond to the staging

7    area?

8    A.  Yes.

9    Q.  What happened when you got there?

10   A.  When I got there, I met up with my battalion chief who was

11   there in his private vehicle, too.  And I got my radio and my

12   medical gear and put it in his truck.  And I staffed his truck

13   with him.

14   Q.  How long did you have to wait at the staging area before

15   you got the all clear to go to the scene itself?

16   A.  We staged -- first we staged in one location.  And he

17   decided that we needed to stage closer to the actual incident.

18   And as we were changing the location to get closer to the

19   incident itself, we got the all clear to go in.  So we had

20   already started driving towards the incident to get closer to

21   it when we got cleared to enter.

22   Q.  And you were saying you met up with your battalion chief at

23   the staging area?

24   A.  Uh-huh.

25   Q.  What's his name?

1    A.   Tom Browning.

2    Q.   At some point did you get the all clear and move to

3    actually get to the scene of where the shooting had taken

4    place?

5    A.   Correct.

6    Q.   And tell us what happened when you arrived on scene?

7    A.   When we arrived on scene, there was quite a few police

8    vehicles there, law enforcement.  And we had one patient that

9    was an officer, that had a gunshot injury to his upper torso.

10   Q.   Did you treat him?

11   A.   I did not.  Another EMT from my department treated him.

12   And we talked to law enforcement at the scene, and they

13   described they had another patient in the forest a little ways

14   that they wanted treatment for.

15       And we got escorted, myself, Tom Browning and another

16   officer from another department.  We got escorted in there to

17   provide patient care.  We brought our medical gear with us into

18   there.

19   Q.   How did you get to where the patient was?

20   A.   We walked.

21   Q.   You walked?

22   A.   Yes.

23   Q.   Now, what happened when you arrived at the location where

24   the patient was located with multiple gunshot wounds?

25   A.   It was cordoned off by security tape.  So we walked under

1    that.  We got guided in to not disturb the scene.  And we found

2    the patient on the ground with an officer providing patient

3    care.

4    Q.  And did you take over care at that point?

5    A.  Yes.  He did a hand over to me.  He described what he was

6    treating, what was going on.  And I took over the patient care.

7    Q.  Do you remember the officer who you relieved for patient

8    care, what his name was?

9    A.  I don't,  no.

10   Q.  Was it a CHP officer or a Nevada County sheriff?  Do you

11   remember?

12   A.  It was CHP.

13   Q.  What level of treatment, in your opinion, had the defendant

14   received when you assumed care for him?

15   A.  The patient was exposed, which means they had cut off his

16   clothes to be able to see his injuries.  And he was holding

17   direct pressure on a bleeding gunshot wound.

18   Q.  The officer was?

19   A.  Yes.  And he described the injuries to me.  And he

20   described that the injury he was holding direct pressure on was

21   the one that concerned him the most.

22   Q.  Why was that?

23   A.  Because it was bleeding actively.  And it was under control

24   by holding direct pressure.  And I was impressed.  He did -- he

25   did a good hand over to me.

1   Q.  And had he done any treatment for any of the other wounds

2   or areas of concern on the body?

3   A.  He was holding the direct pressure on the one that was

4   bleeding actively.  He had an arm injury that was not bleeding

5   actively.  He had another injury in his abdomen that was not

6   bleeding actively at that time.  So he was holding pressure

7   with both his hands on the other one that was bleeding.

8   Q.  And once you do this hand over, do you do your own

9   assessment once the patient is in your control at that point?

10  A.  Yes.

11  Q.  And let me ask you, before we talk about the assessment

12  that you did, do you know the name of the patient you took

13  control over at that point?

14  A.  Only through media.  Cole.

15  Q.  Are you able to recognize him?

16  A.  Yes.

17  Q.  Is he sitting in the courtroom here today?

18  A.  I don't recognize him.  No.

19  Q.  All right.

20  A.  He had a beard when I took over patient care.

21  Q.  Okay.  So you don't recognize the patient that you took

22  care of?

23  A.  Oh, yes, I do.  I'm sorry.  He's sitting right there.

24  Q.  Would you please point to him and identify an article of

25  clothing he's wearing?

1    A.   He's wearing a black shirt.

2    Q.   Thank you.

3           MR. MCCOY:   Your Honor, let the record reflect that

4    the witness has identified the defendant, Brent Cole.

5           THE COURT:   It shall.

6    BY MR. MCCOY:

7    Q.   You testified he looked different at the time; is that

8    correct?

9    A.   Yes.

10   Q.   What was different about him compared to how he looks

11   today?

12   A.   He was -- his hair was unkept.  He had a beard.

13   Q.   When you first took over patient care of Mr. Cole, you

14   stated that you did your own assessment; is that correct?

15   A.   Correct.

16   Q.   What did that assessment entail?

17   A.   I got my own medical gear out.  I needed extra gauze to be

18   able to wrap his injuries.  And I took a couple of pads --

19   thicker pads than they had at the scene.  And I took over.  I

20   lifted up the gauze that he was holding direct pressure on, the

21   patient's thigh.

22   Q.   Why did you do that?

23   A.   It was still bleeding.  I put gauze down, and I wrapped

24   that quickly.  Then I proceeded to look at the other injuries

25   too.

1  Q.  While you were treating the patient, was he conscious?

2  A.  Yes.

3  Q.  Was he communicating with you at all?

4  A.  Yes.

5  Q.  And what, if anything, was he communicating to you?

6  A.  He was agitated at that point.  He was complaining about

7  the handcuffs.

8  Q.  Was he handcuffed?

9  A.  Yes.  Behind his back.

10  Q.  And at some point did those handcuffs -- were those

11  handcuffs removed?

12  A.  We -- at that point, before I walked in, I had another

13  firefighter in our department, I asked him to get a Stokes

14  basket on wheels, so that if need be, we could get the patient

15  out of there.

16       And at this point we had the basket there on wheels.  And

17  we were -- to be able to transport him, we have to put him on

18  his back.  And so I asked the officer to put the handcuffs in

19  front, instead of on the back, which the officer did.

20  Q.  So you just testified that you made the decision to move

21  him through the Stokes -- on the Stokes basket, correct?

22  A.  Yes.

23  Q.  Where were you going to move him to?

24  A.  To the ambulance.  The ambulance could not drive in there,

25  so the ambulance was down on the main road waiting for us.

253

1   Q.   How long were you with the patient at the campsite, at the

2   scene that you initially encountered him at, before you loaded

3   him into the Stokes basket and started to move him down towards

4   the ambulance?

5   A.   Not very long.  It is hard to recall the exact time.  I

6   know that it was maybe between five and ten minutes.  Probably

7   on the lower side of that.  And I needed to get the patient to

8   the ambulance.  And that was my goal, to stop the bleeding,

9   control the bleeding, and being able to get him to a higher

10  level of care, a paramedic.

11  Q.   During that period of time, and as you transported him down

12  to the ambulance, did he remain conscious?

13  A.   Yes.

14  Q.   Was he less agitated after the handcuffs were put on the

15  front of him?

16  A.   Yeah.

17  Q.   Did you get in the ambulance with Mr. Cole?

18  A.   I did.

19  Q.   And why did you do that?

20  A.   Because he asked me to come with him.

21  Q.   Who asked you that?

22  A.   Kyle Rutherford, the paramedic, because on the ambulance

23  there is one EMT and one paramedic.  And the paramedic felt he

24  needed an extra hand to provide patient care in the ambulance.

25  Q.   So you got into the ambulance with Kyle Rutherford?

1    A.  Correct.

2    Q.  Where was the ambulance headed; do you know?

3    A.  It was heading towards what we call LZ, a landing zone for

4    the air ambulance, the helicopter.

5    Q.  How far was that from the scene?

6    A.  Maybe ten minutes.

7    Q.  During that ten-minute drive, approximately, did Mr. Cole

8    remain conscious during that trip?

9    A.  Yes, he did.

10         MR. MCCOY:  May I have a minute, Your Honor.

11         THE COURT:  Yes.

12     (Government cocounsel confer.)

13         MR. MCCOY:  Those are all my questions, Your Honor.

14         THE COURT:  Do you desire to examine the witness,

15    Mr. Toney?

16         MR. TONEY:  Yes, I do.  Very briefly.  Thank you.

17     I didn't hear he was done because I was communicating with

18    my client.  I'm sorry.

19                    CROSS-EXAMINATION

20    BY MR. TONEY:

21    Q.  Good morning.

22    A.  Good morning.

23    Q.  One wound was especially concerning because it was

24    bleeding; did I hear that correctly?

25    A.  Yes.

1    Q.   And where was that wound?

2    A.   It was on his thigh, his upper thigh.

3    Q.   Now, you have pointed.  Could you stand up so the jury can

4    see where you pointed?

5    A.   (Witness stands.)

6    Q.   Just face the jury over here and point to where that wound

7    was.

8    A.   Probably up here somewhere in this area right here.

9         (Indicating.)

10        (Witness sits down.)

11   Q.   Did you notice any wound or tearing on his buttocks?

12   A.   Wound or tearing on his buttocks?

13        I addressed that area too, yes.

14   Q.   Could you tell whether that was an entry or exit?

15   A.   No.  I can't.

16   Q.   Okay.  Could you tell that the wound that you pointed to

17   was an entry wound or exit?

18   A.   I can't tell.  No.

19   Q.   How many other wounds did you see on him, other than the

20   ones you just explained?

21   A.   His arm.  Those were the wounds.

22   Q.   So three?

23   A.   Yes.

24        MR. TONEY:  One second.

25        (Counsel confers with defendant.)

1  BY MR. TONEY:

2  Q.  Do you recall a wound right below the umbilical?

3  A.  Correct.

4  Q.  There was?

5  A.  Yes.  Yes.  I dressed that.

6  Q.  Is that the one that was getting the pressure?

7  A.  No.

8  Q.  Okay.

9  A.  But it was getting pressure once I dressed it because I

10  dressed it with pressure gauze around his whole torso -- or not

11  his torso but his abdomen.

12          MR. TONEY:  That's all I have.

13          MR. MCCOY:  Nothing further from the government, Your

14  Honor.

15          THE COURT:  You are excused.

16          MR. MCCOY:  Your Honor, the government calls Kyle

17  Rutherford.

18          THE CLERK:  Raise your right hand, please.

19  (WHEREUPON, KYLE RUTHERFORD WAS CALLED AS A WITNESS AND SWORN)

20          THE CLERK:  Please, state and spell your name for the

21  record.

22          THE WITNESS:  Kyle Rutherford, K-y-l-e,

23  R-u-t-h-e-r-f-o-r-d.

24  ///

25  ///

1                          DIRECT EXAMINATION

2    BY MR. MCCOY:

3    Q.  Good morning.

4    A.  Good morning.

5    Q.  Where are you currently employed?

6    A.  I currently work for Sierra Nevada Ambulance part-time and

7    Nevada County Fire Department full-time.

8    Q.  What is your position with Sierra Nevada Ambulance?

9    A.  I'm a paramedic.

10   Q.  How long have you been a paramedic?

11   A.  About ten years.

12   Q.  Has all that time been with Sierra Nevada Ambulance?

13   A.  No.  I've spent about a little over a year with Sierra

14   Nevada, and then prior to that I worked for First Responder

15   down here in Sacramento.

16   Q.  What brought you -- what caused you to make the change from

17   Sacramento up to Sierra Nevada?

18   A.  I wanted to work locally within the community that I live.

19   Q.  How long have you been with the fire department?

20   A.  I started a little less than two years ago as an intern.

21   I've been full-time the last six months.

22   Q.  What did your paramedic training involve when you -- I'm

23   assuming -- let me ask the question.  Have you been through

24   paramedic training?

25   A.  Yes.

258

1   Q.  How long ago did you go through that?

2   A.  It was 2004 when I graduated the class.  You have to do an

3   EMT class.  Prior to that, a couple college prerequisites.

4   Then it's about six months of in-class training and another six

5   months of interning.

6   Q.  What's your position with the fire department?

7   A.  Firefighter and advanced EMT.

8   Q.  So even though you're a trained paramedic for Sierra

9   Nevada, you don't hold that same position with the fire

10  department?

11  A.  That's correct.  I'm between EMT and a paramedic at the

12  fire department.

13  Q.  I want to focus your attention to actually June 14th of

14  this past year, 2014.  Were you on duty that day?

15  A.  Yes.

16  Q.  And in which capacity, with the ambulance or fire

17  department?

18  A.  With the ambulance.

19  Q.  During that day -- at some point during that day, did you

20  respond to the scene of a shooting near North Bloomfield Road

21  in Nevada County?

22  A.  Yes.

23  Q.  What happened after you arrived at the location of the

24  shooting?

25  A.  So we arrived at the staging area.  Basically, we came into

1   an area where there is a bunch of CHP and sheriff cars parked.

2   We were informed that a shooting patient was going to be

3   brought to us by the fire department -- North San Juan Fire

4   Department.  Then from there we were going to transport that

5   patient to the LZ, the landing zone for the helicopter.

6   Q.  Do you remember where was the staging area?

7   A.  It was on a dirt road.  I don't recall the exact name.

8   Q.  Do you know how far it was from where the patient was

9   located?

10  A.  No.  I know they had to hike him in with a Stokes basket.

11  I'm unclear of how far it was.

12  Q.  How long after you arrived at the staging area before the

13  patient was brought down to you?

14  A.  I would say approximately 15 minutes.

15  Q.  Were you at any point, prior to the patient arriving,

16  briefed on his condition, what you would be receiving?

17  A.  I was told that I was receiving a shooting victim.

18  Q.  That was it?

19  A.  Yeah.

20  Q.  Who brought the patient down to the ambulance where you

21  were located?

22  A.  It was Chris Montelius with North San Juan Fire and a

23  couple other North San Juan guys.  I'm unclear on their names.

24  Q.  How was he brought down to your location?

25  A.  He was in a Stokes basket that is set up on, like, a wheel

1   device, basically so they cannot have to fully carry him all

2   the way through the rough terrain.

3       So he was brought to me bandaged up, kind of ready for me

4   to put him in the ambulance.

5   Q.  Are you able to identify the patient that was brought to

6   you on the Stokes basket?

7   A.  Yes.

8   Q.  Is he in the courtroom here today?

9   A.  Wait a minute.

10  Q.  You can stand up if you need to.

11  A.  Okay.  (Witness stands.)

12      I'm assuming that's him over there.  It is hard to tell.

13  I'm not 100 percent sure on exactly who it was.

14  Q.  The patient you received back on June 14th, was he bearded

15  or not bearded?

16  A.  I believe he was bearded.

17          MR. TONEY:  Counsel, if you want a stipulation --

18          MR. MCCOY:  Yes.

19          MR. TONEY:  I'm prepared to stipulate the patient he

20  was dealing with is my client.

21          THE COURT:  Okay.

22          MR. MCCOY:  Thank you, Your Honor.

23  BY MR. MCCOY:

24  Q.  Now, once you received the patient, are you back briefed.

25      You said that Chris Montelius brought him to you on the

1  Stokes.  Did he provide you -- basically brief you on the

2  patient's condition?

3  A.  Basically he gave me what his assessment was, pointed out

4  all the wounds that had been inflicted on the patient and kind

5  of just gave me a brief passover about what has been occurring

6  with the patient as far as vital signs, wounds, stuff like

7  that.

8  Q.  Do you accept this briefing, or do you do your own

9  assessment once you receive the patient?

10  A.  So I take his briefing, and then I go ahead and do my own

11  assessment at that point when we received him.  I looked over

12  him real quick.  I kind of pulled up the bandaging a little

13  bit.  And then at that point I wanted to put him on a back

14  board and put him in full C-spine, to protect his spine and

15  stuff.

16  Q.  Why did you want to put him on a C-spine?

17  A.  Basically he was shot in between the belly button and the

18  pelvis.  I knew there was a possibility he could have been hit

19  in the spine there.  And so to prevent further damage to his

20  spine, I wanted to hold him in an immobilized position.

21  Q.  In addition to assessing his physical condition, do you

22  also attempt to assess his mental condition or mentation?

23  A.  Yes.

24  Q.  If you could, explain to the jury what "mentation" means?

25  A.  Basically the mentation would be is how oriented he is to

1   place, times and events to make sure that he is acting at a

2   normal capacity.

3       Basically, if someone is not acting with normal capacity,

4   they're not going to know some very general questions.  In

5   these instances I usually ask what city they're in, who is the

6   president, how many quarters make a dollar.  General questions

7   the average person is going to know.

8   Q.  And when you initially assessed him, you asked him some of

9   these questions?

10  A.  That's correct.

11  Q.  And were his responses appropriate?

12  A.  Yes.

13  Q.  And so were you able to determine the level of -- his level

14  of mentation?

15  A.  Yes.  He was alert and oriented and knew where he was and

16  what was going on.

17  Q.  You say "alert and oriented."  Does that mean fully

18  conscious?  What does that mean?

19  A.  It means fully conscious and all of his wits were there.

20  Q.  Once you put the patient in the C-spine, is he loaded into

21  the ambulance?

22  A.  Yes.

23  Q.  And you get in the ambulance with him?

24  A.  Yes.

25  Q.  Does anyone else join you in the back with the patient?

1   A.   Yes.  Chris Montelius did.

2   Q.   Why did he join you?

3   A.   Basically for extra hands, in case I need help for

4   something.  And also he was going to help us guide us to the LZ

5   since he was familiar with the area of North San Juan.

6   Q.   You used the term "LZ."  What does that mean?

7   A.   Landing zone.  Basically where the helicopter is going to

8   be landing to pick up the patient.

9   Q.   Who made the decision that you needed a helicopter for the

10   patient?

11   A.   First off, a helicopter had already been ordered due to the

12   nature of the call.  But I also make the ultimate decision

13   whether he needs to go by helicopter.

14       Basically he fits under a certain trauma criteria that says

15   they need to go to a trauma center.  And being the fact that

16   we're more than 45 minutes out from that trauma center, he

17   needs to go by air ambulance.

18   Q.   When you get him, the patient, the defendant, into the

19   ambulance, are you able to assess his blood pressure?

20       Is that part of the one things --

21   A.   Yes.  We go over his vitals.  We hook him up to the heart

22   monitor, look at his blood pressure, heart rate, his breathing.

23   Like I said, his mentation too.

24   Q.   Based on your assessment, did you start an IV?

25   A.   Yes, I did.  I started two.

1    Q.  At any point during this time was the defendant

2    complaining -- or was the patient complaining of dizziness or

3    he felt like he was going to pass out or anything along those

4    lines?

5    A.  He didn't complain of dizziness or passing out.  He did

6    complain of some pain.

7    Q.  Did you continue to, again, not only assess his physical

8    conditional, but also his mentation while you were driving in

9    the ambulance to the landing zone?

10   A.  Yeah.  I would say maybe one other time I assessed his

11   mentation.

12   Q.  During that time that you were assessing his mentation, did

13   you ask him a question about what happened?

14   A.  I did.

15   Q.  Why did you ask him that question?

16   A.  Basically, I wanted to just get a general idea of exactly

17   what occurred there on scene so that when I gave my passover to

18   the paramedic on the helicopter, I could kind of give him a

19   general idea of what had occurred.

20   Q.  When you asked him what happened in the ambulance, how did

21   he respond?

22   A.  So I asked him what happened, and he said that the officers

23   had drew on him and he didn't have a choice but to fire at

24   them.

25   Q.  Did he tell you what type of weapon he used to fire at

1  them?

2  A.   He did.   He said he used a .44.

3  Q.   And when he told you he fired at the officers, what was

4  your response?

5  A.   I said:   They're cops.   You can't shoot at cops.

6  Q.   Did he respond to you?

7  A.   He repeated the same thing back, that they drew on him and

8  he had no choice but to fire at them.

9  Q.   Did you continue to --

10 A.   No.   At that point he started to become slightly agitated,

11 so I just kind of dropped the conversation with him and just

12 continued my care.

13 Q.   Prior to arriving at the landing zone -- or prior to

14 turning the patient over at the landing zone, did the patient

15 lose consciousness?

16 A.   No.

17 Q.   What happened when you arrived at the landing zone?

18 A.   So we arrived at the landing zone, which was at a school

19 out in the North San Juan area.   The helicopter had already

20 landed.   The CHP officer/paramedic got in the back of the

21 ambulance.   I gave a passover, let them know where he was

22 wounded, what his vitals had initially been, what they had

23 changed to.

24     I let them know what treatment I had done for him, and at

25 that point he basically wrote it all down.   And then he was

1  unloaded from the ambulance and carried by the fire department

2  to the helicopter.

3  Q.  Did you accompany the patient in the helicopter to the

4  hospital?

5  A.  No.

6  Q.  That was your last contact with him?

7  A.  Yes.

8       MR. MCCOY:  May I have a moment, Your Honor?

9       THE COURT:  Yes.

10     (Government cocounsel confer.)

11      MR. MCCOY:  Those are all the questions I have at this

12  time, Your Honor.

13      THE COURT:  Okay.

14                     CROSS-EXAMINATION

15  BY MR. TONEY:

16  Q.  Hello.

17  A.  Hi.

18  Q.  Was there a -- there was a wound near the umbilicus; is

19  that correct?

20  A.  Yes.

21  Q.  And how many wounds did you notice?

22  A.  I noticed there was one in the -- I don't recall which

23  bicep it was, but one that went through the bicep, one that

24  went in the umbilicus, and then there was also one on the inner

25  thigh.

1    Q.  Did you notice any on his buttocks?

2    A.  I did not.

3    Q.  Was he always in a face-up position while you were dealing

4    with him?

5    A.  Yes, for the most part, except for when we rolled him

6    slightly to put him on the backboard.

7    Q.  So would it be fair to say there might have been one, but

8    you wouldn't have seen it?

9    A.  Correct.

10    Q.  Okay.  And when you got to him, did you take his blood

11    pressure?

12    A.  Yes.

13    Q.  Was it of some concern?

14    A.  Yes.

15    Q.  What was it?

16    A.  It was in the -- I knew it was around 70.  I don't have the

17    exact number.  It was 70 systolic.

18    Q.  Can you tell me what systolic means?

19    A.  So basically you have -- your blood pressure has got two

20    numbers.  Systolic, which is the top number, and the diastolic,

21    which is the bottom number, the systolic is the pressure of

22    when your heart is actually pushing and putting the pressure on

23    your veins.  The diastolic pressure is your resting pressure.

24    Q.  Would 120 be considered normal?

25    A.  That is -- yeah.  That's on the high end of normal.

1  Q.  Okay.  Do you remember testifying at the grand jury?

2  A.  Yes.

3  Q.  And do you remember saying 120 is considered normal?

4  A.  I don't recall that.

5  Q.  The low 100 you start paying attention?

6  A.  Yes.

7  Q.  Why?

8  A.  It's just beginning on the low range.  That's becoming low

9  blood pressure.

10  Q.  What effect -- in your training and experience, what's the

11  concern when it becomes too low?

12  A.  That basically they're going to -- their vital organs are

13  going to start shutting down once the blood pressure becomes

14  too low.

15  Q.  So this was about 70?

16  A.  Uh-huh.

17  Q.  So by the way, that number is what?  Is it pounds per

18  square inch or miles per hour?

19  A.  Milligrams of mercury.

20  Q.  So it was a full 30 milligrams of mercury under the point

21  where you start paying attention?

22  A.  Correct.

23  Q.  Do you know if that also has an effect on mental

24  impairment?

25  A.  It's going to be based on patient-to-patient.  I have seen

1    patients be fine at 50, and some of them not be okay at 90.

2    Q.  Okay.  Now, with respect to the actual conversation about

3    what happened --

4    A.  Uh-huh.

5    Q.  -- he said that the officers had drawn guns --

6    A.  Uh-huh.

7    Q.  -- on him?  And he didn't have a choice but to shoot -- or

8    shoot back at the officers?

9    A.  Correct.

10   Q.  Do you recall him saying "shoot back"?

11   A.  No.  I recall it as being to shoot at the officers.

12   Q.  Do you remember in your grand jury testimony you said "he

13   didn't have a choice but to shoot back at the officers or to

14   shoot at the officers"?

15   A.  The way I recalled it was that he had describe it was he

16   shot at them first.  So not as shooting back at them, after

17   they had shot at him.

18   Q.  You said that they had shot at --

19   A.  No, he didn't say that.  It's just the way I had drawn up

20   the conclusion.

21   Q.  But -- if I can approach, I just want to show him one

22   answer.

23            THE COURT:  You don't have to seek permission to

24   approach.

25            MR. TONEY:  Okay.  Thanks.

1   BY MR. TONEY:

2   Q.  I'm going to ask you to read the first four lines of this

3   page.

4           MR. MCCOY:  Excuse me.  Just so I can see the page

5   number?

6           MR. TONEY:  I'm sorry.  Excuse me.

7       (Counsel confer.)

8       (Document shown to witness.)

9           THE WITNESS:  Four lines?

10  BY MR. TONEY:

11  Q.  Top four lines.

12  A.  I asked him what happened --

13  Q.  Just read it to yourself, not out loud.

14  A.  Okay.

15          THE COURT:  For what purpose are you having him to

16  read it to himself?

17      What is it that you -- what is your goal?

18      I mean, is it a 612 question -- Evidence Code 612 question?

19          MR. TONEY:  I just want to see if it refreshes his

20  recollection.

21          THE COURT:  That's how you communicate with the

22  witness.

23          MR. TONEY:  Thank you.

24          THE WITNESS:  If that's what they wrote down, that's

25  what I said.

1        MR. TONEY:  Okay.

2   MR. TONEY:

3   Q.   Now, this was in early October, correct, when you came

4   before the grand jury?

5   A.   I think somewhere at that time, yeah.

6   Q.   Does October 2 sound right?

7   A.   I think so, yes.

8   Q.   You remembered it a little better then than now.

9   A.   Yeah.  As it is written there.

10  Q.   Yes.  So I'll ask, if after looking at this, you believe

11  this was your testimony.  And you were sworn before the grand

12  jury?

13  A.   Yes.

14  Q.   And you were trying to be as accurate as you could?

15  A.   Correct.

16  Q.   "I asked him what happened, and he had told me that the

17  officers had" --

18        MR. MCCOY:  Objection, Your Honor.  He's reading the

19  testimony at this point.  He's asked the question.  He's

20  answered it.

21        MR. TONEY:  I believe it is inconsistent.

22        MR. MCCOY:  Has he refreshed his memory, or is he

23  going to have past recollection recorded where he reads it?

24        MR. TONEY:  I believe it is inconsistent.  I'm going

25  to ask him if this is what he said.

1          THE COURT:  Okay.  You can proceed.

2    BY MR. TONEY:  Okay.  (Reading:)

3        I asked him what had happened, and he had told me that the

4        officers had drew their guns at him, and he didn't have a

5        choice but to shoot back at the officers or to shoot at the

6        officers.

7        (Reading concluded.)

8        You think now, as you say, if it is written that way,

9    that's what you said?

10   A.  Yes.

11          MR. TONEY:  That's all I have.

12          MR. MCCOY:  Just a few questions, Your Honor.

13                         REDIRECT EXAMINATION

14   BY MR. MCCOY:

15   Q.  Mr. Toney asked you questions about the patient's blood

16   pressure?

17   A.  Uh-huh.

18   Q.  You testified on direct that you started an IV when you got

19   him in the ambulance?

20   A.  Correct.

21   Q.  What effect did the IV have on his blood pressure?

22   A.  At that point, by the time I had gotten him and gotten him

23   to the LZ, his blood pressure had raised from 70 to 90 with

24   1000 liters of normal saline -- 1000 milliliters.

25   Q.  You said that 90 could be normal.  With this patient did he

1    appear to be -- did it appear to be a normal blood pressure, a

2    safe blood pressure for this patient based on your assessment

3    of him?

4           MR. TONEY:  Object that he is misquoting the

5    testimony.  He never said 90 would be normal.

6           MR. MCCOY:  Okay.

7    BY MR. MCCOY:

8    Q.  You previously testified that some patients are okay at 50?

9    A.  Uh-huh.

10   Q.  And some are okay at 90; is that correct?

11   A.  The mentation of them, yes.

12   Q.  How is the defendant's mentation during the period that you

13   were treating him in the ambulance?

14   A.  It stayed the same.  He was oriented.

15   Q.  And that was until -- the entire time you were with him?

16   A.  Throughout the whole time, yes.

17   Q.  Now, Mr. Toney had you review testimony you provided to the

18   grand jury in this case, correct?

19   A.  Uh-huh.

20   Q.  In response to a question about what the defendant said,

21   you responded that he told you that "the officers had drawn

22   their guns on him"?

23   A.  Uh-huh.

24   Q.  "And he didn't have a choice but to shoot back at the

25   officer or shoot at the officers."  Is that correct?

1    A.   Yes.

2    Q.   How did you interpret his response as far as who shot

3    first?

4             MR. TONEY:   I'll object to the conclusion.   The words

5    speak for themselves.

6             THE COURT:   What difference does it make how he

7    interpreted something?   Sustained.

8             MR. MCCOY:   May I have a minute, Your Honor?

9             THE COURT:   Yes.

10        (Government cocounsel confer.)

11            MR. MCCOY:   No further questions, Your Honor.

12            THE COURT:   Okay.

13            MR. TONEY:   No redirect either.

14            THE COURT:   You are excused.   Court is in recess until

15   10:45 a.m.

16        (Off the record at 10:30 a.m.)

17        (Back on the record at 10:48 a.m.)

18            THE CLERK:   Court is back in session.

19            THE COURT:   You may proceed.

20            MR. MCCOY:   Your Honor, may we have a sidebar?

21            THE COURT:   No.

22            MR. MCCOY:   If we could, before we call our next

23   witness, I would like to read a stipulation into evidence.

24            THE COURT:   Okay.

25            MR. MCCOY:   We marked for the record, as Government

1    Exhibit 9, a stipulation regarding the nature and injury

2    sustained by BLM Ranger Tad Pultorak and the medical treatment.

3        (Reading:)

4        The United States, through Assistant United States

5    Attorneys Michael D. McCoy and Heiko Coppola, and the

6    defendant, through his counsel of record J. Toney, hereby

7    stipulate to the following:

8        If called as a witness, Dr. Zia A. Dehqanzada, a board

9    certified general surgeon at Sutter Roseville Medical Center in

10   Roseville, California, would testify as follows:

11       BLM Ranger Tad Pultorak was treated at the Sutter Roseville

12   Medical Center on June 14th, 2014, for a gunshot wound to his

13   left shoulder.  Dr. Dehqanzada was the attending physician who

14   provided medical treatment to Ranger Pultorak for his injuries.

15       After assessing Ranger Pultorak, Dr. Dehqanzada concluded,

16   based on his medical training and experience, that

17   Ranger Pultorak sustained a through and through gunshot wound

18   to the left trapezius region.  X-rays taken of Tad Pultorak's

19   chest and left shoulder revealed no evidence of bony injuries.

20       The trapezius is a muscle located on each side of the upper

21   and back part of the neck, shoulders, and back.  The trapezius

22   raises, or rotates, or draws back the shoulders, and pulls the

23   head backwards or to one side.

24       Prior to being discharged from the hospital, Ranger

25   Pultorak's wound was cleaned and bandaged.  Dr. Dehqanzada sent

1   Ranger Pultorak home with an antibiotic to reduce the risk of

2   bacterial infection developing as the wound healed.

3       (Reading concluded.)

4           Your Honor, that's the stipulation regarding the

5   nature and injury sustained by BLM Ranger Tad Pultorak and his

6   medical treatment.

7           MR. COPPOLA:  Your Honor, the United States calls

8   Deputy Andrew Liller.

9           THE CLERK:  Raise your right hand, please.

10    (WHEREUPON, ANDREW LILLER WAS CALLED AS A WITNESS AND SWORN)

11          THE CLERK:  Please, state and spell your full name for

12  the record.

13          THE WITNESS:  Andrew Liller, A-n-d-r-e-w,

14  L-i-l-l-e-r.

15                      DIRECT EXAMINATION

16  BY MR. COPPOLA:

17  Q.  Good morning.

18  A.  Good morning.

19  Q.  What do you do for a living?

20  A.  I'm a deputy sheriff, County of Nevada.

21  Q.  How long have you been employed by the Nevada County

22  Sheriff's Office?

23  A.  About eight years.

24  Q.  What is your current position with the Nevada County

25  Sheriff's Office?

1   A.   Patrol deputy.

2   Q.   I want to direct your attention, Deputy Liller, to June 14,

3   2014.  Were you working that day?

4   A.   Yes, I was.

5   Q.   What was your assigned patrol area that day?

6   A.   My assigned patrol area was Nevada City.  During the summer

7   I do work with the Forest Service up in the forest.

8   Q.   Okay.  On June 14th, do you recall about -- do you recall

9   your assigned shift that day?

10   A.   I remember being pulled out of the forest because of an

11   incident down in Nevada City.

12   Q.   Okay.  Did you have occasion to respond to the North

13   Bloomfield Road area of Nevada County for an officer-involved

14   shooting call?

15   A.   Yes, I did.

16   Q.   How did you receive the information about that call?

17   A.   I have a radio.

18   Q.   And what preliminary information did you receive?

19   A.   Through our dispatch they were getting info from the Forest

20   Service dispatch regarding a possible shooting with a BLM

21   officer involved.  And later there was also a report of a CHP

22   officer who had been shot.

23   Q.   Do you recall what your location was in Nevada County when

24   you began responding to the call?

25   A.   Yes, I do.

1    Q.  Where were you located?

2    A.  It was Highway 49 near North Bloomfield Road.

3    Q.  About how long did it take you to respond from the Highway

4    49 area?

5    A.  I would say seven to ten minutes.

6    Q.  Okay.  And do you recall, as you were responding, if there

7    were any other police or emergency vehicles responding in that

8    same general area and direction?

9    A.  Yes, I do.

10   Q.  Okay.  What other agencies were responding?

11   A.  CHP.  There was also other units from my agency that were

12   responding from different areas.

13   Q.  Did the CHP officer actually pass you?

14   A.  Yes.  I was driving a pickup truck.  He was in a car, so I

15   figured I would let him pass and proceed.

16   Q.  Okay.  Now, did you continue to monitor radio traffic while

17   en route to the scene?

18   A.  Yes, I did.

19   Q.  And were your emergency lights and siren activated?

20   A.  Yes, they were.

21   Q.  Once you arrived at the location to where you were

22   dispatched, did you make contact with any other law enforcement

23   officers.

24   A.  Yes, I did.

25   Q.  What officer did you make contact with?

1    A.   The first CHP officer that passed me.  We arrived at the

2    scene at the same time.  I don't recall his name.

3    Q.   Okay.  But it was a CHP officer?

4    A.   Yes, it was.

5    Q.   Okay.  Once you made contact with the CHP officer, what did

6    you do?

7    A.   I switched over to my other radio, which had the Forest

8    Service's dispatch direct, so I wasn't getting information

9    secondhand through my dispatch.

10   Q.   Okay.  And did you and the CHP officer then hike into the

11   forest?

12   A.   Yes, we did.

13   Q.   Did you take a weapon, other than your sidearm with you?

14   A.   Yes, I did.  Circumstances were unclear, so I charged my

15   duty rifle.

16   Q.   Okay.  When you arrived at the scene -- actually, about how

17   long did it take you, from where you and the CHP officer left

18   your vehicles, to the time you arrived at the campsite?

19   A.   I was able to talk to Tad directly via my radio, so once we

20   determined his location, it took a couple of minutes.

21   Q.   Okay.  When you say "Tad," you mean -- do you mean

22   Ranger Pultorak?

23   A.   Yes, I do.

24   Q.   Okay.  Once you arrived at the scene, what observations did

25   you make?

1    A.   When I first arrived at the scene, I saw that

2    Officer Pultorak had an injury to his shoulder.  I saw another

3    CHP officer, Officer Hardin, working on the suspect.

4    Q.   Okay.  Were you given -- or what did you do once you got to

5    the scene?

6    A.   I checked to make sure everybody was okay as far as the

7    officers, if they needed any assistance.  I asked if there was

8    any outstanding suspects and basically asked what I could do.

9    Q.   Okay.  And were you given an assignment at that point?

10   A.   No.  The other CHP officer I was with took over medical

11   care from Officer Hardin.  At that point I had noticed a

12   firearm near the suspect, and I ended up clearing the firearm.

13   Q.   About how far away from the suspect was the firearm that

14   you saw?

15   A.   A couple of feet.

16   Q.   And was that -- was it a pistol?

17   A.   It was a revolver pistol, yes.

18   Q.   Okay.  And did the fact that it was laying so close to the

19   suspect cause you concern?

20   A.   It did.

21   Q.   Why is that?

22   A.   Officer safety.  I didn't know if that gun was live -- if

23   there was live rounds in the firearm.  I just wanted to make

24   sure that it was safe.

25   Q.   Okay.  So what did you do?

1  A.  So what I did is I picked up -- I grabbed some sterile

2  gloves from the CHP medical kit, knowing that this is a

3  probable piece of evidence, and I cleared the firearm.  I

4  dumped out the shells from the chamber.

5  Q.  And was the -- so were all of the shells that came out of

6  the chamber, had they been fired or expended?

7  A.  They were empty.  Yes.

8  Q.  How many shells were in the chamber?

9  A.  Six.

10  Q.  After you picked up the firearm and emptied the cylinder,

11  what did you do with the pistol and those shells?

12  A.  I set them directly back down where they were.

13  Q.  Okay.  There is a binder in front of you, Deputy Liller.

14  What I would like for you to do is turn to the tab in the

15  binder marked 4A.

16      Do you recognize 4A?

17  A.  Yes, I do.

18          MR. COPPOLA:  Your Honor, I move to admit 4A.

19          THE COURT:  It's admitted.

20      (Whereupon, Government's Exhibit 4A was received.)

21      (Exhibit published.)

22  BY MR. COPPOLA:

23  Q.  Deputy Liller, we're looking at what's been admitted as 4A.

24  What is -- can you tell the jury what we are looking at here,

25  please?

1   A.   Marker 42 is showing approximately where the firearm was

2   located.   I'm not sure what the other tags are.

3   Q.   I'm just interested in 42.

4   A.   Okay.   So 42 is approximately where the firearm is.

5   Q.   Okay.   Now what I would like for you to do is turn to Tab

6   4B in the binder.

7        Do you recognize what's been mark for identification as

8   Exhibit 4B?

9   A.   Yes, I do.

10            MR. COPPOLA:   Your Honor, at this point I move to

11   admit 4B.

12            THE COURT:   It is admitted.

13       (Whereupon, Government's Exhibit 4B was received.)

14       (Exhibit published.)

15   BY MR. COPPOLA:

16   Q.   Deputy Liller, what are we looking at here on 4B?

17   A.   This is the firearm that I cleared.

18   Q.   And I'm going to point to -- I placed a blue dot on the

19   screen.   Do you see that?

20   A.   Yes, I do.

21   Q.   What are those items there?

22   A.   Those are the expended rounds from the chamber of the

23   firearm.

24   Q.   I'm going to hand you what's been marked for

25   identification, Deputy Liller, as Government's Exhibit 8E.

1     Could you take a look at that?

2     Deputy Liller, do you recognize 8E?

3    A.  Yes, I do.

4    Q.  What is it?

5    A.  It's the firearm I cleared at the scene.

6    Q.  So this is the same firearm that's depicted in

7    photograph -- in Exhibits 4A and 4B?

8    A.  Yes.

9          MR. COPPOLA:  Your Honor, at this time I move to admit

10   Government Exhibit 8E.

11         MR. TONEY:  No objection.

12         THE COURT:  It's admitted.

13   (Whereupon, Government's Exhibit 8E was received.)

14   (Exhibit published.)

15   BY MR. COPPOLA:

16   Q.  After you unloaded the firearm -- or excuse me -- the

17   revolver, did you perform any other duties while at the

18   campsite?

19   A.  Yes.  Other personnel were arriving on scene.  I was

20   directed by one of the CHP.  I believe he was the officer in

21   charge that day.  I helped him with some tasks as far as

22   bringing Officer Hardin back to his vehicle.  Then I also

23   completed a crime scene log.

24         MR. COPPOLA:  Okay.  If I could have just a moment,

25   Your Honor?

 1          THE COURT:  Okay.

 2      (Government cocounsel confer.)

 3          MR. COPPOLA:  Your Honor, I don't have any further

 4   questions for this witness.

 5          MR. TONEY:  I have no questions.

 6          THE COURT:  Okay.  You are excused.

 7          THE WITNESS:  Thank you.

 8          MR. COPPOLA:  Your Honor, at this time the

 9   United States calls Special Agent Marcus Knutson.

10    (WHEREUPON, MARCUS KNUTSON WAS CALLED AS A WITNESS AND SWORN)

11          THE CLERK:  Please, state your full name and spell it.

12          THE WITNESS:  Marcus Knutson, M-a-r-c-u-s,

13   K-n-u-t-s-o-n.

14                       DIRECT EXAMINATION

15   BY MR. COPPOLA:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  What do you do for a living?

19   A.  I'm a Special Agent with the Federal Bureau of

20   Investigation here in Sacramento.

21   Q.  How long have you been employed by the FBI?

22   A.  Approximately, 17 years.

23   Q.  And after you were hired by the FBI, did you undergo any

24   special training?

25   A.  Yes, sir.

1   Q.   Where did that training take place?

2   A.   Quantico, Virginia, and throughout the United States.

3   Q.   How long was your initial basic FBI agent academy?

4   A.   Approximately 16 weeks in Quantico, Virginia.

5   Q.   Are you currently assigned to the Sacramento Field Office?

6   A.   Yes, sir.

7   Q.   How long have you been assigned to Sacramento?

8   A.   Since July of 2006.

9   Q.   Special Agent Knutson, what is your current job title with

10  the FBI?

11  A.   I'm currently a senior team leader with the evidence

12  response team here in Sacramento.

13  Q.   How long have you been the senior team leader for the

14  evidence response team?

15  A.   Since October 2012.

16  Q.   After you became a team leader for the evidence response

17  team, did you have to undergo some type of special training for

18  that job?

19  A.   Yes, sir.

20  Q.   Could you please describe that training for the jury?

21  A.   We continually have ongoing training, whether it is

22  latents, DNA, post-blast-type incidents.  We also have senior

23  team leader training where we're taught how to, obviously, lead

24  our teams.

25  Q.   Can you -- I got a little bit ahead of myself in terms of

1  your training.  Can you describe for the jury what is an

2  evidence response team?  What do they do?

3  A.  An evidence response team is the CSI version that we have

4  in the FBI.  We are a trained team, and we respond to crime

5  scenes and other incidents and collect and document evidence.

6  We collect that evidence like a typical police CSI team.

7  Q.  As the team leader, what are your duties and

8  responsibilities?

9  A.  As the team leader my duties are initially to get the call

10  in, determine if it's a case that we're going to rollout on.

11  At that point we determine what equipment we're going to need,

12  how many bodies we'll need, so I make all of those decisions.

13      At the scene, then I control the scene.  Make sure we

14  have -- we collect what we need to collect, the evidence that

15  is at the scene, and then make sure we have proper

16  documentation of the scene.

17  Q.  Now, does the evidence response team, or for ease of

18  language here, ERT, do you often assist state police agencies

19  with crime scene documentation and evidence collection?

20  A.  Yes, sir.

21  Q.  Special Agent Knutson, how many people are generally on

22  your ERT?

23  A.  We flow between 30 to 32 people.

24  Q.  Okay.  You don't take all 30 to 32 people out to every

25  crime scene, do you?

1    A.  No, sir.

2    Q.  Okay.  When you respond to a crime scene, generally

3    speaking, how many of your team will you take?

4    A.  We're divided into four teams, so we have one team on call

5    at all times.  So once a week there is a team that's on call.

6    Those teams consist of six to eight individuals that can

7    respond to a scene.  And depending on the scene or depending on

8    the requirements at the scene, we may bring additional people

9    if needed.

10   Q.  Okay.  And does each individual member of the evidence

11   response team have a specific assignment?

12   A.  Some do, but a majority of them are just generalists.  They

13   have a general knowledge of all aspects of doing a crime scene.

14   Q.  Okay.  Is there a standard method by which you, as the team

15   leader, direct a crime scene to be processed when you respond

16   to it?

17   A.  Yes, sir.

18   Q.  Okay.  Can you please describe that for the jury?

19   A.  Yes, sir.  We have what is called the 12-step process.

20   It's a very systematic process by which we, as the FBI, process

21   crime scenes.  And there are 12 steps.

22       We kind of do it in our heads because we're taught and it

23   is ingrained in us how to go through the steps, but, you know,

24   it varies from preparation, to getting to the scene, to

25   collecting evidence, to photographing evidence, to at the very

1    end documenting, making sure.  So there is 12 processes that we

2    go through.

3    Q.  Okay.  Now, as part of your documentation of any particular

4    crime scene, is it typical to take photographs of items?

5    A.  Always.  There is always photographs.

6    Q.  All right.  And as part of the documentation process of

7    those photographs -- or as part of that documentation process

8    and the photographic process, are certain item numbers or

9    placards laid by different pieces of evidence?

10   A.  Yes, sir.

11   Q.  Okay.  And is it customary for you to photograph or for

12   your team photographer to photograph items in place with those

13   placards without first manipulating those items?

14   A.  That's correct.  That's our policy.

15   Q.  And why is that?

16   A.  Well, we want to show the scene, how it was when we arrived

17   on scene.  We want to show, obviously, when we go to trial,

18   that this is how it was when we found it so that way you guys

19   can get the best -- you can see the how the scene was when we

20   arrived.

21   Q.  All right.

22       I want to direct your attention now, Agent Knutson, to June

23   the 14th, 2014.

24   A.  Yes, sir.

25   Q.  On that date did your ERT have occasion to respond to the

1    area of North Bloomfield Road in Nevada County?

2    A.  Yes, sir.

3    Q.  Okay.  And why was it that ERT responded to that location?

4    A.  I believe we were contacted by the Nevada County Sheriff's

5    Office who advised that there had been a shooting, what they

6    believed to be on BLM, Bureau of Land Management property, up

7    in that area.

8    Q.  Okay.  And once you received that call, what did you do?

9    A.  At that point I received authorization from my front office

10   to go to the site.  At that point I started calling in

11   individuals off the teams to figure out who I had, make sure I

12   had a photographer that was available.

13       And then we responded to the office where we gathered our

14   equipment and our vehicles, and then we responded to the scene.

15   Q.  Okay.  Did it take you -- when you responded to the scene,

16   are you responding from your offices in Sacramento?

17   A.  Yes, sir.

18   Q.  Okay.  Did it take you a little bit of time to get from

19   your offices in Sacramento to the scene?

20   A.  Yes, sir.  I believe it was approximately an hour or so

21   to -- actually drive time from our office to the scene.

22   Q.  Okay.  Approximately, if you recall, what time did you get

23   to the scene on June the 14th, 2014?

24   A.  I believe it was around 6:40 p.m.

25   Q.  6:40 p.m.?

1    A.   Yes, sir.

2    Q.   So this is in June, summer months, still light outside?

3    A.   Yes, sir, it was.

4    Q.   Okay.  Now, were you able to simply -- what type of

5    vehicles do you folks have for the evidence response team?

6    A.   We have some larger trucks.  A F-450 with a large

7    compartment on the back, extended cab, Suburbans.  We were also

8    pulling some trailers that night for lights because we

9    anticipated losing light fairly quickly since we responded at

10   6:40 p.m.  So we attempted to get up there with as many

11   four-wheel drives as possible.

12   Q.   When you got to the scene were you able to just drive your

13   vehicle right up to the camp area?

14   A.   No, sir.

15   Q.   Okay.  What did you have to do in order to get your vehicle

16   close to the camp area?

17   A.   Our main crime scene truck is the large 450 with the large

18   cab on the back, kind of like a construction truck that you

19   would see.  It is white in color.  And we had problems getting

20   the truck in because of the manzanita overgrowth that had

21   occurred.  It was very dense.

22        We had to cut back a bunch of the manzanita and pine in

23   between us and the road to get our truck in there, to get our

24   equipment in.

25   Q.   Now, when you arrived at the scene, Agent Knutson, did you

1    make contact with anyone?

2    A.  Yes, sir.

3    Q.  Who was it that you contacted?

4    A.  Well, down below on North Bloomfield Road they had, for

5    lack of a better word, a command post set up where they were

6    trying to get bodies up to the scene.

7        I was contacted down there at the bottom of the hill by the

8    Nevada County Sheriff's Office and CHP and advised what

9    occurred up the hill.  And obviously that helps us to make sure

10   we have the proper equipment and the proper people.

11   Q.  Okay.  Now, were -- when you and your team reached the

12   scene, were you assisted by a state evidence collection team or

13   a state evidence documentation team?

14   A.  Yes, sir.

15   Q.  And who was that?

16   A.  That was the California Highway Patrols Major Accident

17   Investigation Team, MAIT, M-A-I-T.

18   Q.  How was it that they assisted you with processing the

19   scene?

20   A.  They have a system called Total Station, which is like a

21   survey -- like you see the guys with surveying equipment.

22   There will be the tripod with the electronic item on top, and

23   then the guy down the way with the pole.  We have one of those

24   systems, but our system is broken at this time so we were glad

25   to have CHP because they had that system.

292

1          The nice thing about that system is particularly in a rural

2     area, a forested area like this one, you can get exact

3     measurements, I believe down to an inch or less than an inch

4     where an item is placed so you can re-create the scene very

5     easily.

6     Q.   So the MAIT team then was -- the CHP MAIT team then was

7     responsible for taking the scene measurements?

8     A.   Correct.  We worked together.

9     Q.   Okay.  And when you and the rest of your team arrived, what

10    did you do in terms of evidence collection, evidence

11    photographing, those types of things?

12    A.   Okay.  Initially myself, the photographer, and my person

13    that keeps the log of photography, we walked up to the scene.

14    Were met by the Nevada County Sheriff's Deputy keeping the

15    crime scene log.

16         We logged ourselves into the scene, meaning put our name

17    down and the time we entered the scene.  At that point we

18    entered the scene and began the photography, the most important

19    thing we do when on scene.

20    Q.   And that involves laying down the markers that you

21    mentioned?

22    A.   Correct.  There will be -- a typical scene, we will come

23    in, do some photography, and also put down numbers on the items

24    to number those items that we recover or we believe that might

25    be pertinent pieces of evidence.

1    Q.   Okay.  And were you, as the team leader, supervising your

2    photographer as she made photographs of the crime scene?

3    A.   Yes, sir.  We -- you know, when we show up on scene, I give

4    her a general idea of what's going on, what the permanent items

5    are.  And at that point she comes back to me for advice on what

6    happens, but also on that date I had one of my senior

7    photographers so I had two working together.  One was kind of

8    guiding her through the scene, and one we had as the official

9    photographer.

10   Q.   Okay.  I want to talk about some specific items of evidence

11   that were recovered, Special Agent Knutson, from the scene, and

12   also the approximate locations of where the items were located.

13   A.   Okay.  Yes, sir.

14   Q.   Okay.  What I would like you to do first, if you could,

15   please, take -- I'm sorry -- take a look at the binder in front

16   of you.  And I would like for you to turn to what's been marked

17   for identification as 2P, if you would, please.

18   A.   2P.  Okay, sir.

19        (Exhibit published.)

20   Q.   This is a photograph of some handcuffs?

21   A.   Yes, sir.

22   Q.   Okay.  The marker or the placard there that says 4, is that

23   something that would have been placed by your photographer?

24   A.   Yes, sir.  That's one of our markers.

25   Q.   Okay.  This particular pair of handcuffs, where was that

1    located, Special Agent Knutson?

2    A.  This would have been located along the roadway that would

3    have been just to the -- it would have been east of the

4    shooting scene, but it was in the roadway.

5    Q.  Okay.  So this would have been along the trail as you

6    approach the campsite?

7    A.  Yes, sir.

8    Q.  Okay.  All right.  Let's take a look now, if you would

9    please, in the binder.  If you would, turn to what's been

10   marked for identification as 3I.

11   A.  Okay, sir.

12   Q.  Okay.  Do you recognize what's been marked for

13   identification as 3I?

14   A.  Yes.  This is Item Number 30, which is a coffee pot.

15          MR. COPPOLA:  Your Honor, I move to admit exhibit --

16   what's been marked for identification as Government's Exhibit

17   3I.

18          MR. TONEY:  This is part of our stipulation.  I have

19   no objection.

20          THE COURT:  It is admitted.

21      (Whereupon, Government's Exhibit 3I was received.)

22      (Exhibit published.)

23   BY MR. COPPOLA:

24   Q.  This coffee pot, where was it located in the crime scene?

25   A.  There was a fire pit that was located south of the -- I

1    keep calling it a roadway.  It was kind of a dirt-path-type

2    thing that ran through the campsite.  So it would have been

3    south of there, next to the campfire.

4    Q.  All right.  Take a look in the binder at 3J, if you would,

5    please.

6    A.  Yes, sir.

7    Q.  Okay.  Is that a closeup of that same coffee pot?

8    A.  Yes, sir.

9    Q.  I'm going to hand you what's been marked for identification

10   as Exhibit 8F.

11   A.  Yes, sir.

12   Q.  Take a look at Exhibit 8F, if you would, please.

13   A.  Yes, sir.

14   Q.  Is Exhibit 8F the same coffee pot that is depicted in the

15   two photographs that we just looked at?

16   A.  Yes, sir.

17   Q.  Go ahead and take it out of the bag.

18           MR. COPPOLA:  Your Honor, I move to admit 8F.

19           MR. TONEY:  No objection.

20           THE COURT:  Admitted.

21      (Whereupon, Government's Exhibit 8F was received.)

22   BY MR. COPPOLA:

23   Q.  You can take it out if you like.

24      Agent Knutson, there appears to be a large hole in the

25   coffee pot?

1   A.  Yes, sir.

2   Q.  Does it appear to be a bullet hole?

3   A.  It is a projectile of some sort.

4   Q.  All right.

5       I want you to turn in the exhibit binder, if you would

6   please, to Exhibits 4A and 4B.

7   A.  Okay.  I'm on 4A, sir.

8       (Exhibit published.)

9   Q.  Specifically looking at marker 42?

10  A.  Yes, sir.

11  Q.  Okay.  That appears to be a .44 caliber revolver?

12  A.  Yeah.  That would have been the revolver that we found.

13  Q.  Now, at what location in the campsite did you find 42?

14  A.  So 42 was, again, with the path, the roadway, the dirt that

15  went through the camp.  This would have been north of that

16  roadway or pathway.

17  Q.  Okay.  Now, if you would please, turn in the binder to

18  what's been marked for -- or to Tab 4I, please.

19      (Exhibit published.)

20  A.  Okay, sir.

21  Q.  Looking at what appears to be Item 49, a pair of bloody

22  pants and what appears to be some medical supplies; is that

23  correct?

24  A.  Yes, sir.

25  Q.  Where in the campsite were these items located?

1   A.   Again, these are north of the pathway/roadway, and it would

2   have been in the same general area of the gun -- the revolver

3   that had been found.

4   Q.   Let's take a look now if we could at Exhibit 4J.

5   A.   Okay, sir.

6   Q.   Okay.  You have this labeled in the photograph as Item 38.

7        (Exhibit published.)

8   A.   Yes, sir.

9   Q.   Does that appear to be a T-shirt and hoodie?

10  A.   Yes, sir.

11  Q.   Where was the T-shirt and hoodie located when you arrived

12  at the scene?

13  A.   I believe it was all -- I would have to refresh my

14  knowledge on this item with where it was at, but it would have

15  been either on the roadway or north of the roadway.

16  Q.   Okay.  In the same general area as the medical equipment

17  bag?

18  A.   Yes, sir.

19  Q.   Just a moment, Your Honor.

20       (Brief pause.)

21       I want to direct your attention now to Exhibit 3E, if you

22  would.

23  A.   3E, sir?

24  Q.   Three echo, yes.

25       (Exhibit published.)

1    A.   Okay.

2    Q.   I'm looking at specifically evidence marker 23, the empty

3    magazine.

4    A.   Yes, sir.  It's a handgun magazine.

5    Q.   Where in the campsite was that located?

6    A.   This would have been over -- it would have been on the

7    south side of that roadway/pathway, where the actual campsite

8    was located.

9    Q.   Okay.  So closer to the fire pit?

10   A.   Correct.

11           MR. COPPOLA:  If I could have just a moment, Your

12   Honor?

13       (Government cocounsel confer.)

14           MR. COPPOLA:  Your Honor, if I have not already moved

15   to admit 3J, I would move to admit it at this point.

16           THE COURT:  It's admitted.

17       (Whereupon, Government's Exhibit 3J was received.)

18           MR. COPPOLA:  I don't have any further questions for

19   Special Agent Knutson.

20                        CROSS-EXAMINATION

21   BY MR. TONEY:

22   Q.   Obviously you cannot tell whether items were moved prior to

23   the time you got there?

24   A.   No, I can't.

25   Q.   Okay.  So what you are doing was measuring precisely the

1    location and photographing the location of items sometime after

2    6:00 that day, correct?

3    A.   Correct, sir.

4         MR. TONEY:   Okay.   I have nothing further at this time.

5              MR. COPPOLA:   I don't have any redirect.

6              MR. TONEY:   But I would like this witness subject to

7    recall possibly.   I'll give notice a day in advance.

8              MR. COPPOLA:   No objection, Your Honor.

9              THE COURT:   Okay.   You can leave the stand, sir.

10             THE WITNESS:   All right.   Thank you.

11             MR. MCCOY:   Your Honor, the government anticipates it

12   will be calling just two more witnesses during its case in

13   chief.   Because we're moving quicker than anticipated, those

14   witnesses are en route, but not yet in the courthouse.   So if

15   possible, the government would request an early lunch.   We know

16   that they will be here and ready to go by 12:30 p.m.

17             THE COURT:   Approach the bench.

18        (Whereupon, the following discussion was held at sidebar.)

19             THE COURT:   I heard what you said.   Who wanted to

20   approach the bench when I first came out after the recess?

21             MR. MCCOY:   I did.

22             THE COURT:   For what purpose?

23             MR. MCCOY:   It's Mike McCoy.

24        Mr. Toney and I have been discussing the case and schedule.

25   We're moving far quicker than anticipated, the government is,

1   with its case.  As I said, we have just probably two more

2   witnesses in its case in chief.  I anticipate we'll rest this

3   evening -- this afternoon.  Or, you know, at the very least,

4   spill into tomorrow morning.

5        But I know Mr. Toney has subpoenas out for witnesses.  I'll

6   let him speak for himself.  Those subpoenas will not -- I

7   believe he has them coming on Tuesday, so we're just moving

8   very quickly.

9            MR. TONEY:  I relied on the government's estimate it

10  would take all of this week -- that it would take all this week

11  for their case and subpoenaed witnesses for 9:00 a.m. on

12  Tuesday.

13       Here's my request.  This case of mine will take far less

14  than a day under any circumstance.  My request is to not

15  inconvenience the court and jury.  And so after the government

16  closes its case, I request we not appear tomorrow and come back

17  on Tuesday when the evidence would be finished.  We would be

18  arguing Wednesday, if not Tuesday night.

19       I definitely could put the client on tomorrow, but I can't

20  guarantee I can get witnesses here by tomorrow.  So that's, I

21  think, the most expedient way.

22       I'm sorry that the time of the government was wrong, but

23  that's where I am.

24           THE COURT:  And it is anticipated that witnesses will

25  be subpoenaed so that they are ready to take the stand

1   immediately upon a side resting?

2       I'm going to have to take a longer break than what the

3   government has just requested because I have a judges' meeting

4   at noon.  I had not intended to be at the judges' meeting for

5   the duration of the meeting, but it starts at noon, and I

6   wanted to be at the beginning of it.

7       In taking a longer break perhaps, Mr. Toney, you can make

8   arrangements with the subpoenaed witnesses and have them come

9   in earlier.

10      I'm trying to figure out what to do with the jury, whether

11  I have the jurors come in for an hour or so tomorrow.  I

12  believe one of the jurors is from Redding.  I'm not sure about

13  that, which is a couple of hours from the courthouse.

14      That seems to be a tremendous inconvenience.  And if it's

15  feasible to accommodate that juror, I think we should strive to

16  do that.

17      So given the extra time I'm going to give you for the

18  break, perhaps an adjustment could be made so that we can

19  finish the trial earlier and not be dark for the vast portion

20  of tomorrow?

21      MR. TONEY:  Sure.  As soon as we break, I'll be on the

22  phone to my investigator, who I am not sure expects my call

23  because this was a surprise to me, but I'll do it right away.

24      THE COURT:  We'll adjourn until one o'clock.

25      (Sidebar discussion concluded.)

1        THE COURT:  I have a judges' meeting that begins at

2   noon today.  In talking to the jurors, I had anticipated that

3   we would not be in session from 12:00 to noon (sic), so we're

4   not going to be in session from 12:00 to noon (sic).  As far as

5   every --

6        THE CLERK:  12:00 to 1:00.

7        THE COURT:  I meant 12:00 to 1:00.  As far as everyone

8   is concerned, we're in recess until one o'clock.

9      (Off the record at 11:31 a.m.)

10     (Back on the record at 1:00 p.m.)

11        THE CLERK:  You may remain seated.  Court is now in

12  session.

13        THE COURT:  All participants are present.  You may

14  proceed.

15        MR. MCCOY:  Thank you, Your Honor.

16    The government calls CHP Sergeant Steve Day.

17        THE CLERK:  Raise your right hand, please.

18    (WHEREUPON, STEVE DAY WAS CALLED AS A WITNESS AND SWORN)

19        THE CLERK:  State and spell your full name for the

20  record.

21        THE WITNESS:  My name is Steve Day, D-a-y.  Steve,

22  S-t-e-v-e.

23                    DIRECT EXAMINATION

24  BY MR. MCCOY:

25  Q.  Good afternoon.

1    A.   Good afternoon.

2    Q.   Where are you currently employed?

3    A.   I'm employed with the California Highway Patrol, VALLEY

4    Division, MAIT Unit here in Sacramento.

5    Q.   And what is MAIT?

6    A.   MAIT is a Multidisciplinary Accident Investigation Team.

7    Q.   What does the CHP MAIT team do?

8    A.   Typically we are a team that goes out to major collisions

9    and documents physical evidence at the collisions and do

10   reconstructions of those collision events.

11        In addition to that, we also are part of the Critical

12   Incident Investigation Team for the Highway Patrol, which will

13   do investigations for shootings or other critical-incident-type

14   events for the Highway Patrol.

15   Q.   How long have you been with MAIT?

16   A.   Since 2002.

17   Q.   What's your current position within MAIT?

18   A.   Currently I am the MAIT sergeant, the team leader, so I

19   essentially oversee the day-to-day operations of our team.

20   Q.   Now, you referenced -- when you are speaking about MAIT,

21   you referenced it as "a team."  What typically is the team

22   composed of, or who typically is the team composed of?

23   A.   Our team is composed of a sergeant, the team leader.  I

24   have four officers who are investigators.  I have a motor

25   carrier specialist, who is essentially our mechanic, so for --

1   primarily for mechanical inspections of our vehicles.  He also

2   has the ability to go in and get information from commercial

3   carriers, the guys driving the truck tractors and hauling all

4   the commercial goods.  And we also have a Caltrans engineer who

5   is assigned to our team through Caltrans.

6   Q.  Now, you referenced surveyors, correct, on the team?

7       Is there a surveyor on the team?

8   A.  If we -- myself and my officers, we all know how to survey,

9   but our Caltrans engineer is kind of, I guess, the overseer of

10  surveying because that's kind of civil engineering.  He's a

11  civil engineer so that civil engineering is part of the

12  surveying and is incorporated into the civil engineering

13  program.

14  Q.  In regards to that surveying that you said that many of you

15  do on the team, what type of equipment are you using to conduct

16  the surveying?

17  A.  We have a -- it's essentially an electronic theodolite.  We

18  have a couple of different brands.  They work on the same

19  principle.  An electronic head or base unit measures out to a

20  prism that we move around.  It's a rod -- or a prism on top of

21  a rod, and that rod is what we utilize to document different

22  items of evidence.

23  Q.  And how are you documenting them using the rod?

24      What are you capturing through the use of that rod?

25  A.  The way the survey instrument works is we set the survey

1   instrument in a location, and we give it an approximate north

2   heading, which would be our zero.  Then, as we move around to

3   the different items of evidence, either the instrument head

4   will follow us, and when we push a button telling it to survey

5   that location, it sends out an electronic request to locate the

6   prism.

7       It is following the prism, so it knows how far out the

8   prism is based on the wavelength of beam that goes out and

9   returns.  It knows how fast that is -- how fast that item goes

10  and knows how long it takes to get the return for the

11  measurement.

12      So it knows how far out that item is from the instrument

13  itself -- or the head, and then based on the angle that the

14  instrument has turned, we have a polar coordinate system of an

15  angle, a distance and elevation, depending how high or low the

16  prism is in relation to the head.

17      At that point, once it collects that information, it

18  converts it over to a cartesian coordinate system, an x-y-z

19  coordinate system.  And that's how we get the information into

20  our computers, is on this Cartesian coordinate system.

21  Q.  I'm assuming that the prism, what the head is following, is

22  it fixed onto some sort of rod?

23  A.  The prism is attached to the top of a rod.

24  Q.  Does the head automatically follow the prism as it's being

25  moved around, or does the head have to be specifically

306

1    adjusted?

2    A.  Most of the time it follows the prism.  Occasionally it

3    will get -- if you walk behind a tree or something or a person,

4    it will sometimes get lost.  But it usually picks up pretty

5    quickly.  So occasionally we'll have to get it turned back on,

6    the prism itself, but it won't take a measurement if it is not

7    on the prism

8    Q.  So once the control point is set on a particular -- just

9    speaking generally here -- a scene, whether an accident scene

10   or another crime scene that you are working, that is a fixed

11   point from that point forward, correct?

12   A.  It is --

13   Q.  A control point?

14   A.  It's a point.  We can move the instrument and tie into

15   other locations if we need to.  If, say, there is a wall, and

16   we can't see behind the wall, we can move the instrument to a

17   different location, tie back into that original location via

18   reference points, nails or whatever it is, and then we can

19   start surveying again from another location.  But it is all

20   tied into the same coordinate system.

21   Q.  Do you have background and experience in the field of

22   surveying?

23   A.  Yes.

24   Q.  What's that?

25   A.  I've got a degree in civil engineer as well from Cal Poly

1  San Luis Obispo.  I worked as a civil engineer for about three

2  years during college and two years after college, and then

3  shortly thereafter I went to work for the highway patrol.

4  Q.  I would like to focus your attention on June 14th of 2014,

5  this past year.

6      Were you called out or notified about an event that MAIT

7  was requested to respond to that day?

8  A.  Yes.

9  Q.  How were you notified?

10  A.  I was notified via phone.

11  Q.  Who contacted you?

12  A.  My captain.  Boy, that's bad.

13      Patrick.  Captain Patrick.  Sorry.

14  Q.  That's all right.

15      And what did Captain Patrick inform you when he notified

16  and requested a MAIT response?

17  A.  He notified me that there had been a CHP-involved shooting

18  in the Grass Valley area.  He didn't have details, but

19  suggested that I give a call to our dispatch center to find out

20  more details and locations and such.

21  Q.  Did you make a call to the dispatch center?

22  A.  I did.

23  Q.  What did they tell you?

24  A.  They told me it was -- I don't remember the road -- Edwards

25  Crossing is a crossing over the Yuba River, but it was

1    essentially off -- way up north of Highway 20, kind of out in

2    the boonies.  Bloomfield Road, I think.  I don't remember

3    exactly.

4    Q.  And who assembled the MAIT team to respond to this

5    location?

6    A.  At that point I called my team personnel and had them

7    respond up to the scene.

8    Q.  And what was the team composed of for this event?  Who was

9    it composed of?  Sorry.

10   A.  Myself, I believe all four officers, last names Ruppert,

11   Nashimi, Hamilton and Nelson, and then my motor carrier

12   specialist, Gilerstrum.

13   Q.  What was your role on the team?

14   A.  Essentially, I was there to oversee what it was we were

15   going to do.  At the time we didn't know.  When we -- on the

16   way up, often when we get there it takes a little bit of time

17   for all the agencies to figure out who is doing what, so it is

18   kind of to coordinate what our portion of the investigation was

19   going to be.

20   Q.  Once the team was assembled, you responded together to the

21   scene or separately?

22   A.  We all responded separately.  We met up at the scene.

23   Q.  Just in your own personal vehicles or government vehicles?

24   A.  Correct.

25   Q.  What happened when you arrived on scene?

1   A.   When we arrived on scene, we initially discussed with, at

2   that time Grass Valley CHP Commander Arnswald, and then Nevada

3   County investigators to, you know, try to figure out what it

4   was our role was going to be in this investigation.

5   Q.   Was there some decision made on that?

6   A.   Initially it was decided that Nevada County Sheriff's

7   Department was going to handle the criminal investigation.   I

8   believe the FBI was called to document the physical evidence at

9   the scene.   And we were kind of just waiting to see if we were

10  going to be used in any way at all at that point.

11       So FBI hadn't shown up at that point, so we just waited for

12  the FBI to show up and see what they were going to handle.

13  Q.   Once the FBI showed up, was there some determination made

14  as far as what MAIT would be doing at the scene, if anything?

15  A.   Yeah.   At that point it was decided that the FBI folks

16  would locate evidence -- placard the evidence, mark everything,

17  and collect the evidence, and then we would document the

18  location of the evidence because at the time their survey

19  instrument was not functioning.

20  Q.   How were you going to document the location?

21  A.   We were going to document that with our survey instrument.

22  Q.   So the same instruments you previously testified about that

23  involved the control point and prism?

24  A.   Yes.

25  Q.   Once the FBI arrived and everyone's roles were established,

1   what did you do?

2   A.   We went up.   The FBI folks drove up.   The area where the

3   incident took place wasn't drivable in our vehicles without

4   doing some serious scratching and damaging to the side of them.

5   So the FBI had some cutters, and they were able to drive their

6   truck up to the location, cutting some of the -- it was a lot

7   of branches overhanging the road, scrub brush.

8       They were able to cut a lot of that out of the way and were

9   able to get their truck up there.   We didn't have anything to

10  cut away a lot of the shrubbery.

11  Q.   What happened once the FBI and your team made it up that

12  path to the scene itself?

13  A.   Once we got to that location, our team and the FBI folks,

14  we kind of set up a scrimmage line, a line of people to try to

15  walk through the incident scene to locate different items of

16  physical evidence.

17      If we would see something, we would let the FBI know.   And

18  then they would provide a placard and placard the item.

19  Q.   How long did that initial walk-through, for lack of a

20  better term, take?

21  A.   I'm not exactly sure.

22  Q.   Once the walk-through was completed, did you start to

23  survey the evidence?

24  A.   Yeah.   After the placards were put down, we set up a

25  location kind of in the center so we hopefully could get all of

1    the items surveyed.  And then we started surveying shortly

2    thereafter.  Yeah.

3    Q.  How long did it take you to complete the survey of that

4    scene approximately?

5    A.  You know, I'm not sure.  I know we arrived about 7:30.  No.

6    5:30.

7    Q.  This is p.m.?

8    A.  It was p.m.  Correct.  And then we probably didn't get up

9    onto the scene until close to 7:30.  And then we didn't leave

10   until a little after midnight.

11   Q.  Does the fact that it is dark out impact your ability to

12   use the surveying equipment at all?

13   A.  No.

14   Q.  And had the FBI brought up lights to illuminate the crime

15   scene?

16   A.  Yes.

17   Q.  Once you completed the survey of the scene, and in the days

18   following, did the information that you gathered during that

19   survey, was it reconstructed into any sort of diagram or a

20   chart that could be used?

21   A.  Yeah.  Part of what we do with that survey data is we'll

22   take it back to the office.  We download it to a computer.  And

23   essentially we get -- as we are surveying each point, we'll

24   give it a point number, say point 100.  And then we'll give it,

25   on a pad, a description as to what that item is.

1    So we'll go through a list of, you know, 100 through 300

2    points, whatever it happens to be.  And each of those items

3    will have some sort of descriptor as to what that surveyed item

4    was.

5    So once we get back to the office, we put the data that we

6    surveyed into a computer, an AutoCAD program, a drawing

7    program, and we essentially get a bunch of points throughout

8    the diagram.

9    Now we know what all those points are based on our notes,

10   and we can draw and create a diagram locating where all the

11   evidence was in relation to any paths, we'll survey the trees,

12   we'll survey the edge of the path, in addition to any of the

13   evidence that's out there.

14   So we can create a diagram, almost a picture -- an overhead

15   picture of what the incident looked like and where all the

16   evidence was located.

17   Q.  Did you create that type of diagram or overhead picture in

18   this case?

19   A.  We did.

20   Q.  Based on the information you acquired during the survey?

21   A.  Correct.

22   Q.  And was that information contained in a report that you

23   generated that included the diagrams?

24   A.  Yes.

25   Q.  I would like you to turn, if you could, to Tab 5A.

1    Do you recognize this?

2    A.   Not yet.

3    Q.   Sorry.  The item is above the tab, or should be.

4    A.   It's behind actually.

5         (Witness reviews exhibit.)

6         Yes, I do recognize that.

7    Q.   What is that?

8    A.   That is what we call our Incident Environment Diagram No.

9    1.  It is a general location of where the incident took place

10   in relation to the roads in the vicinity.

11        We have a Google satellite image, as well as an incident

12   location outlined in that image, with kind of a blowup showing

13   our surveyed data included within that.

14   Q.   Did you participate in the creation of this diagram?

15   A.   Creating it, no.  I did the edits for the entire report

16   though.

17        MR. MCCOY:  Your Honor, I move at this time to admit

18   Government Exhibit 5A.

19        MR. TONEY:  No objection.

20        THE COURT:  It is admitted.

21        (Whereupon, Government's Exhibit 5A was received.)

22        (Exhibit published.)

23   BY MR. MCCOY:

24   Q.   So the overhead here, the image that we have of the terrain

25   and the area, that was not a photograph taken by your MAIT

1   team, correct?

2   A.   Correct.   That's a Google image.

3   Q.   But the insert to the right of the diagram, that was -- or

4   sorry -- to the right of the exhibit, that was created by you?

5   A.   Yes.

6   Q.   Could I have Government's Exhibit 5B.

7        I've just brought up Government's Exhibit 5B on the

8   monitor.   Can you explain to the jury what this is?

9        (Exhibit published.)

10  A.   This is titled Incident Environment Diagram No. 2.   So this

11  is an overview of what the area looked like prior to any

12  incident taking place.

13       This is kind of like -- it is set up kind of like a

14  campground.   There is some bedding.   There's some clothes.

15  There is a campfire, a couple of motorcycles.

16       This is kind of a view of what the area looked like prior

17  to any incident taking place.

18  Q.   I notice on the diagram that towards the center of the

19  diagram itself there is -- next to what appears to be a

20  motorcycle, there is a mark.   And below it it says Control

21  Point No. 1000?

22  A.   Yes.

23  Q.   What is that?

24  A.   That's where our instrument was set up, the control head

25  for our instrument.

1    Q.  In regards to this scene itself -- I know you said

2    sometimes there is multiple control points, but in regards to

3    this scene, was this the only control point established?

4    A.  Yes.

5    Q.  So this was a fixed point during the entire period of the

6    survey; is that correct?

7    A.  Correct.

8    Q.  Were you using the survey equipment -- in regards to this

9    environment diagram, were using the survey equipment to confirm

10   the distances -- confirm the distances between the control

11   point and some of items that you mentioned, like the

12   motorcycle, the bedding, things along those lines?

13   A.  It wasn't to confirm, it was to measure.

14   Q.  I'm sorry.  Measure.

15   A.  It was to measure the location.  From that control point it

16   measures out.  We would move our rod to the different locations

17   with the prism on it, and it would measure to those different

18   evidence items.

19   Q.  Now, how about the -- in addition to the specific pieces of

20   evidence -- or not pieces of evidence, rather these items, like

21   the motorcycle and the bedding that's noted in the diagram, you

22   also have foliage, trees that appear, the green around the

23   trail itself?

24   A.  Yes.

25   Q.  Were all of those measured out as well?

1    A.   Not all of them.  If there's a -- in the diagram there if

2    there's a brown round trunk, that's something we measured,

3    versus if there is no trunk at -- typically they'll be at the

4    center of these circles depicting trees.  If there is no center

5    round trunk, then we didn't survey.  So some of those are

6    inserted there based on the Google aerial photograph.  But in

7    and about the campsite itself, those trees are surveyed.

8    Q.   So let me ask this first question.  There is a tree with,

9    as you said, a brown circle trunk in the bottom center of that

10   diagram close to what's marked "Additional Bedding."

11        Do you see that?

12   A.   Yes.

13   Q.   So because there is a trunk there, you actually -- or

14   someone actually measured that out with the survey equipment?

15   A.   Correct.

16   Q.   Now, when you -- stepping back little bit, when you came

17   into the campsite area depicted in this diagram with the FBI to

18   do your walk-through, you were able to observe the entire scene

19   at that point, correct, as you walked through?

20   A.   Yes.

21   Q.   I would like you to flip, if you would, to Tab 2A.

22   A.   Okay.

23   Q.   If you could, explain what's pictured here.

24   A.   That is a view from the east towards the west.  There's a

25   trail that kind of comes in from that easterly direction that

317

1    continues up in a westerly direction.

2    Q.  What do you recognize this to be?

3    A.  That is the motorcycle, the one that you referenced in the

4    diagram that we created.  In addition, there's some EMT -- CHP

5    EMT bags, it looks like two of them, and medical supplies

6    strewn around the ground there.

7    Q.  Does this picture depict the scene as you remember it when

8    you were moving through with the FBI?

9    A.  Yes.

10         MR. MCCOY:  Your Honor, I move at this time to admit

11   Government Exhibit 2A into evidence.

12         THE COURT:  It is admitted.

13     (Whereupon, Government's Exhibit 2A was received.)

14     (Exhibit published.)

15   BY MR. MCCOY:

16   Q.  So you referenced the motorcycle, then you also referenced

17   medical bags.  Using your finger, would you please circle the

18   area where the medical bags are located on the picture?

19   A.  (Indicates on picture.)

20   Q.  Do you know which agency medical bags those were?

21   A.  These are CHP medical bags.

22   Q.  How are you able to identify them as CHP?

23   A.  I've got one just like it in my truck.  And they say it on

24   the bags.

25   Q.  If you could now turn to 5C.

1    A.   Okay.

2    Q.   What is this?

3    A.   This is our first physical evidence diagram.  It's labeled

4    Physical Evidence Diagram No. 1.  This is similar to the

5    environment diagram except this shows where the physical

6    evidence items that we surveyed, or at least a portion of them,

7    where some of the physical evidence items are that we

8    surveyed -- where they are located.

9        On that diagram it also has got an area outlined in a red

10   dashed line that would reference Physical Evidence Diagram No.

11   2, which is a blowup, a detail of a certain area.

12            MR. MCCOY:  Your Honor, at this time I move to admit

13   Government Exhibit 5C.

14            MR. TONEY:  No objection.

15            THE COURT:  It is admitted.

16       (Whereupon, Government's Exhibit 5C was received.)

17       (Exhibit published.)

18   BY MR. MCCOY:

19   Q.   Now, on this diagram -- this physical evidence diagram, I

20   notice that there are -- well, first I notice that the control

21   point that we had seen on the environment diagram is no longer

22   there?

23   A.   Correct.

24   Q.   Does that mean the control point wasn't being used, or you

25   just removed it from this diagram for purposes of tracking

1   evidence?

2   A.   We just removed it for clarity on the diagram.

3   Q.   Thank you.

4        There are also some items there that have -- that are

5   marked with blue numbers as opposed to red.  What's the

6   distinction?

7   A.   The red items are items that were placarded by the FBI.  So

8   all the FBI placarded items are going to show up as red

9   identifiers.  Anything that wasn't placarded by the FBI is

10  going to show up as a blue identifier.  So that is just

11  something else we picked up and we're identifying in our log.

12  Q.   Now I would like you to turn to Tab 5D, please.

13  A.   Okay.

14  Q.   And when you were speaking about the diagram that we just

15  saw, the Physical Evidence Diagram No. 1, you referenced an

16  insert.  What is contained behind Tab 5D?

17  A.   5D is Physical Evidence Diagram No. 2 Detail.  So this is a

18  blowup of a portion of the area that was visible in Diagram No.

19  1 -- the Physical Evidence Diagram No. 1.

20            MR. MCCOY:  Your Honor, I move to admit 5D.

21            MR. TONEY:  No objection.

22            THE COURT:  5D?

23            MR. MCCOY:  Yes, please.

24            THE COURT:  It is admitted.

25       (Whereupon, Government's Exhibit 5D was received.)

1          (Exhibit published.)

2     BY MR. MCCOY:

3     Q.   Sorry.  If we could, go back to 5C for a moment.

4          (Exhibit published.)

5          So 5C is the general view of the campsite, correct?

6     A.   Correct.

7     Q.   And then 5D, is that area checkered in red?

8     A.   Correct.

9     Q.   5D, please.

10          (Exhibit published.)

11          And that's just a more detailed view; is that right?

12     A.   It's a detail of that one area.  There was a lot of

13     evidence clustered in that one area, so we blew that area up so

14     you could see it a little better.

15     Q.   If you would, would you turn to Tab 2P.

16          (Exhibit published.)

17          In fact, it is on the monitor, too.  This has been

18     admitted.  Whatever is easiest for you to look at.

19     A.   Okay.

20     Q.   Do you recognize this?

21     A.   Yes.

22     Q.   What is this?

23     A.   Those are handcuffs that were located at the incident scene

24     associated with Placard No. 4.

25     Q.   I'm going to go back to 5C, please.

1    (Exhibit published.)

2    Now, in the picture we just looked at, there was an

3  evidence placard, Item No. 4.

4    Is the location of that Item No. 4 depicted on the physical

5  evidence diagram currently in front of you?

6  A.  Yes.

7  Q.  If you could -- that screen is sensitive, but if you could,

8  try to circle the approximate location of No. 4?

9  A.  (Marks diagram.)

10  Q.  Would you like me to erase that?

11  A.  Erase those, please.  I'll try again.

12    (Marks diagram.)

13    Oh, that wasn't pretty either.

14  Q.  But it is depicted there?  That No. 4, that is indicating

15  the location of that evidence item?

16  A.  Yes.

17  Q.  And that corresponds with the photograph -- or the evidence

18  placard used by the FBI in that photograph that we just saw?

19  A.  Correct.

20  Q.  If I could go back to 2P.

21    (Exhibit published.)

22    This photograph; is that correct, Sergeant Day?

23  A.  Correct.

24  Q.  So just so I'm clear, the items that you're placing on the

25  diagram -- the physical evidence diagram corresponds to the FBI

1    placard numbers?

2    A.   Correct.

3    Q.   If I can, go to 3E, please.  This image will be popping up

4    on your monitor here in a second.

5         (Exhibit published.)

6    A.   Okay.

7    Q.   Do you recognize what's depicted in this photograph?

8    A.   Yes.

9    Q.   What is that?

10   A.   There are three placards, 22, 23 and 24.

11   Q.   If you could, focus in on 23 for us, please.

12        (Exhibit published.)

13   A.   Okay.  That would be a magazine.  A gun magazine.

14   Q.   Go to 5C.

15        I'm sorry.  5D.

16        (Exhibit published.)

17        Is that magazine with Evidence Placard No. 23 depicted on

18   the diagram here?

19   A.   Yes.

20   Q.   If you could, point out its approximate location, just in

21   case it is hard for the jury to see.

22   A.   (Marks diagram.)

23   Q.   Okay.  3I, please.

24        (Exhibit published.)

25        What's depicted in this photograph?

1   A.   That would be the coffee pot, Placard Item 30, that has a

2   bullet hole in it.

3   Q.   5D, please.

4        (Exhibit published.)

5        Is that Evidence Item 30 located on this diagram?

6   A.   Yes.

7   Q.   Would you circle its approximate location?

8   A.   (Marks diagram.)

9   Q.   4D, please.

10       Can I have you turn to 4D, please.

11  A.   Okay.

12  Q.   Do you recognize what's depicted in that photograph?

13  A.   Yes.

14  Q.   What is that?

15  A.   It is a brown boot with Placard 44 located next to it.

16  Q.   And that's an evidence placard that the FBI would have

17  placed there?

18  A.   Correct.

19          MR. MCCOY:   Your Honor, the government would move 4D

20  into evidence.

21          MR. TONEY:   No objection.

22          THE COURT:   It is admitted.

23       (Whereupon, Government's Exhibit 4D was received.)

24       (Exhibit published.)

25  BY MR. MCCOY:

1    Q.  It is now going to come up on your monitor.

2    A.  Okay.

3    Q.  If you could, go to 5C, please.

4        (Exhibit published.)

5        Is Evidence Item 44 shown on the diagram here?

6    A.  Yes.

7    Q.  If you could, circle its approximate location?

8    A.  (Marks diagram.)

9    Q.  I'll remove your markings.

10       Just so I'm clear, we talked about the tree located in the

11   bottom center, the trunk depicted there, as being something

12   specifically surveyed by the MAIT team, correct?

13   A.  Correct.

14   Q.  I also notice another tree with a trunk depicted in the

15   upper center, sort of to the left.

16       Does that indicate that it was also -- you used your survey

17   equipment to capture its location as well?

18   A.  Yeah.

19   Q.  I'm looking -- so you are clear, I'm looking directly above

20   the number 43?

21   A.  Above the number 43 or 48?

22   Q.  I'm sorry.  48.

23   A.  Okay.  Yeah.  Just above 48, yeah.  That is a tree we

24   surveyed.

25   Q.  Okay.  If you could, go to 4J.  We'll try 4J first, please.

325

1      (Exhibit published.)

2      And do you recognize this?

3   A.   Yes.

4   Q.   What is this?

5   A.   I believe that's a blue sweatshirt, Evidence Placard 38.

6   The evidence placard was placed by the FBI.

7   Q.   5C, please.

8      (Exhibit published.)

9      Is that item located on this Physical Evidence Diagram No.

10   1?

11   A.   Yes.

12   Q.   Would you circle its location?

13   A.   (Marks diagram.)

14   Q.   It's all right.

15   A.   Can you erase those?

16   Q.   I think they can -- I think we can see it.

17   A.   One of the arrows is on it.

18      (Marks diagram.)

19   Q.   4K, please.

20      (Exhibit published.)

21      Do you recognize this?

22   A.   Yes.

23   Q.   What is this?

24   A.   That would be Evidence Placard 49 next to -- I believe

25   those are the pants that were cut off from Mr. Cole.  Yeah.

1    Q.  And 5C, please.

2         (Exhibit published.)

3         Did you document the location of No. 49 on the physical

4    evidence diagram?

5    A.  I myself did not, but it is documented on this diagram.

6    Q.  Okay.  And can you either put an arrow or circle the

7    approximate location of that item?

8    A.  (Marks diagram.)

9         Can you erase that one, please.

10        Where the arrow is approximately where it is.

11   Q.  Okay.  4P, please.

12        (Exhibit published.)

13        And do you recognize what's captured in this photograph?

14   A.  Yes.  That's an evidence placard.  Again, that's FBI

15   Evidence Placard 50 next to another brown boot.

16   Q.  5C, please.

17        (Exhibit published.)

18        And is this item documented -- or the location of this item

19   documented in the physical evidence diagram?

20   A.  Yes.

21   Q.  And I'll ask if you can try again?

22   A.  I will try.

23   Q.  Great.

24   A.  Here we go.

25        (Marks diagram.)

327

```
1              MR. MCCOY:  Thank you.

2         May I have a moment, Your Honor?

3              THE COURT:  Yes.

4         (Government cocounsel confer.)

5    BY MR. MCCOY:

6    Q.  Could I have 4A, please.

7         (Exhibit published.)

8    A.  Okay.

9    Q.  Sergeant Day, do you see that on the screen there?

10   A.  Yes.

11   Q.  What does this photograph capture?

12   A.  Evidence Placards 42, 43 and 44.

13   Q.  Can I have Exhibit 4B, please?

14        (Exhibit published.)

15   A.  Okay.

16   Q.  Do you recognize this?

17   A.  Yes.  That appears to be the handgun at location 42.

18   Q.  Can I have 5C, please?

19        (Exhibit published.)

20        I think this is the last time I'll ask you to do this, but

21   could you circle the approximate location of where 42 is

22   located on the physical evidence diagram?

23   A.  Yes.

24        (Marks diagram.)

25        Guess not.  Well, it is a little -- can you erase that one.
```

1    I'll try one more time.

2         (Marks diagram.)

3       There we go.  That's better.

4            MR. MCCOY:  I have no further questions at this time,

5    Your Honor.

6            THE COURT:  Okay.

7            MR. TONEY:  I have no questions.

8            MR. MCCOY:  Thank you, Your Honor.

9            THE COURT:  You are excused, sir.

10           MR. MCCOY:  Your Honor, the United States calls Randy

11   Billingsly.

12           THE CLERK:  You can be seated.  Raise your right hand

13   please.

14   (WHEREUPON, RANDALL BILLINGSLY WAS CALLED AS A WITNESS AND

15   SWORN)

16           THE CLERK:  Please, state and spell your full name for

17   the record.

18           THE WITNESS:  Randall Billingsly, R-a-n-d-a-l-l,

19   B-i-l-l-i-n-g-s-l-e-y.

20                      DIRECT EXAMINATION

21   BY MR. COPPOLA:

22   Q.  Good afternoon.

23   A.  Good afternoon.

24   Q.  Who do you work for?

25   A.  I'm the chief criminal investigator for the Nevada County

1   District Attorney's Office.

2   Q.  Are you a commissioned peace officer?

3   A.  Yes, I am.

4   Q.  How long have you been the chief criminal investigator for

5   the Nevada County District Attorney's Office?

6   A.  Approximately, five years.

7   Q.  Prior to joining the Nevada County DA's Office, have you

8   held any other law enforcement positions?

9   A.  Yes.

10  Q.  Where?

11  A.  I was a criminal investigator with the San Mateo District

12  Attorney's Office for seven years previous to that.  Prior to

13  that I was a police officer with the City of San Mateo for

14  approximately seven years in which I was also a detective and

15  homicide investigator.  And prior to that I was an Oakland

16  police officer, a patrol officer for two years.

17  Q.  So you have been a police -- or law enforcement officer for

18  nearly 20 years or --

19  A.  Over 20 years.

20  Q.  Over 20?

21  A.  Yes.

22  Q.  Can you please describe for the jury what the duties and

23  responsibilities of a district attorney investigator are?

24  A.  In this situation?

25  Q.  Just generally speaking, and then we'll take about this

1   situation.

2   A.   A district attorney investigator's job is to assist the

3   district attorney in the investigation of major criminal acts

4   that occur within the county of jurisdiction, trial preparation

5   as well.

6        One of our main focuses is crimes against persons,

7   homicides, attempted homicides, officer-involved shootings,

8   in-custody deaths, things of that nature.

9        We assist the DA with making filing decisions and/or trial

10  preparation for cases that are brought to trial.

11  Q.   I want to direct your attention now, Investigator

12  Billingsly, to June 14th, 2014.

13  A.   Yes.

14  Q.   Do you recall what day of the week June 14, 2014, was?

15  A.   Saturday.

16  Q.   Now, as a DA Investigator, is your usual work schedule the

17  business week, Monday through Friday?

18  A.   Yes.

19  Q.   Okay.   What happened on June 14th, 2014?

20  A.   I received a call from the Nevada County Sheriff's

21  Department advising there had been an officer-involved shooting

22  in our jurisdiction, and they requested our assistance.

23  Q.   And do you recall where it was when you received that phone

24  call?

25  A.   At home.

1   Q.   Okay.   After you received that phone call, Investigator

2   Billingsly, what did you do next?

3   A.   I notified members of my staff, other investigators, that

4   they were going to be called out for an extensive follow-up

5   investigation into this matter.

6   Q.   Okay.   Specifically, which investigators did you notify?

7   A.   Investigator Tom Swisher and Investigator Jim Souza.

8   Q.   You mentioned, at the beginning of your testimony, that you

9   are the chief investigator for the Nevada County District

10  Attorney's Office.

11      How many other investigators are employed by that office?

12  A.   Currently there are five, including -- or excluding myself.

13  So six total.

14  Q.   Okay.   And back on June 14th, 2014, was it the same number?

15  A.   Yes.

16  Q.   Okay.   Now, as the chief investigator, is it your job to

17  supervise the other investigators in the office?

18  A.   Yes.

19  Q.   Okay.   At some point, Investigator Billingsly, did you go

20  to the scene up off North Bloomfield Road?

21  A.   Yes, I did.

22  Q.   Who, if anyone, went with you?

23  A.   Investigator Swisher went with me, and we meet Investigator

24  Souza on scene.

25  Q.   Okay.   When you got up to the scene, do you recall

332

1   approximately what time of day it was?

2   A.   It was in the afternoon.

3   Q.   And when you got up to the North Bloomfield Road area, how

4   many different law enforcement agencies were present at the

5   scene?

6   A.   Numerous.

7   Q.   Okay.  Once you arrived at that location, did you enter the

8   campsite area?

9   A.   Yes, I did.

10  Q.   And did anybody go with you?

11  A.   Yes.

12  Q.   Who went with you?

13  A.   Investigator Swisher.

14  Q.   And approximately how long were you inside the campsite

15  area?

16  A.   Approximately, ten minutes.

17  Q.   Okay.  And what were you doing while inside the campsite

18  area?

19  A.   Walking around, examining the scene, trying to get an idea

20  of what occurred.

21  Q.   Now, Investigator Billingsly, were you present at the scene

22  when the FBI arrived?

23  A.   Yes.

24  Q.   And were you part of discussions related to how the scene

25  was going to be processed, who would collect evidence, those

1   types of decisions?

2   A.   Yes.

3   Q.   Okay.   And what was decided?

4   A.   It was decided that the FBI forensic team was going to

5   conduct the forensic collection of evidence, and that it was

6   going to be co-stored with the Nevada County Sheriff's

7   Department.

8   Q.   After you and Investigator Swisher took a look at the scene

9   and those decisions were made, did you then depart that area?

10  A.   At some point, yes.

11  Q.   Now, at some point had it been decided to make -- or to

12  attempt an interview of an individual by the name of Brent

13  Cole?

14  A.   Yes.

15  Q.   Okay.   And which agency was going to be tasked with

16  attempting that interview?

17  A.   We collectively decided that the Nevada County District

18  Attorney's Office would be the most appropriate to interview

19  Mr. Cole, due to the fact that we had no law enforcement

20  officers involved in this shooting and that we were a third

21  party.

22  Q.   Okay.   Was that decided on June the 14th while you were

23  still at the scene?

24  A.   No.   At that point we did not know what Mr. Cole's status

25  was.

1    Q.   Okay.  All right.

2         I want to direct your attention now, Investigator

3    Billingsly to June 16th, 2014.

4         On June 16th, 2014, did you and Investigator Swisher have

5    occasion to go to the Sutter Roseville Hospital?

6    A.   Yes.

7    Q.   Why was it that you went to the Sutter Roseville Hospital

8    on June the 16th, 2014?

9    A.   We were advised that Mr. Cole was awake and talking, and

10   that he was in the intensive care unit there.  And we wanted to

11   attempt to get an interview from him.

12   Q.   When you arrived at the hospital, did you go directly to

13   the intensive care unit?

14   A.   Yes.

15   Q.   And did you go directly to Mr. Cole's room?

16   A.   Yes.

17   Q.   Okay.  Do you see Mr. Cole in the courtroom today?

18   A.   I do.

19   Q.   Where is he seated, and what's he wearing, please?

20   A.   He's seated at the defense table.  Looks like he's wearing

21   a black collared shirt.

22            MR. COPPOLA:  Your Honor, the record should reflect

23   that Investigator Billingsly has identified the defendant.

24            THE COURT:  It shall.

25   BY MR. COPPOLA:

335

1   Q.   When you first arrived at Mr. Cole's hospital room, what

2   observations did you make of Mr. Cole?

3   A.   He was sitting upright in bed watching television.

4   Q.   Okay.   When you contacted Mr. Cole, did he appear to be

5   alert?

6   A.   Yes.

7   Q.   Did he appear to be oriented?

8   A.   Yes.

9   Q.   Was he on any type of respirator or ventilator?

10  A.   No.

11  Q.   Did Mr. Cole appear to know who you and Investigator

12  Swisher were?

13  A.   Not initially.   However, we did identify ourselves.   We

14  told him who we were.   He understood.   And I then Mirandized

15  him.

16  Q.   Before we get to the Miranda piece, did Mr. Cole appear to

17  be in any physical pain when you initially contacted him?

18  A.   No.

19  Q.   Did he appear to be under the influence of any medication?

20  A.   No.

21          MR. TONEY:   Object.   It would call for expertise.

22          THE COURT:   Overruled.

23  BY MR. COPPOLA:

24  Q.   Your answer?

25  A.   No.

1  Q.  During your interview, did Mr. Cole ever complain of pain?

2  A.  No.

3  Q.  Did Mr. Cole appear to understand the questions that both

4  you and Investigator Swisher were asking during the interview?

5  A.  Yes.  In fact, he seemed eager to want to speak with us.

6  Q.  Did Mr. Cole ever express any confusion about the questions

7  that were being asked?

8  A.  No.

9  Q.  And were Mr. Cole's answers to your questions appropriate?

10  A.  Yes.

11  Q.  Approximately, how long did your interview with Mr. Cole

12  last, Investigator Billingsly?

13  A.  I believe we spoke to him for approximately an hour and 14

14  minutes.

15  Q.  Okay.  Now, prior to asking you, you had mentioned that you

16  Mirandized Mr. Cole before you asked him any questions.

17      Did you advise Mr. Cole of his Miranda Rights from memory

18  or did you utilize a form?

19  A.  I used a form.  I believe I asked him one question prior to

20  the Miranda.  I asked him if he minded if we turned off the

21  television.  And he said, "Yes, please do."

22  Q.  Now, what are the Miranda Warnings, Investigator

23  Billingsly?

24  A.  You have a right to remain silent.

25  Q.  Please, continue.

1    A.   You have a right to counsel.  If you cannot afford counsel,

2    one will be -- if you cannot afford an attorney, one will be

3    appointed to represent you before and during questioning if you

4    desire.

5    Q.   There's also:  Anything you say can and will be used --

6    A.   -- will be used against you in a court of law.

7    Q.   You also have the right to an attorney?

8    A.   Yes.

9    Q.   Okay.  And you read these rights from a form to Mr. Cole?

10   A.   I always read them from a form so that I don't make a

11   mistake.

12   Q.   Okay.  And did Mr. Cole indicate to you that he understood

13   his Miranda Rights?

14   A.   Yes.

15   Q.   Okay.  And did he indicate he wanted to waive his rights

16   and speak with you?

17   A.   Yes.

18   Q.   And when he -- when he indicated that he wanted to speak

19   with you, do you recall specifically what he said?

20   A.   Specifically at that moment?

21   Q.   When he indicated "yes" or "yeah, I want to talk to you,"

22   did he say anything specific after that that you recall?

23   A.   I do remember him saying "Yes, I do want to talk to you."

24        If you are looking for the specific verbiage of that exact

25   line, I would have to refer to my report to refresh my

1    recollection.

2    Q.  All right.  That's fine for now.  We'll continue at this

3    point.

4         Now, you indicated this interview with Mr. Cole lasted for

5    approximately an hour and 14 minutes?

6    A.  Yes.

7    Q.  Okay.  During your interview with Mr. Cole, were questions

8    asked about how it was he came up to the campsite on June the

9    14th, 2014?

10   A.  Yes.

11   Q.  Okay.  And what did Mr. Cole say about how it was he came

12   up to the campsite?

13   A.  Are you referring to prior --

14   Q.  Let me back up.

15   A.  Thank you.

16   Q.  Okay.

17   A.  Because we talked about some extensive detail.

18   Q.  Right.  Where I'm looking for -- what I'm looking for,

19   Investigator Billingsly, is did Mr. Cole talk to you -- make

20   any statements regarding hiking up through the woods to get to

21   the campsite?

22   A.  Yes.

23   Q.  Okay.  What did Mr. Cole tell you about hiking up through

24   the woods to get to the campsite?

25   A.  Mr. Cole indicated to me that he walked up the side of a

1   hill, blazed his own trail to his campsite.  There was a tree

2   leaning, that's how he knew how to recognize how to get to his

3   campsite from a lower point on Bloomfield Road.  And that he

4   walked directly up the side of the hill based on the location

5   of that tree to his campsite, blazed a trail through brush, cut

6   his own path towards the site.

7   Q.  Okay.  And did Mr. Cole say anything about hearing voices

8   coming from the campsite?

9   A.  Yes.

10  Q.  What do you recall him telling you about that?

11  A.  He said that prior to his arrival at the campsite, before

12  he got there, he heard voices at the campsite.

13      Later in the interview I believe he also indicated he heard

14  police radios.  That's how he knew law enforcement was in his

15  campsite.

16  Q.  Did Mr. Cole indicate to you that he waited for a period of

17  time in the brush before announcing himself to the officers in

18  the campsite?

19  A.  Yes, he did.

20  Q.  Did he indicate how long he waited?

21  A.  I believe he said a few minutes.

22  Q.  Did Mr. Cole express to you what his concerns were about

23  the police officers being at that campsite?

24  A.  He stated he was concerned that they were rifling through

25  his belongings and taking them.

1    Q.   Okay.   Now, did Mr. Cole, during your interview, indicate

2    how it was he first had contact with Ranger Pultorak?

3    A.   Yes.

4    Q.   Okay.   Describe what Mr. Cole indicated about that?

5    A.   Mr. Cole indicated that prior to walking back to the camp

6    that I just described, earlier in the day he had had a

7    confrontation with Ranger Pultorak at the bottom of a trailhead

8    leading up to that campsite in which he indicated -- excuse

9    me -- Mr. Cole indicated that Ranger Pultorak had been very

10   rude and obnoxious to him.

11   Q.   Okay.   And did Mr. Cole tell you about what his interaction

12   was now as he broke through the tree line and made contact with

13   Ranger Pultorak when he returned to the campsite?

14        That was a bad question.   Let me try again.

15        Did Mr. Cole say anything about his -- now this would be

16   his second contact with Ranger Pultorak on June 14th, 2014,

17   when he emerged from the tree line?

18   A.   Yes.

19   Q.   What did he tell you about that contact?

20   A.   He stated that upon coming out of the tree line and the

21   brush, he was immediately confronted by law enforcement

22   officers.   And that Ranger Pultorak had handcuffs in his hand,

23   and that he was advancing towards him.

24   Q.   Did Mr. Cole indicate at that point if there was some

25   discussion between himself and Ranger Pultorak about being

1    armed?

2    A.   Yes.

3    Q.   Okay.   What did Mr. Cole tell you about that?

4    A.   Several times during the interview we discussed this.   And

5    at one point during my discussion with Mr. Cole, he stated

6    that -- when I asked him did Ranger Pultorak ask you any

7    questions, he stated -- Mr. Cole told me Ranger Pultorak --

8    Ranger Pultorak told him -- or asked him are you armed.

9        And Mr. Cole indicated that he told Ranger Pultorak, yes, I

10   am armed.

11   Q.   Okay.   Now, you mentioned that Mr. Cole made some comments

12   about Ranger Pultorak having handcuffs in his hand --

13   A.   Yes.

14   Q.   -- when he first made contact with the defendant?

15       Did Mr. Cole say anything about what Ranger Pultorak was

16   doing with those handcuffs?

17   A.   Yes.

18   Q.   What did he say about what Ranger Pultorak was doing with

19   those handcuffs?

20   A.   Mr. Cole indicated to me that Ranger Pultorak had turned

21   his back to CHP Officer Hardin, and that he was twirling the

22   handcuffs on one finger inside the loop, taunting him.

23   Q.   Did Mr. Cole say anything about what Ranger Pultorak did

24   with the handcuffs after twirling them?

25   A.   Upon realizing that Mr. Cole was armed, Mr. Cole said he

1  started putting them back -- or looked like he was trying to

2  put them back.

3  Q.  And what did -- what did Mr. Cole tell you happened at this

4  point?

5  A.  Mr. Cole stated that Ranger Pultorak drew down on him,

6  meaning he pointed his firearm towards Mr. Cole.

7  Q.  Okay.  And what did Mr. Cole indicate to you at this point

8  in the interview his response was?

9  A.  That he drew his weapon and fired at Ranger Pultorak.

10 Q.  Now, during the interview with Mr. Cole, did you discuss

11 the -- rather did Mr. Cole say anything about being convinced

12 that Ranger Pultorak was there to cause him harm -- there at

13 the campsite to cause him harm?

14 A.  Yes.

15 Q.  Was that a recurrent theme throughout the hour and 14

16 minutes that you interviewed Mr. Cole?

17 A.  Yes.  I asked him extensive questions about that.

18 Q.  I would like to talk about the questions that you asked

19 regarding that.

20     What was Mr. Cole -- what did Mr. Cole share with you about

21 why it was he thought Ranger Pultorak was out to do him harm on

22 June the 14th, 2014?

23 A.  It varied.  However, it started with Mr. Cole indicated

24 that because of the contact earlier in the day and how surly

25 and vicious Mr. Pultorak had spoken to him previous, he knew

1    that he wanted to kill him when they met later in the day.

2        He also indicated that when he saw the handcuffs -- excuse

3    me -- when Mr. Cole saw the handcuffs, he indicated to me that

4    he thought Ranger Pultorak was going to handcuff him in a

5    remote place and kill him.

6    Q.  Was Mr. Cole able to provide you with any specific examples

7    of what Ranger Pultorak said to him that caused him to fear for

8    his life?

9    A.  No, he was not.

10   Q.  Did you ask Mr. Cole repeatedly throughout the interview

11   what it was about Ranger Pultorak's comments that caused him to

12   think that -- or caused Mr. Cole to think that he was in fear

13   for his life?

14   A.  Yes, I did.

15   Q.  Okay.  And at any point during your interview was he able

16   to point to a specific thing that Ranger Pultorak said that

17   caused him to fear for his life?

18   A.  No.

19   Q.  Going back to the shooting portion that we left off with a

20   moment ago, what did Mr. Cole tell you about where it was he

21   shot Ranger Pultorak?

22   A.  He indicated that he shot Ranger Pultorak in his shoulder.

23   Q.  Okay.  And at some point did he indicate that he believed

24   Ranger Pultorak was pulling up for a heart shot?

25   A.  Yes.

1  Q.  Now, we talked about the handcuffing portion already.  Did

2  Mr. Cole describe for you what his reaction was upon seeing

3  Ranger Pultorak begin to draw his firearm?

4  A.  Yes.

5  Q.  How did Mr. Cole describe his reaction?

6  A.  I remember one line specifically in reviewing the

7  transcript, 1107, which was very noteworthy to me, in which

8  Mr. Cole indicated that in a gunfight you don't wait to get

9  shot, basically that you act first.

10  Q.  Okay.  Did Mr. Cole at any point say that he just freaked

11  out?

12  A.  He did indicate that as well.

13  Q.  Okay.  Now, throughout your interview, or at least in one

14  other place during your interview, did Mr. Cole reiterate that

15  Ranger Pultorak was pulling up for a heart -- he thought

16  Ranger Pultorak was pulling up for a heart shot when he fired?

17  A.  Yes.

18  Q.  Now, during your interview with Mr. Cole, Investigator

19  Billingsly, was Mr. Cole asked questions about why it was he

20  was carrying a .44 caliber pistol that day?

21  A.  Yes.

22  Q.  And what was Mr. Cole's response to those questions?

23  A.  Mr. Cole indicated that there was a bear that had been

24  harassing his campsite on several occasions.  And that he had

25  come face-to-face with the bear on at least one prior occasion,

1  and so he was carrying it for security purposes.

2  Q.  Now, did you ask -- did you ask him -- ask Mr. Cole any

3  further questions about the bear later in the interview?

4      Was the bear a recurring theme in the interview as well?

5  A.  Yes, it was.

6  Q.  At some point during the interview, do you recall Mr. Cole

7  saying anything about the bear not being an obnoxious bear?

8  A.  Yes, I do.

9  Q.  Okay.  What do you recall Mr. Cole telling you about the

10  "obnoxiousness," I guess, for lack of a better word, of the

11  bear?

12  A.  Just what you said, that the bear was not obnoxious.

13  However, that it was looking for food in his camp.

14  Q.  Now, Investigator Billingsly, as the interview progressed,

15  were questions asked in an attempt to flesh out the sequence of

16  events leading to the first shot?

17  A.  Yes.

18  Q.  Okay.  And how specifically did you ask those questions?

19  A.  Very.  Upon numerous occasions, quite frankly, and came up

20  with varied responses from Mr. Cole.

21  Q.  Okay.  Did the defendant -- or did Mr. Cole at some point

22  indicate to you or were -- let me try again.  I apologize.

23      What did the defendant say about -- or what did the

24  defendant tell you about firing first in this case -- about who

25  fired first?

1  A.  There are several occasions when we discussed that, so I

2  recall in the transcript -- or in my interview with Mr. Cole

3  that several times he indicated that they fired first.

4  However, upon further questioning, he changed his story several

5  times.

6      When asked point blank who fired first, about -- probably

7  about 40 minutes into the interview or longer, he said that the

8  officers fired first.

9  Q.  So let me see if I understand you correctly.  Initially the

10  story was that Mr. Cole fired first?

11  A.  Yes.

12  Q.  Correct.

13  A.  Yes.

14  Q.  And then deep into the interview, the story changed to

15  Ranger Pultorak fired first?

16  A.  Yes.

17  Q.  Okay.

18  A.  And that changed several times throughout.

19      MR. TONEY:  I'll object.  Move to strike.  It is not

20  responsive.

21      THE COURT:  Overruled.

22  BY MR. COPPOLA:

23  Q.  Did the defendant say -- did you and Investigator Swisher

24  continue to ask the defendant, in an attempt to nail down what

25  had happened, did you continue to ask questions about that

1  throughout the interview?

2  A.  Yes.

3  Q.  Okay.  Did the defendant ever indicate to you during the

4  interview that he had just reacted wrong?

5  A.  Yes.

6  Q.  Okay.  How many times did he tell you that; if you recall?

7  A.  At least twice.

8  Q.  As you continued to press Mr. Cole during your interview,

9  did he ever indicate he was wrong to shoot Ranger Pultorak and

10  Officer Hardin?

11  A.  Yes.

12  Q.  Did that occur towards the end of your interview?

13  A.  Yes.

14  Q.  And do you recall specifically what he said?

15  A.  I believe he said:  I don't know what happened.  I just

16  freaked out.

17      MR. COPPOLA:  Your Honor, if I could have just a

18  moment.

19      THE COURT:  Okay.

20    (Government cocounsel confer.)

21  BY MR. COPPOLA:

22  Q.  Couple of final questions for you, Investigator Billingsly.

23    When you were discussing Ranger Pultorak's attitude -- or

24  when Mr. Cole was discussing Ranger Pultorak's attitude, did

25  the defendant -- did the defendant make some comments about his

1  short-term memory not being particularly good?

2  A.  Yes.

3  Q.  Okay.  What specifically did he say?

4  A.  That was the only time in the interview that he stated

5  that.  He stated that he could not recall specifically what

6  Ranger Pultorak had told him that was so vicious and rude

7  because he had some short-term memory loss based on this

8  incident.

9  Q.  In terms of getting back to the bear for just a moment, did

10 Mr. Cole also tell you that the bear had never caused him any

11 personal trouble, like coming at him or anything along those

12 lines?

13 A.  That's correct.  Yes.

14         MR. COPPOLA:  Your Honor, I don't have any further

15 questions for Investigator Billingsly.

16                     CROSS-EXAMINATION

17 BY MR. TONEY:

18 Q.  How many times did Mr. Cole tell you that he was shot

19 first?

20 A.  At what point during the interview?

21 Q.  At any point during the interview, how many times did

22 Mr. Cole say he was shot by Pultorak first?

23 A.  It varied.

24 Q.  Sir, the question is, how many times did he say that they

25 shot him first?

1  A.  Twice during the course of this interview, I believe.

2  Q.  Do you have your interview with you?

3  A.  I do have a copy, yes.

4      (Witness retrieves interview.)

5  Q.  First of all, some background before we get into it.

6      Had you talked to hospital staff about Mr. Cole before you

7  interviewed him?

8  A.  No.

9  Q.  So you had no indication if he was on any medications?

10  A.  No.

11  Q.  And you didn't ask him if he was on any medications?

12  A.  No.

13  Q.  He was lying in a hospital bed?

14  A.  He was sitting up in a hospital bed.

15  Q.  Was there an IV on him?

16  A.  Yes.

17  Q.  You knew that he had been shot multiple times two days

18  before, correct?

19  A.  Yes.

20  Q.  Was it important to you to determine if he was on any

21  medications?

22  A.  I wanted to determine if he was coherent enough to talk to

23  us.

24  Q.  In your experience as a law enforcement officer and

25  investigator, would any kind of pain killing medications affect

1    somebody's ability to think?

2    A.  Possibly.

3    Q.  First of all, he indicated to you that he was not mad when

4    he reached the campsite, correct?

5    A.  Yes, he did indicate that.

6    Q.  That he just wanted his belongings, right?

7    A.  That's what he said.

8    Q.  Did you talk with the CHP officer?  Did you interview him?

9    A.  I did not.

10   Q.  Did you talk with Pultorak?  Did you interview him?

11   A.  I did not.

12   Q.  On your copy of the interview, do you have the numbering

13   system at the bottom or at the top or both, so we're on the

14   same wavelength?

15   A.  I have the page numbers in the upper-right corner, and I

16   also have the numbering on the left-hand column.

17   Q.  Okay.  Page 15 at the top, 518 at the bottom.

18   A.  The one that begins with "Barely."

19   Q.  Yes, it does.

20   A.  Okay.

21   Q.  Do you recall the sequence of testimony from line 636 to

22   643?

23   A.  Yes, I do.

24   Q.  Okay.  It says "Q1."  Is that you?

25   A.  That's me.

1    Q.   So there -- how many questioners in this interview?

2    A.   Two.

3    Q.   Who is the second Q2?

4    A.   Investigator Tom Swisher with the DA's Office.

5    Q.   So you asked him:

6         (Reading:)

7         So I'm just trying to figure out what your mind-set was

8    when you shot this guy because he pissed you off earlier.

9         And Mr. Cole's answer is:

10        I was just, I -- I no.

11        And you said:

12        ...you were scared he was gonna kill you?

13        Cole said:  No, I was -- I was under fire.  I had already

14   been shot.

15        (Reading concluded.)

16        Now, is that an accurate transcription of what he said at

17   that time?

18   A.   Yes.  But I would like to point out No. 645 as well where I

19   say:  I don't understand.

20             MR. TONEY:  Your Honor, he's nonresponsive at this

21   point.

22             THE COURT:  Okay.

23   MR. TONEY:

24   Q.   You have testified before?

25   A.   Absolutely.

1    Q.   Okay.  You understand if the U.S. government wants to ask

2    you some questions to explain, you'll have a chance?

3    A.   Yes.  Yes, I do.

4    Q.   All right.  With respect to page 542, and that's obviously

5    the bottom ones.

6    A.   Sir, I don't have that number.  I just have the top number.

7    Q.   39.

8    A.   Okay.

9    Q.   Line 1729 through 1739.

10        Do you recall Swisher would have been asking the questions,

11   correct?

12        That's Q2?

13   A.   Yes.

14   Q.   Okay.  But you were there?

15   A.   Yes, I was.

16   Q.   All right.  Q2.  The question was:

17        (Reading:)

18        What did he say to you?

19        Answer:  Not much of anything.  I mean, he just basically

20   drew down on me.

21        (Reading concluded.)

22             MR. COPPOLA:  Your Honor, I object.  At this point

23   he's reading the transcript.  If he wants to ask a question, he

24   can.

25             MR. TONEY:  I'm asking if this testimony is

1    accurate.

2          THE COURT:  When you say "testimony," do you mean

3    testimony, or do you mean whether a question and a response?

4          MR. TONEY:  I misspoke.  It is not testimony.  I want

5    to know if these specific things were said.

6          THE COURT:  And what's the objection?

7          MR. COPPOLA:  The objection is he hasn't asked a

8    question.  He's simply reading from the transcript, Your Honor.

9          MR. TONEY:  I will rephrase because I thought it was

10   in the form of a question.  May I?

11         THE COURT:  Sure.

12         MR. TONEY:  Okay.

13   BY MR. TONEY:

14   Q.  I want to ask you if you recall this testimony -- these

15   statements.  Okay.

16      (Reading:)

17      Question by Swisher:  What did he say to you?

18      Cole said:  Not much of anything.  I mean, he just

19   basically drew down on me.

20      Swisher said:  Okay.  Who fired the first shot?

21      Cole said:  He did.

22      Swisher said:  He did?

23      And Cole answered:  Yeah.  He hit me.

24      (Reading concluded.)

25      Do you remember that being said?

1   A.  Yes, I do.

2   Q.  At page 42, at lines 1843 through 1849, I'm going to ask

3   you if this statement was given.  I'll start at top of the

4   page.  See if this is correct.

5       (Reading:)

6       Question:  Did he say don't move, did he say get down on

7   the ground?

8       Answer:  No.  He just drew.

9       Question:  He just shot you?

10      Answer:  He just drew and shot me.

11      (Reading concluded.)

12      Was that said?

13  A.  That was said, yes.

14  Q.  And if you go to page 51 at the top, the question is by

15  you.  I'm going to ask if you remember this question.

16      (Reading:)

17      I had a question for you because I'm confused now.  You

18  told this investigator that the trooper, the BLM officer, fired

19  first.  But you told me earlier that you fired first to get him

20  off you.

21      Answer:  No.  He had already hit me.  He had already shot

22  and hit me.

23      (Reading concluded.)

24      Was that said?

25  A.  That was said during the course of the interview, yes.

1    Q.   Where in this interview did he say "I fired first"?

2    A.   Can we go back to page 15.

3    Q.   You can go to any page that answers the question.

4         Page 15?

5    A.   Page 15 from the numbers that I have.

6    Q.   Okay.  I'm at page 15, which is Bates 518.  I'm just

7    telling the prosecutor the pagination I had.

8         What lines are you at?

9    A.   So the questioning directly below what you asked me

10   previously, so 643, 644 to end of the page.

11   Q.   Just a second.

12        (Brief pause.  Counsel reviews interview transcript.)

13        Okay.  So you're saying that part of it, 645 through 672,

14   is that what --

15   A.   That's one of the times, yes.

16   Q.   Okay.  So with the court's permission, would you read that?

17   A.   You want me to read Q1 and A, both of them?

18   Q.   I'll do it, or you can do it if you are willing to.  Go

19   ahead.

20   A.   So just after the one you asked me?

21   Q.   Right.

22   A.   I said at Q1, 645:

23        (Reading:)

24        I don't understand.

25        Response:  The both of them were shooting at me and I was

1    under fire.

2        Q1:  So --

3        (Reading interrupted.)

4        I'm trying to say something, but he interrupts me.

5        (Reading continued:)

6        A:  I mean, what is it that you don't understand about

7    that?  I don't...

8        Q1:  So -- so you fired at the BLM officer first to get him

9    off you?

10       Answer:  Right.  Just --

11       (Reading interrupted.)

12       That's A responding.

13       (Reading continued:)

14       Q1:  To just to -- to get him away?

15       (Reading interrupted.)

16       That was my response.

17       (Reading continued:)

18       A:  I -- I tried for the shoulder.

19       Q1:  You shot one time at his shoulder -- at his shoulder

20   trying to get him away from you?

21       A:  Right.

22       Q1:  And then you came under fire?

23       A:  Right.

24       Q1:  Okay.  Then both officers began...

25       A:  Right.

357

1        Q1:  Interacting with you at that point?

2        A:  Well, they were both shooting at me.

3        (Reading concluded.)

4   Q.  Any other places that you say that he admitted firing

5  first?

6   A.  Yes.  Can you give me a moment, please.

7   Q.  Certainly.

8   A.  (Witness reviews interview transcript.)

9   Q.  Let me interrupt.  I know you are looking.  Are there going

10  to be several of these that you'll need a little time to find?

11   A.  I think so, yes.

12       MR. TONEY:  I'm happy to do it this way, but if it

13  would be more expedient to break, that's up to you obviously.

14  I just want to know what you would like to do.

15       THE COURT:  What am I breaking for?

16    I mean, what do you expect -- what do you anticipate

17  occurring during the break?

18       MR. TONEY:  He would have time to find all of the

19  references he claims my client said that my client shot first.

20    It was just a suggestion.

21       THE COURT:  Perhaps you could communicate with the

22  witness to see if that's what the witness prefers?

23       MR. TONEY:  Sure.

24  BY MR. TONEY:

25   Q.  Would it help to give you a few minutes to find all of

1    these things?

2    A.  I could do it either way, Your Honor.

3              THE COURT:  What is your preference?

4              THE WITNESS:  I'll be happy to do it now.

5              MR. TONEY:  All right.

6    MR. TONEY:

7    Q.  Okay.  Take your time.  Go through it.

8    A.  (Witness reviews interview transcript.)

9        Counselor, I found one additional one now.  If you want me

10   to go through an hour and 14 minutes of transcript, it will

11   take a while, but I can go page-by-page and find them.

12   Q.  All right.  What page are you on?

13   A.  I'm looking at page 25.

14   Q.  Okay.  By the way, there are only 56 pages to this, right?

15   A.  Yes.

16   Q.  Okay.  So we're up to page 25.  Just give me a second.

17       And just tell me, without reading first, what lines you are

18   at?

19   A.  This is just one of the instances I recall.

20   Q.  All right.  What lines are you at?

21   A.  Well, I think to make it understandable, up to 1090.

22   Q.  Up to 1090 from the top of the page?

23   A.  Yes.

24   Q.  Okay.  That would be --

25   A.  So there is some context.

1    Q.   No.   I'm not trying to muzzle you.   I want to know what you

2    are testifying to.

3         Okay.   Let me try and read that and see if I read it

4    correctly.

5         I think if we want context, we need the question.   Well,

6    no, we don't.   All right.

7         First of all, Mr. Cole says:

8         (Reading:)

9         I was just trying to tell them that, you know, look, I need

10   my things.

11        And you said:   Mm-hm.

12        And he said:   I'm complying when you were telling me not,

13   you know, to bring the pickup here, but I've got my backpack

14   and sleeping bag and a few things that I need.

15        And you say:   Mm-hm, did you tell him that?

16        Answer:   No, I didn't have time.

17        Question:   Okay.   Do you think maybe he saw the gun on your

18   hip?

19        (Reading concluded.)

20        Is that where you wanted to stop?

21   A.   That's where I wanted to start.

22   Q.   Well, we've got more context then.

23        (Reading:)

24        Answer:   I know he saw the gun on my hip.   Why else would

25   he ask his question?   It wasn't concealed.   I wasn't concealing

1    it.

2        Question:  Do you think that might have been why he was

3    alarmed, though?

4        Answer:  I hadn't thought about it, but yeah, probably.

5        Question:  Because the first time he saw you, you didn't

6    have it, right?  The second time he sees you, you know.

7        Answer:  Yeah.  Yeah.  It really wasn't for him.  It was

8    just in case the bear decided he wanted to come up.

9        Question:  Except that ultimately it was for him.  I mean,

10   you put a round in him.

11       Answer:  Well, better than wait for you to put a round in.

12   It was, you ever had one come at you, but they don't wait.  If

13   they're gonna take you, they're gonna take you right now.

14       Question:  Yeah.  I've had -- I've had them come up on me,

15   trust me.  But in my experience...

16       Answer:  They usually don't.

17       Question:  ...a law enforcement officer is different than

18   somebody, some stranger I don't know out there.

19       Answer:  In this case, like I say, I was pretty afraid of

20   him and what he was going to do.

21       (Reading concluded.)

22   A.  That's correct.

23   Q.  So --

24   A.  I'm sorry.  Can I speak or --

25   Q.  Well, that's the testimony that you felt indicated that he

1  had fired first -- one of the times, right?

2  A.  And actually it showed his state of mind as to firing first

3  as well.

4  Q.  Okay.  All right.  So find the next one.

5  A.  (Witness reviews interview transcript.)

6     So pages 51 and 52 there are a couple of conversations in

7  there.  To have the full context, I think 51 and 52, both

8  pages.

9     I believe you already read into the record at the beginning

10 of page 51.

11 Q.  Right.  You think all of that and 52?

12 A.  Because I try to clarify those questions that you focused

13 on.

14 Q.  Sure.  Go ahead and read what you think is pertinent here,

15 please.

16 A.  Do you want me to read both full pages?

17 Q.  I want you to read what you think is important that you're

18 relying on, when you say that he admitted that he shot first.

19 So if it is both pages, fine.  If some of it doesn't apply to

20 it, I don't mind skipping it as long as you tell me what number

21 you are going to.

22 A.  I would rather not skip it.  I would rather just make sure

23 it is all understood.

24 Q.  Go for it.

25 A.  So on line 2246:

1       (Reading:)

2       Q1:  I had a question for you cause I'm confused now.  You

3   told this investigator that the trooper --

4       (Reading interrupted.)

5       Then I correct myself.

6       (Reading continued:)

7       -- the BLM officer fired first, but you had told me earlier

8   you fired first to get him off you.

9       Answer:  No.  He already hit me.  He already shot and hit

10  me.

11      Question:  So then I'm trying to make -- I'm trying to make

12  sense of things.  If he'd already drawn and hit you and shot

13  you, meaning you think the BLM officer shot you first?

14      Answer:  Mm-hm.

15      Question:  Why at that point are you just trying to wing

16  him?

17      Q2:  I mean, he gut shot you.

18      Q1:  If that's the case, I mean, but -- and then that's

19  the -- and that's different then what you told me initially

20  when you said you winged him to get him away -- to get him away

21  from you.

22      Answer:  Yeah, after he shot me.

23      Question:  I can -- that makes more sense.

24      Answer:  After he shot me.

25      Q1:  But it doesn't make sense to me if somebody's already

1   shooting me and hitting me and gut shot me, that I'm just gonna

2   wing him.  I'm thinking it's end game now.  So the two stories

3   you told us so far, I'm just trying to figure out which one's

4   which -- which one -- which one is right.

5       Answer:  I don't want to hurt anybody.  Okay?  I, even

6   after somebody's hurt me, I don't want to hurt them really.

7       Q2 --

8       (Reading interrupted.)

9   Q.  That would be Swisher?

10  A.  Yes.

11      (Reading continued:)

12      Q2:  So do you think you're saying the reason you shot them

13  was to keep them away from you?

14      Answer:  Yes.

15      Q1:  So which one -- so which one is it, Brent?  Is it what

16  you told me initially that you -- cause initially you said you

17  fired first.

18      Answer:  No, I didn't tell you that or it was a

19  misunderstanding.

20      Q1:  Okay.

21      Answer:  He fired first.

22      Q1:  And that you were hit first, and that then -- then you

23  decided you were gonna wing him to keep him off of you.

24      Answer:  Yes.

25      Q2:  Cause see, I thought you said at first he went and

1  drew his gun, started to draw his gun and you thought he was

2  gonna kill you.

3       Q1:  Exactly.

4       (Reading interrupted.)

5  Q.  Is that correct, or was that his answer?

6  A.  That's me.  "Q1:  Exactly."

7  Q.  Okay.

8  A.  (Reading continued:)

9       Q2:  And then you drew your gun and you shot him in the

10  shoulder.  And after you shot him in the shoulder...

11       Answer:  Ah...

12       Q2:  ...then you got shot.

13       Answer:  I don't -- I don't know.  I was hit awfully fast.

14       Q2:  I, you know what, it is easy for me to ask all of

15  these questions cause I wasn't standing there.

16       Answer:  I -- I --

17       Q2:  But you're the only one I got that was there when this

18  happened cause I think the first time you said this -- is he

19  drew his gun and you figured you were gonna end up getting

20  killed so you drew your gun and shot him.

21       Answer:  No.  He...

22       Q2:  And you said you shot him in the shoulder to get him

23  away from you.

24       Answer:  He drew down on me first.  As to who got --

25       Q2:  No.  No.  I know he drew down.  That's what you said.

1      Answer:  As to who got the first round in, I don't know.

2      Q2:  It's not a matter of who got the first round in, my

3   brother.  It's who fired the first shot because I think you

4   told my partner, and maybe I'm wrong, is you said he drew his

5   gun and you drew your gun, and he started backing up and you

6   shot him in the shoulder to keep him away from you.

7      Answer:  Well, he fired immediately.

8      Q2:  And...

9      Answer:  And...

10     Q2:  So did he fire after you shot him in the shoulder?

11     Answer:  No, before I think.  I believe it was before.

12     (Reading concluded.)

13  Q.  Okay.

14  A.  That's on page 53.

15  Q.  Page 53.

16     And the last four pages is there anything?

17  A.  I believe I'm missing something.

18  Q.  Okay.

19  A.  (Witness reviews interview transcript.)

20     So page 9.

21  Q.  Sure.  Just a second.  Okay.  And whoops.  Sorry.

22     Okay.  I'm on page 9.  What lines?

23  A.  Page -- or line 374.

24  Q.  Okay.  Through where?

25  A.  (Witness reviews interview transcript.)

1      387.

2  Q.  So are we 374 through 387?

3  A.  Sure.  Yes.

4  Q.  Okay.  Let me read it and see if I have done it right.

5      (Reading:)

6      Q1:  Can you kind of recount the conversation of what you

7  guys discussed?

8      Answer:  There really wasn't any conversation.  He asked me

9  if I had weapon, and I answered him yes.  And he drew down on

10  me right then and there.  He didn't tell me I was under arrest,

11  nothing.  He just drew on me.

12      Q1:  Then what transpired from there.  Did you put your

13  hands up and say, Whoa, Whoa, Stop, or how -- what happened

14  next?

15      Answer:  No.  I was standing close enough to him, and I was

16  convinced that he was going to shoot me so I pulled my gun and

17  tried to make him back away from me cause I was point blank

18  rank.  And he was pulling up for a heart shot.  I tried for a

19  shoulder shot, which I made.

20      (Reading interrupted.)

21      And let me go through 393 and see if this is correct also.

22      (Reading:)

23      Q1:  So tell me what happened after that.

24      Answer:  Well, the other officer shot me a couple of times

25  and I went down.  It's that simple.  He pulled down on me.  I

1   was convinced he was going to kill me, and I tried to shoot him

2   in the shoulder to stop him from killing me.  No warning, no

3   nothing.

4       (Reading concluded.)

5       Okay.  Did I read that correctly?

6   A.  Yes.

7   Q.  Okay.  So I'm not saying that's every example of every

8   nuance in the hour, but that's -- those are the -- those are

9   some, at least, of the items -- parts of the transcript that

10  indicate that he was inconsistent in saying who shot first,

11  correct?

12  A.  Yes.

13  Q.  I take it the entire conversation was audio recorded?

14  A.  Absolutely.

15  Q.  And this is -- you reviewed it, and it appears to be an

16  accurate transcription of it?

17  A.  Yes.

18           MR. TONEY:  I'm concluded.

19           MR. COPPOLA:  Probably about five minutes, Your Honor,

20  maybe less.

21           THE COURT:  Okay.

22                        REDIRECT EXAMINATION

23  BY MR. COPPOLA:

24  Q.  Just a couple of follow-up questions for you, Investigator

25  Billingsly.

1    Mr. Toney asked you some questions about when you arrived

2  at the hospital, whether or not you contacted any of the

3  hospital staff.

4    Do you recall those questions?

5  A.  Yes, I do.

6  Q.  Okay.  Why didn't you contact any hospital staff?

7  A.  Because the hospital administration contacted the sheriff's

8  office earlier that day and said that this person is awake and

9  talking if you want to come speak with him.

10 Q.  And in relation to -- where was Mr. Cole's room in relation

11 to the nursing station, if you know?

12 A.  Directly in front of it.

13 Q.  Did any of the hospital staff ever enter the room and

14 attempt to stop the interview from proceeding?

15 A.  No.

16 Q.  At any point during the interview did the defendant

17 indicate he wanted to stop the interview?

18 A.  No.

19 Q.  All right.  Mr. Toney asked you some specific questions

20 about the transcript.  I have a few myself.  Okay.

21    I want to direct your attention -- when Mr. Toney left off

22 just now with you, you were going through places in the

23 transcript and we were identifying where Mr. Cole was

24 inconsistent with who shot first.

25    Do you recall those questions?

1   A.  Yes.

2   Q.  All right.  Let's go to page number 11 -- actually bottom

3   of page number 10 on the transcript and starting, for context

4   purposes, starting at line 434.

5   A.  Do you want me to read it?

6   Q.  Line 434 through line 454, if you could read those, please.

7   A.  434 through 454.

8   Q.  Yes, sir.

9   A.  Okay.  (Reading:)

10      Q1:  So why -- how did he go from twirling to drawing down,

11   I don't understand?

12      Answer:  He just put them back up.  He put them back in his

13   pocket.  I don't know, he just showed them to me and twirled

14   them on his finger.  And then he fucking drew down on me.  I

15   don't know.  I just freaked.  I just freaked.

16      Q1:  How many rounds did you fire?

17      Answer:  I fired six.

18      Q1:  At what point did you realize this might have been a

19   bad idea?

20      Answer:  After I was hit.  I guess I just freaked.  I --

21   I -- when he drew down, I mean, I just freaked.  I don't know

22   how to explain it.

23      Q1:  Well, do the -- I'm trying to -- I'm trying to

24   understand.

25      Answer:  I -- I wasn't trying to cause a problem.  I wasn't

1   trying to hurt anybody.  When he drew down on me, I just -- he

2   was so close, I had to get him away from me cause he was

3   pulling up for a heart shot.  And he would have shot me in the

4   heart if I hadn't clipped him.

5       (Reading concluded.)

6   Q.  Is that another example of one of the inconsistencies we

7   were talking about?

8   A.  Yes.

9   Q.  I want to also direct your attention now to page 54 in the

10  transcript, when you were talking at -- or when the interview

11  was concluding, after Mr. Cole had given you the varying

12  accounts of what had happened.  Was there -- did he say

13  anything about not knowing what had really happened?

14      Specifically I'm looking at lines --

15  A.  2403.

16  Q.  Yes.  2401 through 2406, I guess.

17  A.  Okay.  (Reading:)

18      Q1:  Brent...

19      Answer:  I'm trying to cooperate.  I don't know what went

20  down to be real honest.  It happened so fast.  I just -- I

21  don't know.  I -- I -- I know that I didn't handle it right,

22  obviously.  Well how bad are they hurt?

23      (Reading concluded.)

24          MR. COPPOLA:  I don't have any further questions, Your

25  Honor.

```
1              MR. TONEY:  Very brief, I promise.

2                      RECROSS-EXAMINATION

3   BY MR. TONEY:

4   Q.  He was in the intensive care unit, wasn't he?

5   A.  Yes.

6              MR. TONEY:  That's all I have.

7              MR. COPPOLA:  Nothing further, Your Honor.

8              THE COURT:  You are excused.

9              THE WITNESS:  Thank you, Your Honor.

10             MR. TONEY:  Can we go to sidebar?

11             THE COURT:  Okay.

12        (Whereupon, the following discussion was held at sidebar.)

13             MR. TONEY:  I think maybe the short version is that we

14   cannot get our witnesses here.  I can explain why, because I

15   talked extensively to my investigator, if you would like at

16   this time.

17             THE COURT:  When you say that you can't get your

18   witnesses here, are you referencing today, are you

19   referencing --

20             MR. TONEY:  Tomorrow.

21             THE COURT:  Tomorrow.

22             MR. TONEY:  Tomorrow.  I'll explain.

23             THE COURT:  You have no witnesses for tomorrow?

24             MR. TONEY:  I could put on the client tomorrow, okay,

25   which would not take a full day.  The four witnesses we're
```

1    trying to get here are not available for different reasons.

2         Would you like me to explain why?

3              THE COURT:  No.

4              MR. TONEY:  Okay.

5              THE COURT:  I said no, not at this juncture.  What do

6    you want to do, Mr. Toney?

7              MR. TONEY:  My suggestion, and I talked to the

8    prosecution about this too, is that we recess the jury until

9    Tuesday morning.

10             THE COURT:  Are you done?

11             MR. MCCOY:  We're prepared to rest.  That was our last

12   witness in our case in chief.  Obviously, we would like to keep

13   the door open for rebuttal, but that was our last witness in

14   our case in chief.

15             THE COURT:  Okay.

16        (Sidebar discussion concluded.)

17             THE COURT:  Government?

18             MR. MCCOY:  May I have just a moment, Your Honor?

19             THE COURT:  All right.

20        (Government cocounsel confer.)

21             MR. MCCOY:  Your Honor, earlier the government read

22   into evidence a stipulation marked for the record as Government

23   Exhibit 9, but I failed to move it into evidence and would make

24   that motion at this time.

25             MR. TONEY:  I have no objection.

1          THE COURT:  It is admitted.

2      (Whereupon, Government's Exhibit 9 was received.)

3      (Government cocounsel confer.)

4          MR. MCCOY:  Your Honor, may I request a brief recess

5  just so we can review the evidence list to ensure we're

6  prepared to rest?

7          THE COURT:  Brief means the regular afternoon recess,

8  15 minutes?

9          MR. MCCOY:  That's correct, Your Honor.

10         THE COURT:  Okay.  Court is in recess for 15 minutes.

11     (Off the record at 2:55 p.m.)

12     (Back on the record at 3:05 p.m.)

13         THE CLERK:  You may remain seated.  Court is now in

14  session.

15         THE COURT:  All participants are present.  You can

16  proceed.

17         MR. MCCOY:  Yes, Your Honor.  The United States rests.

18         THE COURT:  Okay.  I've been informed that there won't

19  be additional evidence until Tuesday at 9:00 a.m.  Therefore,

20  court is in recess until Tuesday at 9:00 a.m.  You are excused

21  until then.

22     (Off the record at 3:07 p.m.)

23                     ---o0o---

24

25

1                    REPORTER'S CERTIFICATE

2                         ---o0o---

3
     STATE OF CALIFORNIA   )
4    COUNTY OF SACRAMENTO  )

5

6         I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
7
          IN WITNESS WHEREOF, I subscribe this certificate at
8    Sacramento, California.

9

10   /S/_Catherine E.F. Bodene_____
          CATHERINE E.F. BODENE, CSR NO. 6926
11        Official United States District Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25