1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF CALIFORNIA
2     BEFORE THE HONORABLE GARLAND E. BURRELL, JR., JUDGE

3                    ---o0o---

4

   UNITED STATES OF AMERICA,
5
         Plaintiff,
6
   Vs.                          CASE NO. 2:14-CR-269 GEB
7                               VOLUME 3 - PAGES 374-529

   BRENT DOUGLAS COLE,
8
         Defendant.
9   _____/

10

11          REPORTER'S TRANSCRIPT OF JURY TRIAL
          TUESDAY, FEBRUARY 10TH, 2015, 9:00 A.M.
12        WEDNESDAY, FEBRUARY 11TH, 2015 - 11:00 A.M.

13

14   For the Government:      OFFICE OF THE UNITED STATES ATTORNEY
                              501 I Street, Suite 10-100
15                            Sacramento, California  95814

16                            BY:  MICHAEL D. MCCOY,
                              Assistant United States Attorney
17
                              BY:  HEIKO COPPOLA,
18                            Assistant United States Attorney

19

20   For the Defendant:      LAW OFFICE OF J. TONEY
                              P.O. Box 1515
21                            Woodland, California  95695

22                            BY:  J. TONEY, Attorney At Law

23   Reported by:  CATHERINE E.F. BODENE, CSR #6926, RPR
                    Official Court Reporter USDC, 916-446-6360
24                  501 I Street, Room 4-200
                    Sacramento, California  95814
25
   TRANSCRIPT PRODUCED BY COMPUTER-AIDED TRANSCRIPTION

1                    EXAMINATION INDEX

2                       ---o0o---

3   FOR THE DEFENDANT:

4       EXAMINATION:                                    PAGE

5     BRENT DOUGLAS COLE

6       Direct Examination by Mr. Toney            377
        Cross-Examination by Mr. Coppola           403
7       Redirect Examination by Mr. Toney          429
        Recross-Examination by Mr. Coppola         429
8     PAUL CASTIGLIONI

9
        Direct Examination by Mr. Toney            430
10      Cross-Examination by Mr. McCoy             436
        Redirect Examination by Mr. Toney          441
11

12    MICHAEL RADON

13      Direct Examination by Mr. Toney            442
        Cross-Examination by Mr. McCoy             449
14      Redirect Examination by Mr. Toney          453
15    KEVIN RADON

16      Direct Examination by Mr. Toney            453
        Cross-Examination by Mr. McCoy             458
17

18              REBUTTAL CASE BY GOVERNMENT
                    EXAMINATION INDEX
19                     ---o0o---

20   FOR THE GOVERNMENT:

21      EXAMINATION:                                    PAGE

22    TAD PULTORAK (Previously Sworn)

23      Direct Examination by Mr. McCoy            469
        Cross-Examination by Mr. Toney             471
24

25                     ---o0o---

376

1                    EXHIBIT INDEX

2                    ---o0o---

3    DEFENDANT'S EXHIBITS:                 EVD        VOL

4      A                                   401         3

5      B                                   401         3

6      C                                   401         3

7      D                                   401         3

8      E                                   401         3

9      E                                   401         3

10     F                                   467         3

11                   ---o0o---

12

13                PROCEEDINGS INDEX

14                   ---o0o---

15   PROCEEDINGS:                              PAGE

16   (February 10, 2015)

17   Jury Instruction Rulings                  472

18   Closing by Government                     485

19   Closing by Defendant                      501

20   Final Closing by Government               507

21   Jury Instructed                           511

22   Jury Retires to Deliberate                523

23   (February 11, 2015)

24   Verdict Returned                          525

25                   ---o0o---

1    SACRAMENTO, CALIFORNIA, TUESDAY, FEBRUARY 10, 2015, 9:00 A.M.

2                          ---o0o---

3         THE CLERK:  You may remain seated.  Court is now in

4    session.

5         THE COURT:  All participants are present.  You can

6    proceed.

7         MR. TONEY:  I'd call Mr. Cole to the stand.

8         THE CLERK:  Raise your right hand.

9    (WHEREUPON, BRENT DOUGLAS COLE WAS CALLED AS A WITNESS AND

10   SWORN)

11        THE CLERK:  Please, state and spell your name for the

12   record.

13        THE WITNESS:  My name is Brent Douglas Cole.  That's

14   B-r-e-n-t, D-o-u-g-l-a-s, C-o-l-e.

15                     DIRECT EXAMINATION

16   BY MR. TONEY:

17   Q.  Hello.

18   A.  Hello.

19   Q.  The questions I'm going to ask refer to this day of the

20   shooting.  At that time, that morning, where were you before

21   you saw BLM Agent Pultorak or the CHP, where did you wake up?

22   A.  I was in the back of my pickup truck.  It was parked up at

23   the camp area.

24   Q.  And that's the area that ultimately wound up where the

25   gunfire was exchanged, correct?

```
 1    A.  Yes.
 2    Q.  Okay.  And at that time, that night, was anyone else with
 3    you?
 4    A.  Well, I had come up there to meet with Mike Radon because I
 5    had agreed to give him a ride to his aunt's house the following
 6    day.
 7    Q.  Wait a minute.  Okay.  So when you -- had you then arrived
 8    at that campsite the day before?
 9    A.  Yes.  That evening.
10    Q.  Okay.  So that's the evening before all this happened?
11    A.  Yes.
12    Q.  And how long had you known Mike?
13    A.  Oh, probably four months.  Three or four months.
14    Q.  Now, just getting ahead for one question, there were a
15    couple of motorcycles found that have been talked about at that
16    site, correct?
17    A.  Correct.
18    Q.  Did any of them belong to any of the Radons?
19    A.  The Honda belonged to Mike Radon, yes.
20    Q.  So when you got there the evening before, was Mike there?
21    A.  Yes, he was.
22    Q.  Was anyone with him?
23    A.  No.
24    Q.  And was his motorcycle there?
25    A.  Yes.  His motorcycle was parked right on the roadway -- at
```

1   the edge of the roadway.

2   Q.  So why were you -- if he had a motorcycle, what was your

3   understanding of why he wanted you to give him a ride?

4   A.  Well, the motorcycle didn't have any current tags on it.

5   Q.  So you slept in the bed of the truck, right?

6   A.  Yes.

7   Q.  And where was Mike sleeping that day?

8   A.  He was sleeping in the camp area over underneath the

9   madrone trees.

10  Q.  When you were stopped first by Pultorak, the testimony from

11  him is that there were two people with you, correct?

12  A.  Correct.

13  Q.  Who was the other?

14  A.  The other was Kevin Radon.  It was Mike's brother.  He had

15  walked over to meet us that morning.

16  Q.  Okay.  So he arrived on foot at that campsite?

17  A.  Correct.

18  Q.  So eventually, did you drive your vehicle down that road?

19  A.  Yes.  I drove down to the bottom where the North Bloomfield

20  Road meets up with it.

21  Q.  And what happened then?

22  A.  Well, before we got to North Bloomfield Road, the ranger

23  was parked right there in the flat.  And he turned his lights

24  and siren on and stopped us.

25  Q.  Who was driving?

1    A.  I was driving.

2    Q.  And when he stopped you, did you stay in the vehicle?

3    A.  Yes.

4    Q.  And did he come up to it?

5    A.  Yes.

6    Q.  And as best you recall, what was the first thing said

7    between you and the ranger?

8    A.  He wanted registration, driver's license and proof of

9    insurance.

10   Q.  By the way, did you have insurance on that vehicle?

11   A.  Yes, I did.  And it was current.

12   Q.  Did you have the proof in your car?

13   A.  The actual card was expired.  I hadn't had a chance to

14   print it up, but the insurance was current.

15   Q.  All right.  And you had your registration and your driver's

16   license?

17   A.  I had registration and driver's license, yes.

18   Q.  At that time did he take any identification from any of

19   your -- either of your passengers?

20   A.  I believe he did from Mike, but I'm not certain.

21   Q.  Did he say why he was doing this at that time?

22          MR. COPPOLA:  Object to hearsay at this point, Your

23   Honor.

24          THE COURT:  Sustained.

25   ///

1    BY MR. TONEY:

2    Q.   So you showed them all of that information, correct?

3    A.   Correct.

4    Q.   And what was the -- what did he do?

5    A.   He insisted that Kevin Radon go back to his vehicle.   And

6    he went back to his vehicle, and he called in to check my

7    driver's license to see if I had any warrants.   I don't know.

8    I had told him he could check the insurance and verify that it

9    was, in fact, current.

10   Q.   All right.   So after that, did he again approach the

11   vehicle?

12   A.   Yes.   After about ten minutes or so he came back up.

13   Q.   And were you still seated at the steering wheel?

14   A.   Yes.

15   Q.   And was there an exchange of words between you at that

16   time?

17       Did he say anything or did you say anything?

18   A.   Well, he indicated that the area was closed to vehicular

19   traffic.

20   Q.   And do you remember what he -- what his words were?

21   A.   Yes.   He insisted that the road was completely brushed in

22   and that it wasn't drivable.   And that he was closing the area

23   on his authority.

24   Q.   Did you respond?

25   A.   I pointed out that there weren't any signs, and I asked him

1  if it was BLM land.

2  Q.  What did he say?

3  A.  He got angry.

4  Q.  What did he say?

5          MR. COPPOLA:  Objection.  Hearsay.

6          MR. TONEY:  This is, I believe, going to be

7  inconsistent with the testimony of the ranger who already

8  talked about the exchange between them.

9          THE COURT:  It's admitted for that limited purpose

10  only should the jury find that it serves that purpose.

11          THE WITNESS:  What was the question again?

12  BY MR. TONEY:

13  Q.  Sure.  Okay.  You asked him if it was BLM land?

14  A.  Yes.

15  Q.  And what did he say?

16  A.  Like I say, he got angry.

17  Q.  What did he say?

18  A.  Basically, he just repeated himself, that it was closed to

19  vehicular traffic.

20  Q.  Obviously you have been through the trial.  You heard him

21  at one time say that he told you:  I am the sign.

22      Do you remember that testimony?

23  A.  He said something to that effect, yes.  He indicated that

24  he was closing the area on his authority.

25  Q.  Did he ask you if you were camping up there?

1  A.  Not that I recall, no.  He asked us where we came from, and

2  I pointed up the hill.  I said right up the road there.

3  Q.  So after that, did he finally let you go?

4  A.  Eventually, yes.

5  Q.  Well, after the exchange where he told you that the road

6  was closed on his authority, did you have any other words

7  between the two of you?

8  A.  Well, I was trying to inform him that I had some property

9  that I wanted to pick up, and he wouldn't allow me to speak.

10  Q.  How would he keep you from speaking?

11  A.  He would start screaming and cut me off where I couldn't

12  speak.

13  Q.  So after that -- how long did that take by the way?

14  A.  Oh, just maybe three or four minutes.

15  Q.  So after that, did you leave?

16  A.  Yes.

17  Q.  Where did you go?

18  A.  I took Mike and Kevin Radon up to North San Juan, and then

19  took them back by the Four Corners, dropped them off at the end

20  of the road where their aunt's house was.

21  Q.  How far is that from the campsite?

22  A.  About 11 miles.

23  Q.  And after that, what did you do?

24  A.  After that I drove back to the top of the ridge where

25  Grizzly Hill Road meets North Bloomfield Road and parked the

1    truck.

2    Q.   Why did you park it there?

3    A.   Well, Mr. Pultorak had told me that if I brought the

4    vehicle -- or if he saw me in the vehicle anywhere on BLM land,

5    that he would arrest me and have my vehicle towed.

6    Q.   So why did you come back to the scene?

7    A.   Because I had property I set off the back of the truck, to

8    be able to use the bed of the truck to sleep in that night.

9    And I wanted to get my sleeping bag and my backpack and my

10   property.

11   Q.   So what did you do?

12   A.   So when I walked back, I walked through the woods instead

13   of going all the way down to the bottom and coming back up

14   because it's a lot shorter.

15   Q.   And at the time you had arrived there and parked, was the

16   BLM vehicle in sight of you?

17   A.   No.  He, I believe, had parked at the bottom of the hill,

18   which I didn't walk down that far.  I cut across through the

19   woods and up the hill.

20   Q.   Okay.  How long would it take you to get there?

21   A.   About 15 minutes from where I parked.

22   Q.   And why were you going there again?

23   A.   To pick up my belongings, my backpack, my sleeping bag, my

24   toolbox, my gold pans, my sluice boxes.

25   Q.   So did you go right to the campsite or did you stop

```
1    somewhere?

2    A.   I stopped and listened because I could hear them and watch

3    them for a few minutes before I came up to the campsite.

4    Q.   Why?

5    A.   Well, I just wanted to see what was going on.

6    Q.   All right.  How long were you just stopped there before you

7    walked up?

8    A.   Oh, I don't know.  Maybe five or ten minutes.

9    Q.   And then you walked up, did you?

10   A.   Yes.  When I saw them packing everything up and taking

11   things out of the campsite and taking my property, I walked up

12   to talk to them about it.

13   Q.   Okay.  And do you recall what you said?

14   A.   Well, when I was walking up the hill, I made sure to make

15   enough noise that they were aware that I was coming up because

16   I didn't want them thinking I was sneaking up on them.

17       And Mr. Pultorak poked his head through the edge of the

18   woods there and looked down the hill as I was walking up and

19   said something about:  Who goes there.  Identify yourself.

20   Q.   Did you?

21   A.   Yes.

22   Q.   What did you say?

23   A.   I told him that I was coming up to get my things.  He knew

24   who I was.  He had stopped me just a little bit before, and he

25   indicated that was okay, to come on up to the top of the hill
```

1    and get my things.

2    Q.  Okay.  And so did you?

3    A.  Well, I did come up.  And he told me as I was on my way up

4    to come on up into the clearing.  So I walked up to the top of

5    the ridge and stepped into the edge of the clearing, at which

6    point he told me to stop right at the front of the Honda

7    motorcycle parked on the edge of the road there.

8    Q.  Did you have any conversation with him about the

9    motorcycles?

10   A.  Yeah.   After he stopped me, he asked me who the motorcycle

11   belonged to that was right next to me.

12   Q.  Did you respond?

13   A.  I responded.  I told him that to the best of my knowledge

14   it belonged to Mike Radon.

15   Q.  There's been testimony that there was another motorcycle

16   that was disassembled -- at least partially disassembled there.

17   Do you recall that?

18   A.  Yes.  Back in the trees behind the camp there was a

19   motorcycle.  And the starter was off it and a couple of things

20   off the side case.

21   Q.  Did you know who put that there?

22   A.  No.  I had no idea who put that there.

23   Q.  By the way, had you used that particular campsite before?

24   A.  I had used that campsite off and on for 40 years or better.

25   Q.  And you understood it was legal with certain restrictions?

1   A.   My understanding was that it was legal as long as you

2   didn't stay more than 14 days.

3   Q.   So after -- how long did the conversations about the

4   motorcycles take?

5   A.   After I informed him that the one belonged to Mike Radon,

6   he asked me about the Kawasaki in the trees behind the camp.

7   And I told him I didn't know who it belonged to and didn't have

8   any idea where it had come from.

9   Q.   And then what happened?

10  A.   Well, he indicated that he was towing them, which didn't

11  really mean anything to me because I didn't have anything to do

12  with either of them, didn't claim any ownership in either of

13  them.

14  Q.   All right.  And what happened next?

15  A.   Well, I pointed to the backpack that he was taking and

16  informed him the backpack was mine, and that I needed my

17  backpack and my sleeping bag and my personal belongings.

18  Q.   Okay.  And your personal belongings?

19  A.   Being Granddad's gold pan, my separators, my sluice box.  I

20  had set a toolbox with tools in it off, sleeping pads, sleeping

21  bag, things like that.  My dentures were in my backpack.  That

22  was one of my main concerns.

23  Q.   So you indicated, as I understand your testimony, that

24  those were your things and that you wanted them?

25  A.   Yes.

1   Q.  Okay.  And what did he respond?  What did he do or say?

2   A.  He responded by pulling out handcuffs and brandishing them.

3   Q.  When you say "brandish," could you demonstrate?

4   A.  Well, he --

5   Q.  Just stand up so the jury can see.

6   A.  (Witness stands.)

7       He was actually wearing a serape over his uniform or a

8   poncho.  And he pulled the handcuffs out from underneath the

9   poncho and held them in front of me.  And he kind of, I don't

10  know, just brandishing them.

11  Q.  Okay.  Have a seat.  And try not to hit the microphone.

12      Okay.  Then what happened?

13  A.  Then he asked me if I was -- if I was armed.

14  Q.  All right.  And what did you say?

15  A.  I responded, yes, I am.

16  Q.  And did you do anything at that time?

17  A.  No.

18  Q.  So what happened then?

19  A.  At that point basically he drew his gun.  He and Hardin

20  both drew their guns.

21  Q.  When you said, "Yes, you are," did you make any gestures

22  with your arms?

23  A.  No.  I had my hands out in front of me.  I was standing

24  there talking to him in a calm, you know, just a conversation

25  voice.

1    Q.   Did you -- was the gun in a holster?

2    A.   Yes.  It was in a holster on my right-hand side.

3              MR. TONEY:  I think you have said we can always

4    approach?

5              THE COURT:  Yes.

6              MR. TONEY:  Thank you.

7              THE COURT:  Once earlier in the trial I said that.

8              MR. TONEY:  I remember now.

9    BY MR. TONEY:

10   Q.   I'm going to show you what's Government's 8B.  Does that

11   appear to be your belt and holster?

12   A.   Yes.  That's my belt and my holster.

13   Q.   It's a little hard to see in the plastic bag.

14        Did the holster have a flap over it?

15   A.   It does have a flap over it, yes.

16   Q.   So if the gun is in the holster, there is a flap over the

17   top of the gun?

18   A.   Well, it was over the top of the gun.  It wasn't actually

19   buttoned down fastened.

20   Q.   Okay.  And what happened next?

21   A.   I saw the barrel of his gun.  I saw his shoulders move and

22   the barrel of his gun coming up underneath the poncho.

23   Q.   And what happened next?

24   A.   I pivoted on my right foot and pulled my left foot back to

25   get away from it.  As soon as he got the gun up, he shot me.

1    Q.   Where?

2    A.   The bullet entered just below my navel.

3         Okay.  And it exited out of my inner thigh.

4    Q.   I'm going to show you some pictures.  First, I'll show you

5    what's been marked -- just one second, if I can.

6         (Defense counsel confers with government counsel.)

7         I'm going to show you something labeled Defendant's C, as

8    in Charlie.

9         (Exhibit handed to witness.)

10        Do you recognize that?

11   A.   I recognize the EMTs were dressing my wound at that time.

12   I was a little bit out of it.

13   Q.   I'm going to show you D.

14        (Exhibit handed to witness.)

15        Is that the way you looked as you recall while you were

16   still there?

17   A.   It looks like -- that's what I looked like after they cut

18   my clothes off, yes.

19   Q.   All right.  And I'm going to show you E.

20        (Exhibit handed to witness.)

21        Is this a picture of the way you looked?

22   A.   Yes.

23   Q.   Now, you've indicated so far one shot.  And I'm going to

24   show you this, which shows a little more of you than would

25   normally.

1       Do you recognize that?

2   A.  Yes.

3   Q.  And you have indicated where the bullet went in and where

4   it went out.  Is the area where it went out on that photo?

5   A.  Yes.

6   Q.  Could you -- just a second.

7       (Defense counsel confers with clerk.)

8       Could you put a blue dot where the wound came out?

9   A.  How about right beside it.

10  Q.  Okay.

11          THE COURT:  What exhibit is in front of the witness

12  now?

13          THE WITNESS:  Picture 869.

14  BY MR. TONEY:

15  Q.  No.  Turn it over.  There is a blue sticker and a letter on

16  it.

17  A.  It would be Exhibit B.

18  Q.  As in boy, right?

19  A.  Yes.

20  Q.  Okay.  So did you put the dot there?

21  A.  I hadn't, but I will.

22      (Witness marks photo.)

23      Can you see that?

24  Q.  I do.  Now, in the previous photo, and I'm showing you

25  again E as in Edward, there's something blue on your elbow.

1      Your elbow seems wrapped?

2    A.  The only thing blue is the gloves from the paramedics.  The

3    elbow is bloody, but...

4    Q.  How many times were you shot?

5    A.  Five times.

6    Q.  All right.  You have indicated one was -- you have already

7    described one of them.  Where were the other ones?

8    A.  I was shot twice through the elbow.  And one of the shots

9    hit me just above the groin here, and one of them hit me on

10   this side just above the groin.

11     (Stands and indicates.)

12   Q.  Ultimately, were bullets removed from you?

13   A.  Only one bullet was removed from me.  The rest of them were

14   either splintered into particles where they couldn't remove the

15   particles, or went all the way through me.

16   Q.  You have indicated one went all the way through you.

17   A.  Well, both of these went all the way through me.  The one

18   that went through my stomach and my inner thigh went all the

19   way through me.  And one of the bullets that went through the

20   elbow went all the way through me.  The other one hit the

21   bone -- shattered the bone and lodged on the bone.

22     (Stands and indicates.)

23   Q.  The one that was lodged on the bone was removed?

24   A.  That was removed, and it was turned over at Sutter Hospital

25   for evidence.

1   Q.   Now, after you were first shot -- first of all, how close

2   was Pultorak to you when he shot that first shot that hit you?

3   A.   Probably about four feet.

4   Q.   And you had turned at that point?

5   A.   Well, when I saw the barrel of the gun pushing the poncho

6   out, I pivoted on my right foot and brought my left foot back

7   to keep from being shot right here.

8   Q.   By "here" you --

9   A.   As soon as he got the gun up, he fired.  And I pivoted back

10  so it hit here instead.

11       (Indicates.)

12  Q.   And you were first pointing to the area over your heart?

13  A.   Yes.

14  Q.   Okay.  Now, you actually fired some bullets yourself,

15  didn't you?

16  A.   Yes, I did.  After I was shot.

17  Q.   So after the first shot, what did you do?

18  A.   After I was shot, I drew my gun.

19  Q.   And what?

20  A.   Since Pultorak had shot me, I went after him.

21  Q.   How many shots did you fire all together?

22  A.   All together I fired six.

23  Q.   Was the first one at Pultorak?

24  A.   The first one was the one I put through his shoulder.

25  Q.   And what -- at that point were you still being shot at?

1  A.  Yes.  He was continuing to shoot, and Officer Hardin had

2  opened up on me.

3  Q.  After that first shot, is the one that was -- there was

4  testimony that it went through his shoulder, correct?

5  A.  Yes.

6  Q.  Okay.  What was the next shot that you recall firing?

7  A.  I fired another one, a deliberate miss, just over his head

8  a little bit because he was running away from me.  I just

9  wanted to keep him running, keep the pressure on him.

10  Q.  And then what?

11  A.  And then I turned back, and I fired a deliberate miss

12  toward Officer Hardin to try to make him move back.

13  Q.  Then what?

14  A.  At that point Officer Hardin shot me twice through the arm

15  when I turned back towards Pultorak and fired another shot to

16  keep him running, which was, again, a deliberate miss.

17  Q.  Right.  Then what?

18  A.  And after I was shot in the arm twice by Officer Hardin, I

19  turned back.  And I aimed for his lower leg, trying to knock

20  him down.  And I fired, and I missed.  And I hit the coffee

21  pot.

22  Q.  Okay.  That coffee pot has been in evidence.  Was that your

23  coffee pot?

24  A.  That was my coffee pot.

25  Q.  Did you shoot Officer Hardin?

1    A.   I was being careful not to actually catch him solid.   I

2    just wanted to put a minor wound on him and try to put him down

3    on the ground.   So I fired a second shot, and I actually got

4    what I was looking for the second time.   I got a graze wound on

5    his leg which took him down.

6    Q.   And after that, were you shot again?

7    A.   Yeah.   When he hit the ground, I didn't do myself any

8    favors.   He was a better shot prone, and that's when he shot me

9    in the groin again.

10   Q.   Then what happened?

11   A.   He was out of bullets, and I was empty, too.

12   Q.   So what did you do?

13   A.   Well, since Pultorak had disappeared, and since he was the

14   major threat, I told Officer Hardin that it was over.   I was

15   shot up pretty bad, and I needed a little help.

16   Q.   All right.   So when you said that, were you still standing?

17   A.   Yes.

18   Q.   There's testimony that when he -- so how did you wind up on

19   the ground?

20   A.   I sat down.

21   Q.   Were you in pain from all of this?

22   A.   Yes.

23   Q.   From the time where you first talked to Pultorak at the

24   campsite -- not that earlier morning -- to the time you sat

25   down after being shot, can you estimate how long that took?

1    A.   Three, four minutes.

2    Q.   From the time of the first shot at you, to the end of the

3    episode when you were out of bullets and you sat down, how long

4    was that?

5    A.   Ten to 12 seconds.

6    Q.   So again, how long had you been talking to Pultorak at the

7    campsite prior to him pulling out the handcuffs, would you

8    estimate?

9    A.   He said something to me when I was about 30 yards or a

10   little more from the campsite.  And there was some conversation

11   that was exchanged as I made that last 30 yards up the hill.

12      And then he asked several questions.  It may not have been

13   more than two minutes or something, but...

14   Q.   At least well over a minute?

15   A.   Yeah.  It was well over a minute I'm sure.  I mean --

16   Q.   You had said earlier in the day he had been angry and

17   shouting when you were in the car --

18   A.   Yes.

19   Q.   -- in your truck?

20      Okay.  As you were talking with him about your stuff and

21   the motorcycles, did he appear angry at that point?

22   A.   Yes.

23   Q.   So then there has been testimony that you were attended to

24   by Hardin until other law enforcement arrived?

25   A.   I don't recall having any treatment until the one officer

1  that testified that he had held pressure on the wounds came up.

2  That was the first I recall of any actual first aid or

3  treatment.

4  Q.   Okay.  What was your state of mind then?  What were you

5  feeling?

6  A.   Well, I was losing a lot of blood.  My hands had been

7  handcuffed behind my back for probably about 45 minutes.  And

8  Mr. Hardin and Mr. Pultorak were taking turns holding a gun on

9  me, watching me bleed.

10  Q.   Ultimately, they took you from the scene, correct?  You

11  were wheeled away?

12  A.   After several other CHP showed up, I was given first aid.

13  They cut my clothes off.  The EMT showed up and bandaged the

14  wounds.

15  Q.   I'm going to show you Defendant's Exhibit A and see if you

16  recognize that.

17       (Exhibit handed to witness.)

18  A.   Yes.

19  Q.   What's that a scene of?

20  A.   That's where they loaded me onto the -- I'm not sure what

21  they call it.  Basically a wheel carry for back country.

22  Q.   Now, there's some items on the ground, right?

23  A.   Yes.

24  Q.   What are they?

25       Let me ask it a little differently.  Are any of those

398

1    yours?

2    A.   I don't believe so.  I see a couple of what look like

3    medical bags.

4    Q.   So from being placed on that device, were you taken down to

5    the road?

6    A.   Yeah.  They had an ambulance staged at the bottom of the

7    road.  They took me on that wheel carry gurney or whatever it

8    is, and took me down to the ambulance.  And that was the point

9    that Carl Rutherford took care of me.

10   Q.   Now, do you recall talking with the medical personnel?

11        You were eventually helicoptered somewhere, weren't you?

12   A.   Yeah.  They took me up to the schoolhouse -- next to the

13   North Columbia Schoolhouse.  I forget the name of it now.

14   Q.   And there was a helicopter there?

15   A.   There was a helicopter staged at the school, yes.

16   Q.   And you were flown where?

17   A.   From there to Roseville -- or Sutter Roseville Hospital.

18   Q.   Now, did you have conversations with the medical personnel?

19   A.   I did with Kyle Rutherford, yes.

20   Q.   Do you recall what was -- what were you feeling at that

21   point?

22   A.   Lightheaded.  Dizzy.

23   Q.   Had you been given any pain medication or anything?

24   A.   No.

25   Q.   At that point?

1   A.   At that point, no.

2   Q.   Do you recall talking to him about what had happened?

3   A.   I recall a few comments about it, yes.

4   Q.   You heard his testimony.  As far as you know, is that at

5   least the best you remember what was said?

6   A.   I remember saying that I -- that they had drawn down on me,

7   and I had to return fire.

8   Q.   So you were treated at the hospital, correct?

9   A.   Correct.  The last thing I remember was being rolled onto

10   the surgery table, and then I don't remember anything until I

11   woke up.

12   Q.   There's been testimony by a district attorney investigator

13   in this trial about an interview with you.  Do you remember

14   that?

15   A.   I do remember it vaguely.

16   Q.   Okay.  But you remember the testimony here, though, what he

17   said?

18   A.   Yes.  I remember the testimony here, yes.

19   Q.   At the time that you talked to him, were you on any

20   medications?

21   A.   Yes.  They were giving me morphine shots every hour.

22   Q.   And there was testimony from the district attorney

23   investigator of an IV?

24   A.   Yeah.  There was an IV.  They had -- I forget what they

25   call it now, but they had an IV set up so they could just put

1    whatever they wanted into the IV.

2    Q.  What effect did the morphine have on you?

3    A.  Well, it's an opiate.  Obviously, it has a lot of mental

4    effect on you.

5    Q.  How long were you in the hospital?

6    A.  I believe about four days.  It was intensive care the whole

7    time.  When they came in, I wasn't even able to reach the call

8    button and call the nurse.

9    Q.  Why?

10   A.  Because I couldn't move.

11   Q.  When you say "when they came in," that's when you had the

12   discussion with the district attorney's office person who

13   testified?

14   A.  Well, they didn't tell me that they were district

15   attorney's office.  They stated they were independent

16   investigators.

17   Q.  Were you trying to tell them what happened as best you

18   could?

19   A.  I was trying.  I couldn't remember it very well with the

20   shock or whatever.

21   Q.  Did your memory come back?

22   A.  Yes, it did.

23   Q.  When?

24   A.  Slowly, over about a two or three week time.

25   Q.  Finally, when you went up there to the campsite on foot,

1   was there any other reason other than to pick up your things?

2   A.   That was the only reason, was to get my property.

3   Q.   Why did you have a gun?

4   A.   Because there was about a 500-pound bear that was regularly

5   coming through the camp.  The bucket that was on the rope, it

6   was on the rope to keep it strung up in the trees so he

7   couldn't get at it for food cache.

8   Q.   There was some testimony that the bear, in your

9   recollection, had been friendly or not?

10  A.   I mean, you know, you never know what a bear is going to

11  be.  He hadn't been a real terrible threat, but...

12  Q.   Okay.  All right.

13       Had you ever seen Pultorak before that day?

14  A.   No.

15  Q.   Did you have any idea why he acting the way he was?

16  A.   I have my suspicions, but no real idea.

17          MR. TONEY:  Your Honor, these photographs are, I

18  believe, subject to the same stipulation as to the ones the

19  government's photos were, so I'm moving admission of

20  Defendant's A, B, C, D and E.

21          MR. COPPOLA:  No objection, Your Honor.

22          THE COURT:  Admitted.

23      (Whereupon, Defendant's Exhibits A, B, C, D and E were

24      received.)

25          MR. TONEY:  I don't have the tech skill.  Can I

1    publish these by having the jury look at them by passing them

2    around?

3              THE COURT:  Okay.

4        (Exhibits published.)

5    BY MR. TONEY:

6    Q.  After you were released from the hospital, were you taken

7    to jail?

8    A.  Yeah.  They had come in and chained me to the bed in the

9    hospital in the ICU unit.

10   Q.  After you were discharged from the hospital, did they take

11   you to the jail?

12   A.  Yes.  They took me to the county jail in Auburn.

13   Q.  And were you treated there for injuries?

14   A.  Yeah.  They were treating the wounds by taking a swab every

15   day and going up inside the wound with disinfectant.

16   Q.  Which wound were they going --

17   A.  At that point there were at least five open wounds.  All of

18   them basically.

19   Q.  Okay.  The one that was, what, inside thigh or leg?

20   A.  The surgeons put it as the perineum.

21   Q.  How was that being treated?

22   A.  They would take about a ten-inch long wooden stick with a

23   Q-Tip on the end of it, and would stick that up inside of it

24   and swab it out with disinfectant.

25             MR. TONEY:  That's all I have.

1          CROSS-EXAMINATION

2     BY MR. COPPOLA:

3     Q.   Good morning, Mr. Cole.

4     A.   Good morning.

5     Q.   I want to pick up where Mr. Toney left off about your

6     memory of these events.

7          Do you recall those questions?

8     A.   I mean, yeah, I remember, you know, the --

9     Q.   I'm talking about the questions that Mr. Toney just asked.

10    A.   Yes.

11    Q.   Okay.  You indicated, just a few moments ago, that at the

12    time Investigator Billingsly and Investigator Swisher

13    interviewed you in the hospital, that your memory of the events

14    was not clear; is that correct?

15    A.   Really wasn't, no.  I told them that in the interview.

16    Q.   Okay.  In fact, what you told them in the interview,

17    Mr. Cole, was that your short-term memory isn't very good;

18    isn't that correct?

19    A.   I think that's the way I phrased it, yes.  What I was

20    trying to tell them --

21    Q.   Hold on, Mr. Cole.  Please, just answer the questions I'm

22    asking you.

23         You did not tell Investigator Billingsly or Investigator

24    Swisher that you felt as though you were under the influence of

25    medication at that point?

1    A.  They didn't ask.

2    Q.  But you didn't tell them, did you?

3    A.  I thought they knew.

4    Q.  So your answer then is, no, you did not tell them?

5    A.  No, I did not tell them.

6    Q.  Okay.  And, in fact, you told Investigator Billingsly at

7    the end of the interview that you didn't really know what had

8    happened up at the campsite; isn't that correct?

9    A.  I was having trouble recalling clearly, yes.

10   Q.  And your testimony today is that as you have had an

11   opportunity to think and reflect over the events of June --

12   since June 14th, your memory has actually gotten better; is

13   that correct?

14   A.  Not only has the memory gotten better, but I've been able

15   to look at the evidence to help jog my memory.

16   Q.  I want to talk little bit about Ranger Pultorak and your

17   initial contact with Ranger Pultorak.

18   A.  Okay.

19   Q.  Now, you have already testified that before June 14th,

20   2014, you had never met Ranger Pultorak?

21   A.  That's correct.

22   Q.  You had never seen him before?

23   A.  Never seen him before.

24   Q.  Never had a conversation?

25   A.  Never had a conversation with him.

1   Q.   But you knew when he contacted you that he was a law

2   enforcement officer?

3   A.   He was in a BLM truck, and he had a uniform on, yes.

4   Q.   Okay.   And when Ranger Pultorak contacted you while you

5   were -- when he made the traffic stop, that was the first time

6   you had ever spoken with Ranger Pultorak?

7   A.   That is the first time, yes.

8   Q.   Now, you have characterized -- or rather you characterized

9   Ranger Pultorak's attitude during that traffic stop to

10  Investigator Billingsly as disrespectful; is that correct?

11  A.   That's correct.

12  Q.   Okay.   And at one point during the interview with

13  Investigator Billingsly you described -- further described

14  Ranger Pultorak's attitude as ugly; is that correct?

15  A.   That was correct.

16  Q.   You also told Investigator Billingsly during that period of

17  time that -- or during the interview that it was because of

18  Ranger Pultorak's ugly and disrespectful comments that you were

19  in fear of your life; is that correct?

20  A.   It went beyond that.

21  Q.   But you also told Investigator Billingsly during that

22  period of time that you had no specific recollection of what it

23  was that Ranger Pultorak said during the traffic stop that put

24  you in fear of your life;  isn't that correct?

25  A.   That is correct.

1    Q.  All you remember is that he -- that Ranger Pultorak had an

2    ugly and disrespectful attitude?

3    A.  I think I said "surly."

4    Q.  So a surly attitude with you?

5    A.  Yes.

6    Q.  And it was because of that surly attitude, and only surly

7    attitude, that put you in fear of your life?

8    A.  That and him screaming.

9    Q.  Ranger Pultorak, during that initial traffic stop, didn't

10   threaten to kill you, did he?

11   A.  No.  He didn't threaten to kill me, no.

12   Q.  He didn't threaten to beat you up?

13   A.  He threatened to arrest me.  He threatened to impound my

14   vehicle.

15   Q.  But he made no threats of any physical harm to you, did he?

16   A.  Not directly, no.

17   Q.  Okay.  In fact, he didn't threaten your life in any way

18   during that initial traffic stop?

19   A.  No.

20   Q.  He simply told you that the road was closed to vehicular

21   traffic, didn't he?

22   A.  He told me that the road was closed on his authority to

23   vehicular traffic, yes.

24   Q.  And he told you not to drive on the road?

25   A.  He did.  And I complied with that.

1   Q.  He also told you that if he found your vehicle -- saw you

2   driving on -- in that area or on that road later, that your

3   vehicle would be impounded?

4   A.  Yes, he did.

5   Q.  Okay.  Now, this part of the traffic stop, it ended with

6   Ranger Pultorak essentially giving you a warning; isn't that

7   correct?

8   A.  That's correct.

9   Q.  He didn't write you a traffic citation?

10  A.  A traffic citation for what?

11  Q.  The point is he didn't write you a ticket for anything, did

12  he?

13  A.  No.

14  Q.  Okay.  As you left that area from -- during that traffic

15  stop, is it your testimony that you feared for your life?

16  A.  It's my testimony that I told others that I thought about

17  going to get a restraining order against him because he was so

18  surly.

19  Q.  So your testimony is at that point you were not in fear for

20  your life from Ranger Pultorak, at the conclusion of the

21  traffic stop?

22  A.  At the conclusion of the traffic stop, no, I wasn't.

23  Q.  And to this day you still can't point to any specific thing

24  that Ranger Pultorak said during that traffic stop that made

25  you fearful of him later, can you?

1    A.   Just his general attitude.

2    Q.   All right.   Because your memory is faulty; isn't that

3    correct?

4    A.   When they came up to interview me, I wasn't remembering

5    very clearly because I was -- I think they call it

6    posttraumatic shock syndrome.

7    Q.   Now, let's talk about when you came back after dropping the

8    Radons off.

9    A.   Okay.

10   Q.   So your testimony, Mr. Cole, was that you parked your

11   car -- or parked your truck at the intersection, I think you

12   said, of Grizzly Hill and North Bloomfield Road?

13   A.   It was on North Bloomfield Road close to the intersection,

14   yes.

15   Q.   Okay.   Now, the reason you parked there was because you

16   were trying to comply with Ranger Pultorak's order?

17   A.   That's correct.   I did comply with what he said.

18   Q.   And while you were at that -- after you parked your car --

19   let me back up a second.

20        During the initial traffic stop, Mr. Cole, you did not have

21   your .44 revolver strapped to your hip; is that correct?

22   A.   No.   It was behind the seat.

23   Q.   It was in the vehicle?

24   A.   Yes.   And I told him that.   He was aware of it.

25   Q.   Now, when you got out of your truck to walk up the hill

1   towards your campsite, you put that .44 caliber pistol on,

2   didn't you?

3   A.  I did.

4   Q.  In fact, you had to reach behind the seat, because it was

5   still in the holster behind the seat; is that right?

6   A.  It was in a case behind the seat.

7   Q.  In a case behind the seat.  So you took it out of that

8   case?

9   A.  Yes.

10  Q.  Okay.  You loaded it?

11  A.  I had to get in the back and get the ammunition out of the

12  back.

13  Q.  Okay.

14  A.  So yes, I loaded it.

15  Q.  So you loaded it.  And you put it in the holster and put

16  the holster on your hip?

17  A.  Yes, I did.

18  Q.  Now, June 14th was a pretty warm day, wasn't it?

19  A.  Actually, it wasn't that warm.  I believe that the airport

20  temperature recorded in Nevada City was 70 degrees.  It would

21  have been a bit cooler than that up on the hill there.

22  Q.  You have heard the testimony of Officer Hardin who said it

23  was a warm day; is that correct?

24  A.  It wasn't a cold day, but it was about 68 degrees.

25  Q.  Now, you were wearing a T-shirt that day; is that right?

1    A.   Yes.

2    Q.   And you were also wearing that dark, what looks like a

3    Carhartt hoodie sweatshirt over the top of that; is that right?

4    A.   That's correct.

5    Q.   Okay.  And your gun at this point was strapped to your

6    right hip; is that correct?

7    A.   That's correct.

8    Q.   And that Carhartt hoodie sweatshirt conceals your waist

9    area, doesn't it?

10   A.   It covers the handle on the gun.

11   Q.   Okay.  So your testimony then is that the lower portion of

12   that firearm would have been poking below --

13   A.   I believe --

14   Q.   The seam of the jacket?

15   A.   I believe it would.

16   Q.   Okay.  But you don't have a clear recollection as to

17   whether or not it did?

18   A.   No.

19   Q.   All right.

20        Now, your reason for putting the sweatshirt on that day was

21   to cover up the gun; isn't that right?

22   A.   No.  The reason is because I didn't know how long I was

23   going to be.  It was 68 degrees.  I didn't know if it was going

24   to be until dark or thereabouts.  And it turns, you know, a lot

25   colder after dark.

411

1    Q.  Now, this was when you initially started hiking up the

2    hill.  This would have been midafternoon approximately; is that

3    right?

4    A.  Yeah.  Basically, about two o'clock or something like that.

5    Q.  Fair to say though you weren't checking your watch?

6    A.  No, I wasn't.

7    Q.  Okay.  And so you hiked up the hill towards the camp area?

8    A.  Yes.

9    Q.  Okay.  Now, you stopped at a place below the campsite and

10   you listened; is that correct?

11   A.  I could actually see them.

12   Q.  From the location that you stopped?

13   A.  Yes.

14   Q.  Now, your testimony a few moments ago was you stopped for

15   about 10 to 15 minutes before you made yourself known; is that

16   correct?

17   A.  I would say five to ten minutes.  I'm not sure exactly how

18   long because they originally had AR-15s.  And they walked back

19   down the hill and put them up and then come back up.

20   Q.  So let me see if I understand this correctly, Mr. Cole.

21   You stood in the woods -- you stood in the woods and quietly

22   watched the officers in your campsite from your location; is

23   that right?

24   A.  Yeah.

25   Q.  Okay.

1    A.   I watched them.

2    Q.   Your testimony now is that they were carrying long rifles,

3    both of them?

4    A.   Automatic recoil assault rifles.

5    Q.   Right.  I know what an AR-15 is.  So a rifle essentially,

6    right?

7    A.   Right.  When they first were running up and down the hill,

8    yes, they had AR-15s.

9    Q.   So from your vantage point, you could see them going back

10   and forth from the campsite, and then the brushed-in trail that

11   you had driven on earlier in the day; is that right?

12   A.   Correct.

13   Q.   And from your location, you could see the rifles?

14   A.   I could.

15   Q.   And you could see them both, Officer Hardin and

16   Ranger Pultorak, leave the camp area and come back to the camp

17   area; is that right?

18   A.   That's about all I could see.  I could see them when they

19   were in the camp area, and maybe a few feet above it, a few

20   feet below it.  But just that was all I could really see is

21   when they came into that spot.

22   Q.   Okay.  But you also -- your testimony, just a few moments

23   ago, was that you could see them leave the camp area?

24   A.   I could tell when they left by the footsteps and whatnot.

25   I could see them when they were in the camp area.

413

1    Q.  So at that point you remained in the woods after they left

2    the campsite?

3    A.  When they left with the AR-15s, yeah, I stayed there to

4    watch for a few minutes to see what they were doing.

5    Q.  All right.  You waited until they returned to the campsite?

6    A.  Correct.

7    Q.  Is that correct?

8        And it was at that point you made the observation that they

9    were not carrying their rifles anymore?

10   A.  That's correct.

11   Q.  Okay.  And what you have just told us, Mr. Cole, that's the

12   first time you have told anybody about the officers leaving the

13   campsite and having AR-15 rifles; isn't that correct?

14   A.  That is correct.

15   Q.  You did not tell that to Investigator Billingsly?

16   A.  No, I didn't.  I didn't remember it.

17   Q.  But you remember it now?

18   A.  Yes, I do.

19   Q.  In fact, just a few moments ago, when Mr. Toney was asking

20   you questions, you didn't tell him that either, did you?

21   A.  He didn't ask the question.

22   Q.  Now, while you were in the woods, Mr. Cole, waiting and

23   watching the officers, you were concerned that they were taking

24   your stuff, weren't you?

25   A.  Not until I saw them taking it.

414

1   Q.  When you saw them taking it, that made you mad, didn't it?

2   A.  It made me concerned because I needed my things.

3   Q.  And so it was at that point that you decided -- let me back

4   up.

5        You were concerned because it was law enforcement that was

6   taking your things; is that right?

7   A.  I was concerned because I needed my things.  I needed my

8   dentures.  I needed my backpack.  I needed my sleeping bag.

9   Q.  So it was at that point that you decided it was time to go

10  and confront the officers; isn't that right?

11  A.  I decided I probably should say something about, you know,

12  my property, and try to collect my property, yes.

13  Q.  Now, at that point, Mr. Cole, you weren't in fear of your

14  life, were you?

15  A.  I wasn't in fear for of my life at that point, no.

16  Q.  You were just concerned because people were messing with

17  your stuff, and you wanted to go get it?

18  A.  I was concerned because I wanted to be able to have a

19  sleeping bag to sleep in.  And I needed my backpack, and I

20  needed my dentures.

21  Q.  So the answer to my question is "yes"?

22  A.  Yes.

23  Q.  So when you saw the agents -- or the officers dealing or

24  putting their hands on your property, okay, you immediately

25  then began making noise and walking towards the campsite; is

1    that right?

2    A.  Well, I made enough noise to make sure they weren't

3    thinking I was sneaking up on them.

4    Q.  And it didn't take you very long from your observation

5    position to actually get to the campsite, break the brush line

6    and make contact with Ranger Pultorak; isn't that right?

7    A.  I made contact with Ranger Pultorak before I got in the

8    campsite and broke the brush line, probably by 30 or 40 yards.

9    Q.  You made contact with him with your voice at that point?

10   A.  He had visual on me.  He came to the edge of the campsite,

11   walked down the ridge a little bit to where he could see me.

12   He walked down by the live oak tree.

13   Q.  And you approached him?

14   A.  I did.

15   Q.  Okay.  And you said, "Hey, it is me.  You know me from

16   earlier"?

17   A.  That's what I said.

18   Q.  On that day, Mr. Cole, we've already talked about the fact

19   that you were wearing that black Carhartt hoodie sweatshirt.

20   Were you wearing a hat that day, too?

21   A.  Yes.

22   Q.  A leather brimmed --

23   A.  Yes.

24   Q.  -- kind of like --

25   A.  Outback --

1   Q.   -- an outback hat?

2   A.   Yes.

3   Q.   Okay.  And Ranger Pultorak then waited for you as you

4   approached his position?

5   A.   Basically, at the top of the ridge, yes.

6   Q.   Okay.

7   A.   He told me to come on up.  When I told him that I wanted to

8   get my things, he told me to come on up, it was okay.

9   Q.   Now, at that point Ranger Pultorak was using a normal tone

10   of voice, wasn't he?

11   A.   A little loud, a little domineering, but fairly normal.

12   Q.   At that point you certainly weren't in fear of your life,

13   were you?

14   A.   Well, when he told me it was okay for me to come up and get

15   my things, I was not, no.

16   Q.   Did you tell Investigator Billingsly that Ranger Pultorak

17   told you that it was okay to come up and get your things?

18   A.   I don't recall.

19   Q.   Now, you heard Ranger Pultorak's testimony.  The first

20   words out of his mouth were, "Police," "Identify yourself."

21   Something along those lines?

22   A.   And I did.  Yes, something along that line.

23   Q.   And that's when you responded, "Hey, it is me.  You know me

24   from earlier."

25   A.   I think I said that I'm the one that you stopped earlier.

1   Q.  And at the time of the traffic stop, were you wearing the

2   hat?

3   A.  I don't recall.  Probably not.  I normally don't wear the

4   hat, you know, when I'm in the truck.

5   Q.  Okay.

6   A.  Or it was probably on the dash.

7   Q.  At that point you and Ranger Pultorak, your testimony is,

8   you engaged in a conversation?

9   A.  Yes.

10  Q.  Okay.  And that conversation was polite?

11  A.  It was.

12  Q.  Okay.  And --

13  A.  At least my end of it.

14  Q.  And while you were engaged in the initial conversation with

15  Ranger Pultorak, you were not fearful for your safety in any

16  way; isn't that right?

17  A.  I was a little apprehensive perhaps, but not fearful, no.

18  Q.  Okay.  Now, your testimony is that the conversation went

19  downhill pretty quickly from that point?

20  A.  Well, I mean, he was asking questions, and I was answering

21  his questions.

22  Q.  And during that question-and-answer session, you told him

23  that you were there to get your stuff?

24  A.  I did.  I pointed out that he was taking my backpack, and

25  that backpack was mine and that I needed it.

1  Q.  And at that point Ranger Pultorak wasn't agitated, was he?

2  A.  I don't think that's true.

3  Q.  You were getting progressively upset?

4  A.  No, I wasn't getting progressively upset.  You're

5  incorrect.

6  Q.  Okay.  But he was messing with -- or they were -- you

7  thought that he was taking your stuff?

8  A.  I didn't think.  I watched him taking it.  They had loaded

9  parts of it, and they were taking it.

10 Q.  Now, your testimony today was that Ranger Pultorak was

11 wearing a uniform so you recognized him as a law enforcement

12 officer; is that right?

13 A.  I recognized him from the stop, but he had a poncho over

14 his uniform.

15 Q.  So when you made contact with him at the campsite, your

16 testimony today is that he was wearing something over his

17 uniform?

18 A.  Yes, he was.

19 Q.  But you recognized him from the traffic stop?

20 A.  I did recognize him, yes.

21 Q.  You didn't tell Investigator Billingsly that he was wearing

22 anything -- that Ranger Pultorak was wearing a poncho during

23 that period of time, did you?

24 A.  I didn't remember it.

25 Q.  Okay.  But you remember it now?

1    A.   Yes, I do.  It was brown plaid.  It had tassels on the

2    bottom of it.  It had a kind of sideways-z-shaped decoration

3    around the peripheral of it that was underlined with white,

4    about a half-inch by about three-inches long.

5    Q.   And you have a clear recollection of that today as you sit

6    in the chair that you are sitting in now?

7    A.   I do.

8    Q.   Okay.  Any law enforcement markings on that poncho?

9    A.   No.

10   Q.   When you told Ranger Pultorak you wanted your things, your

11   testimony here today is that he pulled out handcuffs?

12   A.   Basically, that's exactly what he did.

13   Q.   Now, you told Investigator Billingsly that Ranger Pultorak

14   reached to his side and withdrew his handcuffs.

15        Do you remember telling Investigator Billingsly that?

16   A.   He held them out in front of him.

17   Q.   After he withdrew his handcuffs; is that right, from his

18   belt, Ranger Pultorak held them out in front of him?

19   A.   I couldn't see his belt.  I couldn't see his hands.

20   Q.   But you did see his hands with the handcuffs in front of

21   you?

22   A.   When he put his hands in front of him, yes, I did see the

23   handcuffs.

24   Q.   And then you told Investigator Billingsly that

25   Ranger Pultorak twirled the handcuffs, didn't you?

1   A.   He brandished them by twirling them on his fingers.

2   Q.   So he put one finger through one of the loops and twirled

3   them on his finger?

4   A.   He had his fingers through both loops and twirled them on

5   his finger -- or was rolling them around his finger with his

6   other fingers.

7        I don't know exactly the motion that he was making, but he

8   was basically brandishing them and rolling them around on his

9   finger, yes.

10  Q.   At that point that caused you concern, didn't it?

11  A.   Well, that and the little smirk on his face, like I'm going

12  to do whatever I want to you and there is nothing you can do

13  about it.

14  Q.   In fact, you told Investigator Billingsly about that

15  interaction, that Ranger Pultorak was acting like he had all

16  the power; isn't that right?

17  A.   That is correct.  He did.

18  Q.   Okay.  In fact, you even told Investigator Billingsly that

19  at that point you feared Ranger Pultorak was going to put the

20  handcuffs on you and shoot you?

21  A.   I did.

22  Q.   So the minute those handcuffs came out, Mr. Cole, you were

23  afraid for your life?

24  A.   I was.

25  Q.   You also told Investigator Billingsly -- or it was at that

1    point, with those handcuffs out, you recall Ranger Pultorak's

2    testimony, "You're not putting those on me"; isn't that

3    correct?

4    A.   I didn't say anything.

5    Q.   Ranger Pultorak told you to turn around, didn't he?

6    A.   No, he didn't.

7    Q.   So at that point, Mr. Cole, Ranger Pultorak asked you if

8    you were armed, didn't he?

9    A.   He put the handcuffs up, and then he asked me if I was

10   armed.

11   Q.   That's not what you told Investigator Billingsly, is it?

12   A.   I believe it is.

13   Q.   You told Investigator Billingsly that he asked you if you

14   were armed, that when you responded "Yes, I am," he put the

15   handcuffs away and then he began to draw his weapon.

16        Do you recall that?

17   A.   I -- I do recall he drew his weapon immediately after

18   putting the handcuffs away, yes.  I saw his shoulders move.

19   Q.   And you heard the testimony of Officer Hardin who was some

20   feet away watching your interaction with Ranger Pultorak?

21   A.   He was behind him.

22   Q.   Okay.  You heard Officer Hardin testify that you took an

23   aggressive stance, reached for your waist and put your hand

24   out.

25        Do you remember that?  Do you remember that testimony?

1  A.  I remember the testimony, but --

2  Q.  That's what you did, isn't it?

3  A.  No.

4  Q.  So your testimony is that you just stood there while both

5  officers drew and pointed their weapons at you?

6  A.  I stood there with my hands in front of me.  And when I saw

7  the gun barrel pushing the poncho out, I pivoted on my right

8  foot and brought my left foot back.

9  Q.  You were focused on that gun barrel?

10  A.  I was focused on his center body mass right here so that I

11  could see everything around it.  Because I knew by that smirk

12  on his face that he was going to do something malignant.

13  Q.  Something malignant?

14  A.  Yes.

15  Q.  So Mr. Cole, you told Investigator Billingsly that your

16  response in this situation is you just reacted.

17      Do you remember telling him that?

18  A.  I did.

19  Q.  Do you remember telling Investigator Billingsly that you

20  just reacted, and that you just freaked out?

21      Do you remember telling Investigator Billingsly those

22  things?

23  A.  I remember telling him that because I didn't remember

24  clearly what had happened.

25  Q.  In fact, Mr. Cole, you went from zero to 100 miles an hour

1   in less than a second; isn't that right?

2   A.   Yeah.   After I was gut shot.   That's correct.

3   Q.   In fact, you told Investigator Billingsly that you drew and

4   fired only as Ranger Pultorak was coming up for what you

5   characterized as a "heart shot"; isn't that right?

6   A.   He drew his pistol.

7   Q.   That's not the question I asked you.   The question that I

8   asked you, Mr. Cole, was you told Investigator Billingsly that

9   you drew and fired as you perceived Ranger Pultorak pulling up

10   for a shot?

11   A.   I don't believe I did.

12   Q.   You heard Investigator Billingsly testify to that; did you

13   not?

14             MR. TONEY:   I'll object.   I think it misstates.

15             THE WITNESS:   I don't believe that's what I told him.

16             MR. COPPOLA:   I didn't hear the objection or ruling,

17   Your Honor.   Sorry.

18             THE COURT:   Okay.   I haven't ruled.   And I'm not sure

19   that I need to rule.

20        Do you think I need to rule, Mr. Toney?

21             MR. TONEY:   Yes.   I believe he is misquoting the

22   testimony.

23             THE COURT:   "I believe," is that a fact?

24             MR. TONEY:   Objection.   He's misquoting the testimony.

25             THE COURT:   I'm not in a position to respond to that.

1    What's the government's position?

2          MR. COPPOLA:  The government's position is that's the

3    recollection, and I'm asking -- the recollection the government

4    has of Investigator Billingsly's testimony.  I'm asking the

5    Mr. Cole a question about that in a good-faith belief to do

6    that.

7          THE COURT:  The jury -- the jury will make a

8    determination as to whether something is in the record in

9    connection with the disputed issue that's before me now.

10   BY MR. COPPOLA:

11   Q.  You also told Investigator Billingsly that -- to back up

12   again, Ranger Pultorak was pulling up for a heart shot; do you

13   recall that?

14   A.  I do recall that.

15   Q.  Okay.  So you tried for a shoulder shot?  Do you recall

16   telling him that?

17   A.  I was on morphine.  My recollection wasn't that clear.  I

18   had told him that my recollection wasn't that clear before that

19   testimony.

20   Q.  My question to you is, do you recall telling Investigator

21   Billingsly that you tried for a shoulder shot, which you made?

22   A.  I was on morphine, and what I was telling him was not

23   coming out very clearly, even according to the memory that I

24   had which wasn't very good.

25   Q.  Now, Investigator Billingsly, while he was interviewing

1  you, Mr. Cole, you heard his testimony earlier, was trying to

2  clarify what the sequence of events was; is that right?

3  A.  I remember not being able to move, and I remember them

4  drilling me for well over an hour.  And when I told him I

5  couldn't remember, they just kept grilling.

6  Q.  Now, you've had an opportunity to review the transcript of

7  that interview?

8  A.  I have not had an opportunity to hear the audio recording,

9  and I know the transcript is not necessarily accurate.

10 Q.  Now, one of the other things, when Investigator Billingsly

11 was trying to clarify the sequence of events for you, do you

12 recall his testimony about those issues?

13 A.  No, I don't.

14 Q.  From last week?  When he testified in this courtroom, you

15 don't recall what he testified to?

16 A.  You would have to refresh my memory on what he said.

17 Q.  Do you recall telling Investigator Billingsly that you shot

18 one time at his, meaning Ranger Pultorak's shoulder, to get him

19 away from you?

20 A.  Well, he had already started backing up.  He had already

21 moved away from me.

22 Q.  Okay.

23 A.  Irregardless of what I said at that time, when I was on

24 morphine every hour.

25 Q.  So at that time Ranger Pultorak was retreating while you

426

1    were firing at him?

2    A.   He was backing up after he shot me, and I started to draw,

3    yes.

4    Q.   Now, you told us a few moments ago, when Mr. Toney was

5    asking you questions, that there were a number of intentional

6    misses on your part?

7    A.   That's correct.

8    Q.   Now, your weapon is a .44 Taurus revolver that we've seen

9    in court?

10   A.   Yes.

11   Q.   That's your gun, isn't it?

12   A.   Yes.

13   Q.   Okay.  And the cylinder of that weapon -- the cylinder of

14   that firearm holds six shots?

15   A.   That's correct.

16   Q.   You fired all six rounds?

17   A.   I did.

18   Q.   You fired at Ranger Pultorak's shoulder and hit him?

19   A.   That's correct.  And I knew I hit him when I shot.

20   Q.   And as he continued to proceed down that brushed-in trail,

21   you fired at least one more shot to keep him --

22   A.   Yeah.

23   Q.   -- to keep him going in that direction, didn't you?

24   A.   If you'll look, it was over his head because it hit that

25   madrone tree.

1    Q.   It was at that --

2    A.   Well over his head.

3    Q.   It was at that point, Mr. Cole, that you turned your

4    attention to Officer Hardin?

5    A.   That's correct.

6    Q.   Okay.  Who was firing at you?

7    A.   That's correct.  Who was hitting me.

8    Q.   Right.  And you fired several rounds in his direction?

9    A.   I fired one.  I don't recall whether it was beside him or

10   over his head, but I fired one to try to get him to move back,

11   which he did move back.

12   Q.   In fact, he was retreating as well?

13   A.   After I fired one round, yes.

14   Q.   In fact, you saw that he tripped over that fire pit; isn't

15   that right?

16   A.   I'm not sure if he tripped over the fire pit or I was

17   trying to graze his leg or if I actually made the shot and he

18   went down.  I'm not certain.

19        Keep in mind, there were -- they fired 17 rounds at me

20   within ten seconds.

21   Q.   This is a fairly traumatic event for everybody, isn't it?

22   A.   Yes.

23   Q.   And your testimony, when Mr. Toney was asking you

24   questions, was that when you shot Officer Hardin in the leg,

25   that's what caused him to go down?

1   A.  I'm not certain if he tripped or if that's what caused him

2   to go down because it was a pretty minor flesh wound.  I

3   barely, barely touched him.

4   Q.  In fact, you characterized Officer Hardin's wound as -- or

5   excuse me -- Ranger Pultorak's wound as barely touching him as

6   well?

7   A.  It was above the bone.  It was basically through the soft

8   part of the shoulder.  Yes.  If I had hit a bone with that, it

9   would have been a lot worse.

10  Q.  You told Investigator Billingsly during that interview that

11  you knew you had made a mistake just as soon as you reacted and

12  you reacted wrong; isn't that right?

13  A.  When your gut shot logic goes out the window.

14  Q.  You also told Investigator Billingsly that it was better --

15  words to this effect -- it was better to put a round in someone

16  first than waiting for them to put one in you.

17      You believe that, don't you?

18  A.  I don't believe you have to use lethal force in every

19  instance as was being tried towards me.

20  Q.  You admitted to Investigator Billingsly that you were wrong

21  to shoot the officers; isn't that right?

22  A.  I just wanted them to quit interrogating me.

23  Q.  And at the end of that interview you reiterated to

24  Investigator Billingsly that you just didn't know what

25  happened?

1    A.   You know, it is funny.  Morphine clouds your mind a bit.

2         MR. COPPOLA:   Could I have just a moment, Your Honor?

3    (Government cocounsel confer.)

4         MR. COPPOLA:   Your Honor, I don't have any further

5    questions for Mr. Cole.

6         THE COURT:   Okay.

7                    REDIRECT EXAMINATION

8    BY MR. TONEY:

9    Q.   After you came back, after -- just to put it in context,

10   there was the truck stop, you took the Radons somewhere, you

11   came back, correct?

12   A.   Correct.

13   Q.   You got out of the truck.  Why did you put the gun on?

14   A.   Because that bear had been through the camp almost daily.

15   He was pretty bad about coming right into the camp, day or

16   night, and he was very aggressive.

17        MR. TONEY:   That's all I have.

18                    RECROSS-EXAMINATION

19   BY MR. COPPOLA:

20   Q.    Do you remember telling Investigator Billingsly that the

21   bear was not a particularly obnoxious bear?

22   A.   I remember saying he was not particularly obnoxious.  That

23   doesn't mean I know what he's going to do, and it doesn't mean

24   that he didn't come into camp all the time.

25   Q.   You just testified a moment ago that he was aggressive.

1    A.   He was aggressive.   He wanted something to eat.

2              MR. COPPOLA:   I don't have any further questions, Your

3    Honor.

4              MR. TONEY:   Nothing else.

5              THE COURT:   Okay.   Court is in recess for 15 minutes.

6         (Off the record at 10:45 a.m.)

7         (Back on the record at 11:00 a.m.)

8              THE CLERK:   You may remain seated.

9              Court is now in session.

10             THE COURT:   All participants are present.   You may

11   proceed.

12             MR. TONEY:   I'll call Paul Castiglioni.

13             THE CLERK:   You can be seated.   Raise your right hand.

14   (WHEREUPON, PAUL CASTIGLIONI WAS CALLED AS A WITNESS AND SWORN)

15             THE CLERK:   Please, state and spell your name for the

16   record.

17             THE WITNESS:   My name is Paul Castiglioni,

18   C-a-s-t-i-g-l-i-o-n-i.

19                            DIRECT EXAMINATION

20   BY MR. TONEY:

21   Q.   Good morning.

22   A.   Good morning.

23   Q.   What's your occupation?

24   A.   I'm self-employed.   I make molds and patterns for the

25   jewelry industry and light foundry work.

1   Q.  Do you have any volunteer organizations you belong to?

2   A.  I do.  North San Juan Fire Department.

3   Q.  Do volunteers have a rank within that?

4   A.  I'm a captain.

5   Q.  Do you recall an incident where you were called to a

6   shooting at a campsite?

7   A.  I do remember.

8   Q.  And this would have been last June?

9   A.  June.

10  Q.  Yes?

11  A.  Yes.

12  Q.  Okay.  When you got there, what did you do?

13  A.  When I got to the scene, I was there with another

14  firefighter.  And he took a med bag, went down to find out what

15  our assignment would be.  We got that assignment.  We needed a

16  wheeled Stokes.

17  Q.  What is that?

18  A.  A wheeled Stokes, it's a cart that has a single wheel on

19  it.  You can roll somebody down a trail rather than carrying

20  them.  So it is, in essence, like a rigid stretcher with a

21  wheel.

22  Q.  Okay.

23  A.  And I went and got that off the rig and started to wheel it

24  toward the patient with another firefighter.  I realized I left

25  my radio behind.  He continued on with the wheeled Stokes.  I

1    went and got my radio and met them at the scene.

2        Already at the scene were -- Doug Lincoln was the one that

3    rolled the Stokes.  Already at scene was Christopher Montelius

4    and Tom Browning, the battalion chief.  He was --

5    Q.  Just a minute.  Let me show you something.

6    A.  Okay.

7    Q.  This is Defendant's A in evidence.

8        (Exhibit handed to witness.)

9    Q.  Do you recognize that?

10   A.  I do.  That is the wheeled Stokes.

11   Q.  Are you pictured in that?

12   A.  I am.

13   Q.  Where are you?  Right?  Left?  Somewhere in the center?

14   A.  I'm on the far right.

15   Q.  Okay.  And does that appear to be the situation at that

16   scene?

17   A.  It does.

18   Q.  So I interrupted you.  What did you do next?

19   A.  I was directed to bandage his arm, which I did.

20   Q.  Did it appear to have a wound?

21   A.  It did.

22   Q.  And were you directed to do any other work there?

23   A.  No.

24   Q.  How long were you with the patient?

25   A.  If I had to guess, I would think not much more than about

1    five minutes.

2    Q.  How did he look?

3    A.  His skin tones were gray, and he was cold to the touch.  So

4    he was cool and pale.  I had gloves on.  Whether he was

5    diaphoretic or not, I don't remember.

6    Q.  What does that mean?

7    A.  Diaphoretic means clammy, moist.

8    Q.  I'm going to show you Defendant's D as in David.

9        (Exhibit handed to witness.)

10       Take a look at that photo.

11   A.  Uh-huh.

12   Q.  Is that how he appeared?

13   A.  I would say so.  He -- from my memory, he was a little

14   paler, but I see his chest is pale in this.  That's how he

15   looked.

16   Q.  Did he talk at all while you were there with him?

17   A.  No.

18   Q.  His eyes were open?

19   A.  His eyes were open.

20   Q.  Did you question him at all?

21   A.  No.

22   Q.  So your job was just to --

23   A.  Bandage his arm.

24   Q.  Bandage his arm.

25       I may have just asked you this, but did you notice any

1   other wounds on him?

2   A.   His leg wound was already bandaged when I got there.

3   Q.   Okay.  How about any wounds in the groin area?

4   A.   I didn't see any other wounds.

5        MR. TONEY:   That's all I have.

6        Just one second.  If I can have one second?

7        (Counsel confers with defendant.)

8   BY MR. TONEY:

9   Q.   I'm sorry.  I do have a couple more questions.

10       While you were there, did you see some handcuffs?

11  A.   I did.

12  Q.   And what -- did you do anything with them?

13  A.   You're talking about the handcuffs on the ground?

14  Q.   I'm talking about any handcuffs you might have seen there.

15  A.   There were some handcuffs on the ground.

16  Q.   Yeah.  And what did you do?

17  A.   That was when we were leaving.

18  Q.   Uh-huh.

19  A.   As we left, I noticed there was handcuffs on the ground.  I

20  picked them up, and I said to the law enforcement that somebody

21  left their handcuffs.  And they said leave that.  That's

22  evidence.  I put them down where they were and then continued

23  out.

24       By then we were leaving.  I had a med bag in my hand, and

25  we were on our way out.  The patient had already left the

1    scene.

2    Q.  All right.  Almost done.

3         (Counsel confers with defendant.)

4         I'm going to show you a photograph that's F for

5    identification.  It is black and white.

6         (Exhibit handed to witness.)

7         Does that appear to be the scene, as best you recall?

8    A.  As best as I recall, that's what the area looked like.

9    Yeah.  I would say that was about right.

10   Q.  Is that photo -- does that photo show the location of where

11   you saw the handcuffs?

12   A.  I don't think so.  If this is looking up the trail, the

13   handcuffs would have been out of -- they would have been out of

14   the picture by another 15 feet, 20 feet.  Guessing.

15   Q.  In what direction?

16   A.  Toward the bottom of the photo.  If I'm looking -- yeah.

17   It would have been toward the bottom of the photo.

18        The trail, as far as I can remember, is coming up from this

19   way, and the scene that I saw would have been this view coming

20   in.

21   Q.  Okay.  Could you, with this pencil, draw an arrow pointing

22   to where you recall, as best you recall, the handcuffs were?

23   A.  Like I said, it would be off the photo.

24   Q.  That's why I'm saying draw an arrow.

25   A.  If I'm looking in the right direction and not coming from

1  this way.

2       (Witness marks exhibit.)

3            MR. MCCOY:  Your Honor, I'm going to object here.  The

4  attorney is asking the witness to draw an arrow to someplace

5  off the photograph.

6     How is that relevant or probative?

7            THE COURT:  I'm having 403 issues with this, too.  I'm

8  surprised you're not.

9            MR. TONEY:  All right.

10           THE COURT:  The objection is sustained.

11           MR. TONEY:  That's all I have.

12                        CROSS-EXAMINATION

13  BY MR. MCCOY:

14  Q.  Good morning.

15  A.  Good morning.

16  Q.  I just have a few follow-up questions for you.

17     Now, you told Mr. Toney, you just testified that you

18  arrived on scene with another fireman, correct?

19  A.  I arrived at, if you want to call it a staging area, not at

20  the scene itself.  I was behind because I went back to get my

21  radio.  They went on to the scene.

22  Q.  And the other fireman you arrived with was Fireman Chris

23  Montelius?

24  A.  Correct.

25  Q.  So you testified that you had to go back to get your radio;

1   is that right?

2   A.  Correct.

3   Q.  And Chris Montelius and other firemen went up to the

4   location of the shooting?

5   A.  Correct.

6   Q.  And they were with the patient while you were down getting

7   the radio?

8   A.  Correct.

9   Q.  How long after -- let me ask this:  How long did it take to

10  get the radio and get back up to the campsite?

11  A.  It didn't take long to grab the radio.  However, there's

12  two roads.  There is one road going in, but the road split off,

13  one road going to the left.  There was a state vehicle, if I'm

14  not mistaken, at that road.  I went down that road because I

15  could not see all the way down.  I couldn't see the scene.

16      So I went down that road, realized it's the wrong road,

17  then came back.  All told, it couldn't have been, you know,

18  six -- six, seven minutes.

19  Q.  So the other paramedics -- or the other emergency medical

20  service providers are with Cole for five to six minutes before

21  you arrived?

22  A.  Correct.

23  Q.  When you arrived, you didn't conduct an assessment of Cole,

24  correct?

25  A.  No.

1  Q.  In fact, he was already in the Stokes basket when you got

2  there, correct?

3  A.  That's correct.  He was in the Stokes.

4  Q.  So when you arrived, you didn't do what they call a

5  head-to-toe assessment?

6  A.  No.  That was not my job.

7  Q.  Take his blood pressure?

8  A.  No.

9  Q.  Heart rate?

10  A.  No.

11  Q.  In fact, you were just asked to bound up or bandage up his

12  arm wound; is that correct?

13  A.  Correct.

14  Q.  I believe you testified that the total time -- or total

15  period of contact you had with the defendant was five minutes;

16  is that right?

17  A.  Approximately.

18  Q.  Before he left the scene in the Stokes basket?

19  A.  That's about right.

20      And my actual contact with the patient was probably less

21  than that, where I was bandaging him.  That went pretty

22  quickly.

23  Q.  Mr. Toney asked you if you had any conversations or

24  communication with the defendant while bandaging up his arm?

25  A.  He did ask me, and I had no conversation with him.

1  Q.  But you didn't ask the patient -- the defendant any

2  questions, correct?

3  A.  No.

4  Q.  While you were with the patient, you didn't hear him say

5  anything; is that right?

6  A.  No.

7  Q.  That includes there was no confused speech that you heard

8  him making?

9  A.  No.

10  Q.  Now, Mr. Toney asked you, in addition to the arm wound,

11  what other wounds you noticed in this brief contact you had

12  with him.  And you said that you noticed a leg wound; is that

13  correct?

14  A.  Well, he had a bandage in his upper leg.  I couldn't -- at

15  that point I could not tell whether that was a groin wound, an

16  abdominal wound, or a leg wound.  That was bound already.

17  Q.  That's because you didn't do an assessment?

18  A.  Exactly.  Like I said, my part was to bandage his arm.

19  Q.  Let's talk about these handcuffs that Mr. Toney asked you

20  about at the end of his examination.  You testified that you,

21  as you're walking out of the campsite, you discover handcuffs

22  laying on the side of the trail; is that correct?

23  A.  Correct.

24  Q.  You picked the handcuffs up?

25  A.  I picked the handcuffs up.

1    Q.  Once you had them in your hands, did you move them at all?

2    A.  Did I physically move myself?

3    Q.  I'm sorry.  Bad question.

4        Once you picked the handcuffs up, did your body physically

5    move, either further down the trail or back toward the

6    campsite?

7    A.  No.

8    Q.  So you stayed stationary once you put the handcuffs in your

9    hand?

10   A.  Correct.

11   Q.  And at that point you were told by someone, "That might be

12   evidence, put it down"?

13   A.  Correct.

14   Q.  And you put it down in the exact spot?

15   A.  As close as it could be.  Once they said it could be

16   evidence, I put it back down as close as I could to the exact

17   spot.

18   Q.  Could I have Government's Exhibit 2P, please.

19       (Exhibit published.)

20       I'm showing you what's been previously admitted as

21   Government Exhibit 2P.  It's a photograph of handcuffs.

22       Do you recognize the handcuffs?

23   A.  I recognize them as handcuffs.  I don't remember what those

24   handcuffs looked like.

25   Q.  You're not certain if these are the handcuffs you picked up

1    or not?

2    A.   That's correct.   They were darker handcuffs, so they were

3    approximately the color of this.   Not bright handcuffs.

4    Q.   Okay.   So darker color?   Black or brown?

5    A.   Yeah.   You know, if you want to say gun metal, you know,

6    something like that.   Gray.   Dark gray.

7    Q.   Now, Captain Castiglioni, what is your medical training?

8    A.   I am an EMR.

9    Q.   That stands for Emergency Medical Responder?

10    A.   It does.

11         MR. MCCOY:   May I have a moment, Your Honor?

12         THE COURT:   Yes.

13      (Government cocounsel confer.)

14         MR. MCCOY:   Those are all the questions I have, Your

15    Honor.

16         THE COURT:   Okay.

17                    REDIRECT EXAMINATION

18    BY MR. TONEY:

19    Q.   Did you notice anything near the handcuffs?

20    A.   At the time that I picked up the handcuffs?

21    Q.   Right.

22    A.   No.

23    Q.   Or after?

24    A.   Afterwards, I may have.   I think there was shell casings

25    there.

1   Q.   Okay.   Any glasses that you saw?   Eyeglasses?

2   A.   No.   I saw no glasses.

3   Q.   From the photograph that the government showed you on the

4   screen, could you tell if that was where the handcuffs that you

5   had were?

6        MR. MCCOY:   Objection, Your Honor.   The same basis, it

7   is a photograph of the handcuffs.   It is not put in context on

8   the crime scene diagram.

9        MR. TONEY:   My question was, if he could tell from

10  that if that appeared to be where the handcuffs were?

11       THE COURT:   Sustained.

12       MR. TONEY:   That's all I have.

13       THE COURT:   You are excused.

14       MR. TONEY:   I'll be calling Michael Radon.

15       THE CLERK:   You can be seated up here in the witness

16  stand.

17       THE CLERK:   Raise your right hand, please.

18   (WHEREUPON, MICHAEL RADON WAS CALLED AS A WITNESS AND SWORN)

19       THE CLERK:   Please, state and spell your name for the

20  record.

21       THE WITNESS:   Michael Radon, M-i-c-h-a-e-l, R-a-d-o-n.

22                      DIRECT EXAMINATION

23  BY MR. TONEY:

24  Q.   Good morning.

25  A.   Good morning.

1  Q.  Do you know Brent Cole?

2  A.  Yeah.

3  Q.  Do you see him here?

4  A.  Yeah.

5  Q.  Point him out.

6  A.  Right over there.  (Witness points.)

7          MR. TONEY:  Okay.  Let the record show he's indicating

8  the defendant.

9          THE COURT:  Yes.

10  BY MR. TONEY:

11  Q.  Do you recall an incident in June of last year where you

12  were with Mr. Cole and a ranger stopped you?

13  A.  Yes.

14  Q.  All right.  Now, prior to the ranger stopping you, where

15  had you been?

16  A.  Up the road a little ways.

17  Q.  Pardon?

18  A.  Up the road a little ways.

19  Q.  At a camp?

20  A.  At a camp, yeah.

21  Q.  Had you been camping there?

22  A.  Yeah.  My stuff was there.

23  Q.  How long had you been camping there?

24  A.  Just a couple of days.

25  Q.  Did you have a car, truck or motorcycle?

1  A.  I had a motorcycle.

2  Q.  Where was the motorcycle?

3  A.  Parked up by the camp.

4  Q.  I'm going to show you a photograph that's marked

5  Defendant's F as in Frank.

6      (Exhibit handed to witness.)

7      I'd ask you to take a look at that.  Do you see the

8  motorcycle in that?

9  A.  Yeah.

10  Q.  Is that yours?

11  A.  Yes.

12  Q.  So had you ridden that up to the campsite?

13  A.  I did.  A couple days before, yeah.

14  Q.  Was there another motorcycle at that camp?

15  A.  There was a junk bike up there.

16  Q.  Was it there when you got there?

17  A.  No.

18  Q.  When had it arrived?

19  A.  We found it, and took it up there a couple days before that

20  incident.

21  Q.  You found it a couple of days before?

22  A.  Yeah.  Correct.

23  Q.  Okay.  So did you see anybody take it there?

24  A.  No.

25  Q.  So you just found it after a couple of days?

1    A.   Yeah.

2    Q.   Where was it?

3    A.   I don't know exactly up there.

4    Q.   Was it in the camp area itself?

5    A.   As far as I know, yeah.

6    Q.   And how -- if you know, why was Mr. Cole there?

7    A.   He was trying to help me move my stuff from another camp

8    area.

9    Q.   So had you asked him to come up and help?

10   A.   He was the only person around in the area that would help

11   us out with getting water or food to us.

12   Q.   So on that day, it's the day of the meeting at the truck

13   with the ranger, when did you first see Mr. Cole?

14   A.   That morning.

15   Q.   Was he on foot or in a truck or what?

16   A.   He was -- he had the truck.

17   Q.   Did you see him drive up?

18   A.   No.

19   Q.   But the truck was at the camp?

20   A.   Yeah.

21   Q.   And after you saw him, what did you do?

22   A.   We was -- well, I asked him for a ride to my aunt's.  And

23   he gave me and my brother a ride to my aunt's.

24   Q.   How did your brother get there?

25   A.   He walked.

446

1    Q.  Was he camping there with you?

2    A.  No.

3    Q.  Had you planned to meet him your brother?

4    A.  Correct.

5    Q.  Had you planned to meet Mr. Cole there?

6    A.  Correct.  Yes.

7    Q.  Do you know about what time it was that you got there --

8    that the three of you were together there?

9    A.  Not exactly.  9:00 or 10:00, I would guess.

10   Q.  In the morning?

11   A.  Yeah.

12   Q.  It was daylight?  Yes?

13   A.  Yes.

14   Q.  All right.  So after that, what did you do?

15   A.  We got in the truck to go to -- for him to drop us off at

16   my aunt's.  And we got on the road, and there was a ranger down

17   at the road.

18   Q.  All right.

19   A.  He pulled us over.

20   Q.  How did he pull you over?

21   A.  Red light.

22   Q.  Who was driving?

23   A.  Driving what?

24   Q.  Who was the driver of the truck?

25   A.  Brent.

1   Q.   Okay.  And were you all in the same seat?  Is it a bench

2   seat?

3   A.   Yeah.  Bench seat.

4   Q.   Were you in the middle or --

5   A.   I was on the outside.

6   Q.   All right.  So what happened when the ranger came up?

7   A.   He asked for our IDs, and I handed him mine.  Brent handed

8   him his.  My brother didn't have one, so he asked my brother to

9   get out of the vehicle.

10   Q.   And did your brother get out -- you let him out?

11   A.   Yeah.  I had to open the door and let him out.

12   Q.   And did the ranger come back to the car -- to the truck

13   later?

14   A.   Yeah.  After about ten minutes.

15   Q.   And what did the ranger say?

16   A.   He just told us to get out of there, and we weren't allowed

17   on that road.

18   Q.   Go ahead.

19   A.   And we asked him why.  He said that it was a closed road.

20   There was no closed signs.  There was no evidence it was a

21   closed road.  There was no gates.

22   Q.   Did any of the three of you, you, your brother or Brent,

23   say to him that there was no sign?

24   A.   Brent tried to.

25   Q.   What happened?

448

1  A.  He wouldn't let him speak.

2  Q.  How did he prevent him?

3  A.  He kept stopping -- every time Brent would try to say

4  something, he would interrupt him and stop him and not let him

5  speak.  He was really agitated.

6  Q.  Did he say what -- did he say anything about the fact that

7  there was no sign there that said it was closed?

8  A.  He said -- well, yeah.  He tried to say he was the lock to

9  that road.  He said:  I'm the lock.

10  Q.  Okay.  Was his voice soft, loud, medium?

11  A.  Agitated.

12  Q.  While you were there, did anyone appear agitated with him?

13  A.  No.

14  Q.  How many times did you hear Brent try to say anything and

15  the ranger would interrupt?

16  A.  At least three times.

17  Q.  After this, did the ranger let you go?

18  A.  Yeah.  I just said, let's just get out of here.

19  Q.  And did Brent take you to your relative's house?

20  A.  Yes.

21  Q.  Drop you off?

22  A.  Yes.

23  Q.  Drop your brother off?

24  A.  After we went to the store first to get something to drink.

25  Q.  Okay.

1    A.  Then he took us to my aunt's and dropped us off.

2           MR. TONEY:  All right.  That's all I have.

3                    CROSS-EXAMINATION

4    BY MR. MCCOY:

5    Q.  Good morning.

6        You're friends with the defendant, Brent Cole, correct?

7    A.  Yes.

8    Q.  You testified that he would take you on trips to get

9    groceries and get water and other things like that?

10   A.  Sometimes, yes, if he could.

11   Q.  You lived with the defendant in the campsite for a while,

12   didn't you?

13   A.  A little bit.  Couple days, yeah.

14   Q.  Four or five days or so?

15   A.  Yes.

16   Q.  And he let you come up there and live with him there in the

17   campsite; isn't that right?

18   A.  A couple days, yeah.

19   Q.  In fact, he helped move some of your stuff up there, didn't

20   he?

21   A.  Yes.

22   Q.  One of the pieces of items that you brought into that

23   campsite was a shotgun, wasn't it?

24   A.  Yes.

25   Q.  It's your shotgun; is that correct?

1   A.   Yes.

2   Q.   You kept it under some bedding, didn't you?

3   A.   Yes.

4   Q.   Now, you also know -- well, Mr. Toney asked you some

5   questions about the traffic stop with the ranger, but that

6   wasn't the first time you had met the ranger, is it?

7   A.   No.

8   Q.   You had met him before, correct?

9   A.   Yes.

10  Q.   In fact, hadn't he told you to get off some land that you

11  were camping on for over 14 days?

12  A.   Yes.

13  Q.   Because you hadn't paid?

14  A.   Well, it was a no pay area.

15  Q.   But you had stayed longer than 14 days; isn't that right?

16  A.   Only about 14 days, yeah.

17  Q.   Now, when you saw -- when you were driving down the

18  brushed-in trail with the defendant and saw the ranger's car

19  there, you got worried, didn't you?

20  A.   A little bit.

21  Q.   Why was that?

22  A.   I did not know if I had a warrant out or not for my arrest,

23  but I did not.

24  Q.   So it wasn't because of the prior contact you had with this

25  ranger.  It was because you were concerned there may be a

1   warrant; is that right?

2   A.   Correct.

3   Q.   Now, you testified that after the ranger ran all of your

4   IDs and came back and said everyone is clear, he told the

5   defendant not to come up on this road again; is that right?

6   A.   Yes.

7   Q.   You told Mr. Toney that the defendant didn't get a chance

8   to talk to the ranger or to respond; is that right?

9   A.   Right.

10  Q.   Do you remember you came down last September and testified

11  in front of the grand jury about this case, didn't you?

12  A.   Right.

13  Q.   And when you were asked a question about that, you

14  responded that, in fact, the defendant did respond to the

15  ranger, correct?

16  A.   He tried to.

17  Q.   Not that he tried to, but that he did.  He said:  How is

18  the road closed if there is no sign?  Isn't this BLM land?

19  A.   That was the only thing he got to say.

20  Q.   So he did get to say that, correct?

21  A.   Yes.

22  Q.   But the defendant kept continuing to argue with the ranger,

23  didn't he?

24  A.   No.  He had tried to tell him that my stuff was up there.

25  He would not give him a chance to tell him at all.

452

1    Q.  Now, at the end of the traffic stop the ranger told the

2    defendant that if he saw him up there again, he would impound

3    his car, correct?

4    A.  Yes.

5    Q.  At any point during the traffic stop did the ranger take

6    out his handcuffs?

7    A.  Not while I was there.

8    Q.  You didn't see any handcuffs?

9    A.  No.  Well, I didn't see him pull any out.

10   Q.  Did he make any threats to you?

11   A.  Not to me personally.

12   Q.  Did he make any threats to anyone in the car?  He didn't,

13   did he?

14   A.  Yeah.  Towards Brent.

15   Q.  But the threat he made to Brent is:  If I see your car back

16   up here again, I'm going to impound it.  Isn't that right?

17   A.  That's right.

18   Q.  Is that the threat you are talking about, correct?

19   A.  Uh-huh.

20           MR. MCCOY:  May I have a moment, Your Honor?

21           THE COURT:  Yes.

22       (Government cocounsel confer.)

23           MR. MCCOY:  No further questions, Your Honor.

24   ///

25   ///

1                        REDIRECT EXAMINATION

2     BY MR. TONEY:

3     Q.   The question was asked you about a prior incident with

4     Pultorak?

5     A.   Yeah.

6     Q.   So how was Pultorak acting on that occasion?

7     A.   Fine.  He just told me that I'm -- I had to move off that

8     camp spot and I'm not supposed to be around in that area for 90

9     days.

10    Q.   So on that earlier occasion he wasn't agitated?

11    A.   No.

12              MR. TONEY:  That's all I have.

13              MR. MCCOY:  No more questions.

14              THE COURT:  You are excused.

15              THE WITNESS:  Thank you.

16              MR. TONEY:  My next witness is Kevin Radon.

17              THE CLERK:  Raise your right hand, please.

18       (WHEREUPON, KEVIN RADON WAS CALLED AS A WITNESS AND SWORN)

19              THE CLERK:  Please, state and spell your name for the

20    record.

21              THE WITNESS:  My name is Kevin Radon, K-e-v-i-n,

22    R-a-d-o-n.

23                        DIRECT EXAMINATION

24    BY MR. TONEY:

25    Q.   Good morning.

1   A.  Good morning.

2   Q.  You know Brent Cole?

3   A.  Yes, I do.

4   Q.  Do you see him?

5   A.  Yes.

6   Q.  Can you point to him?

7   A.  (Witness points.)

8        MR. TONEY:  Can the record reflect he's indicated my

9   client?

10        THE COURT:  Yes.

11  BY MR. TONEY:

12  Q.  Do you recall a time in June of last year where you and

13  your brother and Brent were in a truck and had an interchange

14  with a BLM ranger?

15  A.  Yes, I do.

16  Q.  Now, the night before that, had you been at a camp?

17  A.  No.  Not the night before.

18  Q.  How did you get there that day?

19  A.  I walked there that morning.

20  Q.  Why?

21  A.  Brent was going to give me and my brother a ride to my

22  aunt's.

23  Q.  And when you walked to the campsite, was Brent already

24  there?

25  A.  Yes.

1    Q.  Was his truck there?

2    A.  Yes.

3    Q.  And so what happened after you got there?

4    A.  We sat there for 15, 20 minutes maybe, and then we all

5    loaded up in the truck to go.

6    Q.  What were you doing during that 15, 20 minutes?

7    A.  Just talking and visiting.

8    Q.  Okay.  So you loaded up the truck with what?

9    A.  Us.

10   Q.  Oh, okay.  You got in?

11   A.  Inside.

12   Q.  Did you put any belongings of anybody in the truck, too?

13   A.  Not that I recall.

14   Q.  All right.  And so after you all got in the truck, who was

15   driving?

16   A.  Brent was.

17   Q.  Okay.  And what happened next?

18   A.  We got -- we went about 50 or 100 feet down the road, and

19   there was a BLM ranger parked on the side of the road.  And

20   when we passed, he pulled us over.

21   Q.  How?

22   A.  He put on his lights and pulled in behind us.

23   Q.  What happened next?

24   A.  He came to the window and asked for our IDs.

25   Q.  Did you have one?

1   A.  No, I didn't.

2   Q.  So what happened then?

3   A.  He asked me to get out of the vehicle, and he set me on the

4   back bumper of Brent's truck.

5   Q.  Did you identify yourself by name?

6   A.  Yes.

7   Q.  Date of birth?

8   A.  Yes.

9   Q.  All right.  Then what happened?

10  A.  He -- he went to his truck.  He ran me for warrants like

11  they do.  And I believe he went and talked to my brother and

12  Brent.

13  Q.  All right.  And at any time did you get back -- did you

14  hear any conversation that he had with Brent?

15  A.  Yes.  He -- after I came back all clear, he let me get back

16  in the truck.

17  Q.  Then what happened?

18  A.  He was -- he said that the road that we were on was a

19  closed road.  And we asked where -- if it's a closed road,

20  where is a sign stating it's a closed road.

21  Q.  Did he say anything in response?

22  A.  Yes.  He said he's the sign.

23  Q.  What was his demeanor?  Was it soft?  Loud?  How did he

24  appear?

25  A.  He was loud and -- I don't know how to say it.  He was

1  really -- I didn't like him.

2  Q.  Obnoxious?

3  A.  Obnoxious.  Yeah.  That would be a good --

4  Q.  A polite word for it?

5  A.  A polite word, yeah.

6  Q.  Had you dealt with him before?

7  A.  Yes.  About a year before I had dealt with him.  He kicked

8  me out of a camp area.

9  Q.  At that time was he obnoxious to you?

10  A.  Yeah.  He was -- he threatened to arrest me and my

11  girlfriend if he caught us camping up there again.

12  Q.  All right.  So I think your testimony just now was that --

13  I'm trying to quote you -- we asked about the absence of the

14  sign.

15      Who actually asked?

16  A.  Brent did.

17  Q.  That's when the ranger said:  I am the sign?

18  A.  Yes.

19  Q.  Did Brent ask anything else or say anything else?

20  A.  Not that I recall.

21  Q.  Did you hear Brent attempt to say anything?

22  A.  Yeah.  He was attempting.

23  Q.  To say something?

24  A.  To try to talk.  And the ranger kept interrupting and

25  telling us to leave.

1  Q.  How long did the -- from the time you got back in the

2  truck, after the warrants were run, to the time you left, how

3  long was it?

4  A.  I would say five minutes.  Five, maybe ten minutes.

5         MR. TONEY:  That's all I have.

6                         CROSS-EXAMINATION

7  BY MR. MCCOY:

8  Q.  Good morning.

9      You're friends with the defendant, correct?

10  A.  Yes.

11  Q.  He would take you and your brother to go get groceries and

12  water and things like that, right?

13  A.  Yes.

14  Q.  And you knew him for about a year or so before the

15  shooting; is that correct?

16  A.  Yeah.

17  Q.  Now, talking about the traffic stop, when you and the

18  defendant were driving down the brushed-in trail, and you saw

19  the ranger, you got worried when you first saw the ranger,

20  didn't you?

21  A.  Yes.

22  Q.  And why is that?

23  A.  Because I just didn't know if I had any warrants or not,

24  and I knew he would probably pull us over.

25  Q.  And when he pulled you over, he came to the window.  And

1   because you didn't have an ID, he had you get out of the car,
2   correct?
3   A.   Yes.
4   Q.   And that was just so he could run your name and date of
5   birth, correct?
6   A.   Yes.
7   Q.   When he came back, he told you:  You're all clear.  You're
8   good to go.  Isn't that right?
9   A.   Yes.
10  Q.   And you were allowed to get back in the car?
11  A.   Yes.
12  Q.   Now, you just testified that when the ranger explained to
13  Cole why you had been pulled over because the road was closed,
14  that the ranger didn't give Cole a chance to talk; is that
15  correct?
16  A.   Right.
17  Q.   Do you remember testifying in front of the grand jury in
18  September?
19  A.   Yeah.
20  Q.   Do you remember telling us in response to that question
21  that, in fact, Cole did respond?
22  A.   He tried to.
23  Q.   He did though.  Don't you remember telling -- testify in
24  front of the grand jury that Cole asked if the road is closed,
25  why is there no sign?

1     Do you remember saying that in front of the grand jury?

2  A.  Right.  That's what I just said.

3  Q.  And the ranger said that he's the sign; is that right?

4  A.  Yes.

5  Q.  Remember testifying in the front of the grand jury that

6  Cole kept trying to argue with him; isn't that right?

7  A.  Right.

8  Q.  In fact, weren't you getting a little frustrated with Cole

9  at one point, just wanting him to be quiet?

10  A.  Yeah.

11  Q.  Because he was trying to argue too much; is that right?

12  A.  I wouldn't say too much.

13  Q.  But he wouldn't be quiet?

14  A.  Well, neither would the officer.

15  Q.  But he wouldn't drop it, right?  Cole would not drop it

16  with the officer.  He kept trying to explain; isn't that right?

17  A.  Okay.

18  Q.  Not "okay."  "Yes" or "no"?

19  A.  Yes.

20       MR. MCCOY:  May I have a moment, Your Honor?

21     (Government cocounsel confer.)

22       MR. MCCOY:  Those are all my questions, Your Honor.

23  Thank you.

24       THE COURT:  Okay.

25       MR. TONEY:  I have nothing else.

1          THE COURT:  You are excused.

2          MR. TONEY:  I have no on other witnesses at this time.

3          THE COURT:  What does that mean, "at this time"?

4          MR. TONEY:  Can we approach?

5          THE COURT:  Okay.

6     (Whereupon, the following discussion was held at sidebar.)

7          MR. TONEY:  J. Toney speaking.  After a lot of

8     difficulty, my investigator was able to subpoena Susan Voice

9     and Amanda Tarpazk, T-a-r-p-a-z-k, who treated Mr. Cole at the

10    jail.  She went to the jail, and the jail would not allow --

11         THE COURT:  You have to lower your voice.

12         MR. TONEY:  She went to the jail, and the jail would

13    not allow her to serve them.  She had to serve corporate legal.

14    Finally she contacted corporate legal and explained that we

15    were not trying to sue them, that we needed evidence about the

16    treatment of Mr. Cole.

17    She's here and can testify to all of this outside the

18    presence of the jury.

19    She then faxed them a subpoena, as they indicated that's

20    how they would accept it.  They are not here today.  She called

21    them, and she was told that we've decided not to send the

22    nurses.

23    So I'm going to be asking for an Order to Show Cause Re:

24    Contempt against the people refusing a valid order.  And I have

25    the subpoena, but I have no other witnesses at this time before

1   this jury.

2           THE COURT:  What's the government's position on this?

3           MR. MCCOY:  First of all, Your Honor, we would object

4   to the testimony of these nurses on the -- because of

5   relevance.

6       I'm not sure what the routine care of the defendant after

7   this incident has to do with anything except to perhaps put an

8   inference in front of the jury, that somehow the angle of the

9   wound that was being cared for gives them some ability to

10  determine the direction the bullet entered the body.

11      I only say this because I have not received any reports

12  related to what the nurses will and will not say, but during my

13  conversations with Mr. Toney, he said that they're going to

14  testify basically to the fact that when they're cleaning the

15  wounds, they were putting the gauze strip in a vertical

16  direction.

17          THE COURT:  Let me interrupt you.  If the government

18  is correct, I think I'm going to want to hear this in open

19  court.  My inclination is to excuse the jury and bring them

20  back.

21      Are these the only two witnesses the defense wants to call,

22  then you're done?

23          MR. TONEY:  Yes.

24          MR. MCCOY:  Your Honor, the government would have a

25  brief rebuttal case.  By brief, I mean 20 to 30 minutes.

1     THE COURT:  All right.  Then my intention is to excuse

2  the jury for the noon break until one o'clock, and then let you

3  argue this other issue in open court.

4     My assumption is that won't take longer than ten minutes.

5     MR. MCCOY:  Thank you, Your Honor.

6     (Sidebar discussion concluded.)

7     THE COURT:  The jury is excused for the noon break

8  until one o'clock.

9     (Jury excused at 11:50 a.m.)

10     THE COURT:  Let the record reflect the jury has exited

11  the courtroom.

12     At sidebar I decided to excuse the jury after I decided to

13  ask the government a question concerning the government's

14  response to the two witnesses that Mr. Toney stated the

15  defendant was having difficulty bringing to court.

16     I interrupted the government's response so that I could

17  excuse the jury and have the matter argued in open court.

18     Mr. Toney, do you want to say anything else?

19     MR. TONEY:  I'll wait to respond.  I do not want to

20  say anything else at this time.

21     THE COURT:  You want to subpoena two nurses, correct?

22     MR. TONEY:  Yes.

23     THE COURT:  And what jail are they in?

24     MR. TONEY:  Nevada County, Wayne Brown Correctional

25  Center.

1    And I'd ask the court, do you want my investigator here to

2    testify to this?

3          THE COURT:  Well, I think what your investigator would

4    be testifying about is the difficulty in having the subpoena

5    complied with, but I don't think that's -- at this juncture I'm

6    not convinced that's the issue.

7      I think, in light of what the government has argued, I want

8    you to respond to what the government has argued.

9          MR. TONEY:  A defendant's credibility is always going

10   to be an issue, and they've attempted to impeach him.  So I

11   brought out, without argument, a number of --

12         THE COURT:  Let me interrupt you.  What I heard the

13   government argue before I interrupted the prosecutor is that

14   the government understands you're bringing the two nurses to

15   talk about how they treated your client?

16         MR. TONEY:  Right.

17         THE COURT:  Do you want to make a proffer concerning

18   that so I can understand why that is relevant to the issues

19   being tried?

20         MR. TONEY:  It corroborates what the defendant said

21   about the nature of his wounds, and --

22         THE COURT:  I see you standing, Mr. Cole.  Why don't

23   you take a seat, Mr. Cole.

24     (Defendant Cole resumes his seat.)

25     Thank you.

1    I assume you were going to stand to speak, and your lawyer

2    is speaking, Mr. Cole.

3            THE DEFENDANT:  I was going to ask you to be able to

4    speak.

5            MR. TONEY:  May I talk to him and find out what he

6    wants?

7            THE COURT:  Yes.

8        (Counsel confers with defendant.)

9            MR. TONEY:  Our position is that the testimony of the

10   medical personnel at the jail would indicate a path of the

11   wound, that that would have a tendency to corroborate the

12   defendant's version, that he was shot a certain way.

13       I know the government had disputed that this was relevant,

14   but our position is that the angle that Mr. Cole has already

15   testified to about how that bullet went through him, and this

16   would corroborate that.

17           THE COURT:  Corroborate "that," meaning what?  That a

18   bullet went through him?

19           MR. TONEY:  Yep.  And in that direction.  Through --

20   near the belly button and out through the groin area.

21           THE COURT:  Okay.

22           MR. MCCOY:  Your Honor, as the government indicated at

23   sidebar, we would object to the testimony of the nurses on the

24   basis of relevance.

25       The proffer that the court just received from Mr. Toney is

466

1   basically what the government received.  We have no reports

2   from these nurses.  No interview summaries of the interview.

3       The government doesn't know, and I'm not sure the defense

4   knows, what they will testify to, but that's sort of beside the

5   point.

6       What is significant here is you have two nurses who

7   provided postoperative care to the defendant -- I'm not sure if

8   this was a week later or two months later, it is not clear to

9   me at this point -- testifying about the wound and potential

10  angle of the wound that they were treating.

11      The point of the matter is, if that's the case, are they

12  going to be classified as experts in ballistics?

13      Are they -- they would have to be voir dired to determine

14  what kind of basis they would have to make that sort of a

15  opinion.  Otherwise, all the testimony is going to do is have

16  the nurses talk about what the wound looked like, and then it

17  it's going to be left to the jury, I'm assuming, based on

18  defendant's argument, that they should draw some sort of

19  inference from how the wound looked, like, two weeks after the

20  incident to how he was shot and in what manner.

21      Quite frankly, it is not relevant.  No one denies that he

22  was shot.  That is not the issue.  The issue here is who shot

23  first.

24      And what these nurses, providing postoperative care, based

25  on what the government knows, and based on the proffer provided

1    by defendant, will not add any clarity.

2        Under Rule 403, Your Honor, all it will do is add more

3    confusion and prejudice the jury more than anything else.

4        The prejudicial value, Your Honor, would be significantly

5    outweighed by -- or the probative value, if any -- and I don't

6    think there is any -- would be significantly outweighed by the

7    prejudice it would cause and the confusion.

8        So the government would object to these witnesses being

9    called to begin with on the grounds of relevance.

10           THE COURT:  Okay.  Objection sustained.

11           MR. TONEY:  The only --

12           THE COURT:  It's sustained under Rule 403 grounds.

13           MR. TONEY:  The only other thing, before I rest, is to

14   ask that Defendant's F be admitted.  I believe that it is part

15   of the stipulation on the photos.

16           MR. MCCOY:  No objection.

17           THE COURT:  It is admitted.

18       (Whereupon, Defendant's Exhibit F was received.)

19           MR. TONEY:  We'll be resting.

20           THE COURT:  Okay.  How about the jury instructions?

21   I received the government's response to the instructions I

22   filed late yesterday.

23           MR. TONEY:  I have not seen it.

24           THE COURT:  It has a typo in the last sentence.

25           MR. COPPOLA:  I noticed that after I filed it, Your

1  Honor.  It should read "or" instead of "of."

2          THE COURT:  Correct.

3          MR. COPPOLA:  I apologize for that.

4      (Defense counsel reviews instruction.)

5          MR. TONEY:  I would like some time, since I just

6  received it, to respond.

7          THE COURT:  How about any other -- I understand what

8  you just said.  You're going to be given some time.

9      How about other jury instructions?

10      Tentatively I'm going to take this instruction and replace

11  mine that I sent you yesterday with this one.

12      How about the other instructions?

13          MR. TONEY:  They're fine.

14          MR. COPPOLA:  Government doesn't have any objection.

15          THE COURT:  All right.  Thank you.  It is adjourned

16  until one o'clock.

17      (Off the record at 12:00 p.m.)

18      (Back on the record at 1:00 p.m.)

19          THE CLERK:  You may remain seated.  Court is now in

20  session.

21          THE COURT:  All participants are present.  You may

22  proceed.

23          MR. TONEY:  I believe the court, after the jury was

24  excused, admitted my Exhibit F?

25          THE COURT:  That's correct.

1          MR. TONEY:  I rest.

2          THE COURT:  All right.

3          MR. MCCOY:  Your Honor, the government has one witness

4    to call in rebuttal.  That is Ranger Tad Pultorak.

5          THE COURT:  Okay.

6    (PREVIOUSLY SWORN, TAD PULTORAK RESUMES THE WITNESS STAND)

7          THE CLERK:  Please, state your name for the record.

8          THE WITNESS:  Tad Pultorak.

9                        DIRECT EXAMINATION

10   BY MR. MCCOY:

11   Q.  Good afternoon.

12   A.  Good afternoon, sir.

13   Q.  I have a few questions for you on rebuttal.

14       You testified last week that on June 14th you were wearing

15   a uniform similar to what you are wearing here today, correct?

16   A.  Yes, sir.

17   Q.  On that day, during any of your interactions with the

18   defendant, were you wearing a poncho?

19   A.  No, sir.

20   Q.  Do you own a poncho?

21   A.  No, sir.

22   Q.  Do you own a brown plaid poncho with tassels?

23   A.  I do not, sir.

24   Q.  Have you ever owned one?

25   A.  No, sir.

1   Q.   Now, do you have an AR-15 as one of your service-issued

2   weapons?

3   A.   Yes, sir, I do.

4   Q.   And where do you keep that weapon?

5   A.   When I'm on patrol, it's in a lock in the vehicle.

6   Q.   On June 14th, 2014, when you conducted the traffic stop

7   with the defendant, did you remove the AR-15 from this lock in

8   your patrol car?

9   A.   No, sir.

10  Q.   On that same day, when you and Officer Hardin were in the

11  campsite -- the defendant's campsite, at any point during that

12  time did you remove the AR-15 from your vehicle?

13  A.   No, sir, I did not.

14  Q.   At any point on June 14th did you remove your AR-15 from

15  your vehicle?

16  A.   No, sir.

17  Q.   You testified last week about removing your handcuffs when

18  you encountered the defendant in the campsite.

19       When you had the handcuffs -- when you removed the

20  handcuffs, at any point did you twirl them on your fingers?

21  A.   No, sir.

22            MR. MCCOY:  May I have a moment, Your Honor?

23            THE COURT:  Yes.

24       (Government cocounsel confer.)

25  ///

1   BY MR. MCCOY:

2   Q.  When you were in the campsite with Officer Hardin on June

3   14th, you testified -- just testified you didn't have your

4   AR-15, but did Officer Hardin?  Did you see him with a long

5   gun?

6   A.  No, sir.

7   Q.  An AR-15 or shotgun or anything?

8   A.  No, sir.

9           MR. MCCOY:  Those are all my questions, Your Honor.

10                      CROSS-EXAMINATION

11  BY MR. TONEY:

12  Q.  At any time did responders have long guns?

13  A.  I believe I saw one responder with an AR-15.

14  Q.  So that would be after the shooting?

15  A.  Yes, sir.

16  Q.  Do you remember if any of the -- how many people wound up

17  at that site before the defendant was taken away?

18  A.  I couldn't tell you, sir.  I went down to the medic prior

19  to the defendant being transported down.

20  Q.  Okay.  So do you know if any -- you don't know what they

21  all were wearing either, do you?

22  A.  No, sir.  It was a hectic scene.

23          MR. TONEY:  That's all I have.

24          MR. MCCOY:  Nothing further from the government, Your

25  Honor.

1          THE COURT:  You may leave the stand.  You are excused.

2          THE WITNESS:  May I remain in the courtroom?

3          THE COURT:  He wants to know if he can remain in the

4     courtroom?

5          MR. TONEY:  Are you resting?

6          MR. MCCOY:  We are resting, Your Honor.  We have no

7     objection.

8          MR. TONEY:  So are we.

9          THE COURT:  Okay.  Yes.

10         THE WITNESS:  Thank you, sir.

11         THE COURT:  Is there anything to cover concerning the

12    jury instructions?

13         MR. TONEY:  Yes.

14         THE COURT:  Can that be covered at the side of the

15    bench?

16         MR. TONEY:  Yes.

17         THE COURT:  All right.

18       (Whereupon, the following discussion was held at sidebar.)

19         MR. TONEY:  I believe from the cover sheet in my

20    looking at the instructions that you were giving the three we

21    proposed.  However, it appears that your Instruction No. 2 was

22    omitted by the court.

23         THE COURT:  Do you have it with you?

24         MR. TONEY:  No.  I just have yours.

25         THE COURT:  I think this is what you characterize as

1    Instruction No. 2, I take it?

2         MR. TONEY:  Yes.  133.  May I look at it?

3      (Counsel reviews instruction.)

4         Yes.

5         THE COURT:  Line 5 appears to be the only thing that

6    is not -- well, lines 5 to 8 appear to be the only things that

7    are not explicitly set forth in the proposed instructions.  So

8    the line reads "Engaged in official duties during their

9    encounters with the Defendant Cole outside the campsite near

10   the Yuba River Campground."  You want that?

11        MR. TONEY:  The reason I put that in -- I don't need

12   that, but the only reason I put that in was to differentiate it

13   from the earlier stop.  So I don't mind if it goes out because

14   it will be obvious.

15        THE COURT:  So you're not asking that be included

16   then?

17        MR. TONEY:  I withdraw that part of it.

18        THE COURT:  Okay.  I'm inclined to excuse the jury for

19   20 minutes concerning the other aspects of it.

20        MR. COPPOLA:  Thank you, Your Honor.

21      (Sidebar discussion concluded.)

22        THE COURT:  Ladies and Gentlemen of the jury, I'm

23   going to excuse you for 20 minutes while we discuss an issue.

24      (Jury excused at 1:10 p.m.)

25        THE COURT:  Let the record reflect the jury has exited

1    the courtroom.

2        I'm going to give each side the proposed jury instructions

3    that were discussed before the adjournment, and they're on the

4    ledge.

5        (Jury instructions handed to counsel for review.)

6        So the language you seek to have included in the

7    instruction someplace is:  "An officer who acts provocatively

8    or in bad faith is acting outside the scope of official

9    duties"?

10           MR. TONEY:  Yes.

11           THE COURT:  Government?

12           MR. COPPOLA:  Your Honor, the government clearly

13   objects to that language.  In reviewing the cases that counsel

14   cited, there is no explicit mention in either of those cases

15   that such an instruction would be -- that such an instruction

16   is, in fact, the law.  There is some dicta discussing

17   provocation and acting in bad faith.

18           THE COURT:  What is meant by "bad faith"?

19           MR. COPPOLA:  That would be my question, Your Honor.

20   It is not defined in his instruction.  And we have -- we also

21   haven't defined "provocatively."  To that extent, Your Honor, I

22   think we run the risk of confusing the jury if the court were

23   to give that instruction.

24           THE COURT:  Mr. Toney, what is your understanding of

25   what is meant by "bad faith" in your instructions?

1          MR. TONEY:  Like most things, I think it is a commonly

2     used word, and it doesn't require specific definition.  I

3     believe that the cases say that that I have cited.

4          And I believe it is germane to this case because part of

5     what's in this case is what we believe were provocative acts.

6     I believe counsel can argue that they were.

7          THE COURT:  Sir, I didn't ask you about that.

8          Your proposed instruction appears to have two concepts,

9     "bad faith" and the word "provocative" because it says "an

10    officer who acts provocatively or in bad faith."

11         And so what's meant by the part of your instruction that

12    states "bad faith."

13         Let me ask it another way.  If an officer did not

14    reasonably believe that what he did was necessary to protect

15    his safety, is that acting in bad faith?

16         MR. TONEY:  Yes.  I believe so.

17         THE COURT:  And if that's acting in bad faith, why do

18    you need that in the instruction since the instruction requires

19    the officer to reasonably believe?

20         MR. TONEY:  I understand.  As far as the bad faith, I

21    believe that that is correct.

22         THE COURT:  The case on which you rely, it doesn't

23    define the word "provocative," does it?

24         MR. TONEY:  I think not.  No.

25         THE COURT:  Did the government find a case that

1    discusses that word, that defines it?

2              MR. COPPOLA:  No, Your Honor.

3              THE COURT:  The Ninth Circuit, in a civil case -- I

4    will paraphrase and quote what the circuit states about that

5    concept.

6         In a civil case, Espinosa versus City and County of

7    San Francisco, at 598 F.3d, 538 to 539:

8         (Reading:)

9         If a law enforcement officer intentionally or recklessly

10   provokes a violent confrontation, if the provocation is an

11   independent Fourth Amendment violation, he may be held liable

12   for his otherwise defensive use of deadly force.

13        If an officer intentionally or recklessly violates a

14   suspect's constitutional rights, then the violation may be a

15   provocation creating a situation in which force was necessary,

16   and such force would have been legal but for the initial

17   violation.

18        (Reading concluded.)

19        Is that the way the term is being used in your proposed

20   instruction, Mr. Toney?

21             MR. TONEY:  Yes.

22             THE COURT:  I'm not certain that this definition is

23   applicable, but if it is, it appears to say that "if the

24   provocation is an independent Fourth Amendment violation."

25        What is the independent Fourth Amendment violation?  What

1   are the facts from the defendant's perspective that constitutes

2   the independent Fourth Amendment violation?

3           MR. TONEY:  The showing and approaching of handcuffs,

4   and later the pulling of weapons -- of firearms.  And

5   furthermore, the fact that they appeared to be taking his

6   belongings.

7           THE COURT:  Government?

8       You may have to either take the lectern or take a seat so

9   you can use the microphone.

10          MR. COPPOLA:  I'll come forward.  I'll make it a

11  little bit simpler.

12      Your Honor, at this point the showing of the handcuffs in

13  and of themselves does not render this an improper Fourth

14  Amendment situation.

15      More to the point, the evidence, at least from the

16  government's perspective, is that Ranger Pultorak was in the

17  process of drawing his firearm only after the defendant

18  indicated that he was armed and drew his firearm.

19  Officer Hardin drew his firearm upon the defendant's admission

20  that he was armed.

21      More to the point, the other argument -- or the other

22  factual basis that counsel puts forward is that the officers

23  were somehow taking the defendant's stuff.

24      From the government's perspective, the testimony, at least

25  from Officer Hardin, was he found an empty backpack, and he was

1    attempting to put the pieces from what they knew at that point
2    was a stolen motorcycle in that backpack.  And he was
3    attempting to -- actually, that's what he was attempting to do.
4    So at this point, those facts don't rise to the level of a
5    Fourth Amendment violation.
6        More to the point, if they had, the proper thing for the
7    defense to have done was filed a motion to suppress prior to
8    trial so we could have discussed these issues.
9               THE COURT:  I thought you were done.
10              MR. COPPOLA:  I am done, Your Honor, I thought perhaps
11   you had more questions for me.  Otherwise, I'll retreat back to
12   counsel table.
13              THE COURT:  Okay.  Mr. Toney, I will state some things
14   to see what your response is.
15       I believe that the evidentiary record shows that the
16   officers were engaged in what could be characterized as a
17   criminal investigation.  The campsite could be characterized as
18   the crime scene.  There was a stolen motorcycle that was found
19   there -- an unregistered motorcycle and the registration on one
20   was not updated.
21       Mr. Cole approached that campsite or that area of
22   investigation coming uphill through the woods.  And then you do
23   have a dispute concerning what was said between the officer and
24   Mr. Cole.  But the officers were engaged in an investigation,
25   and their attention had to stop from that investigatory process

1    and turn to Mr. Cole.

2         And you're indicating if an officer, when having an

3    individual to approach the investigation site shows handcuffs,

4    that's provocative conduct that violates the Fourth Amendment.

5         I don't see that.

6         There is a factual dispute concerning at what point the

7    officer drew his weapon and what your client did.  Based upon

8    the factual record and the nature of the dispute, I need you to

9    explain why this is provocation?

10         MR. TONEY:  Under the evidence, I believe the

11   following things are shown:  That he was being polite and just

12   asking to get his stuff.  That the officer, not only from

13   Mr. Cole, but also Officer Hardin, engaged in conversation

14   about the motorcycles.

15         THE COURT:  Did the officer ask him if he had a

16   weapon?  If he was armed?

17         MR. TONEY:  Yes.  Eventually.

18         THE COURT:  And he said yes?

19         MR. TONEY:  Yes.

20         THE COURT:  That creates a safety issue for an

21   officer, doesn't it?

22         I'm trying to see the provocation.

23         You are indicating he had an absolute constitutional right

24   to go to the investigation site and retrieve items where the

25   officers are in the process of investigating.  How can an

1    officer do that and feel safe?

2            MR. TONEY:  If the officers had explained anything to

3    Mr. Cole we might have a different situation, but that's not

4    what happened.

5            THE COURT:  Okay.  I'm not seeing the basis for

6    giving -- how would you word it?

7        How would you word this aspect of the instruction if it is

8    given?

9            MR. TONEY:  The way the court indicated just

10   earlier.

11           THE COURT:  Well, I didn't -- I wasn't indicating

12   anything.  I was reading from the Ninth Circuit's decision.  It

13   discusses that if the provocation is an independent Fourth

14   Amendment violation.  And if I read it that way, you have to

15   know I would have to tell the jury what the independent Fourth

16   Amendment violation is.

17       What is it?

18           MR. TONEY:  Can I get my paper.

19       I think it is the Court's Instruction 17, is the Fourth

20   Amendment instruction.

21           THE COURT:  I think there are two Fourth Amendment

22   instructions, Instructions 16 and 17.

23       Instruction 17 concerns factors a juror considers when

24   deciding the excessive force issue.

25       Instruction 16 is also a Fourth Amendment instruction, and

1    it concerns the United States Supreme Court principle

2    enunciated in Terry -- an aspect of the Terry concept or the

3    Terry principle.

4        So your focus on 17 deals with, I think, what you could

5    characterize as a seizure.  Because excessive force is a form

6    of a seizure.  And are you stating that that is the independent

7    Fourth Amendment violation?

8             MR. TONEY:  Yes.

9             THE COURT:  And what constitutes the seizure?

10            MR. TONEY:  Not only the actions of the officer in

11   using an empty backpack, but also the apparent --

12            THE COURT:  How did they know it was your client's

13   backpack?  How could that -- I don't understand.

14       Sir, you're focused, I think on -- I thought the concept

15   that you are focused on is what the officer actually does

16   himself to provoke your client, and that the officer engaged in

17   an action that could be characterized as an independent Fourth

18   Amendment violation.  And the Ninth Circuit says, in part,

19   "intentionally or recklessly provokes."

20            MR. TONEY:  I'll submit on this issue.

21            THE COURT:  Okay.

22            MR. TONEY:  I do want to talk about 16, but I'll

23   submit on this.

24            THE COURT:  You can talk about 16.

25            MR. TONEY:  The original 16 was, I think, correct, in

1    that it was balanced.  It indicated when an officer can and

2    cannot use handcuffs or weapons.

3        The government takes out -- proposes to take out the part

4    that indicates that ordinarily they can't, and that there has

5    to be this.  So I think the original instruction was balanced

6    and correct.

7            THE COURT:  Okay.  That's not an instruction that was

8    proposed by either side.

9            MR. TONEY:  I know.

10           THE COURT:  That's an instruction -- the instruction

11   you are referencing is an instruction I thought of yesterday

12   and included it in the proposed instructions that I sent to the

13   parties yesterday.

14           MR. TONEY:  Yes, I know.

15           THE COURT:  Government?

16           MR. COPPOLA:  Yes, Your Honor.  In terms of this

17   instruction, as I reviewed the case law that the court had

18   provided, it certainly did not appear, at least from my review,

19   that the language "under ordinary circumstances an officer is

20   not permitted to use handcuffs or draw a weapon in connection

21   with such a stop or detention" was explicitly stated in the

22   case law.

23       The concern the government had was the language

24   specifically, as it all relates together, is what was an

25   ordinary circumstance.

1    I think it is a clearer statement of the law, as it is

2    proposed by the government, which is when an officer can use

3    his firearm or handcuffs as opposed to telling the jury on one

4    hand there are ordinary circumstances when they can't, without

5    defining those "ordinary circumstances," and then moving into

6    when they -- when an officer may use those items.

7        I understand counsel thinks this is -- that the court's

8    initial proposal was balanced, but I think the government's

9    proposal is more straightforward and minimizes the risk of

10   confusing the jury because it simply says when an officer may

11   use force.

12       THE COURT:  I'm looking at the instruction now.

13       Did you want to say anything else before I focus on the

14   latest draft of it, Mr. Toney?

15       MR. TONEY:  Yes.

16       THE COURT:  You may.

17       MR. TONEY:  I have a possible compromise proposal, and

18   that would be to put the word "only" before the word "when,"

19   and then grammatically in the next line reverse the words "he

20   may."

21       So it would read:

22       Only when an officer reasonably believes doing so is

23   necessary to protect his or another person's safety may he use

24   handcuffs or draw a weapon in connection with such a stop

25   and/or detention.

484

```
1          MR. COPPOLA:  Your Honor, may I be heard with respect
2     to Mr. Toney's compromise?
3          THE COURT:  Yes.
4          MR. COPPOLA:  The government has a problem with the
5     word "only" because there are other times when officers may
6     take their handcuffs out, when they're arresting someone, for
7     instance.  And when that's beyond -- and at that point we're
8     beyond the scope of a Terry stop.
9        I think at this point the law is properly stated as:
10       When an officer reasonably believes doing so is necessary
11    to protect his or another person's safety, he may use handcuffs
12    or draw a weapon in connection with such stop and/or detention.
13       I don't think the word "only" adds anything.
14         THE COURT:  Mr. Toney, under Mr. Cole's version of the
15    facts, aren't you really taking the position that the officer
16    did not reasonably believe he had a safety purpose for using
17    his handcuffs?
18         MR. TONEY:  Yes.
19         THE COURT:  And also for drawing his weapon?
20         MR. TONEY:  Yes.
21         THE COURT:  Then why isn't this language sufficient?
22         MR. TONEY:  Because it isn't inclusive.  It doesn't
23    indicate that that's when.  There could be, as written, many
24    other reasons.  That's why I liked the court's version that
25    said under ordinary circumstances you can't, but when this
```

1  happens you can.  And I think it's important to say that these

2  are the circumstances when an officer can do this.

3          THE COURT:  This trial is about a dispute concerning

4  the circumstances.  I think the way it is worded is sufficient

5  for you to argue your position to the jury, isn't it?

6          MR. TONEY:  I just -- yes, I think I can argue the

7  position, but I think that the instruction should clearly, as

8  your first instruction did, or my modification, say this is

9  when and by implication at other times you can't.

10         THE COURT:  Okay.  All right.

11     The instructions I gave you are the final instructions.

12     Bring the jury in.

13     (Jury seated at 1:40 p.m.)

14         THE COURT:  Let the record reflect that the jury has

15  joined us.

16     Does the government desire to make a closing argument?

17         MR. MCCOY:  We do, Your Honor.

18         THE COURT:  You can proceed.

19         MR. MCCOY:  May I have one moment to set up the

20  PowerPoint?

21         THE COURT:  Yes.

22     (Brief pause.  Government sets up PowerPoint.)

23         MR. MCCOY:  Good afternoon, Ladies and Gentlemen of

24  the Jury, Cocounsel Mr. Toney, Your Honor.

25     When I spoke to you last week during opening statements, I

1   told you that the evidence that would be presented during the
2   this trial would establish the defendant is an island unto
3   himself, that it is his way that matters, that it is his sense
4   of right which should control, that it is his sense of justice
5   which would govern.
6       So when he was stopped on the road by Ranger Pultorak,
7   rather than accepting the warning, driving away, he decided to
8   argue with him.  And when he listened to the officers walking
9   through his campsite, picking up his stuff, he decided to
10  confront them.
11      Ranger Pultorak, after learning the defendant was armed,
12  pulled out his handcuffs.  Rather than submitting, he decided
13  to take a fighting stance.  When the officers drew their
14  weapons, rather than dropping his weapon, he decided to shoot
15  them.
16      There was a right way to handle each of these circumstances
17  that day, and then there was the defendant's way.  Each time
18  the defendant chose his way, culminating in the shooting of
19  these two officers.
20      The impact, the harm, the consequences that his actions
21  would have, simply didn't factor into his analysis.  And that's
22  why we're here today.
23      (PowerPoint played.)
24      That's why the defendant stands charged here today with the
25  following crimes:

1      Assault on a federal officer for the shooting of Ranger Tad

2  Pultorak;

3      Assault on a person assisting a federal officer;

4      For the shooting of Officer Brant Hardin and using a

5  firearm in furtherance of those assaults.

6      As you'll soon be instructed by the court, each of these

7  charges contains certain elements that must be proved in order

8  for you to convict.

9      It will be your duty to find the facts from all the

10 evidence presented in this case, to apply the facts to the law

11 as Judge Burrell instructs, to determine whether we, the

12 government, have established each of those elements beyond a

13 reasonable doubt.

14     Now, I'll take this opportunity to say that if what I tell

15 you the law is, or what Mr. Toney tells you the law is in his

16 closing argument, and that differs from what the judge tells

17 you, what the judge tells you controls.  Always.  His

18 instructions control.  But I will try to be faithful to the law

19 as I go through this argument.

20     Now, this slide that you are looking at contains the

21 elements for both Counts One and Two, the assault charges.

22 They're very similar.  The primary difference is the fact that

23 in Count One the victim is Ranger Pultorak, and in Count Two,

24 the victim is Officer Brant Hardin.

25     The first element, as you can see for both Counts One and

1    Two, is a forcible assault.  So what is a forcible assault.

2         Well, it can be one of three things.  It can be when one

3    person intentionally strikes another with a fist, with a bat,

4    with a gun, with a bullet.  Or willfully attempts to inflict

5    injury on another, or intentionally threatens to harm another

6    and has the ability to do it.  A clenched fist, for example.

7         In this case the evidence has shown the defendant committed

8    forcible assault in all three ways.

9         The second element for both Counts One and Two concern the

10   status of the victim at the time the assaults occurred.  For

11   Ranger Pultorak, a federal law enforcement officer, the

12   government must establish he was on duty at the time,

13   fulfilling his duty as a federal law enforcement officer.

14        For Officer Hardin, who is not federal, but a state law

15   enforcement officer, we must establish that he was assisting

16   this federal officer, Ranger Pultorak, in his duties or was

17   attacked on account of that assistance.

18        The final element is the same for both Counts One and Two,

19   that's use of a deadly weapon.  So what qualifies as a deadly

20   or dangerous weapon.

21        Well, as you'll be instructed by the court, in this case a

22   Taurus .44 caliber revolver, the weapon used, is a deadly or

23   dangerous weapon if it is used in a way that is likely to cause

24   seriously bodily injury or death.

25        Now, the third count is using a firearm in furtherance of

1    these two assaults.  And there is two elements to this.  The

2    first is that the defendant committed one or both of the

3    assaults alleged in Counts One or Two.  And second, during and

4    in relation to those assaults, he used this Taurus .44 caliber

5    revolver.

6       Now the defendant is raising the claim of self-defense,

7    arguing it was the officers who attacked him and that he was

8    simply trying to defend himself.

9       Because of this, in addition to proving all the elements of

10   the three counts I just went over with you, the government must

11   also refute the self-defense claim that the defendant is

12   making, by establishing either that the defendant's belief that

13   he needed to protect himself against the immediate use of

14   unlawful force was not reasonable, or even if it was

15   reasonable, that the defendant used more force than necessary

16   in the circumstances.  So obviously a critical element of the

17   self-defense claim is the issue of unlawful force.

18      What is unlawful force?

19      Well, there is no specific definition for it, but the court

20   will instruct you there are certain factors to consider in

21   determining whether the force used by the officers was lawful

22   or unlawful.

23      For instance, the nature of the crime being investigated,

24   whether the defendant posed an immediate threat to the safety

25   of the officers, whether the defendant was actively resisting

1    detention, and the amount of time the officers had to make the

2    decision on the amount of force they deemed necessary.

3        So with the law providing the structure, let us now review

4    the evidence that you received to determine whether the

5    United States has, in fact, met its burden, not only in

6    establishing the elements of the offenses, but also in refuting

7    the defendant's self-defense claim.

8        The traffic stop:

9        You have heard a lot about this traffic stop.  Quite

10   frankly, this traffic stop does nothing to establish the

11   elements of the offense.  It provides context for this event.

12       The defendant would have you believe, though, this was a

13   critical moment.  Because this is the moment when he and

14   Ranger Pultorak first came in contact.  And this was the moment

15   when Ranger Pultorak, who was, in his words, rude and

16   obnoxious, somehow developed this desire, this intent to harm

17   him that would manifest itself in the campsite just a few short

18   hours later.

19       But, again, you have heard from the defendant, and you have

20   heard from the Radons.  The traffic stop amounted to five or

21   ten minutes of the Ranger telling them:  Don't drive up this

22   brushed-in trail.

23       You have seen the pictures of this thing.  It is clear it

24   is not meant for vehicular traffic.

25       What does he tell him?  What's the threat the ranger tells

1    him?

2        If you come back up here with your car, I will cite you and

3    impound your car.

4        That's the threat.  That's the threatening language.  The

5    defendant can provide nothing more than that.

6        The key events, the critical evidence that you will

7    consider is what happens here, Government's Exhibit 5B in that

8    campsite.

9        Now, you heard from Ranger Pultorak that he was on duty

10   that day.  After the traffic stop, he went up to the campsite,

11   and there he discovered two motorcycles, right?  One with

12   clearly expired registration tags.  Not the crime of the

13   century, but the other, which he subsequently learned, was

14   stolen.

15       So he called CHP because he needs help impounding the

16   motorcycles.  Officer Brant Hardin responds to assist

17   Ranger Pultorak, a federal law enforcement officer with his

18   duties.

19       So we can stop here.  We can go back to our element slide

20   and say:  Hey, now we have evidence to establish the second

21   element of both Counts One and Two.

22       Ranger Pultorak was on duty doing his job as a federal law

23   enforcement officer.  CHP Officer Hardin was assisting him with

24   it at the time of the offense.

25       It was when Officer Hardin and Ranger Pultorak were in the

1    campsite investigating the stolen motorcycle when they heard a

2    rustling come from this general direction of the forest.  It

3    caught Ranger Pultorak's attention.  It caught both their

4    attention.  But Ranger Pultorak walked in the direction of

5    where the sound was coming.  And there emerging from the forest

6    was the defendant, the man he stopped a couple hours before.

7         So what does Pultorak do?

8         He tells him to stop.  They engage in some conversation.

9    At this point Pultorak removes his handcuffs.

10        Why did he do that?

11        Here's the defendant who he had stopped earlier with two

12   other men coming into the campsite from a strange direction,

13   not up the trail, but through the forest.

14        Pultorak is in the campsite investigating the theft of a

15   weapon (sic), and the defendant is admitting to him he's armed

16   with a weapon.  So is this the unlawful force the defendant

17   needs you to believe for a self-defense claim?

18        All of these things factored into Pultorak's decision to

19   remove his handcuffs.  When Pultorak did remove his handcuffs,

20   the defendant's reaction was something less than what he

21   expected and Hardin expected as well.

22        Rather than submitting, he refused.  And he refused to turn

23   around or said "You're not putting those on me," or words to

24   that effect.

25        Here's the first key point that needs to be made in regards

493

1    to the defendant's claim that he acted in self-defense.  Once

2    again the defendant needs you to believe that Pultorak was

3    being overly aggressive at this point, escalating the situation

4    unnecessarily by using more force than was necessary.

5        But consider what Pultorak did when faced with the

6    defendant and all of these circumstances, the defendant coming

7    out of the forest, investigating the theft of the motorcycle,

8    the defendant admitting he was armed.

9        What does he do?

10       Does he remove his firearm?

11       No.  Pultorak removes his handcuffs.  His handcuffs.  An

12   action which is entirely inconsistent with the defendant's

13   assertion that Pultorak was out to get him, out to do him harm,

14   out to kill him even.

15       If Pultorak wanted to harm the defendant, shouldn't he have

16   taken the opportunity, once he heard the defendant was armed,

17   rather than removing his handcuffs, to take out his gun?

18       No.

19       This is what he took out.  Handcuffs.  He held them in his

20   left hand.

21       Now, Hardin, the CHP officer, did not remove his handcuffs.

22   Although, he testified he would have done the same thing if he

23   had been in Pultorak's position at that point.

24       Hardin was still back in this general area investigating

25   this stolen motorcycle.  But he began to proceed towards the

494

1   center of the campsite when he could tell by the tone of Cole's

2   voice that things were not going well.  Cole was refusing the

3   orders being directed to him by Pultorak.

4       And when Hardin heard the defendant announce that he was

5   armed, Hardin drew his weapon.  Hardin knew, based on his

6   training and experience, that the situation they faced at that

7   point was deathly serious.  And he needed to be prepared for

8   any eventuality.  As he testified, he feared for his safety at

9   that moment.

10      Did Hardin's actions at that time of withdrawing his

11  firearm from its holster amount to unlawful force?

12      Well, let's consider the factors again which we're to

13  consider when determining whether the force was unlawful.

14      The defendant was armed, now taking a fighting stance and

15  refusing the handcuffs.  This was not an unnecessary escalation

16  by Officer Hardin.  This was necessary preparation based on his

17  20 years of law enforcement experience.  He knew what he needed

18  to do.  He needed to be prepared for any eventuality.  So he

19  removed his service weapon.

20      Compare Hardin's actions with Pultorak's.  At this point in

21  time Pultorak was still standing there with the handcuffs in

22  his hands.  As he testified, he didn't begin to remove his

23  firearm until after he observed the defendant sweep his shirt

24  back and reveal a big silver thing.

25      This big silver thing.

1    There was the defendant, taking a fighting stance, right
2  hand back as Hardin testified, his right -- sorry -- his right
3  leg back, his right hand sweeping back suddenly, revealing --
4  because of the hoodie, suddenly revealing the gun, left hand
5  up.

6    Now, Pultorak is standing no more than five or eight feet
7  from him at time.  There he sees it.  As he testified, he
8  didn't begin to remove his firearm until he saw it.

9    What happened next, happened so fast.  As Hardin testified,
10 the defendant held his stance for a second, maybe two, and then
11 he just drew up and pointed the gun at Pultorak.

12    This was the swift action of a skilled craftsman, a
13 marksman, who knew exactly what he wanted to do at that point.
14 Perhaps it was due to shock and disbelief at what was
15 happening, but you'll remember Pultorak testified he had never
16 been in a situation like this before.

17    But Pultorak testified he hesitated just a moment too long,
18 and he wasn't able to get his firearm up and out on point
19 before suddenly, Bam, Crack, a loud boom as he testified, and a
20 feeling of pain in his left shoulder.  He was shot.  A bullet
21 had blown through the top of his bulletproof vest and had
22 penetrated his shoulder.

23    So now we can go back to the elements' list.  I talked to
24 you about what a forcible assault is.  At the moment this
25 bullet enters Pultorak's shoulder, we have a forcible assault.

1    Clearly a forcible assault on Ranger Pultorak.

2        What about Pultorak's action of drawing his weapon, delayed

3    though it may have been?  Was that an example of the use of a

4    unlawful force?

5        We know from Pultorak's testimony he feared for his life at

6    that point.  Absolutely.  Anybody would in his position.  The

7    defendant was mere feet from him when the defendant drew his

8    weapon and began to point it in his direction.

9        He didn't have enough time to get his weapon out and on

10   point before the gunshot occurred.

11       Now, the defendant testified just a few hours ago that

12   Pultorak shot first, but even if we assume -- and this is just

13   for sake of argument -- assume this is true, he did so,

14   Pultorak fired first only, if he did fire first, after the

15   defendant drew his weapon.

16       Pultorak had a suspect pointing a gun at him, and he used

17   force to try to stop the threat.  Should he have waited to see

18   if the defendant was a bad shot?

19       Should he have let him fire the first shot, even assuming

20   the defendant's own testimony is true.

21       And Hardin fires only after he hears the first shot.  And

22   he hears the first shot only after he observes the defendant

23   hold his gun out and put it down range.

24       That's a key piece of evidence.  Hardin is watching.  He

25   testified he had tunnel vision on the defendant at that point.

1    He's watching him.  He sees him remove the gun.  He sees it

2    pointed in the direction of where Pultorak had last been seen.

3    It is only when the defendant is fully extended that Hardin

4    hears the crack and the first shot being fired.

5        It all happened so quickly that Pultorak didn't have enough

6    time to put his handcuffs back.  You heard him testify, when he

7    got his gun out, he still had his handcuffs in his hand and was

8    gripping the gun with the handcuffs as he retreated down the

9    trail.  Officer Hardin also began to back away, looking for

10   cover or concealment.

11       Under his version of events the defendant wants you to

12   believe, and needs you to believe, that the officers were the

13   aggressors.  That they were the ones on offense, and he was the

14   one on defense.  That he had done absolutely nothing wrong.

15   That his actions were reasonable in light of the display of

16   unlawful force, and that he acted in self-defense.

17       But let us remember where each of the players ended up in

18   this scenario because I think that is very telling and

19   undermines the defendant's argument.

20       Once the defendant started shooting, the officers fell back

21   down the trail and into the woods.

22       Where does Pultorak end up?

23       He ends up 35 feet down the trail approximately.

24       Where does Hardin end up?

25       Well, after tripping over the fire pit, he end up behind

1    this tree.

2        How do we know this?

3        We know this because the handcuffs that Pultorak had been

4    griping were found down in this location where the arrow is

5    pointing, evidence marker 4.

6        He testified by the time the shooting stopped and he came

7    to a rest -- his final resting place at that point, he saw that

8    he had the handcuffs and dropped them.

9        And Hardin?  Hardin testified that when the shooting came

10   to a stop, where he came to a stop, was behind this tree.  And

11   he knows it because he dropped his empty magazine at that

12   point.

13       Where's the empty magazine?

14       Evidence marker 23.  Here.

15       The defendant?  Where did defendant end up?

16       Basically in the same place he started in.  He didn't move.

17   As he testified, he stood up.  Then just sat down.  He didn't

18   retreat.  We know this because there's his revolver.  There's

19   his hat.

20       Now, you'll recall before Officer Hardin found concealment

21   behind the tree, he tripped over the fire pit and landed on his

22   back.  And the defendant, who would have you believe he was

23   acting in self-defense, took that opportunity to point the gun

24   at Officer Hardin who is laying on his back, extremely

25   vulnerable at that moment.

1   The defendant, who was acting in self-defense, he would

2   have you believe, took the gun and pointed it at Hardin and

3   shot him while he was on his back.  He shot the coffee pot,

4   too.  If nothing else, there is the evidence -- the descriptive

5   evidence of the violence the defendant caused that day.

6   So we now have a forcible assault on Officer Hardin with

7   him being shot in the leg by the defendant.

8   We also have the use of a deadly or dangerous weapon and

9   infliction of bodily injury for both.  The defendant admitted

10  he used this Taurus .44 caliber revolver to shoot them.  And

11  both, as you have seen from the evidence presented in this

12  case, were injured during the shooting.

13  Now, we also have defendant's own statements.  The first

14  statement he makes shortly after to the paramedic:  They drew

15  down on me, so I shot them.  That statement has evolved.  It

16  even evolved today while testifying on the stand.

17  The fact of the matter is -- and the statement as it stands

18  today, what the defendant wants you to believe is he was the

19  victim here.  They attacked him.  They shot him.  They were out

20  to get him.  Pultorak in particular was out to get him.

21  Let me ask you this:  If those officers, if they were

22  really rogue cops who wanted to kill this man, why is he still

23  alive?

24  What did they do when the shooting stopped?

25  Hardin and Cole approach him.  Once they secure the

1   situation, they start providing medical aid.  Hardin who has a

2   wound -- a gunshot wound to his leg, walks the 300 yards back

3   down to his car because his radio is not working to ask for

4   medical support.  He grabs his med bag and walks all the way

5   back up.

6        The defendant testified no one provided him medical aid,

7   but we have seen through the evidence two medical bags, two CHP

8   med bags next to him.  One from Zelhart, who he did say gave

9   him aid.  The other bag, that was Hardin's.  The defendant had

10   gunshot wounds.  Hardin provided full pressure on the wounds to

11   prevent defendant from bleeding until he would get relieved.

12        If they wanted to kill him, they're pretty bad at it.

13        Now, Count Three:  Question is whether or not the defendant

14   committed one or both of the crimes alleged in Count One and

15   Two.  If you find the defendant committed either Count One or

16   Count Two or both, this first element is satisfied.

17        And the second element is also satisfied because as we have

18   seen and heard, through defendant's own testimony, he admitted

19   to use of the Taurus .44 caliber revolver to assault the two

20   officers.

21        The evidence in this case not only establishes the elements

22   of these crimes beyond any reasonable doubt, it also soundly

23   refutes defendant's claims of self-defense.

24        What the officers did that day was reasonable.  What the

25   defendant did was criminal.  He shot two officers who were just

1    trying to do their jobs.  They didn't wake up that morning

2    looking for a gunfight.  They didn't seek the defendant out.

3    He sought them out.

4         And when things didn't go the defendant's way, when this

5    island unto himself started to lose a little bit of control, he

6    lashed out.  Not with his words, not with his fists even, but

7    with a gun.  And he shot these two men.

8         In light of this, we ask you return the only verdict that

9    the evidence presented in this case supports, guilty on all

10   three counts.

11        Thank you.

12        MR. TONEY:  Here's the short version of this:

13        This man has committed no crime.  His property is at a

14   campsite.  He's hassled by an officer earlier.  He's told he

15   can't drive up the road even though it is not posted.  He obeys

16   the officer.  Instead of driving up the road, he walks up.  He

17   only wants one thing.  His own property.  He's done absolutely

18   nothing illegal.  Nothing.  He's exercising his rights to his

19   own property.  In the space of a few seconds, he winds up being

20   shot multiple times.

21        First of all, this case has to be constantly viewed through

22   the prism of the burden of proof.  This is not a civil case

23   where there is damages involved.  This is a criminal case where

24   liberty is involved.  And according to traditions that go back

25   longer than this country, if you have a reasonable doubt in

1    this case, the defendant gets the benefit of it.

2        It's not a 49 percent.  It's not 82 or any other number.

3    But the government has to prove it beyond any reasonable doubt.

4        There are three different versions of what happened there.

5    Three.  Hardin, Cole and Pultorak.

6        I realize that Hardin and Pultorak are officers, and

7    Mr. Cole is just a guy camping in the forest without apparently

8    a lot of assets to him.   And anybody who testifies in their

9    own defense is probably somebody you want to look at twice

10   because they're the ones on trial.

11       And I also understand that we have to trust police officers

12   for protection.  In a policeless state it becomes chaotic

13   quick, but some policemen are good and some aren't.  And I say

14   to you, and I think I can show this, not just by Brent Cole's

15   statement, but Pultorak is not only a bad cop, but he's a liar.

16       I'll tell you where it is clear.

17       What does Pultorak say and why about the confrontation at

18   the camp?

19       What he says is:  I immediately asked him if he was armed.

20       That's a lie.

21       What does Hardin say in his testimony?

22       Hardin says:  He came up.  He just was begging for his

23   property.  Please, can I get my property.

24       And then Pultorak starts quizzing him about the property.

25   And it's very clear in the testimony Cole's not agitated.  He's

1  just asking to get his stuff.

2      Please, let me have my things.  Sort of pleading.

3      Is that fair?

4      Hardin said yes.

5      Please give me my stuff.

6      And then they talk about motorcycles.  That's not just Cole

7  saying that.  That is Hardin saying that.  They start talking

8  about motorcycles.

9      Why is this important?

10     I'll get to it.

11     So Cole is saying:  Yeah.  That one is one of the Radon

12  boys'.  And I don't know who that motorcycle belongs to.

13     I understand they know it is a stolen motorcycle.  Okay.  I

14  understand that.  But it is after that conversation, which

15  Hardin himself, as well as Cole, say was not animated.  The guy

16  is just asking Cole questions, and he's responding.

17     Furthermore, according to Hardin, there is a conversation

18  about Cole can't get the motorcycles.  And Cole's testimony,

19  which is consistent with Hardin's, is that:  They're not mine.

20  I don't care.  I just need my stuff.

21     That's when Hardin sees him pull out the handcuffs.

22     Why is this so critical?

23     Here's why.

24     I believe the court will instruct:

25     When an officer reasonably believes doing so is necessary

1    to protect his or another person's safety, he may use handcuffs

2    or draw a weapon in connection with such a stop and/or

3    detention.

4        I'm going to repeat it:

5        When he reasonably believes doing so is necessary to

6    protect his or another person's safety.

7        You can't just pull handcuffs on somebody doing nothing

8    illegal unless you believe it's necessary.

9        Now, under the version that Pultorak wants you to believe,

10   which I claim is a flat lie, he's doing it because immediately

11   there is a concern because somehow Cole is coming to this

12   campsite.

13       Pultorak pretty well knows that it is likely that Cole has

14   his property there because he's seen him come out.  But he

15   doesn't.  That's the point.  He talks in a calm voice to Cole

16   who responds.  That's what Hardin sees.

17       You can't reasonably infer that Pultorak was in fear of his

18   safety or anothers if he is talking with somebody, for what

19   Cole believes is a couple of minutes, and probably was about

20   that.

21       So the officer does not believe that, but to make a case

22   that he believed that, he suddenly says:  Oh, I immediately

23   asked him if he was armed, and when he gestured, things

24   happened.

25       Why would Cole come up there except to get his property?

1    In the opening statement Mr. McCoy was saying he's fuming.

2    He's not fuming.  He's doing what the officers said to get his

3    property, as any citizen should be able to.

4    Pultorak who has been abusive before, is being abusive

5    again when he comes at him with handcuffs.

6    Now, you may recall the testimony of Hardin.  It isn't what

7    Mr. McCoy is saying, that there was a weapon pulled and then

8    handcuffs came out.

9    It is clear from Hardin's testimony the handcuffs come out

10   after this discussion.  There is no way that the officer

11   reasonably doing so is necessary suddenly now because Cole has

12   done nothing but comply with what exactly the officer told him

13   to do, by not driving up there and by answering his questions.

14   Nothing has happened to justify the handcuffs.

15   And only when Cole reacts to this unlawful use of force,

16   and is asked if he's armed, and he says yes -- and he keeps his

17   hands out.  He's taking a step back because he's being

18   confronted.

19   There's been a lot of testimony about who fired first.  I

20   say to you under the law two things:  One is when Hardin says

21   that I don't know, and when Cole says that he fired first, and

22   when Pultorak says Cole fired first, you certainly don't have

23   enough evidence to prove it one way or another beyond a

24   reasonable doubt.

25   But it doesn't matter because the law doesn't talk about

1  who fired first.  What the law talks about is if he has a

2  reasonable belief that the use of force was necessary to defend

3  himself against the immediate use of unlawful force and he used

4  no more force than necessary under the circumstances, it is a

5  self-defense case.

6      And unless the government can prove beyond a reasonable

7  doubt that that isn't a exactly what happened here, whoever

8  shot first, Mr. Cole is entitled to an acquittal.

9      Then the government seems to be saying that during all the

10  time that this gunfire was being exchanged that somehow Cole

11  should have stopped firing.

12      Well, they were firing at him.

13      Remember, this happened, I think between two and 15 seconds

14  depending on the testimony.  Two is probably low, 15 could be

15  accurate or even high.

16      What the government would have you believe is, oh,

17  somewhere in this where bullets are flying, he suddenly should

18  have, as a reasonable person, said:  Oh, I don't have to keep

19  firing anymore.

20      The bullets are flying.  In 15 seconds he's shot at

21  numerous times.  He's hit numerous times.  He empties his gun.

22      None of this would have happened if the officer had acted

23  in any kind of reasonable way with a citizen trying to get his

24  property.

25      Did the officer say:  Look, there is a stolen motorcycle

1    here, and we want you to sit down.  Before we do anything, I'm

2    going to handcuff you because we're out in there.

3        That would have been one thing, but that's not what

4    happened.  That is not what happened.  And it is not just the

5    unlikelihood of Pultorak's testimony.  It is as shown by

6    Hardin.

7        The bottom line of this case is that Mr. Cole was faced

8    with an amazing reaction to someone who was exactly obeying the

9    law, not raising his voice, not trying to do anything, pleading

10   with the officer.  And because of that conduct, the government

11   tries to make it out that he is guilty of an unwarranted

12   assault on these officers and he isn't.

13       I'm concluded.

14            MR. COPPOLA:  If Ranger Pultorak is a liar, then he's

15   a bad one.  And if Ranger Pultorak is a murderer, then he's

16   also a bad murderer because the defendant is still alive

17   despite taking this hand cannon and pointing it at a police

18   officer, who hasn't drawn his weapon, and is standing there

19   with his handcuffs in his hand.

20       Let me say that again:  Standing there with his handcuffs

21   in his hand.

22       What do we know took place after that?

23       Officer Hardin tells you that from his vantage point the

24   defendant drew, and he drew fast.  It was practiced.  It was

25   smooth.  He says the weapon came up.  It was pointed at

1    Ranger Pultorak, and then he heard a loud boom.

2        Now, remember that Officer Hardin drew his firearm, pointed

3    it at the defendant the minute he heard the defendant say "I'm

4    armed."

5        In response to whose question?

6        Ranger Pultorak's question.

7        Now, Ranger Pultorak doesn't deny that there was a

8    conversation between himself and Mr. Cole for a few short

9    minutes.  He says he doesn't recall that conversation.

10       And Ladies and Gentlemen of the Jury, why would you recall

11   each and every detail of what is likely the most traumatic

12   event of your career?

13       Someone's just drawn a firearm on you and started shooting

14   at you.

15       Ranger Pultorak didn't wake up looking for a gunfight on

16   Saturday June the 14th, and neither did Officer Hardin.  We're

17   here in this courtroom today not because of the actions of two

18   law enforcement officers, who were just doing their job that

19   hot Saturday afternoon.  We're here because the defendant, in

20   his own words, just reacted.  He freaked out.

21       And then he told how many different stories about what

22   occurred on Saturday, June the 14th?

23       The first story to Investigator Billingsly was:  I fired

24   first.

25       Excuse me.

1    The first story to Investigator Billingsly was that

2    Ranger Pultorak was pulling up for a heart shot so I fired

3    first to get him away from me.

4    Intermixed in that conversation was defendant's comments

5    about that it's better to get a round in first than to let

6    somebody else get a round in on you.

7    Then nearly 40 minutes into that interview with

8    Investigator Billingsly, that story changes.  It changes

9    markedly.

10   How does it change?

11   Suddenly Officer Pultorak is firing the first shot.

12   When we get to the witness stand today, what does defendant

13   tell you?

14   Even more details.  I only hit twice.  I was deliberately

15   missing.  I just wanted him to run away.

16   This is all because Ranger Pultorak and Officer Hardin were

17   in the campsite with the stolen motorcycle and were doing their

18   job.

19   Now, Mr. Toney is correct, there are three stories about

20   what transpired, all from different perspectives.  Two of those

21   stories make sense, that of Officer Hardin and that of

22   Ranger Pultorak.

23   The person whose story doesn't make sense is the

24   defendant's.  He armed himself on Saturday, June 14th.  He

25   walked up through the woods, quietly at first.  He sat below

1    that campsite or stayed below that campsite, as he told you

2    today, somewhere around ten or 15 minutes, maybe longer.

3        He says from his vantage point he saw the two officers in

4    and out of the campsite carrying long guns, and that Tad

5    Pultorak was wearing a poncho with tassels.  The defendant laid

6    in wait because he was formulating what he was going to do next

7    because, as Mr. McCoy told you in his argument, they were

8    messing with his stuff.

9        I submit to you none of this would have happened had the

10   defendant put his hands up when he said -- when asked if he was

11   armed.  Yes, I am.

12       Instead, he took a fighting stance, swept his coat back,

13   put his hand on his hip, his other hand forward.  Shortly

14   thereafter the fight was on.

15       Ranger Pultorak was not, as suggested, a man with a

16   vendetta.  He had never met Mr. Cole before June 14th.  And any

17   suggestion that Ranger Pultorak was out to get him that day is

18   simply not supported by the evidence.

19       The person who gives you the most version of events in this

20   particular case is not Ranger Pultorak, it is not Officer Brant

21   Hardin.  It's the defendant.

22       I submit to you that based on the facts and the evidence in

23   this case, the most plausible explanation of events is that

24   which you heard from the two officers who testified.

25       Mr. Cole is not the poor, innocent victim in this case.

1    He's an armed, angry man who lays in wait.  And when things

2    don't go the way he wants them to go, he starts shooting.

3        The officers in this case used reasonable force when

4    confronted with an unreasonable man in a threatening situation

5    with a gun he turned on both of those officers.

6        And when the quiet had returned to the campsite, after all

7    the firing on that day, what did the officers who were

8    supposedly out to get Mr. Cole do?

9        They saved his life.

10       Ladies and Gentlemen, when you get back to the jury

11   deliberation room you'll be given a copy of the jury

12   instructions.  I suggest that you read them carefully.  And as

13   you are deliberating and reviewing the evidence, the only

14   conclusion that you will draw at the end of your deliberations

15   is that the defendant is guilty of assaulting a federal

16   officer, he's guilty of assaulting a person assisting a federal

17   law enforcement officer, and he's guilty of discharging a

18   firearm during the course of two crimes of violence.

19           THE COURT:  Members of the jury, now that you have

20   heard all the evidence and the arguments of the parties, it is

21   my duty to instruct you on the law which applies to this case.

22   Each of you is in possession of a copy of these jury

23   instructions, which you may take into the jury room for your

24   use if you find it necessary.

25       It is your duty to find the facts from all the evidence in

1    the case.  To those facts you must apply the law as I give it

2    to you.  You must follow the law as I give it to you whether

3    you agree with it or not.  And you must not be influenced by

4    any personal likes or dislikes, opinions, prejudices or

5    sympathy.  That means that you must decide the case solely on

6    the evidence before you and according to the law.  You will

7    recall that you took an oath promising to do so at the

8    beginning of the case.

9        In following my instructions you must follow all of them

10   and not single out some and ignore others.  They are all

11   equally important.  Do not read into these instructions or into

12   anything I may have said or done, any suggestion as to what

13   verdict you should return.  That is a matter entirely up to

14   you.

15       The indictment is not evidence.  The defendant has pleaded

16   not guilty to the charges.  The defendant is presumed to be

17   innocent unless and until the government proves the defendant

18   guilty beyond a reasonable doubt.  In addition, the defendant

19   does not have to testify or present any evidence to prove

20   innocence.  The government has the burden of proving every

21   element of the charges beyond a reasonable doubt.

22       Proof beyond a reasonable doubt is proof that leaves you

23   firmly convinced that the defendant is guilty.  It is not

24   required that the government prove guilt beyond all possible

25   doubt.

513

1          A reasonable doubt is a doubt based upon reason and common
2     sense, and it is not based purely on speculation.  It may arise
3     from a careful and impartial consideration of all the evidence
4     or from lack of evidence.
5          If after a careful and impartial consideration of all the
6     evidence, you are not convinced beyond a reasonable doubt that
7     the defendant is guilty, it is your duty to find the defendant
8     not guilty.
9          On the other hand, if after a careful and impartial
10    consideration of all the evidence, you are convinced beyond a
11    reasonable doubt that the defendant is guilty, it is your duty
12    to find the defendant guilty.
13         You are here only to determine whether the defendant is
14    guilty or not guilty of the charges in the indictment.  The
15    defendant is not on trial for any other conduct or offense not
16    charged in the indictment.
17         The defendant has testified.  You should treat this
18    testimony just as you would the testimony of any other witness.
19         You have heard testimony that the defendant made a
20    statement.  It is for you to decide whether the defendant made
21    the statement, and if so, how much weight to give to it.
22         In making those decisions, you should consider all the
23    evidence about the statement, including the circumstances under
24    which the defendant may have made it.
25         In deciding the facts in this case, you may have to decide

1    which testimony to believe and which testimony not to believe.

2    You may believe everything a witness says or, part of it, or

3    none of it.

4        In considering the testimony of any witness, you may take

5    into account:

6        The opportunity and ability of the witness to see or hear

7    or know the things testified to;

8        The witness's memory;

9        The witness's manner while testifying;

10       The witness's interest in the outcome of the case and any

11   bias or prejudice;

12       Whether other evidence contradicted the witness's

13   testimony;

14       The reasonableness of the witness's testimony in light of

15   all the evidence;

16       Any other factors that bear on believability.

17       I left out a word:  And any other factors that bear on

18   believability.

19       The weight of the evidence as to a fact does not

20   necessarily depend on the number of witnesses who testify about

21   it.

22       You have heard testimony from persons who, because of

23   education or experience, are permitted to state opinions and

24   the reasons for their opinions.

25       Such opinion testimony should be judged just like any other

1   testimony.  You may accept it or reject it, and give it as much

2   weight as you think it deserves, considering the witness's

3   education and experience, the reasons given for the opinion,

4   and all other evidence in the case.

5       The parties stipulated to certain facts that have been

6   stated to you.  You should therefore treat these facts as

7   having been proved.

8       Certain charts and summaries have been admitted in

9   evidence.  Charts and summaries are only as good as the

10  underlying supporting material.  You should, therefore, give

11  them only such weight as you think the underlying material

12  deserves.

13      A separate crime is charged against the defendant in each

14  count.  You must decide each count separately.  Your verdict on

15  one count should not control your verdict on any other count.

16      The defendant is charged in Count One of the indictment

17  with assault on a federal officer in violation of Sections

18  111(a) and (b) of Title 18 of the United States Code.  In order

19  for the defendant to be found guilty of that charge, the

20  government must prove each of the following elements beyond a

21  reasonable doubt:

22      First, the defendant forcibly assaulted a federal officer,

23  specifically Bureau of Land Management Ranger Tad Pultorak;

24      Second, the defendant did so while Bureau of Land

25  Management Ranger Tad Pultorak was engaged in or on account of

516

1    his official duties; and

2         Third, the defendant used a deadly or dangerous weapon, to

3    wit:  a Taurus .44 caliber revolver, or inflicted bodily

4    injury.

5         The defendant is charged in Count Two of the indictment

6    with assault on a person assisting a federal officer in

7    violation of Sections 111(a) and (b) of Title 18 of the United

8    States Code.  In order for the defendant to be found guilty of

9    that charge, the government must prove each of the following

10   elements beyond a reasonable doubt:

11        First, the defendant forcibly assaulted California Highway

12   Patrol Officer Brant Hardin; and

13        Second, the defendant did so while California Highway

14   Patrol Officer Brant Hardin was assisting Bureau of Land

15   Management Ranger Tad Pultorak, a federal officer, in the

16   performance of Bureau of Land Management Ranger Pultorak's

17   official duties, or on account of that assistance; and

18        Third, the defendant used a deadly or dangerous weapon, to

19   wit: a Taurus .44 caliber revolver, or inflicted bodily injury.

20        The following terms used in Count One and Two of the

21   indictment are defined as follows:

22        There is a "forcible assault" when one person intentionally

23   strikes another, or willfully attempts to inflict injury on

24   another, or intentionally threatens another, coupled with an

25   apparent ability to inflict injury on another, which causes a

1     reasonable apprehension of immediate bodily harm.

2       A Taurus .44 caliber revolver is a deadly or dangerous

3     weapon if it is used in a way that is capable of causing death

4     or serious bodily injury.

5       With respect to Count One, assault on a federal officer,

6     and Count Two, assault on a person assisting a federal officer,

7     the defendant asserts that he acted in self-defense.

8       It is a defense to Counts One and Two if:

9       The defendant had a reasonable belief that the use of force

10    was necessary to defend himself against the immediate use of

11    unlawful force; and the defendant used no more force than was

12    reasonably necessary in the circumstances.

13      Force which is likely to cause death or great bodily harm

14    is justified in self-defense only if a person reasonably

15    believes such force is necessary to prevent death or great

16    bodily harm.

17      In addition to proving all the elements of Count One and

18    Two beyond a reasonable doubt, to find the defendant guilty of

19    those charges the government must also prove beyond a

20    reasonable doubt that either the defendant did not have a

21    reasonable belief that the use of force was necessary to defend

22    himself against immediate use of unlawful force, or that the

23    defendant used more force than was reasonably necessary under

24    the circumstances.

25      A person who is an attacker cannot use self-defense as a

1    justification for an assault.

2         A law enforcement officer may stop and/or detain a person

3    for an officer safety purpose if, under the circumstances, it

4    was reasonable for the officer to do so.

5         When an officer reasonably believes doing so is necessary

6    to protect his or another person's safety, he may use handcuffs

7    or draw a weapon in connection with such a stop and/or

8    detention.

9         Under the Fourth Amendment a law enforcement officer may

10   only use such force as is objectively reasonable under all of

11   the circumstances.  In other words, you must judge the

12   reasonableness of a particular use of force from the

13   perspective of a reasonable officer on the scene and not with

14   the 20/20 vision of hindsight.

15        In determining whether Bureau of Land Management Ranger Tad

16   Pultorak and/or California Highway Patrol Officer Brant Hardin

17   used excessive force in their interactions with defendant in

18   this case, consider all of the circumstances known to them on

19   the scene, including:

20        The severity of the crime or other circumstances to which

21   they were responding or which they were investigating;

22        Whether the defendant posed an immediate threat to the

23   safety of the officers;

24        Whether the defendant was actively resisting detention or

25   arrest or was attempting to evade detention or arrest;

1      The amount of time and any changing circumstances during

2    which the officers had to determine the type and amount of

3    force that appeared to be necessary; and

4      The type and amount of force used.

5      The defendant is charged in Count Three of the indictment

6    with discharging, using, or carrying a firearm during and in

7    relation to the crimes of assault on a federal officer and

8    assault on a person assisting a federal officer, which are both

9    crimes of violence in violation of Section 924(c)(1)(A) of

10    Title 18 of the United States Code.

11      In order for the defendant to be found guilty of that

12    charge, the government must prove each of the following

13    elements beyond a reasonable doubt:

14      First, the defendant committed either the crime of assault

15    on a federal officer as charged in Count One of the indictment,

16    or the crime of assault on a person assisting a federal officer

17    as charged in Count Two of the indictment, or both; and

18      Second, the defendant knowingly discharged, used or carried

19    the Taurus .44 caliber revolver during and in relation to that

20    crime.

21      The defendant "discharged" the firearm if he fired it,

22    whether intentionally or accidentally.

23      The defendant "used" a firearm if he actively employed the

24    firearm during and in relation to the crime of assault on the

25    federal officer and/or the crime of assault on a person

1    assisting a federal officer.

2        The defendant "carried" a firearm if he knowingly possessed

3    it and held, moved, conveyed or transported it in some manner

4    on his person.

5        When you begin your deliberations, you should elect one

6    member of the jury as your presiding juror.  That person will

7    preside over the deliberations and speak for you here in court.

8        You will then discuss the case with your fellow jurors to

9    reach agreement, if you can do so.  Your verdict must be

10   unanimous.

11       Each of you must decide the case for yourself, but you

12   should do so only after you have considered all of the

13   evidence, discussed it fully with the other jurors, and

14   listened to the views of your fellow jurors.

15       Do not be afraid to change your opinion if the discussion

16   persuades you that you should.  Do not come to a decision

17   simply because other jurors think it is right.

18       It is important that you attempt to reach a unanimous

19   verdict, but, of course, only if each of you can do so after

20   having made your own conscientious decision.  Do not change an

21   honest belief about the weight and effect of the evidence

22   simply to reach a verdict.

23       The punishment provided by law for the crimes is for the

24   court to decide.  You may not consider punishment in deciding

25   whether the government has proved its case against the

1    defendant beyond a reasonable doubt.

2         A verdict form has been prepared for you.  After you have

3    reached a unanimous agreement on the verdict, your presiding

4    juror will fill in the form that will be given to you, sign and

5    date it, and advise the United States Marshal's representative

6    outside your door that you are ready to return to the

7    courtroom.

8         If it becomes necessary during your deliberations to

9    communicate with me, you may send a note through the United

10   States Marshal's representative signed by your presiding juror

11   or by one or more members of the jury.

12        No member of the jury should ever attempt to communicate

13   with me except by a signed writing, and I will communicate with

14   any member of the jury on anything concerning the case only in

15   writing or here in open court.

16        If you send out a question, I will consult with the parties

17   before answering it, which may take time.  You may continue

18   your deliberations while waiting for the answer to any

19   question.

20        Remember that you are not to tell anyone, including me, how

21   the jury stands numerically or otherwise until after you have

22   reached a unanimous verdict or have been discharged.  Do not

23   disclose any vote count in any note to the court.

24        Any objection to the closing instructions?

25             MR. MCCOY:  No, Your Honor.

1          MR. TONEY:  No.

2          THE COURT:  Okay.  Is there a United States Marshal

3    representative to take charge of the jury?

4       Thank you, sir.  Please administer the oath to him.

5       (Whereupon, the oath was administered.)

6          THE COURT:  Thank you, sir.

7       The jury is authorized to take breaks, to go to lunch and

8    to take adjournments at will without coming into the courtroom

9    and being excused by me.

10      When the jury does adjourn or go to lunch, we ask that the

11   marshal's office advise my courtroom deputy so the parties can

12   be discharged from standby status while the jury is not

13   deliberating.

14      The jury is authorized to adjourn for the evening without

15   advanced permission and without having to return to this

16   courtroom to be excused.

17      If the jury adjourns for the evening and then returns the

18   next morning for jury deliberations, the jury reports directly

19   into the jury deliberation room but is not to deliberate until

20   all members of the jury are present because you can only

21   deliberate with a full jury.

22      We desire the jury to deliberate between the hours of

23   9:00 a.m. and 4:30 p.m. as necessary.  However, if all jurors

24   decide to deliberate for a shorter or longer period of time,

25   they are at liberty to do that.  Just let us know if it is

1     going to go beyond 4:30.

2         During deliberations, jurors are not to turn on any kind of

3     cell phone or other wireless connection type of device.

4         The United States Marshal's representative will maintain a

5     post outside the jury deliberation room to protect the jury

6     from outside influences or visitors.

7         That representative, however, will not communicate with a

8     juror or the jury about the court system or anything concerning

9     it because such conversations could be misconstrued as a

10    communication seeking to influence the jury.

11        Before any lunch break or any other break, stay in the jury

12    room until the United States Marshal's representative tells you

13    that it is okay to take the break.

14        I would like the United States Marshal's representative to

15    please escort all the jurors, except the alternate jurors, into

16    the jury deliberation room.

17        You may take your notebooks with you, if you desire, and

18    all your belongings.

19        (Jury retires for deliberations at 2:50 p.m.)

20        I'm now going to communicate with the alternate jurors.

21        Under federal law an alternate juror can only go into the

22    jury deliberation room if an alternate juror replaces a regular

23    juror.  In a moment I'm going to authorize you to leave the

24    courthouse and to conduct whatever business you normally

25    conduct, but you will still be under the admonition that you

524

1    not speak to anyone about the case because you may be needed to

2    replace a regular juror on this case.

3        Before you leave, I want you to provide the courtroom

4    deputy with contact information so that she can readily contact

5    you if you are needed.

6        Do you both reside in this county?

7            ALTERNATE JUROR:  We're both in Butte County.

8            THE COURT:  In the event that I don't see you again,

9    I'm thanking you now for your service.  And if I don't see you

10   again, that means that my courtroom deputy will be the one that

11   relieves you from the admonition.  So she will tell you in a

12   telephone call that you are relieved from the admonitions that

13   preclude you from talking to anybody about the case.

14       Any questions?

15       Okay.  Then please provide her with contact information.

16   The parties should do the same so that we can contact you.

17       Court's in recess until we hear from the jury.

18       (Off the record at 2:52 p.m.)

19                          ---o0o---

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

1   SACRAMENTO, CALIFORNIA, WEDNESDAY, FEBRUARY 11TH, 2015, 11 A.M.

2                              ---o0o---

3               THE CLERK:  You may remain seated.  Court is now in

4   session.

5               THE COURT:  Let the record reflect I'm meeting with

6   the parties out of the presence of the jury.

7        I received a note from the jury.  On it is today's date,

8   February 11th of this year, and the time on the note is

9   10:30 a.m.  And the note is on a preprinted form which states

10  in part, "The jury has reached a unanimous verdict."  And next

11  to the line for a check mark is the answer "Yes."

12       I'm going to have the courtroom deputy contact someone so

13  the jury can be brought into the courtroom.

14       (Brief pause while the jury is brought in and seated.)

15              THE COURT:  Let the record reflect that the jury has

16  joined us.

17              I received a note from the foreperson stating that you

18  have reached a verdict.  Is that correct?

19       (Foreperson nods head.)

20       I want the courtroom deputy to please obtain the verdict.

21       (Verdict retrieved from foreperson and handed to the

22        court.)

23       I will read the verdict:

24       We the jury unanimously find the Defendant, Brent Douglas

25  Cole, as follows:

1        As to Count One of the indictment, assault on a federal

2   officer in violation of Title 18, United States Code Sections

3   111(a)(1) and (b), and the response is "Guilty."

4        The second part of the question:

5        If you found the defendant guilty of Count One, do you find

6   beyond a reasonable doubt that the defendant used a deadly

7   weapon or dangerous weapon?

8        The response is "Yes."

9        If you found the defendant guilty of Count One, do you find

10  beyond a reasonable doubt that the defendant inflicted bodily

11  injury?

12       The response is "Yes."

13       As to Count Two of the indictment, assault on a person

14  assisting a federal officer in violation of Title 18, United

15  States Code Sections 111(a)(1) and (b), the "Guilty" box is

16  checked.

17       The next question:

18       If you found the defendant guilty of Count Two, do you find

19  beyond a reasonable doubt that the defendant used a deadly

20  weapon or dangerous weapon?

21       The "Yes" box is checked.

22       If you found the defendant guilty of Count Two, do you find

23  beyond a reasonable doubt that the defendant inflicted bodily

24  injury?

25       The "Yes" box is checked.

1        As to Count Three of the indictment, discharging, carrying,

2    or using a firearm during and in relation to a crime of

3    violence, in violation of Title 18, United States Code Section

4    924(c)(1)(A), the "Guilty" box is checked.

5        If you found the defendant guilty of Count Three, do you

6    find beyond a reasonable doubt that the defendant discharged

7    the firearm?

8        The "Yes" box is checked.

9        The verdict form is dated this 11th day of February 2015

10   and is signed by the presiding juror.

11       Is there any further action to take with respect to the

12   jury?

13            MR. MCCOY:  No, Your Honor.

14            MR. TONEY:  No.

15            THE COURT:  I'm placing the verdict on the ledge so

16   that the courtroom deputy can file it and also the note.

17       Thank you for your service in this case.  You are now

18   discharged from the admonition you were under that precluded

19   you from speaking to others about the case, but it is your

20   decision whether or not you speak to anyone about the case.

21       The key cards that you have -- I'm going to have the United

22   States Marshal's representative to escort you back into the

23   jury deliberation room, and you can place the key cards on the

24   table.  And you are free to leave the courthouse.

25       Thank you very much for your service.

1       You are excused.

2       (Jury discharged at 11:08 a.m.)

3       Mr. Cole, a written presentence report will be prepared by

4    a United States Probation Officer to assist me in sentencing.

5    You will be asked to give information for the report, and your

6    attorney may be present if you desire.

7       You and your attorney will be provided the opportunity to

8    read the presentence report before the sentencing hearing and

9    to speak on your behalf at sentencing.

10       THE CLERK:  May 1st.

11       THE COURT:  How about May 1st of this year for

12    judgment and sentencing, commencing at 9:00 a.m.?

13       Is that date okay?

14       MR. TONEY:  Yes.

15       MR. MCCOY:  It is, Your Honor, yes.

16       THE COURT:  That's the order.

17       (The court and courtroom clerk confer.)

18       How about the exhibits?

19       We're going to return the exhibits to the submitting party,

20    or should the exhibits be returned to one party to keep?

21       MR. MCCOY:  Submitting party, Your Honor, I believe,

22    would be best.

23       MR. TONEY:  Fine.

24       THE COURT:  That's the order.

25       Thank you.  It's adjourned.

```
 1          (Off the record at 11:10 a.m.)

 2                           ---o0o---

 3

 4

 5

 6

 7

 8

 9

10                      REPORTER'S CERTIFICATE

11                           ---o0o---

12
     STATE OF CALIFORNIA  )
13   COUNTY OF SACRAMENTO )

14

15          I certify that the foregoing is a correct transcript
     from the record of proceedings in the above-entitled matter.
16
            IN WITNESS WHEREOF, I subscribe this certificate at
17   Sacramento, California.

18

19      /S/_Catherine E.F. Bodene_____
            CATHERINE E.F. BODENE, CSR NO. 6926
20          Official United States District Court Reporter

21

22

23

24

25
```