1

2

3

4

5

6

7

8                     UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   UNITED STATES OF AMERICA,              No.  2:14-cr-0269-WBS-SCR-1

12              Respondent,

13        v.                                FINDINGS AND RECOMMENDATIONS

14   BRENT DOUGLAS COLE,

15              Movant.

16

17        Movant is a federal prisoner collaterally attacking his conviction and sentence pursuant to

18   28 U.S.C. § 2255.  This matter was referred to a magistrate judge on November 12, 2019 and

19   reassigned to the undersigned on August 6, 2024.  ECF Nos. 217, 339.  Respondent filed an

20   opposition and movant has filed a reply.  For the reasons set forth below, the undersigned

21   recommends denying movant's motion to vacate, set aside or correct his sentence.

22        I.       **Factual and Procedural History**

23        Following a 2015 jury trial, movant was convicted in this court of assault on a federal

24   officer, assault on a person assisting a federal officer, and discharging a firearm during a crime of

25   violence.[1]  The evidence adduced at trial is summarized as necessary herein to aid the court's

26   understanding of movant's current claims for relief.

27   _____

28   [1]  All references to "defendant" have been modified to "movant" to reflect the current procedural
     posture of this case.

1

**A. Jury Trial**

    **1. Prosecution's Case in Chief**

        **a. Testimony of Officer Hardin**

On the afternoon of June 14, 2014, uniformed California Highway Patrol ("CHP") Officer Hardin responded to the area of Grizzly Hill and North Bloomfield Roads to assist a Bureau of Land Management ("BLM") ranger with two vehicle storage forms. ECF No. 176 at 86-89 (Reporter's Transcript ("RT") of Feb. 3, 2015). At that location he met BLM Ranger Pultorak who was also wearing a uniform. ECF No. 176 at 89-91. Officer Hardin radioed into CHP dispatch with the vehicle identification number ("VIN") for a motorcycle found in the area. Id. at 91-92. He was informed that the motorcycle was reported stolen. Id. at 92. Ranger Pultorak informed Officer Hardin that the stolen motorcycle was at an illegal campsite along with another motorcycle that had been broken down into parts. Id. Both officers went to the fairly remote area of the campsite to impound the motorcycles. Id. at 92-93, 95.

When they reached the campsite, Officer Hardin found an empty backpack and started putting the disassembled motorcycle parts into it so that he could take them to the area where a tow truck could come and pick them up. ECF No. 176 at 98. Ranger Pultorak went to the location of the other motorcycle at the campsite. Id. at 103.

At that point, Officer Hardin heard a noise that was "like a rustling in the leaves or the bushes." Id. Officer Hardin stopped what he was doing and headed down the hill in the direction of the noise. Id. at 104. He was approximately 15 to 20 feet from Ranger Pultorak who was in his line of sight and also walking towards the noise. Id. at 104-105. Ranger Pultorak yelled "Police, Identify yourself" or "Police, Who is there?" Id. at 105. Movant then came out from the tree lined area of the rustling noise. Id. at 106-107. He was wearing jeans, a t-shirt, and a hoodie sweatshirt. Id. At first, Officer Harden could not see anything on movant's waist due to the sweatshirt. Id. at 110.

Ranger Pultorak and movant initially engaged in a normal conversation. Id. at 110-111. Movant told him his name and said, "You know me." Id. at 111. Movant also told him that it was his campsite or his stuff at the campsite and he asked if he could have his stuff. Id. at 111,

1  144. Ranger Pultorak responded by taking out handcuffs from his duty belt. Id. Movant then

2  loudly responded, "You're not putting those on me" and took what Officer Hardin described as a

3  "bladed stance." Id. at 112. Movant's right hand went towards his waistband, prompting Officer

4  Hardin to fear for the officers' safety. Id. at 112-113. Ranger Pultorak asked movant if he was

5  armed and he said, "Yes, I am." Id. at 114. At that point, Officer Hardin saw that movant had a

6  gun in a holster on his hip. Id. at 114. Officer Hardin drew his .40 caliber service weapon and

7  pointed it at movant. Id. at 115. He yelled at movant, "Drop the gun, drop the gun" and kept

8  repeating that phrase. Id.

9        Ranger Pultorak began to back away from movant. A second or two later, movant pointed

10  his weapon at Ranger Pultorak. Id. at 115-116. Officer Hardin heard a shot, and started to shoot

11  at movant. Id. at 118-119. He did not know who fired the first shot, but, ultimately Officer

12  Hardin fired 12 rounds at movant. Id. at 141, 151. At some point, movant focused his attention

13  on Officer Hardin and shot at him at least twice. Id. at 119. Officer Hardin was backing up

14  during the exchange of gun fire and fell over the campsite's firepit onto the ground. Id. at 120.

15  Eventually, he took cover behind a tree, noticed that his firearm's clip was empty, and reloaded it.

16  Id. at 121. The shooting stopped. Officer Hardin heard movant say that he was hit and that it was

17  over, or words to that effect. Id. at 122. He approached movant with his weapon drawn and

18  noticed that he was laying on the ground. Id. at 122-124. Officer Hardin handcuffed him. Id. at

19  124.

20        Officer Hardin returned to his CHP vehicle, informed dispatch that shots were fired, and

21  requested an ambulance and a helicopter to treat movant and Ranger Pultorak, as both had been

22  shot. Id. at 125. He returned to the campsite with his medical bag and began to provide first aid

23  treatment to movant. Id. at 126.

24        The parties stipulated that Officer Hardin received medical treatment for a gunshot wound

25  to his lower right leg. ECF No. 176 at 156-157.

26                  **b. Testimony of Ranger Pultorak**

27        Uniformed Patrol Ranger Pultorak from BLM's Nevada County office was on duty on

28  June 14, 2014. ECF No. 176 at 158-161. That day, he carried a .40 caliber Sig Sauer P229

3

1    firearm loaded with 13 rounds.  ECF No. 176 at 166-168.  He was patrolling the South Yuba

2    campground, but before reaching it, he stopped at North Bloomfield Road.  Id. at 169.  While

3    removing a mattress that someone had dumped in the area, Ranger Pultorak noticed a pickup

4    truck that was driving through "a very brushed-in" trail.  Id. at 172-173.  He activated the

5    emergency lights on his patrol vehicle to stop the pickup truck.  Id. at 174.

6        The driver of the truck, who was later identified as movant, tried to exit the vehicle, but

7    Ranger Pultorak told him to sit back down inside the truck. Id. at 174-175.  Movant gave

8    Pultorak his driver's license, registration, and proof of insurance for the pickup truck.  Id. at 175.

9    Ranger Pultorak also identified the two other passengers in the truck as Kevin and Michael

10   Radon.  Id. at 176.  After running their information through dispatch, Ranger Pultorak learned

11   that there were no outstanding warrants for movant or the passengers.  Id. at 177.  Ranger

12   Pultorak told movant that he pulled him over because the area was closed to vehicle traffic.  Id. at

13   177.  Movant became argumentative about the road closure and, ultimately, Ranger Pultorak told

14   him that "if he was found in that area again he would be cited at least, if not possibly have his

15   vehicle impounded."  Id. at 178.  Pultorak conceded on cross-examination that there was no road

16   closure sign posted in the area.  ECF No. 177 at 7.  After approximately 15 minutes, movant

17   drove away and Ranger Pultorak drove his vehicle up the trail where the pickup had come from.

18   ECF No. 176 at 178-179.

19       Ranger Pultorak ultimately stopped his vehicle at a campsite area where he found two

20   motorcycles, bedding, food, and camping equipment.  Id. at 180.  One motorcycle had an expired

21   registration plate on it and the other had only a VIN for purposes of identifying it.  Id. at 180.

22   Ranger Pultorak determined by contacting the Forest Service dispatch that the VIN came back to

23   a non-recovered vehicle.  Id. at 181.  He then requested that a CHP officer respond to the

24   campsite to help impound one or both of the motorcycles.  Id. at 181.

25       Once CHP Officer Hardin arrived, Ranger Pultorak learned that the VIN was reported as

26   stolen.  Id. at 184.  While both officers were at the campsite, Ranger Pultorak "heard some

27   rustling and crunching of brush" which he thought was made by a person.  Id. at 185.  Ranger

28   Pultorak began walking towards the tree line and yelled out twice,  "Hello.  Police."  Id. at 188.

4

After the second time, movant appeared from the downhill portion of the campsite and said, "It is me. You dealt with me earlier. I'm just coming up to get my stuff." Id. at 188-189. He was wearing jeans and a shirt that covered his belt area. Id. at 189. As movant was approaching, Ranger Pultorak told him to stop and he complied. Id. at 190. Ranger Pultorak asked movant if he was armed and he said yes. Id. at 190. At that point, Ranger Pultorak told movant to turn around and movant said, "No, I'm not turning around." Id. at 190. Pultorak pulled out his handcuffs with his left hand, took a step towards movant, and told him to turn around again. Id. at 191-193.

Movant took a bladed stance and reached towards his waistband. Id. at 193-194. This alarmed Ranger Pultorak because he thought movant was "going for the weapon he said he had." Id. at 194. Ranger Pultorak moved to his right and saw movant "draw something big and silver out of his waistband." Id. at 194-195. He crouched down and began to draw his service weapon. Id. at 195-196. Next, he heard a loud bang in his left ear, felt pain in his left shoulder, and knew that he had been shot. Id. at 195. Ranger Pultorak returned fire and kept moving to his right. Id. at 195-197. They exchanged gunfire for "a couple seconds," with Ranger Pultorak firing about seven shots. Id. at 199. Ranger Pultorak reloaded his weapon and heard Officer Hardin tell movant to drop his weapon. Id. at 199-200. Movant responded by saying that he had dropped his weapon and threw it away. Id. at 200. After handcuffing movant, Officer Hardin left the campsite to go get his medical kit. Id. at 202. Ranger Pultorak then notified the Forest Service dispatch that shots had been fired. Id. at 203.

Ranger Pultorak was transported via ambulance and then helicopter to the hospital where he received treatment for his gunshot wound. ECF No. 176 at 207. The parties stipulated that Ranger Pultorak was treated for a "through and through" gunshot wound to his left shoulder. ECF No. 177 at 65.

### c. Testimony of CHP Officer Zelhart

On June 14, 2014, CHP Officer Zelhart responded to the call of an officer-involved shooting. ECF No. 177 at 19. While he was rendering medical treatment, movant told him that the officers were going to take his stuff and he had to shoot them. ECF No. 177 at 29.

1

#### d.   Testimony of Paramedic Rutheford

2

When asked in the ambulance what happened, movant said that the officers drew their

3

weapons on him and he didn't have any choice but to fire at them.  ECF No. 177 at 54.

4

#### e.   Testimony of Investigator Billingsly

5

On June 16, 2014, two criminal investigators from the Nevada County District Attorney's

6

Office interviewed movant while he was still hospitalized for his gunshot wounds.  ECF No. 177

7

at 118, 124.  The investigators did not ask movant or any medical staff whether he was on any

8

medication before interviewing movant.  ECF No. 177 at 139.  After movant waived his <u>Miranda</u>

9

rights, movant told the investigators that he waited a couple of minutes before he announced his

10

presence to the officers at his campsite.  ECF No. 177 at 126-129.  He was concerned that they

11

were taking his belongings.  <u>Id</u>. at 129.  When asked if he had a weapon on the day of the

12

shooting, movant stated that he told Ranger Pultorak that he was armed.  <u>Id</u>. at 131.  Later in the

13

interview, movant explained that he had a weapon for security because he had come face-to-face

14

with a bear on at least one occasion.  <u>Id</u>. at 134-135.  Movant also told the investigators that

15

Pultorak was "twirling the handcuffs on one finger inside the loop, taunting him."  <u>Id</u>. at 131.

16

"Mr. Cole stated that Ranger Pultorak drew down on him, meaning he pointed his firearm

17

towards Mr. Cole…. [and] [t]hat he drew his weapon and fired at Ranger Pultorak."  <u>Id</u>. at 132.

18

According to movant, "because of the contact earlier in the day and how surly and vicious Mr.

19

Pultorak had spoken to him previous, he knew that he wanted to kill him when they met later in

20

the day."  <u>Id</u>. at 132-133.  Based on this, movant told the investigators that he was in fear for his

21

life on the afternoon of the shooting.  <u>Id</u>. at 133.  At another point in the interview, "Mr. Cole

22

indicated that in a gunfight you don't wait to get shot, basically that you act first."  <u>Id</u>. at 134.

23

"When asked point blank who fired first, about – probably 40 minutes into the interview or

24

longer, he said that the officers fired first."  <u>Id</u>. at 136.

25

#### 2.  Defense In Chief

26

#### a.  Brent Cole

27

Movant testified in his own defense that on the morning of the shooting he had been

28

sleeping in his truck at the campsite.  ECF No. 178 at 4-5 (RT of Feb. 10, 2015).  He eventually

drove his truck along with Mike and Kevin Radon down towards North Bloomfield Road.  ECF

No. 178 at 6.  The truck was stopped by a ranger who asked movant for his license, registration,

and insurance which movant provided him.  Id. at 6-8.  The ranger told movant that the road he

had been driving on was completely brushed in and that it wasn't drivable so he was closing it.

Id. at 8.  Movant asked him if there were any signs indicating that the road was closed and

whether it was BLM land.  Id. at 8-9.  According to movant, this made the ranger angry.  Id. at 9.

Movant tried to tell the ranger that he had property back up the hill that he wanted to pick up, but

the ranger started screaming, and cut him off from speaking.  Id. at 10.  Movant then drove away

and dropped off Mike and Kevin Radon at their aunt's house which was approximately 11 miles

from the campsite.  Id. at 10.

Movant returned to the intersection of Grizzly Hill Road and North Bloomfield Road and

parked his truck.  ECF No. 178 at 10-11.  He parked his truck at that location because the ranger

told him that he would be arrested and his vehicle towed if he saw him anywhere on BLM land

again.  Id. at 11.  Movant walked through the woods to get his backpack and other property from

the campsite.  Id. at 11.  Before he got to the campsite, he could hear and see the officers who

were packing everything up at the campsite and taking his property.  Id. at 12.  After five or ten

minutes, movant walked up the hill to talk to them about it.  Id. at 12.  Ranger Pultorak "poked

his head through the edge of the woods there and looked down the hill… and said something

about:  Who goes there.  Identify yourself."  Id. at 12.  After he identified himself, movant was

told that he could come up the hill and get his things from the campsite.  Id. at 12-13.  When

movant got to the campsite clearing, Ranger Pultorak asked him about the two motorcycles.  Id. at

13-14.  Movant told him that the Honda motorcycle belonged to Mike Radon, and that he didn't

know where the partially disassembled motorcycle came from.  Id. at 13-14.  Ranger Pultorak

then told movant that he was towing both motorcycles.  Id. at 14.  At that point, movant told him

that the backpack was his and that he wanted to get his other personal belongings.  Id. at 14.

Ranger Pultorak "responded by pulling out handcuffs and brandishing them."  Id. at 15.

According to movant, Ranger Pultorak was wearing a serape or poncho over his uniform and

pulled the handcuffs out from underneath it.  Id. at 15.  Ranger Pultorak then asked movant if he

1  was armed.  <u>Id</u>. at 15.  Movant told him that he was armed.  <u>Id</u>. at 15.  Both officers drew their

2  guns at that point.  <u>Id</u>. at 15.

3        Movant pivoted on his right foot and pulled his left foot back to get away.  <u>Id</u>. at 16.  As

4  soon as Ranger Pultorak got his gun up he shot movant just below his naval.  <u>Id</u>. at 16-17.  At that

5  point, Ranger Pultorak was about four feet away from movant.  <u>Id</u>. at 20.  After he was shot,

6  movant drew his weapon and fired six shots.  <u>Id</u>. at 20.  Movant's first shot struck Ranger

7  Pultorak in the shoulder.  <u>Id</u>. at 20.  Next, movant shot "a deliberate miss" over Ranger Pultorak's

8  head.  <u>Id</u>. at 21.  Officer Hardin also started to shoot at movant and shot him two times in the arm.

9  <u>Id</u>. at 21.  Next, movant shot towards Officer Hardin aiming for his lower leg to try to knock him

10  down.  <u>Id</u>. at 21.  This shot missed and hit the coffee pot instead.  <u>Id</u>. at 21.  Movant fired a

11  second time at Officer Hardin which grazed his leg.  <u>Id</u>. at 22.  Officer Hardin then shot movant

12  in the groin.  <u>Id</u>. at 22.  Movant was shot up pretty bad and needed help so he told Officer Hardin

13  "that it was over."  <u>Id</u>. at 22.  In total, movant was shot five times.  <u>Id</u>. at 19.  The entire shootout

14  lasted ten to twelve seconds.  <u>Id</u>. at 23.

15        While being treated, movant spoke with Paramedic Rutherford.  <u>Id</u>. at 25.  At that point,

16  movant was feeling light headed and dizzy.  <u>Id</u>. at 25.  Movant remembers telling him that the

17  officers drew down on him and that he had to return fire.  <u>Id</u>. at 26.

18        During movant's interview at the hospital, movant was still on morphine which had a

19  "mental effect" on him.  <u>Id</u>. at 27.  Movant was not told that the investigators were from the

20  District Attorney's Office.  <u>Id</u>. at 27.  Instead, he was told that they were independent

21  investigators and he told them what happened as best he could remember.  <u>Id</u>. at 27.

22        Movant explained during his testimony that he had a gun at the campsite to protect

23  himself from a 500 pound bear.  <u>Id</u>. at 28.

24        On cross examination, movant admitted that he took his pistol out of a case in his truck,

25  loaded it, and put it in a holster on his hip before he walked back up towards his campsite to

26  reclaim his property.  <u>Id</u>. at 36.  For the first time, movant also indicated that both officers were

27  carrying assault rifles.  <u>Id</u>. at 39-40.  Movant watched both officers leave the campsite armed with

28  assault rifles and come back to the campsite without them.  <u>Id</u>. at 40.  From the moment when

1    Ranger Pultorak pulled out his handcuffs, movant testified that he feared for his life.  Id. at 47.

2    Movant also testified that he had not heard the audio transcript of his hospital interview with

3    investigators and that the transcript "is not necessarily accurate."  Id. at 52.

4            **b.  Captain Catiglioni**

5            The defense also called Paul Castiglioni who helped treat movant for his gunshot wounds.

6    ECF No. 178 at 57, 59.  He picked up a pair of handcuffs that he saw on the ground.  Id. at 61.

7    He was told by law enforcement to put them back where they were and leave them.  Id. at 61.

8            **c.  Michael Radon**

9            On the day of the shooting, Michael Radon testified that he was with movant when they

10   were stopped by a ranger.  ECF No. 178 at 70.  He had parked his motorcycle and had been

11   camping for several days at the campsite where the shooting took place.  ECF No. 178 at 70-71.

12   He found the "junk bike" a couple of days before the incident and took it to the campsite as well.

13   Id. at 71.  Mr. Radon asked movant for a ride to his aunt's.  Id. at 72.  After being stopped in

14   movant's pickup truck by the ranger, they were told that the road was closed.  Id. at 74.  At least

15   three times, movant tried to ask the ranger if there were any road closed signs posted.  Id. at 74-

16   75.  The ranger interrupted him each time and wouldn't let him speak.  Id. at 74-75.  According to

17   Mr. Radon, the ranger was "really agitated."  Id. at 75.  On cross-examination, Mr. Radon

18   admitted that movant was able to ask the ranger how the road was closed if there was no sign and

19   that it was BLM land.  Id. at 78.  At the end of the traffic stop, the ranger told movant that he

20   would impound his truck if he saw him on the road again.  Id. at 79.

21           **d.  Kevin Radon**

22           Kevin Radon also testified about his encounter with a BLM ranger on the morning of the

23   shooting when he was a passenger in movant's pickup truck.  ECF No. 178 at 82.  The ranger told

24   them that the road they were driving on was closed.  ECF No. 178 at 83.  When movant asked if

25   there was a sign indicating that the road was closed, the ranger became loud and obnoxious and

26   declared, "He's the sign."  Id. at 83-84.  On cross-examination, he indicated that movant kept

27   trying to argue with the ranger and would not drop the issue about the road closure.  Id. at 87.

28   /////

9

### 3. Prosecution's Rebuttal

In rebuttal, the government recalled Ranger Pultorak who testified that he was not wearing a poncho on the day of the shooting during any of his interactions with movant. ECF No. 178 at 96. He also testified that he did not remove his AR-15 rifle from his vehicle at any time during the traffic stop or while at the campsite. ECF No. 178 at 97. Ranger Pultorak denied twirling his handcuffs after encountering movant at the campsite. Id. at 97.

The jury deliberated for approximately an hour and a half on February 10, 2015. ECF No. 178 at 151. At 10:30 the next morning, the jury returned a guilty verdict on all three counts of the indictment. ECF No. 178 at 152; ECF No. 67 (Verdict Form).

### B. Sentencing

On February 27, 2015, movant filed a motion to discharge his counsel and to represent himself. ECF No. 69. Following a hearing, the motion was granted on April 24, 2015. ECF Nos. 77. Trial counsel was ordered to remain in the case in an advisory capacity. ECF Nos. 77. On August 28, 2015, the court sentenced movant to a total term of 355 months imprisonment, followed by 36 months of supervised release. ECF Nos. 153, 156.

### C. Direct Appeal

Appointed counsel represented movant on the appeal of his conviction and sentence. Movant raised three issues on appeal. He challenged his indictment on the ground that the government interfered with the independence of the grand jury. He challenged his sentence on the basis that he was denied his right of allocution. Finally, movant argued that his two assault convictions were not "crimes of violence" for purposes of his separate firearms conviction. On May 21, 2018, the Ninth Circuit rejected these challenges and affirmed movant's conviction. See ECF No. 193 (Unpublished Memorandum Opinion).

Movant petitioned the United States Supreme Court for a writ of certiorari, which was denied on November 13, 2018. ECF No. 216 at 18. The Supreme Court denied movant's separate petition for writ of mandamus on October 1, 2018. Id. at 19.

### D. Rule 33 Motion

While his direct appeal was pending, movant filed a Rule 33 motion for a new trial. ECF

1    Nos. 189-190, 195-196 (amended motion).  The court deferred consideration of the motion until

2    movant's direct appeal was decided.  ECF No. 192.  By order dated March 14, 2019, the court

3    denied movant's motion for a new trial on the grounds that the claims were raised and rejected on

4    direct appeal, lacked merit, or were untimely filed.  ECF No. 211.

5         **E.  Section 2255 Motion**

6         On November 6, 2019, movant filed the pending § 2255 motion raising seven claims for

7    relief.  ECF No. 216.  Movant contends:

8    •    First, that the prosecutor committed misconduct by concealing material witnesses; making

9         knowingly false statements to the court; suborning perjury in order to discredit movant's

10        testimony; and, concealing material facts from the court and jury.  ECF No. 216 at 7.  As a

11        result, movant's Rule 33 motion was erroneously denied by the trial court.  Id.  This claim

12        centers around potential witness Christopher Donegan, who movant alleges was concealed

13        by the prosecution to discredit his testimony.  Id.

14   •    Second, that his trial counsel was ineffective in violation of the Sixth Amendment.  ECF

15        No. 216 at 7.  Specifically, he faults trial counsel for failing to: 1) file a motion to quash

16        the indictment; 2) file a motion to suppress his statements; 3) call the witnesses movant

17        instructed him to call; 4) introduce exculpatory evidence; 5) secure any expert witness and

18        adequately examine the prosecution's witnesses; 6) challenge the use of perjured

19        testimony by the prosecution; and 7) inform the court that movant wanted to represent

20        himself.  ECF No. 216 at 7.  Movant alleges that his trial counsel was provided with

21        potential witness Christopher Donegan's statement to an investigator in October 2014, but

22        he did not use this information at trial to prove that the prosecution engaged in

23        misconduct.  Id.

24   •    Third, that his appellate counsel was also ineffective in violation of the Sixth Amendment

25        by failing to raise strong issues on appeal.  ECF No. 216 at 8.  Here, movant asserts that

26        appellate counsel should have raised a violation of the Speedy Trial Act and failed to

27        challenge jury instructions numbers 14 and 16.  ECF No. 216 at 8.  Appellate counsel

28        "was imposed as a MASTER who failed and/or refused to follow Cole's direction or

                                                    11

1    allow him to participate and was unavailable to consult with Cole most of the time except

2    by mail." ECF No. 216 at 8 (emphasis in original).

3    • Fourth, that the decision in <u>Davis v. United States</u>, 588 U.S. 445 (2019), is retroactively

4    applicable to his case. ECF No. 216 at 8. As a result, his conviction for discharging a

5    firearm during a crime of violence should be vacated.

6    • Fifth, that he was denied his right to "self-represent and locus standi by this Court, a

7    structural error…." ECF No. 216 at 8.

8    • Sixth, that his conviction under 18 U.S.C. § 924(c) is an ex post facto law and violates the

9    Second, Eighth, Ninth, and Tenth Amendments to the U.S. Constitution. ECF No. 216 at

10    9.

11    • Finally, that the court lacked jurisdiction, rendering his criminal judgment void. ECF No.

12    216 at 9.

13    **F.  Motion to Amend § 2255 Motion**

14    In his motion to amend and expand the record, movant requests to add claims to his

15    pending § 2255 motion.  ECF No. 250.  Specifically, movant seeks to add (1) challenges to the

16    trial court's jurisdiction, (2) various ineffective assistance of counsel ("IAC") claims against the

17    attorneys who represented him at his initial appearance and at trial after the Federal Public

18    Defender's Office withdrew, (3) a <u>Faretta</u> challenge to the denial of his right to represent himself

19    at his initial appearance, and (4) a challenge to the lack of an impartial investigation in his case.[2]

20    **G.  Respondent's Omnibus Opposition**

21    Respondent filed an omnibus opposition to the claims presented in movant's § 2255

22    motion as well as his motion to amend.  ECF No. 291.  First, respondent submits that several of

23    movant's claims are procedurally defaulted because he could have raised them on direct appeal,

24    but failed to do so.  ECF No. 291 at 12-19.  According to respondent, this applies to his claim that

25    he was denied the right to represent himself (Claim 5); his ex post facto challenge (Claim 6); and

26

27    [2]  <u>See</u> <u>Faretta v. California</u>, 422 U.S. 806 (1975) (holding that criminal defendants have a
constitutional right to proceed without counsel when they voluntarily and intelligently elect to do

28    so).

1    claims asserting that the prosecution presented false testimony at trial and concealed a material

2    witness (Claim 1).  Absent cause and prejudice or actual innocence, the court cannot review these

3    claims on the merits.

4         With respect to the claim based on the government's suppression of potential witness

5    Christopher Donegan, respondent points out that movant was aware of this purported witness

6    prior to his sentencing when he filed a motion in arrest of judgment as well as a Rule 33 motion.

7    See ECF Nos. 116, 132.  Additionally, "Nevada County Sheriff Deputy Liller's report indicated

8    that although briefly detained at the scene, Donegan had no substantive information about the

9    shooting to share with law enforcement and was released once law enforcement had made this

10   determination and positively identified him."  ECF No. 291 at 17.  Even reviewing movant's

11   evidence of Mr. Donegan's interview with a defense investigator indicates that he was not a

12   witness to the actual shooting, but only arrived afterwards.  ECF No. 216 at 83-89 (August 8,

13   2014 interview with Chris Donegan by Beresford Investigations).

14        With respect to the IAC claims, respondent asserts that the attorney at movant's initial

15   appearance did inform the court that he wanted to represent himself, but the court took the matter

16   under submission.  ECF No. 291 at 20.  Therefore, counsel's performance was not deficient in the

17   manner identified in the § 2255 motion.  The remaining claims against movant's initial

18   appearance attorney fail because even the § 2255 motion itself does not establish how the

19   outcome of movant's case would have been any different.  ECF No. 291 at 20-21.

20        Respondent submitted two affidavits from trial counsel disputing that any other witnesses

21   would have been able to testify about who fired the first shot in this case.  ECF No. 292 at 4, 9-

22   10.  Trial counsel also indicated that he "never felt that any attempt to argue the exact placement

23   of wounds would – under these circumstances – be of any help."  ECF No. 292 at 4.  Thus,

24   according to respondent, a ballistics expert would not have changed the outcome of this case.  "It

25   is altogether unclear from Cole's briefing how these other 'experts' would have convinced the

26   jury that Ranger Pultorak fired at Cole first or that the shooting did not happen as the officers

27   described it."  ECF No. 291 at 25.  The claim that trial counsel failed to call witnesses movant

28   requested is entirely conclusory because movant does not provide the names of any witnesses or

1   declarations attesting to what their testimony would have been.  ECF No. 291 at 26.  Respondent

2   generally argues that "[g]iven the overwhelming evidence of guilt and the jury's rejection of

3   Cole's self-defense argument at trial, it cannot be said that [trial counsel's] alleged failures

4   presented a reasonable probability that the outcome of Cole's trial would have been different."

5   Id. at 26.

6         Respondent submitted an affidavit from appellate counsel that "describes in detail the

7   issues she considered prior to filing Cole's direct appeal in the Ninth Circuit."  ECF No. 291 at

8   27.  The additional claims that movant wanted appellate counsel to raise were not meritorious in

9   counsel's independent judgment.  Respondent emphasizes that the Sixth Amendment does not

10  require appellate counsel to include every issue that their client requests to be raised on appeal.

11  ECF No. 291 at 28 (citing Jones v. Barnes, 463 U.S. 745, 751 (1983) (holding that "neither

12  Anders nor any other decision of this Court suggests, however, that the indigent defendant has a

13  constitutional right to compel appointed counsel to press nonfrivolous points requested by the

14  client, if counsel, as a matter of professional judgment, decides not to present those points")).

15        Respondent next contends that "[n]otwithstanding Davis's invalidation of the so-called

16  residual clause of § 924(c), Cole's conviction remains intact.  ECF No. 291 at 28.  "In United

17  States v. Juvenile Female, 566 F.3d 943, 947 (9th Cir. 2009), the Ninth Circuit concluded that

18  assaulting a federal officer with a deadly or dangerous weapon and inflicting bodily injury is a

19  crime of violence under the definition found in 18 U.S.C. § 16."  Id. at 29.

20        Regarding movant's vague challenges to the trial court's jurisdiction, respondent submits

21  that there is no merit to his argument, which is why his attorneys did not raise the issue at his

22  initial appearance, trial, or on appeal.  "This court properly exercised subject matter jurisdiction

23  over Cole from the inception of this case."  ECF No. 291 at 33.

24        **H.  Movant's Reply to Omnibus Opposition**

25        By way of reply, movant continues to assert that his conviction is void because this court

26  did not have personal or subject matter jurisdiction over his case since the state court brought

27  charges against him first.  ECF No. 309 at 7-8.  According to movant, the Double Jeopardy clause

28  barred his subsequent federal trial after the state charges were dismissed.  Id. at 11.  Movant

1  further asserts that state and federal officials "colluded and conspired to change [the] venue and

2  institute a federal prosecution, then dismiss the state's prosecutions…." ECF No. 309 at 10.

3  With respect to the procedural default of several of his claims, movant contends that his case falls

4  within the actual innocence exception. Id. at 23. For the first time, movant explains that

5  Christopher Donegan's testimony would be relevant even though he arrived after the shooting

6  because he could reveal the perjured testimony of the two officers because he heard them

7  discussing what their story was going to be. Id. at 31. Movant further asserts that Jury

8  Instruction No. 16 was constitutionally deficient because it "directed the jury to assume criminal

9  intent and presume that the accused had no right to resist any force that was used against him to

10  accomplish their undeclared desire to take him into custody and deprive him of his liberty after

11  having taken his property for their own personal use." ECF No. 309 at 41. Movant submitted

12  additional exhibits identified as appendices to his reply. See ECF Nos. 310-312.

13  **II.    Legal Standards**

14  A federal inmate may move to vacate, set aside, or correct his sentence "upon the ground

15  that the sentence was imposed in violation of the Constitution or laws of the United States, or that

16  the court was without jurisdiction to impose such sentence, or that the sentence was in excess of

17  the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. §

18  2255(a). Not every asserted pretrial or trial error gives rise to a § 2255 claim. The statutory basis

19  for § 2255 relief is intended to be narrow and is not intended to operate as a "chance at a second

20  appeal." See United States v. Berry, 624 F.3d 1031, 1038 (9th Cir. 2010); United States v.

21  Johnson, 988 F.2d 941, 945 (9th Cir. 1993) ("Section 2255 ... is not designed to provide criminal

22  defendants multiple opportunities to challenge their sentence."); United States v. Addonizio, 442

23  U.S. 178, 185 (1979) ("unless the claim alleges a lack of jurisdiction or constitutional error, the

24  scope of collateral attack [under § 2255] has remained far more limited"). Accordingly, a § 2255

25  movant generally may not relitigate issues that were already decided adversely on direct appeal.

26  Odom v. United States, 455 F.2d 159, 160 (9th Cir. 1972). To be entitled to § 2255 relief,

27  movant has the burden of establishing an error of constitutional magnitude which had a

28  substantial or injurious effect or influence on the jury's verdict. See United States v. Frady, 456

15

1  U.S. 152, 170 (1982) (establishing that movant has the burden); United States v. Montalvo, 331

2  F.3d 1052, 1058 (9th Cir. 2003) (stating that "Brecht's harmless error standard applies to habeas

3  cases under § 2255").  If movant so demonstrates, the court "shall vacate and set the judgment

4  aside and shall discharge the prisoner or resentence him or grant a new trial or correct the

5  sentence as may appear appropriate."  28 U.S.C. § 2255(b).

6        Movant alleges that he was denied the effective assistance of trial and appellate counsel.

7  The two prong standard announced in Strickland v. Washington, 466 U.S. 668 (1984), governs

8  movant's IAC claims.  In order to be entitled to relief, movant has the burden of establishing:  1)

9  that his defense counsel's performance was deficient; and, 2) that he was actually prejudiced by

10  counsel's acts or omissions.  When reviewing the performance prong, the court must determine,

11  whether in light of all the circumstances, the identified acts or omissions were outside the wide

12  range of professionally competent assistance.  Strickland, 466 U.S. at 690.  Prejudice is found

13  where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of

14  the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability

15  sufficient to undermine confidence in the outcome."  Id.

16        If the court finds that movant's allegations are sufficient to support both prongs of the

17  Strickland test, "a district court must grant a hearing to determine the validity of a petition

18  brought under… [§ 2255], '[u]nless the motions and the files and records of the case conclusively

19  show that the prisoner is entitled to no relief.'"  United States v. Blaylock, 20 F.3d 1458, 1465

20  (9th Cir. 1994) (quoting 28 U.S.C. § 2255).  In other words, an evidentiary hearing is required if

21  (1) movant alleges "specific facts, which, if true would entitle him to relief; and (2) the petition,

22  files, and record of the case cannot conclusively show that the petitioner is entitled to no relief."

23  United States v. Howard, 381 F.3d 873, 877 (9th Cir. 2004).  No hearing is necessary if movant's

24  allegations, viewed against the record, fail to state a claim for relief or are "so palpably incredible

25  or patently frivolous as to warrant summary dismissal."  United States v. McMullen, 98 F.3d

26  1155, 1159 (9th Cir. 1996) (internal quotations and citations omitted); see also Howard, 381 F.3d

27  at 879 (bald, conclusory or inherently incredible allegations do not support a hearing).

28  ////

1      **III.    Analysis**

2      **A.  Procedurally Defaulted Claims**

3          "A § 2255 movant procedurally defaults his claims by not raising them on direct appeal

4      and not showing cause and prejudice or actual innocence in response to the default."  United

5      States v. Ratigan, 351 F.3d 957, 962 (9th Cir. 2003) (citing Bousley v. United States, 523 U.S.

6      614, 622 (1998)).  Nonconstitutional sentencing errors "may not be raised under § 2255 if [they

7      were] not raised at sentencing or on direct appeal."  United States v. McMullen, 98 F.3d 1155,

8      1157 (9th Cir. 1996) (finding that a challenge to the type of methamphetamine for which he was

9      sentenced was procedurally defaulted for failing to raise it on direct appeal); United States v.

10     Schlesinger, 49 F.3d 483, 485 (9th Cir. 1995).  Here, movant has procedurally defaulted his

11     prosecutorial misconduct claims as well as his Faretta claim because these issues were not raised

12     on direct appeal.[3]

13         To excuse his procedural default, movant asserts that he is actually innocent.  "To be

14     credible, such a[n actual innocence] claim requires petitioner to support his allegations of

15     constitutional error with new reliable evidence—whether it be exculpatory scientific evidence,

16     trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."

17     Schlup v. Delo, 513 U.S. 298, 324 (1995).  Here, movant presents no new reliable evidence that

18     meets this definition of actual innocence.  He does not come forward with an affidavit from

19     Christopher Donegan and, more importantly, even movant acknowledges that Mr. Donegan was

20     not at the campsite during the shootout.  So any affidavit from Mr. Donnegan would not

21     constitute new reliable evidence of who fired first in this case.  Thus, it would not exonerate

22     movant even if it was part of the evidentiary record in this case.

23         Furthermore, movant has not established cause and prejudice to excuse his procedural

24     default.  "Cause" can be established "where a constitutional claim is so novel that its legal basis

25     [was] not reasonably available to counsel [at trial or on direct appeal]…. "  Reed v. Ross, 468

26     U.S. 1, 16 (1984).  To establish prejudice, movant must demonstrate "not merely that the

27     _____

28     [3]  These claims were raised for the first time as claims one, five, and seven in movant's § 2255
       motion and were also included in his amended § 2255 motion.

1   errors...created a possibility of prejudice, but that they worked to his actual and substantial

2   disadvantage, infecting his entire trial with error of constitutional dimensions." United States v.

3   Frady, 456 U.S. 152, 170 (1982).  He must show a "reasonable probability" that, absent the error,

4   the result of the proceedings would have been different.  Strickler v. Greene, 527 U.S. 263, 289

5   (1999).

6         Liberally construing his pleadings, movant asserts that this default was caused by the

7   ineffectiveness of his appellate counsel.  See Murray v. Carrier, 477 U.S. 478, 488 (1986)

8   (finding that constitutionally ineffective assistance of counsel can constitute cause to excuse a

9   procedurally defaulted claim).  However, appellate counsel submitted a declaration indicating

10  that, in her professional judgment, the claims that movant now includes in his present § 2255

11  motion were not viable issues on appeal.  See ECF No. 292 at 97-102.  None of these claims were

12  so novel that they were not reasonably available to appellate counsel.  Nor does counsel's conduct

13  amount to constitutionally deficient performance that would excuse the default of these claims.

14  See Cockett v. Ray, 333 F.3d 938, 943 (9th Cir. 2003) (recognizing that appellate counsel's

15  ignorance or inadvertence in failing to raise a claim does not constitute IAC "unless it rises to the

16  level of constitutionally ineffective assistance of counsel").  As a result, he has not established

17  cause to excuse his procedural default.  For this reason, movant has not demonstrated cause or

18  prejudice to excuse his procedurally defaulted claims.

19        **B.  Merits Based Claims**

20             **1.  Ineffective Assistance of Counsel**

21        Movant's IAC claims are not procedurally barred from review on the merits.[4]  Therefore,

22  the court addresses each of these claims in light of the record developed during this § 2255

23  proceeding.

24  ////

25  _____

26  [4]  Since IAC claims usually rely on facts outside of the record, they are not generally raised on
    direct appeal.  Instead, they are properly presented for the first time on habeas review.  See

27  Massaro v. United States, 538 U.S. 500, 505 (2003) (excluding all IAC claims from the type of
    claims that are procedurally defaulted for not raising them during direct appeal); United States v.

28  Braswell, 501 F.3d 1147, 1149 n. 1 (9th Cir. 2007).

1        **a.  Counsel at Initial Appearance**

2      In his amended § 2255, movant faults the attorney representing him at his initial

3  appearance because he: 1) "failed to object to the unlawful commencement of the prosecution by

4  an information without an indictment…; 2) failed to enforce the treaty formed by the Northwest

5  Ordinance; 3) failed to object to the denial of bail; 4) failed to enforce movant's right "to plead

6  and manage his own cause personally with the assistance of counsel…"; and, 5) failed to

7  challenge venue.  ECF No. 250 at 6.  However, movant includes the relevant portion of the

8  transcript from his initial appearance where his attorney informed the court that movant "would

9  like legal assistance, but does not wish to be represented by anyone."  ECF No. 250 at 7; see ECF

10  No. 174 at 3 (transcript of initial appearance).  His attorney further indicated that he was not sure

11  if movant wanted "hybrid representation, or self-representation.  When asked if he wanted to

12  represent himself he indicated that he wants legal assistance…."  ECF No. 174 at 3.  After trying

13  to engage movant about his choices which resulted in movant citing chapter and verse of the

14  Judiciary Act of 1789, the court declined "to get into an extended conversation" and appointed

15  the Office of the Federal Defender to represent movant.  ECF No. 174 at 3-4.  The court then

16  informed movant that it would address the issue again in a week after movant had more time to

17  talk with his attorney about it.  Id. at 4.  Since the IAC claim for not informing the court of

18  movant's desire to manage his own defense is belied by the record, the undersigned recommends

19  that this claim be denied.  The remaining IAC claims against counsel at his initial appearance fail

20  based on lack of prejudice.  Simply put, movant doesn't even argue, much less demonstrate, that

21  the outcome of the proceeding would have been any different had his counsel made the various

22  legal challenges he asserts should have been made.  The court recommends that these claims be

23  denied because movant has not demonstrated that his counsel's performance was prejudicial.  See

24  Strickland, 466 U.S. at 668.

25        **b.  Trial Counsel**

26      Movant raises seven separate subclaims as to trial counsel.  See ECF No. 216 at 7.

27  Respondent obtained two separate declarations from trial counsel before he passed away.  ECF

28  No. 292 at 4, 9-10.  Movant did not acknowledge the declarations in his reply.  Having reviewed

1    the record in this case, and except with respect to the Miranda/suppression issue discussed in

2    more detail below, the court finds that all of the IAC claims against trial counsel fail for two

3    separate and independent reasons.  First, movant's IAC claims as to trial counsel are conclusory,

4    as he does not provide any declarations from an expert witness or fact witness who would have

5    testified in a manner that could have changed the outcome at his trial.  See James v. Borg, 24 F.3d

6    20, 26 (9th Cir. 1994) (finding that completely conclusory habeas claims do not warrant relief).

7    Simply put, the jury must not have found movant's self-defense claim credible.  That credibility

8    assessment by the jury would not have changed based on movant's challenges to trial counsel's

9    performance in this case.  See Jackson v. Virginia, 443 U.S. 307, 326 (1979) (stating that a jury's

10   credibility assessment is entitled to great deference on habeas review).  For similar reasons, the

11   court finds that the IAC of trial counsel claims also fail based on lack of prejudice to movant.  See

12   Strickland, 466 U.S. at 668; Rios v. Rocha, 299 F.3d 796, 805 (9th Cir. 2002) (emphasizing that a

13   "[f]ailure to satisfy either prong of the Strickland test obviates the need to consider the other.").

14          Movant also challenges trial counsel's decision not to file a motion to suppress statements

15   he made to investigators from the Nevada County District Attorney's Office while hospitalized.

16   This claim too fails for lack of prejudice, though merits additional explanation.  "[T]he failure to

17   file a suppression motion does not constitute per se ineffective assistance of counsel."

18   Kimmelman v. Morrison, 477 U.S. 365, 384 (1986).  An IAC claim based on counsel's failure to

19   file a motion to suppress requires that the Strickland test be met, which in this context requires

20   showing a constitutional violation giving rise to a meritorious suppression motion.  Id. at 375; see

21   United States v. Upshaw, No. 1:14-cr-00256 LJO SKO, 2019 WL 1170483, at *6 (E.D. Cal. Mar.

22   13, 2019).

23          The transcript of movant's interrogation at the hospital demonstrates he waived his

24   Miranda rights.  ECF No. 292 at 14.  Assuming for the sake of argument that movant's waiver—

25   elicited two days after he was shot multiple times and while he was apparently heavily

26   medicated—was involuntary, movant has not shown prejudice from trial counsel's failure to file a

27   ////

28   ////

1    suppression motion.[5]  Movant's first contention is that the audio and transcript of the

2    interrogation should have been introduced at trial.  ECF No. 216 at 37.  But a successful

3    suppression motion would have <u>barred</u> the prosecution from introducing <u>any</u> of the contents of

4    the interrogation at trial.  It would not have led to the introduction of those contents as a whole.

5    Movant also contends that counsel's failure to file a suppression motion "fraudulently" led the

6    jury to believe that movant "confessed."  <u>Id</u>.  However, trial counsel effectively cross examined

7    one of the investigators about movant's interrogation, including eliciting the fact that movant had

8    claimed multiple times during the interrogation that Ranger Pultorak fired first.  <u>See</u> ECF No.

9    291-1 at 207-226 (RT at 199-218).  As respondent correctly notes, trial counsel's ability to elicit

10   favorable testimony about movant's claims to have acted in self-defense likely "boster[ed] the

11   defendant's claim of self-defense."  ECF No. 291 at 17.  Thus, movant has not shown prejudice as

12   to this aspect—of any other—of his IAC claims against trial counsel.  Movant's IAC claims as to

13   trial counsel should be denied.

14          **c.  Appellate Counsel**

15          In response to movant's IAC claims, appellate counsel also submitted a declaration.  This

16   declaration indicates that she spent almost 25 hours communicating with movant during the entire

17   appellate process.  ECF No. 292 at 100.  The majority of this time was spent responding to

18   movant's letters and responding to his inquiries about his case.  ECF No. 292 at 100.  The record

19   also establishes that appellate counsel went so far as to file a petition for certiorari in movant's

20   case because, in her professional opinion, there was a meritorious claim to raise.  Based on this

21   record, the undersigned cannot conclude that appellate counsel's performance was either deficient

22   or prejudicial as defined by <u>Strickland</u>.  <u>Shah v. United States</u>, 878 F.2d 1156, 1162 (9th Cir.

23

24   _____

     [5] It is far from clear that movant's waiver was invalid.  Governing law on <u>Miranda</u> waivers in the
25   context of hospitalization and heavy medication is shockingly permissive.  <u>See, e.g.</u>, <u>United</u>
     <u>States v. Lewis</u>, 833 F.2d 1380, 1384-85 (9th Cir. 1987) (holding statement voluntary despite fact
26   that defendant had recently returned from surgery on her shoulder, was in pain, and had recently
     received a general anesthetic); <u>United States v. Martin</u>, 781 F.2d 671, 673-74 (9th Cir.1985)
27   (holding statement voluntary even though defendant under the influence of Demerol, a pain killer,
     and still in pain).  Moreover, the transcript from movant's interrogation indicates he was coherent.
28   <u>See</u> ECF 292 at 12-68.

                                            21

1  1989) (emphasizing that "[t]he failure to raise a meritless legal argument does not constitute

2  ineffective assistance of counsel") (citation omitted).  Winnowing out weaker arguments is a

3  hallmark of effective appellate advocacy.  See Jones v. Barnes, 463 U.S. 745, 751-52 (1983).

4  Accordingly, the undersigned recommends denying movant's ineffective assistance of appellate

5  counsel claims.

6                    **2.  Prosecutorial Misconduct**

7        The court separately addresses the merits of movant's prosecutorial misconduct claim

8  only with respect to his assertion that the prosecution suppressed potential witness Christopher

9  Donegan.[6]  In his pleadings before this court, movant makes much of this potential witness and

10  alleges that the prosecution violated its obligations under Brady v. Maryland, 373 U.S. 83 (1963),

11  by failing to disclose information about Donegan.  Upon closer review of the record, however, the

12  undersigned finds that this claim does not warrant relief even on the merits.

13        A Brady violation is established when (1) the evidence at issue is "favorable to the

14  accused, either because it is exculpatory, or because it is impeaching:; (2) that evidence was

15  "suppressed by the State, either willfully or inadvertently"; (3) and prejudice ensued.  Strickler v.

16  Greene, 527 U.S. 263, 281–82 (1999).  Prejudice is established when there is a reasonable

17  probability that the outcome of the proceeding would have been different in light of the

18  suppressed evidence.  See Strickler, 527 U.S. at 281.  Review of the trial transcripts shows that

19  the outcome of movant's trial would not have changed had Donegan testified about what he saw

20  after the shootout.  Even assuming for the sake of argument that Donegan's potential testimony

21  constituted impeachment evidence under Brady, any suppression of it by the prosecution was not

22  prejudicial.[7]  Therefore, this claim should be denied.

23                    **3.  Davis Challenge to Count Three**

24        In claim four, movant claims that he is entitled to relief based on the Supreme Court

25  decision in United States v. Davis, 588 U.S. 445 (2019), which held that the residual clause of 18

26  _____

   [6]  The court, supra, concluded that movant's prosecutorial misconduct claims were procedurally
27  defaulted for failing to raise them on direct appeal.

   [7]  A review of Mr. Donegan's interview with a defense investigator does not demonstrate its value
28  even as impeachment evidence.  See ECF No. 216 at 83-89.

                                    22

U.S.C. § 924(c)(3)(B) was unconstitutionally vague.  However, the Supreme Court did not

invalidate the entire statute under which movant was convicted.  The residual clause, which the

<u>Davis</u> decision affects, only applies if the elements of the crime of conviction did not include "the

use, attempted use, or threatened use of physical force against the person or property of another."

18 U.S.C. § 924(c)(3)(A).  In this case, the jury's verdict form specifically found beyond a

reasonable doubt that movant used a deadly or dangerous weapon and inflicted bodily injury

against the officers in Counts I and II.  ECF No. 67 (Verdict Form).  Therefore, the residual

clause doesn't apply to movant's conviction for Count III because the elements of Counts I and II

themselves established that they were "crimes of violence."   There is no cogent argument that

movant is entitled to relief under <u>Davis</u>.  Accordingly, claim four should be denied on the merits.

### 4.   Ex Post Facto Challenge to Sentence

Liberally construing claim six as a constitutional challenge to movant's sentence, it is not

procedurally defaulted even though he did not raise it on direct appeal.  <u>See</u> <u>United States v.</u>

<u>Schlesinger</u>, 49 F.3d 483, 485 (9th Cir. 1999) (emphasizing that as to sentencing, "[a]lleged

constitutional violations are treated differently" on § 2255 review).  In claim six, movant asserts

that 18 U.S.C. § 924(c) is an ex post facto law and constitutes a bill of attainder in violation of

Article I, Section 10 of the Constitution as well as the Second, Eighth, Ninth, and Tenth

Amendments.  ECF No. 216 at 9.  Movant's only attempt to explain this claim indicates that

"[p]age limits preclude presenting [the] merits."  ECF No. 216 at 48.  The court is hard pressed to

believe that any page limitation prevented the merits of this claim from being presented because

movant's § 2255 motion is 171 pages long including the exhibits.  ECF No. 216.  Movant's

amended § 2255 motion was 17 pages long and raised new claims for relief.  The court finds that

this claim is conclusory and does not warrant habeas relief.  <u>See</u> <u>James</u>, 24 F.3d at 26.  Movant

bears the burden of demonstrating his entitlement to § 2255 relief, and he has not met that burden

for this claim.  It is not this court's job to go hunting through the record to develop the arguments

and facts supporting movant's claims for relief.  <u>See</u> <u>United States v. Dunkel</u>, 927 F.2d 955, 956

(7th Cir. 1991) (explaining that "[j]udges are not like pigs, hunting for truffles buried in briefs").

Accordingly, this claim should be denied.

1    **5.  Jurisdiction**

2         Movant also challenges the court's jurisdiction over his prosecution.  In summary, movant

3    alleges that federal officials and the Nevada County District Attorney's Office conspired to

4    fabricate a federal prosecution against him.  Unique due process or other legal issues might be

5    presented if coordination between state and federal authorities at the outset resulted in criminal

6    charges being first brought in state court—with no intention that the state prosecution would be

7    pursued to trial—before being adopted in federal court.  But even that hypothetical scenario

8    would not present a jurisdictional issue.  There was indisputably federal jurisdiction over

9    movant's offenses, which involved assault on a federal law enforcement officer that occurred on

10   federal land.  <u>See</u> 18 U.S.C. § 3231 ("the district courts of the United States shall have original

11   jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United

12   States"); 18 U.S.C. § 111(a)(1) ("Whoever forcibly assaults…any [federal officer or any person

13   assisting such a federal officer] shall … be fined under this title or imprisoned…").  Moreover,

14   movant presents no facts indicating improper coordination between state and federal officials.

15   Movant's jurisdictional challenge fails.

16   **6.  New Claims Raised in Movant's Reply**

17        In his reply to respondent's omnibus opposition, movant appears to raise new claims for

18   relief for the first time including a Double Jeopardy claim as well as a challenge to Jury

19   Instruction Number 16.  ECF No. 309.  In this regard, movant's habeas claims are a moving

20   target.  They change in every new pleading that movant files in this case.  Since movant does not

21   explain why he did not include these claims in his original or amended § 2255 motions, the court

22   declines to exercise its discretion to consider them.  <u>See</u> <u>Zamani v. Carnes</u>, 491 F.3d 990, 997

23   (9th Cir. 2007) (emphasizing that "[t]he district court need not consider arguments raised for the

24   first time in a reply brief").

25   **IV.   No Evidentiary Hearing is Warranted**

26        Although movant requests an evidentiary hearing, the undersigned finds that one is not

27   warranted because the files and records in this case conclusively show that he is not entitled to

28   relief.  <u>See</u> <u>Blackledge v. Allison</u>, 431 U.S. 63, 76 (1977); <u>see</u> <u>also</u> <u>United States v. Mejia–Mesa</u>,

24

153 F.3d 925, 929 (9th Cir. 1998) (noting that a "district court has discretion to deny an evidentiary hearing on a § 2255 claim where the files and records conclusively show that the movant is not entitled to relief."). Therefore, there is no basis upon which to hold an evidentiary hearing. See United States v. Quan, 789 F.2d 711, 715 (9th Cir. 1986) (stating that "[w]here a prisoner's motion presents no more than conclusory allegations, unsupported by facts and refuted by the record, an evidentiary hearing is not required.").

## V.    Plain Language Summary for Pro Se Party

Since movant is representing himself in this case, the court wants to make sure that the words of this order are understood. The following information is meant to explain this order in plain English and is not intended as legal advice.

The undersigned has reviewed the pleadings and record in this case and concluded that the claims raised in the § 2255 motion and motion to amend the § 2255 motion do not warrant relief. If this recommendation is adopted by the district judge assigned to your case, your post-conviction motion will be denied and your case will be closed.

If you disagree with this recommendation, you have 21 days to explain why it is not correct. Label your explanation as "Objections to Magistrate Judge's Findings and Recommendations."

## VI.    CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that:

1. Movant's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (ECF Nos. 216 & 250) be denied for the reasons explained herein.

2. All pending motions related to the § 2255 motion (ECF Nos. 227, 266, 270, 275, 279, 285, 299, 317, 326, 343) be denied as moot.

3. The Clerk of the Court be directed to close the companion civil case No. 2:19-cv-2274-WBS-SCR.

4. This recommendation has no effect on movant's motion for compassionate release and any motion related thereto (ECF Nos. 346, 366) which remains pending before Senior District Judge William B. Shubb.

1    These findings and recommendations are submitted to the United States District Judge

2   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty one days

3   after being served with these findings and recommendations, any party may file written

4   objections with the court and serve a copy on all parties.  Such a document should be captioned

5   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

6   objections shall be filed and served within fourteen days after service of the objections.  The

7   parties are advised that failure to file objections within the specified time waives the right to

8   appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

9   DATED: April 16, 2025

SEAN C. RIORDAN
UNITED STATES MAGISTRATE JUDGE